## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-2381-MEH

WALTER CHARNOFF

    Plaintiff,

v.

NANCY LOVING, ART PORT LLC, ARTSUITE NY, STUDIO 41, LLC

    Defendants.

---

### PLAINTIFF'S EMERGENCY MOTION FOR PRESERVATION ORDER

---

Plaintiff, Walter Charnoff, ("Mr. Charnoff" or "Plaintiff") by and through his undersigned counsel, The Law Office of Ian T. Hicks, LLC, hereby respectfully files his Motion for Preservation Order, as follows:

Certificate of Conferral: Plaintiff conferred with Defendants' counsel, who stated that the relief sought herein is opposed.

### Introduction and Factual Background

*Procedural History and Underlying Dispute Regarding Art, Failure to Ship, and Damage to Art*

    1.    This civil action was originally commenced in Boulder County District Court (the "State Court") on June 20, 2019. Defendants filed a Notice of Removal on the basis of diversity jurisdiction on August 21, 2019 and filed a Motion to Dismiss for Lack of Jurisdiction ("Defendants' Motion") on August 28, 2019, which is fully briefed. The Court issued an Order to Show Cause regarding why this action should not be remanded back to Boulder County District

Court, on August 22, 2019.  The parties have both filed briefing relating to the Order to Show Cause.

2.       This action arises out of and relates to Plaintiff's purchase of artworks sold by the Defendants, on two occasions, totaling approximately $186,000.00, which Nancy Loving ("Ms. Loving") later valued at approximately $440,000.00 in writing, as well as the parties' subsequent dealings.  Plaintiff alleges that Ms. Loving (1) initially refused to ship the artworks to Plaintiff, (2) refused to account for and authenticate the artworks purchased, (3) failed to substantiate that the artworks were properly stored and insured, by providing supporting documentation, (4) later attempted to drastically change the parties' agreement as a condition precedent to shipment, and (5) damaged some of the artwork through improper storage.  *See* Am. Compl., ¶¶ 9-71, attached as Exhibit 1.[1]

3.       Prior to and during this action, the artworks remained in Ms. Loving's possession. Before this civil action was commenced, Plaintiff attempted, repeatedly to have Ms. Loving ship the art he had already paid for.  *See* Emails between Walter Charnoff and Nancy Loving, attached as Exhibit 2, p. 1 (Plaintiff offering to escrow $1,500.00—an amount not agreed to, and after Ms. Loving had promised to pay to ship the art—to obtain delivery of his documenting prior requests for delivery).[2]  In response, even as late as June 21, 2019, Ms. Loving attempted to impose new and additional costs, and most importantly, attempted to force Plaintiff to sign an "as-is" clause, in a new written contract, for art he had never seen, and for which he would not see prior to

---

[1] Plaintiff alleges that Ms. Loving, at all times alleged in the Amended Complaint, was acting on behalf of an entity through which she operates her art gallery, Art Port LLC ("AP"), a fictitious entity she also uses during her business intermittently, ArtSuite NY ("AS"), and as the exclusive and actually-authorized agent of
[2] There are perhaps dozens of written communications from Plaintiff to Ms. Loving requesting delivery of his art, after he had unquestionably paid for it.  These items are not attached for purposes of avoiding duplicative exhibits.

executing the clause. *See* Email from Nancy Loving, dated June 21, 2019, attached as Exhibit 3, p. 1 (stating "Also attached is the sales agreement. The Sales Agreement must be signed by the buyer before the art can be delivered. This is mandatory."); Exhibit 4, Sales Agreement attached to Ex. 3, p. 1 (providing an "as-is" clause, notating its date of June 21, 2019, and acknowledging prior receipt of $141,000.00 from Plaintiff before that written but unsigned contract existed).

4. These concerns regarding the content of what items remained in Ms. Loving's possession, custody, or control, and the condition of that art are motivated by more than her attempt to foist an "as-is" clause on Plaintiff, after he had already paid and without any opportunity to see the art. Those concerns arise from experience, given that on two occasions, with two different items of art, Ms. Loving's actions caused the art to be damaged. With respect to the first item, Ms. Loving, after promising to professionally store Plaintiffs' art, or display it in a museum or gallery, instead put it by a pool table in her boyfriends' house, where it was skewered by a pool cue and damaged. *See* Ex. 2, p. 1 (Noting Plaintiff was credited $20,000.00 for damage to a painting entitled "Two Vessels" for damage from a pool cue).

5. With respect to the second item, Ms. Loving affirmatively deconstructed a bound collection of paintings in a journal and split the journal apart into multiple paintings even though the journal's historic and monetary value was tied to its status as a single, bound item with several attached paintings. *See id.,* p. 2 (documenting that one of the artworks, a collection of 14 paintings in a bound journal, was unbound by Ms. Loving, who then removed several of the paintings, destroying the journal's value that was based on its status as a complete, bound collection), and p. 6 (Ms. Loving acknowledging that the journal was unbound). One of those unbound paintings appears to be for sale online and as far as Plaintiff is concerned, is lost.

6. Plaintiff also has concerns about the condition and content of the art shipped by Ms. Loving, because of the difficulties he had in obtaining specific information and documents about where his art was stored and proof of insurance. For example, Ms. Loving repeatedly told Plaintiff that the art was professionally stored and insured, but refused to provide the invoices and certificates of insurance verifying the same. *See* Emails between Walter Charnoff and Nancy Loving, attached as Exhibit 5, p. 1. After the litigation was commenced, the undersigned also attempted to reach an accommodation with Defendants' counsel, given concerns as to the condition of the art, what art was in her possession, and whether it was properly insured.

7. The prelitigation communications terminated with no resolution. The post-filing communications, from the undersigned, were transmitted not as a settlement offer, and not as an election of remedies, but instead in an effort to preserve the evidence—the art—that the litigation centered around, for purposes of later expert valuation and analysis for authenticity. Counsel for the parties were unable to reach an agreement, primarily because the undersigned did not believe that preservation of key evidence, which will be analyzed by experts and introduced at trial, required Plaintiff to elect remedies between the fraud remedy of rescission and restitution or acceptance of the art and suing for damages for breach of contract.

8. At that stage, the undersigned was ready to seek Court intervention to have the art placed in the hands of a third party to be held pending the outcome of this litigation. The undersigned had asked for an invoice or receipt as to whether the art was allegedly stored, but did not receive that information. Then, out of the blue and without any notice, Plaintiff received a phone call from a moving company stating that it had a single package, shipped from New Jersey, which weighed 350 pounds and for which the description simply said "art" on the outside of the package, a single crate. On the invoice that travelled with the package, under the section listing

4

the amount of insurance, it said "$0." The moving company was not one that deals in art, had no information on what was inside the package, whether it was one or the approximately 30 pieces that was the subject of the two purchases, or whether Ms. Loving sent it.

*Current Status of the Art and Necessity of Preserving its Condition with a Third Party*

9. It is now clear, after the undersigned was forced to ask opposing counsel, that Ms. Loving caused the art to be transmitted across the country, without notice and with an invoice that appears to show it is uninsured. *See* Seko Worldwide Delivery Receipt, attached as Exhibit 6. Plaintiff is desirous of having the art stored, safely, in the hands of a third party, for three reasons: (1) accepting delivery could be viewed as an election remedies, before this case is even at issue, which the law does not require at this stage of the litigation; (2) it is necessary to preserve the condition of the art, in a proper facility, to ensure that chain of custody is preserved, and to make sure that it can be analyzed by experts for authenticity and valuation in the condition in which it was received, and (3) to ensure that key evidence that will be an exhibit for trial is preserved.

10. Plaintiff has already secured the services of a company in Aurora, Colorado, which specializes in the storage and protection of high-value artworks, Ship Art-Terry Dowd LLC ("SA"). As can be seen from the attached Facility Report, SA has a climate controlled building that keeps the temperature and humidity at ideal levels, extensive backup power facilities, which is secured with state of the art security systems, all of which are necessary and ideal for the safe storage of the art. *See* Terry Dowd LLC Facility Report, attached as Exhibit 7. All employees must pass TSA level background checks. Plaintiff is willing to cover these costs during the litigation for storage at SA but may seek to recoup them as recoverable costs. Further, the Storage Agreement, shows that SA is able to conduct a condition assessment once the art arrives, and

further has movers who specialize in moving art to pickup the art from the current location and transport it to SA's facility.

11. Accordingly, Plaintiff is respectfully requesting that the art be picked up, moved, and stored at SA's facility for the pendency of the litigation, and that no action be taken with respect to the art—such as opening, moving, or conducting any analysis thereof—without written agreement of counsel or Court order before such action is taken. Plaintiff further requests that the art be insured during the pendency of the litigation against loss or damage.

## Legal Standard

12. Federal and state common law, as well as various procedural rules governing litigation, impose upon litigants the duty "to preserve documents and property that could potentially serve as evidence in a lawsuit." *R.F.M.A.S., Inc. v. So,* 271 F.R.D. 13, 21 (S.D.N.Y. 2010). The Federal Rules of Civil Procedure provide the protocols for complying with the duty to preserve evidence and the timing of discovery requests and responses. *Id.*; *see also Maracich v. Spears,* 570 U.S. 48, 90 (2013) (recognizing the connection between Rule 26 and a party's "duty to preserve material evidence"). "Not only does a party have a duty to preserve potentially relevant evidence, courts are empowered to issue orders enforcing a party's preservation obligations, especially where failure to preserve poses an unacceptable risk of undermining the integrity of the judicial process or preventing an adjudication on the merits altogether." *Toussie v. Allstate Ins. Co.*, 2018 WL 2766140, at *3 (E.D.N.Y. June 8, 2018).

13. "Although the power to issue preservation orders originates in the equity power to grant injunctions, the substance of a preservation order is not the same as that of an injunctive order . . . [and it] follows that the four-prong test utilized in matters of injunctive relief is not readily applicable to matters of preservation" *Durney v. Swift Transportation Co.*, 2008 WL

11411451, at *1 (D. Wyo. Oct. 15, 2008) (Citing *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 432–33 (D. Pa. 2004); *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 n. 8 (2004)). "The party seeking a preservation order must demonstrate that it is necessary and not unduly burdensome." *Boyd v. Hi Country Chevrolet,* 2011 WL 13289644, at *1 (D.N.M. Aug. 11, 2011) (Citing *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 n. 8 (2004)).

14. First, the movant "must show that absent a court order, there is significant risk that relevant evidence will be lost or destroyed—a burden often met by demonstrating that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place." *Id.* Second, the proponent of a preservation order is also required to show that "the particular steps to be adopted will be effective but not overbroad." *Id.* Further, where the evidence is in the hands of a third party, who is not subject to the Court's authority, it is even more important that a preservation order be issued to ensure the evidence is preserved. *See Bright Sols. for Dyslexia, Inc. v. Doe 1,* 2015 WL 5159125, at *3 (N.D. Cal. Sept. 2, 2015).

### Legal Argument

15. Here, each of the factors necessary for the issuance of a preservation order exists, and it is necessary to issue the order to protect a unique and fragile item, which is one of a kind an irreplaceable—the artworks at issue.

16. First, there is a significant risk that evidence will be lost or destroyed absent a court order. Ms. Loving has previously damaged Plaintiff's art after she stated it would be placed in a secure storage, but in fact placed it on the walls of her home next to a pool table, causing one of the paintings to be poked and damaged with a pool cue. Ms. Loving also physically and affirmatively deconstructed Plaintiff's bound journal of paintings, causing it to lose significant

historical and monetary value. Moreover, Ms. Loving has persistently failed to provide proof of insurance when asked or. proof of storage in a proper facility when asked. She also caused the art to be shipped in a haphazard nature, by sending it to a a non-art storage facility, apparently without shipping insurance, and without notice to Plaintiff. further demonstrates that a preservation order is necessary. These circumstances show that Ms. Loving has caused the evidence to be damaged before, damage that could harm its monetary, historic, and forensic value, and therefore a significant risk that relevant evidence will be lost or destroyed.

17. Second, the steps to be adopted will be effective, but not overbroad. Plaintiff has already found the most ideal facility, at his time and expense, and is willing to pay to store the art pending the outcome of the litigation. This benefits both Plaintiff and Defendants. It is certainly safer there than it would be at its current location. Third and finally, the art is in the hands of a third party, and it is unclear what if any experience they have in handling and storing of art, such as temperature and humidity control, rodent and pest control, fire prevention, security, background checks for employees, or any of the key factors necessary to the safest storage possible. It the art is listed as uninsured on the current storage facility's invoice/bill of lading.

18. Additionally, Defendants, by sending the art, clearly have shown they do not oppose it being held by persons other than themselves, outside their custody and control. The mere act of taking the art and receiving it by Plaintiff could possibly give rise to an argument that by doing so he has elected his remedies and limited his rights contrary to existing law. *See, e.g., H & K Auto. Supply Co. v. Moore & Co.,* 657 P.2d 986, 988 (Colo. App. 1982) (noting that while a party may elect remedies through their litigation conduct, "the choice of remedies belongs to the one who has been defrauded, and may not be forced upon him by the wrongdoer."). For all these reasons, a preservation order is proper.

**Conclusion and Relief Requested**

19. Plaintiff respectfully requests the following: the art be picked up, moved, and stored at SA's facility for the pendency of the litigation, and that no action be taken with respect to the art—such as opening, moving, or conducting any analysis thereof—without written agreement of counsel or Court order before such action is taken. Plaintiff further requests that the art be insured during the pendency of the litigation against loss or damage and that Defendants be required to provide any and all certificates of insurance potentially applicable to the art immediately to determine if such insurance is necessary.

Dated this 6th day of October, 2019

>*/s/ Ian T. Hicks, Esq.*
>Ian T. Hicks, Reg. No., 39332
>The Law Office of Ian T. Hicks LLC
>Attorney for Plaintiff
>6000 East Evans Avenue, Suite 1-360
>Denver, Colorado, 80222
>Telephone: (720) 216-1511
>Facsimile: (303) 648-4169
>E-mail: ian@ithlaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 6th day of October, 2019, the foregoing Motion was filed via CM/ECF, and served upon the following:

**Shoemaker Ghiselli + Schwartz, LLC**
Elizabeth H. Getches
Cynthia A. Mitchell
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO 80302
Telephone: (303) 530-3452
 FAX: (303) 530-4071
Email: lgetches@sgslitigation.com
Attorney for Defendants

>*s/   Ian T. Hicks, Esq.*