**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-2381-MEH

WALTER CHARNOFF

      Plaintiff,

v.
NANCY LOVING d/b/a ARTSUITE NY, ART PORT LLC,
STUDIO 41, LLC, ALICIA ST. PIERRE, MARTIN ST. PIERRE,
ISP HOLDINGS, INC., and DAVID HINKELMAN

      Defendants.

---

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

---

      Walter Charnoff, ("Plaintiff") by and through his undersigned counsel of record, The

Law Office of Ian T. Hicks, LLC, hereby respectfully files his Second Amended Complaint and

Jury Demand and in support thereof, states as follows:

## I.      PARTIES, JURISDICTION, AND VENUE

      1.      Walter Charnoff ("Plaintiff") is a natural person and resident of Boulder County,

Colorado, who resides at 6950 Rabbit Mountain Road, Longmont, Colorado, 80503.  Plaintiff

was solicited repeatedly by the Defendants, other than Alicia and Martin St. Pierre and ISP

Holdings, Inc., including in-person while located in Boulder County, to purchase various

paintings, for which he ultimately transmitted approximately $186,000.00.

      2.      Nancy Loving ("Nancy") is a natural person and resident of Piermont, New York,

who resides at 674 Piermont Avenue, Piermont, New York, 10968.  Nancy personally engaged in

the Nancy is the owner and operator of an art gallery, that utilizes the name Artsuite NY.  Nancy

directly participated in the fraudulent acts and omissions alleged herein and did so both for her

own benefit and to benefit Studio 41, LLC, for which she was and remains an authorized agent

or joint venturer.  Studio 41, LLC is therefore vicariously liable for Nancy's wrongful acts.

      3.      Artsuite NY ("AS") is an art gallery located at 466 Piermont Avenue, in

Piermont, New York, 10968.  AS is not a registered entity in New York, Delaware, or

Connecticut.  AS has never been disclosed to Plaintiff as an assumed name that may permissibly

conduct business in New York other than under the true name of a registered entity.  AS directly

participated in the fraudulent acts and omissions alleged herein and did so both for its own

benefit and to benefit Studio 41, LLC, for which it was and remains an authorized agent or joint

venturer.  Studio 41, LLC is therefore vicariously liable for AS's wrongful acts.

      4.      Art Port, LLC, is a New York limited-liability company ("AP"), with a principal

office address of 75 West Street, Unit 17C, New York, New York, 10006.  Nancy is the

Registered Agent for and Chief Operating Officer of AP, and her wrongful acts and omissions

are thus imputable to AP.  Although utilizing AS as the ostensible name of her art gallery, on

various emails and a purported contract dated June 20, 2019, Nancy used AP as the entity under

which AS operates.  AP participated in the fraudulent acts and omissions alleged herein and did

so both for its own benefit and to benefit Studio 41, LLC, for which it was and remains an

authorized agent or joint venturer.  Studio 41, LLC is therefore vicariously liable for AP's

wrongful acts.

      5.      Studio 41, LLC, ("S41") is a Delaware limited-liabilty company.  Its principal

office address is unknown.  Upon information or belief, and based upon Nancy's express

representations, S41 is the entity under which Harold Garde ("Garde"), an American abstract

EXHIBIT B

expressionist painter and the creator of the paintings that are subject of this action, transacts business through Nancy, AS, or AP, or all of them as their principal or coventurer.

6.      Alicia St. Pierre ("Alicia") is a natural person, and, upon information or belief, domiciled in the state of New Jersey, with a home address of 11 Lams Lane, Cresskill, New Jersey, 07626.  Alicia is, upon information or belief, an owner of AP, and was at all times material to this action, from at least January 1, 2016, through the date of this filing.  Alicia was represented by Nancy as having joint control and coequal decision-making authority over AP's business operations.  Alicia also obtained a benefit from Defendants' wrongful acts an omissions.

7.      Martin St. Pierre ("Martin") is a natural person, and, upon information or belief, domiciled in the state of New Jersey, with a home address of 11 Lams Lane, Cresskill, New Jersey, 07626.  Martin is, upon information or belief, an owner of AP, and was at all times material to this action, from at least January 1, 2016, through the date of this filing.  Martin, either through his direct ownership interest, or an ownership interest held through ISP Holdings, Inc., obtained a benefit from Defendants' wrongful acts and omissions.

8.      ISP Holdings, Inc., ("ISP") is a New Jersey corporation, which is, upon information or belief, owned and managed by Martin and Alicia.  ISP's principal office is located at 11 Lams Lane, Cresskill, New Jersey, 07626.  Nancy claimed in a sworn Declaration filed in this civil action that Martin and Alicia's interest in AP was represented by ISP, and that they invested their funds in AP through ISP.

9.      David Hinkelman ("David") is a natural person and resident of Piermont, New York, who resides at 674 Piermont Avenue, Piermont, New York, 10968.  David is Ms. Loving's life partner and a former business associate of Plaintiff and, upon information or belief, was an

EXHIBIT B

owner of AP from 2016 through 2018.  David personally and directly participated in the fraudulent misrepresentations and omissions, while acting in concert with Nancy, which were directed towards Plaintiff for the purpose of inducing his purchases of art.  After those purchases were made, David personally and directly participated in Nancy's breach of numerous material promises she made to Plaintiff and attempted to directly impose new conditions on the delivery of Plaintiff's art.

10.     The exercise of specific personal jurisdiction is proper under C.R.S. § 13-1-124(1)(a) and (b), because the Defendants transacted business in this state and committed tortious acts within this state, including but not limited to actively soliciting business from the Plaintiff, traveling to Colorado as part of those solicitations, forming and continuing a business relationship with Plaintiff while he was located in Colorado, requesting and receiving numerous large payments of money from Colorado, and engaging in a long-term pattern of fraud directed towards Plaintiff while he was located in Colorado.  Although the St. Pierres, personally or through ISP, did not travel to Colorado, they are nevertheless subject to specific personal jurisdiction in Colorado because their liability arises out of the wrongful acts and omissions committed against the Plaintiff by the remaining Defendants, especially Nancy and AP, who were acting as their agents for purposes of transactions at issue in this litigation.

11.     The exercise of specific personal jurisdiction is likewise proper under the Due Process Clause of the Fourteenth Amendment because Defendants purposely and repeatedly availed themselves of the benefits and privileges of conducting business in Colorado, have dozens of contacts with Colorado as part of those activities, and engaged in wrongful acts while physically present in Colorado.  Accordingly, Defendants should have expected to be sued in Colorado and this action comports with notions of fair play and substantial justice.

EXHIBIT B

12.     Venue is proper under C.R.C.P. 98(c)(5) because the torts that are alleged herein occurred in Boulder County, Colorado and the damages were felt by Plaintiff in Boulder County.

### III.     GENERAL ALLEGATIONS

13.     In early 2016, Nancy began soliciting Plaintiff both by email and over the phone to purchase various paintings by Garde, who is famous for developing "Strappo" printmaking, an artistic technique that combines painting and printmaking.

14.     At the time that Nancy began soliciting Plaintiff, throughout the communications that followed, and up through the commencement of this civil action, she had actual knowledge that Plaintiff was located and domiciled in the state of Colorado.

15.     From the time that she first began soliciting Plaintiff until the date of the commencement of this civil action, Nancy was acting through her art gallery, under the names of both AS and AP, as an authorized agent or coventurer with S41.

16.     In both those initial solicitations and in subsequent communications, her email signature included both AS and AP, and she repeatedly represented in those emails that she was acting on behalf of Garde, the Garde family, and his entity, S41.

17.     During these initial solicitations, Nancy expressly represented to Plaintiff that she had exclusive authority to directly represent Garde, transact in his paintings and other works, and bind him to various obligations ancillary to those transactions.

18.     Those representations by Nancy are further reaffirmed by a written contract she transmitted to Plaintiff in which AP and S41 were identified as the sellers of various artworks sold to Plaintiff, and Plaintiff was identified as the buyer.

5

19.     In another communication from Nancy to the Plaintiff, it was represented that S41 received a substantial portion of the funds paid by Plaintiff for the artworks that are the subject of this civil action and described more fully below.

20.     Moreover, on a publicly-available and highly conspicuous website, www.artsuiteny.com, Nancy, AS, and AP represent that they are responsible for the creative management of Garde's artworks and have several advertisements for exhibitions of those artworks.

21.     On May 13, 2016, Nancy created a portfolio of Garde paintings, with the title of Plaintiffs' first and last name, and transmitted that portfolio to Plaintiff in an email as part of a solicitation effort to induce his purchase of certain Garde paintings identified therein.

22.     On May 17, 2016, four days later, Nancy again emailed Plaintiff.  In that email, Nancy sent additional photographs of paintings completed by Garde that were on display in her gallery in New York.

23.     In that May 17th email, Nancy also stated that she would be traveling to Colorado to meet with Plaintiff as part of her ongoing efforts to solicit his purchase of the Garde works that she had possession, custody, or control of for the purpose of sale to benefit each of the Defendants.

24.     Soon thereafter, in June of 2016, Nancy travelled to the Saint Julian Hotel in Boulder, Colorado, to meet with Plaintiff to solicit the purchase of various Garde paintings.

25.     During this meeting, Plaintiff reviewed the items presented, made his selections of artworks to purchase, and agreed upon the material terms including price, quantity, description, delivery protocol, and certain additional and material promises made by Nancy on behalf of herself and the Defendants.

EXHIBIT B

26.     Those additional and material promises made by Nancy while physically located in Colorado included obtaining certificates of authenticity, storing the works properly at no charge, setting up a meeting between Garde and the Plaintiff, sending a hard copy portfolio, and sending three books signed by Garde.

27.     After the meeting, Nancy sent approximately three emails to Plaintiff reiterating the terms of the agreement, requesting payment, and making a variety of representations relating to the timing of the purchase and her authority to act on behalf of Garde to facilitate and hasten Plaintiff's transmission of funds.

28.     For example and without limitation, in the emails sent in July of 2016, Nancy made the following representations: (1) Garde and his family would only honor the purchase price for a limited period of time because his artwork was rapidly increasing in value; (2) Garde's artwork would continue to escalate in value; (3) that Plaintiff was exempt from sales tax; and (4) confirming the details for shipping, which would be provided at no charge.

29.     Nancy also represented that Garde's artwork was substantially increasing in value due to a significant number of private collector and museum acquisitions of his art, which was creating more demand than supply, thus increasing the price.  These representations were later shown to be utterly false, because even though Nancy was the exclusive agent for the sale of Garde's artworks, her 2016 tax returns showed that she and AP made less than $5,000.00 from the sale of Garde's art above and beyond the amount of Plaintiff's purchases.

30.     David reiterated and restated these same false representations to Plaintiff in an effort to induce him to purchase Garde's artworks.  David also travelled to Colorado with Nancy, to solicit Plaintiff to purchase the art.  For example and without limitation, David stated that

Garde's artworks would be dramatically increasing in value due to the museum and private collector acquisitions, facts which he knew were false when they were made.

31.     David also made false representations with an intent not to perform, or without knowledge as to whether the statements were true, stating that, for example, (1) the Garde family would only honor the purchase price for a limited time because it was rapidly increasing in value; (2) Garde's artwork was continuing to increase in value; (3) Plaintiff was exempt from sales tax, and that (4) the artwork would be delivered signed and with certificates of authenticity.

32.     David also made false representations with an intent not to perform, or without knowledge as to whether the statements were true, by telling Plaintiff that Nancy and AP were going to take actions to increase the value of Garde's artworks, such as setting up displays of the art at various galleries, and undertaking a broad array of marketing efforts that would definitively increase the artwork's value.

33.     David was, according to a sworn declaration filed in this action by Nancy, a part owner of AP at the time he made these misrepresentations, and therefore was aware that AP either could not or would not perform and had no intent to perform the described future promises.

34.     David's misrepresentations, entreaties, efforts to cajole Plaintiff into purchasing the art carried more persuasive force, and Plaintiff relaxed his care and vigilance with David, in light of their previous business relationship.

35.     In reliance upon each of the alleged representations made by Nancy and David, and induced thereby, Plaintiff wired $45,120.00 from his bank while he was physically located in the state of Colorado to AP's bank, which appears to be physically located in Colorado (the "First Purchase").

8

36.     In her email providing wiring instructions, Nancy represented that she was the Chief Operating Officer of AP.  In her emails to Plaintiff, Nancy represented in her signature line that she was the Director of AS but had not reflected her status with respect to AP.

37.     On August 11, 2016, Nancy sent Plaintiff an email confirming Plaintiff's purchase and once again promising to ship the art, provide three certificates of authenticity, set up a meeting between the Plaintiff and Garde, send Plaintiff a hard copy portfolio, and send Plaintiff three signed books.

38.     During the course of their communications in June through August of 2016, Nancy and Plaintiff discussed several times further purchases of Garde works, including the types of works available, the general terms of such an arrangement, and the timeline for facilitating delivery of such works.

39.     Despite Plaintiff's demand, Nancy has failed to comply with those promises, even though Plaintiff paid and thus fully performed with respect to the first purchase of artwork.

40.     In early 2017, and based upon their earlier general discussions, Nancy solicited Plaintiff while she had actual knowledge he was located and domiciled in Colorado to purchase additional pieces of Garde artwork.

41.     Nancy claimed that she needed an additional infusion of purchases in order for Garde and his family to renew her contract to directly represent Garde, transact in his paintings and other works, and bind him to various obligations ancillary to those transactions.

42.     Plaintiff had a prior business relationship unrelated to artwork with David. Pursuant to that prior and unrelated business relationship, Plaintiff travelled to Connecticut to meet with David regarding a possible opportunity with David's consulting company.

EXHIBIT B

43.    While at David's home, where Nancy was apparently residing at the time, Plaintiff noticed that three of his four artworks from the First Purchase were hanging on the walls in high-traffic areas, including near an air-hockey table and a pool table.

44.    As a result, Plaintiff's favorite painting from the First Purchase, entitled Two Vessels, had significant damage.

45.    Upon questioning, Nancy admitted that one of her kids had struck Two Vessels with a pool cue.

46.    This was directly contrary to Nancy's express and material representation to Plaintiff that all artwork from the First Purchase would either be placed into proper, secure storage appropriate for high-value paintings, or put on display in a museum.

47.    Nancy promised to credit Plaintiff for the damage to Two Vessels towards a future purchase.

48.    Nancy further promised to remove all paintings comprising the First Purchase from the home and either property store the paintings, get them into a museum, or promptly ship the paintings to Plaintiff.

49.    Upon information or belief, Nancy failed to remove the paintings comprising the First Purchase from the home, store them properly, or place them into a museum.

50.    The status and location of the paintings comprising the First Purchase was unknown, until recently, when the paintings were shipped to Plaintiff without his consent and in an effort to force a "settlement" on him that was contrary to Colorado law governing his claims and damages.  Proof of the status and location was not been provided by Nancy, despite multiple requests, up until this point in time.  Ultimately, the paintings were transferred to storage at a specialized art storage facility at Plaintiff's expense, a cost recoverable in this litigation.

10

EXHIBIT B

51.     As part of her solicitation to Plaintiff in early 2017, Nancy represented that she had a Garde work constituting a bound journal that was bound with 14 paintings along with two unbound paintings that had been inserted into the journal (the "Journal").

52.     These paintings were dated between 1971 and 1973, and most were dated for the year 1972.  Nancy referred to the Journal as "Journal Paintings 1972."  Nancy and David represented that since the Journal was a bound journal, it was unique, had additional value, and was "historically significant."

53.     Plaintiff ultimately ended up purchasing the Journal along with other pieces described in greater detail below (the "Second Purchase") in reliance upon and induced by Nancy and David's material representations that it was unique, had additional value, and was historically significant because it was a bound journal.

54.     However, after purchasing the Journal, Nancy or David, or both, upon information or belief, intentionally unbound the Journal—irreparably damaging its value and fundamental character—removed three of the formerly bound paintings, and removed the two unbound paintings that had been included with the Journal.

55.     Without Plaintiff's permission, consent, or even notice, Nancy placed at least three paintings from the Journal for sale, on the internet.

56.     That was after Plaintiff had made multiple demands for delivery of the Journal as part of the overall Second Purchase, which Nancy refused to provide, despite her express promises to do so, on numerous occasions.

57.     Plaintiff had no clue that the three paintings—his paintings he paid for—were being offered for sale until, upon information or belief, he saw the listing online.   Upon information and belief after he purchased the journal Nancy unbound it (thereby irreparably

11

diminishing its value) removed three of the formerly bound paintings, removed the two additional unbound paintings, and offered at least three of these paintings for sale.

58.     After arriving back in Colorado at his home in Boulder County, Colorado, Plaintiff was solicited by Nancy through email to purchase the additional Garde works that comprised the Second Purchase.

59.     Nancy had actual knowledge Plaintiff was located in Colorado when she transmitted that email.

60.     In that email, Nancy sent a Plaintiff a spreadsheet with the names of various works she had discussed with Plaintiff, including but not limited to the Journal, a painting entitled "Red Chair," and proposed "free gifts"—including a painting entitled "Tan Vessels"—that she would include to offset the artificially-inflated high prices on the other works comprising the Second Purchase.

61.     Nancy was desirous of inflating the prices on the Garde works comprising the Second Purchase, because like real estate, the value of an artist's work is determined in part by what their other piece have sold for in the recent past.

62.     Nancy negotiated payment terms on the Second Purchase with Plaintiff over email and through telephone calls while Plaintiff was located in Colorado, a fact of which Nancy had actual knowledge.  David also engaged in solicitations by phone, email, and text message directed towards Plaintiff.

63.     One of those payment terms was that Nancy would provide Plaintiff a $21,000.00 credit for the damage to Two Vessels, which Nancy agreed with.  David was also aware of this credit, and that no further amounts were owed by Plaintiff.

EXHIBIT B

64.     An agreement was subsequently made to exchange another painting for the damaged Two Vessels, contingent on Two Vessels being repaired.  And while Nancy agreed to this accommodation, she stated that she would not because Alicia did not want it to occur.

65.     The additional, material terms for the Second Purchase included the following: (1) placing the art into a museum or proper storage immediately following purchase, (2) to have the pieces insured at no extra cost, (3) having Garde sign his name to all unsigned pieces, (4) to provide a hard copy portfolio, (4) provide certificates of authenticity, (5) to set up another meeting with Garde, and (6) pay for the storage, or if storage would create cost for Plaintiff, to notify him sufficiently in advance so that he could negotiate to pay for it at a reduced rate.

66.     Ultimately, in reliance upon and induced by Nancy and David's material representations as alleged above, Plaintiff made the Second Purchase for approximately $141,000.00, bringing the combined total of purchases to $186,000.00.

67.     After Plaintiff transmitted the funds for the Second Purchase, Nancy instructed Plaintiff that he should let her place his art in museums to increase the value of those pieces.  In fact, she stated that several pieces that now belonged to Plaintiff had been actively selected by various museums and would be on their way to those museums promptly.  David also made these same representations, which were knowingly false when made.

68.     After failing for many months to place any of Plaintiffs' purchased artwork into even a single museum, in February of 2018 Plaintiff requested that Nancy ship the artwork, and provided her until April of 2018 to confirm the shipping details since Plaintiff's home was in the process of being remodeled and would not be available until that time.

69.     This began Plaintiff's bizarre, infuriating, and Kafkaesque saga of endless discussions, negotiations, and haggling with Nancy to obtain that which he had contracted and

EXHIBIT B

paid for: his own $186,000.00 in artwork and Nancy's performance of those promises she had expressly made and used to induce Plaintiff's purchases in the first instance.

70.   In March of 2018, Plaintiff emailed Nancy and asked that she provide a valuation of the artwork comprising the First and Second Purchase, and expressly informed Nancy that the valuation would be used for an official legal purpose, thereby requiring accuracy.

71.   Nancy responded in an email stating that Plaintiff's artwork, taken together, was worth over $440,000.00.

72.   In April of 2018, Plaintiff emailed Nancy and requested that she ship the artwork comprising the First and Second Purchase.

73.   Nancy responded several times stating that she was working on arranging shipping, and did not object to or raising a question about who would pay for shipping, storage, or insurance.

74.   In May 2018 Nancy called Plaintiff on the phone and said that since the artwork was worth over $440,000.00, Plaintiff should let her resell it in her gallery and that she would split the profit with Plaintiff.

75.   Plaintiff asked her if Garde would permit her to sell Plaintiff's artwork instead of focusing on selling Garde's unsold work.  Nancy responded by stating that her contract with Garde gave her express permission to do so.

76.   From May of 2018 through April of 2019, Plaintiff requested that Nancy ship his artwork, on the phone and in emails, over dozens of communications, and each time Nancy stated some form of excuse for the delay, but did not once object to or raise a question about who would pay for the shipping, storage, or insurance.

EXHIBIT B

77.     Finally, after dozens of simple and yet maddeningly fruitless requests to have his artwork shipped, followed by Nancy's prevarications, Plaintiff informed Nancy that he had to have the art shipped immediately, with no further excuses or delays.

78.     At that point, the tenor of Nancy's communications changed dramatically.  She became, even more evasive and hostile towards Plaintiff.

79.     Despite numerous requests in writing, Nancy refused (1) to send Plaintiff an inventory list of what she was to going to ship after repeatedly promising to do so; (2) refused to send Plaintiff photos of the artwork to ensure it was actually in her possession and being safely kept; and (3) refused to answer basic and simple questions about where it was stored and how it was insured.

80.     Worse still, Nancy refused to ship the artwork—whatever it was since she wouldn't send pictures or an inventory list—unless Plaintiff agreed to (1) a variety of demands for payment that were directly contrary to their agreement; (2) attempted to pressure Plaintiff into executing a new agreement that had no basis in the parties' dealings; and (3) tried to switch various pieces of artwork that were different from that which had been agreed upon, several times.

81.     For example and without limitation, David, acting in concert with Nancy, told Plaintiff that in fact he was not owed a $21,000.00 credit, but instead owed AP an additional $5,000.00 that had no legal or factual basis, and continued to hold the art hostage until this demand was met.

82.     On numerous occasions, Nancy told Plaintiff that she could not ship the art and could not honor their agreement because her other business partner, Alicia, refused to let Nancy honor that agreement.

EXHIBIT B

83.     Nancy represented that Alicia knew what she and Plaintiff had agreed to, yet she willfully refused to agree.  For example, Nancy said it was Alicia who was refusing to let her ship the art, free of charge, as had long been agreed to.  Nancy still had an obligation, however, to perform.

84.     Moreover, Nancy stated that Alicia and Martin had invested in AP, and that they would be directly receiving funds paid by Plaintiff for the First and Second Purchase.

85.     After spending over $186,000.00 on the First and Second Purchase, an ever-burgeoning amount for attorneys' fees, and hundreds of hours attempting to have Nancy honor her express promises, litigation was necessary to simply have some pieces of art that were in Nancy's possession shipped to Colorado for safekeeping, and it is now clear that the Defendants can only perform limited bits and pieces of an agreement when complete performance is necessary in order for Plaintiff to obtain the benefit of his bargain.

86.     Indeed, the only promise that Nancy has voluntarily  performed is taking Plaintiffs' money.

### III.     CLAIMS FOR RELIEF

### First Claim – Breach of Contract – Against All Defendants Except ISP, Alicia, and Martin

87.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

88.     Plaintiff and Defendants had an agreed-upon exchange of promises, involving an offer, acceptance, consideration, and a reasonably definite subject-matter.

89.     Plaintiff performed his end of the contract by paying in full when requested.

90.     Defendants materially breached the contract.

EXHIBIT B

91.   Defendants' breach caused Plaintiffs to suffer injuries, damages, and losses in an amount to be proven at trial.

**Second Claim – Unjust Enrichment – Against All Defendants**

76.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

77.   Defendants, at Plaintiffs' expense, obtained an item or items of value in the form of approximately $186,000.00 for the First and Second Purchase. and retained an item or items of value that do not belong to them, in the form of dozens of pieces of art belonging to Plaintiff for an extended period of time prior to shipping the art after this litigation was commenced.

78.   Those pieces of art are now allegedly worth over $440,000.00, and Plaintiff has been deprived of the beneficial use of his purchase funds for an extended period of time.

79.   Furthermore, although the art was shipped after litigation was commenced, Plaintiff has suffered damages both in the interim and after the art was shipped because its aesthetic and artistic value, from Plaintiff's perspective, has been destroyed by Defendants' wrongful acts and omissions.

80.   Moreover, Defendants' continued retention of the payment funds and their prior retention of the paid-for art prior to its shipment after litigation was commenced wasunjust under the circumstances, and in equity and good conscience Defendants should be required to compensate Plaintiff for his resulting injuries, damages, and losses.

81.   Specifically with respect to Alicia, Martin, and ISP, they received a benefit in the form of a substantial portion of Plaintiffs' $186,000.00 in purchase funds, which were fraudulently obtained and continue to be wrongfully retained.

82.   Defendants have thus been unjustly enriched in an amount to be proven at trial.

17

**Third Claim for Relief – Fraudulent Misrepresentation – Against All Defendants Except ISP, Alicia, and Martin**

83.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

84.     Nancy and David made a material misrepresentation of a past or present fact, or materially misrepresented that she would perform in the future coupled with a present intent not to perform.

85.     Nancy and David made those material misrepresentations with the intent that Plaintiff would rely upon them in deciding to act.

86.     Plaintiff did so reasonably rely on those material misrepresentations to his detriment.

87.     Nancy and David's material misrepresentations proximately caused Plaintiff to suffer injuries, damages, and losses in an amount to be proven at trial.

**Fourth Claim – Civil Theft Against Nancy, AP, David, and AS Pursuant to C.R.S. §§ 18-4-401 and 405**

86.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

87.     Defendants knowingly obtained, retained, or exercised control over things of value of Plaintiff without authorization.

88.     Defendants did so with the intent to deprive the Plaintiff permanently of the use or benefit of the thing of value.

89.     Defendants also used, concealed, or abandoned the thing of value in such manner as to deprive the Plaintiff person permanently of its use or benefit.

90.      Defendants' actions constitute civil theft, which caused Plaintiff to suffer injuries,

EXHIBIT B

damages, and losses, in an amount to be proven at trial.

### Fifth Claim – Conversion Against AP, AS, David, and Nancy

91.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

92.     Plaintiff has an ownership interest in the artwork comprising the First and Second Purchase.

93.     Defendants are aware of that ownership interest, and yet, have intentionally interfered and continued to interfere with Plaintiff's exercise of his rights of ownership over his artwork for an extended period of time until this litigation was commenced

94.     Defendant's acts of intentional interference and retention of the artwork for that extended period of time, which  did not belong to them was inconsistent with Plaintiff's ownership interest in those items of personal property.

95.     Defendant's wrongful acts constitute conversion and have proximately caused Plaintiff's to suffer injuries, damages, and losses in an amount to be proven at trial.

### Sixth Claim – Vicarious Liability of AS, AP, and S41 for Nancy's Wrongful Acts Under the Doctrine of Respondeat Superior

91.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

92.     In soliciting Plaintiff for the First and Second Purchase, receiving his payment funds, and making additional promises related to the shipment, storage, and insurance related to that artwork, as well as purporting to bind Garde to take additional actions to complete the sale of his art, Nancy was acting within the scope of her employment with AS, AP, and S41.

93.     Nancy's actions were calculated at least in part to benefit AS, AP, and S41 and were customary and routine for a person in her position within the art industry.

EXHIBIT B

94.     Therefore, AS, AP, and S41 are vicariously liable for Nancy's wrongful acts and omissions as if they had committed those wrongful acts themselves.

**Seventh Claim – Joint Venture Liability of S41 for the Wrongful Acts of AS, AP, and Nancy**

95.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

96.     S41 had an agreement, express or implied, with AS and AP to combine their assets, property, knowledge, skills, experience, time or other resources in pursuit of a project or undertaking, namely, the representation, creative management, and sale of Garde's various artworks.

97.     S41 and AS and AP agreed to share in the profits and losses arising from their express or implied agreement, and did in fact share profits arising from that agreement.

98.     S41, AS, and AP shared a community of interest in the subject-matter of their express and implied agreement, whereby AS and AP were given the exclusive right to represent Garde and his artwork, and S41 was entitled to exclusively share in the profits of the venture.

99.     Therefore, S41, AS, and AP were engaged in a joint venture during the course of the events alleged in this pleading, such that they are each vicariously liable for the wrongful acts of the other or their agents.

**Eighth Claim for Relief – Vicarious Liability of AS, AP, and S41 for Nancy's Wrongful Acts and Vicarious Liability of S41 for AS and AP's Wrongful Acts Under and Doctrine of Actual and Implied Authority**

100.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

EXHIBIT B

101.    During the course of the events alleged herein, Nancy was acting as the agent for AS, AP, and S41, whereby she agreed to act primarily for the benefit of those Defendants, to be subject to their control, and to act at their direction to deal with third parties such as Plaintiff.

102.    Under the common-law of agency, Nancy had broad actual authority to represent AS, AP, and S41 for the purpose of providing the exclusive management of these entities, actual authority to sell their artworks, include Garde's artworks (for S41) and Garde's and other artists' artworks (for AS and AP), and actual authority to bind them to various obligations ancillary to the sale of their artworks.

103.    In undertaking the acts and omissions alleged herein, Nancy was acting actual with both actual authority and implied authority, and therefore AS, AP, S41 are vicariously liable for Nancy's wrongful acts and omissions as alleged herein.

104.    Under the common-law of agency, and in the alternative or in addition to Nancy's agency relationship with AS, AP, and S41, AS and AP were acting as agents for S41, for the purpose of providing the exclusive management of that entity and its owner, Garde, actual authority to sell S41's artworks, include Garde's artworks, and actual authority to bind S41 to various obligations ancillary to the sale of its artworks, which were only Garde's artworks, and in this role, Nancy was a subagent of AS and AP.

105.    In undertaking the acts and omissions alleged herein, Nancy as subagent and AS and AP as agent, were acting with both actual and implied authority, and therefore, S41 is vicariously liable for Nancy, AS, and AP's wrongful acts and omissions.

**Ninth Claim for Relief – AS and AP's Vicarious Liability for the Wrongful Acts of Nancy Under the Doctrine of Apparent Authority**

106.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

EXHIBIT B

107.     AS and AP made numerous manifestations to Plaintiff that Nancy was actually authorized to act on their behalf to sell their artworks, to engage in creative management of Garde, and to bind AS and AP, and their artists, to various obligations ancillary to those activities.

108.     A person in Plaintiff's position would reasonably believe, after having received those manifestations, that Nancy was authorized actually and impliedly to act on behalf of AS and AP to sign contracts, and carry out all actions usual, necessary, and related to the scope of her authority.

109.     In undertaking the acts and omissions alleged herein, Nancy was apparently and impliedly authorized to act as AS and AP's agent, and therefore, they are vicariously liable for her acts and omissions.

**Tenth Claim for Relief – Civil Conspiracy Against AP, AS, David, Nancy, ISP, and Alicia**

110.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

111.     Defendants agreed, agreed by words or conduct, or both, to accomplish an unlawful goal or accomplish a goal through unlawful means.

112.     One or more acts were performed to accomplish the unlawful goal or one or more unlawful acts were performed to accomplish the goal.

113.     Plaintiff, as a result of the foregoing civil conspiracy, suffered injuries, damages, and losses in an amount to be proven at trial.

**Eleventh Claim for Relief – Intentional Interference with Contractual Relations – Against Alicia, ISP, and David**

114.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

EXHIBIT B

115.    Plaintiff had an existing contract with Nancy, AP, and AS.

116.    The Defendants knew or should have known about the existence of that contract.

117.    The Defendants, by words or conduct, or both, intentionally caused Nancy, AP, and AS not to perform her contract with Plaintiff, and to attempt to change that contract without consideration or mutual assent.

118.    Defendants' interference with the contract was improper.

119     Defendants' interference caused Plaintiff to suffer injuries, damages, and losses in an amount to be proven at trial.

## V.    PRAYER FOR RELIEF

Plaintiff respectfully requests that judgment be entered on each claim for relief asserted herein in its favor and against the Defendants, and that the Court award the following relief:

1.    Pre and Post-Judgment Interest;

2.    Economic Damages of No Less than $440,000.00 and Non-Economic Damages;

3.    Equitable relief, including but not limited to rescission, restitution, and disgorgement;

4.    Attorneys' Fees; and

5.    Treble damages for Civil Theft.

## VI.    JURY DEMAND

**PLAINTIFF REQUESTS TRIAL TO A JURY OF NO LESS THAN SIX PERSONS**

Dated December 24, 2019

EXHIBIT B

Respectfully submitted,

THE LAW OFFICE OF IAN T. HICKS LLC


By_____*s/ Ian T. Hicks*_____
          Ian T. Hicks
     *Original Signature on File at The Law Office of*
     *Ian T. Hicks, LLC*

EXHIBIT B