## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-2381-MEH

WALTER CHARNOFF

     Plaintiff,

v.

NANCY LOVING d/b/a ARTSUITE NY, ART PORT LLC,
STUDIO 41, LLC, ALICIA ST. PIERRE, MARTIN ST. PIERRE,
ISP HOLDINGS, INC., and DAVID HINKELMAN

     Defendants.

---

### PLAINTIFF'S MOTION FOR LEAVE TO ADD A CLAIM FOR EXEMPLARY DAMAGES

---

Walter Charnoff, ("Plaintiff") by and through his undersigned counsel of record, The Law Office of Ian T. Hicks, LLC, hereby respectfully files his Motion for Leave to Add a Claim for Exemplary Damages:

<u>Certificate of Conferral</u>: Undersigned counsel conferred with opposing counsel. Although a response was not yet received, it is believed to be opposed. The undersigned will update the conferral certificate once a response to the conferral is received.

### I.  INTRODUCTION

Plaintiff respectfully requests leave of Court to add a claim for exemplary damages to the Second Amended Complaint ("SAC"). Plaintiff previously amended the substantive allegations, and now seeks to add a claim for exemplary damages, against Nancy Loving ("Ms. Loving"), David Hinkelman ("Mr. Hinkelman"), and Art Port LLC ("AP").

The SAC added (1) David Hinkleman ("David"), Martin and Alicia St. Pierre ("Martin" and "Alicia," or "the St. Pierres"), and ISP Holdings, Inc., ("ISP"), the St. Pierres' entity as Defendants, (2) added David to the existing claims for unjust enrichment, fraudulent misrepresentation, civil theft, and conversion, (3) added David to new claims for civil conspiracy and tortious interference, (4) added Alicia and Martin to an existing claim for unjust enrichment, (5) added Alicia and ISP to new claims for civil conspiracy and tortious interference, and (6) added Martin and ISP to an existing claim for unjust enrichment.

This action arises out of Plaintiff's purchase of certain artworks authored by Harold Garde ("Garde"), which were sold by Nancy, the owner and operator of ArtPort LLC ("AP") an art gallery operating under the fictitious name of ArtSuite NY ("AS"), while acting as the actually authorized agent of Studio 41, LLC, ("S41"), which is Garde's entity used for transacting business in his artworks. David is Nancy's life partner, and a former business associate of Plaintiff, who introduced Plaintiff to Nancy.

David was also, according to declarations filed by Nancy and David in this action with their Reply to the Order to Show Cause and filed on September 30, 2019 at docket entries 21-1 (the "Loving Declaration") and 21-3 (the "Hinkelman Declaration") (collectively "The Declarations") a part owner of AP. The St. Pierres were also owners of AP, according to the Declarations, but allegedly had their interest through ISP. The Declarations, along with the 2016 Tax Return filed with Defendants' Motion to Dismiss for Lack of Jurisdiction at Docket Entry 11-3 (the "2016 Return"), have further implicated David, the St. Pierres, and ISP as owners, and have further amplified the grounds for their potential liability.

Filed concurrently herewith is an Affidavit executed by Plaintiff as Exhibit A[1], which establishes that Ms. Loving, while working on behalf of AP and for her own benefit, and in conjunction with Mr. Hinkelman, made a broad array of fraudulent misrepresentations and omissions in order to induce Plaintiff to purchase the art at issue in this litigation. This is more than sufficient to meet the minimal threshold of prima face proof of a triable issue of exemplary damages that these Defendants acted with fraud, malice, or willful or wanton conduct under C.R.S. § 13-21-102.

Accordingly, exemplary damages should be treated as having been added to the SAC, and a category of damages that Plaintiff may pursue in this civil action against these Defendants on their tort claims.

## II.   LEGAL STANDARD

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). This is a "mandate . . . to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Leave to amend is a matter committed to the court's sound discretion and is not to be denied without the court giving some reason or cause on the record. *Fed. Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir. 1987).

Leave may be denied when the amendment would cause undue prejudice to the opposing party, when the movant has unduly delayed in requesting leave, when the movant acts on a bad faith or dilatory motive, or when the amendment would be futile. *Foman*, 371 U.S. at 182; *State Distribs., Inc. v. Glenmore Distilleries*, 738 F.2d 405, 416 (10th Cir. 1984). In exercising its discretion, the court must be mindful that the Federal Rules of Civil Procedure are designed to

---

[1] Plaintiff is not refiling the voluminous exhibits to Exhibit A, which are identical to those filed with his Response to the Motion to Dismiss for Lack of Jurisdiction at Docket Entry 15-1 – 15-14, but instead incorporating them by reference herein to Exhibit A under Fed. R. Civ. P. 10 and Fed. R. Evid. 201(d).

facilitate decisions on the merits rather than on pleading technicalities. *Koch v. Koch Indus.*, 127 F.R.D. 206, 209 (D. Kan. 1989).

In terms of undue delay, delay itself is not sufficient, it must be a delay that has no adequate explanation, in consideration of the time periods typically encountered in federal litigation. *See, e.g., Minter v. Prime Equip. Co.,* 451 F.3d 1196, 1204 (10th Cir. 2006). "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim." *Burleson v. ENMR–Plateau Tel. Co-op.,* 2005 WL 3664299, at *2 (D.N.M. Sept.23, 2005) (Browning, J.) (citing *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001)).

Under C.R.S. § 13-21-102(1.5)(a), "[a] claim for exemplary damages . . . may be allowed by amendment to the pleadings only after the exchange of initial disclosures . . . and the plaintiff establishes prima facie proof of a triable issue." The statute "contemplates that the discovery process will provide the requisite prima facie evidence to support a claim for exemplary damages." *Henrickson v. Doyle*, 2015 WL 2106225 at *3 (D. Colo. May 4, 2015) (citing *Stamp v. Vail Corp.*, 172 P.3d 437, 449 (Colo. 2007)). In order for exemplary damages to be awarded, the defendant's conduct must be "attended by circumstances of fraud, malice, or willful or wanton conduct." C.R.S. § 13-21-102(1)(a).

"Willful or wanton conduct" is defined as conduct that is "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Stamp*, 172 P.3d at 442 (quoting C.R.S. § 13-21-102(1)(b)).

The Colorado Supreme Court has noted that "[w]here the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements" are met. *See Coors v. Security Life Ins.*, 112 P.3d 59, 66 (Colo. 2005);

4

*Miller v. Solaglass Cal., Inc.,* 870 P.2d 559, 568 (Colo. 1993) (Willful and wanton conduct is conduct that "creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences."); *see also Cunningham v. Standard Fire Ins. Co.*, 2008 WL 4371929 at *2 (D. Colo. Sept. 23, 2008) (mere inaction by defendant-insurer constituted prima facie proof of willful or wanton conduct).

To establish prima facie proof of a triable issue, the plaintiff is not required to show that the evidence is sufficient to survive a defendant's motion for summary judgment on the issue of exemplary damages, and <u>plaintiff's burden of proof at trial to prove exemplary damages is irrelevant to the amendment analysis</u>. *See, e.g., E & S Liquors, Inc. v. U.S. Fidelity & Guar. Co.,* 2009 WL 837656, at *2-3 (D. Colo. March 26, 2009) (differentiating the standard for granting leave to amend from evaluation of whether evidence is sufficient to defeat summary judgment) (applying Colorado law).

In order to establish prima facie proof of a triable issue, a plaintiff must articulate "'[a] reasonable likelihood that the issue [of whether a defendant's conduct was willful and wanton] will ultimately be submitted to the jury for resolution.'" *Leidholdt v. District Court*, 619 P.2d 768, 771 n. 3 (Colo. 1980). In analyzing this question, the evidence and any inferences therefrom must be viewed in the light most favorable to the plaintiff. *See Am. Econ. Ins. Co. v. William Schoolcraft,* 2007 WL 160951, at *4 (D. Colo. Jan. 17, 2007) (applying Colorado law). Indeed, the Supreme Court has acknowledged that "[t]he trial judge should grant the plaintiff some leeway in establishing his prima facie case." *Leidholdt*, 619 P.2d at 771 (Colo. 1980).

**III.   STATEMENT OF FACTS RELEVANT TO EXEMPLARY DAMAGES**

1. Mr. Charnoff met Ms. Loving on March 17, 2015 in New York. *See* Aff. of Walter Charnoff, attached as <u>Exhibit A</u>, ¶¶ 5-11. Mr. Charnoff's encounter with Ms. Loving on that date was unplanned, solely social in nature, and he did not discuss the purchase of artwork

5

of any kinds, then or to take place at any point in the future. *Id.*. Mr. Charnoff was in New York for the exclusive purpose of attending business meetings with potential funding partners for his three start-up companies. *Id.,* ¶¶ 5-8

2. Those business meetings had been setup in advance, and Mr. Hinkelman attended because he was a consultant hired by Mr. Charnoff, as evidenced by an email from Mr. Hinkelman dated March 8, 2015. *See* Ex. A, ¶ 7;. During one of those meetings, because it was Mr. Charnoff's birthday, Mr. Hinkelman made reservations at a local restaurant. *Id.,* ¶ 9. The initial plan was for the dinner to be attended by Jeff Gravelle, Mr. Hinkelman, and their respective girlfriends, including Ms. Loving. *Id.,* ¶ 10.

3. Mr. Hinkelman, while making the reservations, informed Mr. Charnoff that Ms. Loving had an event at her gallery for Mr. Garde, to which I had not been invited nor informed of. *Id.,* ¶ 11. Mr. Hinkelman asked if Mr. Garde could also attend my dinner, because he was in town for an event with Ms. Loving, and they did not want to leave him aside for the evening. *Id.*. Mr. Charnoff had never met Mr. Garde, had no idea who he was, and he only agreed to his attendance to be accommodating. *Id.,*¶¶ 12-13.

4. Mr. Charnoff met Ms. Loving for the purpose of picking her and Mr. Garde up on the way to my birthday dinner. *Id.,* ¶¶ 14-15. This brief, unplanned, purely social encounter happened on March 17, 2015, not in 2016, contrary to Ms. Loving's Affidavit (the "Loving Affidavit") and was wholly unrelated to Mr. Charnoff's purpose for being in New York at that time. *Id.,* ¶ 15. Mr. Charnoff had zero intertest in purchasing art at that time, and lacked the financial ability to purchase art, because he was a struggling entrepreneur who had placed his life savings into his start-up companies and, in fact, had mortgaged his home for additional funding. *Id.,* ¶ 13.

5. On October 9, 2015, Mr. Charnoff completed the sale of his companies, and Mr. Hinkelman and Ms. Loving began repeatedly stating that because Mr. Hinkelman had helped sell his companies, it was "time to return the favor" by making a substantial purchase from Ms. Loving's gallery. *Id.,* ¶¶ 20-22. Contrary to the Loving Affidavit, while Mr. Charnoff was located in Colorado, Ms. Loving emailed him a portfolio of "New Garde Selections" that she asked him to purchase. *Id.,* ¶ 23.

6. On June 24, 2016, Mr. Hinkelman emailed Mr. Charnoff and solicited him while he was located in Colorado, to purchase art for from Ms. Loving's gallery, and informed Mr. Charnoff that he and Ms. Loving would be traveling to Colorado and wanted to meet for that purpose. *Id.,* ¶ 24. On July 1, 2016, Mr. Charnoff met with Mr. Hinkelman and Ms. Loving at an Italian restaurant in Boulder County, Colorado, for the sole purpose of having Ms. Loving present Mr. Charnoff with a proposed portfolio of Mr. Garde's artworks. *Id.,* ¶ 25.

7. On July 3, 2016, Mr. Charnoff met again with Ms. Loving and Mr. Hinkelman at the St. Julian Hotel in Boulder, Colorado. While there, Mr. Charnoff finalized his selections, negotiated price and terms for the purchase of Mr. Garde's artworks. The purchase of art was the sole purpose of that meeting. *Id.,* ¶ 26. On July 6, 2016, Ms. Loving sent Mr. Charnoff an email while he was in Colorado, confirming his selections from that meeting. *Id.,* ¶¶ 27-28. In that email, Ms. Loving stated pricing was set by the Garde family. *Id.*.

8. On July 11, 2016, while located in Colorado, Ms. Loving emailed Mr. Charnoff to setup final payment and delivery instructions from their meetings in Colorado. *Id.,* ¶ 29. From the time period of their first two meetings in Colorado, as well as numerous text messages, emails, and phone calls, Ms. Loving stated she had the exclusive contract to sell Mr. Garde's artworks. *Id.,* ¶ 30. She further stated that she split the proceeds 50/50 with S41, contrary to the S41 Affidavit. *Id.,* ¶ 31. She also stated there were 3 owners of AP, consistent with the 2016

7

Tax Return attached as Exhibit B to Defendants' Motion, which identifies that three K-1 forms were issued, for three owners on page 1.  *Id.,* ¶¶ 32-33.

9. On July 11, 2016, while Mr. Charnoff was in Colorado, Ms. Loving sent an email to Mr. Charnoff stating that because there had been substantial recent museum and private collector acquisitions of Mr. Garde's artworks, the price would soon increase and Mr. Charnoff would be required to promptly purchase the artworks selected to avoid this increase.  *Id.,* ¶ 34  Mr. Charnoff substantially relied on this representation.  *Id.,* ¶¶ 35-39.  Ms. Loving also stated that she had cleared pricing with the Garde family.  *Id.,* ¶ 28.

10. However, the Federal Tax Return submitted by Ms. Loving only shows $48,502.00 in revenue for 2016, and $45,120.00 was from Mr. Charnoff's First Purchase.  *Id.,* ¶¶ 36-37.  Since Ms. Loving had the exclusive right to sell Mr. Garde's art, the "substantial . . . acquisitions" should have occurred in 2016 and been reported on her Tax Return.  *Id.,* .

11. In any event, Mr. Charnoff's First Purchase accounted for 93% of Ms. Loving, AP, and AS's revenue in 2016, and the $45,120.00 in purchase funds were wired from a Colorado bank to Ms. Loving and AP, the time period when the S41 Affidavit states Ms. Loving had the exclusive right to sell Mr. Garde's artworks.  *Id.*

12. On July 24, 2016, Ms. Loving sent Mr. Charnoff an email wherein she confirmed (1) his decision to purchase items art; (2) that there would be no sales tax because the purchase occurred outside of Colorado; and (3) that AP would cover the costs of shipping.  *Id.,* ¶ 40.  Ms. Loving emailed on August 10, 2016, as well, stating that she had discussed my purchase with Mr. Garde, contrary to the S41 Affidavit.  *Id.,* ¶¶ 41-42.  In an email dated August 29, 2017, Ms. Loving also promised to provide certificates of authenticity, a portfolio, and a receipt.  *Id.,* ¶¶ 40-42.

8

13.     In July of 2017, Mr. Charnoff was in Connecticut for business meetings with Mr. Hinkleman and Mr. Gravelle.  *Id.,* ¶ 46.  After these meetings, Mr. Charnoff went to Mr. Hinkelman's house to hang out in a purely social context.  *Id.*.  Ms. Loving showed Mr. Charnoff some artworks, but he never made any selections or decisions outside of the state of Colorado.  *Id.,* ¶ 47.  Mr. Charnoff made another purchase of Mr. Garde's artworks, based on selections made while located in Colorado, which were paid for my two wires and a check.  *Id.,* ¶¶ 47-48.  The check was picked up by Mr. Hinkelman while physically located in Colorado from Mr. Charnoff's home.  *Id.,* ¶ 48

14.     From the date of the First Purchase, through the Second Purchase, and thereafter, Mr. Charnoff communicated with Defendants only while he was located in Colorado with respect to the art and their art-related dealings.  *Id.,* ¶ 49.  Ms. Loving and Mr. Hinkelman travelled to Colorado approximately seven times for the purpose of soliciting Mr. Charnoff to purchase art, and to discuss the terms and pricing for such purchases.  *See, e.g., id.,* ¶¶ 43-45

15.     During this time period, Mr. Charnoff, directly or through counsel, has communicated with Ms. Loving, AP, and AS dozens of times in an effort to obtain his art, and has been the subject of numerous misrepresentations, attempts to change the terms of our deals, and other wrongful acts while in Colorado.  *Id.,* ¶ 50.  In one email, dated June 25, 2019, Ms. Loving attempted to force Mr. Charnoff to sign a contract that was directly contrary to their agreement, and which included an "as-is" clause for art he hadn't inspected.  *Id.,* ¶ 52.

## IV.     LEGAL ARGUMENT

### Plaintiff's Evidence Shows Prima Face Proof of a Triable Issue of Exemplary Damages

This civil action arises out of the purchase of artworks that were allegedly fraudulently induced by misrepresentations of Ms. Loving, AP, and Mr. Hinkelman.  These misrepresentations concern, primarily, (1) the statement that artworks by the artist in question, Harold Garde

("Garde") were being purchased by private collectors and museums, and would soon be going up in value and (2) the intent to actually deliver the art when it was paid for and honor the terms of the parties' deal.

The attached Exhibit A demonstrates that these misrepresentations were made, that they were material, and that they were relied upon by Plaintiff in making his purchases of art. *See* Statement of Material Facts, ¶¶ 6-14. More specifically, Exhibit A shows that in fact, because AP and Ms. Loving were the sole sellers of Garde's art, and they did not actually sell anything more than the art sold to Plaintiff based on their tax returns, there were no such acquisitions and Ms. Loving and AP were simply misrepresenting facts in a fraudulent manner to induce a purchase of art. Moreover, Exhibit A shows that Ms. Loving and AP have failed to honor the material terms of their deal with Plaintiff, including refusing to even ship the art until litigation was commenced. *See* Statement of Material Facts, ¶ 15. Finally, Exhibit A shows that Mr. Hinkelman acted in concert with Ms. Loving and AP to facilitate these fraudulent misrepresentations.

This evidence meets the minimal threshold necessary to show that these Defendants acted with fraud, malice, or willful or wanton conduct, and therefore exemplary damages are proper under C.R.S. § 13-17-102. Those damages should be treated as added to the SAC, and should be pursuable at trial by Plaintiff.

## V.    CONCLUSION

Plaintiff respectfully requests the instant Motion be granted, and that exemplary damages be treated as added to the Second Amended Complaint against Ms. Loving, Mr. Hinkelman, and AP.

February 12, 2020.

                          Respectfully submitted,

                          THE LAW OFFICE OF IAN T. HICKS LLC

                          By  *s/ Ian T. Hicks*
                               Ian T. Hicks
                              *Original Signature on File at The Law Office of Ian T. Hicks, LLC*

## Certificate of Service

The undersigned certifies that on the date of this filing, the foregoing was served through ECF upon Defendants' counsel, per the below, as required by Fed. R. Civ. P. 5 and any local rules:

**Shoemaker Ghiselli + Schwartz, LLC**
Elizabeth H. Getches
Cynthia A. Mitchell
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO 80302
Telephone: (303) 530-3452
 FAX: (303) 530-4071
Email: lgetches@sgslitigation.com
Attorney for Defendants

                                          *s/Ian T. Hicks, Esq.*