IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-2381-MEH

WALTER CHARNOFF

      Plaintiff,

v.

NANCY LOVING d/b/a ARTSUITE NY, STUDIO 41, LLC, DAVID HINKELMAN, ISP
HOLDINGS, INC., ALICIA ST. PIERRE, MARTIN ST. PIERRE

      Defendants.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANTS ISP HOLDINGS, INC., ALICIA ST.
PIERRE, AND MARTIN ST. PIERRE'S MOTION TO DISMISS FOR LACK OF
PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM**
_____

      Plaintiff, Walter Charnoff, ("Plaintiff" or "Plaintiff") by and through his undersigned

counsel, The Law Office of Ian T. Hicks, LLC, hereby respectfully files his Response to

Defendants' Motion to Dismiss ("Defendants' Motion") as follows:

## I.      INTRODUCTION

      This case arises out of Plaintiff's purchase of art created by Harold Garde ("Mr. Garde"),

which were solicited and sold by Defendant Nancy Loving and unlawfully retained until after this

civil action was filed.  Ms. Loving, during the events alleged in the Amended Complaint

("Complaint"), was doing business through her entity Art Port, LLC ("AP"), under the fictitious

name ArtSuite ("AS"), while acting as the exclusive agent for the sale and promotion of Mr. Garde, who does business through an entity named Studio 41, LLC, ("S41").

The wrongful acts and omissions alleged in the Second Amended Complaint ("SAC") focus on two distinct time periods, including the time period leading up to the two purchases of art ("First Purchase" and "Second Purchase") and then the time period after until the commencement of this litigation. The first time period was fraught with a series of fraudulent misrepresentations and omissions to induce Plaintiff's purchase.

The second time period was characterized by refusals to ship the art—despite payment—interjecting new terms into the parties' agreement, repeated physical damage to the artworks purchased, efforts to bait and switch the items agreed upon, and a maddening litany of ever-changing promises. Both time periods caused Plaintiff to suffer damage and are the subject of distinct claims for relief.

The two purchases were the result of approximately several meetings in Colorado, whereby Ms. Loving physically travelled to meet with Plaintiff to solicit him for the two purchases. It was during those meetings, in Colorado, where the parties' ongoing business relationship was formed. Similarly, all payments were made from Colorado, each misstatement or omission of material fact was directed to Plaintiff in Colorado, and Plaintiff's damages were felt in Colorado. The Court has already held that Colorado has specific personal jurisdiction over Ms. Loving, AP, AS, and S41, as a result of Ms. Loving's purposefully-directed activities in this state.

The SAC alleges that Alicia St. Pierre ("Ms. St. Pierre") was a Director and managing agent of AP, possessing coequal decision-making authority with Ms. Loving. The SAC further alleges that Ms. St. Pierre, with full knowledge of the terms of the agreement between Plaintiff

and AP, willfully interfered with and directly prevented AP from complying with its legal obligations to Plaintiff, and did so for the purpose of increasing her own personal financial benefit.  Despite the intentional nature of the misconduct alleged, the knowledge that the St. Pierres both  possessed regarding the jurisdictionally-relevant facts, and that it is intermixed with a dispute for which personal jurisdiction unquestionably lies in Colorado, Mr. and Ms. St. Pierre have filed a Motion to Dismiss, asserting lack of jurisdiction ("Defendants' Motion").

Defendants' Motion should be denied.  As a threshold matter, it is rooted in a series of misstatements and omissions of material fact that Ms. St. Pierre was merely a passive investor in Ms. Loving's art business.  This is completely false, and Ms. St. Pierre knows it, because she publicly represents to the world that she is a Director in that business, and she in fact—according to her own words—takes a controlling role in the activities of that business.  From her LinkedIn page to numerous print articles splashed across the internet, Ms. St. Pierre's own words refute her sworn Affidavit.

Furthermore, her reliance on the corporate fiction of ISP, Inc., is misplaced, because Colorado federal courts have repeatedly rejected the fiduciary shield doctrine and her personal participation in intentional torts for her own personal benefit is a separate question.[1]  Defendants

---

[1] It seems that Ms. St. Pierre and Ms. Loving are operating under a fictional trade name known as "ArtSuite Gallery."  This is not only illegal in New York, it is irrelevant.  When a person purports to act through a fictional entity or trade name, they are personally liable.  The only lawful entity associated with Ms. Loving's art business, and the one which appears in dozens of emails from Ms. Loving to Plaintiff is AP.  The email address for ArtSuite Gallery is artsuiteny@gmail.com.  AS is yet another fictional, and illegal, trade name used by Ms. Loving during her dealings with Plaintiff, which also appears in her email correspondence with him.  The physical address for ArtSuite Gallery is the same as AS and AP.  Ms. Loving claims that she, AS, and AP act as the exclusive agent for selling Mr. Garde, yet the name ArtSuite Gallery is used all across the internet interchangeably with AS and AP by Ms. Loving and Ms. St. Pierre to promote, advertise, and sell Mr. Garde's artworks.  AS, AP, and ArtSuite Gallery are, in law and fact, the same thing, and Ms. St. Pierre's Affidavit is both false and materially misleading to suggest otherwise.

were part and parcel of a series of wrongs purposefully aimed towards Colorado and their Motion should be denied.[2]

## II.        LEGAL STANDARD

The availability of personal jurisdiction is determined in accordance with Colorado's long-arm statute, C.R.S. § 13-1-124.  That statute "extend[s] the personal jurisdiction of Colorado courts to their maximum limits permissible under the United States and Colorado Constitutions*." Scheuer v. Dist. Court*, 684 P.2d 249, 250 (Colo. 1984).  Courts employ a two-pronged analysis in making jurisdictional determinations for cases filed in Colorado.  *Wise v. Lindamood*, 89 F. Supp. 2d 1187, 1189 (D. Colo 1999).  First, courts determine whether the exercise of jurisdiction is sanctioned by Colorado's long-arm statute, and second, whether such exercise comports with due process under the United States Constitution.  *Id.*

Under specific jurisdiction, the "touchstone inquiry is whether the defendant has purposefully directed its activities toward the forum jurisdiction and whether the underlying action is based upon activities that arise out of or relate to the defendant's contacts with the forum." *Id.* (internal quotation marks and brackets omitted).  Additionally, the Court must "consider whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'" *Omi Holdings Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998) (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal*., 480 U.S. 102, 113 (1987)).

---

[2] The claims against Mr. St. Pierre are more limited, as explained herein below, but he nevertheless obtained a benefit from funds that he knew were wrongfully obtained from Plaintiff.  His Affidavit, attached as <u>Exhibit A</u> to Defendants' Motion, is less directly involved in the analysis and arguments here because he may not have directly attempted to interfere with AP's performance, given that he was not involved as far as Plaintiff is aware in the day to day operations of the business.

Tort claims have a unique analysis.  "The Court must first determine whether the . . . Complaint alleges the commission of a tortious act within the state."  *Oaster v. Robertson,* 173 F. Supp. 3d 1150, 1166 (D. Colo. 2016) (citing *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054 (10th Cir. 2008)).  "Tortious act 'implies the total act embodying both cause and effect.'"  *Id.* (Quoting *Classic Auto Sales, Inc. v. Schocket*, 832 P.2d 233, 235 (Colo. 1992) (holding that a tort is committed where the effect is felt). Next, the Court must "undertake a particularized inquiry as to the extent to which the defendant has purposefully availed [him]self of the benefits of the forum's laws."  *Archangel Diamond Corp. v. Lukoil,* 123 P.3d 1187, 1199–1200 (Colo. 2005) (alterations in original).

If a person purports to act on behalf of a corporation, such a fact does not immunize them from jurisdiction, because Colorado has rejected the fiduciary shield doctrine.  *See Oaster v. Robertson*, 173 F. Supp. 3d 1150, 1166 (D. Colo. 2016) (citing *Carnrick v. Riekes Container Corp.,* 2016 WL 740998, at *6 n. 1 (D. Colo. Feb. 24, 2016).  If the parties present conflicting affidavits on a motion to dismiss for lack of jurisdiction, the court must resolve all disputed facts and draw all reasonable inferences in the plaintiff's favor.  *See Behagen v. Basketball Ass'n of U.S.A.,* 744 F.2d 731, 733 (10th Cir. 1984).

## III.   STATEMENT OF MATERIAL FACTS

1.      Plaintiff met Ms. Loving on March 17, 2015 in New York.  *See* Decl. of Walter Charnoff, attached as Exhibit A, ¶¶ 5-11.  Plaintiff's encounter with Ms. Loving on that date was unplanned, solely social in nature, and he did not discuss the purchase of artwork of any kinds, then or to take place at any point in the future.  *Id.*   Plaintiff was in New York for the exclusive purpose of attending business meetings with potential funding partners for his three start-up companies.  *Id.,* ¶¶ 5-8

2.      Those business meetings had been setup in advance, and Mr. Hinkelman attended because he was a consultant hired by Plaintiff, as evidenced by an email from Mr. Hinkelman dated March 8, 2015.  *See* Ex. A, ¶ 7.  During one of those meetings, because it was Plaintiff's birthday, Mr. Hinkelman made reservations at a local restaurant.  *Id.,* ¶ 9.  The initial plan was for the dinner to be attended by Jeff Gravelle, Mr. Hinkelman, and their respective girlfriends, including Ms. Loving.  *Id.,* ¶ 10.

3.      Mr. Hinkelman, while making the reservations, informed Plaintiff that Ms. Loving had an event at her gallery for Mr. Garde, to which  had not been invited nor informed of. *Id.,* ¶ 11.  Mr. Hinkelman asked if Mr. Garde could also attend the dinner, because he was in town for an event with Ms. Loving, and they did not want to leave him aside for the evening. *Id.*.  Plaintiff had never met Mr. Garde, had no idea who he was, and he only agreed to his attendance to be accommodating.  *Id.,*¶¶ 12-13.

4.      Plaintiff  met Ms. Loving for the purpose of picking her and Mr. Garde up on the way to my birthday dinner.  *Id.,* ¶¶ 14-15.  This brief, unplanned, purely social encounter happened on March 17, 2015, not in 2016, contrary to Ms. Loving's Affidavit (the "Loving Affidavit") and was wholly unrelated to Plaintiff's purpose for being in New York at that time. *Id.,* ¶ 15.   Plaintiff had zero intertest in purchasing art at that time, and lacked the financial ability to purchase art, because he was a struggling entrepreneur who had placed his life savings into his start-up companies and, in fact, had mortgaged his home for additional funding.  *Id.,* ¶ 13.

5.      On October 9, 2015, Plaintiff completed the sale of his companies, and Mr. Hinkelman and Ms. Loving began repeatedly stating that because Mr. Hinkelman had helped sell his companies, it was "time to return the favor" by making a substantial purchase from Ms.

Loving's gallery.  *Id., ¶¶* 20-22.  Contrary to the Loving Affidavit, while Plaintiff was located in Colorado, Ms. Loving emailed him a portfolio of "New Garde Selections" that she asked him to purchase.  *Id., ¶* 23.

6.      On June 24, 2016, Mr. Hinkelman emailed Plaintiff and solicited him while he was located in Colorado, to purchase art for from Ms. Loving's gallery, and informed Plaintiff that he and Ms. Loving would be traveling to Colorado and wanted to meet for that purpose.  *Id., ¶* 24.  On July 1, 2016, Plaintiff met with Mr. Hinkelman and Ms. Loving at an Italian restaurant in Boulder County, Colorado, for the sole purpose of having Ms. Loving present Plaintiff with a proposed portfolio of Mr. Garde's artworks.  *Id., ¶* 25.

7.      On July 3, 2016, Plaintiff met again with Ms. Loving and Mr. Hinkelman at the St. Julian Hotel in Boulder, Colorado.  While there, Plaintiff finalized his selections, negotiated price and terms for the purchase of Mr. Garde's artworks.  The purchase of art was the sole purpose of that meeting.  *Id., ¶* 26.  On July 6, 2016, Ms. Loving sent Plaintiff an email while he was in Colorado, confirming his selections from that meeting.  *Id., ¶¶* 27-28.  In that email, Ms. Loving stated pricing was set by the Garde family.  *Id.*.

8.      On July 11, 2016, while located in Colorado, Ms. Loving emailed Plaintiff to setup final payment and delivery instructions from their meetings in Colorado.  *Id., ¶* 29.  From the time period of their first two meetings in Colorado, as well as numerous text messages, emails, and phone calls, Ms. Loving stated she had the exclusive contract to sell Mr. Garde's artworks.  *Id., ¶* 30.  She further stated that she split the proceeds 50/50 with S41, and that a large portion of her proceeds would go to the St. Pierres. contrary to the S41 Affidavit.  *Id., ¶* 31.  She also stated there were 3 owners of AP, consistent with the 2016 Tax Return attached as Exhibit B

to Defendants' Motion, which identifies that three K-1 forms were issued, for three owners on page 1. *Id.*, ¶¶ 32-33.

9.      On July 11, 2016, while Plaintiff was in Colorado, Ms. Loving sent an email to Plaintiff stating that because there had been substantial recent museum and private collector acquisitions of Mr. Garde's artworks, the price would soon increase and Plaintiff would be required to promptly purchase the artworks selected to avoid this increase. *Id.*, ¶ 34  Plaintiff substantially relied on this representation. *Id.*, ¶¶ 35-39.  Ms. Loving also stated that she had cleared pricing with the Garde family. *Id.*, ¶ 28.

10.     However, the Federal Tax Return submitted by Ms. Loving only shows $48,502.00 in revenue for 2016, and $45,120.00 was from Plaintiff's First Purchase. *Id.*, ¶¶ 36-37.  Since Ms. Loving had the exclusive right to sell Mr. Garde's art, the "substantial . . . acquisitions" should have occurred in 2016 and been reported on her Tax Return. *Id.*, .

11.     In any event, Plaintiff's First Purchase accounted for 93% of Ms. Loving, AP, and AS's revenue in 2016, and the $45,120.00 in purchase funds were wired from a Colorado bank to Ms. Loving and AP, the time period when the S41 Affidavit states Ms. Loving had the exclusive right to sell Mr. Garde's artworks. *Id.*

12.     On July 24, 2016, Ms. Loving sent Plaintiff an email wherein she confirmed (1) his decision to purchase items art; (2) that there would be no sales tax because the purchase occurred outside of Colorado; and (3) that AP would cover the costs of shipping. *Id.*, ¶ 40.  Ms. Loving emailed on August 10, 2016, as well, stating that she had discussed my purchase with Mr. Garde, contrary to the S41 Affidavit. *Id.*, ¶¶ 41-42.  In an email dated August 29, 2017, Ms. Loving also promised to provide certificates of authenticity, a portfolio, and a receipt. *Id.*, ¶¶ 40-42.

13.     In July of 2017, Plaintiff was in Connecticut for business meetings with Mr. Hinkleman and Mr. Gravelle.  *Id.,* ¶ 46.  After these meetings, Plaintiff  went to Mr. Hinkleman's house to hang out in a purely social context.  *Id..*  Ms. Loving showed Plaintiff some artworks, but he never made any selections or decisions outside of the state of Colorado.  *Id.,* ¶ 47. Plaintiff made another purchase of Mr. Garde's artworks, based on selections made while located in Colorado, which were paid for my two wires and a check.  *Id.,* ¶¶ 47-48.  The check was picked up by Mr. Hinkleman while physically located in Colorado from Plaintiff's home.  *Id.,* ¶ 48.

14.     From the date of the First Purchase, through the Second Purchase, and thereafter, Plaintiff communicated with Defendants only while he was located in Colorado with respect to the art and their art-related dealings.  *Id.,* ¶ 49.  Ms. Loving and Mr. Hinkleman travelled to Colorado approximately seven times for the purpose of soliciting Plaintiff to purchase art, and to discuss the terms and pricing for such purchases.  *See, e.g., id.,* ¶¶ 43-45

15.     During this time period, Plaintiff, directly or through counsel, has communicated with Ms. Loving, AP, and AS dozens of times in an effort to obtain his art, and has been the subject of numerous misrepresentations, attempts to change the terms of our deals, and other wrongful acts while in Colorado.  *Id.,* ¶ 50.  In one email, dated June 25, 2019, Ms. Loving attempted to force Plaintiff to sign a contract that was directly contrary to their agreement, and which included an "as-is" clause for art he hadn't inspected.  *Id.,* ¶ 52.

16.     AP's website listed Mr. Garde as an artist it represented exclusively several times during the period when the S41 Affidavit says it had no contract with that entity, from January of 2017 through February 1, 2019.  *See* AP and Harold Garde Website Screenshots, attached as

Exhibit B.  Mr. Garde's website listed Ms. Loving's email as his contact during that same time

on the last page at the bottom. *See* Harold Garde Website Screenshots.  *Id.*.[3]

17.     Ms. Loving informed Plaintiff that she had two business partners, Alicia and

Martin St. Pierre ("Ms. St. Pierre" and "Mr. St. Pierre").  She told Plaintiff the St. Pierres were

aware of the terms of the First and Second purchase.  Ms. Loving also told Plaintiff that Mr. St.

Pierre knew of each act taken by Ms. St. Pierre listed in paragraph 55 of Walter Charnoff's

Declaration.  Ex. A, ¶ 53.  Ms. Loving also told Plaintiff, repeatedly, that Ms. St. Pierre

comanaged the business of AP, had equal decision-making authority, and as a Director of sales

had to approve all sales and the related terms of those sales.  *Id.,* ¶ 53.

18.     In order to facilitate and induce Plaintiff to make the Second Purchase, Ms.

Loving informed him that the St. Pierres had made a substantial investment in AP, and not only

did that result in the gallery having more economic ability to promote Mr. Garde's art, it gave

them a financial incentive to do so.  Thus, according to Ms. Loving, the Second Purchase was a

good investment, because the joint efforts of Ms. St. Pierre and herself would increase the value

of Mr. Garde's art through exhibitions and other promotional activity.  *Id.,* ¶ 57.  Ms. Loving

said that Ms. St. Pierre, as a symbol of her commitment to AP, executed the lease for the gallery

where Mr. Garde' s art is sold.[4]  *Id.,* ¶ 54.

19.     Ms. Loving informed Plaintiff, repeatedly, that Ms. St. Pierre refused to permit

AP to abide by the terms of the agreement previously reached with Plaintiff, including the

following acts and omissions: (1) refused to trade back the painting Two Vessels, as previously

---

[3] The screenshots were taken and preserved by a non-profit known as thewaybackmachine.org and
includes a time stamp at the top of each screenshot page.  *See* https://archive.org/about/.
[4] The lease was requested in written discovery.  Ms. Loving's counsel declined to provide the lease
as of this filing.

promised, because it was more marketable than the painting he and Ms. Loving agreed Plaintiff

could trade, (2) would not allow AP to cover shipping costs, despite Ms. Loving's previous

promise to do so, unless Plaintiff agreed to pay an extra $5,000.00 he did not owe, (3) told Ms.

Loving not to ship the art, unless Plaintiff paid an extra $1,500.00 that he did not owe, (4) tried

to force Plaintiff to sign the contract containing the "as-is" clause, which would mean he was

essentially accepting any defects or damage in the art and would be responsible for the sales tax

unlike the original agreement.  *Id.,* ¶ 55.

     20.    Ms. Loving informed Plaintiff that the name Artsuite Gallery and AS were just

names for the gallery that was operated through AP.  *Id.,* ¶ 65.  Exhibits 13-17 to Exhibit A are

articles, invitations, and other documents demonstrating that Artsuite Gallery, like AS, is nothing

more than an unregistered trade name and thus fictitious name for the gallery that operates

through AP, a New York limited-liability company.  Ex. A, ¶ 66.

     21.    Moreover, these exhibits establish that Ms. St. Pierre was a Director for AP, was

physically present at the gallery on a daily basis, engaged in an active role in the day to day

operations of AP such as preparing exhibitions, marketing, managing sales, artist development,

and generally exercised a role in fact that was equal to Ms. Loving's.  *Id.,* ¶¶ 59-62.  Indeed, Ms.

St. Pierre's own LinkedIn page calls her a Director for AS Gallery, which is nothing more than a

fictious name for the gallery that operates through AP.  *Id.,* ¶ 62.  Even the sign in front of the

gallery uses the term "ArtSuite New York" which is AS, and just below that says "ArtSuite

Gallery."  *Id.,* ¶ 65.

     22.    Ms. St. Pierre's Affidavit filed with the Motion to Dismiss (the "ASP Affidavit")

makes it appear as that she was merely a passive investor with respect to AP, and in support, she

makes numerous statements under oath in paragraphs 11-19 that (1) she owns no shares of AP,

AS, or S41; (2) she has never been employed by AP, AS, or S41; (3) she has never exercised any control over or been involved in the business of AP, AS, or S41; (4) she "has no business relationship" with Ms. Loving; (5) she did not learn of or know of any purchases by Plaintiff until after this litigation was filed; and (6) had no communications regarding Plaintiff's purchases of art with Ms. Loving until after this litigation was filed.  *See* Aff. of Alicia St. Pierre, attached to Mot. to Dismiss as Exhibit B.

      23.    These statements are false, and egregiously so.  Attached as Exhibit 13 to Exhibit A is an article and catalogue for an exhibition solely featuring Mr. Garde, which was put on at the University of Maine from May to August of 2019.  This includes the time period when the parties were at the zenith of their dispute, leading up to the commencement of this litigation in state court.  There are full-page color photographs of the pieces of art featured at the exhibition. This includes, incredibly, a photograph at page 25 entitled "Sculpture of Table" which expressly states that it is from the collection of Walter and Brandi Charnoff.  *Id.,* p. 25.  (Emphasis added). On page 50 of that exhibit, Ms. Loving and Ms. St. Pierre's efforts are described by the curator for the University's Museum of Art as follows:  "Nancy Loving and Aly St. Pierre, who represent Mr. Garde through their gallery ArtSuite in Piermont, New York offered considerable time and assistance in organizing this exhibition."  *Id.,* p. 50 (Emphasis added).

      24.    Not only was Mr. Charnoff's name listed with art that was placed in an exhibition organized by Ms. St. Pierre, her own LinkedIn page describes her as the Sales Director for ArtSuite Gallery—a position she has held since April of 2018—which as discussed above, is a fictitious name synonymous with AS and AP.

      25.    Moreover, Exhibits 13-17 of Exhibit A demonstrate compellingly that Ms. St. Pierre was involved in the day to day operations, strategic planning, marketing, and overall

vision for the AP, operating under the fictitious names AS and ArtSuite Gallery.  Indeed, when the museum for the 2019 exhibition needed to contact AP, they emailed both Ms. Loving and Ms. St. Pierre.  *See* Exhibit 21.

26.     Ms. Loving disclosed a document, entitled "Limited Membership Investment Agreement," (the "AP Investment Agreement") dated January 31, 2014, which is located at Loving 586-591, and is attached hereto as Exhibit 18.   Ms. Loving also disclosed a document, entitled "Transfer of Equity Interest Agreement," dated August 2, 2018, (the "AP Equity Agreement") which is located at Loving 549-550, and is attached hereto as Exhibit 19.

27.     The AP Investment Agreement provides that ISP Holdings, Inc., is making a total investment of $500,000.00 into AP.  In exchange for this investment, it appears under Section C that ISP will receive repayment of its $500,000.00, plus an ownership interest of 17% of in those portions of AP's profits that arise from its sale of Mr. Garde's art.  The AP Equity Agreement appears to relate to Mr. Hinkelman's departure from AP, and provides that "an investor" owns 17% of AP as a whole, not just a 17% portion of AP's profits from the sale of Mr. Garde's art.

28.     Attached as Exhibit 21 is an email that was disclosed by Ms. Loving, at Loving 844.  This email, dated February 12, 2019, was from the registrar at the University of Maine Museum of Art.  It confirms that the Museum received 37 of Mr. Garde's donated works for the exhibition, explains that the loan contract for those works will have to be amended, and requests identification that the works received were correct.  It was neither directed to Ms. St. Pierre and Ms. Loving, both.  However, the registrar requests that Ms. St. Pierre contact her the next day to discuss the exhibition further.  *See id.*

## IV.    LEGAL ARGUMENT

**A.    The Prior Finding of Jurisdiction Incorporates ISP and the St. Pierre's Related Acts**

The Court has already resolved the most critical jurisdictional question in this case when it held that Ms. Loving, AP, and S41 could be sued this forum.  It was the wrongful acts and omissions of those Defendants, purposefully directed at this state, which provided both the framework for the exercise of jurisdiction and the opportunity for the St. Pierres, along with ISP, to take advantage of the Plaintiff.

First, Ms. Loving, acting on behalf of AP and S41, and in concert with Mr. Hinkelman, engaged in misconduct to initially separate Plaintiff from his $186,000.00.  Second, once Plaintiffs' funds were transmitted out of Colorado, all of the Defendants worked to wrongfully siphon as much value from Plaintiff's side of the deal to their benefit.

And the claims for relief asserted against each set of Defendants reflects this reality.  Ms. St. Pierre and ISP are sued for for tortious interference, unjust enrichment, and civil conspiracy and Mr. St. Pierre is sued for unjust enrichment only.  The remaining Defendants are sued on the types of claims involving a direct interface with the Plaintiff, including  fraud, conversion, civil theft, and breach of contract.

The fundamental premise of the Motion to Dismiss is flawed both legally and factually. It contends the St. Pierres and ISP are immune from jurisdiction because they were allegedly passive investors, acted through an entity, and did not have direct contact with Plaintiff.  Not only is this conclusively refuted by the evidence, it is wholly irrelevant.

Just because one person commits burglary to steal property, that does not immunize another person who later receives that property knowing it was stolen for free.  The St. Pierres

and ISP knew Plaintiff had been wrongfully deprived of his funds, and sought to improperly exploit that wrong for their own benefit, in conjunction with the remaining Defendants.

**B.**     **ISP's Presence is no Immunity from Jurisdiction for Direct and Personal Wrongs**

The St. Pierres central premise is twofold: first, they were merely passive investors, nothing more, and second, their interest in AP was represented by an ISP and its limited-liability shield must be overcome for jurisdiction to exist.  We take each in turn.

First, the contention that Ms. St. Pierre was merely a passive investor is groundless at best and an ill-calculated fraud on the Court at worst.  It is helpful to compare what she says, unequivocally and without reservation, under oath, against the evidence.

**Ms. St. Pierre:** With respect to AP, AS, and S41, she had no role, no employment, no control, no authority, and took no action.  *See* Aff., ¶¶ 12-25.

**Evidence:** False.  In Exhibits 13-15, Ms. St. Pierre is referred to as a Director for ArtSuite Gallery (which as explained below and in footnote 1, is a fictious name for AP), she describes being present at the gallery on a regular basis as an employee, her interactions with customers who come into the gallery, the fact that she sets up and prepares exhibitions for Mr. Garde's art, her direct and equal role with Ms. Loving in determining policy, strategy, and vision for the business, and the fact that she is the Director of Sales.  *See* SMF, ¶¶ 60-64.  Her LinkedIn profile states that she is the Director of Sales and has been since 2018.  *Id.,* ¶ 62.

When an exhibition was set to occur at the University of Maine's Museum of Art in 2019, the Museum contacted both her and Ms. Loving to confirm the delivery of various pieces of Mr. Garde's artworks.  *Id.,* ¶ 71.  Most relevant to this case, Ms. Loving, who as a Director has authority under basic principles of agency law to bind AP, repeatedly informed Plaintiff that it could not perform a variety of critical contractual promises precisely because Ms. St. Pierre

intervened, despite knowledge of those promises, and precluded AP from meeting its previously-agreed upon obligations.  *Id.,* ¶¶ 55-56.  Ms. Loving signed the lease for the gallery, but later said that Ms. St. Pierre signed the lease.  *Id.,* ¶ 54.

Completing sales.  Marketing and business development.  Interacting with consumers.  Setting policy, strategic vision, and determining how to achieve those ends.  That is what a business does, from head to toe, from start to finish.  And that is exactly what Ms. Loving's and Ms. St. Pierre's own words confirm she did day in and day out for AP.

**Ms. St. Pierre:** She never became aware of the sale of art to Plaintiff, and never communicated with Ms. Loving regarding that art, until after this litigation was commenced.

**Evidence:** False.  Ms. St. Pierre was the Director of Sales since April of 2018.  Furthermore, the investment agreement between ISP and AP would make it necessary for AP to report all sales to the St. Pierres, and they received a K-1 from AP in 2016 under the 2016 Tax Returns.  *See* SMF, ¶ 8.  Unless the St. Pierres filed inaccurate tax returns themselves, they knew of the sales.  Ms. St. Pierre and Ms. Loving had equal roles in creating an exhibition of Mr. Garde's art at the University of Maine, from May through August of 2019, <u>where Plaintiff's art was an exhibit that specifically identified Plaintiff and his wife by name as owners of the work presented</u>.  *Id.,* ¶¶ 60-61.  Ms. Loving represented to Plaintiff that both Ms. and Mr. St. Pierre were aware of the art that Plaintiff had purchased and the terms of those purchases.  *Id.,* ¶¶ 54-55.

It is unfathomable that Ms. St. Pierre could make the representations in her Affidavit truthfully and accurately considering the evidence presented with this Response.  If she believed that she had no obligation to provide any information regarding her deep and long-term

involvement with AP because she was purportedly acting on behalf of "ArtSuite Gallery," she is mistaken.

Neither ArtSuite NY and ArtSuite Gallery are registered with the New York Secretary of State, and as such, the operation of a business under these fictitious names is wholly ineffectual as a matter of law, for any purpose—whether to shift liability to a fictitious entity, transfer activities undertaken on behalf of a duly-registered entity such as AP to a nonexistent entity,  or to permit artful pleading on an affidavit.  *See* N.Y. Gen. Bus. Law § 130; *see also, e.g., In re Golden Distributors, Ltd.,* 134 B.R. 766, 769 (Bankr. S.D.N.Y. 1991) ("Liberty is liable for the debts of American Tobacco. Liberty, a duly licensed corporation under New York law, does business under the trade name American Tobacco even though Liberty has not filed a certificate designating the trade name [under § 130]"); *see* SMF, ¶ 20.

The manifest purpose of Section 130 of the New York General Business Law is to prevent exactly what Ms. St. Pierre is attempting to do here—misleading representations made to avoid the consequences of unlawful activity:

> The purpose of an assumed or fictitious name statute is to provide a public source of information to prevent fraud and deceit in business practices by identifying the owners of a business operated under an assumed or fictitious name it enables persons dealing with the business to know who will be responsible for liabilities incurred in the business to protect persons giving credit in reliance on such name.

*See Grand Cent. Art Galleries, Inc. v. Milstein*, 89 A.D.2d 178, 181 (1982) (collecting authorities) (internal citations omitted).

Under the clear, explicit language of Section 130, it was not possible to conduct any actual business under the fictitious names of ArtSuite Gallery, ArtSuite NY, or ArtSuite—any such business inures to AP or to the individual liability of Ms. St. Pierre or Ms. Loving, depending on the other's involvement.  *Sierra Rutile Ltd. v. Katz*, 1992 WL 236208, at *6

(S.D.N.Y. Sept. 8, 1992) ("This imposition of personal liability 'is based upon the principle that one who assumes to act for a nonexistent principal is himself liable on the contract in absence of any agreement to the contrary.'") (Quoting 1A Fletcher Cyc. Corp. § 190 (1983); *see also* Republic National Bank v. GSO Inc., 177 A.D.2d 417 (1st Dept. 1991) (holding guarantor who signed above a corporate signature line personally bound on guarantee).

It appears that Mr. and Ms. St. Pierre are conflating the existence of a secret, underlying agreement between an entity, ISP, and Ms. Loving, Mr. Hinkelman, and AP, as somehow binding on Plaintiff as some form of absolute immunity from jurisdiction.  Mr. and Ms. St. Pierre are in effect arguing the fiduciary shield doctrine, under which acts undertaken by an individual for a property-registered entity are not considered as contacts for purposes of jurisdiction.  *See, Otimo Music, Inc. v. Royalty Exch., Inc.,* 2018 WL 6697073, at *7 (D. Colo. Dec. 20, 2018) (the fiduciary shield doctrine precludes personal liability on an officer for acts undertaken in the name of a corporation or assessing those contacts in determining jurisdiction) (collecting authorities).  However, Colorado federal courts have repeatedly considered the fiduciary shield doctrine, and have unanimously concluded that it does not apply to diversity cases applying Colorado law.  *See Oaster,* 173 F. Supp. at 1166 (citing *Carnrick v. Riekes Container Corp.,* 2016 WL 740998, at *6 n. 1 (D. Colo. Feb. 24, 2016); *Powers v. Emcon Associates, Inc.,* 2016 WL 1111708, at *5 (D. Colo. Mar. 22, 2016)).

Moreover, even if it did apply, many jurisdictions hold that its scope does not cover wrongful acts undertaken by an officer for their own benefit, or where the officer is directly involved in tortious activity.  *See Otimo Music, Inc.,* 2018 WL 6697073, at *7 (citing *McGreal v. Semke*, 836 F. Supp.2d 735, 739 (N.D. Ill. 2011) (fiduciary shield doctrine does not apply if the "agent was acting also or instead on his own behalf—to serve his personal interest."); *MMK*

*Group, LLC v. SheShells Co., LLC*, 591 F. Supp. 2d 944, 954 (N.D. Ohio 2008) (fiduciary shield doctrine does not apply where corporate officers "were personal, active participants in allegedly tortious or violative conduct."); *Intermed Labs., Inc. v. Perbadanan Geta Felda*, 898 F. Supp. 417, 420 (E.D. Tex. 1995) (fiduciary shield doctrine does not protect corporate officer from personal jurisdiction based on alleged tortious interference with contract committed in corporate capacity)).

This is consistent with Colorado law, which holds under the corporate officer responsibility doctrine that when an officer of a corporate entity personally engages in wrongful conduct, they are personally liable, even if they were purporting to act on behalf of that entity:

> While an officer of a corporation cannot be held personally liable for a corporation's tort solely by reason of his or her official capacity, an officer may be held personally liable for his or her individual acts of negligence even though committed on behalf of the corporation, which is also held liable. *Snowden v. Taggart*, 17 P.2d 305, 307 (1932) ("To permit an agent of a corporation, in carrying on its business, to inflict wrong and injuries upon others, and then shield himself from liability behind his vicarious character, would often both sanction and encourage the perpetration of flagrant and wanton injuries by agents of insolvent and irresponsible corporations."); *see Sanford v. Kobey Bros. Constr. Corp.*, 689 P.2d 724 (Colo. App. 1984) (corporate representative found jointly and severally liable for construction defects he authorized). The parties do not dispute that this principle applies equally to a manager of a limited liability company. *See generally* § 7–80–101, *et seq.*; Thompson, The Limits of Liability in the New Limited Liability Entities, 32 Wake Forest L. Rev. 1, 21 (1997).
>
> Moreover, that a defendant is at all times acting on behalf of the corporation does not relieve the defendant of liability. *See Galie v. RAM Assocs. Mgmt. Servs., Inc.*, 757 P.2d 176 (Colo. App. 1988); *Sanford v. Kobey Bros. Constr. Corp., supra.* And the corporate veil need not be pierced where a tort action is brought against an officer or Director and the elements of the tort are proved. *See Sanford v. Kobey Bros. Constr. Corp., supra; Huffman v. Poore*, 569 N.W.2d 549 (1997).

*See Hoang v. Arbess*, 80 P.3d 863, 867-68 (Colo. App. 2003) (emphasis added). The reference made in the Motion to Dismiss is simply unavailing, because the allegations and claims against the St. Pierres and ISP are based on their own direct and personal wrongs, not seeking to hold an

officer or owner of an entity personally liable for the debts of that entity.  And the question of whether an officer has engaged in a degree of personal participation sufficient to trigger personal liability is a question of fact for the jury, not a motion to dismiss issue.  *See id.* at 868 (Citing *Grothe v. Helterbrand*, 946 S.W.2d 301 (Mo. Ct. App. 1997); *Wolfe v. Wilmington Shipyard, Inc.*, 522 S.E.2d 306 (1999)).

The St. Pierres and ISP make the assumption that New Jersey law applies to the claims against them, but provide zero legal authority for that proposition.  Colorado federal courts typically apply the choice of law rules of the forum state, which in this state is governed by the Restatement (Second) of Conflicts of Law.  *See In re ms55, Inc*., 420 B.R. 806, 820 (Bankr. D. Colo. 2009) (citing *Ficor v. McHugh*, 639 P.2d 385, 391 (Colo. 1982)).  Under the Restatement, if the forum state has the most significant relationship to the parties and the transaction, then that state's law will be applied to determine an officer or director's liability rather than the state of incorporation.  *See id.* (Citing Section 309 of the Restatement).  Here, the evidence before the Court is that ISP's only known, discrete business was for purposes of investing in the profits from the sale of Mr. Garde's art by AP, which was directly tied to a Colorado purchaser, the Plaintiff.  It is therefore the state of Colorado that has the most significant relationship with the parties and the transaction—a contract formed in Colorado—and the liabilities that flowed from that transaction.  *See Ficor v. McHugh*, 639 P.2d 385, 391 (Colo. 1982) (where a foreign entity's business was centered on Colorado transactions and its state of incorporation had similar laws to Colorado governing officer liability to third parties, Colorado had most significant relationship and its law applied).

Yet, even if New Jersey law applied, the result would be identical to that reached under Colorado law, because in both states, an officer is individually liable for wrongful acts that he

personally participates in, regardless of whether he was purporting to act on behalf of the

corporation such that the doctrine of piercing the corporate veil has no application:

> Any corporate officer, or director who participates by aid, instigation, or assistance in a conversion, is liable. *Fidelis Factors Corp. v. DuLane Hatchery, Ltd.*, 47 N.J.Super. 132, 139-40, 135 A.2d 550 (App. Div. 1957). A director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, but, a director or officer who commits a tort, or who directs the tortious act to be done, or participates or cooperates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort. *Sensale v. Applikon Dyeing & Printing Corp.*, 12 N.J.Super. 171, 175, 79 A.2d 316 (1951); *see also McGlynn v. Schultz,* 90 N.J.Super. 505, 527, 218 A.2d 408 (App. Div.1966) (quotation omitted), *aff'd,* 95 N.J.Super. 412, 231 A.2d 386 (App. Div.), *certif. denied,* 50 N.J. 409, 235 A.2d 901 (1967). Corporate officers are liable to persons injured by their own torts, even though they were acting on behalf of the corporation and their intent was to benefit the corporation. *Robsac Industries, Inc. v. Chartpak*, 204 N.J.Super. 149, 156, 497 A.2d 1267 (App. Div. 1985).

*See Charles Bloom & Co. v. Echo Jewelers*, 652 A.2d 1238, 1243 (App. Div. 1995); *see also,*

*e.g., Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir. 1978) ("The fact that an officer is

acting for a corporation also may make the corporation vicariously or secondarily liable under

the doctrine of respondeat superior; it does not however relieve the individual of his

responsibility . . .  We hold that Casper Pinsker is liable as a participant in a wrongful act. This

liability is distinct from the liability resulting from the 'piercing of the corporate veil' as that

term is commonly used.") (Collecting authorities); *New Jersey Dep't of Envtl. Prot. v. Gloucester

Envtl. Mgmt. Servs., Inc.*, 800 F. Supp. 1210, 1219 (D.N.J. 1992) ("Similarly, other courts have

held shareholders personally liable without piercing the corporate veil where the shareholder

actively participated.").  Plaintiff has provided specific factual evidence that Martin St. Pierre

knew he was gaining a financial benefit from wrongfully-obtained funds and that Alicia St.

Pierre personally directed AP to breach its agreement to Plaintiff for her own benefit.  This is the

hallmark of personal participation and direction wholly separate from any veil-piercing issue.

What the St. Pierres and ISP are attempting is perverse and turns the doctrine of limited corporate liability on its ear.  They are advocating a position that allows them to engage in deceptive acts through the use of fictious entities, directly participate in tortious conduct for their own discrete personal benefit, and yet retain an absolute shield of immunity through the expansion of limited entity liability beyond what the law actually recognizes.  That they must distort governing law to this degree in an ill-fated effort to defeat jurisdiction is a tacit recognition of just how tenuous their legal position is in arguing against personal jurisdiction. And not only are they wrong on the law and facts, the evidence from Plaintiff's Declaration is more than sufficient to demonstrate personal participation in wrongful conduct sufficient to establish jurisdiction in this forum.

**C.**     **Personal Jurisdiction Exists against the St. Pierres and ISP for their Tortious Acts**

The SAC asserts claims for tortious interference, unjust enrichment, and civil conspiracy against ISP and Ms. St. Pierre, and unjust enrichment against Mr. St. Pierre.

Plaintiffs' Declaration and supporting Exhibits establish that although the St. Pierres and ISP did not directly communicate with Mr. Charnoff, they each directly engaged in personal wrongs that exploited and capitalized on the remaining Defendants' wrongful acts and omissions, no difference that a fence buying stolen items from a burglar well below market value.

This is nothing more, when reduced to its core components, than an argument that a person cannot be subject to jurisdiction as long as they commit wrongful acts through a third party, rather than directly, a position that has been soundly rejected and defies common sense:

> A nonresident's purposeful affiliation with a state for purposes of pecuniary gain has long been deemed a sufficient contact to render the nonresident subject to suit in the courts of that state in litigation related to that business transaction, even if the nonresident has no physical presence in the state whatsoever.  Nor can a foreign

corporation escape the jurisdiction of a state simply because the business activities conducted there, though clearly contemplated by the corporate defendant and redounding to its financial benefit, were conducted through 'intermediaries' of one kind or another.

See *Pepsi-Cola Bottling Co. of Ft. Lauderdale-Palm Beach v. Buffalo Rock Co*., 593 F. Supp. 1559, 1565 (N.D. Ala. 1984) (Citing *McGee v. International Life Insurance Co.*, 355 U.S. 220 (1957)).

In *Oaster v. Robertson*, 173 F. Supp. 3d at 1166, the defendant made what is essentially the same argument being made here, and the Tenth Circuit Court of Appeals rejected it, holding that since a tortious act occurs where the damage is felt, in Colorado, there were sufficient contacts with the forum state to support personal jurisdiction. And so too should that result attain here. The Court has already found a wealth of contacts, purposefully directed and occurring within Colorado, which triggered jurisdiction against AP, AS, and Ms. Loving, and Ms. St. Pierre, ISP, and Mr. St. Pierre with full knowledge of the relevant facts sought to intervene in those wrongful acts to obtain a benefit for themselves.

When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts. *See Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990); *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1165 (5th Cir.1985); *DeMelo v. Toche Marine, Inc*., 711 F.2d 1260, 1270–71 (5th Cir. 1983). Therefore, the plaintiff need only present a prima facie case of personal jurisdiction to satisfy its burden. *See Bullion*, 895 F.2d at 217. The burden on the plaintiff is light. *See Wenz v. Memery Crystal,* 55 F.3d 1503, 1505 (10th Cir. 1995). If the parties present conflicting affidavits, the court must resolve all disputed facts and draw all reasonable inferences in the plaintiff's favor. *See Behagen v. Amateur Basketball Ass'n of U.S.A.,* 744 F.2d 731, 733 (10th Cir. 1984).

Here, Plaintiff has more than satisfied his light burden, by showing a long series of direct and wrongful acts that appended to a prior series of wrongful acts occurring inside and outside of the forum state, and purposefully undertaken to avail themselves of the benefit of Colorado. Given the Court's prior ruling, it is clear jurisdiction should be found to exist.

**D.     Plaintiff's Motion to Dismiss against Mr. St. Pierre is Factual and Should be Denied**

Mr. St. Pierre claims that the claim for unjust enrichment against him should be dismissed.  Yet, for the same reasons expressed in the previous section, his personal participation in a wrongful act that is in character tortious satisfies the threshold burden to state a valid claim for what is a factually-intensive inquiry inappropriate for a motion to dismiss.

To recover under a theory of quasi-contract or unjust enrichment, a plaintiff must show (1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the defendant, and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value.  *See Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n*, 649 P.2d 1093, 1096–97 (Colo. 1982); *Mountain Medical, Inc. v. City of Colorado Springs*, 608 P.2d 821 (1979).

Application of the doctrine does not depend upon the existence of a contract, express or implied in fact, but on the need to avoid unjust enrichment of the defendant notwithstanding the absence of an actual agreement to pay for the benefit conferred.  *See, Cablevision of Breckenridge, Inc.,* 649 P.2d 1096.  The scope of this remedy is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another.  "Instead, courts may imply a contract in law, often termed a quasi-contract, and allow recovery to serve the 'law of natural immutable justice and equity.'"  *See DCB Constr. Co. v. Central City Dev. Co*., 965 P.2d 115, 119

(Colo.1998), aff'g 940 P.2d 958, 962 (Colo. App. 1996) (quoting *Valley Realty & Inv. Co. v. McMillan*, 414 P.2d 486, 488 (Colo. 1966)).

In general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract. *Printz Servs. Corp. v. Main Elec., Ltd*., 949 P.2d 77 (Colo. App. 1997), *aff'd in part and rev'd in part*, 980 P.2d 522 (Colo. 1999); *Stanford v. Ronald H. Mayer Real Estate, Inc*., 849 P.2d 921 (Colo. App. 1993). However, this principle recognizes two exceptions. First, a party can recover on a quasi-contract when the implied-in-law contract covers conduct outside the express contract or matters arising subsequent to the express contract. *Scott Co. v. MK–Ferguson Co*., 832 P.2d 1000 (Colo. App. 1991). Second, a party can recover on a quasi-contract when the party "will have no right under an enforceable contract." *Backus v. Apishapa Land & Cattle Co.,* 615 P.2d 42, 44 (1980). For example, quasi-contractual recovery may be allowed when an express contract failed or was rescinded. *See Dudding v. Norton Frickey & Assocs*., 11 P.3d 441 (Colo. 2000).

Here, Plaintiff has no contract with Mr. St. Pierre. Yet, the allegations of the SAC and evidence supplied with this Motion show that he knew Plaintiff had been defrauded, knew that Ms. Loving had no legal basis to inject new terms and conditions into the agreement with Plaintiff, and knew that holding his art hostage was wholly improper, yet he capitalized on those wrongs to obtain a direct monetary benefit. *See* SMF, ¶ 17. This a sufficient basis to rescind the agreement based on precontractual fraudulent inducement, a form of relief pled in the SAC. Further, the agreement with AP resulted in the direct flow of Plaintiffs' monies to Mr. St. Pierre, and that is also what Ms. Loving told Plaintiff repeatedly. Therefore, each element for unjust enrichment is satisfied and the Motion to Dismiss for Failure to State a Claim must be denied.

## V.   CONCLUSION

Plaintiff respectfully request that the Motion to Dismiss be denied as to the jurisdictional

arguments and as to failure to state a claim.

Dated this April 20, 2020

*/s/ Ian T. Hicks, Esq.*
Ian T. Hicks, Reg. No., 39332
The Law Office of Ian T. Hicks LLC
Attorney for Plaintiff
6000 East Evans Avenue, Suite 1-360
Denver, Colorado, 80222
Telephone: (720) 216-1511
Facsimile: (303) 648-4169
E-mail: ian@ithlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of April, 2020, the foregoing Response

was filed via CM/ECF, and served upon the following:

**Shoemaker Ghiselli + Schwartz, LLC**
Elizabeth H. Getches
Cynthia A. Mitchell
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO 80302
Telephone: (303) 530-3452
 FAX: (303) 530-4071
Email: lgetches@sgslitigation.com
Counsel for Defendants Nancy Loving d/b/a ArtSuite NY, Artport LLC, David Hinkelman, and
Studio 41 LLC

Thomas H. Wagner, #38135
Anderson Law Group
7385 W. Highway 50
Salida, CO 81201
Telephone: (719) 539-7003
tom@anderson-lg.com
Counsel for Defendants Martin St. Pierre, Alicia St. Pierre, and ISP Holdings, Inc.

*s/Ian T. Hicks, Esq.*