### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-2381-MEH

WALTER CHARNOFF

      Plaintiff,

v.

NANCY LOVING, ARTPORT LLC, ARTSUITE NY, STUDIO 41, LLC

      Defendants.

---

### DECLARATION OF WALTER CHARNOFF

---

I, Walter Charnoff, being over 18 years of age and duly sworn, hereby verify the following under penalty of perjury:[1]

    1.      I am the Plaintiff in this civil action.  I presently live at 6950 Rabbit Mountain Road, Longmont, Colorado, 80503.  I have lived only in Colorado for the past ten years.  I intend to continue living in Colorado.

    2.      I have reviewed the Affidavit of Nancy Loving ("Ms. Loving") (the "Loving Affidavit") and the Affidavit of Studio 41, LLC ("S41") (the "S41 Affidavit").  I have also reviewed the documentation provided in support of the Loving Affidavit and the S41 Affidavit.

---

[1] Paragraphs 1-52 are substantively identical to the prior Affidavit provided by Plaintiff in his Response to the Motion to Dismiss for Lack of Jurisdiction filed by the remaining Defendants other than Mr. Hinkelman, who was not a party at that time.

**EXHIBIT A**

3.      I have also reviewed numerous emails, text messages, scheduling information, and financial records relating to the allegations in my Amended Complaint ("Complaint") and the sworn statements made in the Loving and S41 Affidavits.

4.      Many of the statements made in the Loving and S41 Affidavits are contradicted by emails, text messages, financial records, and information provided by the Defendants with their Court filings, reviewed in the court of preparing the Complaint and this Affidavit.

5      Prior to March 17, 2015, Ms. Loving's boyfriend at that time, David Hinkelman ("Mr. Hinkelman"), had been hired as a consultant to facilitate the strategic growth and capitalization for my companies, and potentially, to obtain a buyer for those companies once they obtained sufficient value.

6.      I was in New York City on March 17, 2015 for a trip that was  planned and scheduled for the purpose of attending meetings with Mr. Hinkelman and potential investors for my companies. This trip was never focused on purchasing, reviewing, or discussing artworks or the art industry.

7.      This fact is demonstrated by an email dated March 8, 2015, transmitted to me by Mr. Hinkelman, which states as follows:

> Eric, can you let me know when you have some availability tomorrow or Tuesday. Looking to have Wally in NYC the 16th and 17th for meetings with potential funding partners.  Will look to schedule a second call with you and wally for Wednesday morning.  Possibly involve Doug-this will allow to provide thoughts around how to cover salient points that will be important to address in deck.

*See* E-mail dated March 8, 2015, attached as <u>Exhibit 1</u>.

8.      The "17th and 18th" referred to in the foregoing paragraph meant during the month of March, 2015.  The person identified as "Eric" in the foregoing paragraph was Eric Workman, a partner in one of my companies that Mr. Hinkelman was performing consulting

services for. The person identified as "Doug" in the foregoing paragraph Doug Bendt, a partner in one of my companies that Mr. Hinkelman was performing consulting services for. I did actually attend meetings relating to my companies, as planned, during my trip to New York.  None of the Defendants attended those meetings, and neither did Harold Garde ("Mr. Garde").

9.      I attended a meeting in New York with a potential investor in my companies on March 17, 2015.  Because that was my birthday, Mr. Hinkelman, who was also present, made dinner reservations at a local restaurant.

10.     The stated plan was for the dinner to be attended by Mr. Hinkelman and Jeff Gravelle, a business associate and client of my companies, and to the best of my knowledge, Mr. Hinkelman's business partner.  Mr. Hinkelman's and Mr. Gravelle's girlfriends were also slated to attend. Mr. Hinkleman's girlfriend was Ms. Loving.

11.     Mr. Hinkelman, while making the reservation, requested that Harold Garde ("Mr. Garde") attend the dinner.  He explained that Mr. Garde an artist, who was in town for an art event held by Ms. Loving at her art gallery, and as such, he did not want to leave him out of their evening plans.  I did not attend said Art event. Mr. Garde's attendance was solely and entirely Mr. Hinkelman's idea.

12.     I had never met Mr. Garde and had no clue who he was outside of Mr. Hinkelman's description.  It was solely Mr. Hinkelman's idea to have Mr. Garde attend my birthday dinner.  In order to be accommodating, I agreed to Mr. Garde's attendance that evening.

13.     At that point in time, I had neither the interest nor the financial ability to make any purchases of art.  I was an entrepreneur, working feverishly to get my start-up companies off the ground.  Indeed, I had all my savings invested into the companies and had even personally guaranteed over $250,000 of additional debt for the company.

3

14.     We stopped by Ms. Loving's art gallery early evening on March 17th, 2015, for the purpose of picking up her and Mr. Garde on the way to my birthday dinner.   My visit to Ms. Loving's art gallery was nothing more than an unplanned, short-lived social visit.  I understand that Ms. Loving's gallery operates under the entity Art Port, LLC, ("AP") and utilizes the name of ArtSuite NY ("AS").

15.     At no time on March 17, 2015 was I involved in any discussion relating to my interest in purchasing art then or at any time in the future.  My introduction to Ms. Loving and Mr. Garde was unplanned, purely social in nature, and unrelated to my purpose for being in New York at that time.

16.     During the dinner on March 17, 2015, I had no discussions with Ms. Loving and no discussions with Mr. Garde regarding pricing, selection, or availability of any of his artworks. I had no interest and no ability to purchase any of his art at that time.

17.     Contrary to what Keith Garde stated in the S41Affidavit paragraph 9, I did not meet Harold Garde for dinner as a result of my request to do so.

18.      Contrary to what Ms. Loving states in her Affidavit paragraph 17, I did not visit her gallery in October 2015.

19.     Contrary to what Ms. Loving states in her Affidavit paragraph 21, I did not visit her gallery nor meet her nor Mr. Garde on March 17, 2016.   In fact, I did not even visit New York on March 17th of 2016.

20.     On October 9, 2015, with Mr. Hinkelman's assistance, I completed the sale of my three businesses to a publicly-traded company.  Mr. Hinkelman received over $1,000,000.00 from the sale of my companies as compensation for his consulting efforts and as a result of his ownership interests.

21.     Almost immediately after I completed the sale of my companies, Mr. Hinkelman and Ms. Loving began soliciting me by phone and text message, while I was physically located in Colorado, to make a substantial purchase of Mr. Garde's artworks from Ms. Loving's gallery.

22.     Despite the fact that Mr. Hinkelman had received over $1,000,000.00 from the sale of my companies, Ms. Loving and Mr. Hinkelman repeatedly stated that because Mr. Hinkelman had helped me sell my companies, it was "time to return the favor" by making the substantial purchase from Ms. Loving's gallery.

23.     Contrary to the Loving Affidavit, on May 13, 2016, Ms. Loving solicited me to purchase Mr. Garde's artworks, while I was physically located in the state of Colorado, by sending me a portfolio of "New Garde Selections," which she asked me to purchase.  *See* Email dated May 23, 2016, attached as Exhibit 2.

24.     Contrary to the Loving Affidavit, on June 24, 2016, Mr. Hinkelman solicited me via email to meet with him and Ms. Loving solely for the purpose of purchasing Mr. Garde's artworks from Ms. Loving's art gallery, Art Port, LLC, ("AP") operated under the name ArtSuite NY ("AS"), stating as follows:

> Wally,
>
> As of now we arrive late on June 30th and have a family wedding. Nancy and I can meet with you the 1st second or 3rd.  Friday the 1st will have to be no later than early afternoon since the wedding is at 4 p.m.
>
> Nancy will prepare a presentation with full range of Harold's work but also with some other artists she now works with their representation she thinks you will like.
>
> Please confirm a time and date so that we can lock it in.
>
> Look forward to seeing you.
>
> Thanks,

5

Dave

*See* E-mail dated June 24, 2016, attached as <u>Exhibit 3</u>.

25.    Contrary to Loving Affidavit, on July 1, 2016, I met with Mr. Hinkelman and Ms. Loving at an Italian restaurant in Boulder County, Colorado, for the intended purpose of having Ms. Loving present me with a proposed portfolio of Mr. Garde's artworks, as part of their efforts to solicit me for a substantial purchase.

26.    Contrary to Loving Affidavit, two days later, on July 3, 2016, I met with Mr. Hinkelman and Ms. Loving at the St. Julian hotel in Boulder, Colorado for the intended purpose of having Ms. Loving present me with an updated proposed portfolio of Mr. Garde's artworks, as part of their ongoing efforts to solicit me for a substantial purchase.  During that meeting, I finalized my selections, and negotiated price and terms for my purchase of Mr. Garde's artworks from Ms. Loving's art gallery.  The solicitation by her of my purchase of art was the intended purpose of the meeting, as planned and executed in Boulder County, Colorado.

27.    Contrary to Loving Affidavit, on July 6, 2016, and while I was physically located in Colorado, Ms. Loving sent me an email confirming my selections from my July 3, 2016 meeting with her and Mr. Hinkelman at the St. Julian hotel.

28.    Contrary to both the S41 Affidavit and the Loving Affidavit, in that same email, Ms. Loving stated that pricing of my selections was set by the Garde family, which I presume but cannot be for certain is a reference to S41 and its status as the legal entity through which Mr. Garde apparently conducts business, stating as follows:

6

Hi Brande and Wally,

Here is a new catalogue that I have created for you both.  It is comprised of just the art that you were both most interested in.
. . . .
The catalogue reflects the retail prices as set with the Garde family.  I have flexibility, depending on the painting, and I am confident that we can work out a pricing structure for Garde art that you will be comfortable with.
. . . .
Let's schedule a time over the weekend or early next week to discuss your trip to New York.  Looking forward to spending some with you both in NYC – as we had a great time in Boulder and many laughs at the St. Julian!

*See* Email dated July 6, 2016, attached as <u>Exhibit 4</u>.

29.     Contrary to Loving Affidavit, on July 11, 2016, while I was physically located in Colorado, Ms. Loving and Mr. Hinkelman emailed me to setup final payment and delivery of the artworks previously selected after our meetings in Colorado.  *See* July 11, 2016 Email, attached as <u>Exhibit 5</u>.

30.     Contrary to the S41 Affidavit, throughout the entire time that I was negotiating my purchase of the artworks, including our two in-person meetings in Boulder, Colorado, as well as our numerous text messages, emails, and phone calls, Ms. Loving stated on many occasions that she had the exclusive contract to sell Mr. Garde's artworks, and it could only be sold through her.

31.     Ms. Loving further stated that S41 received 50% of the proceeds from her sales of Mr. Garde's artworks, contrary to the S41 Affidavit, which states that S41 only receives 30% of the proceeds from a sale.

32.     Contrary to Loving Affidavit, Ms. Loving further stated to me that she had two business partners in AP, other than herself.  According to Ms. Loving these partners included Mr. Hinkelman and Allie Lapierre (with her husband).  Ms. Loving represented to me that the

Lapierres had contributed over $500,000 to the gallery and had committed to invest more.[2]

When making both my purchases I placed significant reliance on Ms. Loving's statement there were two other partners in the Gallery who had significant resources, leading me to believe the gallery had staying power and could actually afford to make a market for the Garde Art.

33.     Contrary to the Loving Affidavit, the AP 2016 Federal Tax Return, submitted by Ms. Loving with the Loving Affidavit, is a partnership return that can only be used by entities having more than one owner. Additionally, said Federal Tax Return shows that three K-1s were issued by AP for the 2016 tax year, demonstrating that there were at least three owners. Specifically, on page 3, line I, at the top of the page, it states "Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year."  In that column, it says "3," which I believe means that there were three partners or three members in 2016.  *See* Exhibit B to Defs.' Mot. to Dismiss, ECF Doc. No. 11-3.  Ms. Loving appears to have removed the K-1s from the copy of the return she submitted to the court. It is unclear why Ms. Loving would file a partnership return with the IRS providing a K-1 to at least three different alleged partners in AP if, as she claims in her Affidavit, there was only one owner.

34.     On July 11, 2016, Ms. Loving sent a different email to me while I was physically located in Colorado, stating that there had been substantial recent museum and private collector acquisitions in the past year, and as a result, the price of Mr. Garde's art increased and would continue to increase.  *See* Email dated July 11, 2016, attached as Exhibit 6.

35.     Given the timing of the email, the acquisitions of Mr. Garde's artworks Ms. Loving described would have occurred, if they occurred at all, at least in substantial part during a time period when she had the exclusive contract to sell those artworks, during 2016.

---

[2] The exact spelling of the additional partner is unknown to me at this time.

36.    However, her 2016 Federal Tax Returns show that AP had gross revenue of $48,502.00 in 2016.  Of that amount, $45,120.00 is reflected by my initial purchase of Mr. Garde's artworks.  Therefore, over 93% of AP's revenue for the 2016 tax year came only from my purchase.

37.    It is unclear why the recent museum and private collector acquisitions described in Ms. Loving's email of July 11, 2016, which could only occur through her, were not on her tax returns, or why acquisitions of barely more than $3,000.00 in value would be significant enough to impact the market price of Mr. Garde's artworks.

38.    Contrary to Loving affidavit, the $45,120.00 that reflected 93% of AP's total 2016 revenue was paid on August 2, 2016, not July 29th, 2016, and was paid via a wire transfer initiated and executed from Colorado from a financial institution which is physically located in the state of Colorado, and from an account that my wife, Brande, was not a signatory on.

39.    I placed significant reliance on Ms. Loving's statement that there were other recent and significant private investor and museum acquisitions in deciding to make the first purchase when I did.  *See* Ex. B to Defs.' Mot. to Dismiss, ECF Doc. No 11-3, p. 3, line 1(c).

40.    On July 24, 2016, Ms. Loving sent me an email, wherein she confirmed (1) my decision to purchase certain items of Mr. Garde's artworks, (2) that there would be no sales tax since the items were being shipped from New York to Colorado, and (3) that AP would cover the cost for the shipping, stating as follows:

> Hi Brande and Wally,
>
> I hope you all had a great weekend.  We are really looking forward to your visit in late August. Let Dave or I know what days works best for your NYC trip.  We should have all the kids back in school for fall semester at their colleges and we will be in a good place to mix some pleasure and business!

> I am awaiting a final quote from our shipper with possible times for crating and shipping. As a courtesy, we are happy to handle the shipping costs for these paintings. Regarding sales tax, I believe you are exempt from sales tax as we are shipping out of state. I have attached a preliminary invoice as I am awaiting confirmation from our accountant. Once I have these last few details in place we can proceed with final invoice, payment, and a date for the shipping.

*See* Email dated July 24, 2016, attached as <u>Exhibit 7</u>.

41.     On August 2, 2016, while I was physically located in Colorado, I contacted my bookkeeper, who was also located in Colorado, initiate a wire from a Colorado bank to Ms. Loving and AP, in the amount of $45,120.00. *See* Wire Transfer Receipt dated August 2, 2016, attached as <u>Exhibit 8</u>.  This was, according to the S41 Affidavit, the same time period when Ms. Loving had a contract with S41 and Mr. Garde.

42.     On August 10, 2016, while I was physically located in Colorado, Ms. Loving emailed me confirming my purchase.  She also stated that she had discussed my art purchase with Mr. Garde.  *See* Email dated August 10, 2016, attached at <u>Exhibit 9</u>.

43.     Contrary to the Loving Affidavit, Ms. Loving and Mr. Hinkelman solicited me to make a second purchase of art from AP on several occasions in person in Colorado on their subsequent visits to my home or office.

44.     Nancy's visit to my home in the winter of 2016 was for the intended purpose of her viewing my homes layout and wall space so that she could suggest additional pieces for me to purchase.

45.     She followed this visit up with an email on December 12, 2016, in which she offered to lower the price of a painting she suggested I buy while in my home, in an attempt to

induce me to purchase it. I later purchased this painting as part of my second purchase. *See* Email dated December 12, 2016, attached as Exhibit 11.

46.     Contrary to the Loving Affidavit, the primary purpose of my trip to Connecticut in July of 2017 was for several days of business meetings with Mr. Hinkelman and Mr. Gravelle that were unrelated to AP.  After those meetings, Mr. Hinkelman and I would go to his house to hang out.  Ms. Loving showed me various artworks while I was there.  However, also contrary to the Loving Affidavit, selections and terms of my second purchase were not made at this time nor in Connecticut. The selections and terms of my second purchase were finalized, negotiated and paid for at a later date while I was physically located in Colorado and as a result of correspondence and solicitations directed at me by both Ms. Loving and Mr. Hinkelman while I was physically located in Colorado.

47.     Contrary to the Loving affidavit, I did not make selections of the artwork I purchased except when I was physically located in the state of Colorado.  Also Contrary to the Loving Affidavit, the artworks that I purchased in my second purchase were paid for by two wires and a check.  The wires, like the first wire in 2016, were initiated from Colorado.

48.     The check was picked up by Mr. Hinkelman, in person, from my home in Boulder County, Colorado, while both Mr. Hinkelman and myself were physically located in this state.  A text message confirming Mr. Hinkelman's arrival at my home on September 22, 2016, to pick up the check is attached hereto as Exhibit 10.  The check he picked up, in person, is the same check attached as Exhibit C to Defendants' Response to Order to Show Cause, at page 2.

49.     From the date of my initial purchase of the art, through to the second purchase, and until the commencement of this civil action, I have communicated with Ms. Loving, Mr.

Hinkelman, and AP/AS, through those individuals, while I was physically located in the state of Colorado.

50.     Ms. Loving and Mr. Hinkelman travelled to Colorado for the purpose of soliciting me to purchase artworks, to discuss the terms and pricing for such purchases, to review my selections, and/or to receive payment for the art approximately seven different times. During those visits to Colorado, I met with Ms. Loving and/or Mr. Hinkelman for these purposes.

51.     I have attempted to obtain my artworks from Ms. Loving repeatedly.  The art was never shipped because Ms. Loving claimed she was sending the artworks to galleries or museums, next because Ms. Loving convinced me to let her hold the artworks and try to sell it for a profit, and finally because she attempted to extract additional concessions from me contrary to our actual agreement.

52.     Indeed, in one email Ms. Loving attempted to force me to sign a contract that was directly contrary to our actual agreement, which included an "as-is" clause for artworks that I would not have an opportunity to inspect and which further shows Ms. Loving purporting to contract on behalf of S41.  *See* Email dated , attached as Exhibit 12.  Ms. Loving would later tell me that the idea to sign that contract was imposed by one of her business partners.

53.     Ms. Loving informed me that she had two business partners, Alicia and Martin St. Pierre ("Ms. St. Pierre" and "Mr. St. Pierre").  She told me the St. Pierres were aware of the terms of the first and second purchase.  Ms. Loving also told me that Mr. St. Pierre knew of each act taken by Ms. St. Pierre listed in paragraph 55, below.  Ms. Loving also told me, repeatedly, that Ms. St. Pierre comanaged the business of AP, had equal decision-making authority, and as a director of sales had to approve all sales and the related terms of those sales.

54.     Ms. Loving stated that Ms. St. Pierre, in order to show her commitment to AP, agreed to execute the lease for AP's building, where the gallery's business was conducted.  It was my understanding, based on Ms. Loving's statements, that the St. Pierre's received a substantial portion of the profits as a result of the first and second purchase.  It was also my understanding, based on Ms. Loving's statements, that the St. Pierres were investors who were both owed money by AP and who owned a percentage interest in AP.

55.     Ms. Loving attempted to change several material terms of our agreement, after I paid monies to AP.  Ms. Loving, however, often blamed Ms. St. Pierre for imposing these changes.  For example, Ms. Loving said that despite knowing it was contrary to the terms of our agreement, Ms. St. Pierre engaged in the following conduct, each of which was a violation of our agreement: (1) refused to trade back the painting Two Vessels, as previously promised, because it was more valuable than the painting me and Ms. Loving agreed I could trade, (2) would not allow AP to cover shipping costs, despite Ms. Loving's previous promise to do so, unless I agreed to pay an extra $5,000.00 I did not owe, (3) told Ms. Loving not to ship the art, unless I paid an extra $1,500.00 that I did not owe, and (4) tried to force me to sign the contract containing the "as-is" clause, which would mean I was essentially accepting any defects or damage in the art.

56.     These behaviors by Ms. St. Pierre were substantial factors in causing the art not to be shipped, despite my complete performance.  The art was retained for over a year over my objection, despite numerous requests to ship it after it was paid for in full, and the constant reneging on promises, the persistent attempts to impose new terms that were not bargained for, the holding the art hostage, and the delays in shipping the art until after this lawsuit was

commenced destroyed the emotional connection and aesthetic value of the art for me, essentially converting it into a symbol of frustration and a futility.

57.     The second purchase was a substantial sum of money, more than double the cost of the first purchase.  Ms. Loving represented to me that Garde's art was a good investment.  In order to convince me of this, and thus induce the second purchase, she represented that the St. Pierres made a substantial investment and became part owners of AP, and were fully committed to leveraging this investment to grow the market for Mr. Garde's art.  I relied upon Ms. Loving's statement regarding the St. Pierre's investment in deciding to make the second purchase.

58.     I have reviewed the Affidavit executed by Ms. St. Pierre ("ASP Affidavit") in support of her Motion to Dismiss, filed on March 9, 2020 as Document Number 77-2.  A substantial number of the factual statements made in the ASP Affidavit appear to be false and contrary to my knowledge, experience, and course of dealing with AP from the time of the first and second purchase through the present.

59.     In paragraph 11, it states that ISP makes various passive investments.  I do not have personal knowledge of the other investments that ISP makes.  However, I do have personal knowledge of the investment made by ISP into AP, and Ms. St. Pierre's role was not a passive investor, she was an active and key component of AP's daily operations.  I base this not only on my numerous conversations with Ms. Loving where she stated the same, but also on the active role she undertook with the decision-making for AP when it came to the art that I purchased as described in paragraph 55.

60.     My understanding of Ms. St. Pierre's role in AP is supported by and consistent with a number of sources that I located by searching online.  From May 17, 2019 to August 31,

2019, it appears that art I had purchased, but which was then being improperly retained by Defendants despite my full payment and longstanding requests for shipment, was placed in an exhibition at the University of Maine.  *See* Exhibit 13, When There was Another Me Catalogue, p. 23.  On page 48, the Catalogue for the exhibition states that "Nancy Loving and Aly St. Pierre, who represent Mr. Garde through their gallery in ArtSuite in Piermont, New York offered considerable time and assistance in organizing this exhibition."

61.     Attached hereto as Exhibit 14 is an article entitled "ArtSuite Creating a 21st Century Art Salon on the Hudson."  On page 4 of this article, in the first sentence of the second paragraph, it describes Ms. St. Pierre's role in ArtSuite as that of a Director.  In the fifth and sixth paragraphs, there is a description regarding Ms. St. Pierre's role, wherein she explains that she is physically present at the gallery, engaging customers and measuring foot traffic.  In the sixth paragraph, there is also a description about Ms. St. Pierre's direct role in the vision for the gallery.

62.     Attached hereto as Exhibit 15 is a notice for a grand opening event set for September 21, 2018.  The grand opening was for AS and featured Mr. Garde's art.  On the second page, Ms. St. Pierre and Ms. Loving are identified as directors of the gallery.  *See* Exhibit 15, p. 2.  Attached hereto as Exhibit 16 is the LinkedIn page for Ms. St. Pierre.  Therein, on page 1, she describes her employment as Sales Director for ArtSuite Gallery.

63.     In the ASP Affidavit, in paragraphs 12 through 20 and paragraph 28, Ms. St. Pierre denies that (1) she has every owned any share of AP, AS, or S41, (2) ever held any management positions with AP, AS, or S41, (3) ever been employed by AP, AS, or S41, (4) ever exercised any control over the business practices of AP, AS, or S41, (4) ever had any

authority with respect to AP, AS, or S41, or (5) ever instructed AP, AS, or S41 to refuse to perform any contract.

64.     Based on my review of Exhibits 13-15, it is unclear to me how these statements can be truthful.  To the extent Ms. St. Pierre's sworn statements are based upon the use of the name "Artsuite Galley" instead of ArtSuite NY ("AS") or Art Port LLC ("AP"), these names for the same exact business, for several reasons.

65.     First, Ms. Loving told me, repeatedly, that the name ArtSuite Gallery and AS were just names for the gallery that was operated through AP.  Second, the Facebook page for ArtSuite Gallery has the same address as AS, and its website is listed as www.artsuiteny.com, which is the same website that exists for AS.  *See* Facebook home page for ArtSuite Gallery, attached as Exhibit 16.  Third, in Exhibit 14, on page 3, has a picture of what is purportedly ArtSuite Gallery and the sign in front of the building says "ArtSuite New York" then says "Studio and Gallery."  Fourth, Exhibit 15, on page 2, contains an invitation for the grand opening of AS, identified at the top by the name ArtSuite New York, yet below that it is identified as "ArtSuite New York Studio & Gallery," then further below that, in the description, it is identified as "ArtSuite Gallery."  In Exhibit 17, on page 1 at the top left, it states "ArtSuite Gallery @ ArtsuiteNY," thereby using the two names interchangeably.

66.     Fifth, throughout Exhibits 13-15, Artsuite Gallery and AS engage in the same line of business of representing and selling Mr. Garde's art, have the same address, have the same contact information, and have the same directors—Ms. Loving and Ms. St. Pierre.  I have reviewed the New York Secretary of State's publicly-available website and conducted a business search.  Through that search, I discovered that there is no entity or trade name under ArtSuite, Art Suite, ArtSuite Gallery, ArtSuite New York, Art Suite Gallery, Art Suite New

York, ArtSuite NY, or Art Suite New York.  I did, however, locate a listing for Art Port LLC, which is an entity incorporated under the laws of New York.

67.     Paragraph 25 of ASP Affidavit states "I do not personally have any business relationship with Ms. Loving."  This statement is false, in light of Ms. Loving's statements to me that she did in fact have a business relationship with Ms. St. Pierre through their mutual work with respect to AP as previously described herein.

68.     I have reviewed a document disclosed by Ms. Loving, entitled "Limited Membership Investment Agreement," (the "AP Investment Agreement") dated January 31, 2014, which is located at Loving 586-591, and is attached hereto as <u>Exhibit 18</u>.  I have also reviewed another document disclosed by Ms. Loving, entitled "Transfer of Equity Interest Agreement," dated August 2, 2018, (the "AP Equity Agreement") which is located at Loving 549-550, and is attached hereto as <u>Exhibit 19</u>.

69.     The AP Investment Agreement provides that ISP Holdings, Inc., is making a total investment of $500,000.00 into AP.  Ms. Loving previously informed me that ISP is co-owned by Martin and Alicia St. Pierre.  In exchange for this investment, it appears under Section C that ISP will receive repayment of its $500,000.00, plus an ownership interest of 17% of in those portions of AP's profits that arise from its sale of Mr. Garde's art.  The AP Equity Agreement appears to relate to Mr. Hinkelman's departure from AP, and provides that "an investor" owns 17% of AP as a whole, not just limited to AP's profits from the sale of Mr. Garde's art.

70.     I have reviewed the Motion to Dismiss filed by the St. Pierres, wherein they accuse me of having "buyer's remorse," rather than a legitimate claim for relief.  This statement is contradicted by numerous written communications where I attempted to resolve my dispute

with the Defendants, including multiple offers to waive rights I would have otherwise had.  If I truly just had buyer's remorse, rather than being an individual who paid $186,000.00 for a good that I never received for over a year until after I filed this lawsuit, then it makes no sense why I would have tried so many times to attempt a non-litigated resolution.  One of the communications demonstrating my efforts is attached as Exhibit 20, and is located at Loving 188.

Signed and verified under penalty of perjury this 14th day of April, 2020

By: _____
          Walter Charnoff