# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-2381-MEH-REB

WALTER CHARNOFF

       Plaintiff,

v.

NANCY LOVING d/b/a ARTSUITE NY, et al.

       Defendants.

_____

## PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS NANCY LOVING, ARTPORT, LLC, STUDIO 41 LLC, AND DAVID HINKELMAN AND REQUEST FOR EVIDENTIARY HEARING
_____

       Plaintiff, Walter Charnoff, ("Mr. Charnoff" or "Plaintiff") by and through his undersigned counsel, The Law Office of Ian T. Hicks, LLC, hereby respectfully files his Motion, as follows:

       Certificate of Conferral: Plaintiff conferred with counsel for Defendants on numerous occasions and yesterday in writing. She previously opposed the relief sought, and responded today to the most recent conferral, and did not consent to the relief sought herein. It is thus presumed opposed. Her response also continues to contain material misrepresentations and omissions, and the continuing harm to Plaintiff requires that the Motion be filed now.[1]

_____

[1] Ms. Getches conferral response is attached as Exhibit_1. It continues to omit her deeply involved representation of Plaintiff with respect to the facts leading up to the Ladd Litigation, and the management of RentRange, REI, and OnIt, as described below. It likewise states that she does not recall the details of how the Taylor Litigation was settled, even though she drafted the settlement agreement and had a call with Plaintiff expressing shock that he contacted Mr. Taylor directly and obtained a favorable resolution given the dissatisfaction with Ms. Getches' prior representation.

# I. INTRODUCTION

Plaintiff respectfully requests the Court enter an order disqualifying counsel for Defendants Nancy Loving ("Ms. Loving"), Art Port, LLC, ("AP"), Studio 41, LLC ("S41"), and David Hinkelman ("Mr. Hinkelman"), Liza Getches ("Ms. Getches") directly and her law firm, Shoemaker, Ghiselli, and Schwartz, LLC ("SGS") through the rule of imputed disqualification under Colorado Rule of Professional Conduct 1.10. Plaintiff further requests that the Court hold an evidentiary hearing regarding the merits of the instant Motion.[2]

This Court has the power to ensure the fairness of proceedings before it, preserve the respectability of the legal profession, and prevent the appearance of impropriety that erodes public confidence in the judicial process. Here, each of these interests necessitate the remedy of disqualification, which is sought on two grounds: (1) Ms. Getches has used attorney-client privileged information, work-product privileged information, and confidential information obtained during her representation of Plaintiff in two prior actions, for Defendants' benefit in this action, and for a potential claim by Mr. Hinkelman in a future action and (2) Ms. Getches is representing two Defendants, Ms. Loving and AP, who are presently being sued by S41, over the same monies paid by Plaintiff, and S41 is alleged to be vicariously liable for AP and Ms. Loving.

The specific facts establish violations of Ms. Getches' fiduciary duty of loyalty under Colorado common law and C.R.P.C. 1.9(c)(1)-(2), 1.9(a), and 1.7(a)(1)-(2). There are two prior representations of Plaintiff by Ms. Getches relevant to this Motion.

_First_, Ms. Getches previously acted as lead counsel for Plaintiff in a civil action, where he was the Defendant, brought by an individual named Eric Taylor ("Mr. Taylor") (the "Taylor

---

[2] Concurrently herewith, Plaintiff is filing a Motion to Stay this action until the substantial questions raised by the instant Motion are resolved by the Court.

Action"), for nearly six months from its filing to its ultimate settlement.[3]  In the Taylor Action,

Mr. Taylor alleged that he was the former President of Plaintiff's company, RentRange, LLC

("RentRange"), that he was entitled to a performance bonus allegedly promised by Plaintiff, of a

laptop with RentRange proprietary information, and that Plaintiff made defamatory statements

about Mr. Taylor.  The Taylor Litigation was resolved favorably to Plaintiff through a

confidential settlement reflected by a settlement agreement drafted by Ms. Getches.

_Second_, Ms. Getches also represented Plaintiff personally and his companies RentRange,

Onit Solutions LLC ("OnIt"), REIsmart, LLC ("REI"), with respect to the formation,

management, and sale of certain assets and intellectual property between those entities.  In fact,

Ms. Getches' firm at the time, Moye White LLP ("MW"), drafted an opinion letter stating that the

transfer of the intellectual property between those entities was lawful.  Ms. Getches herself

reviewed various demand letters sent by disgruntled an investor in Plaintiffs' entities, and advised

that the threats of litigation by that investor were without merit.  Subsequently, that investor, Bob

Ladd ("Mr. Ladd") through his entity Ladd 2000 Partners Ltd. ("Ladd Partners"), commenced

litigation against Plaintiff, OnIt, REI, RentRange and others for the very same conduct that Ms.

Getches and MW had opined was lawful (the "Ladd Litigation").[4]  The Ladd Litigation lasted

three years, and cost Plaintiff significant attorneys' fees and costs.  While it was later settled and

the judgment was declared void _ab initio_, Plaintiff suffered significant damages.

---

[3]  The Taylor Action was filed in U.S. District Court for the District of Colorado and assigned case number 1:14-cv-01251-REB-MJW.
[4]  The Ladd Litigation was filed in Denver District Court and assigned case number 2015 CV 033785.  Ms. Getches and MW did not represent Plaintiff in the Ladd Litigation because MW claimed it had recently paid a large malpractice judgment and could not take on the potential liability.

In both the Taylor and Ladd Litigation, Ms. Getches and Plaintiff spent several hours discussing legal strategy, Plaintiff's strengths and weaknesses as a witness, and all of his prior cases, from traffic tickets to business arbitrations, the details of some of which are not public record. Ms. Getches explained to Plaintiff that she was doing this to investigate whether Plaintiff's credibility could be attacked by virtue of those prior cases.

During Plaintiff's recent deposition, however, Ms. Getches repeatedly asked Plaintiff questions about the very same confidential matters that were the subject of her prior attorney-client relationship with Plaintiff. This questioning brazenly sought to expose privileged and confidential information. For example and without limitation, Ms. Getches asked Plaintiff about the specifics of the confidential settlement in the Taylor Litigation, which resulted in Plaintiff mistakenly divulging a privileged communication with Ms. Getches.[5]

Moreover, Ms. Getches asked Plaintiff about the content and merits of the Taylor and Ladd Litigation, in a transparent attempt to use the allegations in those cases to paint Plaintiff in negative light, as if the allegations were somehow true. Yet, when she represented Plaintiff in those cases, she advised him that they were meritless, that Plaintiff had done nothing wrong, and that they would be resolved in his favor. Simply stated, Ms. Getches gave Plaintiff legal advice in two prior actions, Plaintiff followed it, and yet in this action she is attempting to use Plaintiff's actions in following that advice against him. That is the height of disloyalty.

Ms. Getches also asked questions about Plaintiff's management of RentRange leading up to the Ladd Litigation, which had no apparent purpose other than to obtain discovery for a future

---

[5] This line of questioning regarding prior traffic tickets and civil actions can hardly be viewed as being reasonably calculated to lead to admissible evidence, given that it sought propensity evidence that is plainly inadmissible under Fed. R. Evid. 404(b).

case by Mr. Hinkelman, who has stated in writing his intent to sue Plaintiff.[6]  Mr. Hinkelman was an investor and officer of RentRange, and Ms. Getches is barred from assisting him in obtaining discovery to harm her former clients, Plaintiff and RentRange.  And although the Taylor Litigation, Ladd Litigation, and this civil action involve different parties opposing the Plaintiff, Defendants' defense strategy, in part, <u>is substantially related to this action</u>, because it is apparent that they intend to utilize Plaintiff's alleged mismanagement of RentRange as a means to demonstrate that Plaintiff lacks credibility, is overly litigious, and seeks to avoid paying legitimate obligations.

What is most unsettling, however, is the dishonesty exhibited by Ms. Getches when confronted with these issues.  When the undersigned raised the issue of her prior representation of the Plaintiff, she denied having ever represented him.  When a copy of the docket showing she was lead counsel for Plaintiff in the Taylor Litigation was sent to her, she claimed she forgot but then said any conflict was not an issue that Plaintiff had standing to raise.  Just a few weeks later, at Plaintiff's deposition, she yet again denied even knowing him, until the Magistrate Judge asked her, at which time she stated that her memory had been "refreshed."

Furthermore, several times during this litigation, Ms. Getches has engaged in conduct that seemingly had no connection to the claims or defenses, and served only to trigger Plaintiff's unique sensitivities she learned during her representation of him, to unnecessarily listing his assets in a public filing, to rolling her eyes and pointing her pen at Plaintiff during questioning.  It is equally concerning that Defendants may have hired Ms. Getches precisely because she formerly represented Plaintiff, indicating an intent to use confidential knowledge to bolster their defense.

---

[6] Defendants did not timely disclose the emails reflecting Mr. Hinkelman's intent to sue Plaintiff with respect to his management of RentRange until after multiple conferrals, approximately six months after they should have been originally disclosed.

Against this backdrop, Plaintiff is also concerned about that the continued representation of adverse parties, S41 and the remaining Defendants, over the same monies at issue in this case. Direct harm also results to Plaintiff because certain discovery has been withheld, and there is a palpable risk that withholding is a consequence of the fact that it would benefit S41's claims against the Defendants. This is in addition to the difficulty inherent in representing both an agent and the principle in a case involving allegations of vicarious liability.[7] Plaintiff therefore respectfully requests the Court hold an evidentiary hearing, disqualify Ms. Getches and her firm, and grant such other relief as it deems proper.

## II. STATEMENT OF MATERIAL FACTS

1. On May 1, 2014, Mr. Taylor commenced the Taylor Litigation by filing a Complaint against Plaintiff personally and his company RentRange. Civil Docket for Case No. 1:14-cv-01251-REB-MJW, U.S. Dist. Court for Colorado, attached as Exhibit 2. The Complaint asserted claims for breach of contract against RentRange, and claims for defamation, tortious interference, battery, and assault against Plaintiff personally. Compl., Docket Entry 1, Case No. 1:14-cv-01251-REB-MJW. Mr. Taylor had been President of RentRange, and Plaintiff was its Chief Executive Officer and Managing Member. *Id.,* ¶¶ 13-14.

2. Ms. Getches was identified and acted as "lead attorney" in the Taylor Litigation, from its initial filing through its dismissal. Ex. 2, Docket Entry No. 12 and 31. RentRange and

---

[7] One defense available to a principal under these circumstances, legally and factually, is to assert that the agent was acting outside their actual or apparent authority, without knowledge of the principal. Even where such a defense does not vitiate vicarious liability, it can certainly be a factor legitimately considered by a jury when assessing damages where joint and several liability is not proven under C.R.S. § 13-21-111.5. A jury could find that although vicarious liability has been proven, in the absence of joint and several liability, it could assess less damages to the principal on the grounds the principal is not as culpable as an agent who was acting without authority. Thus, a principal may often wish to blame the agent for the agent's wrongful acts, which naturally creates a conflict of interest for an attorney attempting to represent both.

Plaintiff filed an Answer and Counterclaim, denying the material allegations of the Complaint and asserting counterclaims for breach of contract and breach of fiduciary duty. Answer and Counterclaim, Docket Entry 14, Case No. 1:14-cv-01251-REB-MJW. Plaintiff alleged in support of the counterclaims that Mr. Taylor stole corporate opportunities to enrich himself and misappropriated intellectual property owned by RentRange. *Id.*

3.      During her representation of both Plaintiff and RentRange in the Taylor Litigation, Ms. Getches had several meetings, phone calls, and emails with Plaintiff. Decl. of Walter Charnoff, attached as Exhibit 3, ¶¶ 1-3. During these communications, Ms. Getches learned a broad array of facts regarding Plaintiff's management of RentRange, its corporate structure, its line of business, and its activities in the marketplace. *Id.,* ¶¶ 3-6. Ms. Getches would become even more involved in advising Plaintiff and RentRange as their primary counsel over the next several years, in both litigation and transactional matters. *Id., ¶¶* 3-12.

4.      More importantly, as a consequence of her representation of Plaintiff in the Taylor Litigation, Ms. Getches requested and received a wealth of privileged and confidential information concerning Plaintiff's unique personal characteristics, including but not limited to his strengths and weaknesses as a witness, and the circumstances likely to cause him stress, annoyance, and frustration. *Id.,* ¶¶ 3-6.

5.      For example and without limitation, Plaintiff informed Ms. Getches that he is uniquely private regarding his business, financial, and personal affairs, he is highly protective of his wife and family and seeks to distance them from his business dealings, that his employment as an investor, manager, and entrepreneur for start-up companies requires that he maintain a public profile of someone who is emotionally stable, law-abiding, and trustworthy, and that he has a strong disdain for being pointed at. *Id.,* ¶ 5.

6.     Ms. Getches also requested and was provided confidential and privileged information regarding the underlying facts and outcomes of various traffic tickets, business dealings, civil cases, and an arbitration. *Id.,* ¶ 6. Ms. Getches requested and received this information because, as she informed Plaintiff, some attorneys will attempt to use a litigant's prior involvement with the courts to attack their character. *Id.,* ¶ 6. As instructed, Plaintiff provided Ms. Getches with the facts, circumstances, and outcomes of various traffic tickets, civil cases, business dealings, which were not public record and not discernable from any public record. *Id.*

7.     With respect to each of these prior matters, Plaintiff was consulted and advised by Ms. Getches that none of them had any relevance to Plaintiff's character, none of them had any merit, and there would be no basis for Mr. Taylor's counsel to attempt to use them for any purpose in the Taylor Litigation. *Id.,* ¶ 7. Ms. Getches advised Plaintiff that the Taylor Litigation was frivolous. Ultimately, the Taylor Litigation was resolved through a confidential settlement whereby Plaintiff received approximately $1 million dollars in returned stock, and dismissal of the parties' claims with prejudice. *Id.,* ¶¶ 7-8.

8.     Plaintiff asked Ms. Getches whether he should seek attorneys' fees or stock in the settlement, and Ms. Getches expressly informed him that it would be better to accept stock, for a variety of reasons. *Id.* Plaintiff accepted Ms. Getches' legal advice, and she drafted the settlement agreement, which included a written promise to keep its terms confidential, absent limited exceptions not applicable to Ms. Getches' representation of Defendants here. *Id.*

9.     Ms. Getches, while employed by MW, also provided advice and guidance on the formation, management, and sale of certain assets between OnIt, REI, and RentRange. *Id.,* ¶¶ 9-11. One of the specific areas of advice and guidance was with respect to whether OnIt had title to certain intellectual property that was initially known as Investorloft, and could therefore license

Investorloft, under the name Investability, to REI. *Id.* Ms. Getches, in association with another attorney at MW, drafted a detailed opinion letter advising that OnIt had clear title to Investorloft, and therefore could license it to REI, and that RentRange could transfer the name Investability to REI, on Plaintiff's personal behalf, lawfully and in compliance with the various entities' and Plaintiff's legal obligations. *Id.*

10.     Moreover, when Plaintiff received a litigation demand letter from Mr. Ladd and Ladd Partners, alleging that the very conduct advised by Ms. Getches and MW as being lawful was in fact a violation of a variety of statutory and common-law duties owned by Plaintiff, OnIt, REI, and RentRange, Ms. Getches advised Plaintiff that the demand letter was meritless and no action was required. *Id.,* ¶ 11. Yet, Ladd Partners filed suit in Denver District Court, based on the same allegations in the demand letter. *Id.,* ¶ 12.

11.     Those claims survived a motion to dismiss and summary judgment, and initially resulted in an adverse jury verdict. *Id.* Ultimately, the Ladd Litigation lasted three years, and cost Plaintiff significant attorneys' fees and costs, and was ultimately resolved through a confidential settlement, which resulted in the claims against Plaintiff being dismissed with prejudice and declared void *ab initio* by the trial court, and reflected by a settlement agreement. *Id.* Plaintiff has received advice from an attorney other than the undersigned that the legal advice given by Ms. Getches and MW was negligent. *Id.,* ¶ 12.

12.     The undersigned transmitted written communications to Ms. Getches expressing concern regarding her prior representation Plaintiff and his former companies and the potential for conflict of interest. Emails between Ian Hicks and Liza Getches dated Aug. 16-17, 2020, attached as <u>Exhibit 4</u>. In response, Ms. Getches misrepresented to the undersigned—and by extension, Plaintiff, her former client—and variously stated that she doesn't remember meeting Plaintiff,

Dep. Tr. of Plaintiff, 9:22-25 attached as Exhibit 5, that she only represented Plaintiff's company, not him personally, Ex. 4, or that even if there were a conflict, Plaintiff lacked standing to raise the issue, Email from Liza Getches dated Aug. 17, 2020, attached as Exhibit 6. Although it was not the undersigned's responsibility to conduct a conflicts check for Ms. Getches, a copy of the docket identifying her as lead counsel in the Taylor Litigation was transmitted to her by email, only a few weeks prior to Plaintiff's deposition. Ex. 4.

13.     Yet, rather than tread carefully, she has instead brazenly weaponized the privileged and confidential information she obtained during her prior representations of Plaintiff and his companies for the benefit of the Defendants in this action, and for the benefit of a potential claim by Mr. Hinkelman in a future action arising out of Plaintiff's management of RentRange.

14.     Defendants also listed Plaintiff's wife, Brande Charnoff, as a party with knowledge of the facts supporting the parties claims or defenses. However, Ms. Getches never sought to take her deposition, until she did so in response to the undersigned sent an email to counsel for S41, explaining that settlement discussions were being made more difficult because of the repeated failures to disclose by Ms. Getches, Ms. Loving, Art Port LLC ("AP"), and Mr. Hinkelman. Emails dated Aug. 4, 2020 attached as Exhibit 7. This first request for Mrs. Charnoff's deposition was made long after the original discovery cutoff, which was initially set for June 14, 2020.

15.     Even at the outset of the case, in response to the Court's Order to Show Cause regarding the failure of Defendants to demonstrate the existence of diversity jurisdiction under 28 U.S.C. § 1332, Ms. Getches conducted a background check of the Plaintiff and Mrs. Charnoff, and publicly filed the contents with the Court. Defs.' Resp. to Order to Show Cause, Docket Entry 12. Mrs. Charnoff is not a party to this action and thus her domicile was irrelevant to the

question of diversity jurisdiction. Yet, Ms. Getches filed documents showing Mrs. Charnoff's political affiliation, her addresses, her assets, and the vehicles she drives. *Id.*

16. Ms. Getches also filed documents reflecting Plaintiff's political affiliation, his addresses, his companies, his assets, and the vehicles he drives. *Id.* To prove the Defendants' domicile, Ms. Getches submitted a smattering of bills and an Affidavit from Ms. Loving, neither of which revealed nearly the same level of personal and financial information as that submitted to prove the domicile of Mrs. Charnoff, a non-party, or Plaintiff. *Id.* Importantly, the same information submitted by Ms. Getches as to Plaintiff and Mrs. Charnoff was confidential information she would have learned in the attorney-client relationship previously and was not publicly known.

17. What is most inappropriate, however, is the fact that during Plaintiff's recent deposition, Ms. Getches repeatedly questioned Plaintiff regarding the very same subjects, facts, communications, and issues as those involved in her prior representations of Plaintiff and his companies. She began by asking him about every case, including traffic tickets, he has had any involvement with, no matter how trivial, since the year 2006:

> Q. And you've been involved in lawsuits
> pretty much every year since 2006, correct?
> A. Not correct.
> Q. Okay. Have you had some kind of lawsuit
> or traffic appearance almost every year since 2006?
> A. No.
> MR. HICKS: Object to the form.
> Q. (BY MS. GETCHES) Okay. Do you recall a
> case in 2006 for failure to appear which was the
> result out of not wearing a seat belt?
> A. I don't recall that case, but -- what
> state was that case in?
> Q. Colorado.
> A. No. I do not recall that case.

Q. Okay. Have you been involved in cases in
other states?
A. I got a ticket in Utah once.
Q. Do you recall a case in 2007 filed by
Mr. Matthews with respect to a self-directed IRA ?
A. Yes.
Q. Do you recall what he was alleging in
that lawsuit?
A. No.
Q. Do you recall that you failed to appear
for that as well?
A. No.
Q. Do you recall a case in 2006, the
Arapahoe Dental Clinic sued you for failure to pay?
A. No.
Q. Do you recall a case filed by Mr. Buckles
that alleged you misrepresented the value of
InvestorDigs?
A. I recall a lawsuit with Mr. Buckles, yes.
Q. And he alleged that you loaned -- that
there was a loan of $450,000 that you did not pay ?
A. All I really care to discuss about that
case is that it was -- I won on summary judgment and
all of the -- the vast majority of his claims were
dismissed with prejudice.
Q. And you claim that the value of the
company was $10 million, and he alleged you
misrepresented that?
A. So all I recall about that case is that I
won on summary judgment and all claims were dismissed
with prejudice.

Ex. 5, 7:1-8:20.  Plaintiff had already communicated with Ms. Getches regarding these matters,
and was advised by her they had no relevance to his credibility, character, or any civil case when
she previously represented him in the Taylor Litigation.  Ex. 3, ¶¶ 3-7.

18.    Next, Ms. Getches asked Plaintiff about the details of the Taylor Litigation, for
which she was lead counsel, and, most disturbingly, denied even knowing Plaintiff:

Q. (BY MS. GETCHES) Do you recall a case in
2014 where a Mr. Taylor alleged that you assaulted him
in the hotel lobby over a laptop?
A. You should remember that case also
because you represented me on that case.
Q. Sorry. No offense, but I don't really
remember that lawsuit . So I was wondering if you
remember that.
A. You don't remember the lawsuit that you
were sitting in first chair on?
**Q. Sorry to offend you, but I don't remember**
**meeting you. I remember representing a company.**
. . .
Q. (BY MS. GETCHES) Mr. Charnoff, I'm
asking you to answer --
A. Ms. Getches, you're surprised that I
didn't remember the details of a lawsuit that I won
very quickly ten years ago but a lawsuit that only
ended four years ago that you represented me, you sat
in first chair, you gave me all the insight, I spent
several hours with you, and you did not represent just
my company; you represented me personally first and
then you represented my company on behalf of me --
Q. I'm asking you what the outcome of the
lawsuit was, because I don't know that I --
A. The lawsuit was also dismissed with
prejudice.
Q. Okay.
A. You knew that there was no -- you were
the one who said, quote/unquote, "There's absolutely
no merit to this lawsuit at all. We should be able to
get legal fees for filing" -- I think you used the
words "frivolous" or something with a "v."

Ex. 5, 9:14-10:23 (emphasis added).  Ms. Getches then asked Plaintiff about the confidential

terms of the settlement agreement and whether he got attorneys' fees in the settlement, which she

knew would be likely to elicit confidential information as well as privileged communications she

had with Plaintiff advising him to take stock and not fees in the settlement, a risk that came to

fruition when in response, Plaintiff did both:

> Q. Did you get legal fees?
> A. Part of the settlement with him was he
> paid me all of his stock back in that company so we
> didn't need to go after legal fees, because we settled
> for more than what our legal fees would have been .
> And at your advice we agreed --

*Id.,* 10:24-11:4.

19.     Plaintiff, to his credit, notified Ms. Getches that her inquiries into prior cases and

the substance of the Taylor Litigation raised issues that were subject to the attorney-client

privilege, and despite this notification, Ms. Getches continued:

> A. Did you do a conflict check before you
> agreed to represent Ms. Loving, because --
> Q. (BY MS. GETCHES) Mr. Charnoff, you don't
> get to ask the questions here. You may answer.
> A. **I want to point out on the record is that**
> **a lot of information that you have asked me about ,**
> **about prior lawsuits and such, were items that I**
> **discussed with you under attorney-client privilege**
> **while you represented me. Because one of the things**
> **you asked me about was had I been involved in any**
> **lawsuits before, because you said one of the tactics**
> **lesser attorneys used, which I'm surprised you're**
> **using those tactics,** is to try and paint an ugly
> picture of a plaintiff by showing that he was involved
> in speeding tickets and other lawsuits and things like
> that to try and insult his character.
> **So you and I had several discussions in**
> **your office while I was under attorney-client**
> **privilege about each of the cases I had been involved**
> **with up until that point.** So I'm really surprised
> that you would ask me about those and actually a
> little bit offended.
> Q. Were you involved in a case where Bob

Ladd sued you?
A. Yes.

*Id.,* 11:17-12:16 (Emphasis added).

20.     Ms. Getches then proceeded to question Plaintiff regarding the Ladd Litigation,

and asked pejoratively about the outcome of that case, when in fact she was the one that gave the

legal advice that was a cause of it being filed:

Q. Were you involved in a case where Bob
Ladd sued you?
A. Yes.
Q. And you lost pretty bad at trial,
correct?

*Id.,* 12:14-18.  Using this foothold, Ms. Getches, through her questioning, made clear that she was

asking her former client about the same cases she had previously said were either irrelevant or

meritless during their privileged attorney-client communications in order to paint him in a

negative light, as if he is overly-litigious, or somehow lacking in character, because of the number

of cases he has been involved in:

Q. How many total lawsuits have you been a
defendant?
MR. HICKS: Object to form.
A. I don't know.
Q. (BY MS. GETCHES) Too many to remember?

*Id.,* 14:8-12.

21.     Yet again, Ms. Getches asked question to her former client regarding the substance

of her prior representation of him and his companies, by making deep inquiry into the facts and

circumstances that led to the Ladd Litigation—the very same facts and circumstances for which

she and MW had provided legal advice.  When Plaintiff mentioned his apprehension with respect

to such testimony due to the existence of a broad confidentiality agreement, Ms. Getches yet again

attempted to ask questions that put her former client at risk of violating a confidentiality

agreement in a matter where she formerly represented Plaintiff:

> Q. Tell me what the Ladd lawsuit was about.
> A. I'm not willing to answer that question
> Q. I'm afraid you don't have a choice.
> MR. HICKS: Liza, there's a
> confidentiality agreement. And anything that's not
> public record, he can't really talk about. So don't
> ask about the content of legal --
> MS. GETCHES: Ian, it's public record
> what the lawsuit was about. I'm not asking about the
> settlement agreement.
> Q. (BY MS. GETCHES) What was the lawsuit
> about, Mr. Charnoff?

*Id.,* 14:22-15:8.  When the undersigned requested a few minutes to go off the record and review

the language of that agreement to ensure the questions would not elicit answers that constituted a

violation, rather than take a few minutes for her former client to whom she owed a continuing

fiduciary duty, Ms. Getches refused.  *Id.,* 17:7-19:18.

22.     Over the next several minutes, Ms. Getches yet again proceeded to ask Plaintiff

questions about the structure and management of his various companies, who were her clients in

the past while at MW, regarding matters within the scope of their attorney-client relationship.  *Id.,*

21:6-24:15.  This included questions regarding whether Plaintiff had ever been accused of

misrepresentation by one of the parties to the Ladd Litigation, which was not a matter and remains

not a matter of public record.  *Id.,* 24:20-22.  Ms. Getches also asked Plaintiff about whether he

had instructed investors in his companies to set aside legal reserves related to the Ladd Litigation.

*Id.,* 45:12-46:11.

23.     These questions have no connection to the claims and defenses in this case, and

appear to have been propounded to facilitate the discovery of facts to support a potential claim

that Mr. Hinkelman believes he has against Mr. Charnoff. This potential claim is reflected in an email from Mr. Hinkelman to Ms. Loving, wherein he states that he is going to sue Plaintiff in connection with the Ladd Litigation. Email dated May 7, 2019, attached as <u>Exhibit 8</u>. It is also reflected in Mr. Hinkelman's deposition testimony, wherein he stated that Plaintiff allegedly committed a misrepresentation leading up the Ladd Litigation, which caused Mr. Hinkelman, an investor and former director of business development, to suffer monetary damage. Dep. Tr. of David Hinkelman, 137:14-144:19, attached as <u>Exhibit 9</u>. Mr. Hinkelman was an investor and shareholder in RentRange, and thus Ms. Getches was asking Plaintiff questions about the very same matters she previously represented Plaintiff on, to benefit a former shareholder of RentRange in a potential future claim. The conflicts of interest here abound.

24.     In their lengthy discussions during the course of Ms. Getches' representation of Plaintiff and his companies, he informed Ms. Getches that two types of behavior by lawyers made it significantly more difficult for him to focus. <u>Ex. 3</u>, ¶ 5. This includes eye-rolling or sarcasm, and being pointed at, either with a finger or an object. *Id.*. Ms. Getches repeatedly engaged in these behaviors during the course of Plaintiff's deposition. <u>Ex. 5</u>, 16:14-16:20, 23:2-23:5.

25.     Plaintiff, as previously listed, also informed Ms. Getches during their many attorney-client privileged discussions that another unique characteristic of his personality was that he was extremely private about his financial affairs, because he grew up poor and it made him extremely uncomfortable to discuss such matters. <u>Ex. 3</u>, ¶ 5. Yet again, Ms. Getches took this privileged information and used it against Plaintiff, by spending substantial time at his deposition on specific questions regarding the types of watches he owned, the types of cars he owned, how much he paid for those items, and his assets in general. <u>Ex. 3</u>, 259:23-260:8.

26.     Prior to asking about the Ladd Litigation in depth, Ms. Getches requested a hearing with Judge Hegarty.  In that hearing, she falsely stated that she had forgotten that she represented Plaintiff, but by virtue of his testimony, her memory had—that day during the deposition itself—been "refreshed," which was a false statement.

27.     Ms. Getches also failed to disclose that one of her clients, S41, is currently suing another of her clients, AP, in Florida, and that the allegations relate to the same art and monies that are at issue in this litigation.  Compl., attached as Exhibit 10.  Ms. Getches also failed to disclose that AP had been terminated as the agent for the sale and representation of S41, which renders her disclosures and discovery responses false or materially misleading.  Amended Responses to Written Discovery, attached as Exhibit 11, Resp. to Non-Pattern Interr. 7.

28.     In their written discovery and AP's deposition under Fed. R. Civ. P. 30(b)(6), Defendants asserted that there are no email, text, or written communications between S41, Harold Garde, and any of the other Defendants and that no such communications were ever made.  Yet, the Complaint filed in the Florida action asserts that AP failed to provide reports and other written information to S41 that is required under their agency agreement.  *See generally,* Ex. 10.  The termination letter attached to the Complaint also states that the failure to provide those communications was the basis for terminating AP's agency agreement.  *Id.,* Exhibit B.  This indicates that prior to the failure to send those communications during the time the parties were regularly corresponding in written form, contrary to their discovery responses and deposition testimony.

29.     Ms. Getches also failed to disclose the email by Mr. Hinkelman threatening suit against Plaintiff for approximately 6 months after initial disclosures were provided.

### III. LEGAL STANDARD

Motions to disqualify are governed by two sources of authority. *See Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1382–83 (10th Cir. 1994). First, attorneys are bound by the local rules of the court in which they appear. *Id.* Federal district courts usually adopt the Rules of Professional Conduct of the states where they are situated. *Id.* This District has adopted the Rules of Professional Conduct, as adopted by the Colorado Supreme Court, as its standards of professional responsibility. *See* D.C.COLO.LAttyR 2(a). Second, because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying standards developed under federal law. *See Cole,* 43 F.3d at 1382-83 (citing *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992), cert. denied sub nom. *Northwest Airlines, Inc. v. American Airlines*, 507 U.S. 912 (1993)); *see also, In re Dresser Industries, Inc.,* 972 F.2d 540, 543 (5th Cir. 1992).

"While the Tenth Circuit has not spoken directly on this issue, the Fifth Circuit Court of Appeals has held that courts must take measures to ensure that unethical conduct does not occur in proceedings before it." *Schrader v. Richardson,* 2011 WL 13291149, at *6 (D.N.M. May 6, 2011), report and recommendation adopted, 2011 WL 3962056 (D.N.M. Aug. 31, 2011), *aff'd,* 461 F. App'x 657 (10th Cir. 2012) (citing *In Re American Airlines*, 972 F.2d 605, 610-11 (5th Cir. 1992); *see also Cole*, 43 F.3d at 1383 (favorably citing *American Airlines*)). The Fifth Circuit later listed several factors to consider when ruling on a motion to disqualify: "(1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any society interests which will be served by the lawyer's continued participation in the case." *Id.* (Quoting *F.D.I.C. v. United States Fire Ins. Co.,* 50 F.3d 1304, 1314 (5th Cir. 1995).

# IV.    LEGAL ARGUMENT

## A.    Ms. Getches Misused Confidential and Privileged Information to Benefit Defendants

Ms. Getches used confidential and privileged information obtained as a consequence of her prior attorney-client relationship with Plaintiff, RentRange, REI, and OnIt for the benefit of the Defendants.  These actions constitute a violation of her fiduciary duty of loyalty owed to Plaintiff as a former client as well as Colorado Rules of Professional Conduct 1.9(c)(1)-(2).

It is settled that in Colorado, an attorney owes fiduciary duties to former clients.  *Allen v. Martin*, 203 P.3d 546, 559 (Colo. App. 2008) ("This theory [breach of fiduciary duty] does not depend on the existence of an attorney-client relationship at the time of the alleged breach") (citing D. Horan & G. Spellmire, Attorney Malpractice: Prevention and Defense § 16–2 (1986) ("[T]he attorney's fiduciary duties do not terminate with the termination of the attorney-client relationship.").  That duty includes two primary components, including (1) a duty of loyalty and (2) a duty of confidentiality.  *See Lariviere, Grubman & Payne, LLP v. Phillips*, 2011 WL 650001, at *21 (D. Colo. Feb. 11, 2011) (applying Colorado law and citing *Moguls of Aspen, Inc. v. Faegre & Benson*, 956 P.2d 618, 621 (Colo. App. 1997); *Damron v. Herzog*, 67 F.3d 211, 213-15 (9th Cir. 1995) (recognizing a continuing duty of loyalty owed by an attorney to a client after termination of the attorney-client relationship); *United States v. Stout*, 723 F. Supp. 297, 309 (E.D. Pa. 1989) (same).

The scope of the duty of loyalty—whether current or former clients—means that "the fiduciary 'cannot act contrary to his principal's interest' or must refrain from self-dealing and conflicts of interest."  *See id.* (Quoting *Brown v. Slenker*, 220 F.3d 411, 424 (5th Cir. 2000); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010); *see also, Alpha Capital Management, Inc. v. Rentenbach*, 792 N.W.2d 344, 2010 WL 1051193, at *7, 19-20 (Mich. App.

2010) ("Damages may be obtained for a breach of fiduciary duty when a position of influence has been acquired and abused, or when confidence has been reposed and betrayed.") (Quoting *Meyer & Anna Prentis Family Foundation, Inc. v. Barbara Ann Karmanos Cancer Institute,* 266 Mich. App. 39, 47, 698 N.W.2d 900 (2005)).

R.P.C. 1.9 provides an outline of the duty of loyalty, and demonstrates that the Rule and the duty of loyalty are not limited to the actual disclosure of information that is privileged:

> Rule 1.9 instead embodies a broader concept—that of continuing fidelity to a former client—a duty of loyalty. Although matters of confidence are an important component of the duty of loyalty, the scope of Rule 1.9 is not limited to, and its application does not turn on, the potential for disclosure of specific matters of confidence. The Rule is prophylactic in nature; it is designed to enforce a broad duty of loyalty and maintain public confidence in the legal system.

*In re PGH Int'l, Inc.,* 222 B.R. 401, 408 (Bankr. D. Conn. 1998) (citing *Prisco v. Westgate Entertainment, Inc.,* 799 F. Supp. 266 (D. Conn. 1992) (collecting authorities).[8]

Moreover, the requirements of R.P.C. 1.9 and the loyalty component of the common-law fiduciary duty owed by an attorney to a former client, as courts have recognized, exist because the attorney occupies a uniquely vulnerable position in a client's life, and it is essential to ensure that she does not use that position and that power to her former client's detriment:

> [Subsection (2) of R.P.C. 1.9] does not require a substantial relationship between the former and current representation. It recognizes that Rule 1.9's duty of loyalty embraces the sanctity of all information obtained in the course of representation, even if that information is not consciously and intentionally communicated to the attorney. This type of information—actively or passively obtained—can be knowingly, or even unknowingly, utilized by counsel to the disadvantage of its former client.
>
> When counsel is engaged, it is given privileged entry into the private world of the client; and in that privileged role counsel becomes privy to potentially innumerable observations, impressions, etc., which are not generally known. It is unseemly, and contrary to the duty of loyalty, for counsel to be in a position to utilize these observations and impressions to the litigation disadvantage of its former client by,

---

[8] Applying R.P.C. 1.9, which, like C.R.P.C. 1.9, is based on the ABA Model Rules.

> for example, exploiting witnesses' known weaknesses. Subsection (2) of Rule 1.9
> honors and enforces this aspect of the duty of loyalty.

*Id.* at 408 (Citing Connecticut's R.P.C. 1.9, which is identical to Colorado's R.P.C. 1.9).

The second component of a lawyer's fiduciary duty to a client is the duty of confidentiality. "[W]henever an attorney-client relationship is formed, we presume that the client reposed confidences in the attorney . . . [o]nce the attorney-client relationship has ended, the attorney then has a duty not to use that confidential information in a manner that would be detrimental to the client." *People v. Shari*, 204 P.3d 453, 461 (Colo. 2009); *Cox v. American Cast Iron Pipe Co.,* 847 F.2d 725, 729 (11th Cir. 1988) (There is a "virtually unrebuttable presumption that [the attorney] has received confidential information" under Pennsylvania R.P.C. 1.9, which is identical to Colorado's R.P.C. 1.9). Under Rest. (Second) of Agency § 396(d), "[u]nless otherwise agreed, after termination of the agency, the agent . . . (d) has a duty to the principal not to take advantage of a still subsisting confidential relation created during the prior agency relation."

Under C.R.P.C. 1.9(c)(1)-(2), an attorney who has formerly represented a client, regardless of whether the former matter and the current matter are substantially related, shall not use information relating to the representation of a client to the disadvantage of the former client, or when the information has become generally known. Comment 8 thereto state that information held by an attorney cannot be revealed until it has become "generally known." This term requires something more than the information existing in a public record, or being known by another person, "[t]hat the information at issue is generally available does not suffice; the information must be within the basic understanding and knowledge of the public." *See Matter of Tennant*, 392 P.3d 143, 148 (Mont. 2017) (Applying Montana's R.P.C. 1.9, which is identical to Colorado's R.P.C. 1.9) (Citing *Pallon v. Roggio,* 2006 WL 2466854, at *7-8 (D.N.J. August 23,

2006))"[T]he client's privilege in confidential information disclosed to his attorney 'is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources.'" *Lawyer Disciplinary Bd. v. McGraw*, 461 S.E.2d at 860 (quoting *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 572-73 (2d Cir. 1973)).

Here, Ms. Getches' many violations of her fiduciary duty to Plaintiff, RentRange, OnIt, and REI are clear, palpable, and unprecedented. The first component of that duty, the duty of loyalty, cannot be reconciled with an attorney accepting the role of trusted adviser in a confidential relationship with a client, providing that client with legal advice, and then using the client's adherence to that advice against the client in a subsequent proceeding. Every client, if such behavior is tolerated, would be forced to assume that their attorney's advice is nothing more than a potential trap, to be sprung on behalf of an adversary at some point in the future. Ms. Getches advised Plaintiff with respect to the Taylor and Ladd Litigation, Plaintiff followed her advice, and in this case she is attempting use the fact he followed that advice against him to attack his character, or somehow intimate that his claims are less valid. SMF, ¶¶ 1-11, 17-28. And this is no mere hypothetical; in response to one question, Plaintiff revealed the content of a privileged communication as to what remuneration to accept in the settlement of the Taylor Litigation and why. SMF, ¶¶ 7-8, ¶ 17-18. Her repeated lies to Plaintiff, both directly and to the undersigned, are also textbook definitions of disloyalty. SMF, ¶ 11, ¶ 18.

Ms. Getches also asked Plaintiff about his management of RentRange with respect to his communications with investors about the Ladd Litigation, such as Mr. Hinkelman, knowing that Mr. Hinkelman has threatened suit against Plaintiff for his alleged failure to accurately communicate the risk of the Ladd Litigation. SMF, ¶¶ 22-24. In other words, Ms. Getches

sought to elicit harmful and confidential information from her former client, to benefit his adversary, for the adversary's use in a future action on a matter that is intertwined with her prior legal advice to the Plaintiff. SMF, ¶¶ 9-11, ¶¶ 22-24. Other questions demonstrate disloyalty, because Ms. Getches sought to incriminate Plaintiff by eliciting information that she knew was confidential, such as the terms of the settlement in the Taylor Litigation. SMF, ¶¶ 7-8, ¶¶ 89-20. Ms. Getches' actions are also a form of self-dealing, because she placed her interest in receiving attorney's fees from a future client, the Defendants, ahead of the interest of her former clients.

The second component of the duty of loyalty, the duty of confidentiality, was violated repeatedly by Ms. Getches, as well. Given the irrebuttable presumption she received confidential information about the Taylor and Ladd Litigation, her questioning on those cases in a deposition in the presence of adverse parties and counsel was as a matter of law founded upon that same confidential information, as well as her privileged discussions with Plaintiff. SMF, ¶¶ 2-23. Her harassing and irrelevant questioning regarding Plaintiff's finances, his assets, the types of watches he owns and cars he drives, disclosing facts about him and his wife when she is a non-party in a public filing, seeking to depose his wife in retaliation for the undersigned's criticism to another attorney, and her deposition conduct demonstrate an intent to utilize Plaintiff's unique sensitivities and weaknesses as a witness, which matters are confidential and privileged, against Plaintiff to harm his interests. SMF, ¶¶ 4-5, ¶¶ 13-14. The same principle applies to her questioning that shows disloyalty. SMF, ¶¶ 9-20.

Disqualification is therefore necessary to ensure both the appearance and reality of fairness for this proceeding. Plaintiff has already been irreparably harmed by Ms. Getches' conduct, because he was placed in a state of mind during his deposition, and throughout this litigation, which the Rules of Professional Conduct and the fiduciary duty owed to former clients

does not tolerate.  In essence, Ms. Getches had an unfair advantage, and she used it, audaciously. She must no longer be permitted to remain in this case, receiving attorneys' fees at Plaintiff's expense, in violation of her professional and ethical obligations.  She was warned, repeatedly, and rather than act with care and prudence, she willfully continued on the wrong path.  No other option can possibly repair the damage already done.

**B.**      **Ms. Getches' Conflict Between Two Clients Threatens the Fairness of this Action**.

Ms. Getches is representing two sets of Defendants, AP and Ms. Loving on the one hand, and S41 on the other, in this action.  Plaintiff is alleging that S41 is vicariously liable for the wrongful acts of its agent, AP and Ms. Loving.[9]  It is undisputed that Ms. Loving and AP were obligated contractually to send a percentage of Plaintiff's payment funds to S41.  It is likewise undisputed that S41 is suing AP in Florida for violations of their agency agreement, and that AP alleges AP or Ms. Loving failed to transmit any percentage of Plaintiff's purchase funds for the second purchase of art.

There is an obvious conflict of interest, because both in this action and in the Florida action the interests of parties are materially adverse.  In this action, S41 cannot raise the defense that Ms. Loving and AP were acting without authority, and in the Florida action, they are embroiled in litigation as adverse parties over, in part, the same monies and reporting failures at issue in this case.  And while there may or may not be an effective and complete waiver of that conflict, given the other conflicts that pervade this case, and the prejudice with respect to discovery Plaintiff has already suffered, the Court should exercise its discretion to disqualify Ms. Getches on this ground, as well.

---

[9] Whether AP or Ms. Loving is the agent has received differing explanations from the Defendants, so we assume each is for purposes of argument.

# V.    CONCLUSION

Plaintiff respectfully requests the Court hold an evidentiary hearing, disqualify Ms.

Getches and her firm, and grant such other relief as it deems proper.

Dated this 16th day of October, 2020

> */s/ Ian T. Hicks, Esq.*
> Ian T. Hicks, Reg. No., 39332
> The Law Office of Ian T. Hicks LLC
> Attorney for Plaintiff
> 6000 East Evans Avenue, Suite 1-360
> Denver, Colorado, 80222
> Telephone: (720) 216-1511
> Facsimile: (303) 648-4169
> E-mail: ian@ithlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 16, 2020, the foregoing Motion was filed

via CM/ECF, and served upon the following:

**Shoemaker Ghiselli + Schwartz, LLC**
Elizabeth H. Getches
Cynthia A. Mitchell
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO 80302
Telephone: (303) 530-3452
Email: lgetches@sgslitigation.com
Attorney for Defendants other than Martin St. Pierre, Alicia St. Pierre, and ISP Holdings, Inc.

Thomas H. Wagner, #38135
Anderson Law Group
7385 W. Highway 50
Salida, CO 81201
Telephone: (719) 539-7003
tom@anderson-lg.com

Counsel for Defendants Martin St. Pierre, Alicia St. Pierre, and ISP Holdings, Inc.


_s/Ian T. Hicks, Esq._____