1

2

DEPOSITION OF:  WALTER CHARNOFF

DATE:    SEPTEMBER 29, 2020

3

4

5

DISCLAIMER:  This uncertified rough draft transcript is
unedited and may contain untranslated words, a note
made by the reporter, a misspelled proper name, and/or
word combinations that do not make sense.  All such
entries will be corrected on the final certified
transcript which we will deliver to you in accordance
with your requested delivery arrangements.
         Due to the need to correct entries prior to
certification, this rough draft transcript can be used
only for the purposes of annotating counsel's notes and
cannot be other parties to the case who have not
purchased a transcript copy.

6

7

8

9

10

11

CONSENT:  By opting for this rough draft transcript,
you have agreed:  (1) To purchase the final transcript
at the agreed-upon rate; (2)  Not to furnish this rough
draft transcript, either in whole or in part, on disk
or hard copy, via modem or computer, or by any other
means, to any party or counsel to the case.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE REPORTER:   The attorneys

2  participating in this deposition acknowledge that I am

3  not physically present in the deposition room and that

4  I will be reporting this deposition remotely.

5      They further acknowledge that, in lieu of

6  an oath administered in person, the witness will

7  verbally declare his testimony in this matter is under

8  penalty of perjury.  The parties and their counsel

9  consent to this arrangement and waive any objections

10  to this manner of reporting.

11      Please indicate your agreement by stating

12  your name and your agreement on the record.

13      MS. GETCHES:   This is Liza Getches.  I

14  represent the defendants Nancy Loving, David

15  Hinkelman, Studio 41, and ArtPort LLC, and we agree to

16  such stipulation.

17      MR. WAGNER:   Good morning.  This is Tom

18  Wagner from the Anderson Law Group.  I represent

19  Defendants Martin and Alicia St. Pierre and ISP

20  Holdings, Inc.  I agree to the stipulation.  And I

21  must state on the record that I am appearing today

22  without waiving any objection that my clients have to

23  personal jurisdiction in this matter.

24      MR. HICKS:   This is Ian Hicks, H-i-c-k-s.

25  I am counsel for plaintiff, Walter Charnoff.  I'm also

1  counsel for Brande Charnoff, who is a nonparty to this

2  case, and I would agree to the stipulation state d by

3  the court reporter.

4              WALTER CHARNOFF,

5  having been first duly sworn to state the whole truth,

6  was examined and testified as follows:

7          (Deponent's reply to oath:  "I do.")

8              EXAMINATION

9  BY MS. GETCHES:

10      Q.   Good morning, Mr. Charnoff.  Where are

11  you currently?

12      A.   I am in my office in my home.

13      Q.   What is your address?

14      A.   6950 Rabbit Mountain Road, Longmont,

15  Colorado 80503.

16      Q.   How long have you lived there?

17      A.   Since September of 2017.

18      Q.   And in September of 2017, did you live in

19  the house at the address you just provided or were you

20  living in the barn?

21      A.   When you say "living in the barn," I have

22  a really nice apartment above my barn that I was

23  living in from September 2017.

24      Q.   Until what period of time?

25      A.   Until approximately the beginning of

1  April of 2018.

2      Q.   How many square feet is this barn

3  apartment?

4      A.   Roughly 2,500.

5      Q.   How many bedrooms is it?

6      A.   There's two sides.  One with a bedroom

7  and then there's a little hallway and across the

8  hallway there is an additional 3,000-square-foot room

9  that we turned into two bedrooms.

10      Q.   When did you turn the 3,000-square-foot

11  room into two bedrooms?

12      A.   Prior to moving in.

13      Q.   Was anyone living in there as of

14  September 2017?

15      A.   I owned the place in 2017.  So we moved

16  into it in September 2017.

17      Q.   Right.  But presumably you were living in

18  the bedroom that you described, and was anyone living

19  in the 3,000-square-foot two bedroom?

20      A.   Yeah.  My son was living in one of those

21  bedrooms, and that bedroom took up approximately 300

22  square feet; and my daughter was living part-time in

23  the other bedroom, because she was attending CSU, and

24  that bedroom also took up approximately 300 square

25  feet.  So that left 2,400 square feet free.

1     Q.   As of September 2017, was the entire
2   5,500-square-foot area --
3     A.   Approximately.
4     Q.   -- above the barn livable and complete
5   with construction?
6     A.   Oh, absolutely.  It's beautiful.
7     Q.   When was the construction  completed on
8   your house proper at 6950 Rabbit Mountain Road?
9     A.   The beginning of April of 2018.
10     Q.   And is that the date that you moved into
11   that area?
12     A.   Yep.
13     Q.   Yes?
14     A.   Yes.
15     Q.   Okay.  Where did you live prior to the
16   Rabbit Mountain Road location?
17     A.   1124 Lookout Road, Longmont -- 11241 --
18   sorry -- Lookout Road, Longmont, Colorado 80504.
19     Q.   How long did you live at the Lookout Road
20   location?
21     A.   Since approximately October of 2010, I
22   believe.  Either 2010 or 2012.
23     Q.   Was that Lookout Road property under
24   construction at any point in time?
25     A.   We remodeled Lookout Road, also after we

1   bought this place, for resale.
2     Q.   So at no point in time when you were
3   living at the Lookout Road location was it under
4   renovation?
5     A.   We remodeled sections of that house
6   ongoing from the time we lived there, but at no point
7   during the time we lived there was the entire home
8   under renovation.
9     Q.   Did you listen to the depositions of
10   Nancy Loving, David Hinkelman, or ArtPort LLC?
11     A.   No.  I did not.
12     Q.   Have you read the transcripts?
13     A.   No.  I have not.
14     Q.   You've been deposed before, correct?
15     A.   Correct.
16     Q.   Many times, correct?
17         MR. HICKS:   Object to form.
18     A.   More than one.
19     Q.   (BY MS. GETCHES)   How many times?
20     A.   This will be my fourth.
21     Q.   How many times have you testified in
22   court?
23     A.   Once.
24     Q.   Was that the Bob Ladd lawsuit?
25     A.   Yes.

1     Q.   And you've been involved in lawsuits
2   pretty much every year since 2006, correct?
3     A.   Not correct.
4     Q.   Okay.  Have you had some kind of lawsuit
5   or traffic appearance almost every year since 2006?
6     A.   No.
7         MR. HICKS:   Object to the form.
8     Q.   (BY MS. GETCHES)   Okay.  Do you recall a
9   case in 2006 for failure to appear which was the
10   result out of not wearing a seat belt?
11     A.   I don't recall that case, but -- what
12   state was that case in?
13     Q.   Colorado.
14     A.   No.  I do not recall that case.
15     Q.   Okay.  Have you been involved in cases in
16   other states?
17     A.   I got a ticket in Utah once.
18     Q.   Do you recall a case in 2007 filed by
19   Mr. Matthews with respect to a self-directed IRA ?
20     A.   No.
21     Q.   Do you recall what he was alleging in
22   that lawsuit?
23     A.   No.
24     Q.   Do you recall that you failed to appear
25   for that as well?

1     A.   No.
2     Q.   Do you recall a case in 2006, the
3   Arapahoe Dental Clinic sued you for failure to pay?
4     A.   No.
5     Q.   Do you recall a case filed by Mr. Buckles
6   that alleged you misrepresented the value of
7   InvestorDigs?
8     A.   I recall a lawsuit with Mr. Buckles, yes
9     Q.   And he alleged that you loaned -- that
10   there was a loan of $450,000 that you did not pay ?
11     A.   All I really care to discuss about that
12   case is that it was -- I won on summary judgment and
13   all of the -- the vast majority of his claims were
14   dismissed with prejudice.
15     Q.   And you claim that the value of the
16   company was $10 million, and he alleged you
17   misrepresented that?
18     A.   So all I recall about that case is that I
19   won on summary judgment and all claims were dismissed
20   with prejudice.
21     Q.   You can't remember what he alleged?
22   That's your testimony under oath?
23     A.   Yes.
24     Q.   Do you recall other traffic infractions
25   where you failed to have your headlamps on, failed to

1 wear a seat belt, things like that?  Do you recall any
2 of those?
3         A.   If you want to ask me about a specific
4 one, I can tell you if I recall them.
5         Q.   But you can't think of one off the top of
6 my head?
7         MR. HICKS:   Same objection.
8         Q.   (BY MS. GETCHES)  You know how this goes.
9 You can answer, Mr. Charnoff.
10         MR. HICKS:   Same objection.
11         A.   Have I ever gotten a ticket for not using
12 my headlight?  I don't know.  Have I ever got a ticket
13 for not wearing my seat belt?  I believe so.
14         Q.   (BY MS. GETCHES)  Do you recall a case in
15 2014 where a Mr. Taylor alleged that you assaulted him
16 in the hotel lobby over a laptop?
17         A.   You should remember that case also
18 because you represented me on that case.
19         Q.   Sorry.  No offense, but I don't really
20 remember that lawsuit.  So I was wondering if you
21 remember that.
22         A.   You don't remember the lawsuit that you
23 were sitting in first chair on?
24         Q.   Sorry to offend you, but I don't remember
25 meeting you.  I remember representing a company.  So

1 I'm asking you whether you --
2         MR. HICKS:   Are you being serious with
3 these questions that you don't remember --
4         Q.   (BY MS. GETCHES)  Mr. Charnoff, I'm
5 asking you to answer --
6         A.   Ms. Getches, you're surprised that I
7 didn't remember the details of a lawsuit that I won
8 very quickly ten years ago but a lawsuit that only
9 ended four years ago that you represented me, you sat
10 in first chair, you gave me all the insight, I spent
11 several hours with you, and you did not represent just
12 my company; you represented me personally first and
13 then you represented my company on behalf of me --
14         Q.   I'm asking you what the outcome of the
15 lawsuit was, because I don't know that I --
16         A.   The lawsuit was also dismissed with
17 prejudice.
18         Q.   Okay.
19         A.   You knew that there was no -- you were
20 the one who said, quote/unquote, "There's absolutely
21 no merit to this lawsuit at all.  We should be able to
22 get legal fees for filing" -- I think you used the
23 words "frivolous" or something with a "v."
24         Q.   Did you get legal fees?
25         A.   Part of the settlement with him was he

1 paid me all of his stock back in that company so we
2 didn't need to go after legal fees, because we settled
3 for more than what our legal fees would have been.
4 And at your advice we agreed --
5         Q.   Okay.
6         MR. HICKS:   He's answering the
7 question --
8         A.   Let me finish answering the question --
9         Q.   (BY MS. GETCHES)  Did you have a lawsuit
10 in 2015 brought by a Mr. Ladd?  Do you recall that
11 case?
12         A.   I wasn't finished answering the last
13 question about the case that you represented me on.
14         Q.   Okay.  I'll follow up if I need to.  Was
15 there a case --
16         MR. HICKS:   Let him finish --
17         A.   Did you do a conflict check before you
18 agreed to represent Ms. Loving, because --
19         Q.   (BY MS. GETCHES)  Mr. Charnoff, you don't
20 get to ask the questions here.  You may answer.
21         A.   I want to point out on the record is that
22 a lot of information that you have asked me about ,
23 about prior lawsuits and such, were items that I
24 discussed with you under attorney-client privilege
25 while you represented me.  Because one of the things

1 you asked me about was had I been involved in any
2 lawsuits before, because you said one of the tactics
3 lesser attorneys used, which I'm surprised you're
4 using those tactics, is to try and paint an ugly
5 picture of a plaintiff by showing that he was involved
6 in speeding tickets and other lawsuits and things like
7 that to try and insult his character.
8         So you and I had several discussions in
9 your office while I was under attorney-client
10 privilege about each of the cases I had been involved
11 with up until that point.  So I'm really surprised
12 that you would ask me about those and actually a
13 little bit offended.
14         Q.   Were you involved in a case where Bob
15 Ladd sued you?
16         A.   Yes.
17         Q.   And you lost pretty bad at trial,
18 correct?
19         MR. HICKS:   Object to form.
20         A.   Not correct.
21         Q.   (BY MS. GETCHES)  You don't consider a
22 $1.6 million loss to be a huge loss?
23         MR. HICKS:   Object to form.
24         A.   I didn't claim a huge loss.  All the jury
25 verdicts in that case were declared void ab initio and

1 the case was dismissed with prejudice.

2 Q. (BY MS. GETCHES) Okay. At the time you

3 lost at trial, did you consider the $1.5 million loss

4 to be a huge loss?

5 A. At no time was there --

6 Q. Yes or no?

7 MR. HICKS: Object to the form.

8 Q. (BY MS. GETCHES) Yes or no?

9 A. No.

10 Q. So $1.5 million is not a big loss to you,

11 Mr. Charnoff?

12 MR. HICKS: Object to the form.

13 A. That's not what I said. And I said I

14 didn't lose $1.5 million in that case.

15 Q. (BY MS. GETCHES) Did you text

16 Mr. Hinkelman and tell him that you lost to Bob Ladd?

17 A. I texted Dave and adjusted some things in

18 my life at that point because of the temporary setback

19 from Bob Ladd.

20 Q. Yes or no, did you text Mr. Hinkelman and

21 tell him you lost to Bob Ladd?

22 MR. HICKS: Object to the form.

23 A. I do not remember the exact content of my

24 text to Mr. Hinkelman.

25 Q. (BY MS. GETCHES) Did you sue Steve Long?

1 A. Yes.

2 Q. He was the attorney who represented you

3 in the Ladd lawsuit?

4 A. Correct.

5 Q. And last year were you sued by a

6 Mr. Barclay?

7 A. Yes. For a car accident.

8 Q. How many total lawsuits have you been a

9 defendant?

10 MR. HICKS: Object to form.

11 A. I don't know.

12 Q. (BY MS. GETCHES) Too many to remember?

13 A. No. I just -- you're trying to

14 categorize -- I didn't realize that speeding tickets

15 and failure to wear a seat belt were considered

16 lawsuits. So I would have to think through every

17 traffic ticket I had gotten since I was 17 years old

18 and learned to drive. You're talking about litigation

19 with business partners or other nontraffic-related

20 litigation, then I believe the number is four,

21 including this one.

22 Q. Tell me what the Ladd lawsuit was about.

23 A. I'm not willing to answer that question.

24 Q. I'm afraid you don't have a choice.

25 MR. HICKS: Liza, there's a

1 confidentiality agreement. And anything that's not

2 public record, he can't really talk about. So don't

3 ask about the content of legal --

4 MS. GETCHES: Ian, it's public record

5 what the lawsuit was about. I'm not asking about the

6 settlement agreement.

7 Q. (BY MS. GETCHES) What was the lawsuit

8 about, Mr. Charnoff?

9 A. All I'm willing to talk about in the Bob

10 Ladd suit is to let you know that any jury verdict was

11 declared void ab initio by the judge. And all of the

12 claims were dismissed with prejudice.

13 Q. (BY MS. GETCHES) Why did Mr. Ladd sue

14 you?

15 A. Again, any jury verdict was declared

16 void ab initio, and all of the claims against me were

17 dismissed with prejudice.

18 Q. That's not my question.

19 THE REPORTER: I'm sorry. Folks --

20 A. There were other parties to the lawsuit

21 as well, and I'm not at liberty to discuss anything

22 else about the case.

23 Q. (BY MS. GETCHES) Mr. Charnoff, yes, you

24 are. You need to answer the question.

25 MR. HICKS: He's not going to answer that

1 question because it's --

2 MS. GETCHES: Are you instructing him not

3 to answer, Mr. Hicks?

4 MR. HICKS: Yep.

5 MS. GETCHES: You're instructing him not

6 to answer why he was sued in the Bob Ladd lawsuit?

7 MR. HICKS: Yeah, the entirety of this

8 case has been declared void. What's the possible

9 relevance to this case?

10 MR. WAGNER: I think we should call the

11 judge.

12 MS. GETCHES: Yeah. I do too. This is

13 totally improper, Mr. Hicks.

14 Q. (BY MS. GETCHES) Answer the question,

15 Mr. Charnoff. Why were you sued in the Ladd lawsuit?

16 A. Liza, can you please not point your pen

17 at me?

18 Q. (BY MS. GETCHES) Answer this question.

19 A. I'm going to ask you again: Can you

20 please not point your pen at me? And please don't use

21 a stern voice with me.

22 Q. Answer the question.

23 A. I'm going to tell you again: Absent a

24 court order, I'm not at liberty to discuss anything

25 else about the Bob Ladd lawsuit because there were

1 other parties to that case that I made a commitment
2 to.
3     MR. WAGNER: Let's stop this deposition
4 and call the judge right now. This is ridiculous.
5     MR. HICKS: Go ahead --
6     MS. GETCHES: What Mr. Hicks --
7     THE REPORTER: Stop, please. I need one
8 at a time.
9     MS. GETCHES: I want to make a record
10 because I'm going to seek attorneys' fees.
11     Q. (BY MS. GETCHES) I'm asking you why you
12 were sued in the Ladd lawsuit, and you need to answer
13 my question.
14     A. You're going to --
15     THE REPORTER: Hold on. Mr. Hicks, I did
16 not hear you. Please repeat it.
17     MR. HICKS: Because the entire lawsuit
18 has been declared void ab initio, there's no possible
19 relevance to this case or it's not reasonably
20 calculated to lead to admissible evidence. It's
21 harassing. And, also, there's a very broad
22 confidentiality agreement he's not allowed to talk
23 about that information. So we can have the judge
24 review that agreement in camera, but at this point,
25 I'm going to instruct him not to answer.

1     Q. (BY MS. GETCHES) Okay. I'm not asking
2 about the settlement agreement, Mr. Charnoff. I'm
3 asking you your understanding for why you were sued in
4 the Bob Ladd lawsuit.
5     A. Who --
6     MR. HICKS: Same objection.
7     A. Why I was sued is because an angry
8 billionaire didn't get his way.
9     Q. (BY MS. GETCHES) And what does that
10 mean?
11     A. Exactly what I said.
12     MR. HICKS: So, Liza, we need to go off
13 the record because I need to review this agreement
14 again to make sure that it's -- these questions
15 themselves, I think, may be in violation of that
16 agreement.
17     MS. GETCHES: Mr. Hicks, I can't
18 understand what you're saying.
19     MR. HICKS: We need to go off the record
20 for ten minutes because I have to review the
21 applicable confidentiality agreement to that lawsuit.
22     MS. GETCHES: No. I'm not asking about
23 the confidentiality agreement.
24     MR. HICKS: I don't care. Here's your
25 option, Liza, respectfully: We can either go off the

1 record, I can review the document, and maybe he can
2 answer questions, or he can just not answer the
3 questions. So it's your choice.
4     MS. GETCHES: No. No. I'm asking about
5 this lawsuit; I'm not asking about the settlement --
6     MR. HICKS: There's nondisparagement
7 clauses, and I believe the scope of that agreement --
8     Q. (BY MS. GETCHES) Mr. Charnoff, did you
9 tell the investors during the pendency of the
10 litigation with Mr. Ladd that you were going to win
11 the lawsuit?
12     MR. HICKS: So because --
13     Q. (BY MS. GETCHES) Yes or no?
14     MR. HICKS: I haven't had a chance to
15 review the agreement. I'll instruct the witness not
16 to answer the question while we go off the record.
17     MS. GETCHES: No. We're not going off
18 the record.
19     MR. WAGNER: Yeah, I think we should call
20 the judge. This is --
21     MS. GETCHES: I do too.
22     MR. WAGNER: The instruction not to
23 answer is not founded in any --
24     MR. HICKS: No.
25     MR. WAGNER: -- confidentiality

1 agreements between private parties don't prohibit
2 discovery in a separate lawsuit.
3     MR. HICKS: That's great. Tom, you're
4 not the judge and weren't part of a lawsuit. And you
5 haven't even seen the agreement. Now, if you want to
6 take the time to call the judge, I'm going to tell him
7 that you guys didn't want to let me take five or ten
8 minutes to look at the agreement and possibly answer
9 these questions, then that's fine.
10     MS. GETCHES: I'm not asking about the
11 settlement agreement, Mr. Hicks.
12     MR. HICKS: It doesn't matter. My point
13 is that the scope of the agreement in that case is so
14 broad, it's potentially -- if you want to take the
15 time to call the judge, but not let me take the time
16 to read the agreement, then that's fine.
17     MR. WAGNER: Ian, your failure to prepare
18 for this deposition is not our problem. I think we
19 should call the judge right now.
20     MR. HICKS: Well, I'm sorry, I didn't
21 predict that you would ask completely irrelevant
22 questions about something --
23     MS. GETCHES: We're going to go off the
24 record and call the judge.
25     MR. HICKS: Okay.

1    MS. GETCHES:  And I'm going to seek fees
2  as well.
3            MR. WAGNER:  I'm going to join in that.
4            MR. HICKS:  Go ahead.
5            (Recess taken, 9:34 a.m .to 9:38 a.m.)
6    Q.  (BY MS. GETCHES)  Mr. Charnoff, where are
7  you currently employed?
8    A.  I have a consulting company called Tec
9  Stem.
10   Q.  Tec Stand?
11   A.  Tec Stem, T-e-c, S-t-e-m.
12   Q.  What does that company do?
13   A.  It consults different starter companies
14 and works on various entrepreneurial endeavors.
15 Currently I'm focused on a project that is trying to
16 make diagnostic heart health tests that are not
17 covered by insurance and currently are only available
18 to the wealthy available to mainstream America.
19   Q.  Did you start this company , or did you
20 invest in this company?
21   A.  Both.
22   Q.  I guess my question is was the company
23 formed before you invested in it or did you create the
24 company?
25   A.  I created the company.

1    Q.  Are there any other investors in the
2  company?
3    A.  No.
4    Q.  Any other owners?
5    A.  No.
6    Q.  Are you involved in any other employment
7  at this time?
8    A.  No.
9    Q.  Where were you employed prior to Tec
10 Stem?
11   A.  Altisource Portfolio Solutions.
12   Q.  What is Altisource Portfolio Solutions?
13   A.  They're a publicly traded company that
14 provides various services to the mortgage space.
15            (At this time Mr. Hinkelman entered the
16 room.)
17   Q.  (BY MS. GETCHES)  Now, did you start
18 Altisource, or did you join it as an investor?
19   A.  They acquired my companies ; and as a
20 result, I got stock in their business.
21   Q.  Which companies did Altisource acquire?
22   A.  REIsmart LLC, Onit Solutions LLC, and
23 GoldenGator LLC.
24   Q.  Altisource acquired all three companies
25 at one time?

1    A.  Correct.
2    Q.  What is REIsmart?
3    A.  I don't know what it is currently.  At
4  the time that they acquired it, it was a --
5  Ms. Getches, please don't roll your eyes at me.
6    Q.  Mr. Charnoff, I was looking up at the
7  ceiling.
8    A.  Okay.  As I started to say, it is not --
9  I don't know what it is currently.  But at the time
10 they acquired it, it was a Zillow-type website, where
11 investors can search for those same investments ; but
12 instead of searching by regular house characteristics,
13 they could also search by what type of yield those
14 investments would give them.
15   Q.  And what was Onit?
16   A.  Onit Solutions, which is O-n-i-t, one
17 word, space, Solutions, was a software development
18 company that developed software for companies that had
19 complex needs they needed to solve with software or
20 regulatory compliance concerns specializing in
21 financial services, real estate mortgage space.
22   Q.  And GoldenGator?
23   A.  Did rental data analytics for the
24 institutional real estate investor space.
25   Q.  Were you involved at Altisource after it

1  acquired these three companies you just mentioned?
2    A.  I was.
3    Q.  In what capacity?
4    A.  I was -- my official title was executive
5  vice president.
6    Q.  For how long were you executive vice
7  president?
8    A.  Until approximately July of 2017.
9    Q.  And from what point in time until July
10 2017 were you executive vice president?
11   A.  It might have been senior vice president.
12 I forget if they use the term "senior" or "executive."
13 And I was the vice president of Altisource from
14 October 10, I believe.  October 10 or October 11 of
15 2015 until, I believe, mid-July of 2017.
16   Q.  And you were asked to leave Altisource?
17   A.  I wasn't asked to leave Altisource.  I
18 left Altisource because of suffering from heart
19 disease at the time.
20   Q.  Were you accused of misrepresentation by
21 employees at Altisource?
22   A.  I was not.
23   Q.  Where were you employed prior to -- first
24 of all, were you employed at REIsmart?
25   A.  I was the founder of REIsmart.

1      Q.   Did you have a job title there or just
2 the founder?
3      A.   I was the manager.
4      Q.   And at Onit Solutions, were you employed
5 there or were you also the founder?
6      A.   I was the founder of Onit Solutions also.
7      Q.   Same question with respect to
8 GoldenGator?
9      A.   Also the founder.
10      Q.   Prior to those three companies, how were
11 you employed?
12      A.   Onit Solutions was since 2004.
13      Q.   2004 until 2015?
14      A.   Yep.
15      Q.   And then how long -- when did you found
16 REIsmart?
17      A.   2014, I believe.
18      Q.   And GoldenGator?
19      A.   2005.
20      Q.   Okay. Prior to Onit Solutions, were you
21 employed?
22      A.   I mean, my work history from 1993 forward
23 was five years in United States Air Force, got out of
24 the United States Air Force when my daughter was born
25 with an honorable discharge in 1998. Became a

1 financial planner. Was a financial planner for three
2 years. And in 2001 started doing technology
3 consulting and working in the tech space.
4      Q.   Have you ever invested in any company
5 before?
6      A.   Yes.
7      MR. HICKS:   Object to form.
8      Q. (BY MS. GETCHES)   Tell me about a company
9 that you invested in that you did not also find --
10 found.
11      MR. HICKS:   Same objection.
12      A.   Can we take a break for a moment?
13      MS. GETCHES:   Yeah. If you could answer
14 the question first.
15      A.   Can you please -- that's a pretty broad
16 question. Can you please . . .
17      Q. (BY MS. GETCHES)   Sure. Can you name one
18 company that you invested in that you did not also
19 found?
20      A.   Coca-Cola.
21      Q.   And I'm not talking about investing in
22 publicly traded companies. I'm talking about -- for
23 example, have you ever invested in a start-up before?
24      MR. HICKS:   Object to the form.
25      A.   Yes. I have invested in start-ups

1 before.
2      MR. HICKS:   So we've answered that
3 question. So can we take a break?
4      MS. GETCHES:   Sure.
5      (Recess taken, 9:48 a.m. to 9:55 a.m.)
6      Q. (BY MS. GETCHES)   I was asking you before
7 the break about whether you invested in any start-up
8 before. Can you name the name of a company that you
9 have invested in that was a start-up?
10      A.   CJ Porter Solutions is a start-up that I
11 have invested in.
12      Q.   What kind of business was that?
13      A.   It was a processing technology for 1031
14 exchange investors.
15      Q.   And to be clear, you invested money in
16 that company but did not found that company, correct?
17      A.   Correct.
18      Q.   What kind of due diligence do you
19 typically do before investing in a company or a
20 product?
21      A.   It depends on the company or the product.
22      Q.   Why is it important to do due diligence?
23      A.   As a philosophy why is it important to do
24 due diligence?
25      Q.   Why is it important to you, Mr. Charnoff?

1      A.   Why is due diligence important to me?
2      Q.   Why is it important to you to do due
3 diligence prior to investing in a company or a
4 product?
5      A.   Depending on the company or product I am
6 investing in, it is important to do enough -- I don't
7 know if you want to say evaluation, research,
8 investigation, to where I feel comfortable putting my
9 money in. Now, how much due diligence I do depends on
10 how I feel about the people involved, how much I trust
11 the people involved, how many prior business deals
12 I've done with those people, and then other factors
13 about the company and the products.
14      Q.   Do you review capitalization of the
15 company before you invest in it?
16      A.   It depends.
17      Q.   Do you think it's a good idea to do that?
18      A.   It depends.
19      Q.   Is it ever a good idea not to review
20 capitalization of a company?
21      A.   It depends on why you're investing and
22 what the use of your proceeds would be.
23      Q.   Okay. When would be an instance where it
24 wouldn't be helpful to review the capitalization of a
25 company prior to investing in the company?

1    A.  That's a really broad question.  I would
2  prefer not to theorize on that just openly.
3    Q.  Can you think of any instance where it
4  would not be a good idea?
5    A.  Sure.
6    Q.  Okay.  What's one?
7    A.  Where it would not be a good idea, or
8  where it would not be necessary?
9    Q.  Where it would not be a good idea.
10    A.  Again, I can't speculate on every
11  situation that could exist when you're looking at
12  putting money into a company.
13    Q.  I'm asking for one instance.  I'm not
14  asking every situation.
15    A.  Can you please clarify the question that
16  you're asking and tell me exactly what you would like
17  me to respond to.
18    Q.  Sure.  When would be, in your opinion, a
19  good idea not to review the capitalization of a
20  company prior to investing in that company?
21        MR. HICKS:   Object to the form.
22    A.  Way too broad a question.  I can't
23  hypothesize about every situation that could exist
24  that would make it necessary and/or to what level to
25  invest to review the capitalization of the company.  I

1  can give you an example for my own investing.
2        I just built a house for River's Promise
3  for Rwandans who don't have shelter.  It cost $2,500
4  to build the house.  I made that investment without
5  reviewing the capitalization of the rest of the
6  company, because I felt strongly that for $2,500 they
7  could build that one house and that that Rwandan
8  family would have shelter in the very near future.
9        So to me, the rest of the capitalization
10  was irrelevant to that specific investment.  And I'm
11  sure there's many other situations where you're
12  investing in a company and they're going to use your
13  money for a specific marketing campaign, a specific
14  endeavor or specific art gallery show, where the
15  overall capitalization of the company is relevant as
16  to do they have the money for the specific activities
17  they're promising they're going to do and where are
18  they going today.  As far as --
19    Q.  (BY MS. GETCHES)  Mr. Charnoff, with your
20  Rwandan house example , did you consider that an
21  investment or was it a donation to a charitable cause ?
22    A.  It was a donation to a charitable cause.
23  But I'm as discerning about my charitable
24  contributions as I am investments.  Because there's a
25  lot of companies out there that don't  really use the

1  money for what you believe you're giving the money
2  for; and, also, when I donate to charity, I care about
3  the actual result, not just the feel-good feeling from
4  donating the money.  So if I was going to give them
5  money to build a house and they didn't actually have
6  the ability to use that money to build a house, then I
7  really wasn't helping the family that I was trying to.
8  So . . .
9    Q.  When you're investing in a company and
10  you're expecting to receive a profit from that
11  investment, is it a good idea to review the
12  capitalization of the company?
13    A.  Is it a good idea?
14    Q.  Yeah.
15    A.  Most likely.
16    Q.  Okay.  Is it a good idea to review the
17  revenue, the profit, the margin trends of that company
18  prior to investing into a company that you expect to
19  get money from?
20    A.  Can you repeat that question, please?
21    Q.  Sure.  If you're investing into a company
22  that you expect to receive a return on your
23  investment, is it a good idea to review that company's
24  revenue, profit trends, or margins?
25    A.  In most cases, I would say so.

1    Q.  Would you look at a company's competitors
2  prior to investing into it?
3    A.  In most cases.
4        MR. HICKS:   Object to form.
5    Q.  (BY MS. GETCHES)  Would you look at
6  valuation multiples, for example, to see if similar
7  assets of that company sold at similar prices in the
8  past?
9    A.  Again, every scenario is different.  It
10  depends on what the purpose of my investment is and
11  how I'm looking at getting a return.
12    Q.  Would you look at balance sheets of the
13  company that you're investing in prior to investing in
14  it?
15    A.  Again, it depends on the investment and
16  the situation.
17    Q.  Would it be a good idea to do that if
18  you're expecting to get a return on your investment?
19    A.  I'm not going to speculate about an
20  unknown investment and an unknown situation.
21    Q.  What experience do you have with
22  purchasing art prior to the Harold Garde artwork you
23  purchased from ArtPort?
24    A.  None.
25    Q.  Did you own any art other than the Harold

1  Garde art that you purchased from Nancy Loving and
2  ArtPort?
3       A.   Prior to my first purchase?
4       Q.   Correct.
5       A.   It depends on what you consider art.  Do
6  you consider the music CDs that I own art?  Do you
7  consider the prints that I bought in American
8  Furniture Warehouse when I bought my furniture art?
9  Do you consider all of the souvenirs and knickknacks
10 that I bought in my various trips to different places
11 art?  Like the definition of art is so broad that is a
12 really difficult question to answer.
13      Q.   Please tell the jury all the pieces of
14 art that you consider art that you purchased prior to
15 the Harold Garde art that you purchased from ArtPort?
16           MR. HICKS:   Object to form.
17      A.   That's a really tough question to answer.
18 Because if you can please define what type of art and
19 what you mean by art, then I can answer that question.
20      Q.   (BY MS. GETCHES)   I'm asking you what you
21 consider art and I'm asking you to tell the jury what
22 you purchased prior to the Harold Garde artwork.
23           MR. HICKS:   Object to form.
24      A.   So fine art paintings like Harold
25 Garde's, I had not purchased any prior to the Harold

1  Garde purchase.
2       Q.   (BY MS. GETCHES)   Do you consider
3  yourself an art collector now?
4       A.   I do not.
5       Q.   Do you have any experience in the
6  valuation of art?
7       A.   I do not.
8       Q.   Do you have any understanding what makes
9  art appreciate in value?
10      A.   Oh, I was going by, until recently, all
11 of the information given to me by Nancy.
12      Q.   And what did Ms. Loving tell you made art
13 appreciate in value?
14      A.   Specifically as it relates to Harold
15 Garde's art?  Because she told me specific things
16 about Harold Garde's art and things about art in
17 general.  Which one are you asking me about?
18      Q.   My question to you was do you have any
19 understanding about what makes art appreciate in
20 value, and you said all of your understanding came
21 from Ms. Loving.  And I'm asking you to explain your
22 answer.
23           MR. HICKS:   Object to form.
24      A.   Ms. Loving told me that once I purchased
25 the art she was going to use those resources to get

1  the art into different museums and different art
2  galleries.  And she said that showing that art in
3  those museums and galleries would make the awareness
4  go up and would increase the value of the art.
5           Ms. Loving also gifted around the value
6  of what I purchased and basically had me overpaying
7  for some paintings and in her words -- it's in her
8  words and underpaying for others, because she said the
9  comparables of me purchasing that art itself would
10 raise the value of Harold Garde's art.
11           Quite morbidly, Nancy would say all of
12 the time -- which really upset me because I really
13 like Harold, and it shocked me to hear Dave speak that
14 way -- I didn't know Nancy well enough to know if that
15 would be part of her character or not -- but
16 shockingly Nancy and Dave would say over and over
17 again that Harold had one foot in the grave and then
18 when he got his other foot into the grave his art
19 would skyrocket in value.  Because once an artist
20 passes away, according to Nancy and Dave both, their
21 art could double, triple, quadruple and even go up 100
22 times in value.
23           Nancy hired this guy Edward, allegedly
24 using my money to hire him, and she told me that
25 Edward's efforts would bring up the value of Harold

1  Garde's art also, because he would be getting it
2  written up in several different art publications and
3  out there into the art community and shown at various
4  places where it would create -- I believe she used the
5  word "provenance" for the art.
6       Q.   (BY MS. GETCHES)   Now, your statement
7  that Nancy Loving said that Harold Garde had one foot
8  in the grave was that a direct quote, or are you just
9  saying that?
10      A.   I can name several direct quotes.  "One
11 foot in the grave" was a direct quote.  I also believe
12 she said several times "He's over 90 years old; I
13 mean, how long can he really live."
14      Q.   And, I mean, that's an accurate statement
15 as far as you can tell, right?
16      A.   What's an accurate statement, "How long
17 can he really live"?
18      Q.   Sure.
19      A.   Some people live until 110, and I
20 sincerely hope Harold is one of those people.  I think
21 someone just passed away in March of this year that
22 was 110 years old.
23      Q.   And you disagree with Ms. Loving's
24 alleged statement that an artist's artwork increases
25 in value after they pass away?

1    MR. HICKS:   Object to the foundation and
2  form.
3         A.   At the time I had no reason to disagree
4  with her. I thought it was morbid, but, again, Nancy
5  was positioning herself as my art counselor and giving
6  me a lot of insight about the value of art and how it
7  was going to go up in value and what I should buy. So
8  at that time I had no reason not to believe her that
9  once Harold passed the art would go up in value.
10        Q.  (BY MS. GETCHES)   You have no reason to
11 disagree with Ms. Loving's statements regarding the
12 value of Mr. Garde's artwork, do you?
13        A.   Well, unfortunately since I've had to go
14 through this litigation with Nancy and since I learned
15 through her actions that I could no longer take at
16 face value or trust what she was telling me -- no
17 matter how strong a prior business relationship I had
18 with David, her life partner, once I started reading
19 more about it and not just taking Nancy at her word, I
20 learned that artists die every day without their art
21 ever going up in value. So did I have any reason to
22 doubt Nancy at the time? No, even though I felt it
23 was morbid; hence, I genuinely like Harold, I didn't
24 want to think about his passing.
25        Since then I have learned that, yes, some

1  people like Basquiat, once they pass away their art
2  goes up significantly in value, but there's so many
3  artists whose art does not go up in value. There's
4  more artists whose art does not go up in value after
5  they pass, apparently, than artists whose art does go
6  up in value after they pass.
7         Q.   And yet you think you know Harold Garde;
8  is that your testimony?
9         A.   It depends on what your definition of
10 know is. I've met Harold Garde, and I've had
11 conversations with him on two different occasions that
12 I really enjoyed; and from those two conversations, I
13 have an affinity for him. As far as knowing him well,
14 like you would know a friend or a comrade, I do not
15 think I know him well enough to call him a friend.
16        Q.   Do you have any experience in marketing
17 art?
18        A.   I do not have experience in marketing
19 art.
20        Q.   Do you have any experience in the
21 restoration of artwork?
22        A.   No.
23        Q.   Do you have any experience in the
24 conservation of artwork?
25        A.   No.

1         Q.   You didn't start -- study art or art
2  history in college?
3         A.   Correct.
4         (At this time Mr. Hinkelman left the
5  room.)
6         Q.   Have you ever worked in a museum?
7         A.   Nope.
8         Q.   You have no degrees or certifications in
9  any art-related fields, right?
10        A.   Correct.
11        Q.   What's the appropriate temperature to
12 store art such as Harold Garde's art?
13        A.   I don't know.
14        Q.   What's the appropriate way to package art
15 such as Harold Garde's art?
16        A.   Well, what Nancy told me when I purchased
17 the art was that each of my large paintings should
18 have been packed in an individual crate for each
19 painting. All of the works on canvas should have had
20 an individual crate built for them and they should
21 have been packed in an individual crate, but I don't
22 know if that's true or not, because Nancy just shoved
23 all my paintings in a box and shipped them without
24 individually crating them. So either she was
25 incorrect in teaching me that they had to be packaged

1  that way or she was incorrect in the way that she
2  shipped the art.
3         But Nancy's -- what Nancy told me and
4  what Nancy went on is part of the foundation of my
5  knowledge, and then what Terry Dowd -- what the
6  company Terry Dowd said about how poorly my art was
7  crated and shipped and the potential damage that could
8  come from shipping it that way is my only way --
9         Q.   Did you read the Terry Dowd deposition
10 transcript?
11        A.   I did not.
12        Q.   Okay. And so if she didn't actually
13 opine that it was poorly packaged, your testimony
14 would be based on information other than her
15 testimony, correct?
16        A.   No. My information -- I have not read or
17 viewed the deposition at all. What my testimony is
18 based on is what they told me, and what they told me
19 is that not only is that not how they would have
20 shipped it but that is not typically how they receive
21 art packaged and shipped of that expense or age.
22        Q.   And you're aware that Terry Dowd is not
23 going to testify that the artwork was improperly
24 packaged or shipped; they're just going to testify
25 that it wouldn't be the way they would do it? Did you

1  know that?

2      MR. HICKS:   Form and foundation.

3      A.   No.  I didn't.

4      Q.  (BY MS. GETCHES)   Okay.  Well, if you

5  review the transcript, I think you'll be apprised of

6  that information.

7      MR. HICKS:   Object to form.

8      Q.  (BY MS. GETCHES)   Would you agree that

9  Nancy Loving is an expert in Harold Garde's art?

10      A.   I would agree that she represented

11  herself to me as an expert in Harold Garde's art.

12      Q.   Would you agree that she knows more about

13  his art than anyone else --

14      MR. HICKS:   Object to form.

15      Q.  (BY MS. GETCHES)   -- other than Harold

16  Garde?

17      MR. HICKS:   Object to foundation.

18      A.   Nancy represented to me that she knows

19  more about Harold Garde's art than anyone else.

20      Q.  (BY MS. GETCHES)   Name one person who

21  knows more about Harold Garde's artwork than Nancy

22  Loving?

23      MR. HICKS:   Object to form and

24  foundation.

25      A.   I haven't tried to find anyone who knows

1  more about Harold Garde's artwork than Nancy.

2      Q.  (BY MS. GETCHES)   And you can't tell the

3  jury a single name, can you?

4      MR. HICKS:   Object to form.

5      A.   Only because I haven't tried to find a

6  single person.

7      Q.  (BY MS. GETCHES)   And so you can't give

8  the jury a name, correct?

9      A.   Correct.

10      MR. HICKS:   Same objection.

11      Q.  (BY MS. GETCHES)   You would agree that

12  Nancy Loving knows more about Harold Garde's art than

13  you do?

14      A.   I would agree that Nancy represented to

15  me that she knows more about Harold Garde's art than I

16  do.

17      Q.   Do you think you know more about Harold

18  Garde's art than Nancy Loving, Mr. Charnoff?

19      A.   I did not say that.

20      Q.   Do you?

21      A.   Know more about Harold Garde's art than

22  Nancy Loving?

23      Q.   Yes.

24      (At this time Mr. Hinkelman entered the

25  room.)

1      A.   So at this point, Nancy has lied to me so

2  much it would be speculative of me to say what Nancy

3  knows or doesn't know about Harold Garde's art.

4      Q.   My question to you, Mr. Charnoff, was do

5  you know more about Harold Garde's art than  Nancy

6  Loving does?

7      MR. HICKS:   Object to foundation and

8  form.

9      A.   And my answer is Nancy has represented to

10  me that she knows significantly more about Harold

11  Garde's art than I do.  I would hope that Nancy knows

12  significantly more about Harold Garde's art than I do,

13  but Nancy has lied to me so much during the course of

14  our relationship what she does or doesn't know is in

15  question to me.

16      MS. GETCHES:   We're going to go off the

17  record because I think the judge is calling me again.

18  I missed one of the calls, and I will try to -- so

19  please go off the record.

20      Q.  (BY MS. GETCHES)   Mr. Charnoff, you have

21  no idea how art ages on different mediums, correct?

22      (Cell phone ringing.)

23      (Recess taken, 10:15 a.m. to 10:38 a.m.)

24      (At this time Ms. Loving and

25  Mr. Hinkelman are not present.)

1      Q.  (BY MS. GETCHES)   Mr. Charnoff, why did

2  Mr. Ladd sue you?

3      A.   What his motivations were, you would have

4  to ask Mr. Ladd.

5      Q.   He claimed that you fraudulently induced,

6  negligently misrepresented, breached fiduciary duty,

7  and that your company committed a breach of contract;

8  is that correct?

9      A.   Correct.

10      MR. HICKS:   Object to form.

11      Q.  (BY MS. GETCHES)   You told your investors

12  that you would win the lawsuit, correct?

13      A.   I don't think I made definitive

14  statements that I would win the lawsuit.  I told the

15  investors that we were in the right and that I

16  believed we would win the lawsuit.

17      Q.   How much did you pay in legal fees?

18      MR. HICKS:   Hold on one second.  Why is

19  that relevant?  And why is that not privileged?

20      MS. GETCHES:   It's privileged -- it's not

21  privileged, and it doesn't matter if it's relevant.

22      MR. HICKS:   I think it is privileged.  Is

23  that something you really want to ask about?

24      MS. GETCHES:   I can't hear you, Ian.

25      MR. HICKS:   Why is that not privileged?

1    MS. GETCHES:  Why would that be
2 privileged, the total amount?
3    MR. HICKS:  If there is a public document
4 or something like that that you can point me to, fine,
5 I will let him answer the question, but how much he
6 paid, I'm not sure if that's -- I mean, those are
7 parts of communications with your client.
8    MS. GETCHES:  Are you instructing him not
9 to answer, Ian, or are you going to pontificate?
10    MR. HICKS:  I am going to pontificate a
11 little more, actually.  So . . .
12    Q.  (BY MS. GETCHES)  Mr. Charnoff, did you
13 instruct investors to set aside legal reserves  related
14 to the Bob Ladd lawsuit?
15    A.  Not that I can remember.
16    Q.  Your attorneys met with David Hinkelman
17 during the Bob Ladd lawsuit, correct?
18    MR. HICKS:  Object to foundation.
19    A.  I don't recall.
20    Q.  (BY MS. GETCHES)  You don't recall
21 telling Mr. Hinkelman you would pay for his airline
22 ticket to come out and meet with his attorney --
23    A.  I do not.
24    Q.  -- meet with your attorney?
25    A.  I do not.

1    Q.  What was your answer?
2    A.  I do not recall if I did.  There would be
3 some kind of email verifying that, and I can look
4 through my emails, but I do not recall.
5    Q.  Do you recall that Mr. Hinkelman met with
6 your attorneys in the Bob Ladd lawsuit.  I believe it
7 was Steve Long.  And after hearing what he was going
8 to say, they decided not to have him testify?
9    A.  That is not true.  That is not true.
10    Q.  Is that why things went south with
11 Mr. Hinkelman and Ms. Loving?
12    A.  Absolutely not.
13    Q.  The jury found against you after a trial
14 in October 2017, correct?
15    A.  On some claims the jury found for me; on
16 some claims the jury found against me.  There were
17 legal errors, and those jury verdicts were declared
18 void ab initio.
19    Q.  I understand that the judgment was agreed
20 by the parties to be void ab initio --
21    A.  That part --
22    Q.  What I'm asking you is was the jury's
23 verdict against you personally $1.6 million plus
24 prejudgment interest?
25    MR. HICKS:  Object to form.

1    A.  Ms. Getches, one, you categorized that
2 incorrectly.  The parties did not agree to have it
3 void ab initio.  The judge voided the verdict void ab
4 initio.
5    Q.  (BY MS. GETCHES)  I understand you might
6 not understand how it works, but the parties filed a
7 motion with the Court to void the judgment , which was
8 an agreement of the parties.
9    My question to you has nothing to do with
10 that; it has to do with the jury verdict.
11    A.  Okay.
12    Q.  Did the jury find against you to the tune
13 of $1.6 million prejudgment interest?
14    MR. HICKS:  Object to form.  Go ahead .
15    A.  I would have to look at the jury verdict
16 and see what they found against me.
17    Q.  (BY MS. GETCHES)  Could you speak up?
18    A.  I would have to look at the jury verdict
19 to see if that is true or not.
20    Q.  So a number of that magnitude doesn't
21 ring a bell to you?
22    MR. HICKS:  Same objection.
23    Q.  (BY MS. GETCHES)  Is that true?
24    A.  Does a number of that magnitude ring a
25 bell to me?  It's funny, because I got the eye roll

1 when I asked you if representing a client and sitting
2 in first chair four years ago rings a bell to you.
3 But I didn't say that number doesn't ring a bell to
4 me; I said I would have to look at the jury verdict to
5 see exactly what they found against me.
6    Q.  (BY MS. GETCHES)  So you can't -- as you
7 sit here today, you can't tell the jury the number in
8 damages that was awarded against you in the claim
9 brought by Bob Ladd for fraudulent misrepresentation,
10 among other claims, correct?
11    MR. HICKS:  Object to form.
12    A.  What was found against me at trial was
13 under a million dollars.  I believe that you were
14 saying that they found the value of an asset  in 985,
15 but the jury failed to value the claim on that.  So I
16 do not know what would have been found or not as to
17 what the damages were.
18    MS. GETCHES:  I just told the defendants
19 they can get back on.
20    Q.  (BY MS. GETCHES)  Mr. Charnoff, you had
21 made your final payment and were the owner of the
22 Harold Garde art that you purchased from ArtPort as of
23 November 2017, right?
24    MR. HICKS:  Object to form.
25    A.  There's an email record of the exact day

1  I made the final payment. I don't recall the exact
2  day. But as of the final payment that I made to
3  Nancy, which was verified in writing, I was the owner
4  of the Harold Garde art.
5      Q. (BY MS. GETCHES) Okay. Does it ring a
6  bell that that was November 2017?
7      A. It does not. I would have to check my
8  email to see the exact date.
9      Q. Okay. And you were the sole owner of the
10  Harold Garde artwork that you purchased from Nancy
11  Loving, correct?
12      MR. HICKS: Object to form.
13      A. What do you mean, the sole owner of the
14  artwork?
15      Q. (BY MS. GETCHES) Did you own it along
16  with your wife?
17      A. We never really discussed whether her and
18  I owned it together, but . . .
19      Q. Do you consider her to be an owner of the
20  art as well?
21      MR. HICKS: Object to form.
22      A. Sure.
23      Q. (BY MS. GETCHES) Sure?
24      MR. HICKS: Object to form and
25  foundation.

1      (At this time Ms. Loving entered the
2  room.)
3      Q. (BY MS. GETCHES) Okay. Now, in one of
4  your court filings, you indicated that the reason you
5  purchased the art was to return a favor to
6  Mr. Hinkelman; is that correct?
7      A. That is not what I -- that is not what I
8  wrote in the court filing. What I wrote is that Nancy
9  and Dave were pushing me over and over again, saying
10  that Dave helped me sell a company and now it was time
11  to return the favor. They were very aggressive about
12  pushing that issue.
13      Q. What was the favor you were being asked
14  to return?
15      A. Well, I didn't consider it a favor,
16  because Dave was compensated for it. But what they
17  considered the favor, apparently, was Dave getting a
18  million dollars richer by helping me sell a company.
19      Q. So Dave got a million dollars richer and
20  he's asking you to do a favor on top of that to --
21  that doesn't make any sense?
22      A. I believe I even said that in my court
23  filings also that -- I mean, there's no --
24      Q. I mean, why did you consider it to be a
25  favor?

1      MR. HICKS: Object to form.
2      A. There's no -- for greed and pushiness.
3  Again, even in the court filing, if you read it, I
4  didn't say I considered it to be a favor. I said Dave
5  and Nancy started hounding me and soliciting me and
6  saying that Dave helped me sell my company, I made a
7  bunch of money, and it's time to return the favor. I
8  didn't say that I considered it a favor.
9      Q. (BY MS. GETCHES) Well, explain to the
10  jury --
11      A. I even said in the court document that
12  Dave pushed me to do that favor, even though Dave made
13  over a million dollars on the sale of my company.
14      Q. So explain to me -- well, explain to the
15  jury why you believed you should return the favor in
16  response to that request from Mr. Hinkelman if you had
17  already allegedly made him a million dollars. Explain
18  why that makes sense.
19      MR. HICKS: Object to form and
20  foundation.
21      A. I've already answered that question.
22  I've never said anywhere that I needed to return the
23  favor. I said that Dave and Nancy started soliciting
24  me and saying it was time for me to return the favor.
25      Q. (BY MS. GETCHES) Okay. You must not

1  have felt much obligation if you had already made him
2  a million dollars, right?
3      A. So at the time I considered Dave a close
4  friend, and Dave had shared with me that the business
5  was suffering and that it would very much help him out
6  if I made the purchase. So part of it, yes, was
7  motivated by a desire to help Dave, but not out of
8  obligation; whereas, I felt like I needed to return a
9  favor, because, again, Dave got paid over a million
10  dollars. So it was more out of -- any sense of
11  wanting to help Dave's life partner with her business
12  was more out of a sense of friendship and loyalty to
13  Dave than it was out of some obligation.
14      Q. Okay. And you and Mr. Hinkelman were
15  good friends, right?
16      A. I thought we were.
17      Q. And you worked closely with him for many
18  months, right?
19      A. Yes.
20      Q. And you trusted him, right?
21      A. Correct.
22      Q. Did you think he knew you well?
23      A. Sure.
24      Q. And you were business colleagues with
25  Mr. Hinkelman in what businesses?

1    A.    REIsmart and GoldenGator and Lift
2  Strategic Partners and during his tenure at Fortress
3  and at Nation Star/Solution Star.
4    Q.    Did Mr. Hinkelman provide an investment
5  prior to the acquisition of your three companies into
6  Altisource that allowed the actual acquisition to go
7  forward?
8        MR. HICKS:   Object to form.
9    A.    That's a two-part question. Would you
10  like me to answer each part of that question
11  separately?
12    Q.    (BY MS. GETCHES)  Sure.
13    A.    Dave invested in one of the businesses
14  that was acquired by Altisource, REIsmart LLC. No,
15  that is not what allowed the acquisition of Altisource
16  to move forward.
17    Q.    What did allow it to go forward if it
18  wasn't his investment or his loan?
19    A.    That is a really --
20        MR. HICKS:   Object to form.
21    A.    -- where the parts of the question are
22  not related to each other.
23    Q.    (BY MS. GETCHES)  Do you think there
24  would have been a bankruptcy if you hadn't provided
25  that investment?

1    A.    No way.
2    Q.    Do you remember the date you were
3  diagnosed with COVID?
4        MR. HICKS:   Object to the form. Why is
5  this relevant?
6    A.    I believe July -- I believe the official
7  diagnosis came in either on Monday, July 13, or
8  Tuesday, July 14. My COVID symptoms started on
9  July 12.
10    Q.    (BY MS. GETCHES)  Were you hospitalized?
11    A.    Twice.
12    Q.    Do you recall the dates you were
13  hospitalized from COVID?
14    A.    Both hospitalizations were between, I
15  believe -- I can look up the exact dates, but I
16  believe they were between the 14th and the 20th.
17    Q.    Meaning you went back to the hospital
18  twice, but both stays occurred between the 14th and
19  the 20th?
20    A.    Correct.
21    Q.    Do you recall the date that your wife
22  contracted COVID?
23    A.    Well, she started showing symptoms the
24  day after I did. So she started showing symptoms
25  on -- and, again, this is to the best of my

1  recollection. I believe she started showing symptoms
2  on the 13th.
3    Q.    After you returned home from the hospital
4  on the 20th, how long until you recovered?
5    A.    So I was still having issues with
6  COVID-related problems as late as a week ago. And I'm
7  waiting to find out if all of my COVID-related issues
8  are still there or not. I have other doctors'
9  appointments next Wednesday and Thursday.
10        And just to be clear, I don't know that
11  it was exactly on the 20th. I believe that it was
12  that day, but I can look at -- there's a hospital bill
13  from the day I was in the hospital. Both days.
14    Q.    Did a doctor ever instruct you that you
15  could not be deposed by video until August 6, 2020?
16        MR. HICKS:   Objection.
17    A.    So our doctor said for both Brande and I
18  it was a better idea not to be deposed, because we
19  were both still having pulmonary symptoms and I was
20  having cardiac symptoms. And he said that --
21  actually, he said the additional stress you put on my
22  wife might have actually already impeded her recovery.
23    Q.    (BY MS. GETCHES)  Did a doctor instruct
24  you that you could not be deposed by video on
25  August 6?

1        MR. HICKS:   Object to form.
2    A.    Doctors can't tell you what to do or not.
3  My doctor instructed me that it would be a bad idea,
4  and he didn't recommend it.
5    Q.    (BY MS. GETCHES)  You're aware that
6  doctors do give instructions that prohibit employees,
7  for example, from lifting over a certain weight,
8  correct?
9        MR. HICKS:   Object to form and
10  foundation. Liza, what does this have to do with the
11  claims or defenses in the case?
12    Q.    (BY MS. GETCHES)  You can answer,
13  Mr. Charnoff.
14        MR. HICKS:   I'm asking you a question.
15  What does this have to do with the claims or defenses
16  in the case?
17        MS. GETCHES:   It has to do with
18  representations that were made to the judiciary, and I
19  want answers.
20        MR. HICKS:   Okay. So you just --
21    Q.    (BY MS. GETCHES)  Mr. Charnoff, you can
22  answer. Unless he instructs you not to answer --
23        MR. HICKS:   I'm instructing him not to
24  answer. Why are we asking these questions? If it's
25  not something that hasn't been already revealed to the

1  Court, it's not something that's been waived, it's
2  medically privileged by statute, okay?  The things
3  you've asked about so far are in court records and
4  filings.  If you go farther, I'm going to instruct him
5  not to answer.
6      Q.  (BY MS. GETCHES)  Mr. Charnoff, were you
7  ordered by a doctor not to be deposed by video on
8  August 6?
9          MR. HICKS:  Object to the form,
10  foundation.
11      A.  What the doctor said is that it would be
12  unsafe and potentially damaging permanently to my
13  health to be deposed on August 6.
14      Q.  (BY MS. GETCHES)  Okay.  So no court
15  order or no doctor order.
16          Were you ordered by a doctor --
17      A.  We live --
18      Q.  -- that you could not be deposed via Zoom
19  until you had two negative COVID tests?  Did that
20  order ever occur?
21          MR. HICKS:  Object to the form.
22      A.  What my doctor said is that I should not
23  be deposed via Zoom until I check the damage to my
24  heart, because I was exhibiting symptoms of cardiac
25  damage that accelerated my already heart disease that

1  I was suffering from.  And I couldn't get the cardiac
2  test necessary to get cleared until I had two negative
3  COVID tests, because that is how it works right now.
4  So what my doctor instructed me is not to -- it would
5  be unsafe to be deposed until I was cleared by the
6  cardiac doctor.
7      Q.  (BY MS. GETCHES)  And was -- I'm talking
8  about a prior doctor's order.  Did a doctor's order --
9  did a doctor ever order you to get two COVID tests,
10  two negative COVID tests, prior to being deposed via
11  Zoom?
12      A.  Liza, I already answered that question.
13  He said that I couldn't -- I shouldn't be deposed.  We
14  don't live in a police state.  A doctor can't tell me
15  to do or not do anything.  I'm not an employer; I'm a
16  human being.  What my doctor said was he strongly
17  advised me not to be deposed because it would be
18  adverse, maybe permanently adverse, to my health until
19  I got cleared by the cardiac doctor, and the cardiac
20  doctor would not do the test until I had two negative
21  COVID tests.
22      Q.  Do the COVID tests, the two negative
23  COVID tests; is that your testimony?
24      A.  That's my testimony.
25      Q.  Okay.  And so do you know the date the

1  doctor told you that you had to get two negative COVID
2  tests prior to being deposed?
3      A.  I'm sure that there's a note of it in his
4  records.  And I can look at my phone records, but I
5  don't remember the exact date.
6      Q.  What is the name of your doctor?
7      A.  Christopher Trojanovich.
8      Q.  How do you spell the last name?
9      A.  T-r-o-j-a-n-o-v-i-c-h.
10      Q.  And the instance where you just referred
11  to that the doctor said you needed to get some heart
12  examinations done prior to being deposed --
13      A.  He strongly advised --
14      Q.  -- did that occur -- sorry?
15      A.  Not needed to.  Strongly advised me to.
16  Again, he cannot order me to do anything.
17      Q.  Your attorney represented to me that your
18  doctor ordered you to get two negative COVID tests
19  prior to being deposed via Zoom, and this was prior to
20  the heart condition instance.  And I'm asking you
21  whether that happened.
22      A.  No.  It wasn't prior to the heart
23  condition instance, because I've been suffering with
24  known heart disease since 2016.  And the two negative
25  COVID tests were specifically related to the cardiac

1  test that I needed to be clear.
2      Q.  Your most recent deposition, your
3  attorney informed all of us that you could not be
4  deposed until you got a heart stress test, and he
5  informed us on Sunday at 5:00 p.m. prior to the day of
6  your deposition.  Do you recall that?
7      A.  I do recall that, yes.
8      Q.  And you found out on the Sunday before
9  your Monday deposition; is that your testimony?
10      A.  So I was having -- I backslid in my
11  recovery quite a bit, and it got to the -- and I was
12  hoping to be able to do a deposition on Monday.  And
13  by the time Sunday rolled around, I was experiencing
14  some pretty major problems.  So, yes, it was Sunday.
15      Q.  It sounds like you and your wife went to
16  the doctor together?
17      A.  My wife and I did not go to the doctor
18  together.
19      Q.  Okay.  Do you know whether a doctor
20  instructed your wife that she could not be deposed for
21  30 days?
22      A.  Yes.
23      Q.  From August 6?  Yes?
24      A.  Yes.
25      Q.  Do you recall --

1      A.   Liza, did you think it was worth putting

2 my wife and my's health at further risk to be deposed

3 a few days earlier?

4      Q.   Do you recall completing some discovery

5 requests in this matter?

6      A.   Yes.

7      MR. HICKS:   I need to take a quick

8 bathroom break. Okay? Ten minutes ? Let's go off the

9 record.

10      (Recess taken, 11:01 a.m. to 11:12 a.m.)

11      MS. GETCHES:   Can you confirm whether

12 there is a document being shared, Kirsten?

13      THE REPORTER:   Yep. I can see it.

14      Q.   (BY MS. GETCHES)   Can you see it,

15 Mr. Charnoff?

16      A.   Yep. I can see it.

17      Q.   Okay. Do you recall reviewing and

18 responding to discovery requests submitted to by the

19 defendants in this matter?

20      A.   I recall reviewing what Ian prepared and

21 signing them, yes.

22      Q.   And that's your signature on the

23 verification page, correct?

24      A.   Correct.

25      Q.   And you signed this verification page on

1 the date that you previously just told me you were

2 diagnosed with COVID, correct?

3      A.   Correct.

4      Q.   Do you recall answering these requests

5 for admission?

6      A.   I recall reviewing the requests for

7 admission.

8      Q.   Did you know that the discovery requests

9 were not submitted on time?

10      A.   I did not know.

11      MR. HICKS:   Objection. Form.

12 Foundation.

13      Q.   (BY MS. GETCHES)   Did you answer,

14 Mr. Charnoff?

15      A.   Can you repeat the question, please?

16      Q.   Do you recall that these requests for

17 admission did not -- we did not receive responses on

18 time?

19      A.   I was not aware of that, no.

20      Q.   Did you know that the legal effect of not

21 responding to requests for admission on time is that

22 the judge has the ability to deem them admitted?

23      A.   I did not know that, no.

24      MR. HICKS:   You should also ask him if

25 you're aware whether the judge --

1      MS. GETCHES:   Please look at

2 Interrogatory Number 5.

3      MR. HICKS:   The Court found that they

4 were timely. So you should ask him about that.

5      Q.   (BY MS. GETCHES)   Okay. Interrogatory

6 Number 5 was the following question: With respect to

7 the journal, identify by name and title and describe

8 each of the 14 paintings, two unbound paintings , and

9 cover of the journal you claim comprised the journal

10 as alleged in paragraph 52 of your complaint.

11      Do you recall reviewing that question at

12 all?

13      A.   I do not.

14      Q.   (BY MS. GETCHES)   You do not?

15      A.   Do not.

16      Q.   One of the items of artwork that you're

17 suing the defendants over in this matter is the

18 journal, correct?

19      A.   Correct.

20      Q.   What did the cover of the journal look

21 like?

22      A.   The front of the journal was -- it was

23 paintings that were bound together.

24      Q.   And what did the cover look like?

25      A.   Like the cover of an old loose-leaf

1 journal.

2      Q.   What color was the cover?

3      A.   I don't remember.

4      Q.   When you say "bound," was it bound like a

5 spiral notebook or bound as in a composition notebook?

6      A.   It looked like it was bound with some

7 kind of -- not like a spiral notebook, but with a

8 combination notebook with peripherals going through

9 the paper actually.

10      Q.   Could you lean forward and repeat your

11 question. I just can't hear you.

12      A.   It's bound with peripherals going through

13 the paper. Like the paper itself had -- if you tore a

14 paper out, you would be able to see where it came. It

15 wasn't spiral like a spiral notebook, but the binding

16 that went through it would make holes in the paper if

17 you pulled the paper out. Little holes.

18      Q.   So it was not a spiral notebook ; is that

19 what you just said?

20      A.   It wasn't -- when I think of a spiral

21 notebook, I think of, like, just really thin metal

22 rungs. It was bound like that, but I don't think it

23 was standard spiral metal that was binding it

24 together. It was more like -- it was a little bit

25 thicker than that. But it still would make

1 peripherals in the paper. If you pulled the paper out
2 you would see where it was pulled out of the notebook.
3 Q. Can you spell the P word that you said a
4 couple times?
5 A. I'm not the best speller, but I believe
6 it's p-e-r-i-p-h-i-l (sic), peripheral.
7 MR. HICKS: Peripheral.
8 Q. (BY MS. GETCHES) And so your testimony
9 is that the journal that you purchased from ArtPort
10 was a spiral bound notebook made out of some kind of
11 spiral material other than metal; is that correct?
12 A. I wouldn't use the word ''spiral'' to
13 describe it, because spiral means one continuous piece
14 of something like metal that goes around and around
15 and around. I said it was more like a peripheral
16 notebook, where it was bound, but I think each of the
17 binding pieces were individual.
18 Q. Were individually what?
19 A. Like not connected, like it didn't go
20 round and round. Like if you run one continuous piece
21 of metal through in a spiral, that's what I consider a
22 spiral notebook. And, again, I purchased it a long
23 time ago. Nancy didn't ask me to pay particular
24 attention to the material that was used to bind it.
25 But my belief is that the material used to bind it,

1 each of the bindings would make a separate hole in the
2 paper; it wouldn't be one continuous connected bind
3 that would go through.
4 Q. Okay. Was the journal in clean condition
5 or was it dirty?
6 A. I mean, dirty as in dusty or dirty as in
7 looked like it was from 1972? I guess I don't
8 understand what you mean.
9 Q. What did it look like to you,
10 Mr. Charnoff?
11 A. It looked like a bunch of paintings in a
12 notebook bound together to me.
13 Q. Was the cover dusty?
14 A. I really don't pay too much attention to
15 whether the cover had dust on it or not.
16 Q. Did you pay attention to what the brand
17 of notebook it was?
18 A. I did not.
19 Q. Did you pay attention to the number of
20 journal paintings that were in the journal?
21 A. So I believe that there were 16 paintings
22 in the journal, and at least two of them were
23 completely unbound and stuck in between the other
24 paintings.
25 Q. Okay. And the ones that were unbound and

1 stuck in, did they have a spiral notebook edge,
2 meaning kind of a scraggly edge where it had been
3 ripped out?
4 A. I believe so.
5 MR. HICKS: Object to form. Go ahead.
6 Q. (BY MS. GETCHES) Describe the two
7 journal paintings that were unbound one at a time,
8 please.
9 A. One was a lady that was, I think, mostly
10 nude or nude next to a vase laid on her side. And the
11 other one had a baseball player in the middle -- in
12 like a little box in the middle of other background.
13 Q. And the remaining 14 paintings you
14 testified were in the bound part of the notebook,
15 correct?
16 A. So I believe 11 of them were fully bound
17 together, and there were three of them that looked
18 like they were partially bound or unbound. Like, I
19 don't know if you would consider that bound or not,
20 the perforates had already started tearing them loose .
21 So 11 of the paintings were fully bound in the
22 notebook. Two were completely loose and tucked in
23 and . . .
24 Q. Tell the jury what partially bound and
25 unbound means.

1 MR. HICKS: Object to the form.
2 A. It means that the entire thing wasn't
3 torn out, but all of the -- the entire painting wasn't
4 still attached.
5 Q. (BY MS. GETCHES) What did the back cover
6 of the journal look like?
7 A. I don't remember.
8 Q. Do you recall the color of the back
9 cover?
10 A. I do not.
11 Q. Do you recall whether the edges of the
12 journal pages were bent from age or not?
13 A. To the best of my recollection, the
14 journal was surprisingly unbent due to its age. It
15 looked pretty clean.
16 Q. Do you have any pictures to show the jury
17 what the journal looked like the time you saw it?
18 A. I believe all the pictures I have have
19 already been submitted.
20 Q. All the pictures you had what?
21 A. Have already been submitted.
22 Q. If you didn't submit any pictures, is it
23 your testimony that you don't have any pictures to
24 show to the jury?
25 A. Oh, I do. I have pictures of the missing

1 paintings, because, interestingly enough, Ms. Loving
2 was nice enough in her discovery responses to send me
3 four of the paintings that she claimed weren't mine,
4 she sent them with the pictures of what she claimed
5 was mine. So I do now have photos of four of the
6 missing paintings.
7  Q. And it's your testimony you got those
8 during discovery in this case?
9  A. It's my testimony that Nancy sent me
10 pictures of the missing paintings during discovery,
11 yes.
12  Q. Through discovery in this case, correct,
13 Mr. Charnoff?
14  A. Correct.
15  Q. Have you taken the time to identify what
16 those four paintings are?
17  A. When we initially got the discovery, yes.
18  Q. And on what pleading forum did you
19 identify what those four paintings are?
20  MR. HICKS: Object to the form.
21  A. I just looked at additional photos that
22 Nancy sent over, which came over late and separate
23 from the rest of her photos, and I was surprised to
24 see that she included photos of what I had been
25 telling her all along were my paintings and she had

1 been saying weren't, she decided to send photos of
2 them and say that they were. But I didn't identify --
3  Q. (BY MS. GETCHES) Okay. Why don't you
4 tell the jury what those four paintings are.
5  MR. HICKS: Object to the form.
6  A. I don't have them in front of me at this
7 point.
8  Q. (BY MS. GETCHES) I'm sorry. What?
9  A. I don't have -- the photos that Nancy
10 sent, I don't have all those in front of me right now.
11  Q. Why don't you describe them one by one,
12 please, for the jury.
13  MR. HICKS: Object to form.
14  A. I already described two of them, two out
15 of the four to you. The rest I can point out.
16 They're all four pretty much right next to each other
17 in the discovery.
18  Q. (BY MS. GETCHES) You can't think of the
19 other two paintings that were missing allegedly?
20  A. All of Mr. Garde's journal paintings
21 looked somewhat similar. So when I look at them, I
22 can tell you, but it is hard to describe.
23  Q. Any other description you can provide the
24 jury so they have some way to understand what the four
25 paintings are that you claim were missing?

1  A. I would rather pull up an exhibit and
2 just show the jury a picture of those four paintings.
3 That would be a lot --
4  Q. Okay. Well, you've been asked in
5 discovery to provide this information. And instead of
6 providing that information, for the first time now
7 you're claiming that you have information regarding
8 which journal paintings were actually missing.
9  A. Unfortunately Ms. Loving's MO during this
10 trial has been to trickle in little bits of discovery
11 at a time that we asked for in January have still come
12 in as late as last month. So unfortunately for us,
13 Ms. Loving withheld a lot of information until after
14 our discovery responses were due, including those four
15 photos. They came over after -- probably
16 strategically and intentionally they came over after
17 these discovery responses were due. So there was no
18 way for us to disclose them, because like the lease
19 and all the other things Ms. Loving chose to -- I
20 don't know the legal term -- spoilate in this case, or
21 at least withhold -- she withheld those until after
22 these responses were due.
23  Q. Mr. Charnoff, let's look at Number 5. We
24 asked you "With respect to the journal, identify by
25 name and title and describe each of the 14 paintings,

1 two unbound paintings, and cover of the journal that
2 you claim comprised the journal" . . .
3  Following your attorney's objection, you
4 state the following: "Plaintiff states that he was
5 sold on the journal as a result of its uniform,
6 complete, and cohesive character as a collection of
7 artworks, and that fundamental character was destroyed
8 when the journal was then incomplete, with parts
9 missing." Correct?
10  A. Correct.
11  Q. And so it's your testimony that even
12 though only 11 pieces of the journal were bound, it
13 was still the fact that this journal had five other
14 pieces stuck in or partially bound and that's what
15 gave the journal its value to you?
16  A. No. That's what Ms. Loving said gave the
17 journal its value. Ms. Loving was very persuasive.
18 And, again, keep in mind, I had no prior experience
19 buying art of this type. Ms. Loving represented
20 herself as an expert to me, much like she's
21 represented herself -- well, she's her own expert
22 witness in this case. And Ms. Loving was extremely
23 eloquent and persuasive in describing to me the
24 importance of that journal to Harold Garde's career
25 and that -- the fact that it was his bound painter's

1  journal that he would paint in and that the vast
2  majority of the journal was still bound together and
3  that the half bound and the two completely unbound
4  pieces were still with it that that was a
5  representation of Harold's journal paintings from the
6  end of 1971 until the beginning of 1973. And that for
7  museums and for part of Harold Garde's story and for
8  the historical relevance that that journal was worth
9  more value specifically because it was a collected
10 journal of paintings mostly still bound even though it
11 was at the time 47 years old-ish.
12            So that's where I got that information
13 from. I was just trusting that Ms. Loving told me,
14 that that journal was valuable because the 11 bound
15 paintings were still in there, because it was a
16 complete collection, because it was going on at that
17 time.
18            I was really surprised that she tried to
19 steal the two paintings she tried to steal, because
20 the one picture -- I forget the baseball player's
21 name. Maybe it was Jackie Robinson. I don't know --
22 Nancy had given me a story about how that specific
23 painting was extremely relevant because of what was
24 going on in the world at that time and the baseball
25 player that was in it.

1             And she also told me about the lady
2  laying on her side, which is why I can remember in
3  detail what that painting looked like, because Nancy
4  said that that was extremely representative of Harold
5  Garde's unique style and it was one of the few
6  paintings that weren't reflective of other artists as
7  well. Anyway . . .
8       Q.   Yeah, anyway, so what -- how many times
9  did you see the journal in person?
10      A.   Once.
11      Q.   How long did you look at the journal?
12      A.   Well, it took Nancy about 30 to 40
13 minutes to go through the spiel about each painting
14 and why they were relevant and how museums look for
15 bound journals even if they're only part bound and
16 some of the paintings are missing and what was going
17 on in those years. I would bet that looking through
18 the paintings and the journal, listening to Nancy's
19 what I know now to be a sales pitch but at the time
20 what I thought was education, 45 minutes to an hour.
21      Q.   Is it your testimony that the journal
22 paintings have no historical significance or value if
23 they are not in a bound notebook?
24      A.   I would say that that is a
25 misrepresentation, mischaracterization of what I said.

1  What my --
2       Q.   I just asked you a yes-or-no question.
3  Is that your testimony or not?
4            MR. HICKS:   Object to form.
5       A.   What Nancy sold was the value of the --
6  the additional value of the journal with those 11
7  pieces being bound and the three pieces being
8  partially bound and then the two pieces included, she
9  sold me on the historical value of the journal as a
10 bound piece of work, as an aggregate collection of
11 Harold's journal paintings for that little over a year
12 time frame and for what was going on in the world at
13 that time. And Nancy very clearly articulated to me
14 that the journal was worth more money because 11 of
15 the paintings were still bound. So what I bought was
16 based on Nancy's representation that the value of the
17 journal was tied to the fact that 11 of the paintings
18 were still bound together and that all 16 paintings
19 were present. So all I --
20      Q.   (BY MS. GETCHES)  What did she represent
21 to you was the difference in value?
22            MR. HICKS:   Liza, you're cutting off his
23 answer to the question. So let him finish, please.
24      A.   What I had to go by is that the number
25 that we came to for what I paid for those journals

1  included the additional value of the 11 paintings that
2  were bound and a few paintings that were partially
3  bound and that all the paintings were there and
4  together.
5            So all I had to go by was that I was
6  buying a bound historic piece of Harold Garde's
7  history and art during that time frame and all of the
8  relevant artworks that were in it, which she tried to
9  remove and still I haven't gotten -- I don't know if
10 those pictures she sent me was a good faith laurel
11 wreath saying that she's going to send the paintings
12 that are missing that are currently -- some of them
13 are still for sale on Artsy, but after she said that
14 those paintings were getting 100 percent online, which
15 is very troubling to me -- but all I had to go by is
16 that Nancy said much of the value -- and I'm talking
17 about she placed a significant amount of her what I
18 now know to be a sales pitch on the fact that it was a
19 bound together journal.
20            So my feeling is unless she was boldface
21 lying to me that journal is significantly less value
22 now that it's unbound. But at any rate, it is not
23 what I purchased. What I purchased was a bound
24 together with 11 paintings. And this --
25      Q.   (BY MS. GETCHES)  Mr. Charnoff, my

1    question to you is what is the difference in value?
2    What is your understanding of the difference in value?
3        MR. HICKS:   Object to form.
4        A.   Well, how Nancy pitched it, she pitched,
5    like, at least half of the value of the journal was
6    tied to the fact that it was bound together . But for
7    me, the value was completely diminished. Because what
8    I bought was a bound together journal; Nancy took it
9    upon herself to unbind it so it is no longer what I
10   purchased. So to me, the value is zero unbound versus
11   what I paid for it bound.
12       Q.  (BY MS. GETCHES)  Has any expert agreed
13   with your opinion that the journal paintings are worth
14   less unbound versus bound?
15       MR. HICKS:   Object to the form.
16       A.   I solicited the advice of an expert as to
17   whether the paintings are less -- worth less. But
18   Nancy is setting herself out as an expert, and, again,
19   she's the expert witness on her side of this case.
20   And Nancy clearly told me prior to purchase and at the
21   time of purchase that much of the value is tied to the
22   fact that it's binding. And I don't need an expert to
23   tell me that those paintings are valueless to me
24   unbound.
25       Valueless to me for several reasons.

1    One, it's not what I paid for. I bought something,
2    Nancy altered it, and now it is irreparable and it's
3    no longer what I purchased. So an expert doesn't need
4    to tell me that I bought something that now I can
5    never get again. That's number one. And, two, I used
6    to get -- it used to be pleasing to me to look at that
7    journal and I planned on keeping that journal as
8    something of esthetics, sentimental, and art value
9    where I would get enjoyment looking at the piece , and
10   now every time I see the journal all I'm going to
11   think about is how Nancy destroyed it, how she
12   tried -- by unbounding it; how she tried to sell the
13   pieces that she sold me on were the most historically
14   relevant, she tried to take away from me and sell it
15   to somebody else without my permission.
16       Q.  (BY MS. GETCHES)  Has anyone corroborated
17   your opinion that the journal has less value unbound
18   versus bound?
19       MR. HICKS:   Object to form.
20       A.   Just Ms. Loving.
21       Q.  (BY MS. GETCHES)  Has anyone corroborated
22   your opinion?
23       A.   Just Ms. Loving.
24       Q.   Okay. And if she doesn't agree with
25   that, then you have no one corroborating your opinion,

1    correct?
2        A.   Ms. Loving is the one who told me the
3    journal would be worth less money unbound than bound.
4        Q.   Okay. Did Ms. Loving tell you that this
5    is akin to buying the original manuscript of a famous
6    book such as Moby Dick or A Tale of Two Cities?
7        MR. HICKS:   Can you read the rest of the
8    sentence, please?
9        Q.  (BY MS. GETCHES)  Did she, Mr. Charnoff?
10       A.   I think you're miscategorizing what  he
11   wrote there. I think --
12       Q.   Did she use any of those words in
13   describing the value of the journal, that it was akin
14   to an original manuscript of a famous book such as
15   Moby Dick or A Tale of Two Cities?
16       A.   I do not remember Nancy using that
17   reference with me, and I don't think we said in our
18   response that she specifically made that reference.
19       Q.   All right. Mr. Charnoff, are these
20   the -- this is an email from May 20, 2019, of 11
21   journal paintings that Ms. Loving is saying were sold
22   to you. Is it your testimony that these 11 journal
23   paintings are not the journal paintings you had
24   purchased or just that they are short of the journal
25   paintings that you purchased?

1        A.   It is my testimony that they are no
2    longer bound together. But what you can clearly see
3    from the holes in the paper that used to hold them
4    together. It is also my testimony that five of the
5    paintings are missing.
6        Q.   And you said that you saw  the journal
7    paintings on Artsy, correct?
8        A.   On Artsy and on haroldgarde.com and , I
9    believe, on Artsy New York.com, yes.
10       Q.   All right. In your complaint, you stated
11   that three journal paintings were placed for sale on
12   the internet and that you saw them on Artsy.net. And
13   then you state in your discovery responses, Number 7,
14   that "Plaintiff is in the process of locating and
15   producing copies or screenshots of those items for
16   sale," correct?
17       A.   That's what it says, yes.
18       Q.   Where are the screenshots, Mr. Charnoff?
19       THE DEPONENT:  Ian, have we provided the
20   screenshots to them?
21       MR. HICKS:  I'll have to double-check.
22   If it's a file that hasn't been provided, then . . .
23       Q.  (BY MS. GETCHES)  Mr. Charnoff, we have
24   received zero copies or screenshots of the items that
25   were for sale on Artsy.net. Is it your testimony

1 under oath that you have copies of the pictures that
2 were for sale on Artsy.net?
3 　　　　MR. HICKS:　Well, we're not required to
4 disclose things your client already has, Number 1.
5 Number 2 . . .
6 　　　　MS. GETCHES:　I can't understand a word
7 you're saying, Mr. Hicks.
8 　　　　MR. HICKS:　I said we're not required to
9 disclose anythings that your client already has, but I
10 will do a good faith search and make sure . . .
11 　　　　MS. GETCHES:　Mr. Hicks, did you just say
12 you are not required to disclose anything in response
13 to this discovery request?
14 　　　　MR. HICKS:　No.　I said nothing like
15 that.　What I said was if your client already has
16 something that she put on the internet, it's not my
17 job to disclose to her like the copy of her driver's
18 license or other information she obviously has.　We
19 did disclose the fact that we saw it and there are
20 screenshots.
21 　　　　MS. GETCHES:　Good luck with taking that
22 position, Mr. Hicks.
23 　　　　MR. HICKS:　Well, it will be the same
24 position of many federal and state courts.
25 　　　　Q.　(BY MS. GETCHES)　All right.　With

1 respect to the journal, you state in response to
2 request Number 10 that Ms. Loving admits unbinding the
3 journal.　Do you recall that?
4 　　　　A.　Yep.
5 　　　　Q.　And why do you think she admits that she
6 unbinded the journal?
7 　　　　A.　Because in her first statement she tried
8 to say the journal was never bound.　And when I wrote
9 back to her and said, "Nancy, you know as well as I do
10 that the journal was bound," she sent another email
11 changing her story and saying the journal was bound ,
12 but it was held with crudely -- it was held with --
13 crudely held together with old tape or something to
14 that effect and it accidentally came unbound　or we
15 unbound it to take the pictures.
16 　　　　So there's an email that specifically
17 says where I got that from.
18 　　　　Q.　Okay.　You state in your discovery
19 requests that she admits unbinding the journal at
20 LOVING 154.　At LOVING 154, which this is an email
21 from you dated June 14, 2019, where you claim she
22 admits unbinding the journal?
23 　　　　A.　You're scrolling way too fast for me to
24 read.
25 　　　　Q.　Well, I haven't got there.　Okay.　This

1 is an email from you, and this is LOVING 154?
2 　　　　A.　Yep.
3 　　　　Q.　And at the bottom, you write, "There were
4 more journal paintings and many of them were bound."
5 And then she responds, "The journal entries had crude
6 40-year-old tape binding only some of them.　That was
7 removed when we went through them."
8 　　　　How is she admitting here that she
9 admitted to unbinding journals after she sold them to
10 you?
11 　　　　A.　I don't think she's referring to me as
12 the "we."　Can you read the rest of that sentence?　I
13 can't see it because of the video stuff that's
14 everybody's video screen.　Can you read that paragraph
15 as a whole?
16 　　　　Q.　The remaining paragraph says, "Again,
17 please show me photos of what you believe is missing.
18 These are all the journal pages that I had
19 photographed and set aside for you.　Happy to look at
20 your photos and inventory and make any adjustments as
21 needed."
22 　　　　A.　I don't think she's referring to me when
23 she says, "We went through them."　I think she's
24 referring to them on the ArtSuite side.　Because the
25 last time I saw the journal paintings they were still

1 bound together, and we did not remove any binding from
2 the paintings.　And, again, Ms. Loving was really -- I
3 don't want to say aggressive but really articulate and
4 strongly stated case that the fact that the journal
5 was bound increased its value.
6 　　　　Q.　All right.　I'm going to show you some
7 journal paintings with time stamps on them.　And I'll
8 just represent to you that the journal paintings
9 starting at LOVING 2428 are identical to the same 11
10 journal paintings that I showed you a　minute ago that
11 were connected to this email dated May 20, 2019.
12 　　　　A.　Okay.
13 　　　　Q.　And if you look at the time stamp, does
14 this refresh your recollection of the date and time
15 that you looked at the journal paintings with
16 Ms. Loving?
17 　　　　MR. HICKS:　Object to the form and
18 foundation.
19 　　　　Q.　(BY MS. GETCHES)　July 31, 2017?
20 　　　　A.　I don't understand.　What are you asking
21 me?　If that's when I looked at those journal
22 paintings with Ms. Loving?
23 　　　　Q.　Yes.
24 　　　　A.　I do not believe so, but I can look at my
25 plane tickets, day and text to see if that was the

1     time. 7/31/2017.

2         Q.   Do you recall the month or date that you
3     reviewed the journal paintings for 45 minutes to an
4     hour with Ms. Loving?

5         A.   I really thought that that was in early
6     July. But, again, I have plane tickets and records
7     that I could review to see the exact date and the text
8     messages that were going back and forth during that
9     time.

10        Q.   When you reviewed the journal paintings,
11    were you in Ms. Loving's house? Ms. Loving's studio?
12    A storage unit?

13        A.   The journal paintings I reviewed in
14    Ms. Loving's home at the time. I don't think she
15    lives there anymore.

16        Q.   Mr. Charnoff, is this a picture of you?

17        A.   Yep.

18        Q.   And if you look at the date and time
19    taken, it says July 30, 2017, at 11:56.

20        A.   I can't see that. Let me move this. Can
21    you scroll up? I moved the video to the bottom, but I
22    can't go back. So it's covering the time stamp. Can
23    you continue to scroll up?

24        Q.   I'll try. Can you see it now?

25        A.   Yep. July 30.

1         Q.   And it looks like you're in a storage
2     unit, correct?

3         A.   Yep. That is the storage unit where
4     Nancy was storing the vast majority of Harold Garde's
5     art that was not in her home.

6         Q.   And was this the time you looked at the
7     journal paintings or a different time?

8         A.   I believe it was the day before that. I
9     believe the journal paintings were picked before we
10    went looking at other -- or attempted to be sold to me
11    before we went and looked -- visited her storage unit
12    for Harold Garde and looked at the other ones. So
13    that would have been after I looked at the journal
14    paintings. So that would make sense because that
15    would put that journal paintings review on the 29th.
16    If her time stamps are accurate. Because, again,
17    they've lied and altered evidence in this case so much
18    I would like to see the original files and make sure
19    that these were actual time stamps.

20        Q.   Why don't you identify all the altered
21    evidence you just referred to for the jury.

22        A.   Well, Nancy provided -- the storage unit
23    that you just took a photo of me inside that Nancy got
24    in June, at that time when I was in there, all the art
25    that is visible in that picture none of it I

1     purchased; none of it ever even really considered to
2     purchase strongly. And that was a storage unit that
3     Nancy had for all of Mr. Garde's art that wasn't in
4     her home or in another state. At least that's what
5     she told me. It was a big unit with hundreds of
6     pieces of art in it, and I believe --

7         Q.   List the altered evidence, Mr. Charnoff.

8             MR. HICKS:  He's trying to answer your
9     question.

10        A.   I'm trying to answer your question.
11    Nancy sent over a --

12        Q.   (BY MS. GETCHES)  If you could get there
13    a little more quickly so we can get out of here at
14    some point.

15            MR. HICKS:  If you ask the question, he's
16    going to answer it.

17        Q.   (BY MS. GETCHES)  I asked you to list the
18    altered evidence.

19        A.   Are you trying to put me under duress
20    while I'm answering the question? I'm answering as
21    honestly and articulately as I can. And maybe I'm
22    speaking slowly because I'm trying to be thorough. Do
23    you want me to try to rush and maybe make a mistake, I
24    mean, really, so that we can get out of here at some
25    time?

1         Q.   Absolutely.

2         A.   Like I was saying, I visited the storage
3     unit that Nancy had for all of Mr. Garde's art. I
4     thought it was much earlier in July than July 30. So
5     I would like to see how those time stamps would come
6     to you. But, again, that can be verified with my
7     plane tickets and the emails. I know that I picked
8     the journal paintings the day before we went to that
9     storage unit. So the 31st date when she took the
10    pictures was not the time when Nancy and I were going
11    through those paintings. So maybe she had to find
12    them to take the photos.

13            But another part that is extremely
14    interesting is she just proved that she altered the
15    evidence or submitted false evidence because that
16    storage unit existed and Harold Garde's art was
17    already in it and I hadn't made any art selections
18    from that storage unit yet, yet she submitted those
19    June receipts trying to say that they were from me,
20    that that was a storage unit that I asked her to get.
21    And then two months later in August, two months after
22    that storage unit was acquired, she sent an email to
23    me saying if I wanted to get a storage unit for my
24    art, I should call the same storage facility we were
25    at because she thinks they still had units available.

1  And then in her discovery responses, she tried to
2  falsely claim that -- and misrepresent the evidence
3  that that storage receipt from June was a storage
4  receipt that she got for art that I didn't purchase
5  until September.
6       So --
7       Q.   Mr. Charnoff, you're aware that your
8  attorney asked for storage receipts where any Harold
9  Garde art was stored, aren't you?
10      A.   That was after Nancy only provided the
11 receipts for -- she asked for storage receipts where
12 my art was stored first.  Nancy sent that art to him
13 even before the lawsuit was filed.  Nancy sent he and
14 I that storage receipt for the 235 a month or two
15 something plus tax a month and claimed that from June
16 forward that was the storage unit that she was storing
17 my art in.  And then submitted her own picture time
18 stamped proving that it wasn't the case, because here
19 I am standing in that specific storage unit holding
20 art that I never purchased and never even actually
21 considered purchasing.  So . . .
22      Q.   Any other altered evidence you can tell
23 the jury about?
24      A.   Give me a minute to think without rushing
25 me and I can remember and think of all the other

1  things that she did in this case that were altered
2  evidence or misrepresentations of the evidence.
3       Q.   I mean, you obviously have no
4  understanding whether she had one or two units at the
5  storage facility?
6       A.   She sent over a tax return saying that
7  there was only one -- she took her LLC partnership
8  return, removed the K-1s, removed the cover page and
9  submitted those tax returns literally as evidence that
10 she was a single-member LLC without partners.  We
11 submitted that tax return to my CPA.  He looked at it
12 and said it would be illegal to file -- it would be
13 unlawful to file an LLC unless it was a partnership,
14 that you can't use --
15      Q.   What does the membership of the LLC have
16 anything to do with this lawsuit, Mr. Charnoff?
17      MR. HICKS:   You're asking him a question.
18 Let him answer.
19      Q.   (BY MS. GETCHES)   What does the
20 membership of the LLC have to do with this case,
21 Mr. Charnoff?
22      A.   You asked me about specific cases.  The
23 question was tell me a time when Ms. Loving altered
24 evidence.  I am trying to give you a clear example of
25 where she blatantly altered evidence to try to make a

1  point, and you are trying to interrupt me because you
2  don't like where I'm going with it.
3       Q.   No.  I don't care.  We've been over this
4  a lot, actually.
5       MR. HICKS:   You keep interrupting him.
6       A.   You can't ask me a question and then stop
7  me from answering because you don't like the answer.
8       Q.   (BY MS. GETCHES)   I like the answer just
9  fine, Mr. Charnoff.  I just want to move on.  I got
10 it.
11      A.   I would like to finish giving you --
12      MR. HICKS:   Go ahead.
13      A.   She altered the evidence because she
14 literally removed the cover page, removed the K-1s.
15 She submitted the tax return and said this tax return
16 proved that we were a single-member LLC with no other
17 partners.  My CPA looked at the tax return and said,
18 "Well, clearly there were two other K-1s.  So there's
19 at least another partner and this is a partnership
20 return that the IRS would not even accept unless there
21 was more than one partner in the firm."  And then when
22 we called her on it, she came up with more altered
23 evidence and a whole backstory of lies as to how she
24 could have possibly not known that she filed a
25 partnership return and submitted it to us as a sole

1  proprietorship return.
2       She also said at first that no lease
3  existed that Ms. St. Pierre signed in order to try and
4  make it look like Ms. St. Pierre wasn't a cosigner in
5  the -- in the business.  And also to try and protect
6  what Ms. St. Pierre said directly in her deposition, I
7  have never signed a contract for ArtPort LLC.  Then
8  she submitted an unsigned lease again to try and hide
9  the fact that Ms. St. Pierre signed it.  And then
10 after we filed all our motions related to that, we
11 finally got the signed lease out of her showing that
12 she lied that the lease didn't exist and then she lied
13 that Ms. St. Pierre had signed.
14      So, you know, forgive me if I don't just
15 take at face value when your client is blatantly
16 willing to lie and alter evidence that these are true
17 and correct time stamps.
18      Q.   (BY MS. GETCHES)   All right.  So is that
19 all you have?
20      A.   I mean, I'm sure I could think of more
21 but for time sake, you would like to move on, so let's
22 move on.
23      Q.   All right.  The general painting on
24 LOVING 2441, can you see it?
25      A.   I can see it.

1    Q.   This looks like it was unbound, correct?

2    A.   Correct.

3    Q.   Looks like it was part of a spiral

4  notebook, correct?

5    A.   Again, that's how I remember it. The

6  holes there don't just indicate it was part of a

7  spiral notebook. I think it was one of those old

8  school plastic spiral binders, where the -- each of

9  the perfs are pierced by an individual piercing. I

10  don't think it was that. I think it was plastic,

11  though.

12    Q.   It looks like it's been unbound for a

13  long time, doesn't it?

14         MR. HICKS:   Object to form, foundation.

15    A.   That does not look.

16    Q.   (BY MS. GETCHES)   What's that?

17    A.   I cannot tell from those holes whether it

18  was unbound five minutes before that picture was taken

19  or not.

20    Q.   You're going to tell the jury that that

21  journal painting doesn't look like it's been unbound

22  for a long time?

23         MR. HICKS:   Object to form.

24    A.   Yes. Liza, how can you tell me that you

25  can tell from that picture how long that painting has

1  been unbound for?

2    Q.   (BY MS. GETCHES)   I didn't ask that

3  question. That's fine. I have your testimony.

4    A.   There's nothing on that painting that

5  would give me any indication at all as to when it was

6  unbound.

7         And didn't your client already say "we,"

8  not knowing who the other person is in the "we"

9  unbound them when we went through them? So, I mean,

10  how long ago could they have been unbound when your

11  client was writing they were bound when I looked at

12  them and then her and somebody else unbound them?

13    Q.   Mr. Charnoff, we're going to look at your

14  affidavit in this case. You recall completing this

15  affidavit, correct?

16    A.   Right.

17         MR. HICKS:   Sorry to interrupt, but who

18  has got the cubicle tweet thing for notifications.

19  It's been going on all day.

20    Q.   (BY MS. GETCHES)   Mr. Charnoff, do you

21  recall completing this affidavit in this case?

22         MR. HICKS:   Whoever has it, turn it off,

23  please.

24    A.   Yes.

25    Q.   (BY MS. GETCHES)   And you --

1    A.   Ms. Getches, I'm going to -- if it's

2  okay, I've got to try to figure out how to -- I've got

3  to pause for a second and try to figure out how to get

4  these videos back on the side because it's cutting off

5  a lot of the bottom of the . . .

6         (Discussion off the record.)

7    Q.   Mr. Charnoff, this is your signature on

8  the bottom of your affidavit?

9    A.   Correct.

10    Q.   You realize the information you were

11  referring to before regarding the tax returns was

12  provided to prove jurisdiction in this case?

13    A.   It was still part of legal pleadings in

14  the case and she still doctored evidence, but yes.

15    Q.   Yes or no?

16    A.   Can you repeat the question, please.

17    Q.   You understand that the tax returns that

18  were provided by the defendants in this matter was

19  provided in an effort to prove jurisdiction, correct?

20         MR. HICKS:   The lack of jurisdiction.

21  Objection to form.

22    A.   Yes.

23         MS. GETCHES:   I can't understand a word

24  you're saying and you're doing speaking objections.

25  So either lean forward or stop objecting.

1         MR. HICKS:   Okay. I'll just lean

2  forward.

3    Q.   (BY MS. GETCHES)   The first time you

4  visited Ms. Loving's art gallery was in March 2015,

5  correct?

6    A.   When I wrote the affidavit, I went back

7  through all my emails to make sure I got all the dates

8  right. You're asking me about five years ago dates,

9  but I believe that was the first time I visited the

10  gallery, yes.

11         MR. HICKS:   Liza, it's noon. I need to

12  take a lunch because I have a medical issue and

13  medication. I have to take a lunch break now. It's

14  noon.

15         MS. GETCHES:   All right.

16         MR. HICKS:   So can we go for an hour,

17  please?

18         MS. GETCHES:   No. Let's go for a half

19  hour.

20         MR. HICKS:   Let's do 45 because of where

21  I work. It's way too busy. I won't be back in time.

22  Let's do 45; is that okay? So 12:46. Thank you.

23         (Recess taken, 12:01 p.m. to 12:51 p.m.)

24    Q.   (BY MS. GETCHES)   Mr. Charnoff, you filed

25  a second amended complaint in this matter. Do you

1  recall that?
2      A.  Yes.
3      Q.  Is the document that I am hopefully
4  shearing on my screen right now the second amended
5  complaint that you recall filing?
6      A.  Can you scroll up some?
7      Q.  Do you mean down?
8      A.  Yeah.  So I can see the document itself.
9          THE DEPONENT:  Ian, is that the -- that
10 should be the second amended complaint, right?
11         MR. HICKS:  There's a file stamp at the
12 top.
13     Q.  (BY MS. GETCHES)  There's a file stamp.
14 Can you see it there?
15     A.  Yep.
16     Q.  Yes?  I'm sorry.  I can't hear you.
17     A.  I believe that's the second amended
18 complaint that we filed.
19     Q.  And one of the claims that you assert
20 against Ms. Loving and Mr. Hinkelman is fraudulent
21 misrepresentation, right?
22     A.  I believe so.
23     Q.  Okay.  And what's your understanding of
24 the basis of that claim?
25     A.  That she misrepresented a bunch of items

1  to me in order to induce me to purchase the art.
2      Q.  Could you lean forward.  It's very hard
3  to hear you.
4      A.  I apologize.  That she misrepresented a
5  bunch of material facts to me in order to induce me
6  to purchase the art.
7      Q.  Okay.
8          MS. GETCHES:  I'm going to mark the
9  second amended complaint as Exhibit 6.
10         (Deposition Exhibit 6, remotely
11 introduced and provided electronically to the court
12 reporter.)
13     Q.  (BY MS. GETCHES)  Let's go back to the
14 discovery requests, which were -- it was Exhibit 1.
15         In those discovery requests, which you
16 signed under oath, I asked you to identify each and
17 every material misrepresentation made by Ms. Loving to
18 you; and, for each, describe in detail the
19 misrepresentation -- when the misrepresentation was
20 made, each document that evidenced the
21 misrepresentation, and the damages that you knew you
22 had suffered as of the time you filed the second
23 amended complaint.
24     A.  Okay.
25     Q.  Do you see where I was just reading?

1      A.  Yep.
2      Q.  And after an objection, your response is
3  that the art was insured and would remain insured
4  until it arrived in Colorado, correct?
5      A.  Correct.
6      Q.  Number 2, the art would be shipped
7  promptly, by a date certain, and professionally when
8  it, in fact, was shipped in a manner that caused
9  substantial damage to the art, correct?
10     A.  That's what it says, yes.
11     Q.  And you believe that was a
12 misrepresentation, correct?
13     A.  The misrepresentation part is that the
14 art would be shipped properly by a date certain, and
15 professionally.
16     Q.  And it's your testimony under oath that
17 the manner in which Ms. Loving shipped the art to you
18 caused substantial damage, correct?
19     A.  It is my testimony that Ms. Loving did
20 not ship the art in the manner in which she promised
21 me she would ship the art.  She promised individual
22 creating of the art.  She promised all the works on
23 paper would be in tubes.  Like, Ms. Loving shipped the
24 art inconsistently with how she represented to me she
25 would ship it.

1      Q.  When, in fact, it is your testimony that
2  it was shipped in a manner that caused substantial
3  damage to the art?
4      A.  Yes.
5      Q.  And who is going to testify that the art
6  suffered substantial damage during shipment?
7      A.  I'm not an attorney, so I don't really
8  understand how all that works.
9      Q.  Can you tell the jury anyone today who is
10 going to agree with your statement and your discovery
11 response?
12         MR. HICKS:  Object to form, foundation.
13     A.  If there's a person who is going to say
14 the art was damaged?
15     Q.  (BY MS. GETCHES)  During shipment.
16 Correct.
17     A.  I believe someone from Terry Dowd.
18     Q.  Anyone else?
19     A.  Me.
20     Q.  Okay.  Anyone else?
21     A.  Not that I know of.
22     Q.  You believe another misrepresentation
23 that caused you to induce your purchase of the art was
24 that the art would be created, shipped, and insured at
25 Artport's expense, correct?

1    A.   Correct.

2    Q.   You believe another misrepresentation
3    that induced you to purchase the art was that the
4    purchases would include certificates of authenticity,
5    and Ms. Loving would ensure that the art was signed,
6    and that there would be free gifts.  Correct?

7    A.   Correct.

8    Q.   The fifth misrepresentation that induced
9    the purchase of your art was that Ms. Loving reneged
10   on her promises and refused to send the art unless
11   Plaintiff agreed to sign a sales agreement he had not
12   seen before, included in an as-is clause, and which
13   was unsupported by any consideration.

14        MR. HICKS:   Is there a question pending?

15   A.   Yeah, what's the question?

16   Q.   (BY MS. GETCHES)   Is that the fifth
17   misrepresentation, Mr. Charnoff?

18   A.   When Nancy sold me the art, she did -- I
19   was not supposed to have to sign a contract with that
20   as-is clause and many other clauses in it.  So she
21   changed the terms on me in order to ship the art.

22   Q.   So you're saying the inducement to
23   purchase the art was that there would not be a sales
24   contract or an as-is clause?

25        MR. HICKS:   Object to form.

1    A.   When she induced me to purchase the art,
2    it was not a -- there was not the other terms that
3    were in that sales contract, including the as-is
4    clause.  But the more important ones were the
5    trademark -- she said, oh, the copyright on the art --
6    she said that I would receive the copyright on the
7    art.

8         She said some of it could be sold for
9    album covers, and said it could be used for event
10   posters and things like that.  And that sales contract
11   she wanted me to sign had copyright language in it
12   that was contrary to what she stated in order to
13   induce me to purchase the art.

14        She said that I wouldn't have to pay
15   sales tax; and then in the contract she tried to get
16   me to sign said I would have to pay sales tax, even
17   though in order to induce me to purchase the art she
18   said there was no sales tax on it before the purchase
19   price.

20        And there were other things in that sales
21   contract that were not consistent with the terms she
22   used to induce me to purchase the art.

23   Q.   (BY MS. GETCHES)   And it's your opinion
24   that she breached the contract by forcing a sales
25   agreement and an as-is clause upon you?

1    A.   It is my opinion that she changed the
2    terms of the agreement after the fact and after she --
3    long after the fact and long after she accepted
4    payment in full for the art.

5         You can't sell somebody something and
6    then change the terms of the contract materially, and
7    accept their money and say either agree to these new
8    terms that you did not previously agree to or I'm
9    keeping your money and the product you purchased.

10   Q.   Ms. Loving's sixth misrepresentation was
11   that she promised to work with Edward Robinson and
12   others to create a market for the art and increase the
13   value as an investment for the second purchase,
14   correct?

15   A.   Correct.

16   Q.   Ms. Loving's seventh misrepresentation
17   was that she would ship the journal.  She admits to
18   unbinding it.  And so she sent you a journal that was
19   no longer bound, correct?

20   A.   She sent me a journal that was no longer
21   bound, yes.

22   Q.   And the seventh misrepresentation was
23   that -- or sorry, eighth -- was that she imposed new
24   conditions, cost conditions, and payments that were
25   not part of the original contract?

1    A.   Correct.

2    Q.   The ninth misrepresentation was that
3    Ms. Loving said she would store the art and care for
4    it professionally when, in fact, it was stored in her
5    home and damaged at some point during her care or
6    during shipping?

7    A.   Yes.  My first purchase, Ms. Loving hung
8    one painting right next to a pool table, another
9    painting above an air hockey table, another painting
10   on the wall next to a doorway -- right next to the
11   doorway in a high-traffic hallway.

12   Q.   The tenth misrepresentation was that
13   Ms. Loving said the art was rapidly increasing in
14   value due to recent collector, museum, and other
15   acquisitions, correct?

16   A.   Right.

17   Q.   The eleventh misrepresentation,
18   Ms. Loving said that you were not the largest
19   collector and, in fact, a doctor in Miami had a much
20   larger collection which was so valuable  it would cause
21   the doctor's kids to inherit a large estate?

22   A.   Correct.

23   Q.   And it's your testimony under oath that
24   that statement induced you to purchase the art?

25   A.   So --

1    Q.   Yes or no?

2    A.   That statement was one of the induce d

3    that she used to have me purchase the art, correct .

4    Q.   And what did you expect, when you thought

5    you were going to be the largest collector of Harold

6    Garde art, as a return on investment?

7    A.   No, I didn't expect to be the largest

8    collector.  I didn't want to be the only one paying

9    the type of money -- I was trying to gauge the value

10    of Harold Garde's art because all I had to go on is

11    what Nancy was telling me.

12        She was an expert, and she was -- or she

13    positioned herself as an expert, rather, and she was

14    the life partner of what I thought was a good friend

15    of mine at the time.  But one of the concerns I

16    expressed to her was that I didn't want to buy art

17    that nobody else was paying real money for.  I didn't

18    want it to be --

19    Q.   What --

20        MR. HICKS:   Come on.  Finish.

21    A.   Let me answer your question, and I'm

22    getting there.  So this is the foundation for your

23    question.  One of my real concerns was that I didn't

24    want to be paying hundreds of thousands of dollars for

25    art that nobody's paid more than a thousand dollars

1    for, for instance.

2        So Ms. Loving, for my first purchase, put

3    in writing on several occasions that the art was going

4    up in value rapidly because of recent collector and

5    museum acquisitions ; and before both the second and

6    first purchases, she highlighted this doctor in

7    Florida who said his kids were going to inherit a

8    large estate because of Harold Garde's art.  She said

9    he had purchased far more art than I had at much

10    higher prices per painting.

11        So how she used that to fraudulently

12    induce me to buy the art was to give me comfort that

13    other professional collectors, not just novices like

14    me, well-known museums, not just novices like me, and

15    this other professional who's a doctor in Miami felt

16    strongly about the value of the art and its potential

17    future value that they were spending as much or more

18    money than I was on the art.

19        So that gave me comfort that I wasn't the

20    only person who was willing to shell out that kind of

21    money for the art.  She further backed that up by

22    sending me different emails and saying here's the most

23    four expensive art sales of this year, and Harold

24    Garde is comparable to Picasso and Basquiat.

25        So when you have an expert or somebody

1    who says they're an expert that you trust, because of

2    your close friendship and business relationship with

3    their life partner, telling you that not only is this

4    art similar to Basquiat and Picasso, and those are

5    actual comparables for Harold Garde, but here are all

6    these museums and collectors and doctor who are paying

7    more money than you are both per painting and for the

8    aggregate collection of the art itself, that

9    definitely gave me more comfort and induced me to

10    purchase the art.

11    Q.   (BY MS. GETCHES)  Is that it?

12    A.   This Sotheby's Magazine where she

13    highlighted several pieces and said you can use these

14    as comparables for that art, and those pieces ranged

15    per painting between $60,000 and 234,000  pounds.

16        So, you know, she went very far out of

17    her way to represent that there were expensive

18    comparables for Harold Garde's art, and that museums,

19    collectors, and that doctor were buying into it, that

20    I wasn't the only one that was forking out that kind

21    of money for the art, and I wasn't even the one -- the

22    single -- the only individual -- that there were other

23    individuals, being the doctor, who forked out more

24    money in aggregate than I did for the art.

25    Q.   Is that it?

1    A.   For that question, yes.

2    Q.   Who is the doctor?  Did you ask the name?

3    A.   He told me the name, and I'm not great

4    with names.  So I don't remember his name, but I do

5    have his name in some emails that we provided, I

6    believe.

7    Q.   How much more did this doctor in Miami

8    purchase than you?

9    A.   I actually asked her that question , and

10    she said to respect his privacy, she wouldn't tell me

11    how much more he spent than me.  But she said whereas

12    I was under $200,000, he was substantially over

13    $200,000.  But she would not give me an exact amount,

14    and I did not press her for it.

15    Q.   And what evidence do you have to show the

16    jury that there is not a doctor in Miami with a much

17    larger collection?

18    A.   Well, Nancy's tax return --

19    Q.   No.  What evidence do you have to show

20    the jury?

21        MR. HICKS:   He's explaining.

22    A.   Yeah.  Nancy's tax return shows that the

23    year that I bought the $46,000 worth of art, that

24    Nancy said that the art was going up in value because

25    of recent and as in that-year acquisitions by museums

1 and collectors. And Dave texted me and said ignorance
2 is not bliss, and that Harold Garde's art continued to
3 sell and continued to go up in value.
4          According to her tax return, my money --
5 my $46,000 was more than 93 percent of what she
6 collected that year. She didn't even make another --
7 that gallery didn't even sell another $5,000 worth of
8 Harold Garde's art. And I believe the approximately
9 $3,000 worth of art that she did sell that year was
10 her Andrew Lich paintings which were on lease to a guy
11 named Perry, who had a data business in Manhattan, and
12 leased her -- some of her Andrew Lich art for a
13 monthly payment.
14          So, you know, I don't know how, at least
15 that year, she could have sold all this art that she
16 leveraged to induce me to not only purchase but to
17 purchase quickly, because she said the more art she
18 continued to sell to museums and the more art she
19 continued to sell to these collectors, the less
20 control she had over the Garde family to honor the
21 alleged discounted pricing she gave me.
22          And she not only used it to induce me to
23 purchase but also to rush me to purchase. And then I
24 was astounded to see on her tax return that she didn't
25 even sell $3,000 worth of art to anybody else. And I

1 bought $46,000 that year.
2          Q.   (BY MS. GETCHES)   And the sole basis for
3 your position that the art has not increased in value
4 and that there haven't been other acquisitions is this
5 tax return, correct?
6          A.   No.   This sole -- no.   First of all,
7 we're not talking about the sole reason the art didn't
8 increase in value. We're talking about the reason why
9 I believe Nancy lied to me about other acquisitions
10 and by museums, collectors, and this doctor in Florida
11 is because there's no way for me to get evidence to
12 prove her case other than Nancy sending it and other
13 by looking at the things she did send.
14          So we've asked in discovery for all of
15 the receipts of the art that she sold. She's already
16 given us her tax return. We have her bank statements.
17 And there's no receipts, deposits. She hasn't
18 provided any evidence to substantiate her claim that
19 museums and collectors were purchasing art with any
20 type of volume even close to mine at any pricing even
21 close to my most expensive paintings at the time frame
22 during which she I believe lied to me and told me that
23 was occurring.
24          And her tax return also reflects that
25 there was very little money made that year, and

1 there's no way it could be true. So if I were Nancy,
2 and she was indeed telling the truth, I mean, the
3 simplest way for her to have proven that she didn't
4 lie to fraudulently induce me to purchase the value --
5 the art by saying that other people were paying the
6 same price or more than I was and buying larger
7 volumes in aggregate, would have been for her to
8 simply disclose, you know, proof that that occurred.
9          She could have ended it right there by
10 just saying, hey, here's the list of all the art that
11 the doctor purchased and the prices he paid for, and
12 here's the museum and collector purchases that we used
13 to -- that were the foundation of our statements to
14 you that the price was going up literally beyond their
15 control.
16          Because keep in mind, Dave and Nancy said
17 not only was the price going up dramatically, but it
18 was going up beyond their control. And Dave used the
19 word "feeding frenzy." And he said the longer this
20 feeding frenzy of Harold Garde art went on, the less
21 Nancy would have the ability to strongarm Harold and
22 the Gardes into giving me current pricing.
23          So, you know, if it was that aggressive
24 of a quote/unquote feeding frenzy, and if there was
25 that much investor interest -- or purchaser interest

1 and museum and collector activity, why didn't your
2 client provide in any of the disclosures or with any
3 of the discovery? And even to the answers of the
4 disclosure requests that we asked for, any
5 foundational proof that that actually occurred?
6          So I have to go by her lack of providing
7 any evidence that she was telling the truth, and the
8 evidence that she did provide that points in the
9 direction that she was lying.
10          Q.   You already testified that you don't know
11 how art appreciates in value. So, you know, you
12 wouldn't know one way or the other whether museum
13 acquisitions increase the value of the art, would you?
14          A.   That's not what that claim of fraudulent
15 inducement is about. I've already testified that I
16 was a complete novice when I was purchasing the art,
17 that Nancy represented herself to me as an expert --
18 not only as an expert, but as a trusted expert who was
19 referred to me by, at the time a dear friend and
20 business colleague who I also trusted, and that Nancy,
21 as the expert -- who also tried to sell me Andy
22 Warhols and another horse painting by a different
23 artist and several Andrew Lich photos.
24          Nancy told me -- she was representing
25 herself as my art adviser, and she even put that in

1 writing. So what I had to go by at the time was that
2 the person who represented herself as an expert and
3 put herself out there as my art adviser, told me that
4 I was safe in paying those prices because art
5 collectors and museums -- who are not novices and who
6 are much more experienced and discerning -- having the
7 capability of being much more discerning because of
8 their knowledge base of -- what the art was worth, and
9 this large collector in Miami who was a professional
10 but who she also said had more art collection
11 experience than me, that those parties were buying art
12 at the same price and higher prices and in larger
13 aggravate volume than me.
14            When the person who represents herself as
15 an art expert to me, who I trusted at the time, who
16 tells me these things to bring me comfort and actually
17 induce me into purchasing the art for the prices I
18 paid, I had no reason at that time not to believe her
19 and take her at her word.
20            So do I know how art appreciates and did
21 I know, other than how Nancy told me, that that
22 brought me safety and made it okay to spend that kind
23 of money on art?  No.  Did I believe Nancy when she
24 told me that those other sales, the museums,
25 collectors, and the doctor in larger aggregate than I

1 was purchasing made my art more valuable and a safer
2 purchase?  Yes.
3        Q.   Anyway, when you got the email from
4 Ms. Loving that said -- which I'll mark it as
5 Exhibit 7 here.
6            (Deposition Exhibit 7, remotely
7 introduced and provided electronically to the court
8 reporter.)
9        Q.   It was July 11, 2016.  She says that
10 current pricing -- I'm sorry.  "As a result of recent
11 museum and private collector acquisitions, Harold's
12 work has increased in value and many of the historical
13 pieces and the master works now reflect a substantial
14 increase in the retail prices in the last year."
15            Now, with respect to this statement, you
16 have no idea whether recent museum's acquisitions
17 would increase the value of the art substantially, do
18 you?
19        MR. HICKS:   Objection to form.
20        A.   Read her next sentence, she says --
21        Q.   (BY MS. GETCHES)   Yes or no,
22 Mr. Charnoff?
23        A.   Well, from her next sentence, I do.
24 Because her next sentence says, "We firmly believe
25 that Garde's work will continue to appreciate as he

1 will be given further recognition for his historical
2 relevance and contributions into the art world."
3        Q.   That's not my question.  Hold on.
4            Do you know one way or another whether
5 museum acquisitions increase the value of the art?
6        MR. HICKS:   Object to the form.  You're
7 admitting --
8        Q.   (BY MS. GETCHES) I'm asking you in
9 general.  Do you know --
10        A.   You're asking me if I'm believing what
11 she's telling me in that sentence.  She said --
12        Q.   No, no, no.  That's not my question.  I'm
13 asking you a separate question.
14            Do you know one way or the other whether
15 museum acquisitions increase the value of art?
16        A.   If your client wasn't lying to me, then
17 yes.  Because she --
18        Q.   Do you know one way or the other whether
19 museum acquisitions increase the value of art?
20        A.   Only if your client was not fraudulently
21 inducing me to purchase it.  Because she told me --
22        Q.   Mr. Charnoff, tell the jury yes or no
23 whether or not museum acquisitions can increase the
24 value of art?
25        MR. HICKS:   Objection to form,

1 foundation.
2        A.   In order to induce me to purchase the
3 art, yes.
4        Q.   (BY MS. GETCHES)   I don't understand.
5 I'm asking you a separate question.
6        A.   Ms. Getches, let me talk.
7        Q.   I can't hear you.
8        A.   Let me talk for one second, please.
9        Q.   You've been talking about everything but
10 my question.
11        A.   In answer to your question --
12        Q.   Let me -- no.  Let me take this down for
13 a second.  My question is simply this --
14        A.   Can you put the email back, please,
15 because you're me --
16        Q.   No, because I'm not asking you about it
17 anymore.
18            Do you know whether or not museum
19 acquisitions can increase the value of any given piece
20 of art?
21        A.   According to your client, who has set
22 herself aside as my expert art adviser and who even
23 you filed a motion explaining why she is qualified
24 enough to be her own expert witness in this case --
25 when your client writes almost verbatim "As a result

1   of recent museum and collector acquisitions, the art
2   has substantially increased in value," if I take your
3   client at her world, then yes, I absolutely believed
4   that -- because I didn't think she was lying to me.
5         So the answer is at the time, yes. Your
6   client made me believe that museum acquisitions and
7   collector acquisitions -- specifically the recent
8   museum and collector acquisitions -- had driven a
9   dramatic increase in Harold Garde's art value because
10  that is what she told me.
11        Are you saying your client's a liar and I
12  shouldn't have believed her?
13        Q.   Mr. Charnoff, would a museum acquisition
14  be reflected on a tax return?  Do you know the answer
15  to that question?
16        A.   If it was a museum acquisition, then
17  everything I know about tax law, and from talking to
18  my CPA who is a really good accountant, that should
19  have been reflected on the tax return.
20        Q.   Great.
21        A.   If you read --
22        Q.   And you would understand whether
23  donations to private investors -- would those be
24  reflected on tax returns too, Mr. Charnoff?
25        A.   They would be reflected on a tax return,

1   yes.
2         Q.   Perfect.
3         Did you review the appraisals that were
4   produced in this case?
5         A.   I have not.
6         Q.   Okay.  So you weren't relying on those in
7   any of your long testimony just now.
8         Did you review any of the purchases by
9   various individuals that were produced in this case?
10        A.   I took Nancy and Dave at their word --
11        Q.   Yes or no?  Did you review them?
12        MR. HICKS:   Wait.
13        A.   Nancy and Dave --
14        MR. HICKS:   Liza, there's not going to be
15  any yelling at my client today.  Okay?
16        MS. GETCHES:   No.  It's a yes-or-no
17  question.  I don't need a speech.
18        MR. HICKS:   That's fine, and I get that.
19  But yelling and flying pens and rolling eyes and
20  cutting him off like 50 times, it's not going to work.
21        Q.   (BY MS. GETCHES)   Anyway, Mr. Charnoff,
22  can you answer my question?
23        A.   I took Dave and Nancy at their word.
24        Q.   Okay.  So you didn't review anything in
25  making your statement?

1         MR. HICKS:   Object to form.
2         A.   They both said there was no need to.
3         Q.   (BY MS. GETCHES)   So she says in this
4   email that she was going to --
5         A.   She snuck a sneaky thing in there.
6         Q.   We firmly believe that --
7         A.   You miscategorized my answer, and I would
8   like to clarify for the record.
9         In making my statement and in actually
10  signing off that I agreed under oath with what Ian
11  prepared in my statement, I reviewed several
12  documents.  When I purchased the art, I didn't see the
13  need to review appraisals or the other sales because
14  at that time I had no reason -- or didn't believe I
15  had a reason not to believe what Nancy and Dave were
16  telling me both verbally and in writing.
17        Q.   You didn't ask who -- what the museums
18  were and what the private collectors were that
19  Ms. Loving was referring to in this email?
20        A.   I did.  And she told me, and that was
21  good enough.  She rattled off a bunch of museum names.
22  She told me one was in Wyoming, one was in Boston, two
23  were in Florida.  She said the one in Florida had a
24  whole mural on the outside wall dedicated to Harold
25  Garde.  She told me the names of the museums.  And,

1   again, I was a novice relying on the expert art
2   adviser to guide me.
3         I trusted her life partner, David,
4   because he had helped me with so many businesses and
5   had gotten compensated well for it.  I had no reason
6   not to trust her at the time.  I asked her the
7   doctor's name.  She told me.  She told me it was more
8   than 200 grand.  I think she even said it was more
9   than 250,000 worth of art, but she wouldn't tell me
10  the exact number because she said she had to respect
11  his privacy.  But she did say that was going to be her
12  kids' estate.
13        And she told me that the museums and the
14  collectors that were purchasing, were purchasing the
15  art at a higher value per painting than I was for
16  similar type paintings.  At that time I had no reason
17  not to believe her.  I didn't think there was a need
18  for me to review all of the purchase agreements and
19  stuff, especially since she got so guarded about
20  trying to tell me what the aggregate value of what the
21  doctor's purchases was.
22        And I didn't think that there was a way,
23  and still don't think there's a way, to misinterpret
24  exactly what she wrote, that as a result of recent
25  purchases by museums and collectors, his art has

1  dramatically increased in value within the last year.
2  I don't know how you can misinterpret that.
3      Q.  And an increase in value is not the same
4  as actual sales, is it?
5      A.  This is what it says, Ms. Getches.  "As a
6  result" --
7      Q.  No, no, no.  I'm not asking you to read
8  it.  I asked you a question.
9      A.  My answer is --
10     Q.  Is an increase in value equivalent to an
11  increase in sales?  Yes or no?
12     A.  It says "As a result of recent museum and
13  private collector acquisitions, his work has increased
14  in value.  And many of the historical pieces and
15  master works now reflect a substantial increase in the
16  retail prices in the last year."
17         That is "as a result of recent museum and
18  private collector acquisitions," and "within the last
19  year."  That would have been reflected in the tax
20  return, or she --
21     Q.  The retail prices?  You're saying the
22  retail prices would be reflected in the tax return?
23  That doesn't say "sales."  It says "retail prices."
24     A.  No.  I'm saying that within the last
25  year, the recent museum and private collector

1  acquisitions would have been reflected in the tax
2  return.  The year before was within the relevant
3  period, so Ms. Loving could have simply provided proof
4  that any museum acquisitions or collector purchases
5  happened, and that there was any actual sales
6  comparables to justify the increase in retail prices
7  that she was claiming in writing here that occurred.
8         So, yes, shame on me for believing
9  somebody who I trusted and who set herself out as an
10  expert and taking her and David at their word.  Who
11  knew at the time that I could not trust them?
12     Q.  How many museum acquisitions and how many
13  private collector acquisitions were you relying upon
14  when you read this email?
15     A.  When I talked to her individually, she
16  said it was more than a dozen.  And when Dave texted
17  me at a later date and opened the text with the words
18  "Ignorant is not bliss.  The continued feeding frenzy
19  drives up the value of Harold Garde's art," and
20  something to the effect of, I'm going to miss out.
21  You know, I assumed it was much more than the dozen or
22  so that Nancy said had already happened that year.
23     Q.  Anything other than your assumption that
24  you're relying on?
25         MR. HICKS:  Object to form.

1      A.  Yeah.  Nancy telling me that it was more
2  than a dozen museums and collectors, and Nancy telling
3  me that the doctor had several dozen pieces by
4  himself, and that in aggregate he purchased more
5  than -- I believe she said it was definitely over
6  200,000, but my belief is that she said more than a
7  quarter million dollars' worth of art.
8         So, yeah, that is what I was relying on,
9  not my assumptions.  The only assumption I made was
10  that Nancy was not lying to fraudulent ly induce me to
11  buy the art.  And that assumption appears to be
12  incorrect.
13     Q.  (BY MS. GETCHES)  I guess we'll find out.
14         When she says she firmly believes that
15  Garde's art will continue to appreciate, she's
16  expressing a belief, not a guarantee.  Correct?
17     A.  She said we firmly --
18         MR. HICKS:  Object to foundation.
19     A.  She says it's already appreciated.  Let's
20  not lose site of that.
21     Q.  (BY MS. GETCHES)  I'm asking about the
22  next sentence.
23     A.  Well, the second part doesn't seem like a
24  belief.  It seems like a statement of fact.
25     Q.  Okay.  If that's your testimony, that's

1  fine.
2      A.  This will be given further recognition
3  for its historical relevance and contributions to the
4  art world.  And then --
5      Q.  Did you look in to see how much Patrick
6  Downs spent on artwork with Ms. Loving?
7      A.  Well, I went by what Dave told me that --
8      Q.  Yes or no?  Patrick Downs?
9      A.  Only what Dave told me, because I told
10  him at his word.
11     Q.  Did you look in to see the value of the
12  art on collection at the University of Wyoming?
13     A.  I did not, but if the art is on
14  collection on loan, it's not the same as the art being
15  purchased.  So if Nancy used the same inflated numbers
16  she used to value my art when I asked her for the
17  value for a court issue, who would have placed the
18  value on that art?  Nancy.
19     Q.  And you have no basis for saying the
20  value was incorrect?
21     A.  Which value?  The value that Nancy sold
22  me the art for?
23     Q.  Whatever value she put on the art that
24  she sold.  You have no basis for saying that it was
25  inflated or that an arm's length transaction would not

1  result in a sale?

2          MR. HICKS:   Object to form.

3      A.   The basis that I have for any value

4  assumptions I made on Garde's art at the time of the

5  purchase is what Nancy stated to me about the value to

6  induce me to purchase the art.

7      Q.  (BY MS. GETCHES)   Perfect.

8          You understand that Ms. Loving was

9  operating a small business at the time you purchase

10  the art from ArtPort, correct?

11          MR. HICKS:   Object to form, foundation.

12      A.   It depends on your definition of small

13  business.  What Ms. Loving told me at the time was

14  that Harold Garde had been painting much longer than I

15  had been alive, and continues to paint.  And she

16  valued that collection at over $5 million, and that

17  she had $5 million worth of art she could sell in the

18  next few years, and that she had the exclusive right

19  for the foreseeable future to do that.

20          She also told me that the St. Pierre's

21  were coming in with half a million dollars, and that

22  Dave would support her in her business endeavors as

23  deep as he needed to go, and that my purchase would

24  also be used to do things to directly build and grow

25  the business.

1      Q.  (BY MS. GETCHES)  So you did not think

2  Ms. Loving was operating a small business at the time

3  you purchased art from her?

4          Is that your testimony?

5          MR. HICKS:   Object to form.

6      A.   My testimony is I don't understand what

7  your definition of small business is.

8      Q.  (BY MS. GETCHES)  Okay.  If that's what

9  you want to tell the jury, that's fine.

10          MR. HICKS:   Same objection.

11      Q.  (BY MS. GETCHES)  Mr. Charnoff, tell me

12  the second time you visited an art gallery or a

13  location where Ms. Loving was displaying art.

14      A.   Her display in Connecticut or her display

15  in New York?

16      Q.   You told me you visited in March of 2015,

17  and I want to know the second time you saw Harold

18  Garde art with Ms. Loving.

19      A.   I would have to go back and look through

20  the emails again to answer that question.

21          (Deposition Exhibit 8, remotely

22  introduced and provided electronically to the court

23  reporter.)

24      Q.   Okay.  Exhibit 8 is an email that

25  Ms. Loving sent to you on October 21, 2015, to

1  Wally@rentrange and Wally@investability, correct?

2      A.   Correct.

3      Q.   Those are your email addresses, correct,

4  Mr. Charnoff?

5      A.   Correct.

6      Q.   And she states that she created a

7  PowerPoint presentation of selected works by Harold

8  Garde that we -- you might dispute the definition of

9  "we" -- spoke about while you were in the studio in

10  New York City, correct?

11      A.   That's what she says, correct.

12      Q.   Did you look at selected works of Harold

13  Garde art in New York City with Ms. Loving?

14      A.   When I was in Ms. Loving's gallery to

15  pick up Harold and Ms. Loving to go to dinner on

16  March 17 of 2015 to go to my birthday dinner after

17  Dave and I had a long day of working on my business,

18  Harold Garde was there.  We had some wine.  We talked.

19  It was pretty fun, actually.

20          He showed me a bunch of his paintings,

21  and he told me what he was thinking when he was

22  painting them and why he pointed them, and we did

23  discuss his art.  But at the time, I was not

24  interested in purchasing any because I was a broke

25  entrepreneur who had all of my money in my business

1  and didn't have the ability to purchase them.

2          So if she means by "we discussed," we

3  talked to Harold Garde and talked about what he was

4  thinking and stuff, that must be what she's referring

5  to.

6      Q.   Okay.  So your statement here is that you

7  did not discuss Harold Garde artwork with Ms. Loving

8  in March of 2015?

9          MR. HICKS:   Object to form.

10      A.   No.  How can you get that from what I

11  just said?  We drank wine and we laughed and we

12  discussed --

13      Q   (BY MS. GETCHES) You said you discussed

14  it with Mr. Garde, and so I'm wondering whether you

15  discussed it with Ms. Loving as well.

16          (Reporter speaks off the record.)

17          MR. HICKS:   He asked to finish his

18  question.  I swear, if I had a nickel for every time

19  you interrupted one of his answers, I would be rich by

20  now.  I wouldn't be in this deposition.  So please

21  stop interpreting.

22          MS. GETCHES:   Are you ready to answer the

23  question, Mr. Charnoff?

24          MR. HICKS:   For probably the 40th time.

25      A.   Okay.  If you would please let me answer

1   just let my answers speak on their own. I did not say
2   Nancy wasn't involved. What I said was I sat with
3   Harold Nancy may or may not have been there. I do not
4   remember. But I specifically remember sitting,
5   drinking wine with Harold, talking about his art but
6   talking about his art in the context of how he feels
7   about painting, how long he's been painting how
8   painting every day keeps his young and thousand we
9   looked at some specific pieces of his work that were
10  on the wall that he pointed out and he talked to me
11  about what was going on in his life while he was
12  painting them and what he was thinking about and how
13  those -- and how they were reflected and how those
14  paintings came out. Nancy might have been there for
15  some of it, listening to some of it I assume she was
16  by the way that she wrote this email maybe as a good
17  salesperson. She saw Harold and I talking and him
18  telling me the history of the art and figured now that
19  he has money I'll try I try to sell him some of that
20  but at that time in his gallery we did not talk about
21  pricing or me about buying any art because I had
22  literally all of my money in the business, I was an
23  entrepreneur, and I was struggling in the business and
24  I was not looking to be an art collector so I did not
25  say --

1     Q. (BY MS. GETCHES) When was the next time
2   you were in New York to view Harold Garde with
3   Ms. Loving?
4     A. I never went to New York specifically to
5   view Harold Garde art with Ms. Loving.
6     Q. That's not my question. I asked when the
7   next time you were in New York and you viewed Harold
8   Garde with Ms. Loving?
9     MR. HICKS: Object to form.
10    A. Kirsten, can you read back the original
11  question, please.
12    Q. (BY MS. GETCHES) My question to you is
13  when was the next time you were in New York to view
14  art with Ms. Loving?
15    A. I would like to hear the original
16  question.
17    Q. (BY MS. GETCHES) This isn't your
18  deposition. I'm asking the questions.
19    MR. HICKS: I'd like to hear --
20    Q. (BY MS. GETCHES) Mr. Charnoff, were the
21  next time you were in New York to view Harold Garde
22  with Ms. Loving?
23    A. There genu asked the question the same
24  way you did the first time. You said when was the
25  next time you were in New York to view Harold Garde

1   with Ms. Loving and my answer was accurate, correct
2   and honest I never traveled to New York to view Harold
3   Garde art with Ms. Loving.
4     Q. I see that you see a distinction. I'm
5   asking when was the next time you viewed Harold Garde
6   art in New York with Ms. Loving?
7     MR. HICKS: Liza, by any objective
8   English language standard, those are two totally
9   different questions. Okay.
10    MS. GETCHES: Ian, you can't object like
11  that.
12    MR. HICKS: Yes, I can and I will.
13    A. You're telling me to answer --
14    MR. HICKS: You probably don't realize
15  you're doing it. The question you're saying they're
16  the same but they're totally different.
17    A. Ms. Getches, I am not an attorney but I
18  have seen law and order a couple times and when you
19  say to me when was the next time you were in New York
20  to view Harold Garde paintings to me that lends the
21  connotation that there was a first time I was in
22  New York to view handguns Harold Garde paintings and
23  then there was a second time I was in New York to view
24  handguns and the answer to that question I stand by I
25  have never traveled to New York to view Harold Garde

1   paintings, period.
2     Q. (BY MS. GETCHES) Okay. Well, I'm really
3   not trying to be as clever as you think I am so thank
4   you for the flattery. I'm just asking when was the
5   next time you viewed Harold Garde art with Ms. Loving?
6     A. I do not remember but I'm sure it's
7   reflected in the emails and text messages.
8     (Deposition Exhibit 9, remotely
9   introduced and provided electronically to the court
10  reporter.)
11    Q. Okay. Exhibit 9 is an email from
12  Ms. Loving to you at Wally@investibility.com and she's
13  stating that I realize I need to send you some photos
14  of the studio and work that we were hanging in the
15  New York gallery when you were last there, correct?
16    A. That is what she wrote, correct.
17    Q. And this is your email address, correct?
18    A. That is my email address, correct.
19    Q. And she attaches photos for you to view,
20  correct?
21    A. Correct.
22    Q. And included if these photos are some
23  pieces of artwork that you purchased, correct?
24    A. Correct. Two years later. But correct.
25    By the way, some of those photos that are

1  attached to this email I don't know how this email was
2  created but some of those photos are not in the
3  studio.  In this photo in the bottom is in her home in
4  Connecticut that she didn't even own at the time in
5  March 2015 when I was in her studio.
6      So I don't know if this is the original
7  attachment to the email or if it's been doctored but
8  I'm going to have to look at my emails because I do
9  not believe that these are the photos.  I see it says
10 lobbing 1887, my guess and it's my strong hunch is
11 that these are not photos that were included can you
12 go back to the date, please?  Because this date might
13 have even been before it was even possible for that
14 photo to exist because that photo is in Nancy's home
15 that I've been in, in Connecticut and she did not own
16 that home -- she did not rent that home in 2015 or up
17 through my first purchase she did not rent that home.
18 So can you please scroll back up so I can see the date
19 of this email that other photo is in her home, too.
20 June 2019?
21      Q.  Mr. Charnoff on July 6 --
22          (Deposition Exhibit 10, remotely
23 introduced and provided electronically to the court
24 reporter.)
25      Q.  This is Exhibit 10.

1      A.  Ms. Getches, can you please go back to
2  the email you asked me about because I'd like to
3  see --
4      Q.  Oh, no.  There's no question pending.
5  Thank you.
6          MR. HICKS:  It's okay.  We'll --
7      Q.  (BY MS. GETCHES)  Mr. Charnoff, on
8  July 6, 2016, Ms. Loving sent you a catalog that she
9  created for both you and your wife, Brande Charnoff,
10 correct?
11         THE DEPONENT:  Ian, are they allowed to
12 doctor evidence that way?  Are we going to be able to
13 go back and review from the --
14         MR. HICKS:  Yes.  I'm looking at it now.
15 We're fine.  Go ahead.
16     A.  Okay.  I'm sorry, Ms. Getches.  Can you
17 repeat the question?  I was still blown away by
18 the . . .
19     Q.  (BY MS. GETCHES)  On July 6, 2016,
20 Ms. Loving sent you a catalog that she had created for
21 both you and Brande Charnoff, correct?
22     A.  That's what she says in this email,
23 correct.
24     Q.  Do you remember receiving this email?
25     A.  I mean, that was July 6, 2016, I'm

1  sure -- if this email is in my in-box, then I received
2  it.
3      Q.  Your email is also wcharnoff@iCloud.com?
4      A.  At the time my email address was
5  wcharnoff@iCloud.com.  That's correct.
6      Q.  And your wife's email is
7  bcharnoff@gmail.com?
8      A.  That's correct.
9      Q.  And she says in the email, the catalog
10 reflects the retail prices as the Garde family,
11 correct?
12     A.  Correct.
13     Q.  And she references having a great time in
14 Boulder and many laughs at the Saint Julian, correct?
15     A.  Correct.
16     Q.  And you met her and Mr. Hinkelman along
17 with your kids and Ms. Charnoff at the Saint Julian
18 around 11:30 p.m. after dinner one night; is that
19 right?
20     A.  Not with my kids.  My kids were not
21 present at any time during any of the art negotiations
22 they were not present at the Saint Julian.
23     Q.  And it's your testimony that you and your
24 wife had an art negotiation at 11:30 p.m. at the
25 Saint Julian?

1      A.  That's not my testimony.  I don't
2  understand how you get from me saying my kids were
3  never present at any of the meetings with Nancy to
4  being my testimony.  Ms. Getches, please --
5      Q.  All you have to do is say yes or no?
6          MR. HICKS:  Yeah, he keep asking
7  misleading questions because that's what's happening.
8  Stop doing it.
9      A.  You stop saying in the deposition that I
10 said things I did not say.  Please.
11     Q.  (BY MS. GETCHES)  Is it your testimony,
12 yes or no that, you met with Ms. Charnoff and
13 Ms. Loving and Mr. Hinkelman at the Saint Julian at
14 11:30 p.m. to review artwork?
15     A.  I do not remember what time we met with
16 Dave and Nancy at the Saint Julian.  I don't know
17 where you're getting 11:30 p.m. from.  I don't know if
18 that's the time this email was sent the next day or if
19 she was after bed finishing up her sales pinch for the
20 day.  I don't know why you're saying we let at 11:30
21 p.m. but I do not remember the time that we met at the
22 Saint Julian.  I do vividly remember that my kids
23 weren't present.  So I don't like that you tried to
24 sneak that in there, but --
25     Q.  Do you vividly remember reviewing art

1  work during that visit at the Saint Julian?
2      A.   I do not remember vividly reviewing
3  artwork at the Saint Julian.
4      Q.   Okay.  Did you review artwork at all at
5  the Saint Julian?
6      A.   I know we reviewed artwork at the Palmer
7  restaurant in Louisville.  It looks like, according to
8  this email, we reviewed -- I believe that this email
9  might be talking about the artwork that we reviewed at
10  Parma.  I would have to go back and look into my
11  emails because this was three years ago whether we
12  reviewed artwork again at the Saint Julian or whether
13  Nancy and I just finalized terms at the Saint Julian.
14      Q.   When was the next time you reviewed art
15  with Ms. Loving?
16      A.   Oh, I don't remember.  I would have to go
17  back and look at the emails.
18      Q.   Well, we saw the time stamp of July 2017.
19  Do you recall whether you were reviewing art with
20  Ms. Loving over a three-day period around the end of
21  July 2017?
22          MR. HICKS:   Objection, form.
23      A.   Oh, the time stamp that can't be correct
24  because I looked at the journals the day before I
25  looked at her studio?  I looked at the art that was in

1  the storage unit that she already had for all of the
2  rest of Harold Garde's art that wasn't in her house?
3  I do not believe those time stamps are correct because
4  I know that I looked at the journal paintings before I
5  looked in her storage unit for the rest of the Garde
6  art so I don't think those time stamp would be correct
7  because they would be out of day order, but also after
8  how much evidence your client has doctored in this
9  case, especially that last email that you won't go
10  back to where she had a picture from a house that
11  didn't exist yet that she wasn't renting at the time
12  she sent that email I can't rely on her dates I would
13  have to go back again and look at my plane tickets.
14  There will be a clear record of when I was at Nancy's
15  house because I was out there primarily to discuss
16  business with David so there was record of the
17  business meetings we had, my plane tickets to and from
18  Connecticut so I would rather not speculate on the
19  dates.  I would rather have accurate records.
20      Q.   (BY MS. GETCHES)  Did you visit the
21  Westport Connecticut home of Ms. Loving?
22      A.   Yes.
23      Q.   Where art was displayed on the second and
24  third floor?
25      A.   If you mean the home where the art that I

1  already purchased was hanging on the walls next to a
2  pool table and hockey table and high traffic area yes
3  I was there and I witnessed that.
4      Q.   Did you go to a storage unit on or about
5  that time and review art with Ms. Loving?
6      A.   I went to the storage unit that she had
7  for Mr. Garde's art, and I reviewed several pieces of
8  art.  There were it looked like several hundred pieces
9  to me of art in that storage unit.  It was very large
10  and contained a pretty large dresser.  I do not know
11  if the date was July 30 as reflected in that picture
12  because I don't trust Ms. Loving's time stamp, but I
13  do vividly remember visiting that storage unit and
14  seeing a bunch of Harold Garde art in that storage
15  unit.  Hundreds of pieces of Harold Garde art, I
16  believe.
17      Q.   Any other times you visited her art
18  gallery to review Harold Garde art?
19      A.   Also at that storage unit was another
20  storage unit that Nancy told me to within the same
21  storage facility there was another unit that was
22  filled with Andrew Lich art and some other personal
23  effects of David's but Nancy told me to that smaller
24  storage unit specifically to look at Andrew Lich art
25  that she was also trying to sell me.  And no, I do not

1  recall the next time I visited any of Nancy's
2  facilities to look at art.
3      Q.   Any other times?
4          MR. HICKS:   Object to form.
5      A.   Again, my emails and texts, you can't go
6  off of what -- Nancy sends me an email and I don't
7  reply.  Anything can write anything in an email so
8  it's not verification.  But I believe I have emails
9  that we've provided that clearly reflect the different
10  times that I visited different facilities and whether
11  or not I was there for the sole purpose of art or not,
12  at least it's a record -- of choosing art or not, at
13  least it's a record of when I was in places where
14  Harold Garde art was displayed.
15          (Deposition Exhibit 11, remotely
16  introduced and provided electronically to the court
17  reporter.)
18      Q.   (BY MS. GETCHES) Exhibit 11 is an email
19  from Ms. Loving to you and Brande Charnoff where she
20  says that we have all the information for us to move
21  forward and finalize your purchase.
22      A.   Ian did they provide that final quote.  I
23  would be interested in seeing the quote --
24      Q.   (BY MS. GETCHES)  Mr. Charnoff, you can
25  talk to your attorney after the deposition.

1        MR. HICKS:   On the break.

2        Q.   (BY MS. GETCHES)   Attached to this email

3   is -- well, it says the final amount was $45,120.  Do

4   you recall that being the final amount for your first

5   purchase of artwork?

6        A.   I don't recall off the top of my head,

7   but, again, I have the wire -- we provided the wire

8   transfer so that's easily verify.

9        Q.   You don't remember how much you paid off

10  the top of my head?

11       A.   I know it was over $45,000 but it was

12  $40,120 or $120.99?  I just want to be really careful

13  about --

14       Q.   Does this look like your first purchase

15  reflected on the invoice here?

16       A.   Yes, that looks like my first purchase.

17       Ms. Getches, because I don't want to be

18  in the middle of you asking a question, I would really

19  like to use a restroom in the next five or ten minutes

20  or so.  So please like keep that in mind.

21       Q.   Sure.  No problem.

22       Ms. Loving refers to the fact in this

23  email that we can determine what gets shipped right

24  away and if you prefer to start with us here or until

25  the house is built or a location for the art

1   determined, correct?

2        A.   I have no idea why she wrote that.  I

3   haven't ever in my life had a house built.  I talked

4   to her on the phone about that and she's like -- I

5   don't know why she wrote that.  It must have been

6   like -- I think she called it a brain snafu.

7        Q.   Okay.  So it's your testimony that there

8   was no building being done on your house that she

9   could have been referring to her hematoma here?

10       A.   What she wrote is until the house gets

11  built.

12       Q.   Okay.  Well, is it your testimony that as

13  of July 29, 2016, you had a place to store the art?

14       A.   My testimony is that at no time --

15       Q.   Yes or no?

16       A.   Yes., I had a place to store the art.

17       Q.   And where was that?

18       A.   There were several places I could have

19  stored the art.  At that time I would have stored the

20  art in my storage -- my climate controlled storage

21  facility in Erie where I was storing some of my other

22  collectibles or I would have stored the art in my home

23  which at no point during a remodel was there not

24  sufficient space in either of my homes to store the

25  art.

1        Q.   Why would you put it in a storage

2   facility if you could store it in your home?

3        A.   You asked me where I could have stored

4   it.  I said I could have stored it either places and

5   thousand said I would have most likely stored it in

6   my home.  At no point was there not room or sufficient

7   space that was not being remodeled for me to store

8   that art.  In fact, in my home on lookout Road I had

9   an empty bedroom that wasn't used as a guest room or

10  an office or it just wasn't being used and that room

11  wasn't even remodeled.

12       Q.   Okay.  So.

13       (Deposition Exhibit 12, remotely

14  introduced and provided electronically to the court

15  reporter.)

16       Q.   If we look at Exhibit 12, which is an

17  email well after the art purchase was complete, and

18  you say here:  "When I laid out over $180,000 for the

19  art, I was factoring in free gifts as part of the

20  deal.  It was also agreed that shipping, crating, and

21  all other costs would be covered by ArtPort."

22       And then further down it says I would not

23  have waited to have the art shipped if I was informed

24  that I was expected to pay for storage and insurance

25  as I had more economical storage and insurance options

1   in Colorado?

2        A.   Right.  Because my homeowners insurance

3   to put the art on would have cost me under $200 a year

4   and to store it at my house is free.

5        Q.   And why would you pay for more chemical

6   storage if you could have put it in your house?  Why

7   wouldn't you just put it your house?

8        A.   Again, you're changing my words, and I

9   really don't appreciate when you do that.  It says

10  exactly I also would not have waited to have the art

11  shipped and was informed I was expected to pay for

12  storage and insurance as I have more economical

13  storage and insurance options in Colorado.  You can't

14  get much more chemical than free storage .  And to

15  cover the insurance -- to cover the art -- to

16  insurance the art not only for theft but also the way

17  it was explained to me, if the art was hanging on my

18  wall and I hit it with high elbow while I was

19  vacuuming and it falls on the floor and broke, they

20  would have covered that also so for approximately $200

21  a year I could have insured that art, all of it on my

22  own insurance policy and for free I could have stored

23  in my home.  There's nothing here where I say I would

24  have had to pay for a storage unit because I would

25  not.

1     Q.  So when you're referring to chemical
2 storage, you're referring to storing it at your house?
3     A.  I didn't include chemical storage.  I
4 said I had more economic solutions for storing it in
5 Colorado.
6     Q.  You said you had more chemical storage?
7     A.  And insurance.  More economical storage
8 and insurance options.  That is together.  You can't
9 get much more economic than free, and Nancy did not
10 get better insurance than $200 a year.
11     Q.  Why does is it say I would not have
12 waited to have the art shipped.
13     A.  Nancy convinced me to allow her in
14 writing several times I asked in writing several times
15 to have the art shipped we argued about it twice and
16 Nancy convince med a text on both occasions saying she
17 was excited about the new pedestrian.  I couldn't wait
18 to get started selling my art.  Nancy convinced Maine
19 to allow her to do two things with my art.  One, to
20 try to get them into museums so she can bring up the
21 historical relevance of my pieces and the exposure of
22 my pieces and make my art more valuable and two she
23 said because I had already picked a lot of extremely
24 relevant and old pieces from Harold Garde's collection
25 that she thought she could sell it because it

1 continued to increase in value, that she thought she
2 could sell it for significantly more money than I paid
3 for it and she volunteered to store and insurance the
4 art while she tried to sell it in exchange for me
5 splitting the profit with her.
6     So, for example, the piece that I paid
7 $25,000 For if she could sell is for $40,000 she
8 would give me back my $25,000 that I paid and then the
9 $15,000 of profit would be split 50-50 between her and
10 I.  So if she was going to do the work to sell it,
11 market it, get it to museum and pay for insurance and
12 storage, at the time that seemed like a predominant
13 deal pour me and her both where will she could keep
14 half the profit half of my art and she was basically
15 selling my art for no additional cost to me.
16     (Deposition Exhibit 13, remotely
17 introduced and provided electronically to the court
18 reporter.)
19     Q.  All right. I'm going to show you
20 Exhibit 13, which is an email from you to Ms. Loving
21 dated five, 2017.  And it's in response to an email
22 where Ms. Loving is telling you she wants to make sure
23 she's clear on the terms of your agreement for the
24 deposit on the balance of the art and create an
25 agreement we are both comfortable with.

1     And she says, "I would like to discuss
2 insurance, conservation and preservation, written
3 appraisals when you have some time.  It'll be
4 essentially to make some decisions in the next dudes
5 as I would like to range for all of your art to be
6 handled with care and put in a safe holding place."
7 Did you see where I was reading?
8     A.  Yes.
9     Q.  Then you respond and you say, thanks for
10 the email below.  I have a few edits --
11     A.  Ms. Getches.  After this question, can I
12 please use the restroom because I would really like to
13 use the restroom?
14     Q.  Oh, yeah.  Go ahead.  You can do it now?
15     A.  I can wait until the question is over if
16 you want.
17     Q.  Well, it will probably be a series of
18 questions?
19     A.  I just drank four cops of coffee at
20 lunch.
21     MS. GETCHES:  Let's go off the record.
22     MR. HICKS:  Ten minutes, thanks.
23     MS. GETCHES:  Let's do five minutes.
24     (Recess taken, 1:57 p.m. to 2:11 p.m.)
25     Q.  (BY MS. GETCHES) Mr. Charnoff, I'm going

1 to show you another email.  This is an email from you.
2 This is Exhibit 13.  An email from you dated August 5,
3 2017, to Ms. Loving.  And we started looking at it
4 before the break.  And in your response, you say
5 "Thanks for the email below.  I have a few edits."
6     You can take your time and read it over,
7 but I'm going to ask you about paragraph Number  4.
8 You tell Ms. Loving, "I don't want any framing or
9 conservation work done to the pieces at my cost prior
10 to me paying in full for said price."
11     A.  Can I have a moment to read it.  You said
12 I could take my time to read over it.  I can't read
13 and listen at the same time.
14     Q.  All right.  Why don't you read
15 paragraph 4.
16     A.  I'm going to read 1 through 4 just so I
17 have context.
18     (Pause.)
19     A.  Okay.
20     Q.  Okay. In paragraph 4 of the email dated
21 August 5, 2017, did you tell Ms. Loving that you will
22 deal with framing and conservation once the art
23 arrives in Colorado?
24     A.  Yes.  That's what it says.
25     Q.  Okay.  And in paragraph 6, did you tell

1 Ms. Loving that you should pay only direct costs for
2 the storage unit and plan to insure the work while
3 it's being stored?
4     A.   I only read one through four. Let me
5 read five, six, and seven and please and me the
6 question again. Give me one second.
7     (Pause.)
8     A.   Okay.
9     Q.   In paragraph 6 of the email dated
10 August 5, 2017, did you tell Ms. Loving that you would
11 pay the direct cost for the storage unit for the art
12 and that you would insure the work while it's being
13 stored?
14     A.   So you took that out of context. This
15 was written specifically to protect myself from Nancy
16 doing what she's trying to do now which is charge me
17 for a storage unit that she had other art in. So what
18 I said is I should select and pay only direct cost for
19 the storage unit meaning I select the facility I pay
20 the facility directly and then the work I have on
21 adopt should be the only work in there and I plan to
22 insure the work while it's being stored so yes that's
23 what it says there but that was described so that
24 Nancy couldn't do what she is doing now whereas if she
25 was ever going to charge me for storage I wanted to be

1 the one who was going to select the unit, I wanted to
2 pay the storage unit fees directly to the storer
3 because I didn't want her marking up as you can see
4 she tried to do because in her email before that she
5 said you should store the art with me for $350 a month
6 and my response was no, I want to select the pay the
7 store directly and I want my art to be the objectively
8 one in there because I believe what she could be me
9 trying to get me to do is pay for that big fancy
10 storage unit that she had all of Harold Garde's
11 artwork in and have my pieces in there when most of my
12 pieces were at the time hanging on the walls of her
13 home. Once the insurance goes, once Nancy changed the
14 detail on me to volunteer to get my art into museums
15 and -- into museums and galleries and try to sell it
16 and even before then she said she would just cover the
17 insurance because it would be easier for her to get
18 suitable insurance for sending it to and from
19 galleries and sending it to and from museums.
20     Q.   Okay. Everything you just said wasn't in
21 the email I was just referencing to you, was it?
22     A.   It is in other emails, actually
23 everything I just said --
24     Q.   But it's not in this email, right?
25     MR. HICKS:   Object to form.

1     A.   Rig.
2     Q.   (BY MS. GETCHES)   Right.
3     A.   I want read this email yet. It wasn't in
4 the previous email. This email has a bunch of new
5 information, so I'm --
6     Q.   I'm talking about the new email I just
7 showed you. I'm going to show you another email now.
8 This is Ms. Loving responding. Her email is in blue.
9     A.   Can you go back up to the top? I would
10 like to read all the blue you're going to ask me about
11 so I have a reference. So just give me a moment.
12     (Pause.)
13     A.   Do I have to keep reading where it says
14 Wally in blue, or are you just asking me about the
15 numbered questions?
16     Q.   I'm just going to ask you one very
17 specific question: Did Ms. Loving say to you, as
18 discussed you will be responsible for packaging your
19 choice and I can assist in helping you make proper
20 choices for each individual work of art if you like,
21 yes or no?
22     A.   Right after she is she's covering all the
23 costs of shopping, in the same paragraph she says
24 she's covering all the costs of shipping.
25     Q.   So the answer to my question is yes?

1     A.   She's not saying responsible for price
2 here. She's saying she's going to cover all the costs
3 of shipping.
4     Q.   My question to you is did Ms. Loving
5 state that you would be responsible for packaging,
6 your choice?
7     A.   In the same sentence as she says she's
8 going to cover all the costs of shipping. And it's in
9 this email which is part of an ongoing negotiation the
10 price changed from 300,000 to less art for 186,000 and
11 other terms changed as well after that email. You're
12 reading an email that was not the final purchase
13 order.
14     Q.   If you want to lean forward. It's hard
15 to hear what you were saying?
16     A.   So you were reading from an ongoing
17 negotiation document that was not the complete terms
18 of purchase as of yet. There were other emails that
19 follow that clarify certain items including that one
20 more, and she said I was responsible for packaging of
21 my choice but she said it in the same sentence as she
22 is responsible for paying for all shipping costs. But
23 also she deprived me of the ability to be responsible
24 for packaging of my choice balls because I was
25 expecting to make packaging decisions before the art

1  was shipped and then Ms. Loving shoved it all in one
2  box like a clown car and sent it to Terry Dowd without
3  me having -- as you just said, your own client put in
4  writing that I should have been able to choose the
5  packaging for my art and then without announce
6  testifying to me first after she said she wouldn't
7  ship it she just shipped it in one package and didn't
8  give me any choice when it came to packaging.
9         (Deposition Exhibit 14, remotely
10  introduced and provided electronically to the court
11  reporter.)
12        Q.  If we look at Exhibit 14 this is an email
13  from you dated August 16, 2017, to Nancy Loving and
14  the subject is amended art purchase, correct?
15        A.  That's what this document says.  Again,
16  even after you showed me a document today with a photo
17  that couldn't have existed at the time I would have to
18  check my emails to see if these match.
19        Q.  Okay.  Why don't you do that.  You say
20  sorry to fall out of communication.  I have had hectic
21  week.  Unfortunately, I did not get the mortgage on
22  the $3.1 million property and I need to close cash.
23  The legal bills on this litigation have also been
24  draining me.  You're referring to the Bob Ladd
25  litigation, correct?

1        A.  Correct.
2        Q.  As a result of this house closing, the
3  legal bills you state that you needed to adjust your
4  purchase and remove some items, correct?
5        A.  Yes.  I adjusted my purchase from 300,000
6  to 186,000 because like a responsible adult I thought
7  through clearly what I could actually spend before I
8  spent it.
9        Q.  One of the cuts was two vessels, correct?
10        A.  No.  One of the cuts was not two vessels.
11  The problem with two vessels was Nancy hit it with a
12  pool stick and I wasn't confident nor was she that she
13  could restore it whack to what it was originally was
14  and I didn't want a doctored painting.  So she offered
15  to trade me two vessels as a concession because
16  instead of storing it properly after I purchased it --
17  I already owned two vessels so I wasn't cutting two
18  vessels.  I already owned it.  Nancy hung it right
19  next to her pool table when I was at her house in
20  Connecticut I believe it was late July.  The plane
21  tickets will say when it was.  While we were standing
22  next to her pool table getting ready to play pool I
23  looked at my two vessels painting hanging right next
24  to the pool table and said Nancy there is a pool cue
25  mark on my two vessels that is hanging right next to

1  the pool table.  And she said, yeah, her son
2  accidentally hit it or with a pool cue or Dave's sone.
3  One of their son hit it with a pool cue.
4        Q.  Do you mention the fact that two vessels
5  is damaged in this email in any way?
6        A.  The one before I do.
7        Q.  Do you mention that two vessels is
8  damaged Mr. Charnoff?
9        A.  There's plenty of a paper trail to show.
10        MR. HICKS:  Object to form.
11        Q.  (BY MS. GETCHES)  And please point to the
12  jury where you've mentioned that two vessels is
13  damaged in this email where you're asking to  trade two
14  vessels for the first time?
15        MR. HICKS:  Object to form.
16        A.  This is not -- we discussed in many
17  emails before this, maybe one email before this and
18  texts, what to do about the fact that she damaged two
19  vessels.
20        Q.  (BY MS. GETCHES)  Okay.  And if there are
21  no emails that have been produced in this litigation
22  and this is the first mention of trading in two
23  vessels answer me whether you mention the damage to
24  two vessels at all in this email?
25        MR. HICKS:  Object to form.

1        A.  One doesn't have to do with the other.
2  This email does not say two vessels was damaged.
3  Absolutely the reason for the two vessels trade was
4  because it was damaged by a pool cue stick.
5        Q.  (BY MS. GETCHES)  And you attach your
6  proposed new purchase, correct?
7        A.  Correct.
8        Q.  And you ask if the prices work and if it
9  still includes all the gifts you had discussed,
10  correct?
11        A.  Correct.
12        Q.  So you expected to get all of the gifts
13  she was giving even though you were cutting your
14  purchase by $100,000?
15        A.  Correct.
16        Q.  And you thought that was fair?
17        A.  Correct.
18        Q.  And this is the amended art purchase,
19  correct, on page 2 of this exhibit?
20        A.  Make it a little bigger so I can read
21  through it.
22        Q.  I will try.
23        A.  It's just little tiny numbers on my
24  screen.
25        A little bit more, please.  Thank you.

1    All right. Hang on.
2                  (Pause.)
3        A.   Okay.
4        Q.   And is there any mention on this email or
5    the attached spreadsheet of insurance or signatures or
6    certificates of authenticity?
7        A.   There is in the email that -- the agreed
8    on final terms before purchase. I can't tell in this
9    document. This is just a price estimate. Go back
10   down. Can you make the document smaller?
11              Nope. Not on that one.
12       Q.   Okay. And on the spreadsheet that lists
13   the artwork that you purchased, it doesn't list out
14   the gifts that you were given by name at all, does it?
15       A.   Not on this spreadsheet, no.
16       Q.   And Tan Vessels versus two vessels is not
17   listed on this spreadsheet, is it?
18       A.   That's correct.
19       Q.   Mr. Charnoff, do you recall that you made
20   four payments for the art that you purchased from
21   ArtPort?
22       A.   I would have to go back and look at the
23   wires and the check that was written.
24       Q.   Okay. Do you recall directing Heather
25   Johnson on August 2, 2016, to send a wire to ArtPort?

1        A.   I believe that was for the first purchase
2    of art.
3        Q.   It was Heather Johnson?
4        A.   45,000 to. That was my bookkeeper.
5        Q.   Your bookkeeper for rent range?
6        A.   Both. I hired Heather personally to keep
7    the books for myself and my farm and also she was the
8    bookkeeper for Rent Range.
9        Q.   And was the wire sent from your bank
10   account or some other bank account?
11              (At this time ^ entered the room.)
12   Mr. Hinkelman
13       A.   I would have to look at the wire to see
14   which bank account it was sent from.
15       Q.   Okay. Well, I have basket records for
16   ArtPort, and it says that -- it says that it's from
17   Wally's Investment Properties?
18       A.   Okay.
19       Q.   What's that entity?
20       A.   It's an LLC that I have.
21       Q.   Say that again?
22       A.   Wally's investment properties is an LLC
23   that I am part owner in.
24       Q.   And the other owner is your wife?
25       A.   Correct.

1        Q.   And why was Wally's investment properties
2    paying for the art you were purchasing individually
3    from ArtPort?
4        A.   I would have to go back and look at my
5    notes at that time.
6        Q.   Your notes?
7        A.   Yeah. I would have to go back and look
8    at why the wire came from Wally's instead of me.
9        Q.   And you would have notes explaining that
10   to yourself?
11       A.   More than likely, yes.
12       Q.   And you didn't produce those notes in
13   this litigation, correct?
14       A.   I didn't think that it was necessary and
15   I didn't know -- I just didn't think about it, to be
16   honest with you.
17       Q.   And do you think it's important to --
18       A.   I've got to go look in the books and see
19   if notes exist to that.
20       Q.   I mean, do you think it's important to
21   tell the jury why another entity is paying for your
22   art?
23              MR. HICKS:   Object to form.
24       A.   It's an entity I had with my wife. So,
25   you know, I will go look at why that specific wire can

1    came from that entity and then I would be happy to
2    tell the jury why.
3        Q.   (BY MS. GETCHES)   Okay. And the second
4    payment, do you recall the total of that payment?
5        A.   No.
6        Q.   Did you say no?
7        A.   I do not.
8        Q.   I'm sorry. I can't hear you,
9    Mr. Charnoff?
10       A.   I do not remember the total of the second
11   payment, no.
12       Q.   Was it not a lot of money to you at the
13   time?
14              MR. HICKS:   Object to form.
15       A.   It was a lot of money to me at the time
16   but I was going by the total amount that I owed, not
17   what each separate payment was.
18       Q.   (BY MS. GETCHES)   Okay. Does this
19   refresh your recollection that the total amount was at
20   a thousand $900 on August 24?
21       A.   Of what year?
22       Q.   2017?
23       A.   Okay.
24       Q.   And that wire came from you individually?
25       A.   That's what it looks like.

1          (Deposition Exhibit 15, remotely
2     introduced and provided electronically to the court
3     reporter.)
4          MS. GETCHES:  This is all part of
5     Exhibit 15.
6          Q.  (BY MS. GETCHES)  And the third payment,
7     do you recall what the amount of the third payment
8     was?
9          A.  Not the exact dollar amount, no.
10          Q.  Do you recall that it was $72,350?  Does
11     that ring a bell?
12          A.  What date was that?
13          Q.  September 25, 2017?
14          A.  Okay.
15          Q.  So does this refresh your recollection
16     that Ms. Charnoff wrote a check for $72,350 on
17     September 27, 2017, for art?
18          A.  Yes.  Dave came to my house and picked
19     that up.
20          Q.  And when David Mr. Hinkelman came to your
21     house to pick up the art check, why was your wife
22     individually paying for that?
23          A.  Because I asked her to because Dave said
24     Nancy needed the money that day because she had made
25     some marketing commitments and some gallery

1     commitments and some other things for the gallery and
2     it would be extremely helpful to him if I could give
3     him that day and I asked Brande to write the check and
4     said we would work it out later so that Dave when he
5     flew to Colorado and said, Hey, man, can you please do
6     this for me so I accommodated.
7          Q.  And you're not listed on this bank
8     account, correct?
9          A.  Correct.
10          Q.  And the fourth payment was $42,750 on
11     November 16, 2017?
12          A.  What was the date?
13          Q.  November 16, 2017.
14          A.  Okay.
15          Q.  Do you see this record stating that
16     there's a wire transfer from Walter Charnoff on
17     November 16 in the amount of $42,750?
18          A.  Yep.
19          (Deposition Exhibit 16, remotely
20     introduced and provided electronically to the court
21     reporter.)
22          Q.  And there's an email where you're
23     directing Heather Johnson now at Wally's investments
24     to send a wire from your personal checking account?
25          A.  Not now.  Heather always had a Wally's

1     email and, again, I told you I hired Heather to also
2     do my business and personal account.
3          Q.  And so did you direct Heather to set up a
4     wire from your personal checking account in the amount
5     of $42,750?
6          A.  That's what it looks like.
7          Q.  And this is the fourth and final payment
8     of art that you made, correct?
9          A.  I would have to go back and look and see
10     what those dollar amounts total or if there's my wires
11     or not.
12          Q.  You think what?
13          A.  I would have to go double-check if those
14     dates match my words and if you -- you gave me four
15     different totals at four different times.  We didn't
16     total each time if they totaled the approximately
17     $186,000.  So I'm leary to go off of what you've shown
18     me because I've already seen one doctored document
19     today and there's been several in this case.
20          Q.  Okay.  Well, we'll let you prove that at
21     trial, Mr. Charnoff.
22          A.  Okay.
23          Q.  So let's talk about two vessels.  You
24     mentioned that two vessels you traded in?
25          A.  Correct.

1          Q.  And so is ultimately not a part of either
2     of your purchases, correct?
3          A.  It was part of the first purchase.  It
4     was damaged while it was in Nancy's care.  To deal
5     with the damage we traded it in during the second
6     purchase.
7          Q.  Okay.  So two vessels is neither a part
8     of the first or the second purchase, correct?
9          A.  Two vessels was part of the first
10     purchase.  I purchased it.  Nancy hung it in her home
11     for over a year.  Damaged it while it was hanging in
12     her home.  According to her depreciated in value at a
13     thousand dollars while it was hanging in her home for
14     a year so she damaged my then $25,000 painting and
15     then since I did not have confidence she was going to
16     be able to repair it as she did not express.
17          very confidentially that she could repair
18     it.  I traded it during the second purchase.  So it
19     was apparently part of both purchases.  I purchased it
20     during the first purchase.  I traded it in for a
21     credit during the second purchase
22          Q.  Okay.  So as we sit here today, is it
23     your position you own two vessels?
24          A.  No.
25          Q.  That's not your position?

1    A.   I do not own two vessels.

2    Q.   Okay.  August 10, 2016, Ms. Loving writes

3 you and your wife, Ms. Charnoff and attaches a

4 portfolio of newly acquired paintings, correct?

5    A.   Correct.

6    Q.   And in that portfolio -- well, first of

7 all, do you recall receiving this portfolio titled the

8 Charnoff collection?  I'll kind of scroll down so you

9 can look.  That's two vessels correct on plaintiff's

10 121?

11    A.   Correct.

12    Q.   And this is round head, I believe?

13    A.   Yep.

14    Q.   And this is sculptures on table, correct?

15    THE COURT:   And you currently own all of

16 the art we just looked at in that email except for two

17 vessels, right.

18    MR. HICKS:   Object to form.

19    A.   I currently have paid in full for all the

20 art in that except for two vessels.

21    Q.   (BY MS. GETCHES)   Okay.

22    A.   Whether I own it or not will be

23 determined on whether -- on the outcome of litigation.

24    Q.   Okay.

25    A.   As far as I understand it.  And, again,

1 I'm not an attorney.

2    Q.   And on this email, Ms. Loving states that

3 she's listed the full retail price on the portfolio

4 for insurance purposes, correct?

5    A.   That's what it says.

6    Q.   Okay.  And so the prices we were looking

7 at were actually higher than what you paid; isn't that

8 right?

9    A.   According to Ms. Loving, that is the

10 prices that they were worth and according to

11 Ms. Loving -- well, that one is what I paid.  I

12 believe I paid 5200 for that one.

13    The rest of them she said she gave me a

14 discount for buying the -- for buying four paintings

15 instead of one and for buying the paintings when I did

16 and she couldn't hold that discount for much longer

17 because --

18    (Court reporter speaks off the record.)

19    A.   This is what the paintings were actually

20 worth, and what I paid was a discounted price,

21 according to Ms. Loving, which is part of how she

22 induced me to purchase the paintings, by stating that

23 I was paying substantially less than retail.

24    Q.   And do you have anything to show that she

25 was inflating the value of the paintings?

1    A.   What do you mean inflating the value of

2 the paintings?

3    Q.   Do you have anything to show that the

4 value she put here is not what she could sell the

5 paintings for to some other art purchaser?

6    A.   No.

7    Q.   Now, tell me, you brought up tan vessels

8 for the first time kind of years -- at least in

9 writing, years after you made your fourth art

10 purchase.  Why did you believe tan vessels was

11 something you were entitled to receive?

12    A.   Nancy had included tan vessels in my

13 purchase.  She took it off of that purchase

14 spreadsheet because she added the value of tan vessels

15 to present among other paintings because she said she

16 needed higher -- I was under the impression from the

17 time I made the purchase that tan vessels was one of

18 the paintings that she called free gifts and she

19 called them free gifts, but in reality some of them

20 were paintings that she said rather than deeply

21 discount the art for me buying in bulk, she would be

22 better off applying extra value to some of the

23 paintings and then giving some of the other paintings

24 as free gifts because the free gifts would not impact

25 the comparable pricing for Harold Garde art, but the

1 paintings that she would inflate the price of would

2 make the comps higher which would make the art higher.

3 Make the art value higher in the future.

4    Q.   Okay.  So this is again a picture of two

5 vessels on plaintiff's 121?

6    A.   Correct.

7    Q.   And at some point in time, you ask

8 Ms. Loving if two vessels was repairable, correct?

9    A.   Because she damaged it with a pool stick,

10 yes.

11    Q.   Okay.  When you say damage, do you mean

12 that it was -- describe the damage.  That you saw with

13 your own two eyes.

14    A.   On the left ish hand bottom of the

15 painting, maybe a few inches from the bottom and a few

16 inches if you're looking at it from the left there was

17 a big rub in the painting where it was obvious that

18 the rubber from one of the pool cues had hit the

19 painting.  And while we were there discussing it, I

20 even showed her -- we even recreated the scenario

21 where we tried to make a shot from that corner and

22 sure enough the pool cue matched up with exactly where

23 that white mark was and she said yes it was either her

24 on sore Dave's son, I forget which, but one of their

25 sons playing pool and hit the painting with a pool  cue

1 so there was a white rub where the -- because that was
2 a work on board. So there was a white rub where the
3 pool cue had scuffed through the paint.
4     Q.   What do you mean work on board?
5     A.   I think it was not on canvas. It was
6 like a work on some kind of masonite. She called it a
7 work on board.
8     Q.   Okay. So --
9     A.   Go back to the description of two
10 vessels. I think it's right on there.
11     Q.   Okay. I'm just asking you your
12 understanding. So you're saying it was a white rub?
13     A.   It was a rub in the painting.
14     Q.   And you said it was white?
15     A.   It appeared white, grayish in color to
16 me, yes.
17     Q.   So from like white or gray caulk?
18     A.   No. Not from chalk. From the rubber
19 scuffing the paint. The paint in that area was like
20 brown and black-y and it was veriest that there was a
21 different color and different texture in that area
22 that was much lighter. It appeared to be whitish gray
23 and you can feel where the scuff was when you rubbed
24 your finger over it.
25     Q.   So you rubbed your finger on two vessels

1 and felt the scuff?
2     A.   After Nancy did, after Nancy felt it,
3 then she told me to feel where it was as well.
4     Q.   And so it was just a scuff, right?
5     A.   As you pointed out several times, I'm a
6 novice when it comes to art. So I don't know what you
7 would call it, but it did not look the same as when I
8 bought it. It was very evident when you look at the
9 painting that there was a section there that was
10 maybe --
11     Q.   Okay. Well --
12     A.   -- three-quarters of an inch tall by half
13 an inch wide, and it was different from the rest of
14 the painting.
15     Q.   Sorry. Describe the dimensions again.
16     A.   Maybe that tall by like that wide.
17     Q.   An inch by a centimeter?
18     A.   No. Like maybe just north of a half an
19 inch, and about half an inch wide. More than half an
20 inch tall and half an inch wide.
21         MR. HICKS:   I obtain to this mixing
22 imperial and metric. It's really confusing.
23     Q.   (BY MS. GETCHES)  So in your discovery
24 responses, which was Exhibit 1, you testified under
25 oath that the -- it was plain and obvious that the

1 pool table caused two vessels to be skewered by a pool
2 cue. Are you changing your testimony now?
3     A.   I don't know how that's -- from my
4 testimony.
5     Q.   You don't think secure means punctured
6 all the way through?
7         MR. HICKS:   Object to form.
8     A.   The word secured I meant just hit with a
9 pool stick. I guess I should have had the dictionary.
10 I didn't do very well in spelling or English in school
11 unfortunately. I guess I should have had the
12 dictionary next to me when I wrote this but the spirit
13 of what I wrote here is exactly what I just told you.
14     Q.   (BY MS. GETCHES)  Okay. And did you have
15 any understanding at the time whether this alleged
16 scuff was actually any actual damage to the piece of
17 art?
18     A.   Again, I only have to go by what Nancy
19 tells me, because at the time I was a novice. I still
20 trusted her, like a dummy, after she hung my art in
21 her house instead of storing it. And Nancy told me
22 that she could try to restore it, but even if Harold
23 was still alive, if he painted it, it still wouldn't
24 be as visible as it was when he painted, and probably
25 the best thing to do would be to trade it in on

1 another painting.
2         I feel like a total Moran because looking
3 back now I realize she just wanted to get that
4 painting back and she believed that she could repair
5 it. At the time, I firmly believed that the right
6 move was to trade the damaged painting for an
7 undamaged painting.
8     Q.   Why would she want to get it back later
9 after it was damaged?
10     A.   Because unfortunately sometimes I do
11 things without checking with my wife first and I
12 didn't share anything about the second purchase with
13 my wife, which is unfortunate. I did have my wife
14 review the paintings for the first purchase and of all
15 the paintings I bought from Nancy the only two that my
16 wife had any desire to purchase or even input on the
17 purchase of was two vessels and the round heads one,
18 the moon face one. Whatever Nancy calls it. She
19 called it moon face to me but it's called something
20 different in that portfolio. I think it's called
21 round heads. Those two paintings were the only
22 paintings that -- the first was the only purchase that
23 I had talked to my wife about. The second purchase I
24 didn't discuss with her at all. I just did it because
25 I was dumb and trying to help out Dave and a bunch of

1    other reasons.  And I believe --
2         Q.   So you were willing to trade two vessels
3    back in even though it had this damage that you're
4    alleging?
5         A.   I talked to Nancy about it and I said
6    that Brande was upset because I traded two vessels
7    without talking to her first and that -- and I was
8    wondering if there was a way to actually repair it so
9    it would be like before so I could trade it back and
10   if there was, could I trade it back so not to upset
11   Brande because I felt really bad about that.
12              And Nancy said that she already restored
13   it and it was fine and that we could go ahead and
14   trade it back for the credit that I was given.
15        Q.   Well, when you asked her about trading it
16   back, all she said was it's fine, right?
17        A.   No.  We talked about it at length in
18   person and we talked about it -- she was working with
19   me on other things at that point like still trying to
20   sell my art and everything else.  We had a great
21   conversation about it.  She said it was fine and she
22   said I could trade it back for the same amount of
23   money that I got credited on my invoice.
24        Q.   In fact, what Ms. Loving said was on
25   April 30, 2019, you said is two vessels repairable?

1    You were going to check on that , and all she wrote
2    back was it's fine, right?
3         A.   Right.  And as I said before we discussed
4    it.  You keep trying to change my answers to what
5    they're not Liza and if you want, we can have Kirsten
6    depo back and read what I said after she told me it
7    was fine, actually at the time I asked her about it
8    verbally, I said if it was fine, I would like to trade
9    it back.  She said I could trade it back for the same
10   amount that she credited me on the invoice for.
11              And she was actually quite nice the first
12   time I talked to her about it.  Oh, she understands
13   they're sad the only one of two I gave Brande input
14   on, and certainly if she likes it, she will trade me
15   back.  She was perfectly willing to trade it back the
16   first few times we talked about it.
17        Q.   Okay.  Another painting that you think --
18        A.   Ms. Getches, it's in this email right
19   here, do you want two vessels?  Yes.  Brande is very
20   upset with me because that is her favorite painting
21   okay let's see what we can do here.  Give me the list
22   please, send it to me art@gmail.com.  You said all she
23   said about it is it's fine.  You didn't read down
24   where she asked me in writing so it wasn't just
25   writing.  It was verbal and writing.  Both.  Did you

1    want two vessels yes Brande is upset with me because
2    it is her favorite one.  Okay.  Let me see what we can
3    do here.  Give me the list so --
4         Q.   Okay.  Are you done?
5         A.   Yep.
6         Q.   Great.  Okay.  Another.
7              (Deposition Exhibit 17, remotely
8    introduced and provided electronically to the court
9    reporter.)
10        Q.   Another painting that you were upset
11   about is red chair, correct?
12        A.   Correct.
13        Q.   And you claim that the red chair that you
14   purchased is not the one that you ultimately received
15   at Terry Dowd, correct?
16        A.   Correct.
17        Q.   And you have no photos of the alleged
18   other red chair to show the jury that there were, in
19   fact, more than one red chair painting?
20        MR. HICKS:   Object to form.
21        A.   Correct.
22        Q.   (BY MS. GETCHES)  Great.  And Nancy
23   Loving would know more about whether there was simply
24   one red chair painting versus multiple as you're
25   alleging?

1         A.   It's funny you say that because there
2    were several other paintings that Nancy sent me that
3    were incorrect that she tried to switch on me just
4    like she tried to switch red chair.  Fortunately,
5    those paintings I did have photos of.  It seems funny
6    to me that all the paintings I had photos of she said
7    was an honest mistake, there were two paintings with
8    the same name in her inventory.  But the only one
9    painting that I neglected to take a phot of is the
10   only one she made a mistake on that she claims was not
11   a mistake and there's no other painting named that.
12   So it seems like your client operates under the
13   premises where if you have proof, she'll fix your
14   mistakes.  If you don't have proof, it didn't happen.
15              Ms. Loving also told me at a meeting in
16   April that --
17        Q.   There's no question pending
18   Mr. Hinkelman.  Thank you.  Or Mr. Charnoff.
19        MR. HICKS:   Objection.
20              (Deposition Exhibit 18, remotely
21   introduced and provided electronically to the court
22   reporter.)
23        Q.   (BY MS. GETCHES)  With respect to the
24   signatures, you've claimed in this lawsuit that you
25   were entitled to receive help from Ms. Loving in

1  obtaining Harold Garde's signatures on a few pieces of
2  art, correct?
3          MR. HICKS:  Object to form.
4          A.  Part of what Ms. Loving put in writing
5  and was contingent on the second purchase was that she
6  would get me signatures on any and all unsigned art.
7  When I purchased it there were some pieces that were
8  unsigned and I said I want them signed and she said I
9  will get them signed for you as part of the purchase.
10  And she put that in writing several times even right
11  up to the filing of litigation.  She still said before
12  she shipped the art that she would get it all signed
13  by Mr. G.
14          Q.  (BY MS. GETCHES)  Well, she said she
15  would help you get the signatures, right?
16          MR. HICKS:  Object to form.
17          A.  No.  Signatures were part of the bargain
18  in.  I would not have purchased any of the art, any of
19  the second purchase.  I probably would have still made
20  the first purchase but the signatures were definitely
21  part of the bargain for the second purchase.  The
22  second purchase was a bulk deal made all at once .  And
23  part of that bargain was Nancy would get me signatures
24  on the unsigned art and she still has not done that to
25  this day and now that art is in Colorado and Nancy was

1  supposed to go get those signatures at her expense,
2  not mine.  So I would like to know if I end up with
3  that art at the end of this litigation those
4  signatures are going to get on that art.
5          Q.  (BY MS. GETCHES)  What's the difference
6  in value between the art signed and unsigned?
7          A.  That's irrelevant.  The deal was I
8  wouldn't have --
9          Q.  It's irrelevant?
10          A.  Your question is relevant as to whether
11  or not she performed on the contractor or not.  The
12  contract called for specific performance for her to
13  get signatures on the art.  I am telling you, and I
14  will testify under oath because it is a fact, I would
15  not have made any of that second purchase for the
16  price I paid if Nancy did not agree that that second
17  purchase would be complete with signatures on all the
18  art.  I also wouldn't have made it if the certificates
19  of authenticity weren't included.
20          Q.  What specific performance, Mr. Charnoff?
21          A.  Nancy was supposed to get all the
22  unsigned art signed before it got shipped to me.
23  Sorry.  I live out in the country I have issues
24  sometimes.
25          Nancy was supposed to go all of the

1  unsigned art signed before it was shipped to me.
2          Q.  And you don't know one way or the other
3  whether Mr. Garde would be willing to sign the art
4  today, do you?
5          MR. HICKS:  Object to form.
6          A.  He already shipped the art without
7  signatures.
8          Q.  (BY MS. GETCHES)  My question to you is
9  do you know one way or the other?
10          A.  I do not.
11          Q.  Whether Mr. G would be willing to sign
12  the art today?
13          A.  I do not but that bargain was not struck
14  today.  Part of the requirement of the purchase, part
15  of her contractual objection to me, part of her
16  specific performance was she was supposed to have all
17  of the unsigned art signed before the art was shipped.
18  That did not occur.  She was also supposed to give me
19  certificates of authenticity for each and every piece.
20  For some reason she shipped the art but I still have
21  not received my certificates of authenticity yet.
22          Q.  And what's the difference in value
23  between the art signed and unsigned?  Please tell the
24  jury so they can understand?
25          MR. HICKS:  Object to form.

1          Q.  (BY MS. GETCHES)  What was your answer?
2          A.  I do not know but I can tell you that the
3  art unsigned is completely less valuable to me and I
4  am the one who is paying for the affirmative that
5  would be like selling somebody a car that has the
6  Camaro SS emblem on it -- RS SS emblem on it, not
7  delivering the car with the RS SS emblem on it, and
8  saying what's the difference in value of your classic
9  1969 Camaro RS SS with the RS SS emblem on it or not.
10          To the person who bought that car, they
11  bought that car with that on there.  I bought original
12  art, allegedly original fine art by an artist who
13  painted some of those paintings more than 50years ago.
14  Part of the bargain was she would guarantee me
15  signatures on all of the art.  That is important to
16  me.  I would not have made that purchase.  I am the
17  one writing the check.  I am the one who is paying the
18  money.
19          It does not matter whether that art is
20  worth more or less money to somebody else.  I'm the
21  one paying for it.  I paid for it with a promise of
22  signatures.  I paid for it with a promise of
23  certificates of authenticity.  I expected to get what
24  I was paying for.
25          Q.  Do you agree with your expert that

1 sometimes artists intentionally choose not to sign
2 artwork and that it does not decrease the value of the
3 art?
4          MR. HICKS:  Objection form, foundation.
5          A.  Again, I made a specific deal.  That is
6 like telling somebody you paid to have your house
7 painted a certain color, but the person painting your
8 house decided that blue would be better in your
9 bedroom than pastel yellow, so you still have to pay
10 the full price for the paint job because that expert
11 decided your room would look better pastel yellow.
12          All that matters in this instance is that
13 I struck a deal.  That deal included all of the art
14 being signed.  That deal included in good faith the money
15 expecting Nancy to hold up her end of the bargain.
16 She didn't get that art signed.
17          So you can't tell me that now I should
18 accept something that's different from what I paid for
19 because a third party gets to decide whether it's more
20 or less valuable or whether that signature was left
21 off intentionally or not.
22          The fact of the matter is Nancy didn't
23 say in writing all signed artwork except that which
24 Harold thinks is better unsigned will be signed.  She
25 said if you buy this artwork, I will get each and

1 every piece signed.  I paid my money.  I expect each
2 and every piece signed.
3          Nobody else has the right -- once the
4 bargain is struck, nobody else has the right to tell
5 me that it's okay to change what I bought or the
6 agreement that we made because somebody else will say
7 it won't impact the value or because the artist
8 intended it that way.
9          Q.  (BY MS. GETCHES)  Okay.  Well, how does a
10 jury award you damages for your unsigned artwork
11 Mr. Charnoff?
12          MR. HICKS:  Object to form.
13          A.  If you buy something and you can't get it
14 in the form that you purchased it in, a refund should
15 be given.
16          Q.  (BY MS. GETCHES)  And if some of this is
17 a gift what does the jury do to put you back in the
18 position you thought you were going to be in?
19          MR. HICKS:  Object to form, foundation.
20          A.  Keep in mind it was a gift.  A lot of it
21 was because I've already explained to you, Nancy
22 wanted to change the value of the art so that the
23 comps would be higher.  She said I am giving ah
24 discounted for buying in bulk it is better to give you
25 above full price so that I can use those comps to show

1 Harold Garde's is increasing in value.  I looked at
2 the whole purchase, including what was marked free
3 gifts, as one bulk purchase made under specific terms
4 and conditions.
5          So if part of that deal cannot be
6 delivered on, then the deal should be rescinded.
7          Q.  (BY MS. GETCHES)  Is that what you want
8 in this lawsuit, Mr. Charnoff, to rescind the death?
9          A.  What I want is to be made whole by
10 whatever a jury of my peers or the Judge thinks --
11 whatever restitution the jury and the judge thinks
12 should be granted.
13          Q.  Restitution is probably a word the jury
14 is not going to understand.  So explain to them what
15 you're seeking in this lawsuit.
16          MR. HICKS:  Object to form and
17 foundation.
18          A.  I paid $186,000 a long time ago.  That
19 was a massive amount of money to me.  Since I spent
20 that money, which I thought I was doing something good
21 for a friend of mine.  I thought I was buying
22 something that I could enjoy for the rest of my life
23 and think happy thoughts when I looked at it and feel
24 a connection to the artist and enjoy.  I thought I was
25 buying something that had at least a monetary value or

1 more than I was paying for it and it would continue to
2 go up in value.  I didn't think I was treated luke a
3 sucker and being duped and getting ripped off.
4          So already the enjoyment of the art, the
5 emotional connection I had to it, the feeling that I
6 got thinking about the art is all being destroyed by
7 Ms. Loving because of all the drama, hardship and even
8 money I had to spend to even get her to perform her
9 side of the deal.
10          Q.  (BY MS. GETCHES)  When Ms. Loving told
11 you she would help you get the signatures?
12          A.  That's not what she said in her
13 agreement --
14          Q.  Can you let me finish my question?
15          A.  Okay.
16          Q.  When she said she would help you get the
17 signatures, did you see that as a guarantee?
18          A.  Ms. Getches, I'm telling you on more than
19 one occasion, more than one occasion, you can look
20 through the texts and the emails that I provided
21 because I've seen this on more than one occasion.  I
22 made a mental note of it every time I saw it.
23 Ms. Loving did not say I would attempt to get the
24 signatures.  She did not say I would try to help you
25 every time.  She said on several occasions I will

1 ensure that the unsigned art is signed before it is
2 delivered.
3     Q.  You're going to put those in front of the
4 jury so they can rely on that testimony at trial,
5 correct, Mr. Charnoff?
6         MR. HICKS:  Object to form and
7 foundation. His testimony, whatever you do in front
8 of --
9         MS. GETCHES:  No speaking objections.
10         MR. HICKS:  I don't care. I'm going to
11 speak. I'm going to speak.
12         MS. GETCHES:  No speaking objections.
13         MR. HICKS:  You don't like it, you can
14 take it up with the Judge.
15         MS. GETCHES:  I will take it up with the
16 Judge.
17         MR. HICKS:  You don't like it. We can
18 sit here and keep talking for 10 minutes. I don't
19 care. What we're going to do at trial, all these
20 legal questions you're asking him, is based upon work
21 product.
22     Q.  (BY MS. GETCHES)  Mr. Charnoff, I'm put
23 another exhibit in front of you.
24         MR. HICKS:  -- or whatever we decide. So
25 we can keep talking each other. I don't care. We can

1 stay here all day doing it.
2         MS. GETCHES:  That's the kind of lawyer
3 you are.
4         MR. HICKS:  Stop asking him legal
5 questions like that. You're harassing him.
6     Q.  (BY MS. GETCHES)  Mr. Charnoff on May 8,
7 2019, Ms. Loving wrote to you that she said I will
8 help you on the signatures of the unsigned work by
9 Harold as well.
10         Did you see that statement as a guarantee
11 she would get you signatures?
12     A.  That was not the statement that was
13 made --
14     Q.  Yes or no?
15     A.  At the time I purchased the art. I saw
16 that as a -- if you look at her original statement
17 where she guaranteed the signatures I saw that as a
18 reaffirmation that she would still honor that part of
19 the agreement, which she did not.
20     Q.  Okay. Well, I would like you to direct
21 me to the date, text, email, where you had a guarantee
22 from Ms. Getches that she would get the signatures
23 from you. So the jury can understand how that was
24 part of the contract.
25     A.  Would you like to stay on the record

1 while I look through all of my original emails on the
2 second purchase?
3     Q.  No. As long as you put it in front of
4 the jury, they will be able to make their decision.
5         How many pieces total --
6         MR. HICKS:  Liza --
7         MS. GETCHES:  Mr. Hicks, this isn't your
8 deposition.
9         (Reporter speaks off the record.)
10         MR. HICKS:  I don't really care.
11         THE DEPONENT:  Can I request to take a
12 break?
13         MS. GETCHES:  Let me ask two more
14 questions.
15     Q.  (BY MS. GETCHES)  Mr. Charnoff, how many
16 purchases of art did you purchase from Artport?
17     A.  I really have to pee really pad.
18         MR. HICKS:  Let's go off the record.
19     Q  (BY MR. HICKS)  No, you need to answer the
20 question before we go off. It's a number.
21     A.  I don't know. Approximately 80.
22         MS. GETCHES:  Okay. We can take a break.
23 Five minutes, please.
24         MR. HICKS:  Come on, Liza. Ten minutes.
25 We're doing ten minutes. If you don't like it, take

1 it up with the Judge.
2         MS. GETCHES:  Ian, no. We're going for
3 five. You've made us wait enough.
4         (Deposition Exhibit 19, remotely
5 introduced and provided electronically to the court
6 reporter.)
7         (Recess taken, 3:08 p.m. to 3:21 p.m.)
8     Q.  (BY MS. GETCHES)  Mr. Charnoff, how many
9 of the 80 you said pieces of art that you purchased
10 are missing signatures?
11     A.  I would have to go look at Terry Dowd
12 report, but it's some of the bigger paintings. When I
13 say there was approximately 80 pieces, there's 27
14 strapos, which are pretty small paintings. There's a
15 bunch of free gifts. You know, there's a handful of
16 very expensive paintings. I want to say it was six or
17 seven that were missing signatures at least.
18     Q.  You're not expecting that the posters be
19 signed by Mr. Garde, are you?
20     A.  That was one of the things that
21 Ms. Loving promised me.
22     Q.  And you're not expecting that the gifts
23 be signed, are you?
24     A.  Absolutely. That was one of the things
25 that Ms. Loving promised me in writing.

1      Q.   Okay.  Okay.  And you think there's six
2  to seven?
3      A.   I'm sorry.  I keep calling you Liza but
4  that's what you adamantly told me to call you when you
5  represented me.
6      Q.   I'm sure I adamantly said that.  It
7  sounds like me.
8      A.   So the free gifts, a number of them --
9  some of are posters and some of them are things that
10  Ms. Loving said it was better to give me those and
11  charge me more for the other paintings.  There are
12  paintings as well that in the total bulk purchase,
13  value was considered for those paintings.
14          So if Ms. Loving said as part of the
15  bargain she will get signatures for all of those, you
16  know, that was part might have expectation when I paid
17  the money.  I expect that if you pay for something for
18  a specific performance that the other side once they
19  accept your money should specifically perform.
20      Q.   Again, that's such a legal term that I
21  guess it just shows your experience in the litigation
22  world.
23      A.   No.  That's just business sense.  If
24  somebody bias something they expect to get what
25  they're buying and nobody should change that.

1      Q.   Okay.  If you look at Exhibit 20.
2          (Deposition Exhibit 20, remotely
3  introduced and provided electronically to the court
4  reporter.)
5      Q.   You told Ms. Loving that --
6      A.   I can't see it.
7      Q.   Or you were telling Mr. Hinkelman, excuse
8  me, that once strapos and free gifts, I have photos to
9  prove it.
10      A.   I don't have it up on my screen.
11      Q.   Do you recall saying that to
12  Mr. Hinkelman?
13      A.   Ms. Getches, all that's on my screen
14  right now is --
15      Q.   It should be sharing.  Is it not there?
16      A.   Now it is.  It was not and that's what I
17  was trying to tell me when you interrupted me.  Can
18  you repeat the question now?
19      Q.   Did you tell Mr. Hinkelman on May 20,
20  2019, that you have photos to prove that Nancy
21  switched your strapos and free gifts?
22      A.   So I'm not seeing that.  As I feared,
23  Nancy switched my strapos and free gifts.  I have
24  photos to prove it.
25          Apparently so, yes.

1      Q.   Do you see it now?
2      A.   Yes.
3      Q.   What are the photos to prove the switch
4  by Nancy of the strapos and the free gifts?
5      A.   So what I have photos of, I sent her
6  photos of and she switched back -- the ones that I had
7  photos of, she switched back.  Even after she tested
8  me and said photos aren't proof that you were supposed
9  to get them, but a handful of the paintings she
10  switched back to the proper paintings and the one I
11  didn't have a photo of -- the free gifts I did not
12  have photos had.  She just said too bad so sad you're
13  not getting them and the one painting that I didn't
14  have a photo of, she said you're just stuck with what
15  I sent you.
16      Q.   Okay.  So you reviewed the Terry Dowd
17  condition reports?
18      A.   I reviewed most of the Terry Dowd
19  condition reports, yes.
20      Q.   And she's your expert in this case,
21  correct?
22          MR. HICKS:  Object to form.
23      A.   Ian, is that what --
24      Q.  (BY MS. GETCHES)  You can't ask him
25  questions?

1          MR. HICKS:  If you don't know that
2  answer, then . . .
3      A.   I don't know.
4      Q.  (BY MS. GETCHES)  You don't know whether
5  Terry Dowd is your expert in this litigation,
6  Mr. Charnoff?
7      A.   I do not.
8      Q.   So when you filed an expert -- your
9  attorney filed an expert disclosure in this case, you
10  never saw that is that your testimony?
11      A.   If there's something signed by me I would
12  have signed it.  I do not review everything my
13  attorney files in the case.
14          (Deposition Exhibit 21, remotely
15  introduced and provided electronically to the court
16  reporter.)
17      Q.   Have you ever seen this document before,
18  which is Exhibit 21, Plaintiff's federal Rule of Civil
19  Procedure 26(a)(2) C disclosure.
20      A.   I don't know.
21      Q.   No?
22      A.   No, I said I do not know.  I do not know
23  if I've seen this or not.
24      Q.   At the bottom it says "Terry Dowd may
25  testify that the shipping of the art was improper,

1  that it was bundled in a manner that was likely to
2  increase its damage, and that the cost to ship that
3  was actually paid was substantially less than their
4  estimate."
5          Did you see where I just read?
6      A.  Yes.
7      Q.  Okay.  Are you aware that Ms. Bradley,
8  who is at Terry Dowd testified that she's not going to
9  testify that the shipping of the art was improper or
10  that it was bundled in a manner that was likely to
11  increase its damage?
12     A.  No.
13         MR. HICKS:  Object to form, foundation.
14     Q.  (BY MS. GETCHES)  This is a portion of
15  the transcript of her testimony where I ask her
16  whether the disclosure I just referenced you which
17  says "Terry Dowd may testify that the shipping of the
18  art was improper, that it was bundle in a manner that
19  was likely to increase its damage and that the cost to
20  ship that was actually paid was substantially less
21  than their estimate."
22         I just read that to you on the other
23  document and I asked her, are you going to testify
24  that the shipping of the art was improper?  And her
25  answer was, I would not word it that way.  And she

1  said it was not Terry Dowd's standard.  And when I
2  asked her, again, you're not assigning any value to
3  this standard in which the art was actually shipped,
4  she says yes."  And with respect to whether it was
5  bundle in a manner that was likely to increase its
6  damage, her answer is I'm not sure that many other
7  shippers would do it this way.  I just can say that
8  it's not the way that they would have done it.
9      A.  Is there a question?
10     Q.  Are you aware of this testimony,
11  Mr. Charnoff?
12         MR. HICKS:  Object to form.
13     A.  This is the first that I've seen of it.
14     Q.  (BY MS. GETCHES)  Okay.  Now, do you know
15  how many of the condition reports you actually
16  reviewed?
17     A.  Most of them.
18     Q.  Okay.  And you understand that Terry
19  Dowd's condition reports all included an opinion that
20  each and every piece of art that you purchase from
21  ArtPort is in stable condition, correct?
22     A.  No.
23     Q.  You think that statement is incorrect
24  that I just made?
25     A.  I don't know.

1      Q.  Really?
2      A.  Really.
3      Q.  Okay.  Well, I will represent to you that
4  each and every 82 pieces actually, 84 pieces of art
5  that you purchased from Ms. Loving, Terry Dowd has
6  represented to be in stable condition, okay?
7          MR. HICKS:  Object to form.
8      Q.  (BY MS. GETCHES)  And Terry Dowd's
9  definition, this is an exhibit, Exhibit 4 from Terry
10  Dowd's deposition has definitions they assign to their
11  condition reports, and Terry Dowd's definition for
12  stable is the best that can be said.  Did you know
13  that, Mr. Charnoff?
14         MR. HICKS:  What are we looking at?
15  Sorry Liza.  What is this?
16         MS. GETCHES:  We're looking at Exhibit 4
17  from Ms. Bradley's deposition.  You were at the
18  deposition.
19         MR. HICKS:  You wouldn't give me
20  exhibits, likes a child.  So I'll remember that.
21     A.  So I think you're taking this out of
22  context like you do everything else.
23         What this says to me is that they don't
24  opine that it's good or excellent, that they say it
25  appears stable.  And they keep looking until they find

1  an exception and then it says possible apparent
2  damage.
3          And one thing I can tell you I know from
4  looking at most of the damage reports there was notes
5  of damage on almost every condition report.  Almost
6  every condition report have notes of damage.  So if
7  you want we can go look through their definitions of
8  blanching because I saw a bunch of that, brazing
9  because I saw a bunch of that.
10         I notice you just took that away from me.
11  So to me, that document simply states that they're not
12  going to use the term good or excellent.  They're
13  going to say that it's stable and note what damage is
14  worth noting and I think you just actually helped our
15  case because they had noted a lot of damage on a lot
16  of artwork.
17     Q.  (BY MS. GETCHES)  And you're aware that
18  no one at Terry Dowd is going to opine that any of the
19  damage -- what you're characterizing as damage, at
20  least -- occurred during Ms. Loving's care, custody or
21  control of the art?
22     A.  I am not aware of that but I don't
23  believe that's what we hired them to opine on.  Like,
24  how are they supposed to -- all they can tell you is
25  whether the art is damaged or not, if Nancy kicked it

1 down the stairs or jammed it into a box or hung it
2 next to a pool table for, I wasn't present for those
3 actions.
4     Q.   Okay.  So who is going to tell a jury,
5 other than you, that any of the -- what you're
6 characterizing as damage occurred during Ms. Loving's
7 custody or control of the art?
8     A.   Nancy is because I've already submitted
9 emails to you where Nancy said I bought the first
10 artwork off of that portfolio Nancy put together site
11 unseen.  Nancy sent an email saying this reflects the
12 art and then sent me those pictures which I've blown
13 up super big on a giant screen and those pictures do
14 not include the damage that is currently on those
15 first four pieces and also I have several emails from
16 Nancy where she uses the word pristine, perfect,
17 damageless, describing the art that I'm purchasing.
18 So since Nancy was my art counselor and my art expert
19 I bought the art off of Nancy's photos and description
20 of what the art looked like and it currently does not
21 look like that.
22     Q.   Okay.  You're going to show the jury
23 emails or texts where she uses the word pristine,
24 right?
25     A.   I'm not going to answer legal questions

1 as to what my attorney is going to direct to the jury
2 or not.  I'm simply saying those emails exist.
3     Q.   Okay.  And is it your testimony that if a
4 piece of art has an accretion or an abrasion that it
5 is worth less than if it doesn't have those
6 conditions?
7     MR. HICKS:   Object to form.
8     A.   It is my testimony that the art should
9 have been delivered to me in the condition it was in
10 when I purchased it and it was not.  How much it
11 decreased the value as a factor but it's not as big a
12 factor as the fact that I bought the art, the art was
13 left in Nancy's care.  The art was not delivered in
14 the condition it was sold to me in.  So whether she
15 misrepresented the condition it was sold to me in and
16 doctored those photos and in her email and while it
17 was damaged after I purchased it while it was in
18 her car or shipping, either of those --
19     Q.   (BY MS. GETCHES)   What art did you not
20 see in person that you were sold on by these
21 portfolios that you're referencing?
22     A.   Two chairs, two vessels, this sculptures
23 on table which is the only one that museums were
24 willing to take, and I believe that's because the
25 damage on the other ones.

1     Q.   Anything to support that belief other
2 than just your hunch?
3     MR. HICKS:   Object to form.
4     A.   I believe you stalled in getting us
5 Edward's contact information.  I believe Edward will
6 substantiate that story.
7     Q.   (BY MS. GETCHES)   You believe that we
8 have Edward's contact information, Mr. Charnoff?
9     A.   I know you do because Edward was the
10 curator who was working for the gallery who was
11 supposed to get my art into museums at the time of the
12 purchase and he left the gallery under, according to
13 Nancy, extremely bad terms.  So I'm thinking part of
14 that is due to Nancy's business practices and I'm
15 hoping we can at least get Edward on the stand to
16 substantiate the fact that the museums would not take
17 my artwork because of the damage that Nancy didn't
18 tell me about.
19     Q.   And that's just your hope, right,
20 Mr. Charnoff?
21     A.   You guys have been pretty good at
22 brinkmanship and gamesmanship so far; so yes, so far
23 that is just my hope.
24     Q.   Great.  So you think that the only pieces
25 of art that was museum level quality was cultures on

1 table?  That's what you just said, right?
2     A.   Well, Nancy told me for a long time that
3 she was working aggressively on getting my art into
4 museums and the only one that made its way that I know
5 of or that she informed me being a museum exhibit is
6 sculptures on table.
7     Q.   That's because it got into a museum
8 because it didn't have damage like the rest of the art
9 that you're alleging has damage, right?
10     MR. HICKS:   Object to form, form,
11 foundation.
12     A.   Against I'm not an expert so I don't know
13 all the reasons why it made it into a museum but it
14 appears to have less dang than some of the other art.
15     Q.   (BY MS. GETCHES)  Okay.  So when you make
16 these broad statements, it's just your opinion.  It's
17 not based on any person's opinion who actually has
18 knowledge in the art world about the condition,
19 status, value of the art, right Mr. Charnoff?
20     MR. HICKS:   Object to form.
21     A.   No.  That is an incorrect statement.  If
22 you want to ask --
23     MR. HICKS:   Just ask the question.
24     Q.   (BY MS. GETCHES)   Let's look at
25 Exhibit 7, and if we school down to the photos and

1  damage, it says there's cracks, there's rub
2  discoloration, scratch?
3          MR. HICKS:   Is there an answer to the
4  last question or not?
5      Q.  (BY MS. GETCHES)  Here's another rub
6  which is what you were saying in two vessels?
7      A.   So, again, after this one if you look at
8  the --
9          MR. HICKS:   Hold on, Wally, stop.  Did
10  you answer the last question or not?
11      Q.  (BY MS. GETCHES)  Are these the kinds of
12  damage that you're saying were precluding the other
13  pieces of art from going to a museum?
14          MR. HICKS:   Wally did you answer the last
15  question.
16      A.   Even this painting, see how it has all
17  these rubs and abrasions and dirt?  I purchased this
18  painting site unseen off of the photo that Nancy sent
19  me in that portfolio that you pulled up yourself
20  earlier today and said, do you recognize this?  This
21  is the portfolio that Nancy put together that
22  contained two vessels and a moon face, which I think
23  she referred to as round heads , two chairs and this
24  sculptures on table.
25          The only thing I had to go by -- I had

1  never seen this painting live before, or any of the
2  other ones.  The only thing I had to go by for those
3  four paintings when I made the purchase was the photos
4  Nancy included in -- this is not a first purchase --
5  was on the photos that Nancy included in that
6  portfolio and her word that the art was, and in her
7  words -- I think she used the word "pristine" or
8  "undamaged" or "flawless," but that's in writing also.
9  And her verbal representations that the art was museum
10  quality and undamaged.
11          Now, if you blow up the photos and you
12  look at the photos of this art, for instance,
13  sculptures on table, in the portfolio that she used to
14  sell it to me, you blow up and you look at these
15  photos from Terry Dowd, there is damage visible even
16  on the front of the painting in this that is not
17  visible in the catalog that Nancy used to sell me the
18  art.  That's a fraudulent misrepresentation.  She sent
19  me a picture and said this is what it looks like,
20  including the damage that's on it, and then she sends
21  me a painting that is substantially more damaged once
22  I got it.
23          Now, was this damaged when she took those
24  photos and she photo shopped the damage?  Or was this
25  damage because I witness with my own two eyes this

1  hanging in a rec room above an air hockey table where
2  her kids were playing hair hockey all the time.  So
3  did this get damaged by people slamming up against it
4  when they were playing air hockey?  Did it get damaged
5  form the air hockey air blowing across the top of the
6  painting?  Because it was literally not even two feet
7  away from the air hockey table.  Did it get damaged
8  because people were smoking in that room?  Did it get
9  damage it had because people were roughhousing?  Or
10  did it get damaged during shipment?  Or were the
11  photos that she sent me originally doctored and a
12  fraudulent misrepresentation?
13          Well, whichever one of those -- whichever
14  way the damage occurred, the fact is I got the
15  painting in a different condition than it was
16  represented to me when I bought it.
17      Q.  (BY MS. GETCHES)  Okay.  And what is the
18  difference in value between the value of the painting
19  that you believed you were receiving at the time you
20  were sent the portfolio and today?
21      A.   Ms. Getches, the difference in value
22  of -- the questions that you're asking me now, the
23  difference in value without signatures, the difference
24  in value --
25      Q.   No, no, no.  I'm asking about sculptures

1  on table.
2      A.   The difference in value of sculptures on
3  table is 100 percent because I purchased the painting
4  in a certain condition.  I gave my money to buy a
5  painting in the condition Nancy represented it was to
6  me.  Whether she misrepresented the condition of the
7  painting in the catalog that you, yourself, said she
8  used to sell it to me or if had he damaged it by
9  hanging it next to her air hockey table and letting
10  her kids roughhouse around it , whether she damaged it
11  by shoving it in a box when specifically in writing my
12  first purchase came with custom crates.  My first
13  purchase, I was not responsible to pay for crating.
14  She put in writing on the first purchase this painting
15  was supposed to be custom created in its own
16  individual create, paid for completely by her.
17          So whether she damaged it by shipping,
18  whether she damaged it by hanging it next to the pool
19  table, whether she just lied in the first place and
20  photo shopped the photo she sent to me, what matters
21  to me is I paid, I think for this painting, close to
22  $15,000 for something I was promised in a certain
23  condition and then got it in a completely different
24  condition.
25          And the answer to your question is the

1 value difference to me is 100 percent. Just like the
2 value difference to me is 100 percent of the art
3 having those signatures on it. And just like the
4 difference to me is 100 percent of not having COAs.
5     Q.    Mr. Charnoff, can you tell the jury
6 whether or not sculptures on table, for example, has
7 increased in value since the time you purchased it ?
8     A.    What I can tell you is --
9     Q.    Yes or no?
10         MR. HICKS:   Object to form, foundation.
11     Q.  (BY MS. GETCHES)   I don't need a speech.
12 I just need to know can you tell the jury yes or no
13 whether sculptures on table has increased in value
14 since the time you purchased it?
15     A.    It has decreased in value to me.
16     Q.    And what's the basis for that statement
17 other than your own feeling that you didn't get what
18 you thought you purchased?
19     A.    What else matters?  I paid -- not my own
20 feeling.  I didn't get what I purchased.  When you buy
21 something that is like you going and buying a car that
22 has no scratches on it and has never been driven.  The
23 dealer takes it through the mud, beats the crap out of
24 it, delivers it with scratches, you bought it with
25 1,000 miles on it, he there was it to you with 2,000

1 miles on, relied on and says the value isn't less
2 because it still drives the same even though it looks
3 different than what you purchased.
4     Q.    Okay.  So Mr. Charnoff, based on your
5 hypothetical, if you're buying a car based on a
6 picture in a catalog, you're taking the risk that that
7 picture might not show all of the little scratches and
8 dents that might be visible on that car in person,
9 aren't you?
10         MR. HICKS:   Object to form.
11     A.    When you buy a car online they have to
12 identify all the scratches and dents and you do have
13 recourse in most states if they sell you a car that
14 has unidentified scratches and dents on it online.
15     Q.  (BY MS. GETCHES)   Is that the way it
16 works in the art world, Mr. Charnoff?
17         MR. HICKS:   Object to form, foundation.
18     A.    Nancy was my art adviser, and I'm a
19 novice.  Here is what I know.  Nancy showed me a
20 picture and said this is what it looks like.  When I
21 asked her if there was any damage on it, she said it
22 was in pristine condition.  All I knew about the art
23 world is at the time I made the first purchase is
24 trust Nancy.  She's Dave's life partner.  She's an art
25 expert.  She has my best interest at heart.  She tells

1 me the painting is undamaged, it's museum quality,
2 it's pristine; and I'm looking at the picture in a
3 catalog that doesn't show me damage.  At that point in
4 time, I had no reason not to believe her.
5     Q.  (BY MS. GETCHES)   What's the value of
6 your art worth today, Mr. Charnoff?
7         MR. HICKS:   Object to form.
8     A.    To me, nothing.  To the rest of the
9 world, I don't know.
10     Q.  (BY MS. GETCHES)   To you it's worth what?
11     A.    Nothing.
12     Q.    So you're asking for your art purchase to
13 be rescinded, aren't you?
14     A.    You didn't and me that.  You asked me
15 what the value of my art is to me and to me right now
16 it is worth nothing.  It is worth less than nothing
17 because every time I look about having to sue, all the
18 parties involved, having to go through this
19 litigation, having Nancy use my $186,000 for a long
20 time for free with no interest in failing to deliver
21 the art, having to pay to store the art, having to pay
22 to fly it, dealing with the fact that the art is
23 damaged and not in the condition she promise d that she
24 would sell it in.  Having to deal with the fact that I
25 still haven't received my COAs.  Having to deal with t

1 he fact that art still isn't signed.  This ordeal went
2 from me spending more money than my first house on
3 something that was supposed to bring me long-term joy,
4 draw me close to the artist, and be a sense of
5 happiness and enjoyment, and hopefully increase value
6 over time and it's turned into aggravation, heartache ,
7 and additional expense.
8     Q.    How long were you waiting for the art to
9 increase in value?  What was your timeline for that?
10     A.    I didn't have a timeline but according to
11 Nancy in writing in an email you pulled up, the art
12 had already increased in value even over the course of
13 that year and continued to increase in value -- I
14 forget the words she used, but that it was rapidly
15 increasing in value.
16     Q.    What she actually said is she believed it
17 would increase in value and I'm asking you after you
18 purchased it, what was the trajectory of the increase
19 this value in your mind?
20     A.    Well, Nancy told me when she decided to
21 keep the art to -- they had talked me into having her
22 sell the art and split the profit with me, she felt
23 like the majority of my pieces could be sold at a
24 profit in the very near term.  As far as the
25 trajectory of value on the rest of the art, I didn't

1    know.

2         Q.   Mr. Charnoff, if you believe the art is

3    worth zero dollars today --

4         A.   To me.

5              MR. HICKS:   Objection, form.

6         Q.   (BY MS. GETCHES)   Why did you insure it

7    for $200,000 at Terry Dowd?

8              MR. HICKS:   Same objection.

9         A.   This art is the subject of litigation.

10   She already lied to me about the insurance and failed

11   to insure it.  If Nancy had the proper insurance, then

12   shipped it or damaged it she could have done an

13   insurance claim to cover the difference.  I felt it

14   was responsible to insure the art while it was in

15   storage and still the subject of litigation.

16        Q.   (BY MS. GETCHES)   Where did you get the

17   $200,000 number, Mr. Charnoff?

18        A.   What do you mean where did I get the

19   $200,000 number?

20        Q.   Say it again?

21        A.   What do you mean where did I get the

22   $200,000 number.

23        Q.   Why did you insure it for $200,000?

24        A.   Because I paid $186,000 for it.  Nancy

25   has spent that money already.  It's obvious from the

1    bank statements.  Nancy took my money and spent it and

2    didn't even reserve the money to ship the art to me.

3    The $186,000 at this point is going to be hard to

4    collect, I believe even if I win.  If the art got

5    stolen or damaged and I paid $186,000 for it I wanted

6    it insured at least for what I paid for it and I

7    believe it was $20,000 increments at Terry Dowd for

8    the stated value for the art.  So I was trying to

9    insure the art to insure the amount of money that I

10   purchased the art for.

11        Q.   So you believe the art has increased in

12   value $14,000?

13        A.   What part of my answer did you hear me

14   say I believe the art has increased $14,000?

15        Q.   You said you paid 18 of thousand dollars

16   yet you insured it for 200,000, correct?

17        A.   Because I believe it was $20,000

18   increments, so I would have been stuck insuring it for

19   180 or 200.  I was trying to insure the art for the

20   money that I had paid for it so if anything happened

21   to the art, I could at least be paid made whole on my

22   purchase.

23        Q.   Okay.  Well, if the actual increment was

24   $1.25 for $1,000 of declared value --

25        A.   You keep trying to change my answers and

1    sometimes I fall for it.  I didn't say my art wars

2    worthless.  It was worth at least $186,000 to me

3    evident at the time I purchased it ask through Nancy's

4    actions, breach of contract it has become worthless to

5    me.  So what it's worth to rest of the world what an

6    art appraiser would say it's worth, I do not know.

7    What Nancy says its worth is $440,000.

8         Q.   Well, let's talk about that.  Earlier in

9    this exhibit that I just shared with you, it showed

10   your actual increments for the art is $1.25 for every

11   $1,000 of declared value and that you insured it for

12   200,000.

13        A.   Okay.

14        Q.   Earlier in the exhibit there's --

15        A.   Whoa.  If I insured it for 200,000 and

16   it's $1.25 for declared value that means that I

17   declared the value at --

18        Q.   I couldn't hear you.  That's okay?

19        A.   The reason I declared the value at 180 is

20   that what you're saying?

21        Q.   You could have declared it for zero.  I'm

22   asking you why you chose 200.  But you've answered so

23   I'm going to move on.

24             You had a discussion with Ms. Loving and

25   I'll represent to you that this is a text exchange

1    between you and Ms. Loving and she texts you and says,

2    hey, I'm headed -- I think she meant to say back to

3    the office.  Are you ready to do the valuations?  On

4    March 16, 2018, correct?

5         A.   That's what it looks on this text stream.

6    Can you make it a little bit bigger?  It's really hard

7    for me to see.  Okay.  Thank you.

8         Q.   All right.  So it looks like on March 17,

9    2018, there's a valuation sent.  And I'll blow that up

10   for you here.

11             It may be hard to read but does this

12   looks like what the valuation was that you and

13   Ms. Loving discussed?

14             THE DEPONENT:   Not what me and Ms. Loving

15   discussed.  I asked her for a valuation for a court

16   proceeding.  I told her it was important that the

17   valuation be accurate because it was for a legal

18   venue, and she said she would get the valuation to me.

19   This is what she sent.

20        Q.   (BY MS. GETCHES)   So why would she call

21   you and say are you ready to do the valuations if she

22   was just dictating what the number was?  It sounds

23   like you guys were working together?

24        A.   I don't know why she wrote it that way

25   but we were not working together on it.  I needed her

1  to give me an accurate value of the art and I told her
2  she had to include my first and second purchase so
3  maybe she needed to make sure that she had all the
4  paintings correct.
5      Q.  Maybe?
6      A.  Well, it looks like she spread out and
7  has the -- a total value for the first purchase and
8  then separately added the three of the four paintings
9  I still owned from the first purchase.
10     Q.  If you add that up that equals $446,200,
11  correct?
12     A.  No.  It equals more than that.  It equals
13  at least -- it equals -- I can't in my head.  I
14  thought it was around 440.  If you can make it bigger,
15  I can add it up about you I can't really see the
16  numbers.
17     Q.  Well, 376?
18     A.  Okay.
19     Q.  I mean, this is the number you used in
20  what court proceeding, Mr. Charnoff?
21     A.  It was for the bankruptcy court.
22     Q.  Okay.  If you add this up, I think it's
23  what you just said it was?
24     A.  No.  You said $404,000.  It looks like
25  it's four ho thousand dollars to me.

1      Q.  It's $46,200, correct?
2      A.  That is correct.  That's not what you
3  said earlier.
4      Q.  And that's the number you gave your
5  bankruptcy court, Mr. Charnoff?
6      A.  I believe I gave them what Nancy said.
7      Q.  You believe you gave them what?
8      A.  I have to go back and look.  I mean, you
9  can look too.  It's public record but I believe I
10 would have given them the number that Nancy gave me
11 because after I received this from her, I called her
12 and said Nancy it is really important this is
13 accurate.  Are you sure that it is worth this much and
14 she said yes.  And once she had that, I had no choice
15 but to give them what she gave me because otherwise it
16 would look like I was deflating the value.
17     Q.  Why was it important to be truthful with
18 the bankruptcy court, Mr. Charnoff?
19     A.  You've got to be truthful in every legal
20 proceeding, Ms. Getches.  Do you not think it's
21 important as an attorney to be truthful?
22     Q.  All right.  Here is a Schedule A and B
23 from your bankruptcy proceeding, which is Exhibit 25.
24         (Deposition Exhibit 25, remotely
25 introduced and provided electronically to the court

1  reporter.)
2      A.  Okay.
3      Q.  And that's your name as the debtor,
4  correct?
5      A.  Correct.
6      Q.  And the Case Number is 17-21-594-JGR,
7  correct?
8      A.  Correct.
9      Q.  This was in the District of Colorado,
10 correct?
11     A.  Correct.
12     Q.  You understood that what you included in
13 your Schedule A/B for property, you were doing under
14 penalty of perjury, right?
15         MR. HICKS:  Object to form, foundation.
16     A.  Correct.
17     Q.  (BY MS. GETCHES)  And if we scroll down,
18 it says under part 3, describe your personal and
19 household items.  And you've been listed under 8,
20 collectibles of value, decorative paintings totaling
21 $250, correct?
22     A.  Correct.
23     Q.  And you had already are purchased and
24 paid for the Harold Garde art as of January 10, 2018,
25 correct?

1      A.  Correct.
2      Q.  All right.  Let's look back at --
3      A.  Are those all the questions on that?
4      Q.  Yep.  Let's look at the second amended
5  complaint?
6      A.  The date of the valuation is 3/17.
7      Q.  Which is Exhibit 6?
8      A.  Ms. Getches, you realize I didn't get the
9  valuation until after this and then this was amended,
10 correct?
11     Q.  I sure do.
12     A.  So then --
13     Q.  Yet, it wasn't amended to say it was part
14 of your assets.
15     A.  Is that a question?
16     Q.  Yeah.  I do have a question.  So your
17 disclosure statement.
18         (Deposition Exhibit 26, remotely
19 introduced and provided electronically to the court
20 reporter.)
21     Q.  To accompany your plan of reorganization
22 dated April 20, 2018, that occurred after this
23 valuation discussion, correct?
24     A.  Correct.
25     Q.  Okay.  Because the valuation discussion

1 we just saw occurred on March 16 and 17 of 2018,
2 correct?
3     A.   Correct.
4     Q.   All right.  And so -- at this point in
5 time, you didn't list your claim against Ms. Loving as
6 an asset, did you?
7     A.   I didn't know I had a claim against
8 Ms. Loving at this point in time.
9     Q.   Okay.  And you list wearing apparel,
10 health aids, firearms, and here's your arts objects
11 and collectibles and it's still $250, right?
12     A.   Correct.
13     Q.   Okay.  Not had $46,200, right?
14     A.   I believe it's on the schedule somewhere.
15     Q.   Okay.  Well, if it's not, then I guess
16 we'll see how that plays out?
17     A.   Okay.
18     Q.   All right.  In your second amended
19 complaint, Mr. Charnoff, you had no allegations of
20 damage to the artwork, correct?
21         MR. HICKS:   Object to form, foundation.
22     A.   I do not know.
23     Q.   (BY MS. GETCHES)   Okay.  If you don't
24 know, we can scroll through the whole thing.  Would
25 you like to do that?

1         MR. HICKS:   Liza, why were you asking
2 about a nonoperative pleading.  I'm really confused by
3 that.
4         MS. GETCHES:   Mr. Hicks, no speaking
5 objection.  You haven't filed any additional pleading ,
6 although you were granted leave to file a different
7 pleading.
8         MR. HICKS:   Third amended complaint is
9 the operative pleading.  It was filed in the motion to
10 amend.
11         MS. GETCHES:   No, it isn't because you
12 have a claim in there that you lost and you can't
13 file.
14         MR. HICKS:   That's not what the court --
15     Q   (BY MS. GETCHES) Okay.  Mr. Charnoff --
16         MR. HICKS:   I object that you're asking
17 about --
18     Q.   (BY MS. GETCHES)  Mr. Charnoff, when you
19 filed your complaint in this action, did you have any
20 allegation that Ms. Loving damaged the artwork that
21 you actually purchased from her?
22     A.   We didn't know that the artwork was
23 damaged until Ms. Loving shipped the artwork and the
24 damage reports were done from Terry Dowd.  So I don't
25 know which version of the complaint has the damage

1 allegation and we didn't know until the artwork was
2 shipped.  Other than the damage that I witnessed to
3 two vessels, which got traded out, until the artwork
4 was shipped to Terry Dowd and the condition reports
5 were done, I did not have any way to know that the
6 artwork was damaged or the extent of the damage .
7     Q.   Okay.  So when you filed the complaint
8 and up until the time you hired Terry Dowd to do
9 condition reports, what was the difference in value
10 between the art that you purchased from Ms. Loving and
11 ArtPort to the time it was shipped to Terry Dowd and
12 prior to the condition reports being completed?
13     A.   To me, 100 percent.
14     Q.   So the value of the art, to you has zero
15 value regardless of whether there's damage, correct?
16     A.   Not regardless of whether it's been
17 damaged.  It's because I begged Nancy to honor her
18 side of the agreement and send me art and then
19 conceded to pay her money I didn't owe her as part of
20 trying to get her to ship me the art.
21         Once Nancy created a situation where I
22 had to sue all the parties involved to try to get my
23 art shipped she didn't get the art signed that I
24 purchased she didn't send me the actual art that I
25 purchased she unbound my journal, all the other issues

1 that happened with the art, all the drama associated
2 with it, all the pain associated with it, all the
3 expense associated with it, significantly diminished
4 the value of the art, dwindled it down to nothing to
5 me.
6     Q.   Okay.  But my question is, the art had
7 zero value at the time you filed the complaint where
8 there were no allegations of damage and it also has
9 zero value now that you've seen the Terry Dowd reports
10 and you believe there is damage to the artwork,
11 correct?
12     A.   There's two different values, Liza.
13 There's the value to me like I paid her -- keep in
14 mind $186,000 is so much money.  It is a massive
15 amount of money and I paid her $186,000 for a specific
16 bargain that she did not deliver her end of.  I gave
17 her my money right away.  She even showed and I should
18 have not been sodium because she showed how desperate
19 she was by pushing so hard for the money to come
20 quicker and not delivering on anything as soon as she
21 got it.
22         So she took my money, $186,000 that I
23 paid her in good faith thinking she was going to
24 fulfill her end of the bargain.  She did not fulfill
25 her end of the bargain of there's no way for her to

1  restore the value of what -- to me of what I paid
2  $186,000 for.
3          Now, what's the value to a third party if
4  in the unfortunate scenario that I lost this case and
5  was stuck with the damaged art that Nancy didn't care
6  for properly or didn't represent the value of or
7  shipped improperly, or all of the above. If I'm stuck
8  with art that is now more than when I received it, the
9  value to a third party might be 50 percent, it might
10  be 20 percent, it might be 80 percent. I really don't
11  know. I don't know what the value to a third party in
12  a liquidation sale would be of the art if I tried to
13  sell it.
14          I believe that the damage on the art
15  would make it less valuable than if the art was
16  undamaged. I think that's common sense. But the
17  value to me as the person who paid for the bargain was
18  zero once Nancy unlawfully detained my art, tried to
19  extort me for more money, refused to ship it, and
20  caused all the other issues relied to the art. And
21  ruined my relationship with the artist.
22      Q.  Ruined your relationship with the artist ?
23      A.  Ruined my -- how I feel about the artist
24  and his artwork and How he probably feels about me.
25  She made it so that instead of feeling at least having

1  an amicable colleague relationship with the artist,
2  we're now in litigation.
3      Q.  And you don't really know what he thought
4  about you before everything went south, do you?
5          MR. HICKS:  Object to form, foundation.
6      A.  He didn't tell me.
7      Q.  (BY MS. GETCHES)  And the value of art to
8  a third party could have actually increased in value?
9          MR. HICKS:  Object to form.
10      A.  I don't know what the value to a third
11  party is. I just it decreased to me and I'm the one
12  who paid for it.
13      Q.  (BY MS. GETCHES)  List out all the pieces
14  of art that Ms. Loving promised to deliver but failed
15  to deliver?
16      A.  Well, she failed to deliver all the time,
17  100 percent, when I tried to get the art delivered she
18  said no, I won't deliver it until you pay me varying
19  amounts of money. First it was 15,000. Then it was
20  1500. Then it was 500. Then it was 6500.
21      Q.  So the art purchase all went south based
22  on a couple thousand dollars?
23      A.  That's not what I just said.
24          MR. HICKS:  Object to form.
25      A.  She initially refused to ship any of the

1  art, any of the art. Because --
2      Q.  (BY MS. GETCHES)  And then she shipped
3  the art to you and you refused to accept it, right?
4      A.  No. She didn't ship the art to me until
5  after she diminished the value. She didn't ship the
6  art to me until after I was forced to file litigation.
7  Fist it was the moving and it was a moving target and
8  it was variable amounts of money. Then it was a new
9  contract that took away my copy right to the art,
10  added sales tax, added an as-is clause and a whole
11  bunch of things I didn't agree to. The target kept
12  moving and she still doesn't fill her obligation she
13  still today hasn't sent the certificate of
14  authenticity.
15      Q.  True or false, Ms. Loving shipped the art
16  to you after the litigation commenced and you refused
17  to accept delivery of the art?
18          MR. HICKS:  Object to form, foundation.
19      A.  Ms. Loving shipped the art to me in
20  attempt to force a remedy that I did not agree to on
21  the art. I refused shipment of the art because I
22  wanted it to be stored in a safe facility pending the
23  outcome of litigation and unpacked by professionals so
24  Ms. Loving couldn't try to shift any damage that
25  occurred during shipping on to me and also because I

1  had a suspicion which end up being correct that
2  Ms. Loving shipped the art absent if filling her
3  obligations i.e., the certificates of authenticity,
4  replacing the rest chair painting with one I didn't
5  buy with the red chair painting I did buy, having the
6  journal in the same bound condition that it was in
7  when I purchased it, having the missing journal
8  paintings back, yeah. Ms. Loving did not still even
9  by shipping the art she did not fulfill on her
10  agreement.
11      Q.  (BY MS. GETCHES)  How did you know if you
12  didn't even bother to open up the package when it was
13  sent to you?
14      A.  Because Terry Dowd unpacked the package.
15      Q.  No. That's not what I asked. You
16  refused shipment of the art?
17          MR. HICKS:  Object to form.
18      Q.  (BY MS. GETCHES)  Before it went to Terry
19  Dowd without knowing the contents. So how did you
20  know you weren't getting what you purchased?
21      A.  It was a much better idea to have a third
22  party who was in the business of receiving and
23  unpacking and restoring art unpack, document the
24  condition, and record the packing method/condition the
25  art was delivered in because -- and video record all

1 the contents as they came out of the box. Because if
2 I was incorrect -- after Nancy behaved the way she
3 behaved, any reasonable person would assume she was
4 going to continue to behave that way but if I was
5 wrong and all of a sudden woke up and said everything
6 she said she was going to do then it was safer to hear
7 that from the third-party shipper than it would have
8 been for me to open the art, unpack it myself and then
9 we would be arguing now about whether or not the
10 certificates of -- that your client would just said I
11 did send the certificates of authenticity they were in
12 the box.
13     Q.   Okay.  Well, setting aside all the
14 speculation, at the time the art arrived added your
15 house in a crate you didn't know one way or the other
16 what was in that crate, did you?
17     A.   That was one of the reasons it was safer
18 to have a third party on pack it.
19     Q.   Okay.  Great.
20          And you know that the art was not in
21 perfect condition because you agreed to conserve the
22 art after you received it?
23     A.   No.  There's a difference -- how Nancy
24 explained it to me, the novice is there's a difference
25 between restoration and conservation.

1          So Nancy said that the art was in perfect
2 condition and did not need to be restored.  I believe
3 she even said that in writing.  She explained to me
4 and it still is a little bit over my head but she
5 explained to me that conservation and restoration were
6 two completely different things.  And the reason why,
7 if you read the rest of that email in that context,
8 context, like I said I do not want any conservation
9 work done at my expense until I either pay for the
10 piece in full or make my final selection because my
11 fear was Nancy would do a bunch of work on a piece
12 that I didn't end up buying and then try to send me
13 the bill for it.
14     Q.   Okay.  Other than these fears you have,
15 you agreed to conservation, meaning, you knew that
16 conservation needed to be done?
17     A.   Again --
18         MR. HICKS:   Object to form, foundation.
19     A.   -- there is a difference between
20 conservation and restoration.  The restoration work
21 would be done to repair existing damage to the art and
22 conservation work would be done to prevent any future
23 damage.  So once I received the art, I planned on
24 finding somebody like a Terry Dowd-type company who
25 specialized in conservation to help me conserve the

1 art against future damage.  But Nancy said there was
2 no need forest ration because the art had been
3 properly cared for until now and was not currently
4 damaged.
5     Q.   (BY MS. GETCHES)   Okay.  So it's your
6 testimony that art conservation is not the cleaning,
7 repairing damage, reshaping, reassembling and retoning
8 and repairs to blend in with the original art; is that
9 right?
10         MR. HICKS:   Object to form, foundation.
11     A.   Again, you're putting words in my mouth.
12 My testimony is all that I had to go on when I made
13 the conservation decision is when Nancy told me when
14 she set herself out as my art adviser and expert that
15 conservation and recitation work were different that
16 that a there was no need to restore the art because it
17 was in pristine condition and I needed to do
18 conservation work at some point in the future to
19 protect the art's future value.
20     Q.   (BY MS. GETCHES)   Is it your testimony,
21 Mr. Charnoff, that you never told Ms. Loving to keep
22 the art in storage?
23     A.   I think there was a period between -- I
24 don't know, maybe April or February, where she was
25 trying to hit me up for a bunch of fees and I was

1 getting on a plane to go out of the country, and I was
2 going to have no access to text or email, and she was
3 trying to change the shipping terms on me and I said
4 well I'm not going to have any access to text or
5 email.  I'll be back in a week, so just keep it in
6 storage until I get back and then we'll figure it out.
7 That was during the one-week period.  I believe that
8 was back in early 2018.  After that, I asked, begged
9 several times for her to ship my art and it was
10 different excuses every time.
11     Q.   Are you aware that between the time that
12 you told Ms. Loving in June of 2018 to keep the art in
13 storage and April of 2019 that there are no
14 communications from you requesting that Ms. Loving
15 ship the art to you?
16     A.   I do not believe that the last
17 communication between -- I know factually the last
18 oral communication between Nancy and I was not keep
19 the art in storage, but I don't even believe -- and I
20 would have to go back and review all the texts that
21 were sent.  I don't believe that keeping it in storage
22 for a week was the last communication regarding that,
23 but I do know that when I got back from that trip,
24 Nancy sent me a text saying she's excited about the
25 new plan and can't wait to get started selling the

1 art.

2 Like it was evident that Nancy and I,

3 when I got back, worked out her solution. Once she

4 admitted to me that she had got in too deep on some of

5 the marketing stuff that she was doing and that it

6 would be easier for her to not ship the art at that

7 time and try to sell the art and split the profit with

8 me.

9 Once we came to that arrangement, I think

10 she sent a confirmation text something to the effect

11 of she's excited about a new plan and can't wait to

12 get started trying to sell my art or get it into

13 museums or something.

14 Q. Okay. So all of those communications

15 were Ms. Loving's allegedly offering to resell your

16 art, it must have been verbal because none of them are

17 in writing; is that right?

18 A. I do not believe that is correct. I

19 would have to review all the disclosures.

20 Q. Well, I guess time will tell.

21 A. Okay.

22 Q. Are you aware that Ms. Nancy Loving asked

23 to ship the art to you at least six times in writing

24 during 2016, 2017, and 2018?

25 A. I believe that every time I replied with

1 what she asked for and said go ahead and ship it.

2 Q. Okay. I guess we'll also find out

3 whether that plays out.

4 Now, you threatened to contact Harold

5 Garde at one point in time in May of 2019 in an effort

6 to extort Ms. Loving, correct?

7 MR. HICKS: Object to form. Wally don't

8 answer that question. You're phrasing your question

9 includes a crime so don't answer it. Fifth amendment.

10 MS. GETCHES: Actually, the definition of

11 extortion is the practice of obtaining something

12 through force or threats.

13 MR. HICKS: Okay. Well, I'll tell the

14 client. You're not still his attorney. I am. So

15 Wally don't answer the question. Fifth amendment.

16 MR. WAGNER: A fifth amendment doesn't

17 apply in a civil case.

18 MR. HICKS: Okay. Well, it does.

19 MS. GETCHES: You should have listened to

20 the magistrate who said you can't instruct your client

21 not to answer unless little privileged so go ahead and

22 answer, Mr. Charnoff.

23 MR. HICKS: Do not answer and do not

24 instruct my client. What does it matter?

25 MS. GETCHES: You can answer.

1 MR. HICKS: Do not include the word

2 extortion. Do not include a crime in the phrasing of

3 your question. My question is not going to answer a

4 question that's harassing. If you want me to call the

5 judge I will stop the deposition right now and we can

6 do that. Or we can answer another question extort.

7 What if your question included the word murder? Do

8 you want him to answer that too?

9 MS. GETCHES: Ian, if you really want to

10 call the Judge --

11 MR. WAGNER: I was going to say that I'm

12 going to make the record right now that Ian you're

13 delaying the deposition, and we're going to reserve

14 all rights to seek fees, costs, sanctions.

15 MR. HICKS: Go do it. Thank you.

16 MS. GETCHES: I join in the objection.

17 MR. HICKS: Great.

18 MS. GETCHES: It's surprising that we

19 were on the phone with the magistrate just hours

20 ago --

21 MR. HICKS: Okay.

22 MS. GETCHES: -- or have you forgotten?

23 MR. HICKS: You are not allowed to ask my

24 client who is not going to answer the question the

25 predicate of which did not commit a crime. I don't

1 care. Period. It's not happening today.

2 Q. (BY MS. GETCHES) Mr. Charnoff, using the

3 definition of extortion as follows which is the

4 practice of obtaining something through force or

5 threats did you use that method of extortion to enlist

6 Harold Garde's help in attempt to receive the art that

7 you believe you were entitled to from ArtPort?

8 MR. HICKS: Don't answer the question,

9 Wally. Why don't you just ask a different one if you

10 want to waste time on this.

11 MS. GETCHES: Why don't you stop talking.

12 MR. HICKS: Because you're asking

13 ridiculous, abusive questions. I mean, it's absorbed.

14 It's completely unprofessional. I don't really care

15 about your difference of opinion. I'm not going to

16 sit here under any circumstances and let my client

17 admit to a crime that's the predicate of that crime.

18 It's not happening, okay? So how would you like to

19 proceed?

20 MS. GETCHES: We'll bring it up with the

21 judge. I think you already have a bunch that's going

22 to be brought up.

23 Q. (BY MS. GETCHES) Mr. Charnoff, did you

24 threaten to send an email to Harold Garde where you

25 told -- you were going to tell Mr. Garde that you felt

1 your art was being held hostage in an attempt to
2 extort money from you?
3     A. That is a complete mischaracterization of
4 what happened.
5     Q. All right. Well, we can look at it. You
6 and your extortion definition will work out well here.
7 This is an email, Exhibit 27.
8     (Deposition Exhibit 27, remotely
9 introduced and provided electronically to the court
10 reporter.)
11     Q. You wrote, Ms. Loving and Mr. Hinkelman,
12 please confirm I will be receiving my art so I do not
13 need to send this. Otherwise, I will try to enlist
14 Harold's help. And then you put what appears to be
15 the extortion email that you're writing to Mr. Garde ?
16     A. Why don't you read that out loud.
17     Q. If you scroll down --
18     A. It is not an extortion email. Ms. Loving
19 was holding my art hostage. I advised her several
20 times that she's causing a bunch of problems for me
21 and other people, including Harold that she doesn't
22 need to cause and that she needs to come to her senses
23 and this was not an effort to extort or threaten or
24 anything else. I felt like Harold should be given to
25 chance to help this type of litigation from occurring.

1 I felt like he was a nice guy. I felt like he and I
2 got along well during the thing and I really felt like
3 he had no idea what Ms. Loving was doing and like he
4 could talk some sense into her if I couldn't. This
5 was an honest effort to try and enlist the help of the
6 other party who was involved so that he could help me
7 try to stop this nonsense from happening because I was
8 in utter disbelief of how Nancy and Dave were behaving
9 and I genuinely thought Harold could help me fix the
10 problem. This was not designed to threaten. Even if
11 you read the email this is not a threatening letter
12 that I wrote to Mr. Garde. I was trying to appeal to
13 him and say, look, you probably don't know this is
14 going on. You may not even know, because Nancy seems
15 to be not as honest as I thought she was, that I spent
16 $180,000 plus on your art.
17     I hope you remember who I am and that I
18 liked your work. I just couldn't afford to buy any at
19 the time. And all I'm trying to do is get my art
20 delivered, and I don't want this to go any further
21 because I genuinely want Nancy to be unimpeded in
22 building a market for your art . And I just wanted
23 everybody to be happy. This doesn't seem threatening
24 to me at all and --
25     Q. Mr. Charnoff, your attorney just had a

1 very long yelling match about the fact that the word
2 extortion was inappropriate and you're using --
3     A. You didn't let me finish the question.
4     Q. This statement in email as a threat to
5 Harold Garde which says at this point I fear the art
6 is being held hostage in an extent to extort more
7 money from me?
8     A. That is exact --
9     Q. If you feel extortion was an issue then
10 why were you following your attorney's instructions
11 because I was simply using that same word?
12     A. Ms. Getches, I was trying to answer but
13 you were talking over me. My answer would have been
14 no, that I did not try to extort anybody for anything.
15     I think that you were using the
16 definition of "extort" improperly in the question you
17 asked me in trying to goat me into admitting a crime I
18 didn't commit. And I believe Nancy and Dave did
19 commit a crime. I believe Nancy and Dave did try to
20 extort me for more money.
21     If you look at your definition of
22 extortion, I mean they exercised power over something
23 that I paid $180,000. I don't know if that's a lot of
24 money to you. That's an insanely massive amount of
25 money to me. A paid $180,000 for a product. They

1 held their product hostage. They tried to extort more
2 money and other terms and conditions from me.
3     And in this email, I was not threatening,
4 I was not unnice, I was not even unkind. I was like,
5 hey, dude, I enjoyed meeting you. I love your work.
6 I genuinely care about the success and future sales of
7 your art, and I'm concerned and disappointed that a
8 lawsuit will hurt the credibility of ArtPort as an art
9 dealer. Please help me stop this from happening.
10     That's consistent with the texts I sent
11 Nancy where I begged her. I said, Nancy, I'm going to
12 pay you this $1,500 that I know I don't owe. I'm
13 going to forgive everything. Just please send me my
14 art so we both don't have to waste time and money on
15 litigation. That is not extortion. That is begging
16 somebody to stop acting irrational and taking insane
17 actions that cause people to waste money on
18 litigation , because the people who benefit are you and
19 the other attorneys.
20     This is not ill-intended. This is not
21 meant to extort. It was not meant to scary anybody.
22 I just thought that he had a right to know what was
23 going on because he has a vested interest in how Nancy
24 behaves. And I genuinely thought that he could help
25 me talk some sense into her so that this could have

1 ended and had a much better outcome.

2     Q. You said they committed a crime by asking

3 for more money out of you. How much was the amount of

4 money Ms. Loving and ArtPort were asking you to give

5 them?

6     A. It was a moving target. It was first

7 $15,000 plus. I think it was $15,500, but it was over

8 15 grand. Then it was 1500 bucks. Then it was 6500

9 bucks. And I don't remember if there was any other

10 numbers in between those, but those numbers are the

11 ones that I vividly remembered and I believe are in

12 writing. 15 thousand-plus and 1500, I think at one

13 point it was 1,000, 1250.

14     I mean, you can look through the text. I

15 gave you my entire text stream in our disclosure

16 documents. It was a moving target. And then when I

17 finally agreed, before the 65 number came out, which

18 she didn't even try to recover in this lawsuit because

19 I think that one we might have talked her off the

20 ledge on. Once I agreed to pay the 1500 number and

21 forgive everything just to get the art shipped, then

22 she emails my attorney and says now he's got to agree

23 to take -- shift the burden of sales tax from her to

24 me, and to give up his copyright and to signs an as-is

25 clause. It just kept getting worse and worse and

1 worse, which I guess happens when you negotiate with a

2 terrorist. Every time I conceded to one of her

3 extortion demands, she just added new ones. And I

4 didn't think it was eve going to end.

5     Q. Okay. You think Ms. Loving is a

6 terrorist?

7     MR. HICKS: Object to form.

8     Q. (BY MS. GETCHES) Is that who you were

9 referring to or is it Mr. Hinkelman or is it both?

10     A. Well, can you break out your dictionary

11 like you did for extortion.

12     Q. No. You used the word. A terrorist so I

13 want to know who is the terrorist, Nancy Loving, David

14 Mr. Hinkelman or both of them?

15     MR. HICKS: Object to form, foundation.

16     A. I used the metaphor, don't negotiate with

17 a terrorist because they will keep asking you for more

18 and more, in the manner of once I conceded to one of

19 their demands, they just kept increasing them. They

20 behaved like a terrorist in that one instance.

21     Q. (BY MS. GETCHES) And ultimately the deal

22 fell through over a mere $1,500 bucks, right?

23     A. No, the deal did not fall through over a

24 mere 1500 bucks. Look at the text stream. I offered

25 to give her the $1,500. I even offered to wire the

1 money to an escrow account at her law firm. It didn't

2 even have to be mine.

3     I said, Nancy, in writing I will give you

4 the $1,500 bucks. Your attorney can hold the money

5 because you're afraid that I will give you the 1500

6 bucks and you won't ship the art. But I will put the

7 money in escrow at your law firm with the instructions

8 that once I receive the art in good condition, you can

9 have the 1500 bucks. You can -- I'll forgive all of

10 the journal, everything else. I'll even take the --

11 all the paintings as is. You can hold red chair and

12 while I try to find a photo to prove it wasn't mine.

13 If I can't prove it wasn't mine, you can ship it to me

14 at my expense or I'll come pick it up and you'll be

15 out nothing. But I know that wasn't my painting so I

16 wanted a chance to find it. And even though I know

17 that I'm in the right, I concede all these issues just

18 ship me my art. And the $1,500 bucks wasn't good

19 enough. Then it became 65. But worse than the 65, it

20 became sales tax, it became give up my copyright, it

21 became sign an as-is clause. There was no end with

22 her. I did not file this litigation over $1,500. I

23 filed the litigation because the civil theft and the

24 extortion wouldn't end. Every time I conceded one

25 thing, she added two more.

1     Q. Are you done?

2     A. Yep.

3     (Recess taken, 4:31 p.m. to 4:39 p.m.)

4     Q. Mr. Charnoff, you knew that at the time

5 you were purchasing art from Ms. Loving and ArtPort

6 that you were helping a struggling business, correct?

7     A. Correct.

8     Q. And at one point in time, Ms. Loving

9 referred to your art purchase as throwing her a

10 lifeline, correct?

11     A. Correct.

12     Q. And you understood that she saw your

13 purchases as an investment not just for you but

14 something that would that hopefully would return value

15 to ArtPort, right?

16     MR. HICKS: Object to foundation.

17     A. Ms. Loving wrote me an email where she

18 described what she was going to do with my money,

19 which I anticipated her actually doing . And in the

20 email she described my $186,000 as an investment for

21 all involved, because she said she was going to use

22 the money specifically to make a market for the Garde

23 art to get these gallery shows off the ground, to pay

24 Edward to do a bunch of things in the promoter's name,

25 and do other things.

1    So, yes, as I understood it, she was
2    looking at my money as a lifeline and something that
3    would reap benefit to the business. But that was also
4    because of what she conveyed to me, and I genuinely
5    believed, that she was going to do with the money.
6        And by the way, this is -- sometimes this
7    can get confusing, bus this is the second purchase
8    only. The first purchase she led me to believe things
9    were going excellent. They were doing gang busters.
10   The first purchase was much more salesman, saleswoman
11   style. The first purchase was like, hey, we have so
12   much business we can't handle it. It's a feeding
13   frenzy. Ignorance is not bliss. All these museums
14   are buying the art. All these collectors are buying
15   the art. You know, the art is selling like hotcakes.
16   Everything is awesome. It was like used salesman,
17   these things are flying off the shelf.
18       It was more like you're lucky we're
19   giving you the art at this price. Things are going so
20   good. We can't even guarantee you that Garde will let
21   us sell this art to you at this price much longer.
22   And, you know, it's going to be his decides not ours
23   so we have to raise the price because the retail value
24   is going so fast. So that was the first $45,120. The
25   setup -- and I do think it was a setup -- was things

1    are awesome. You're not throwing us a lifeline. Even
2    though we said it's time to return the favor and buy
3    some art, we're also giving you the friend discount
4    and the Gardes might not let us do that longer.
5        And then it completely changed for the
6    second purchase. And the biggest thing about the
7    second purchase was she said she needed my purchase --
8    she needed a big purchase, a sizable purchase, or the
9    Gardes were going to pull her contract. So she still
10   lead me to believe that the doctor was the biggest
11   collector and that there was still value to the art
12   and that I was paying a deep discount on the art. But
13   she said she needed more volume. And the way she
14   presented to me is that the Gardes were being
15   unreasonable and greedy and all these other things
16   we'll probably get into here.
17       But she gave me the impression that the
18   art sales themselves were good but that her business
19   was struggling and that I was throwing her a lifeline
20   by helping her sell enough art to appease the Gardes
21   in one purchase and get her -- get the resources she
22   needed to do these galleries and do these other
23   marketing materials.
24       Q. (BY MS. GETCHES) Okay. So you knew as
25   of the second purchase that ArtPort wasn't this

1    gallery selling art like hotcakes as you said it?
2        A. No. That's not what I said. She still
3    said she had sold a substantial amount of art and
4    there was value in the art. The gallery itself, I
5    mean, I think she had made some bad spending decisions
6    like on her New York gallery and some other things.
7    She just said that she had blown through a meaningful
8    amount of money. It wasn't -- I didn't get the
9    impression the business was struggling. She didn't
10   give me the impression wow, I wonder if that was
11   intentional because she didn't want me to question the
12   value of the art. But she didn't give me the
13   impression that it was because the art wasn't
14   valuable. She gave me the impression it's because she
15   spent too much on her original attempts at making a
16   market for the art.
17       Q. Okay.
18       A. And combined with the fact that in her
19   words, the Gardes were being unreasonable about their
20   contract deal.
21       Q. Okay. We're going to look at the
22   discovery responses again, which is Exhibit 1. And
23   we're going to look at Question Number 20. Is it on
24   your screen yet?
25       A. Yeah. But can you make it a little bit

1    bigger. Let me grab my glasses.
2        Q. Okay. It says identify by Bates number
3    all of the photographs and art you purchased from
4    ArtPort which support your claim that the defendants
5    damaged the art you purchased after you purchased it,
6    correct?
7        A. Correct.
8        Q. And then your response is that -- you
9    point to these two separate sets of -- one is actually
10   an email chain with some pictures, and then these are
11   photographs that my clients produced. Do you have any
12   other photographs in your possession that you can show
13   that the art was actually damaged during the time
14   after you purchased the art from ArtPort and the time
15   in which it was received at Terry Dowd?
16       A. So keep in mind for the first purchase I
17   bought the art off of the PowerPoint that you used
18   earlier today at least the one that -- if it's the
19   same one that Nancy sent to me to try to solicit me to
20   purchase the art and then as pie my portfolio once I
21   did purchase the art or at least as my PowerPoint
22   portfolio. So the photos within that PowerPoint would
23   be I think the best baseline I have of photographs
24   with those four paintings allegedly at the point of
25   purchase combined with Nancy's email in word that they

1  were in pristine condition for the set of photos, I
2  don't know those -- I don't have all the Bates numbers
3  memorized, but I believe we disclosed all the photos
4  we have and then there's the photos that we received
5  from Grosso shippers prior to -- prior to shipping and
6  they did their condition reports and the photos that
7  Nancy sent with her discovery.
8      Q.   Are you aware that I asked for an example
9  of one at least one piece of art that shows a before
10 picture where there's no damage and an after picture
11 where there is damage?  One example.
12     A.   Asked today during the deposition?
13     Q.   During this case I've asked for that
14 several times.  Are you aware of that?
15     A.   Not that I can recall.
16     Q.   Weird.  Okay.  You have referred to a
17 PowerPoint, and this is also the reference you just
18 made to me in your discovery responses, which was that
19 the photographs were at the Bates numbers we describe
20 in response to question Number 20, and in this one, is
21 this the PowerPoint that you were referring to, I've
22 created a PDF list and then.
23         (Deposition Exhibit 28, remotely
24 introduced and provided electronically to the court
25 reporter.)

1      Q.   These are the --
2      A.   No.  That's not what I was referring to.
3  There's a PowerPoint that you used earlier today for
4  the first purchase that -- this is a good -- this is a
5  PowerPoint for the second purchase that Nancy put
6  together.  I don't know what the date of this one is.
7      Q.   Well, I mean, this includes pictures from
8  the first purchase, doesn't it?
9      A.   Yeah, but this didn't exist at the time I
10 made the purchase.  The decision that I made to make
11 the first purchase was based off of the PowerPoint
12 that she sent me prior to the first purchase.
13     Q.   Okay.  Well, in the response you say that
14 plaintiff points to plaintiff's 57 to 71, and that's
15 what we were just looking at and this is in response
16 to my request that you show that the art is different
17 from what you think that it was damaged after you
18 received it.  And if we look at it, I'm not
19 understanding why this is responsive to my question .
20     A.   I think your question refers to the first
21 and second purchase, correct?
22     Q.   My question simply, here's 57 through 71,
23 right?
24     A.   No.  Let's go back to your question in
25 Question 20, please.

1      Q.   Okay.  How does this --
2      A.   20 it doesn't say first and second
3  purchase.
4      Q.   It doesn't need to.  I'm asking -- tell
5  me the Bates numbers that show that the art you
6  purchased from ArtPort was damaged after you purchased
7  it.
8      A.   I'm telling you that I don't know what
9  1775 and 76 is or 57 through 71.  But --
10     Q.   I just showed you 57 through 71, and you
11 just told me that it was created after you purchased
12 it.  And I'm asking you --
13     A.   It was after --
14     Q.   How this supports your position.
15     A.   After I purchased the first purchase.  So
16 I don't know if the photos in that one are what I
17 looked at in that PowerPoint.  So that document is
18 relevant to the second purchase but the decision I
19 made to make the first purchase was based on the
20 PowerPoint that you used earlier today that had two
21 vessels, heads on table, round heads and two chairs,
22 that is what Nancy used to solicit me to buy that
23 first purchase.  The 75 through -- or 57 through 71?
24 Is that right?
25     Q.   Yeah.

1      A.   That is a full portfolio that has the
2  photos from the second purchase -- not portfolio.
3  That's a bad word but that is something that Nancy
4  took all the photos from the first and second purchase
5  and put them together into one document.  Or what she
6  felt were all the photos from the first and second
7  purchase.  Because it was missing the free gifts and
8  it was incorrect at least on red chair.  I don't see
9  the document anymore.  I can just see the video.
10     Q.   Yeah.  I took it down.  Thanks.
11         You believed at one point in time
12 Mr. Hinkelman defamed you, correct?
13     A.   Correct.
14     Q.   And you're aware that the judge denied
15 your claim to add that claim in your lawsuit?
16     A.   Not based on validity.  He just said it
17 belongs in a separate lawsuit, that I could bring the
18 claims that just didn't belong in this lawsuit because
19 it's a different case and it would delay this case.
20     Q.   That's your understanding?
21     A.   Yes.  That's my understanding.
22     Q.   Okay.  Well, just so you don't waste any
23 time on another lawsuit, the actual order in the case
24 is Exhibit 29, I believe and --
25         MR. HICKS:  Are you asking about a claim

1 that you just admitted as a predicate is not in this
2 case?
3       MS. GETCHES:  And the order states that.
4       (Deposition Exhibit 29, remotely
5 introduced and provided electronically to the court
6 reporter.)
7       MR. HICKS:  I'll make a record as
8 harassing and abusive --
9       MS. GETCHES:  I don't think your attorney
10 wants you to see this.
11       MR. HICKS:  No.  I'm happy to see it.
12    Q.  (BY MS. GETCHES)  It says that the
13 proposed amendments to defamation claims, ultimately
14 the judge said that they are new and largely unrelated
15 at this late stage in the proceedings and he denies
16 your request to add a defamation claims but he went
17 further which is very interesting and not necessary.
18 And the judge said having found the defendants would
19 be unduly prejudiced by addition of the defamation
20 claims it's not necessarily for me to address in
21 detail defendants alternative arguments that these
22 claims would be futile or pointless but the judge goes
23 on to say it bears noting however that the definition
24 claims would be highly suspectable to on a dispositive
25 motion should plaintiff seek to pursue these claims

1 via an independent action."  Were you aware of that,
2 Mr. Charnoff.
3       MR. HICKS:  Hold on.  Don't answer that
4 question.  So what claims or defenses does this relate
5 to in this case?
6       MS. GETCHES:  You have to answer the
7 question, Mr. Charnoff.
8       MR. HICKS:  No.  I'm instructing him not
9 to answer.  I'm asking you a direct question before I
10 seek sanctions.  Why don't you ask him about his
11 personal injury accident?  Why don't you do that?
12 It's just as related as this.  Ms. Getches, what claim
13 or defense does this question relate to in this case.
14       MS. GETCHES:  You can answer,
15 Mr. Charnoff.
16       MR. HICKS:  So you can't answer that?
17    Q.  (BY MS. GETCHES)  Mr. Charnoff, were you
18 aware of this order?
19       MR. HICKS:  Okay.  Thank you.  That's
20 going to be very good for my motion.  Go ahead, Wally,
21 answer the question.
22    A.  I was aware of the order, yes.
23    Q.  (BY MS. GETCHES)  And the full substance
24 of the order?
25       MR. HICKS:  Object to form, foundation.

1    A.  I don't understand what that means.
2    Q.  (BY MS. GETCHES)  Okay.  Great.
3       Is it your testimony that you never saw
4 round heads or sculptures on table in person at the
5 gallery in New York?
6    A.  Not that I can remember.
7    Q.  Okay.  And is it your testimony that the
8 PowerPoint that you were referring to earlier which I
9 believe was titled the Charnoff collection was used to
10 induce you to purchase the art, not provided to you
11 after you purchased the art as a collector book?
12    A.  No.  That one that you -- the one that
13 showed me clearly from the email it was attached to
14 was after I purchased the art and given to me as --
15 not the collector book that was promised but as a
16 PowerPoint of my collection.  Which she promised a
17 physical book also but there was another email that
18 contained the same works of art in a similar
19 PowerPoint that she used to solicit me with the -- for
20 the purchase also.
21    Q.  So it was not the PowerPoint that I
22 showed you earlier that is titled Charnoff collection
23 that was sent to both you and Ms. Charnoff in July of
24 2017?
25    A.  If we can go back to it and look at the

1 email that was attached, then I can tell you if it was
2 the exact same one or not because we used one
3 PowerPoint to pick the artwork and then she sent an
4 email afterward saying here's what you selected.  I'm
5 excited about your purchase.  I believe what you
6 showed me was the second PowerPoint that said here's
7 what you selected.  I'm excited about your purchase
8 and whether it's identical to the one used to solicit
9 the purchase, I would have to look at the email that
10 it was attached to, to solicit the purchase and then
11 look at that one and compare the two to see if they're
12 identical.
13    Q.  Okay.  This is the email I showed you
14 earlier which is marked as I believe Exhibit 9.  But
15 in any event, it is an email July 6, 2016.  It's a new
16 catalog that Nancy Loving created for both you and
17 Brande, and it's that email that references the
18 Saint Julian, and attached to it are several pieces of
19 art.  Sorry, the way your document production came in,
20 sometimes things are in a different order.  Is this
21 the one you're referring to, the selected works for
22 the Charnoff collection?
23    A.  I don't know.  I'd have to look at the
24 email that this one was attached to.
25    Q.  Okay.  I just showed you the email.  And

1  this is a PowerPoint -- or catalog we looked at
2  earlier you recall seeing this one, I believe. Is
3  this what induced your purchase of the art?
4      A.  Show me the email this is attached to
5  again, please.
6      Q.  Sure.
7      A.  What's the date of this document?
8      Q.  The email is July 6, 2016 is this the
9  email you relied on in making your purchases.
10     A.  One of them, yes. Can you show me the
11 email?
12     Q.  I'll show you the other one we looked at,
13 I believe, if not, I can mark it. This is the
14 October 21 email where Nancy is writing you with the
15 PowerPoint presentation of selected works by Harold
16 Garde.
17     A.  Where is the PowerPoint that was attached
18 to the July 6 email?
19     Q.  Oh. The one we were just looking at?
20 You want to see it again, Mr. Charnoff?
21     A.  Yes.
22     Q.  Here's the email and this is what was
23 attached to it.
24     A.  And that was attached to the July 6
25 email?

1      Q.  This is your production.
2      A.  Okay. Thank you.
3      Q.  Is this the PowerPoint you relied on in
4  making the purchase or do you know?
5      A.  Can you keep going down. This is the one
6  that had two chairs in it two and the other three.
7  Okay. Yep. This is one of the PowerPoints I relied
8  on to make my purchase, yes.
9      Q.  Okay. And the email earlier that you
10 said is altered, what's the basis for your statement
11 that this email was altered?
12     A.  Let me see because that's May 17, 2016?
13     Q.  Yep.
14     A.  This is not modify production. This is
15 her production, right?
16     Q.  Yeah. And I asked you what your basis is
17 for saying this is some kind of altered email. What
18 evidence do you have to show the jury?
19         MR. HICKS:  Object to the form.
20     A.  So this is different from what was in my
21 email on this date. If you scroll back up, I believe
22 that some of this art is hanging at Nancy's
23 Connecticut home, not in the studio.
24     Q.  (BY MS. GETCHES)  Well, I mean, the date
25 is May 17, 2016. What evidence do you have as you sit

1  here today that this is an altered email?
2          MR. HICKS:  Object to form. Foundation.
3      A.  This is something I would like my
4  attorney to look into because this does not look
5  like --
6      Q.  (BY MS. GETCHES)  Okay.
7      A.  Go back up to the email, please.
8      Q.  Sorry?
9      A.  Can you go to the body of the email. So
10 I would like to see the time stamps on the all of the
11 emails because this was sent on May 17, 2016, and some
12 of these photos are in Nancy's home in Connecticut.
13     Q.  Do you recall this spiral staircase?
14     A.  Do I recall that spiral staircase?
15     Q.  Yeah.
16     A.  No. I'm talking about if you keep going
17 down --
18     Q.  Yes or no, do you recall this spiral
19 staircase next to the piece of art that you ultimately
20 purchased?
21     A.  I did not -- the first time I remember
22 seeing that piece of art was in the storage unit in
23 Connecticut at that much later date we did not even
24 discuss me purchasing any of this art that is on this
25 screen right now during my first purchase.

1      Q.  Have you ever seen this staircase that is
2  on Loving 1887?
3      A.  I don't know. That could be in her
4  gallery but the exact look and feel of the staircase,
5  I don't remember but I do remember --
6      Q.  Do you remember this fireplace on 18al
7  seven?
8          MR. HICKS:  Tell her what you remember
9  because she cut you off.
10     A.  That fireplace, I believe is in Nancy's
11 Connecticut home.
12     Q.  (BY MS. GETCHES)  And you have seen this
13 fireplace before, correct?
14     A.  Correct. I believe so.
15     Q.  Okay. And have you seen this fireplace
16 that's on 1887?
17     A.  I don't know.
18     Q.  And it's your testimony under oath that
19 you did not see two vessels in person at any point in
20 time prior to the first purchase?
21     A.  Not that I could recall or it stood out
22 to me. If it was in the studio on March 17, when I
23 was in there if that's what you're trying to get at,
24 again, we were there to pick up Nancy and I spent time
25 socializing Harold but we definitely didn't look at

1  every painting because I don't remember the dip
2  tick -- the spiral staircase.  I don't recall seeing
3  that one prior to seeing it at the storage unit in
4  Connecticut in July of 2017.  But, again, I don't
5  remember every painting that I look at and every
6  building that I go into so those two could have very
7  well have been hanging on the walls of the art gallery
8  when I visited on my birthday in 2015 but since I
9  wasn't there to buy art.  But the two pictures you
10  just asked about, the fireplace in Nancy anesthesia
11  home, I'm pretty sure it's the fireplace in Nancy's
12  Connecticut home.
13       Q.  Mr. Charnoff, you said $186,000 is a lot
14  of money to you.  You purchased an Aston Martin that
15  costs over $100,000, right?
16            MR. HICKS:  Object to form, foundation.
17       A.  No.
18       Q.  (BY MS. GETCHES)  Did you purchase a
19  Maserati convertible that costs over $140,000?
20            MR. HICKS:  Object to form, foundation.
21       A.  Yes.
22       Q.  (BY MS. GETCHES)  Do you still own it?
23       A.  No.
24       Q.  When did you sell it?
25       A.  I think I sold it -- I think it might

1  have been June of 2019.
2       Q.  And what about a range recover?  Do you
3  own a range recover that costs over $100,000?
4            MR. HICKS:  Same objection.
5       A.  Yes.
6       Q.  (BY MS. GETCHES)  Do you still own that?
7       A.  Yes.
8       Q.  And how much is that worth?  Do you know?
9            MR. HICKS:  Object to foundation.
10       A.  What's it worth today?
11       Q.  (BY MS. GETCHES)  What did you buy it
12  for?
13       A.  I don't remember the exact price.  I
14  think I paid somewhere around 108.
15       Q.  And the Maserati, do you remember what
16  you paid for that?
17       A.  I think I paid like 118.
18       Q.  And you have watches that cost tens of
19  thousands of dollars, don't you?
20       A.  Yes.
21       Q.  Could you list those for me?
22            MR. HICKS:  Object to form.  Foundation.
23       A.  I mean, you learn --
24       Q.  (BY MS. GETCHES)  How about your Rolex,
25  how much the rose gold one how much is that?

1       A.  You learned when I represented me that
2  I'm extremely private person.
3       Q.  You can't tell me what I know about you
4  that's not this deposition because I don't know any of
5  this.  So you just need to answer my question and it
6  is how much did the rose gold Rolex cost.  I don't
7  mean to offend you but I don't remember any of that?
8            MR. HICKS:  It's okay.  It's the
9  brilliant defense of it's okay you're rich.  So go
10  ahead Wally.
11       A.  $40,000 ish.
12       Q.  (BY MS. GETCHES)  That's the rose Gold
13  Rolex?
14       A.  Correct.
15       Q.  I don't know how to pronounce this.
16  H-u-b-e-l-o-t.  That watch?  Hubelot.
17       A.  Okay.
18       Q.  How much is that one?
19       A.  $8,500.
20       Q.  Any other watches?
21       A.  Do I have other watches?
22       Q.  Yeah.
23       A.  I have a silver Rolex that's worth about
24  $7,500.
25       Q.  And that's it?

1       A.  That's it.
2       Q.  Any other kind of sports cars or fans see
3  cars that you have?
4       A.  Nope.
5       Q.  Okay.  Anything else you collect?
6       A.  What do you mean?
7       Q.  Well, it sounds like you collect watches
8  and cars and art.  Anything else?
9            MR. HICKS:  Object to the form.
10       A.  Nothing that comes to mind.
11       Q.  (BY MS. GETCHES)  Gold?
12       A.  Nope.
13            MS. GETCHES:  I'm going to take a
14  two-minute break.  I don't know if Tom's going to  ask
15  questions because I think the judge dismissed his
16  clients from the case, but I only need like
17  two minutes.
18            MR. HICKS:  Okay.
19            (Recess taken, 5:14 p.m. to 5:23 p.m.)
20       Q.  (BY MS. GETCHES)  Mr. Charnoff, have you
21  ever seen the art in person that is in the possession
22  of Terry Dowd?
23       A.  Some of the art I saw in person while it
24  was in -- hanging in Nancy's home and some of it I've
25  seen in person while it was in the storage unit in

1    Connecticut, Nancy's storage unit in Connecticut.
2         Q.   I didn't ask the question very well I
3    guess.  I'm asking whether since the time the art has
4    been in the possession of Terry Dowd, have you seen
5    the art that you purchased from ArtPort?
6         A.   No.
7         Q.   Okay.  And I just want to be able to tell
8    the jury what you're seeking in this lawsuit.  Is it
9    rescission of the art purchase that you made from
10   ArtPort meaning return of $186,000 or is it damages to
11   the tune of $446,200?
12        MR. HICKS:   Object to the form,
13   foundation.
14        A.   What I'm asking the jury for is a return
15   of my $186,000, my legal fees, and whatever else the
16   jury thinks is fair.
17        MS. GETCHES:   Okay.  That's all I have.
18   I don't know if Tom has any questions.
19        MR. WAGNER:   No.  No questions from me.
20        MR. HICKS:   I have some questions.
21              EXAMINATION
22   BY MR. HICKS:
23        Q.   Mr. Charnoff, you know me.  I'm your
24   attorney, correct?
25        A.   Correct.

1         Q.   Okay.  Do you know where in the law it
2    says that in America if you're successful and you make
3    money, you have less rights?
4         A.   No.
5         Q.   Okay.  Is it okay to commit wrongful acts
6    and steal from people just because they're wealthy?
7         A.   No.
8         Q.   Okay.  And in your businesses, you
9    employee people, correct?
10        A.   Correct.
11        Q.   So you just didn't make yourself money
12   but you provided jobs and livelihoods for lots of
13   other people, right?
14        A.   Correct.  I also started from zero, agree
15   up lunch for dinner poor, which means I could only
16   afford -- my family could only afford to feed me two
17   meals a day when I was a kid instead of three.  Went
18   in the United States Air Force, did five years and
19   worked my way up from literally zero.
20        Q.   Ms. Getches asked you during the
21   deposition about appraisals and whether you looked at
22   any appraisals that were produced in this case.  Do
23   you generally recall that?
24        A.   Yes.
25        Q.   Okay.  And obviously you did not disclose

1    any appraisals, but did you see an appraisal disclosed
2    by one or more of the defendants in this case?
3         (At this time Ms. Loving left the room.)
4         A.   Yes.
5         Q.   All right.  And did you have any
6    discussions with David Mr. Hinkelman or Ms. Loving
7    about how they would get appraisals done for tax
8    purposes or something of that nature?
9         A.   Yes.  Yes.  Mr. Hinkelman was also a very
10   wealthy person.  By the way, I owned a Maserati but
11   Mr. Hinkelman owned a Ferrari that is almost $300,000
12   and he has some watches that are much nicer than mine.
13   And Mr. Hinkelman explained and tried to get me to do
14   this but I don't think it was on the right side of the
15   law enough for me but he said basically a way to make
16   money on the arts is to buy the art and then donate it
17   at a much higher appraised value and take the tax
18   write-off on the donated art to subsidize the money
19   that you spend on the art that you actually keep.  So
20   he basically told me he had appraisers who would
21   especially for the Waksman Institute and for one other
22   one where Dave would get various art pieces donated on
23   an almost annual basis, I think appraised at a much
24   higher value than what the customer paid and then that
25   customer would get a nice tax write-off when they

1    donated the art to the charitable auction.
2         Q.   Okay.  And then also Ms. Getches asked
3    you about disclosing the value of the art in a
4    bankruptcy case.  Do you recall that line of
5    questions?
6         A.   Yes.
7         Q.   Okay.  And that bankruptcy was ultimately
8    voluntarily dismissed by you, correct?
9         A.   Correct.  And all creditors were paid in
10   full.
11        Q.   Okay.  So -- and there was, in fact, a
12   disclosure of the art in the bankruptcy -- Ms. Getches
13   didn't ask you about that, but it's your understanding
14   it was actually disclosed through your bankruptcy
15   attorneys, right?
16        A.   Correct.
17        Q.   Okay.
18        A.   And I believe the 440 value that Nancy
19   provided me.
20        Q.   Okay.  Now, in your discovery responses
21   that were an exhibit, there was a reference to a
22   question about pictures that weren't -- pictures that
23   were identified as possibly being things that you
24   would look at to induce you to purchase the art.  Do
25   you recall that testimony generally?

1      A.   Say that again Ian. I'm sorry.
2      Q.   Were there pictures that you looked at to
3   induce your purchase of the art, in part?
4      A.   Yes.
5      Q.   And when I say in part, were there a
6   variety of misrepresentations that were all material
7   and formed a basis for your inducement to purchase the
8   art?
9      A.   Yes.
10     Q.   As to both the first and second purchase,
11  right?
12     A.   Correct.
13     Q.   Are you aware that written discovery was
14  requested by you of the defendants other than ISP
15  Holdings, Inc., and Alicia St. Pierre and Martin
16  St. Pierre in January or February of 2020?
17     A.   Can you repeat that?
18     Q.   Yeah. You served written discovery on
19  Ms. Loving, Mr. Hinkelman and Studio 41 in January of
20  2020 of this year, correct?
21     A.   Correct.
22     Q.   This year being 2020, correct?
23     A.   Correct.
24     Q.   And do you have an understanding that the
25  discovery responses are generally due in 30 days from

1   the report?
2      A.   Correct.
3      Q.   And you requested documents in suppose
4   written discovery questions, correct?
5      A.   Correct.
6      Q.   Okay. And are you aware that we are now
7   approximately at the end of September and that there's
8   still documents being provided and disclosed by the
9   defendants upon whom you served written discovery ?
10     A.   I think as late as last evening.
11     Q.   That's correct.
12          Okay. So to the extent your written
13  discovery responses were served before documents were
14  disclosed, until those are supplemented, obviously ,
15  you're not going to be able to incorporate those new
16  documents, are you?
17     A.   Correct.
18          MR. WAGNER:   Form, foundation.
19     Q   (BY MR. HICKS) As far as what you're
20  asking the jury for, have you ever heard the
21  difference or the terminology equitable versus
22  monetary claims?
23     A.   I've heard the term, but I'm not an
24  attorney.
25     Q.   Okay. Well, obviously, if a judge

1   provides equitable remedies or equitable claims like a
2   rescission and a jury is not allowed to rule on that,
3   you're not going to be asking the jury to rescission,
4   are you?
5      A.   Not if that's something the judge would
6   rule on, no.
7      Q.   Ms. Getches asked you a lot of questions
8   about the value of the art or whether certain acts or
9   omissions of her clients diminished the value of the
10  art. I believe one of the questions was about whether
11  the cost to you of the things Ms. Loving was trying to
12  get you to pay before she said ship the art in 2019
13  was $1,500. Do you recall her putting a monetary
14  amount on what the cost was to you of what Ms. Loving
15  was requesting in 2019?
16     A.   I believe what she tried to say is I
17  filed this lawsuit over $1,500.
18     Q.   Okay. And, in fact, one of the things
19  that Ms. Loving -- you're alleging in this case is
20  Ms. Loving after you paid the money in full and you
21  made the selection and you performed in full that
22  after that in 2019 Ms. Loving tried to get you to sign
23  a written agreement. Do you remember that? Is that
24  something you're alleging in this case?
25     A.   Yes.

1      Q.   Okay. And you, as far as you understand,
2   already had a fully formed contract and, in fact, you
3   had already performed by paying your money under that
4   contract, correct?
5          MR. WAGNER:   Object to form, foundation.
6      A.   Correct.
7      Q.   And one of the things in that contract
8   was an as-is clause, correct?
9      A.   In the contract that she wanted me to
10  sign.
11     Q.   Yes. That's correct.
12     A.   Yes.
13     Q.   In the contract in 2019 for the new
14  terms, the new written agreement, one of the things
15  that was added in that contract that was not part of
16  your actual agreement as you've alleged was the as-is
17  clause, correct?
18     A.   Correct.
19     Q.   All right. And, in fact, the value of
20  that -- do you know what an as-is clause means you
21  accept the condition of it, so if a car is scratched
22  or doesn't run or if a painting has got a hole in it
23  or it's physically damaged an as-is clause as you
24  understand it in your general experience in life means
25  you accept that as is with all faults, correct?

1    MR. WAGNER:   Object to form.
2    A.   Correct.
3    Q.   (BY MR. HICKS)   So, in fact, if you're
4  able to recover for damage to the art, then the value
5  of that as is clause is not $1,500, is it?
6    A.   No.
7    Q.   It is actually whatever the jury awards
8  for damage to the art, correct?
9    A.   Correct.
10   Q.   Okay.  So could it be worth a basis for
11 rescission, possibly, it could be worth a lot more
12 than $1,500, hypothetically, correct?
13   MR. WAGNER:   Object to the form,
14 foundation.  He's already said he's not a lawyer and
15 he's not a judge.
16   MR. HICKS:   So why are you doing a
17 speaking objection?  This is your third objection, and
18 you're doing a speaking objection.  Please stop.
19   Wally, you can answer.
20   A.   So my feeling was that contract exposed
21 me to a lot more issues than just $1,500.  Not only
22 would I be accepting the art as is and waiving my
23 rights I had to seek any remedies for damage that  was
24 either represented -- there was already
25 misrepresentation from condition of purchase or from

1  the time it was in Nancy's care or from the time Nancy
2  shipped it.  But the other problems in the contract I
3  think exposed me to much more than $1,500 worth of
4  damage were Nancy clearly said in writing several
5  times on both purchases that she had no sales tax to
6  collect and that there would be no sales tax.  And
7  then in that contract that she wanted me to sign, she
8  tried to shift the responsibility of collecting and
9  paying sales tax from her to me, which could have
10 exposed me to sales tax on $186,000 which I believe it
11 was the merchant's responsibility to collect and pay,
12 but also that she put in writing because I was an
13 out-of-state purchaser, it didn't apply to my
14 purchase.
15   She also tried to take away the copyright
16 to the art which would prevent me from using those
17 images from anything in the future and would give them
18 permission to sell prints and use images of the
19 artwork.  And there were other provisions in there
20 also.
21   So, you know, I viewed that addition of
22 the contract was a significantly higher risk than just
23 paying $1,500.  But also, once I agreed to pay the
24 $1,500, then Nancy changed the price on me anyway.  It
25 wasn't -- once I agreed to escrow to her attorney

1  $1,500, even though I stated the whole time I don't
2  feel I owe it, I definitely know that I don't owe it,
3  but it wasn't worth $1,500 for me to pursue the fight
4  then Nancy changed the number to 6500, added that
5  contract, and some other issues as well.
6    Q.   (BY MR. HICKS)   So and you recall that
7  being asked questions about why you chose to insure
8  the art at Terry Dowd in the amount of $200,000?
9    A.   Yes.
10   Q.   And notwithstanding whether it hundred
11 thousand dollars is what it's actually insured for,
12 are you aware that the placing of the art at Terry
13 Dowd and insuring it was the subject of motions
14 practice and a court order in this case?
15   A.   Yes.
16   Q.   So to the extent there's a court order
17 requiring that it be insured that's something
18 obviously a court order you're not supposed to ignore,
19 right?
20   A.   Correct.
21   MR. HICKS:   Okay.  I have no further
22 questions.
23   MS. GETCHES:   Sounds like we can go off
24 the record, right?
25   MR. HICKS:   Yes.