# CHARNOFF

# VS.

# LOVING

**Deposition**

## WILLIAM DAVID HINKELMAN

*08/26/2020*

---

## AB Court Reporting & Video
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

EXHIBIT 9

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-2381-LTB-MEH

---------------------------------------------------

RECORDED ZOOM DEPOSITION OF WILLIAM DAVID HINKELMAN
August 26, 2020

---------------------------------------------------

Plaintiff:

WALTER CHARNOFF,

v.

Defendants:

NANCY LOVING d/b/a ARTSUITE NY, STUDIO 41, LLC,
DAVID HINKELMAN, ISP HOLDINGS, INC., ALICIA ST.
PIERRE, MARTIN ST. PIERRE.

---------------------------------------------------

## Page 2

1
2  APPEARANCES:
3  THE LAW OFFICE OF IAN T. HICKS LLC
      By Ian T. Hicks, Esq.
4      6000 East Evans Avenue, Suite 360
      Denver, Colorado 80222
5      Appearing via Zoom on behalf of
      Plaintiff
6  SHOEMAKER GHISELLI + SCHWARTZ LLC
      By Elizabeth H. Getches, Esq.
7      1811 Pearl Street
      Boulder, Colorado 80302
8      Appearing via Zoom on behalf of
      Defendants Nancy Loving d/b/a
9      ArtSuite NY, Studio 41, LLC, and
      David Hinkelman
10 ANDERSON LAW GROUP
      By Thomas H. Wagner, Esq.
11     7385 West Highway 50
      Salida, Colorado 81201
12     Appearing on behalf of Defendants
      Martin St. Pierre, Alicia
13     St. Pierre, and ISP Holdings, Inc.
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1       Pursuant to Notice and the Colorado Rules
2  of Civil Procedure, the Zoom deposition of WILLIAM
3  DAVID HINKELMAN, called by Plaintiff, was taken on
4  Wednesday, August 26, 2020, commencing at
5  9:33 a.m., via remote video conference, before
6  Lisa A. Dague, Certified Professional Reporter and
7  Notary Public within and for the State of Colorado.
8
9
10              I N D E X
11 DEPOSITION OF WILLIAM DAVID HINKELMAN
12 EXAMINATION BY:              PAGE
13    Mr. Hicks                 5
14    Ms. Getches               --
15    Mr. Wagner                --
16
17 EXHIBITS              INITIAL REFERENCE
18 (None were marked.)
19
20
21
22
23
24
25

## Page 4

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are on the record
3  at 9:33 a.m.  Today is August 26, 2020.  This
4  begins the video deposition of David Hinkelman in
5  the matter of Charnoff vs. Loving.  This video
6  deposition is being recorded via video conference.
7  The court reporter is Lisa Dague.  I'm the
8  videographer and technician, Paula Wolff.
9        Will counsel please introduce themselves.
10       MR. HICKS:  Good morning.  This is Ian
11 Hicks, H-i-c-k-s, representing the Plaintiff Walter
12 Charnoff, Colorado attorney registration 39332.
13       MS. GETCHES:  This is Liza Getches.  I
14 represent the Defendants Studio 41, ArtPort, LLC,
15 Nancy Loving, and David Hinkelman.
16       MR. WAGNER:  Good morning.  My name is
17 Tom Wagner.  I represent Defendants Martin and
18 Alicia St. Pierre and ISP Holdings, Inc.  And I
19 have to add that my appearance today is without
20 waiving any objection that my clients may have to
21 personal jurisdiction in this matter.
22       THE VIDEOGRAPHER:  Will the court
23 reporter please swear in the witness.
24 /////
25 /////

Page 5

1    EXAMINATION
2 BY MR. HICKS:
3    Q   Good morning, Mr. Hinkelman.  How are you
4 today?
5    A   Good.  How are you today?
6    Q   I'm okay.  I know we're in a deposition,
7 so it's kind of an awkward question, so it's nice
8 that these can have a little bit of importance
9 sometimes, in times like these.
10       And you understand what this deposition
11 is generally about, and it relates to a Colorado
12 lawsuit filed by my client, Plaintiff Walter
13 Charnoff, against Nancy Loving, ArtPort, yourself,
14 and some other businesses and individuals,
15 correct?
16   A   Correct.
17   Q   Where are you -- are you in New York
18 right now?
19   A   I am.
20   Q   Okay.  And have you ever been in a
21 deposition before?
22   A   I have.
23   Q   Okay.  And how many times?
24   A   One deposition and another deposition
25 prep.

Page 6

1      THE REPORTER:  I'm sorry.  Could you
2 repeat the last part?  "One deposition and another
3 deposition" --
4    A   Preparation for a deposition that they
5 did not hold that involved Wally Charnoff.
6    Q   (BY MR. HICKS)  Understood.  Well, let me
7 just go over some real basic rules.  I know this
8 isn't your first rodeo, but just to make things go
9 as smoothly and efficiently as possible and
10 hopefully get you out of here in an efficient
11 manner.
12       You have to give verbal answers, and wait
13 until I'm done asking the question before you
14 answer.  If you don't understand any of my
15 questions -- sometimes I might start talking fast
16 or I may ask a question that doesn't make sense to
17 you, for whatever reason -- I'm happy to repeat.
18 My goal here is to get your factual information
19 that is in your current personal knowledge.
20       I may share the exhibits through this
21 screen sharing feature, and I will identify what
22 I'm talking about, and it should show up in front
23 of you.  But I don't want you to guess.  I don't
24 want you to speculate.  Just to the best of your
25 ability, tell me what you know in response to my

Page 7

1 questions.  Does that all makes sense?
2    A   It does.
3    Q   And if your attorney objects, unless she
4 tells you not to answer, just wait until she's
5 done, and then go ahead and give your answer, of
6 course.
7       The deposition testimony you are giving
8 today is being transcribed by a court reporter
9 typing it down.  That's why we need verbal answers.
10 There's also a videographer, so there will be a
11 video of today's deposition.  But that's why it's
12 important.  And I'm guilty of it too.  It's not
13 like a normal conversation where you want to guess
14 what someone is saying and talk over them and so
15 forth.
16       So, anyways, having said all that, can
17 you state your first and last name for the
18 record?
19   A   William David Hinkelman.
20   Q   And do you know Nancy Loving, a defendant
21 in this case?
22   A   Yes.
23   Q   Okay.  And how do you know Ms. Loving?
24   A   Ms. Loving and I are in a relationship.
25   Q   Not to pry, is that a romantic

Page 8

1 relationship?
2      MS. GETCHES:  Object to the form.
3    A   I'm sorry.  I couldn't hear you.  Could
4 you repeat the question?
5    Q   (BY MR. HICKS)  When you say, "a
6 relationship," she's described you as her life
7 partner; is that an accurate statement?
8    A   Yes.
9    Q   Okay.  And how long have you known
10 Ms. Loving?
11   A   Nine years.
12   Q   And did you meet her through business or
13 in some other way?
14   A   Some other way.
15   Q   Okay.  And where do you presently reside?
16   A   I'm sorry.  I couldn't hear you.
17   Q   Where do you presently reside?
18   A   27 Hester Street, Piermont, New York.
19   Q   And for approximately how long?
20   A   Seven months at this address.  I'm sorry,
21 nine months at this address.
22   Q   And another rule I should have -- or not
23 a rule, but advisement, if you will.  When you're
24 talking about time periods or dates -- I'm not
25 great with dates and remembering things.  So if you

1 don't remember the exact date that something
2 happened or exactly how long something was, unless
3 it's super critical, in which case I'll make it
4 very clear that it's super critical, you know,
5 without speculating, just give me your best
6 estimate with respect to time and dates, okay?
7    A  (Nodded head.)
8    Q  All right. And where did you reside
9 prior to 27 Hester Street?
10    A  464 Piermont Ave.
11    Q  464?
12    A  46 -- I'm not quite -- 464 or 474.
13    Q  Is that also in Piermont, New York?
14    A  Correct.
15    Q  Approximately how long did you reside at
16 that address?
17    A  18 months, approximately.
18    Q  And prior to that, did you live on a
19 street called Covelee? Does that ring any bells?
20    A  I did.
21    Q  Okay. And just give me the address of
22 that, if you remember.
23    A  26 Covelee Drive in Norwalk, Connecticut.
24    Q  And approximately how long did you reside
25 there?

1    A  Two years.
2    Q  And at each of these three addresses that
3 I have discussed with you so far -- 27 Hester, the
4 464 or 474 Piermont, and 26 Covelee -- did you
5 reside at those addresses full-time? Meaning, was
6 that the place that you lived full-time?
7    A  No.
8    Q  Okay. Is that because you were traveling
9 or some other reason?
10    A  Some other reason.
11    Q  Okay. The reason I ask is, again, not to
12 pry into anything that's not relevant to this case.
13 As you're probably aware, there are some issues in
14 the case regarding where art is stored and so
15 forth. And so your general understanding as to how
16 those properties were used and their general layout
17 may be things I ask you about. So that's why I was
18 asking if you lived at those places full-time.
19    A  Okay.
20    Q  Now -- okay. So are you -- were you
21 generally familiar -- during the time periods that
22 you resided at those three addresses, for a
23 percentage of the time, would you say that you're
24 generally familiar with the layout of those
25 properties and how they were used?

1    A  Sorry. I couldn't -- could you repeat
2 that? I couldn't hear it.
3    Q  No -- no problem. For those three
4 addresses, during the time periods that you have
5 testified about residing there as part of the time,
6 would you say that you are generally familiar with
7 the layout of each of those properties?
8      MR. WAGNER: Object to the form.
9      MS. GETCHES: Object to the form.
10 What -- what were -- what were the words after
11 "layout," Ian? You're jumbling up.
12      MR. HICKS: I think it's the microphone,
13 because I'm getting it on his end too. I'll just
14 re-ask the question, because I don't remember
15 exactly how I asked it.
16    Q  (BY MR. HICKS) So, David, you're
17 generally familiar -- or were you generally
18 familiar with the layouts and use of those
19 properties during the time periods that you lived
20 there?
21      MS. GETCHES: Object to the form.
22      MR. WAGNER: Join.
23    A  I guess I don't understand.
24    Q  (BY MR. HICKS) Okay. So let me ask you
25 very specific questions. At 27 Hester Street, that

1 was a townhouse, a home, or something else?
2    A  It's a home.
3    Q  And how many floors?
4    A  Four.
5    Q  Did it have a garage?
6    A  No.
7    Q  The address at 464 or 474 Piermont, was
8 that a -- again, a house, a townhome, or something
9 else?
10    A  Something else.
11    Q  An apartment?
12    A  No.
13    Q  Did you say yes? I'm sorry.
14    A  No.
15    Q  Okay. What -- what was that?
16    A  It was a stand-alone house.
17    Q  And how many floors?
18    A  Three.
19    Q  And with 26 Covelee, what kind of
20 building was that?
21    A  A house.
22    Q  And how many floors was that?
23    A  Four.
24    Q  Did that have a garage?
25    A  No -- yes, it did. Yes, it did.

1    Q    Did Ms. Loving use any of those
2  properties for any business purpose that you
3  perceived?
4    A    Yes.
5    Q    And what did she use them for?
6    A    Which property are you referring to?
7    Q    Let's -- let's go through that.  So let's
8  go through the three of them.  27 Hester Street.
9  What did she -- go ahead.
10   A    She used it as a living space.
11   Q    Does she have an office there?
12   A    She has an office.
13   Q    And does she store any art there?
14   A    Beyond our personal art?
15   Q    Correct.
16   A    And art on loan?
17        MS. GETCHES:  Object to the form.
18   A    We do not store art here.
19   Q    (BY MR. HICKS)  That -- so that's what I
20  mean.  At the 27 Hester Street address, is there
21  any art that does not belong to either you or
22  Ms. Loving in that property?
23   A    Yes.
24   Q    And is that art on loan from Harold
25  Garde?

1    A    Some of it.
2    Q    What is the rest of it, generally?
3        MR. WAGNER:  Object to the form.
4        MS. GETCHES:  Join.
5    A    The rest of it that's on loan or the rest
6  of the art that we have here?
7    Q    (BY MR. HICKS)  The rest of it that's on
8  loan.
9    A    To the best of my knowledge, it's all
10  Harold Garde except for one piece that I have.
11   Q    And what is -- is that a piece that you
12  own personally?
13   A    Yes.
14   Q    Did you buy it from Ms. Loving or
15  ArtPort?
16   A    No.
17   Q    As far as you're aware, is any of the art
18  located at twenty -- sorry -- 27 Hester Street for
19  sale by ArtPort?
20   A    I'm not sure.
21        MS. GETCHES:  Objection; foundation.
22   Q    (BY MR. HICKS)  So 464 or 474 Piermont,
23  was there an office used at that location by
24  Ms. Loving?
25   A    No.

1    Q    Was there art for -- strike that.  I'll
2  rephrase.
3        Did Ms. Loving or ArtPort have art at
4  that address that was not personally owned by you
5  or Ms. Loving?
6        MS. GETCHES:  Objection.  Form.
7  Foundation.  What time period?
8        MR. WAGNER:  Join.
9        MR. HICKS:  Any time he lived at that
10  address.
11        MR. WAGNER:  Same objections.  Form.
12  Foundation.
13        MS. GETCHES:  Join.
14   A    What time period we were at that address?
15   Q    (BY MR. HICKS)  Yes.  When you lived at
16  the 464 or 474 Piermont, as you described in your
17  prior testimony, was there any art that was not
18  personally owned by you or Ms. Loving at that
19  location?
20   A    Yes.
21   Q    Okay.  And can you describe what that art
22  was?
23        MS. GETCHES:  Objection.  Foundation.
24   A    I can't recall exact pieces.
25        MS. GETCHES:  Is there a little bit of

1  feedback that people are -- like, a high-pitched
2  feedback that people are hearing?  Maybe if the
3  court reporter -- Lisa, maybe if you muted.  I'm
4  not sure what it is, but it's a little bit --
5        THE DEPONENT:  I'm going to mute.  You
6  tell me --
7        THE REPORTER:  Paula, tell me if it goes
8  away when I mute.
9        MS. GETCHES:  I think it does, so --
10  okay.  Go ahead.  Sorry, Ian.
11        MR. HICKS:  No problem.
12   Q    (BY MR. HICKS)  As far as you know, the
13  art that was not owned personally by you or
14  Ms. Loving at the Piermont address, what type of
15  art was that?  Was it paintings, was it drawings,
16  or something else?
17        MS. GETCHES:  Objection.  Foundation.
18   A    To the best of my knowledge, it was a
19  mix.
20   Q    (BY MR. HICKS)  Was any of -- the
21  plaintiff in the case, who we'll call Wally -- was
22  any of his art ever located at any of the three
23  addresses we've discussed today -- 27 Hester
24  Street, 464 or 474 Piermont, or 26 Covelee?
25   A    Yes.

## Page 17

1    Q    And do you recall -- well, strike that.
2    I'll rephrase.
3         Was it stored -- I'm sorry -- was it
4    located at all three of those addresses or just
5    one?
6    A    To the best of my knowledge, it was
7    located at two of the addresses.
8    Q    Which -- which two addresses?
9    A    26 Covelee and then one piece at -- on
10   Piermont Ave.
11   Q    And what were the -- what was that one
12   piece that you just described, if you recall?
13   A    I don't recall the exact piece, but I do
14   recall that I informed Wally.  He asked me to take
15   it down, and we took it down immediately -- though,
16   he was aware of it being there and approved prior
17   to.
18   Q    Was there a pool table nearby?
19   A    At which address?
20   Q    Where -- you just described a piece of
21   art that you -- Wally had asked to be taken down.
22   A    It was at one of the addresses.
23   Q    Okay.  Which address was the pool table
24   at?
25   A    There was a pool table at 26 Covelee.

## Page 18

1    Q    And that's the address where Wally
2    physically saw a piece of art and asked that it be
3    taken down; is that your testimony?
4         MS. GETCHES:  Objection.  Foundation.
5    A    No.
6    Q    (BY MR. HICKS)  Okay.  What was -- what
7    art that belonged to Wally was ever housed at 26
8    Covelee?
9         MR. WAGNER:  Object to the form.
10   A    I -- I don't know, and you would have to
11   ask ArtPort.
12   Q    (BY MR. HICKS)  Okay.  Was there a piece
13   of art that Wally asked to be taken down that was
14   stored in any address you lived at in the past
15   seven years?
16   A    At which address?
17   Q    Any address you've lived in the past
18   seven years that Wally said, "Take that down off
19   the wall."
20   A    I don't understand the question.
21   Q    Okay.  When you mentioned that Wally
22   asked that art be taken down from a wall, which
23   address was that at?
24   A    474 Piermont Ave.
25   Q    Okay.  And when did that happen?

## Page 19

1    Meaning, when did Wally request that that be taken
2    down?
3    A    I don't recall.
4    Q    Do you recall why he wanted it taken
5    down?
6    A    I don't recall.
7    Q    Was that one piece of art near a pool
8    table at any time?
9    A    No.
10   Q    Where was it located in the house at 474
11   Piermont?
12   A    On a wall.
13   Q    On what floor?
14   A    Sorry?
15   Q    Which floor was that on?
16   A    First floor.
17   Q    Was it in a hallway or in a room?
18   A    It was in a room.
19   Q    And what else was in that room as far as
20   furniture or other physical items?
21   A    Now, I -- I think a table.
22   Q    What was that room used for at the time
23   that Wally's art was hanging in there?
24   A    To the best of my knowledge, it was a
25   sitting room.

## Page 20

1    Q    Was it a game room with an air hockey
2    table?
3    A    No.
4    Q    So there was no recreational equipment in
5    that room at any time that Wally's art was hanging
6    in that room?
7    A    No.
8    Q    Do you recall Wally complaining that that
9    piece of art had suffered damage --
10   A    No.
11   Q    -- while at that house?
12   A    No.
13   Q    Do you recall Wally ever complaining
14   about a piece of his art suffering physical damage
15   while located at any of the addresses we've
16   discussed today?
17   A    To the best of my knowledge, yes.
18   Q    Okay.  Tell me about that.
19   A    I -- could you please be more specific?
20   Q    What did he say, when did he said it, and
21   what location did the alleged event happen at?
22   A    I don't recall exactly what he said.  I
23   don't recall exactly when he said it.  And the
24   location, that was at 26 Covelee.
25   Q    What item of art did he complain about

Page 21

1 that was located at 26 Covelee?
2    A    I'm sorry.  Could you repeat the
3 question?
4    Q    What item of art did Wally complain about
5 that was located at 26 Covelee?
6    A    I really don't -- he did not complain
7 about any item or part about the painting.
8    Q    Did he claim that it was damaged?
9    A    Yes.
10    Q    And do you recall what the nature of the
11 damage was that he was alleging?
12    A    There was no damage.  There was a piece
13 of dust on the art.
14    Q    So my question is about what he said.
15 Whether it's true or not is a separate -- not part
16 of this inquiry, at least.
17        So do you recall him saying what the
18 damage was as he alleged, even if you disagree with
19 whether that actually happened?
20        MR. WAGNER:  Object to the form.
21        MS. GETCHES:  Join.
22    A    I don't recall the exact -- exactly what
23 Wally said.  You would have to ask ArtPort.
24    Q    (BY MR. HICKS)  For 26 Covelee, do you
25 maintain an insurance policy over that property or

Page 22

1 does someone else, if you know?
2        MS. GETCHES:  Object to --
3        MR. WAGNER:  Object to the form.
4    A    We didn't have an insurance policy.
5    Q    (BY MR. HICKS)  Does -- when you say,
6 "we," do you mean you and Ms. Loving?
7    A    Yes.
8    Q    Same questions with respect to the two
9 other addresses -- 27 Hester Street and the 464 or
10 474 Piermont.  Did you maintain an insurance policy
11 over either of those properties at any time that
12 you resided there?
13        MR. WAGNER:  Object to the form.
14    A    Yes.
15    Q    (BY MR. HICKS)  Were those policies
16 maintained by you and Ms. Loving, or just you?
17 When I say, "maintained," I mean the named insured.
18    A    I'm sorry.  Named insured, we had a
19 policy that was for Nancy and I.
20    Q    At any of these three addresses we've
21 discussed today -- 27 Hester Street, 464 or 474
22 Piermont, or 26 Covelee -- as far as you know, were
23 any of those locations used to store art used by
24 ArtPort in its business?
25        MR. WAGNER:  Object to the form.

Page 23

1    A    Why don't you qualify the question?
2    Q    (BY MR. HICKS)  What part would you like
3 me to qualify or is unclear to you?
4    A    There was no art stored.
5    Q    Thank you.  And just to explain what I'm
6 getting at here so we can move on, I'm trying to
7 figure out the extent to which any of these
8 addresses that you lived at as a residence were
9 used by ArtPort for business purposes, whether
10 that's Ms. Loving having an office there, doing
11 showings there for art, storing art, any of those
12 art gallery-type activities.  And as far as I
13 understand it, she had an office.  Part of the
14 time, there was some art there that belonged --
15 we've gone over that.  I don't need to re-explain
16 all that, but that's what the focus was.
17        So as I understand your testimony, none
18 of these three addresses were used as a place to
19 store art used in ArtPort's business; is that
20 correct?
21        MS. GETCHES:  Object to the form.
22        MR. WAGNER:  Join.
23        MS. GETCHES:  Object to foundation.
24    A    That's not correct.
25    Q    (BY MR. HICKS)  And tell me how it's

Page 24

1 incorrect.
2        MR. WAGNER:  Object to the form.
3 Foundation.
4        MS. GETCHES:  Join.  Ian, the word
5 "store" is, I believe, problematic.  Maybe you
6 should explain what you mean by that.
7        MR. HICKS:  Okay.  So, yeah.  Thank you.
8    Q    (BY MR. HICKS)  When I say, "store,"
9 Mr. Hinkelman, I mean art that is located in any of
10 those three addresses which is not owned by you or
11 Ms. Loving personally.
12    A    There was art that was displayed, but not
13 stored.
14    Q    Okay.  So any art that was located at any
15 of those three addresses that was not owned by you
16 or Ms. Loving personally was on display, meaning it
17 was on a wall and not sitting on the floor or in a
18 closet or something like that; is that correct?
19    A    No.
20    Q    How was art displayed at those three
21 addresses that we've been -- as you described it?
22    A    It wasn't at three addresses.
23    Q    I'm sorry.  Say that again?
24    A    It was not at three addresses.
25    Q    Okay.  What addresses -- let's go through

1 these. Again, let me ask this a different way.
2 Was there any art not owned by you or Ms. Loving
3 personally located at any of those three addresses
4 when you lived there?
5    A  Could you be more specific, please?
6    **Q**  **Did you or Ms. Loving personally own all**
7 **of the art physically located at those three**
8 **addresses during the time that you lived there?**
9    A  Again, please be specific about the
10 addresses.
11    **Q**  **Well, I'm talking about any of them, and**
12 **then we can narrow it down, okay. So --**
13    A  Okay.
14    **Q**  **I'll ask you one by one --**
15    A  Okay.
16    **Q**  **-- if that's what you'd like to do.**
17    A  All right.
18    **Q**  **So at 27 Hester Street, during the time**
19 **period that you have lived there, is there -- have**
20 **you seen any art at that location that is not**
21 **personally owned by you or Ms. Loving?**
22    A  Yes.
23    **Q**  **Okay. And what is that art?**
24    MS. GETCHES: Object to the foundation.
25    THE DEPONENT: Do you mind if I just take

1 a quick bio break?
2    MR. HICKS: No problem.
3    THE VIDEOGRAPHER: We're going off the
4 record. The time is 10:06 a.m.
5    (Break taken.)
6    THE VIDEOGRAPHER: We're back on the
7 record. The time 10:16 a.m.
8    **Q**  **(BY MR. HICKS) All right.**
9 **Mr. Hinkelman, we're back on the record. Let's**
10 **switch gears. Can you tell me about your work**
11 **experience over the last, say, ten years?**
12    A  So it's -- it's pretty broad. Exactly
13 what would the question be?
14    **Q**  **Let's go back -- let's start with**
15 **education. What is your educational background?**
16 **And I'm talking about college forward.**
17    A  I went to college.
18    **Q**  **Okay. Where did you go to college?**
19    A  University of Colorado.
20    **Q**  **All right. Are you from Colorado?**
21    A  I am.
22    **Q**  **You were born in Colorado?**
23    A  Yeah.
24    **Q**  **And what did you get your degree in?**
25    A  I don't have a degree.

1    **Q**  **Okay. You did not complete college of --**
2 **of any kind?**
3    A  No.
4    **Q**  **Do you have any other education from**
5 **college, that time period that you attended the**
6 **University of Colorado, forward?**
7    A  That's a really broad question,
8 Mr. Hicks.
9    **Q**  **Formal education, I mean.**
10    A  I had a -- I would say I'm a licensed
11 securities professional. I have what's called a
12 Series 7, a Series 63.
13    **Q**  **And approximately when did you obtain the**
14 **securities license?**
15    A  1989.
16    **Q**  **Did you have to take a test for that?**
17    A  Yes.
18    **Q**  **And who administered that test?**
19    A  I believe, to the best of my knowledge,
20 it's the National Association of Securities
21 Dealers --
22    THE REPORTER: Can you please repeat that
23 Mr. -- and could you please speak up as well?
24    THE DEPONENT: Yeah.
25    A  Again, I'm not -- I don't recall exactly

1 the -- who administered the test and who was --
2 the background. It's a licensed Series 7 test.
3 You can look it up.
4    **Q**  **(BY MR. HICKS) Why did you obtain that**
5 **license?**
6    A  Excuse me?
7    **Q**  **Why did you obtain that license?**
8    MS. GETCHES: Object to the form.
9    A  I was asked to by my company -- required.
10    **Q**  **(BY MR. HICKS) Did you have to undergo**
11 **any training to obtain that license?**
12    A  Yes.
13    **Q**  **And generally describe what that training**
14 **was. How long it lasted and -- just very**
15 **generally.**
16    A  To get the license itself?
17    **Q**  **Yeah.**
18    A  I don't recall the exact amount of time.
19 Less than a year.
20    **Q**  **And you said that your employer required**
21 **it. What employer was that?**
22    A  Bear Stearns and Company.
23    **Q**  **When did you discontinue your education**
24 **at the University of Colorado?**
25    A  1974. I'm sorry, 1973.

1  **Q   And what did you do after that as far as**
2  **education or employment?**
3  A   I moved to Aspen and I taught skiing.
4  **Q   For about how long?**
5  A   One and a half seasons.
6  **Q   And same question as far as education or**
7  **employment.  What did you do after that?**
8  A   Education to teach skiing?
9  **Q   No.  So I'm just getting a chronological**
10 **listing of your background, experience, training,**
11 **things of that nature.  And so I don't need, like,**
12 **super exact dates or anything like that.  I just**
13 **want to know what you did as far as education or**
14 **employment after you were a skiing instructor in**
15 **Aspen.**
16 A   I moved to Boston.  I became a licensed
17 Realtor.
18 **Q   And did you actually work as a Realtor**
19 **selling real estate in Boston?**
20 A   I worked for a Boston-based company, yes.
21 **Q   What did you do at that Boston-based**
22 **company?**
23 A   I'm sorry?
24 **Q   What did you do for that company?**
25 A   I was a salesman.  We sold real estate.

1  **Q   For approximately how long?**
2  A   Approximately a year and a half, two
3  years.  I don't recall the exact amount of time.
4  **Q   That's fine.  It was a long time ago.  I**
5  **understand.  What did you do as far as education or**
6  **employment after that?**
7  A   I worked for a Mercedes Benz dealership.
8  **Q   As a -- were you selling cars?**
9  A   I was.
10 **Q   For approximately how long?**
11 A   Approximately two years.
12 **Q   And what did you do after that as far as**
13 **employment or education?**
14 A   I purchased part of a company that made
15 mountain bikes.
16 **Q   Were you solely an investor or did you**
17 **have any active role in that company?**
18 A   I had an active role.
19 **Q   And tell me about that.  Did you design**
20 **the bikes, did you do sales, or something**
21 **different?**
22 A   We had a bike designer.  I did marketing
23 and business development.
24 **Q   And what was the outcome of your time**
25 **with that mountain bike company?  Did you -- was it**

1  **successful?  How did that all turn out?**
2  A   Successful is a -- what would you define
3  as successful, please?
4  **Q   Is it still in business, as far as you**
5  **know?**
6  A   I believe they're actually back in
7  business.
8  **Q   How long did you perform the marketing**
9  **and business development for that mountain bike**
10 **company?**
11 A   Approximately -- I don't recall the exact
12 amount of time.  Two, three years.
13 **Q   After that two to three years, did you**
14 **continue to have any ongoing business dealings with**
15 **that company?**
16 A   Could you please define business
17 dealings?
18 **Q   Did you perform any work or receive any**
19 **salary or compensation?**
20 A   No.
21 **Q   Did you exercise any management duties**
22 **with that company after that two-to-three-year**
23 **period?**
24 A   No.
25 **Q   Did you continue to communicate with**

1  **anybody who was employed by that company after that**
2  **two-to-three-year period?**
3      MS. GETCHES:  Object to the form.
4  **Q   (BY MR. HICKS)  Let me rephrase.  The**
5  **reason I'm asking is you said define what an**
6  **affiliation or association or business dealings is.**
7  **And we've gone through that you didn't do any work**
8  **for them.  You didn't exercise any management.  So**
9  **is there something I'm missing that related to the**
10 **business of that company and you?  That's what I'm**
11 **getting at.  Does that make sense?**
12 A   Yeah.  I stayed friendly with my former
13 partners.
14 **Q   So after that two-to-three-year period at**
15 **that mountain bike company, as far as education or**
16 **work experience, what came next in your life?**
17 A   I then went to work for -- or work with,
18 became a partner in a software distribution
19 company.
20 **Q   Do you recall the name of that company?**
21 A   It was called Software Wholesalers.
22 **Q   Is that a company you started or founded?**
23 A   I was an early employee.  I did not start
24 or found it.
25 **Q   And how long -- strike that.  I'll**

1 rephrase.

2  **Q**  What was your function at that company?
3 Were you an employee, a manager, an investor, or
4 something else?

5  **A**  Yes.

6  **Q**  You were an employee?

7  **A**  I was, yes.

8  **Q**  Okay.  What were your job duties?

9  **A**  I was head of marketing, business
10 development, and sales.

11  **Q**  How long did you work with that company?

12  **A**  For approximately three years.

13  **Q**  Did your job duties remain the same
14 throughout your time with that company?

15  **A**  Yes.

16  **Q**  And why did you leave that company?

17  **A**  The company was dissolved.

18  **Q**  As far as work or education, what came
19 next in your life?

20  **A**  For work, I went back to work for the
21 same Mercedes Benz dealer in a different role.

22  **Q**  And what was that role?

23  **A**  The role was overseeing some sales,
24 leasing, and finance office.

25  **Q**  As of that time, did you have any formal

1 accounting or bookkeeping education or training?

2  **A**  Beyond reading books and studying
3 independently, no.

4  **Q**  How long did you work at the Mercedes
5 dealership in the role you just described?

6  **A**  A little over, I think -- to the best of
7 my knowledge, I'm not exactly sure, but I think a
8 little over two, two and a half years.

9  **Q**  And what did you do next in your life as
10 far as education or employment is concerned?

11  **A**  I went to work at Bear Stearns.

12  **Q**  And what was your employment title when
13 you started at Bear Stearns?

14  **A**  I did not have a title.

15  **Q**  What were your job duties at Bear Stearns
16 when you first started?

17  **A**  I was a salesman.

18  **Q**  What did you sale -- sorry.  What did you
19 sell?

20  **A**  I was part of what's called a fixed
21 income group.  We sold securities, U.S. treasuries,
22 et cetera.

23  **Q**  Does the term fixed income refer to the
24 people you sold to or the type of investment?

25  **A**  Both -- no.  I'm sorry.  It refers to the

1 type of investment.

2  **Q**  Like a bond or something that's a fixed
3 rate of return, something like that?

4  **A**  (Nodded head.)

5  **Q**  All right.  And how long did you work at
6 Bear Stearns?

7  **A**  20 years.

8  **Q**  I assume during this time, your job
9 duties changed?

10  **A**  They did.

11  **Q**  So after you worked in this fixed income
12 group as a salesman, what was your next category of
13 job duties?

14  **A**  I was still part of the same group.

15  **Q**  Okay.  Did anything change?

16  **A**  I'm sorry?

17  **Q**  So how did your -- did you get promoted?

18  **A**  Yeah.  I received a series of titles,
19 responsibilities, employees.

20       THE REPORTER:  I'm sorry.  Could you
21 repeat the last word?

22       THE DEPONENT:  Employees.

23       THE REPORTER:  Thank you.

24  **Q**  (BY MR. HICKS)  We don't need to go
25 through all of those changes, if you will.  Did you

1 just get promoted to managing the same people you
2 had formerly been working with or something like
3 that?  Just kind of briefly explain how you grew in
4 the company.

5  **A**  Well it started out, I became the first
6 vice president that they had for the time I was
7 there.  I became the first director for the time
8 that I was there, a -- or the shortest time frame.
9 I became a managing director.  I became a senior
10 managing director, which put me as an officer of
11 the company.  My group grew.  I managed a fixed
12 income team inside of our fixed income group.

13  **Q**  And did you meet Martin St. Pierre or
14 Alicia St. Pierre during your time at Bear Stearns?

15  **A**  I met Martin St. Pierre while I was at
16 Bear Stearns.

17  **Q**  All right.  What were you both doing at
18 the company at the time that you met him?  Were you
19 in the same group?  Was it doing something
20 different?

21       MR. WAGNER:  Object to form.  Foundation.

22  **A**  Martin was not in my group.

23  **Q**  (BY MR. HICKS)  Have you had any business
24 dealings with Martin outside of Bear Stearns?

25       MR. WAGNER:  Object to the form.

Page 37

1    A    Yes.
2    Q    **(BY MR. HICKS)  Describe the general**
3 **nature of those business dealings.**
4         MR. WAGNER:  Object to the form.
5    A    Of the business dealings outside of Bear
6 Stearns?
7    Q    **(BY MR. HICKS)  Yes, sir.**
8    A    We both invested in companies.
9    Q    **How many companies did you and Martin**
10 **St. Pierre invest in?**
11        MR. WAGNER:  Object to the form.
12 Foundation.
13   A    We invested in two companies.  We also
14 worked -- we kept a relationship inside of the --
15 shall I call it investment banking.
16   Q    **(BY MR. HICKS)  Okay.  What was the first**
17 **company?  If you don't remember the name, that's**
18 **fine.  If you can give me a general description.**
19   A    What was the question again?
20   Q    **Yeah.  What was the first company that**
21 **you and Martin invested in?**
22   A    That we invested together outside of our
23 traditional fixed income business?
24   Q    **Correct.**
25   A    It was a company called CMJ.

Page 38

1    Q    **What -- what did that company do?**
2    A    The company produced a music festival.
3    Q    **Just one music festival or an ongoing**
4 **series?**
5    A    A single music festival.
6    Q    **What was the next business that you and**
7 **Martin St. Pierre invested in outside of your**
8 **business dealings at Bear Stearns?**
9    A    That would be ArtPort.
10   Q    **How much did you invest in ArtPort?**
11   A    My investment was over a period of years.
12 The exact dollar amount, I don't recall right now.
13   Q    **Do you recall an approximate amount?**
14   A    Approximately three quarters of a million
15 dollars.
16   Q    **So when you say, "three quarters," do you**
17 **mean 750?**
18   A    Yes, again, approximately.  I don't
19 recall the exact number.
20   Q    **That's fine.  I was just trying to get a**
21 **ballpark neighborhood of whether it was $10,000 or**
22 **something more significant.**
23        **How did you learn about ArtPort in order**
24 **to invest in it?  Who brought that opportunity to**
25 **you, if anybody?**

Page 39

1         MR. WAGNER:  Object to the form.
2    A    Well, Nancy and I formed ArtPort.
3    Q    **(BY MR. HICKS)  Did you have any**
4 **experience transacting in art prior to forming**
5 **ArtPort?**
6    A    Some, yes.
7    Q    **And when you and Nancy formed ArtPort,**
8 **what did you understand its business would be?**
9    A    ArtPort was formed as an art dealer.
10   Q    **And as far as you know, has it remained**
11 **an art dealer throughout its existence?**
12   A    Yes.
13   Q    **And does part of being an art dealer, at**
14 **least with respect to ArtPort, include the**
15 **representation of artists?**
16   A    That's correct, yes.
17   Q    **And are you aware how much Martin**
18 **St. Pierre invested in ArtPort?**
19        MR. WAGNER:  Object to the form.
20   A    Well, I'm not sure of the exact amount.
21 I can't recall the exact amount.
22   Q    **(BY MR. HICKS)  And when I said Martin**
23 **St. Pierre invested in ArtPort, I'm speaking more**
24 **generally.  I understand that he may have formed an**
25 **entity to represent that investment.**

Page 40

1    A    I'm sorry?
2    Q    **When I said Martin St. Pierre invested in**
3 **ArtPort, I understand that he may have invested**
4 **through an entity.  So I just wanted to clarify**
5 **that.**
6         MR. WAGNER:  Object to the form of that,
7 if that was a question.
8         MS. GETCHES:  No question pending.  Don't
9 say anything, Mr. Hinkelman.
10   Q    **(BY MR. HICKS)  The funds contributed by**
11 **Martin St. Pierre to invest in ArtPort, do you know**
12 **if those were his funds or a combination of his**
13 **funds and Alicia St. Pierre's funds?**
14        MR. WAGNER:  Object to the form.
15        MS. GETCHES:  Join.
16   A    I think you'd have to ask Mr. St. Pierre
17 that.  I don't know the exact source.
18   Q    **(BY MR. HICKS)  So did you bring that**
19 **investment opportunity in ArtPort to Martin**
20 **St. Pierre?  As far as you know, is that how he**
21 **learned about it, through you?**
22        MS. GETCHES:  Object to the form.
23        MR. WAGNER:  Object to the form.
24 Foundation.
25   Q    **(BY MR. HICKS)  Strike that.  I'll ask a**

1 different question, Mr. Hinkelman.

2     Tell me about your first discussion with

3 Martin St. Pierre regarding ArtPort.

4     MR. WAGNER: Object to the form.

5     A   I'm sorry. Could you repeat the

6 question?

7     Q   (BY MR. HICKS) Sure. Tell me about your

8 first discussion with Martin St. Pierre regarding

9 ArtPort.

10     MR. WAGNER: Object to the form.

11     A   I don't recall the first discussion.

12     Q   (BY MR. HICKS) Did you have any

13 discussions with Martin St. Pierre about investing

14 in ArtPort?

15     A   Not -- yes. Yes.

16     Q   Okay. And so you brought him that

17 investment opportunity, correct?

18     MR. WAGNER: Object to the form.

19     A   Could you rephrase the question?

20     Q   (BY MR. HICKS) Well, he -- based upon

21 the documents provided in this case, he -- one of

22 his companies and his wife invested a half million

23 dollars. That's a pretty large investment. So I'm

24 just trying to figure out how he came to learn of

25 ArtPort and who solicited him to invest that half

1 million dollars. Was that you?

2     MR. WAGNER: Object to the form.

3     MS. GETCHES: Join.

4     A   I don't recall. I -- the -- I guess the

5 question is, is define solicitation.

6     Q   (BY MR. HICKS) Did you talk to Martin

7 St. Pierre about ArtPort at any time?

8     A   Martin and I discussed a lot of different

9 business opportunities over a period of time, yeah.

10     Q   And was one of those business

11 opportunities you discussed with Martin St. Pierre

12 an investment in ArtPort?

13     A   Yes.

14     Q   And tell me about those discussions.

15     A   I don't recall the exact time, date,

16 format.

17     Q   Do you recall describing to him what

18 ArtPort did for its line of business?

19     A   I don't recall the exact conversation,

20 no.

21     Q   Do you recall providing any information

22 to Martin St. Pierre regarding ArtPort when you

23 were discussing it as a business opportunity with

24 him?

25     MR. WAGNER: Object to foundation.

1     A   Can you kind of, please, define the

2 question? That would be helpful to me.

3     Q   (BY MR. HICKS) Well, sure. Do you

4 remember having any discussions with Martin

5 St. Pierre about ArtPort as a business opportunity

6 to secure his half million dollar investment?

7     MR. WAGNER: Object to form.

8     A   And I can't hear parts of that question.

9 So can you just repeat it, please?

10     MR. HICKS: Lisa, can you read that

11 question back.

12     (The last question was read.)

13     MR. WAGNER: I'm going to object to form.

14     MS. GETCHES: Join.

15     A   I recall having discussions with Martin

16 St. Pierre about ArtPort.

17     Q   (BY MR. HICKS) And what did you tell him

18 about ArtPort?

19     A   I --

20     MR. WAGNER: Object to foundation.

21     A   I -- I don't know. I don't recall.

22     Q   (BY MR. HICKS) Do you recall him having

23 any questions about ArtPort as a business

24 opportunity?

25     MR. WAGNER: Object to form. Foundation.

1     A   I don't recall.

2     Q   (BY MR. HICKS) Did Martin St. Pierre ask

3 or did you discuss with him how much money ArtPort

4 needed?

5     MR. WAGNER: Object to the foundation.

6     A   I don't recall that discussion.

7     Q   (BY MR. HICKS) Do you recall

8 approximately when you first discussed ArtPort with

9 Martin St. Pierre?

10     MR. WAGNER: Object to the form.

11 Foundation.

12     A   I recall it was sometime in the winter of

13 2016. Maybe late '15, but 2016.

14     Q   (BY MR. HICKS) Approximately when did

15 you form ArtPort with Nancy Loving?

16     A   In the late fall of 2015.

17     Q   And were you a member of ArtPort when it

18 was formed?

19     A   Yes.

20     Q   Were you a manager of ArtPort when it was

21 formed?

22     A   No.

23     Q   Was there an operating agreement drafted

24 when ArtPort was formed?

25     A   Yes.

1  **Q   And was that operating agreement executed**
2  **by anyone?**
3      MS. GETCHES:  Object to the form.
4  **Q   (BY MR. HICKS)  And by executed, I mean**
5  **signed.**
6  A   Yes.
7      MS. GETCHES:  Object to the form.
8  **Q   (BY MR. HICKS)  Who signed that operating**
9  **agreement?**
10  A   I did and Nancy Loving.
11  **Q   And was she the manager of ArtPort when**
12  **it was formed?**
13  A   Yes.
14  **Q   Are you still a member of ArtPort?**
15  A   Yes.
16  **Q   Do you own any equity or shares in**
17  **ArtPort?**
18  A   Being an LLC, I'm not sure of the -- how
19  the exact format would be, but do I own -- there's
20  no actual shares, and it is -- and there's no
21  defined equity.  I'm not trying to avoid the
22  question, but to answer your question.
23  **Q   Yes.  I understand.  And part of this is**
24  **LLCs can structure their interest in various**
25  **different ways.  They have a lot of flexibility**

1  with that.  So is -- do you have any membership
2  interest in ArtPort currently today?
3  A   Yes, I do.
4  **Q   And what is that?**
5      MS. GETCHES:  Object to foundation.
6  **Q   (BY MR. HICKS)  What is the percentage of**
7  **your membership interest?**
8      MS. GETCHES:  Object to foundation.
9  A   My interest in ArtPort is -- I have to
10  re-look at the agreement because I'm not involved
11  in the day-to-day operations, but it started out as
12  50 percent.
13  **Q   (BY MR. HICKS)  Do you recall signing any**
14  **agreements that would have affected the size of**
15  **your membership interest in ArtPort since it was**
16  **formed?**
17      MS. GETCHES:  Object to form.
18      MR. WAGNER:  Also object to foundation.
19      MS. GETCHES:  Join in that.
20  A   Can you better describe what your
21  question is?
22  **Q   (BY MR. HICKS)  Sure.  Have you done**
23  **anything that, as far as you're aware, would have**
24  **reduced or increased your membership interest in**
25  **ArtPort?**

1  A   Nancy and I, for financial planning and
2  family planning, had put together a document that
3  would have reduced my ownership of ArtPort, but we
4  just never put it into effect.
5  **Q   And what was the intent of that document,**
6  **generally?  I understand that you didn't put it**
7  **into effect, but what did you understand the**
8  **purpose to be?**
9  A   I'm not clear.  What was the intent for
10  myself?  The intent for Nancy?  For our family?  I
11  guess, what are you looking for?
12  **Q   Why was the document created?**
13  A   When was the document created?
14  **Q   No.  Why?  Because you said for**
15  **planning --**
16  A   It was part of a financial planning
17  exercise that when we went through.
18  **Q   Is there anything else that you have**
19  **done, as far as you are aware, that may have**
20  **increased or reduced your membership interest in**
21  **ArtPort?**
22      MS. GETCHES:  Object to the form and
23  foundation.
24      MR. WAGNER:  Join.
25  A   I can't recall.  I'm not sure.

1  **Q   (BY MR. HICKS)  Have you sold any of your**
2  **membership interest in ArtPort?**
3  A   Have I sold any --
4  **Q   Right.**
5  A   -- interest in ArtPort?  No.
6  **Q   Have you transferred any of your**
7  **membership interest in ArtPort?**
8      MS. GETCHES:  Object to the form and
9  foundation.
10  A   I'm trying to just -- can you just
11  clarify the question?
12  **Q   (BY MR. HICKS)  Yeah.  So have you**
13  **transferred any of your membership interest in**
14  **ArtPort?**
15  A   I have not transferred any of my interest
16  in ArtPort.
17  **Q   Have you transferred any interest in**
18  **ArtPort that's not a membership interest?**
19      MS. GETCHES:  Object --
20  A   I'm sorry?
21  **Q   (BY MR. HICKS)  Have you transferred any**
22  **interest in ArtPort at any time that is not a**
23  **membership interest?**
24      MS. GETCHES:  Object to the form.
25      MR. WAGNER:  Join.

1  A   I guess define transferred.

2  **Q   (BY MR. HICKS)  Affected in any way.**

3  MS. GETCHES:  What -- what do you mean,

4  "interest"?

5  MR. HICKS:  Well, this is the terminology

6  used from various things filed in the case, so I'm

7  just trying to figure that out.  So interest is --

8  actually, I'll go through these questions one by

9  one.  So strike that.  There's no pending question.

10  **Q   (BY MR. HICKS)  David, how is -- I'm**

11  **sorry.  Mr. Hinkelman, how are ownership interests**

12  **in ArtPort reflected in its operating agreement?**

13  MS. GETCHES:  Object to the form.

14  MR. WAGNER:  Foundation as well.

15  MS. GETCHES:  Join.

16  A   In the operating agreement, 50-50.

17  **Q   (BY MR. HICKS)  Are they referred to as**

18  **membership interests or something else?**

19  A   As membership interest.

20  **Q   Okay.  Is there any other type of**

21  **interest in ArtPort?**

22  MS. GETCHES:  Object to the foundation.

23  MR. WAGNER:  Join.

24  A   There was an investment in ArtPort by ISP

25  Holdings.

1  **Q   (BY MR. HICKS)  Did your membership**

2  **interest in ArtPort include voting rights at the**

3  **time it was formed?**

4  MS. GETCHES:  Object to the foundation.

5  A   My personal interest?

6  **Q   (BY MR. HICKS)  Correct.**

7  A   Yes.

8  **Q   As far as you know.  As far as you're**

9  **aware.**

10  A   Yes.  I believe so, yeah.

11  **Q   Do you retain that voting interest in**

12  **ArtPort, as far as you're aware, today?**

13  A   As much as I can recall, I believe so.

14  **Q   Do you still have a 50 percent membership**

15  **interest in ArtPort today?**

16  A   Do I still have 50 percent interest?

17  **Q   Correct.**

18  A   To the best of my knowledge, I believe

19  so.

20  **Q   Has your membership interest in ArtPort**

21  **ever included managerial rights?**

22  MR. WAGNER:  Object to the form.

23  Foundation.

24  A   Can you define managerial rights?

25  **Q   (BY MR. HICKS)  The right to vote on or**

1  direct company policy.

2  MR. WAGNER:  Same objection.  Form.

3  Foundation.

4  A   I've never directed company policy.

5  **Q   (BY MR. HICKS)  Mr. Hinkelman, you have**

6  **formed LLCs prior to ISP Holdings, correct?**

7  A   Object to the form.  In what

8  capacity do you mean, Ian?

9  MR. HICKS:  The same capacity that he

10  formed ArtPort.

11  MR. WAGNER:  Yeah.  Object to form.

12  A   I'm trying to think of how the CMJ

13  investments was structured.  We -- I believe, to

14  the best of my knowledge, we invested in the

15  company.  And then that company was sold, and

16  transferred, and I don't -- I don't recall if it

17  was to an S, a C corp, or an LLC.

18  **Q   (BY MR. HICKS)  Do you have a general**

19  **understanding that in an LLC you have members who**

20  **have interest in the company, similar to shares in**

21  **a corporation, and then there's other people called**

22  **managers who manage the day-the-day operations?**

23  MS. GETCHES:  Object to the form and

24  foundation.

25  MR. WAGNER:  Join.

1  A   I'm not a lawyer, so I couldn't give you,

2  you know, an exact answer on that.

3  **Q   (BY MR. HICKS)  Did you exercise any**

4  **control at any time over the operations of ArtPort?**

5  A   I never exercised any control over the

6  operations, the day-to-day operations of ArtPort.

7  **Q   As far as you're aware, do you have the**

8  **right, even if you have not exercised it, to**

9  **exercise control over the operations of ArtPort?**

10  A   To the best of my knowledge, I -- I don't

11  know.  I'd have to review the operating agreement.

12  MR. HICKS:  I actually need to take a

13  quick bathroom break.  So let's take ten minutes

14  and go off the record.

15  THE VIDEOGRAPHER:  We're going off the

16  record.  The time is 11:00 a.m.

17  (Break taken.)

18  THE VIDEOGRAPHER:  We're back on the

19  record.  The time is 11:17 a.m.

20  **Q   (BY MR. HICKS)  Mr. Hinkelman, we were**

21  **talking about your experience with ArtPort, LLC,**

22  **prior to the break, and I wanted to continue on**

23  **that line of questioning.**

24  **Were you a passive investor only in**

25  **ArtPort, or did you do something more with respect**

1 to that entity?

2     MR. WAGNER: Object to the form.

3   A  Can you just kind of describe or define

4 the difference between passive and active or what

5 you mean by passive?

6   **Q  (BY MR. HICKS) Yes. Did you consult**

7 **with anyone at ArtPort regarding decision-making or**

8 **policy or anything of that nature?**

9     MR. WAGNER: Object to the form.

10   A  Nancy set policy.

11     UNKNOWN SPEAKER: Can we get started?

12     THE DEPONENT: Liza?

13     THE REPORTER: Was that you, Paula?

14 Paula?

15     THE VIDEOGRAPHER: Yes. I'm sorry.

16     THE REPORTER: Was that you that just

17 said something?

18     THE VIDEOGRAPHER: No. I think that was

19 Liza.

20     THE REPORTER: Okay. I'm sorry.

21   A  Okay. Sorry. Can you repeat the

22 question?

23   **Q  (BY MR. HICKS) Yes. Well, I'll ask a**

24 **different one, because I don't remember the exact**

25 **wording.**

1     **Mr. Hinkelman, did anyone with ArtPort**

2 **consult with you regarding ArtPort's company**

3 **policies?**

4   A  Nancy set policy. And, no, I did not set

5 policy.

6   **Q  Did Ms. Loving ever talk to you about any**

7 **problems she was having at ArtPort?**

8   A  That's a really broad question. What

9 would you define an example of a problem?

10   **Q  A problem with an employee. Let's start**

11 **there.**

12     MR. WAGNER: Object to the form.

13   A  I don't recall a -- any issue with a

14 problem with an employee.

15   **Q  (BY MR. HICKS) Did you ever talk to**

16 **Nancy -- I'm sorry. Did you ever talk to**

17 **Ms. Loving about decisions that she needed to make**

18 **on behalf of ArtPort?**

19   A  Again, could you give me an example? I

20 mean, that's a really broad question.

21   **Q  Did Ms. Loving ever talk to you about any**

22 **disputes she was having with someone who had**

23 **purchased art from ArtPort?**

24     MS. GETCHES: Object to the form.

25   A  Again, Mr. Hicks, can you be specific?

1 That's a really broad question.

2   **Q  (BY MR. HICKS) Did Ms. Loving ever**

3 **consult with you about any disputes she had with a**

4 **purchaser who bought art from ArtPort?**

5     MS. GETCHES: Object to the form.

6   A  So can you ask me a specific question,

7 please?

8   **Q  (BY MR. HICKS) That's pretty specific.**

9 **I mean, did she -- I'm trying to think of how else**

10 **I could ask that more specifically. Did Ms. Loving**

11 **ever talk to you about that she was having a**

12 **problem with someone who had purchased art from**

13 **ArtPort?**

14   A  Okay. So the answer is the only -- yes.

15 The answer is, yes, she did.

16   **Q  Okay. And you said, "the only" -- were**

17 **you going to say the only person she had such a**

18 **discussion with you about was Wally?**

19   A  Could you ask a question, please?

20   **Q  Sure. Tell me about that discussion that**

21 **you just said yes to.**

22   A  We had many discussions. I don't recall

23 an exact discussion.

24   **Q  And who were the discussions about?**

25   A  Again, the -- okay. So the only

1 discussions we had about a customer that had

2 complained was Wally.

3   **Q  And what did you understand your role**

4 **with ArtPort to be when it was formed?**

5   A  My role was as treasurer when it was

6 formed.

7   **Q  And what would a treasurer do in that**

8 **capacity?**

9   A  In that capacity, I oversaw the keeping

10 of the books originally.

11   **Q  Did your role with ArtPort change over**

12 **time?**

13   A  It did.

14   **Q  And tell me how it changed and what you**

15 **did.**

16   A  We hired a bookkeeper. Hired a

17 bookkeeper. We engaged with a tax attorney, tax

18 accountant, somebody I had used for years. And

19 we -- I was busy. I had a business. I had a

20 full-time job. I worked with Wally during that

21 period. We were friends. We were associates. He

22 confided in me.

23   **Q  Other than having acted as a treasurer,**

24 **is there any other role that you performed with**

25 **ArtPort?**

1    A    Nancy really handled the business.
2    Q    Where did you work after you worked at
3  **Bear Stearns?**
4    A    Bear Stearns became J.P. Morgan, who
5  purchased us. I worked there.
6    Q    **J.P. Morgan?**
7    A    Yep.
8    Q    **Okay. For how long did you work at**
9  **J.P. Morgan?**
10    A    Well, they -- the -- I continued in the
11  same role I had, but I was selected as one of the
12  few managing directors that they assigned that
13  title to from Bear Stearns, and I stayed there for
14  approximately a year and a half.
15    Q    **And what did you do next for employment?**
16    A    I went to work -- I was solicited by Bank
17  of America and Cerberus, and I chose to go to work
18  at Bank of America.
19    Q    **Is -- is that the reason you left**
20  **J.P. Morgan --**
21    A    Yes.
22    Q    **-- because you were solicited? Okay.**
23      **And what was your title at Bank of**
24  **America?**
25    A    Managing director.

1    Q    **And what were you the managing director**
2  **of?**
3    A    Managing director is a title. My role
4  was I was part of a fixed income group, and we had
5  a subgroup, which was a bank advisory group.
6    Q    **Did your job duties change from that at**
7  **all during your time at Bank of America?**
8    A    Did my what?
9    Q    **Did your job duties change at all from**
10  **that job description that you just provided during**
11  **your time at Bank of America?**
12    A    Well, they expanded.
13    Q    **Okay. And how did they expand?**
14    A    I became part of the warehouse lending
15  team on top of what I was doing, and I also became
16  a lead product specialist at the bank during or
17  kind of in the initial days of the recovery from
18  the financial crisis.
19    Q    **That warehouse lending that you**
20  **described, is that lending for mortgage loans?**
21    A    Yeah. I mean, the business lent to a
22  variety of different entities, and some of those
23  loans we had on that warehouse were -- actually,
24  the majority of the loans we had in that warehouse
25  were some type of mortgage loans, securities,

1  et cetera.
2    Q    **When you worked at Bank of America and**
3  **your job duties expanded as you described,**
4  **approximately what -- what time period did that**
5  **expansion of your job duties occur?**
6    A    I started at Bank of America, I don't
7  recall the exact date, but it was in the fall of
8  2009, and I left in the spring of '13. So, you
9  know, it went from, again, our bank strategy group
10  added into the warehouse, which expanded my role
11  due to a mandate that the CEO of the bank had. And
12  I was helping with some of the integration from
13  Countrywide Securities. I also managed very, very
14  large special projects, which were, again, related
15  to coming out of the financial crisis.
16    Q    **Did you ever perform any work for Bank of**
17  **America Home Loan Servicing?**
18    A    No, not directly.
19    Q    **What about for Countrywide Home Loans?**
20    A    Well, Countrywide went bankrupt.
21  Countrywide didn't exist anymore.
22    Q    **So how long were you with Bank of America**
23  **in some capacity?**
24    A    Approximately four years, I think.
25    Q    **And why did you leave Bank of America?**

1    A    One of the senior leaders at Bank of
2  America, who ran one of the four fixed income
3  groups inside of the bank, was leaving the bank and
4  asked me if I had an interest in taking a job at
5  Fortress Investment Group, and I took the role at
6  Fortress Investment Group.
7    Q    **And what did you -- what were your job**
8  **duties at Fortress Investment Group?**
9    A    They were relatively broad. My -- my
10  title was, again, managing director. I helped form
11  the -- a REIT that sits inside of Fortress today
12  and managed the process and restructuring of other
13  REITs, including public entities, inside of
14  Fortress.
15    Q    **When you say, "REIT," do you mean**
16  **R-E-I-T, Real Estate Investment Trust?**
17    A    Correct.
18    Q    **And how long did you work at Fortress?**
19    A    I was officially employed for about
20  16 months the first time.
21    Q    **Approximately -- so where did you work**
22  **next or what was your next place where you**
23  **performed work?**
24    A    I worked for a Fortress -- basically, a
25  Fortress company that was called Nationstar.

1  Q   Nationstar is a mortgage loan servicing
2  company, correct?
3  A   A mortgage loan servicing, mortgage
4  origination. And I spent most of my time at one of
5  their affiliates called Solutionstar.
6  Q   Is that the same Nationstar -- they're
7  based in Texas, or were they at the time that you
8  worked there?
9  A   Correct, yep.
10  Q   What was your role with Nationstar or
11  Solutionstar, as you described?
12  A   I was an EVP. I sat on the advisory
13  board, and I managed what was called third-party
14  business development.
15  Q   And Nationstar, they received a lot of
16  the Bank of America -- former Bank of America home
17  loans to service; is that correct? If you don't
18  know, that's fine, but that's my understanding.
19  A   I have no idea.
20  Q   And was that a newer company or had it
21  been around a long time?
22  A   Can you rephrase the question? Was what
23  a newer company?
24  Q   Nationstar.
25  A   Nationstar was formed sometime between --

1  I actually don't know when it was formed, but I
2  believe sometime between 2000 and 2005.
3  Q   And what type of third-party development
4  did you work on at Solutionstar? Meaning, what
5  were you actually doing there as far as to
6  facilitate that business of the company?
7  A   Solutionstar owned a series of verticals
8  that -- that provided services and resources to
9  primarily mortgage originators, asset managers,
10  servicers, et cetera.
11  Q   And how long did you work for Nationstar
12  and Solutionstar?
13  A   A very short period of time.
14  Q   And what did you --
15  A   Five, six months.
16  Q   Sorry. I didn't mean to cut you off.
17  About six months?
18  A   Yeah.
19  Q   And what did you do next for employment?
20  A   I went back to Fortress Investment Group.
21  Q   And were your job duties the same as they
22  had been before your departure?
23  A   I did -- I moved more into a banking,
24  banking advisory company acquisition role.
25  Q   And how long did you work at Fortress

1  this time?
2  A   Short period, about six months.
3  Q   Where did you work next?
4  A   I worked technically, but without pay,
5  for one of Wally's companies, Investability.
6  Q   How did you meet Wally or come to know of
7  him?
8  A   I met Wally in the fall of 2014.
9  Q   Were you introduced to him? Or just tell
10  me how, generally, that interaction --
11  A   I was introduced to him.
12  Q   Okay. And who made the introduction?
13  A   I'm sorry?
14  Q   Who made that introduction?
15  A   The chief marketing officer of
16  Solutionstar.
17  Q   And what was the purpose of meeting
18  Wally?
19  A   The chief marketing officer thought that
20  one of the businesses that Wally represented as
21  having a solution to the single-family rental
22  marketplace would be helpful to Solutionstar.
23  Q   And what did you understand that Wally's
24  company, Investability, did for its business? You
25  said it was a solution. What exactly was that

1  product? What did it do?
2  A   Well, at that time, he had formed the
3  business. He had not developed the product.
4  Q   What was the product intended to do, if
5  you know?
6  A   It was intended to provide a resource
7  platform to the single-family rental industry.
8  Q   And what would that accomplish? Meaning
9  what was the purpose? I mean, there was some need
10  for it, and I just don't -- in laymen's terms,
11  like, what was it intended to do, and what was the
12  purpose of the product.
13  A   Well, first of all, the need for it had
14  not been truly defined. The purpose of the company
15  and the product was to provide single-family
16  investors, which included buyers and sellers, a --
17  basically a platform -- technology-driven platform
18  that would be -- that would make the purchase and
19  sale process more efficient and the interbidder
20  disparate business.
21  Q   The purchase and sale of homes or the
22  purchase and sale of rentals?
23  A   Mostly the rentals.
24  Q   Okay. So when you met Wally as -- when
25  you were working -- you were working for Fortress.

## Page 65

1 You go to meet Wally because he had this company,
2 Investability, that might have a useful product.
3 And then did you go to work for Investability at
4 that time?
5     A   At that time, no.  He offered me the role
6 as president of his company, and I turned it down.
7     Q   Okay.  And where did you -- how long did
8 you continue to work at Fortress?
9     A   I wasn't at Fortress at that time.
10     THE REPORTER:  Excuse me.  It looks like
11 we dropped Liza.
12     THE VIDEOGRAPHER:  Do you want to go off
13 the record?
14     THE REPORTER:  Yes.
15     THE VIDEOGRAPHER:  We're going off the
16 record.  The time is 11:40 a.m.
17     (Break from 11:40 a.m. to 12:51 p.m.)
18     THE VIDEOGRAPHER:  We're back on the
19 record.  The time is 12:51 p.m.
20     Q   (BY MR. HICKS)  Good afternoon,
21 Mr. Hinkelman.  We are back on the record.  And I
22 wanted to follow up on some issues we were
23 discussing in your testimony earlier.  What do you
24 understand your present interest in ArtPort to be?
25     MR. WAGNER:  Object to the form.

## Page 66

1     MS. GETCHES:  Join.
2     A   I believe you already asked that, and I
3 answered.
4     Q   (BY MR. HICKS)  Well, I'm asking again.
5     A   Okay.  50 percent.
6     MR. WAGNER:  Object to the form.
7     Q   (BY MR. HICKS)  50 percent ownership?
8     A   50 percent what?
9     Q   Ownership?
10     A   Yeah.
11     Q   Okay.  All right.  I'm going to share a
12 screen with you.  It will be a document for you to
13 look at, and I will ask you some questions about
14 it.
15     A   Okay.
16     Q   All right.  Do you see in front of you,
17 the first page of this document is -- it says
18 Exhibit A, and then below that on page 2 of 3, it
19 says, Declaration of Nancy Loving, and then it
20 looks like there's a signature on the third page of
21 this document.  It says page number 2, but I'm
22 talking about page 3 of the PDF, because there is
23 that cover page with Exhibit A.  Do you see this in
24 front of you?
25     A   Yes.

## Page 67

1     Q   Do you recognize that signature?
2     A   I do.
3     Q   Okay.  And that's the signature of whom?
4     A   Nancy Loving.
5     Q   Have you seen this document before?
6     A   I don't recall.
7     Q   And do you see in front of you where it
8 says Walter Charnoff, Plaintiff v. Nancy Loving,
9 and it's got some other entities listed as
10 defendants?
11     A   Yep.  Yes, I do.
12     Q   And your name is not listed there as a
13 defendant, but is it your understanding that you
14 are presently a defendant in this lawsuit reflected
15 in this page?
16     A   I do.
17     Q   And you understand what a declaration
18 is -- or do you understand what a declaration is?
19     A   I do.
20     Q   Okay.  So this is a statement under oath
21 in the form of a declaration filed by Nancy Loving
22 in this case that we're here for today.  And in
23 paragraph 2, it says, "In 2018, I believe we
24 changed the membership of ArtPort such that
25 Mr. Hinkelman assigned me his interest in ArtPort

## Page 68

1 and he gave notice that he was no longer a member
2 of ArtPort."  Do you see that in paragraph 2?
3     A   I do.
4     Q   And do you understand what she's
5 referring to there?  What transaction?
6     A   Well, she said she believed --
7     MS. GETCHES:  Object to the form.
8     A   She said she believed we changed the
9 membership of ArtPort, or Mr. Hinkelman assigned me
10 his interest in ArtPort and gave notice that he was
11 no longer a member of ArtPort.  And I believe --
12 I'm not completely positive -- she was referring to
13 a -- I think it was a change in the certificate.
14     And, again, I'm not exactly sure what she
15 was referring to, but there was -- the membership
16 wasn't changed, and I think Nancy made up -- kind
17 of just -- she had a misunderstanding of what
18 happened at that time.  But I'm not sure.  You'd
19 have to ask her.
20     Q   (BY MR. HICKS)  All right.  I'm going to
21 show you another document.
22     My bad.  Sorry.  Wrong one.  There we go.
23     We'll have to just come back to it.  I
24 was going to pull up a document, but let me come
25 back to that.

1    **Who do you understand the present members**
2  **of ArtPort to be?**
3    A    Again, you've already asked that
4  question, and I've answered.
5    **Q    Okay.  Can you answer again?  Is it just**
6  **you and Ms. Loving, as far as you know, and ISP**
7  **Holdings?**
8    A    It is just myself and Ms. Loving.
9    **Q    And you said that you had you had put**
10  **approximately $750,000 into ArtPort over its**
11  **existence.  What did you receive in return for that**
12  **money?**
13    MR. WAGNER:  Object to the form.
14    A    I didn't receive anything.  There were a
15  couple times that I made small loans that were
16  reimbursed, but I received no -- it was all
17  basically monies that I put into ArtPort.
18    **Q    (BY MR. HICKS) And have you had any --**
19  **actually, strike that.**
20    **I'm going to share a screen with you**
21  **again, Mr. Hinkelman.**
22    A    Sure.
23    **Q    All right.  And it looks like -- do you**
24  **see the -- it says, Declaration of David Hinkelman**
25  **on this page?**

1    A    Yeah.
2    **Q    I'm just going to scroll down so you can**
3  **see the document.  Is that your signature on the**
4  **fourth page?**
5    A    Yes, it is.
6    **Q    And do you remember signing this**
7  **document?**
8    A    I do.
9    **Q    Okay.  So going through this, I just want**
10  **to ask you about some of the paragraphs in this**
11  **document.  I understand the first paragraph.  It**
12  **says -- well, the first sentence is consistent with**
13  **your testimony.  But on the first paragraph, it**
14  **says, We were also managers in the LLC.  And this**
15  **is a statement by you under oath, correct?**
16    A    Correct.
17    **Q    Okay.  Is -- is that accurate?  Were you**
18  **designated a manager in the LLC at any time?  The**
19  **LLC being ArtPort.**
20    A    Yeah.  As of November 21st, 2013, I was
21  active.
22    **Q    Do you still have that status?**
23    A    No.
24    **Q    And when did that status change?**
25    A    I don't recall.  The operating agreement

1  was loose, at best, and I don't remember when it
2  actually changed.
3    **Q    On paragraph 2 it says, "I terminated my**
4  **membership in the LLC and provided notice of the**
5  **same in August of 2018.  I did so for personal,**
6  **tax, and relationship reasons."  Do you see that?**
7    A    Correct.  Yep.
8    **Q    All right.  Is that accurate as you sit**
9  **here today?**
10    A    When we wrote the affidavit, I
11  misunderstood the difference between changing as
12  registered agent.  And, again, the document that
13  Nancy and I had worked on together and that -- it
14  had never been put in place.  And as I've said,
15  I've had little -- little, really, just involvement
16  in ArtPort.  And as a result, when I filled that
17  out, I -- again, it was -- I terminated my -- I
18  believe that was the time when I terminated as the
19  registered agent.
20    And at the same time, it was when Nancy
21  and I were in that period when we were working on
22  the financial planning and what we were doing.  And
23  I thought that it had been put into effect, and
24  later realized that it hadn't.  And as a result, I
25  needed to answer, respectfully, that it was still a

1  50-50 ownership.
2    **Q    Okay.  So let's -- let's take that**
3  **situation and break it down a little further.  In**
4  **paragraph 2 where you say that, I terminated my**
5  **membership interest in the LLC and provided notice**
6  **of the same in August of 2018, who did you provide**
7  **notice to?**
8    A    Well, that's in -- that was in
9  the agreement.  I believe it was in 2018.  I don't
10  recall.  I don't have the agreement in front of me.
11  But I basically -- Nancy and I wrote up an
12  agreement where we were -- for financial planning,
13  were changing basically how our lives would look in
14  the future.  And, again, I don't really recall
15  whether it was directly related to the change in
16  the language that would have been -- and to the
17  best of my knowledge, that it had to do with the --
18  the registered agent or the agreement.
19    But both of them have virtually the same
20  impact on me.  I was no longer the registered agent
21  at some point.  And my kind of -- I was just
22  operating from the point of view that Nancy and I
23  were in the process of working with a local
24  attorney on creating a better financial plan for us
25  moving forward, and that included a lot of

1 different components, which ArtPort had one piece
2 of.
3     **Q   So you mentioned a change of registered**
4 **agent, the document or transaction.  What are you**
5 **referring to?**
6     A   It was a point where there was a -- where
7 I believe I was originally put on a doc by the
8 original attorney as the registered agent.  That
9 wasn't accurate.  And I don't remember when that
10 change was.  But if I look at paragraph 3 here, I
11 think this is the clarity that we were discussing
12 at that time, which was transferring my equity
13 interest to Ms. Loving, and then she became 100
14 percent owner, and then she transferred a portion
15 of her interest -- basically, of her interest, but
16 not a direct interest in ArtPort.  So it became a
17 portion of her estate.  And so, as a result, I
18 think that was the direct relationship of that
19 question.  Again, I don't recall.
20     What I do recall is we were working on a
21 series of financial planning that involved us,
22 insurance, our children, et cetera, and -- and we
23 created that document, and then it never got
24 ratified.  The -- the LLC operating agreement was
25 never adjusted, and as a result, I made a mistake

1 thinking that that had happened.
2     **Q   So you thought that, as I understand your**
3 **testimony, a registered agent change might impact**
4 **your membership interest in ArtPort, LLC; is that**
5 **correct?**
6     A   No, I said -- that's not what I said,
7 okay.  What I said is that there were two events
8 that occurred.  Now that I look at this, I realize
9 that it was purely reflected on the agreement that
10 Nancy and I were working on, because this is -- if
11 I look at Number 3, I transferred my -- in that
12 document that we wrote up with -- originally with
13 the guidance of an attorney, and then we never
14 ratified and we never implemented, that's exactly
15 what happened, and I believed it had been put in
16 place.  It was my mistake.
17     **Q   Okay.  Because a registered agent change,**
18 **as I understand it, is -- changes who receives**
19 **letters and such on behalf of an LLC.**
20     A   So I think that when I just spoke of it,
21 I said, to the best of my knowledge and my belief,
22 is that may have been part of it.  As you relayed
23 that, it probably wasn't.
24     **Q   Okay.  And then when it says in number --**
25 **in paragraph 3, I transferred my equity interest to**

1 **Ms. Loving, I believe that you -- what do you mean**
2 **by equity interest?  Did you say that's the equity**
3 **interest in her estate or something else?  What do**
4 **you mean?**
5     A   Again, it was a -- you know, possibly a
6 mistake in the way that the language reads.  It
7 should have read I transferred my LLC interest to
8 Ms. Loving, and she transferred a portion of her
9 interest back to me, which I understood to be a
10 portion of her interest, but not a direct interest
11 in ArtPort.
12     It would be very similar to you saying to
13 your wife, Mr. Hicks, I'm going to give you a
14 portion of my law practice, but she's not the owner
15 of your law practice, in case of death, divorce,
16 whatever.
17     **Q   Okay.  So equity interest means -- that**
18 **means equity interest in ArtPort.  I think you**
19 **answered that, but I just want to be clear.**
20     A   Yeah, that was my understanding at the
21 time.
22     **Q   Okay.  And where it says, "a portion of**
23 **her interest, but not an interest in ArtPort," when**
24 **it says, "her interest," that means -- I'm a little**
25 **confused by that.  So let me ask an actual question**

1 **that makes sense here.**
2     **If she has an interest, doesn't that have**
3 **to be an interest in ArtPort, because the equity**
4 **interest you just defined earlier as being her**
5 **interest in ArtPort?**
6     MS. GETCHES:  Objection --
7     A   You're the --
8     MS. GETCHES:  -- foundation.  Object to
9 form.
10     THE DEPONENT:  Sorry.
11     A   You're a -- you're an attorney.  I assume
12 you've done wills and trusts.  In that process, you
13 will put in a document -- in this case it was not
14 done inside of a will or a trust -- that in the
15 case of an event, somebody would have a -- an
16 ownership or an interest in their business.
17     **Q   (BY MR. HICKS)  Okay.  Let me ask this a**
18 **little bit differently.  In paragraph 3, the word**
19 **interest appears four times; would you agree?**
20     A   Yes, I agree.
21     THE REPORTER:  Could you repeat that,
22 David?  I don't think we all heard it.
23     A   Yes, I agree.
24     **Q   (BY MR. HICKS)  So where it says equity**
25 **interest, that means interest in ArtPort, correct?**

1  We've already established that?

2      MS. GETCHES:  Object to the foundation.

3      Ian, I think he's explained to you that

4  he didn't understand -- he didn't understand at the

5  time.  So getting definitions isn't making a lot of

6  sense here.

7      MR. HICKS:  Well, we'll see in a minute

8  here.

9      A    Well, the question even more is that it

10 was never ratified and never put in place in the

11 operating agreement or the operating agreement was

12 never changed.  And so we were advised that wasn't

13 in effect, though I thought at the time it was in

14 effect.

15     Q   (BY MR. HICKS)  Okay.  I guess -- so I

16 just want to make sure what the term interest means

17 as it is stated four times in this paragraph, okay?

18 Because I want to make sure that the way I

19 understand it or the way that someone else might

20 understand it -- I want to know how you understood

21 it.

22     And so we've already established that

23 equity interest, you said previously, correct me if

24 I'm wrong, should say an interest in ArtPort.  Do

25 you remember that testimony?

1      A    Right.  So --

2      MS. GETCHES:  Objection.  Misstates

3  testimony.

4      Q   (BY MR. HICKS)  Is it your understanding

5  that that's yes, that's fine?  I'm not trying to

6  trick you.  I just --

7      A    Yeah.  Again -- but I think that when you

8  said "your understanding," okay, or my

9  understanding is the -- I transferred my equity

10 interest -- it probably should have read my

11 interest in the LLC -- to Ms. Loving.  And she

12 transferred a portion of her interest back to me,

13 which I understood is a portion of her interest,

14 but not an interest in ArtPort.

15     So it's very different than -- you know,

16 it's handing somebody -- again, if it had been put

17 in place and if it truly existed, okay, it would be

18 something different than what exists today.  As I

19 said, I thought that the document itself had been

20 ratified, and it had not been.  My mistake.  I

21 wasn't -- I wasn't involved in the day-to-day

22 business of the business.

23     Q   And my questions are much more granular

24 than that, although I do appreciate your

25 explanation.

1      And the second time it says "interest" in

2  paragraph 3 of this declaration, what is that

3  intending to reflect?

4      A    Well, again, I was --

5      MS. GETCHES:  Object to foundation.

6      A    The second portion -- she transferred a

7  portion of her interest back to me, which I

8  understood to be a portion of her interest, but not

9  an interest in ArtPort.  It's no different than --

10 my understanding at the time -- I could be

11 incorrect, and, you know, this is just to the best

12 of my knowledge -- is that if you have an estate,

13 and you -- basically, one person owns assets in

14 that estate, that you then have the right to a

15 percentage of that estate, okay?  That would be

16 transferred a portion of her interest back to me,

17 okay, of her -- I guess, should it have read

18 estate?  And I understood it to be a portion of her

19 interest, but not an interest in ArtPort.  So it

20 was not a direct interest in ArtPort.

21     But, again, this all comes back to a

22 document that I believed at the time had been

23 ratified.  It had not.  It had been signed by Nancy

24 and I, but it had never been put into the operating

25 agreement, et cetera, and I never followed up on

1  it.  And so as a result, with advice, we were told

2  that it did not exist and that at that point, I

3  still owned 50 percent of ArtPort.

4      Q   (BY MR. HICKS)  Okay.  So the second time

5  it says "interest," it could say "estate" as well?

6  I think it's -- I just want to make sure I heard

7  that right.

8      MS. GETCHES:  Objection.  Foundation.

9  Form.

10     Q   (BY MR. HICKS)  Mr. Hinkelman, is

11 interest as used the second time in paragraph 3 --

12 should that say estate?

13     MS. GETCHES:  Objection.  Foundation.

14 Form.

15     A    Mr. Hicks, you know, we've gone over this

16 numerous times, and I, you know -- again, I wrote a

17 line in this affidavit.  I probably should have

18 referred back to one of our counsels about, you

19 know, how that should read and what that would

20 mean.  Very simply, it is as it's stated, okay?  I

21 transferred interest to Ms. Loving.  She

22 transferred a portion of her interest back to me,

23 which I understood to be a portion of her interest,

24 but not an interest in ArtPort.

25     So if you -- again, if you wanted a

1 broader take, it would be a portion of her interest
2 in X, but not a direct ownership in ArtPort.
3       But the document was not ratified.  The
4 document is not in place.  The operating agreement
5 was not changed.  And so it was, at the time, to
6 the best of my knowledge, and as of now, to the
7 best of my knowledge, it is -- and from advice, it
8 does not exist.  The operating agreement was not
9 changed.  And Nancy and I own 50-50 percent.
10     Q    (BY MR. HICKS)  Okay.  So, again, I'm
11 sorry that -- well, I'm not really sorry, actually.
12 You know, it's unfortunate that this is something
13 we have to sit here and keep talking about.  But
14 with all due respect, I'm not the one who filed and
15 made this -- these are mistakes.  We've established
16 that under oath twice.  This was supposed to
17 correct the prior affidavit, which was also wrong.
18       So it doesn't make sense to me.  Your
19 language does not make sense.  And if we have to
20 sit here for a very long time and figure out what
21 this means, I'm entitled to do that, and the
22 Court's going to -- I would believe is going to let
23 me finish that question.  So I'm not trying to give
24 you a hard time, but the explanation that you gave
25 made sense, I asked you to confirm it, when you

1 said that this word interest as used the second
2 time should say her estate.
3       So I need to know what this sentence,
4 which is kind of nonsensical, means, okay?  So it
5 depends how long you want to sit here and talk
6 about this.
7       So, again, I'll ask --
8       MS. GETCHES:  David --
9     Q    (BY MR. HICKS)  -- again, the second
10 paragraph --
11       MS. GETCHES:  You have no obligation to
12 change your answer, David.  If he's going to badger
13 you into asking the same question over and over
14 expecting a different result, you don't have to --
15 you don't have to answer the question.
16       THE DEPONENT:  Okay.  Thank you.
17       MS. GETCHES:  He just said it's clear to
18 him, and then he asked you to confirm it, and you
19 didn't do he wanted you to do.  So if it's clear to
20 him, you're done.
21       MR. HICKS:  There's actually nothing
22 about this sentence that's clear, with all due
23 respect, nor the testimony.
24       MS. GETCHES:  Okay.  Well, he clearly
25 didn't understand what he wrote when he wrote it,

1 and he told you that seven times now.  So move on.
2     Q    (BY MR. HICKS)  David, what is the
3 "interest," as used the second time in paragraph 3,
4 referring to?  An interest in her estate or an
5 interest in ArtPort?
6       MR. WAGNER:  Object to form.  Asked and
7 answered.
8       MS. GETCHES:  Join.
9     A    I'm sorry.  Can you repeat the question?
10       MR. HICKS:  Can the court reporter please
11 read back that question.
12       (The last question was read.)
13     A    You know, I probably have to refer you
14 back to the attorney that helped us write it,
15 because, again, my -- not helped me write this, but
16 the original agreement, because that's how the
17 agreement was written.  Transferred a portion of
18 her interest back to me, which I understood, and
19 to the best of my knowledge, to be a portion of her
20 interest, but not an interest in ArtPort.
21       I can understand your confusion, okay?
22 But, I think if you look at the reality of the
23 situation, it was very simple, and my answer is the
24 same.
25     Q    (BY MR. HICKS)  Okay.  Whatever the

1 drafter meant, what did it mean to you when you
2 signed it as to that second "interest"?  Was it
3 your understanding that it meant an interest in
4 ArtPort or an interest in her estate?
5       MR. WAGNER:  Objection.  Asked and
6 answered.
7       MS. GETCHES:  Join.
8     A    It would be an interest --
9       MS. GETCHES:  This is becoming badgering,
10 Ian.
11       THE DEPONENT:  Yeah, it's a little
12 ridiculous.
13     A    But it would be an interest in -- no
14 difference in a -- in the rights to her interest.
15 I've explained this to you numerous times.
16       THE REPORTER:  I'm sorry.  Repeat that.
17       THE DEPONENT:  I said I have explained
18 that numerous times.
19     Q    (BY MR. HICKS)  What's the name of the
20 attorney who drafted this, or who drafted -- the
21 attorney you've been referring to in connection
22 with paragraph 3?
23     A    Neil Jacobs.
24     Q    N-e-i-l and then J-a-c-o-b-s?
25     A    Correct.

1    Q    So is paragraph 3 accurate or not, as
2 you -- as you read it right now?
3       MS. GETCHES:  Object to the form and
4 foundation.
5    A    I can't see paragraph 3 on the screen
6 anymore.
7    Q    (BY MR. HICKS)  I'm sorry.
8    A    So at the time when I wrote this, I
9 thought that it had been ratified and implemented.
10 It was not.  So when I wrote the affidavit, I
11 believed it to be accurate and a true statement.
12    Q    And just to clarify, this is a
13 declaration.  So when you said, "affidavit," are
14 you talking about --
15    A    When I signed this document --
16    Q    Okay.
17    A    -- and I wrote the document, that is what
18 I believed to be accurate at the time.
19    Q    And I just had to clarify you weren't
20 speaking about some earlier affidavit, basically.
21       Can you read paragraph 5, and let me know
22 when you're done, please.
23    A    I'm sorry.  What was that?
24    Q    Can you read paragraph 5 of this document
25 in front of you, and let me know when you're done,

1 please.
2    A    I filed taxes for ArtPort's --
3    Q    You can read it to yourself.  I'm sorry.
4 I didn't mean to make it public.
5    A    Yep.  Okay.
6    Q    Okay.  So is that paragraph accurate, as
7 you sit here today?
8    A    The paragraph is accurate that I signed
9 the taxes for ArtPort's -- ArtPort in two
10 thousand -- ArtPort 2014 tax return.  K-1s were
11 issued to ISP Holdings, the majority of the
12 assigned loss from ArtPort.  Mine was extremely
13 small.
14       After return -- reviewing the Plaintiff
15 Charnoff's filing, I consulted with my tax
16 attorney, tax adviser, and his -- and his statement
17 was I did that based on my belief, okay.  And then
18 I said that I may have done so in error.  I'm no
19 longer a member as of August of 2018, okay, which
20 was incorrect.  But by virtue of my erroneously
21 filing including ISP, though Nancy Loving believed
22 that ISP was not a member until recoupment, I
23 treated them as members for tax purposes, okay.
24       Now, I am not a tax attorney.  I am not
25 an accountant.  I am not a tax expert.  And so in

1 that, okay, based on my knowledge and the knowledge
2 that I had given to our tax attorney, who is also
3 an accountant, I believed this to be true.  But I
4 was a member of -- of ArtPort in August of 2018.
5    Q    And that's my only inquiry, so thank you.
6       Paragraph 7.  Read that to yourself, and
7 let me know when you're done, please.
8    A    When I wrote this, I was operating
9 under --
10    Q    David, there's no pending question -- I'm
11 sorry.  Mr. Hinkelman, there's no pending question.
12    A    Oh, okay.  I can read it.  I've read it.
13    Q    And again, I don't mean to cut you off or
14 be rude.  I just -- your attorney probably doesn't
15 want you the answer questions that haven't been
16 asked yet.
17       Is that -- is paragraph 7, as you sit
18 here today, an accurate statement?
19    A    No.  It should read sole managing member
20 of ArtPort would be Nancy Loving.  But, again, it
21 was based on the document from 2018, which was not
22 ratified and not -- and the operating agreement was
23 not changed.
24    Q    And then in paragraph 9, do you see that
25 there's a 674 Piermont Avenue --

1    A    Yeah.
2    Q    -- address listed?
3    A    Yeah.
4    Q    Okay.  And is that -- I think in the
5 beginning of the deposition you had mentioned, I
6 believe, three places where you had resided.  Is
7 that one of those places?
8    A    Yes.
9    Q    Okay.  Mr. Hinkelman, I'm just pulling up
10 a document.  I think we're getting close.  I
11 appreciate your patience.
12       Let's go back to your employment history.
13 So as I understood it, when you were at
14 Solutionstar, that's when you met Wally Charnoff,
15 and at some point you went to work with him or
16 consult with him with his entity known as
17 Investability; is that right?
18    A    Correct.
19    Q    Okay.  And when did you go to work with
20 Mr. Charnoff?
21    A    Just say it was approximately -- okay, so
22 let's -- let's define that.  What do you mean by
23 work for Mr. Charnoff?
24    Q    When did you enter into an agreement or
25 receive compensation from Investability?

1    A    When I entered into the agreement, I was
2  not receiving compensation.
3    Q    When did you begin performing services
4  for Investability?
5    A    Under the contract that we had, I began
6  performing services for Investability in -- I
7  believe it was July or August of 2015.
8    Q    And what was your role?
9    A    My role was EV -- I turned down the
10 president's role.  So my role was EVP, executive
11 vice president.
12   Q    What were the nature of the services you
13 provided to Investability?
14   A    I provided an advisory role in working
15 with Mr. Charnoff to secure capital to eventually
16 sell his company.
17   Q    Did you have interactions with Wally
18 during your time providing services for
19 Investability?
20       MS. GETCHES:  Object to the form.
21   Q  (BY MR. HICKS)  Let me -- let me rephrase
22 that, Mr. Hinkelman.
23       Did you have an opportunity to work with
24 Wally on a regular basis during your time providing
25 services for Investability?

1        MS. GETCHES:  Object to the form.
2    A    Wally hired me or offered me a position,
3  though he could not afford to pay me, so that I
4  could help him get through this deal, be an adviser
5  and a confidante to him, and, yes, we worked very
6  closely together.
7    Q  (BY MR. HICKS)  And what was Wally's role
8  with Investability?  What did he do for the
9  company?
10   A    He was the CEO.
11   Q  (BY MR. HICKS)  Let me -- I'm going to
12 pull up a -- share the screen again.
13       All right.  Do you see this document
14 entitled Transfer of Equity Interest Agreement at
15 the top on the first page.  At the bottom right, it
16 says Loving 0549?
17   A    Yes, I see the document.
18   Q    Is this the document that you were
19 referring to in your earlier testimony when you
20 were looking at the declaration filed by you -- I'm
21 sorry -- signed by you that was filed in this case?
22       MS. GETCHES:  Object to the form.
23   A    Yes.
24   Q  (BY MR. HICKS)  And I believe you said
25 this was prepared for, at least in part, estate and

1  family planning purposes; is that right?
2    A    I'm sorry.  Could you repeat the
3  question?
4    Q    I'll actually strike that.  I don't --
5  who prepared this document?  What drafted it?
6    A    I had already told you, Neil Jacobs.
7    Q    Okay.  I just wanted to make sure we're
8  talking about the same thing.  Thank you.
9        And how long did you work with or for
10 Investability?
11   A    Officially -- I'm not sure exactly how
12 long it was.  A few months -- until the deal closed
13 with AltiSource.
14   Q    You used the term "officially."  So
15 let's -- I'd like to inquire about that
16 distinction.  Did you have a formal employment
17 agreement with Investability?
18   A    Yes.  We already stated that.
19   Q    Okay.  And you mentioned the word
20 "officially."  Was there a time period when you
21 worked outside of that employment agreement?
22 Meaning, before or after its effective period.
23   A    Afterwards, in a capacity with
24 Mr. Charnoff, when the deal closed, Wally was
25 transferring over employees to AltiSource.

1    Q    And did you provide services of any kind
2  to help with that transition?
3    A    No, I didn't.
4    Q    Okay.  Did you have discussions with
5  Wally about Investability's business activities
6  after the deal closed?
7    A    Yes, I did.
8    Q    Okay.  And tell me what you were
9  discussing or how you were helping him or
10 Investability.
11   A    Wally and I had discussions every day or
12 every few days for months, okay.  Wally asked me
13 originally to be part of his new management team.
14   Q    And the new management team at a
15 different entity?  At AltiSource?
16   A    Correct.
17   Q    Okay.  So as I understand it,
18 Investability sold this product or idea that Wally
19 had come up with to AltiSource, and then he was to
20 work at AltiSource, form a new management team, to
21 implement it or run it or something like that?
22   A    That's not correct.
23   Q    Okay.  This is beyond my understanding a
24 little bit.  Can you explain, like, what -- what
25 AltiSource had to do with Investability and what

1 the process -- what was Wally trying to do and how
2 were you going to help him?
3     A   Well, I mean, Mr. Hicks, I'm not trying
4 to be combative, but you represent Wally. I assume
5 that you've had numerous conversations with him
6 about all of this.
7        And so AltiSource bought the company,
8 both Investability and Rent Range. It didn't buy
9 products. Wally continued on as the CEO of the
10 combined entity that sat inside of AltiSource. We
11 had numerous conversations about the company, the
12 future, him personally, his family. You know, a
13 myriad of conversations from -- during the time I
14 was there, before the time I was there, after the
15 time I was there officially.
16     Q   Okay. Was there a lawsuit filed against
17 Wally in connection with Investability or
18 AltiSource, as far as you're aware?
19     A   No.
20     Q   As far as you know, has Wally ever been
21 sued before?
22     A   Yes.
23     Q   Okay. And what is your awareness as to
24 what that lawsuit was about?
25     A   Which lawsuit?

1     Q   Okay. There's more than one, so just
2 tell me each lawsuit against Wally that you have
3 some knowledge of or understanding of.
4     A   Wally had told me about a lawsuit he had
5 with an ex-partner where the partner accused him of
6 taking -- again, I don't recall the whole thing,
7 but the partner had accused him of taking an
8 investment from him and taking the company, I
9 believe. And, again, that -- so there was a
10 lawsuit against an ex-company. I believe he had a
11 lawsuit against an employee. I believe he had a
12 lawsuit against a contractor, you know. It -- and
13 then he had a lawsuit that was filed by an investor
14 prior to the sale of Rent Range and Investability
15 to AltiSource.
16     Q   Did you provide testimony in a deposition
17 in any of those lawsuits?
18     A   No. I prepared for a deposition, but I
19 did not provide testimony.
20     Q   Up until the date that -- well, strike
21 that question. We'll deal with this a different
22 way.
23        Did you receive any compensation from
24 Investability?
25     A   I received an advisory payment that was

1 directly due to sourcing the capital for
2 Investability and Rent Range.
3     Q   Okay. And how much was that
4 compensation?
5     A   I'm not sure exactly. Somewhere in the
6 half -- about a half a million dollars.
7     Q   Okay. Half a million before or after
8 taxes?
9     A   I'm sorry?
10     Q   Was that before or after taxes, that
11 figure you just gave?
12     A   Half a million --
13     Q   You cut out. Did you say before? I'm
14 sorry.
15     A   Half a million before taxes.
16     Q   Did you receive any equity interest, any
17 shares, or anything of that nature by virtue of the
18 services you provided for Investability?
19     A   No.
20     Q   Were you promised any shares or equity as
21 a result of your services for Investability?
22     A   No.
23     Q   What I'm getting at is, I understand you
24 didn't receive anything like that in actuality, but
25 were you supposed to get it and something happened?

1 Do you understand the distinction?
2     A   Not that I -- I don't recall.
3     Q   Okay.
4     A   Not in Investability or Rent Range.
5     Q   Did you receive any compensation of any
6 kind or anything of value by virtue --
7     A   Other than $500,000?
8     Q   Other than that, I mean. I'm sorry.
9     A   No.
10     Q   Okay.
11     A   No compensation.
12     Q   And where did you work after performing
13 services for Investability? Chronologically
14 speaking.
15     A   Wally had -- actually, I did not work
16 after the Investability sale until I formed my
17 current company, which we began working in January
18 of 2016.
19     Q   And is that company Lift Strategic
20 Partners or something like that?
21     A   Yep, it is.
22     Q   All right. So when did you form that
23 company? I'm sorry. I think you already told me.
24     A   I think we actually legally formed right
25 at the end of 2015 or at the beginning of 2016. I

1 don't remember the exact date. Sometime -- formed
2 sometime between the end of '15 and the first month
3 of two of '16, and then operating in the beginning
4 of '16.
5    **Q**   **And what is the business that Lift**
6 **Strategic Partners is involved in? What does it**
7 **do?**
8    A   We're an advisory firm to the housing
9 industry.
10    **Q**   **And do you provide services on a**
11 **full-time basis or part-time or something else?**
12    A   We provide a series of consulting
13 services, advisory services, yes, on a full-time
14 basis.
15    **Q**   **And how many employees does that company**
16 **have, if any?**
17    A   We have no actual employees.
18    **Q**   **Does the company have vendors or**
19 **independent contractors?**
20    A   We have 1099 contractors.
21    **Q**   **And just generally, what do they -- what**
22 **do they do? I'm not trying to be tricky or**
23 **anything like that. I'm just trying to understand**
24 **generally what the business is about, what these**
25 **people do, and then we can move on.**

1    A   One, provides research, competitive
2 analysis for the companies that we represent.
3 Market research.
4    THE REPORTER: I'm sorry. Repeat the
5 end.
6    THE DEPONENT: Market research.
7    THE REPORTER: Thank you.
8    **Q**   **(BY MR. HICKS) And did you form this**
9 **company with someone named Jeff Gravelle?**
10    A   I did.
11    **Q**   **And how did you know Jeff?**
12    A   I'd known Jeff from working him at Bear
13 Stearns -- with him at Bear Stearns.
14    **Q**   **And when did -- does he still work there**
15 **or with you at this company?**
16    A   No.
17    **Q**   **Okay. And when did he leave Lift**
18 **Strategic Partners?**
19    A   In January of 2020.
20    **Q**   **Did Mr. Gravelle file a lawsuit or**
21 **threaten to file a lawsuit against you in**
22 **connection with Lift Strategic Partners?**
23    A   No.
24    **Q**   **Would you consider Mr. Gravelle's**
25 **departure from Lift Strategic Partners to have been**

1 **amicable?**
2    A   Completely. I talk to him almost every
3 day.
4    **Q**   **Have you ever drawn a salary or**
5 **compensation from ArtPort?**
6    A   No.
7    **Q**   **At some point, you had prepared a tax**
8 **return for ArtPort; is that correct?**
9    A   No.
10    **Q**   **Have you ever been designated as a tax**
11 **matters partner on a tax return for ArtPort?**
12    A   Can you define that question, please?
13    **Q**   **Well, who prepares the taxes for ArtPort,**
14 **if you know?**
15    A   We've had two parties. One is a tax
16 attorney and -- a tax attorney and the other one is
17 an accounting firm.
18    **Q**   **So as I recall -- I'll just tell you what**
19 **I'm getting at so we don't have to waste time. But**
20 **there was, I believe, a 2016 tax return filed in**
21 **this case where you appeared as a tax matters**
22 **partner. That's my recollection. Obviously, it's**
23 **not my deposition. Assuming that's -- do you**
24 **recall anything like that?**
25    A   Can you define tax matter partner?

1    **Q**   **It says it on the document -- on the**
2 **document itself. I have no idea what it means. If**
3 **you don't recall it, that's fine.**
4    A   Will you please show me the document?
5    **Q**   **We'll get to that.**
6    A   You just referred to a document. Can you
7 please show it to me?
8    **Q**   **Yeah. I'll have to pull it up. So we'll**
9 **move on, and then on a break, I'll grab it, and**
10 **I'll ask you about it later. It's not super**
11 **important, so I don't want to waste any -- your**
12 **time on it right now.**
13        **Did you ever have a painting entitled**
14 **"Blue Bowl" hanging in your house?**
15    A   Yes. I actually told you at the
16 beginning of the deposition that we did.
17    **Q**   **And do you understand that Blue Bowl was**
18 **purchased by Wally Charnoff?**
19    A   I do.
20    **Q**   **Okay. When was the last time Blue Bowl**
21 **was hanging in a place that you lived?**
22    A   I don't remember the exact date. But I
23 told Wally that it was there. He asked me to take
24 it down -- which Wally had known and actually asked
25 us to leave pieces hanging in our previous home

1 that he had purchased. I didn't really think it
2 was a big deal. I informed him. He asked me to
3 take it down. I took it down that day.
4    **Q**  **What address was that at?**
5    A  I'm sorry?
6    **Q**  **What address are we referring to?**
7    A  674 Piermont Ave.
8    **Q**  **Are you aware of a painting named "Two**
9 **Vessels"?**
10    A  I think so.
11    **Q**  **Okay. We -- I asked you questions**
12 **earlier in your deposition about an accusation by**
13 **Wally that a painting that was hanging up in one of**
14 **the houses you lived at may have been damaged. And**
15 **you described that as just dust on the painting.**
16 **Do you generally recall that testimony?**
17    A  I do.
18    **Q**  **Okay. And what painting was that? Was**
19 **that Two Vessels or Blue Bowl or something else?**
20    A  No, I think it was Two Vessels.
21    **Q**  **Did Wally ever ask that that painting be**
22 **taken down?**
23    A  No. Not that I'm aware of. Again, Wally
24 dealt with Nancy, not with me on this. To the best
25 of my knowledge, no.

1    **Q**  **Did you ever talk to Martin St. Pierre**
2 **about investing in an opportunity developed by**
3 **Wally?**
4    MR. WAGNER: Object to the form.
5    MS. GETCHES: Ian, could you repeat the
6 question, please?
7    MR. HICKS: Sure.
8    **Q**  **(BY MR. HICKS) Mr. Hinkelman, did you**
9 **ever talk to Martin St. Pierre about investing in**
10 **an opportunity developed by Wally?**
11    MR. WAGNER: Objection to form.
12    A  Can you -- can you give me an example?
13    **Q**  **(BY MR. HICKS) Well, yes. Did Wally**
14 **have an investment opportunity that you then took**
15 **to Martin St. Pierre and asked him if he would be**
16 **interested in investing in that opportunity from**
17 **Wally?**
18    A  Can you tell me what the investment
19 opportunity was?
20    **Q**  **Well, are you able to answer the question**
21 **as it's -- as it's posed?**
22    A  I -- I -- I don't know what you're
23 talking about. Wally had -- Wally had a lot of
24 ideas, you know. I think at the beginning, you
25 said something that was developed by Wally. Some

1 of his ideas were actually developed by others, and
2 Wally was -- Wally was good at turning things into
3 companies that were visions, and he definitely had
4 strong visions. So as I said, I'm not sure what
5 you're talking about.
6      I don't recall ever having -- to the best
7 of my knowledge, ever having a direct conversation
8 with Martin about a company that Wally had that was
9 in existence that -- about Martin investing in
10 it.
11    **Q**  **Thank you for that answer and**
12 **clarification. And to state this as -- more simply**
13 **and more in laymen's terms, my question is merely,**
14 **did you ever talk to Martin St. Pierre about**
15 **providing an investment in an idea, a company, a**
16 **product, or anything --**
17    MS. GETCHES: Objection. Foundation.
18    **Q**  **(BY MR. HICKS) -- brought to you --**
19 **brought to you by Wally?**
20    MR. WAGNER: Objection. Form.
21 Foundation.
22    A  I -- I don't recall. Martin and I talked
23 about a lot of things. I don't recall.
24    **Q**  **(BY MR. HICKS) Did you ever ask Martin**
25 **to invest in something presented to you by Wally?**

1    A  I --
2    MS. GETCHES: Foundation.
3    A  I don't recall.
4    **Q**  **(BY MR. HICKS) Have you ever talked to**
5 **Martin St. Pierre before the filing of this lawsuit**
6 **in July of 2019 about Wally?**
7    A  About what?
8    **Q**  **Anything.**
9    MS. GETCHES: Objection. Foundation.
10    MR. WAGNER: Yeah. Object to form.
11 Foundation.
12    **Q**  **(BY MR. HICKS) I assume that if you**
13 **talked to him about it, you would probably know**
14 **that, so that's --**
15    A  Sorry. What did you say?
16    **Q**  **Did you ever have a conversation --**
17    A  No, no, no, that's not what you said.
18 Will you please repeat or the court reporter repeat
19 what you said?
20    **Q**  **Yeah. I said if you talked to him about**
21 **it, I assume you would know it, so you may answer**
22 **the question. I was referencing the foundation**
23 **objection that was made, which is an objection --**
24    MS. GETCHES: What?
25    **Q**  **(BY MR. HICKS) Let me ask the question**

1 again.

2    A   I'm not trying to be combative. I don't

3 understand. You're saying you assume something.

4 What is it that you assume?

5    **Q  I'll re-ask the question, okay?**

6    MS. GETCHES: Ian, ask him what you want

7 to ask him. You can ask leading questions in

8 depositions.

9    MR. HICKS: I don't know who you think

10 you're talking to. You think I don't know that?

11    **Q  (BY MR. HICKS) Did you ever have --**

12    A   I'm sorry. Can you repeat --

13    **Q  Mr. Hinkelman, did you ever have a**

14 **conversation with Martin St. Pierre about Wally**

15 **Charnoff before this lawsuit was filed in July of**

16 **2019?**

17    A   Yes.

18    **Q  Okay. And what were those conversations**

19 **about?**

20    A   We had numerous conversations about life,

21 about family, about business, about when I worked

22 with Wally in 2015, et cetera.

23    **Q  I think we may be having a technical**

24 **issue, because my question was did you talk to**

25 **Martin St. Pierre about Wally any time before this**

1 **lawsuit, not when you talked to Wally. Did you**

2 **understand that?**

3    A   No, I never said I talked to Wally. I

4 said I talked to Martin many times -- he was a

5 friend, a colleague, an associate, a partner --

6 about many things. And, you know, I'm sure he knew

7 about me working with Wally on Investability and

8 Rent Range. We talked about a lot of things.

9    **Q  In any of those discussions, did you tell**

10 **him about an investment opportunity that you**

11 **learned through Wally?**

12    MR. WAGNER: Objection. Asked and

13 answered. Foundation.

14    A   Can you describe the investment

15 opportunity?

16    **Q  (BY MR. HICKS) Just do the best you can**

17 **with that. I don't know that I can make that**

18 **more specified.**

19    A   Wally -- Wally had a lot of ideas. Wally

20 had a lot of investment opportunities. Wally asked

21 me, confided in me, asked me for help, asked me for

22 advice, you know, promised me that if I helped him,

23 he would give me equity in numerous concepts and

24 even companies of his. So, you know, without a

25 specific -- I do not recall a specific conversation

1 with Martin Pierre (sic) about a specific company.

2    But if you want to let me know of the

3 specific idea, company, whatever was going on, I'm

4 happy to try to provide you with a more accurate

5 answer. But I don't recall anything specific, and

6 I really am struggling with what you're referring

7 to.

8    **Q  We'll come back to this.**

9    **What is the nature of your relationship**

10 **now with Martin St. Pierre? Are you guys friendly,**

11 **amicable, or do you not talk anymore?**

12    A   Very friendly, very amicable. I spoke to

13 him this morning. He asked me a question about his

14 business. I answered it.

15    **Q  And are you aware of any return on the**

16 **investment that ISP made in ArtPort?**

17    MR. WAGNER: Object to form.

18    MS. GETCHES: Join.

19    A   I'm aware of one payment of, you know --

20 to the best of my knowledge, Nancy handled running

21 the business. But I'm aware of one payment that

22 was made to the St. Pierres.

23    **Q  (BY MR. HICKS) Is that a $10,000**

24 **payment?**

25    A   I believe so.

1    **Q  I'm going to pull up a document real**

2 **quick, so just bear with me.**

3    **All right. Mr. Hinkelman, do you see the**

4 **document in front of you entitled Limited**

5 **Membership Investment Agreement?**

6    A   I do.

7    **Q  And what is the date on the second**

8 **sentence of this document, first page?**

9    A   January 31st, 2014.

10    **Q  And is -- on the first page of this**

11 **document, the bottom right, does it say**

12 **Loving 0586?**

13    A   It does.

14    **Q  And on the last page, does it say**

15 **Loving 0591 in the bottom right?**

16    A   It does.

17    **Q  Do you see two signatures?**

18    A   I do.

19    **Q  And they are the signatures of who?**

20    A   ISP Holdings and myself.

21    **Q  Do you recognize this document? And if**

22 **you want me to, I'm happy to scroll through it**

23 **slowly for you if you would like.**

24    A   Yes.

25    **Q  And what is this document?**

1  A   It was an investment agreement between
2  ISP Holdings and ArtPort.
3  **Q   And how much was invested?**
4  A   As a result of this investment agreement?
5  **Q   Yes.**
6  A   $500,000.
7  **Q   What conversations, if any, did you have**
8  **with Martin St. Pierre about this investment before**
9  **this document was signed?**
10  A   We had numerous conversations. I don't
11  recall exact ones, but we had numerous ones. It's
12  seven -- almost seven years ago.
13  **Q   What did you tell him about ArtPort as**
14  **far as what it did for business or things of that**
15  **nature?**
16  A   I don't recall the exact conversations.
17  **Q   Were there other investments in ArtPort**
18  **that you're aware of?**
19       MR. WAGNER:  Object to form.  Other than
20  what?
21       MR. HICKS:  This investment.
22       MR. WAGNER:  Object to form.
23  A   Other investments by --
24  **Q   (BY MR. HICKS)  Let me specify that for**
25  **you, Mr. Hinkelman.  Are you aware of any other**

1  **limited membership investment agreements other than**
2  **this one?**
3  A   No.
4  **Q   Were there any other investments in**
5  **ArtPort that you're aware of other than what's**
6  **reflected in this document or monies that you may**
7  **have put into ArtPort?**
8  A   Can you qualify "may have"?
9  **Q   Do you know of any other people who**
10  **provided money to ArtPort to obtain a greater**
11  **return than what they put in at any time?**
12  A   Okay.  Then, who is "they"?
13  **Q   Anyone who put money into it with that**
14  **expectation.**
15  A   I'm not clear.  You asked if I recall
16  anyone who put money into ArtPort.  ISP invested in
17  ArtPort.  I, over the years, put money into
18  ArtPort.
19  **Q   Okay.  Does ArtPort have any other**
20  **investors you're aware of?**
21  A   Any other investors?
22  **Q   Yes.**
23  A   No.  I'm sorry.  Nancy Loving was a
24  limited partner and invested time, et cetera.
25  **Q   Did you travel with Ms. Loving to**

1  **Colorado to meet with Wally about opening a**
2  **gallery?**
3  A   No.
4  **Q   Okay.  Did you meet with Wally and**
5  **Ms. Loving in Colorado at any time from 2015 --**
6  **January 1, 2015, to the present?**
7  A   Yes.
8  **Q   And tell me about those meetings.  When**
9  **they occurred and how many there were, first.**
10  A   I met with Wally -- from January 1 of '15
11  or January 1 of '16?
12  **Q   January 1 of '15.**
13  A   I probably traveled to Colorado 15 or 20
14  times during 2015 to meet with Wally, his team,
15  investors, et cetera.  Nancy traveled with me to
16  Colorado for holidays and visits with my family.
17  From 2016 forward -- I'm sorry.
18       In 2015, we did have a dinner with Wally,
19  Brande, Nancy, and I at a restaurant in downtown
20  Boulder, because Wally was looking for me to become
21  a partner in both Investability and Rent Range, and
22  then potentially working with him going forward.
23  The original context was that Wally would raise
24  capital and that I would help Wally raise capital
25  to grow Investability and Rent Range independently,

1  and that I would be a partner of his in that.
2       We were unable to complete two deals of
3  those, which one was with George Soros's company,
4  due to actions by Wally.  And one was another
5  company that I was not involved in the transaction,
6  but my understanding was that Wally and the
7  investors did not get along.
8       And after that -- and during that period
9  and during the time that I was working with
10  Wally -- and I don't remember the exact date --
11  Wally wanted to meet Nancy, and we all wanted to
12  look at making sure that if we move forward, that
13  everybody knew each other, because this was a very,
14  shall we say, life-changing opportunity.
15       I had been working for investment banks
16  and private equity for the last, at that point, 26
17  years.  I had a very high income.  I was very
18  successful and respected in the industry.  And I
19  was taking a large risk in my career to work with
20  Wally.  And so we wanted to make sure that
21  everybody knew each other.
22       So we had that dinner in 2015.  That was
23  when Nancy was with me in Boulder for a family
24  visit.
25  **Q   Did you and Nancy ever meet with Wally in**

1  Boulder to discuss Wally going into business with
2  Nancy?
3     MS. GETCHES:  Object to the --
4     THE REPORTER:  Sorry.  Excuse me just one
5  second.  Liza, I didn't -- I only got "Object to
6  the."  I didn't hear the rest of that.
7     MS. GETCHES:  Form.  Sorry about that.
8     THE REPORTER:  Thank you.
9   A   To the best of my knowledge, we only met
10  Wally and also Brande twice in Boulder.
11    Q   (BY MR. HICKS)  Did you ever have a
12  meeting with or dinner with Wally at Caprese
13  Trattoria in Longmont on January 1, 2015, forward?
14    A   Yes, I think that was the name of the
15  restaurant, and it was lunch.
16    Q   And what was the purpose of that lunch
17  meeting?
18    A   It was for -- I was out visiting Wally's
19  new office, and Nancy was out there with me for a
20  family visit, and we scheduled some time with
21  Brande and Wally to discuss -- I believe to discuss
22  Wally and Brande purchasing -- personally
23  purchasing some art, along with catching up,
24  family, friendly.  Wally kept me updated all the
25  time on what was going on with his children, with

1  his business, with his purchases.
2     Q   Was there any other meeting that you had
3  where Wally was present, Ms. Loving was present,
4  and you were present and a topic of discussion was
5  opening a gallery to sell art, to be funded by
6  Wally?
7     A   I don't recall those being -- that any
8  discussions happened in an actual meeting.
9     Q   Did you have discussions while physically
10  located in Colorado in the presence of Wally and
11  Ms. Loving about Wally opening a gallery to sell
12  art with Ms. Loving?
13    A   Again, the only times that I recall
14  Wally, Nancy, myself, and Brande meeting was in --
15  was for lunch and one other time.
16    THE DEPONENT:  I need to take a bathroom
17  break.  Can we --
18    MR. HICKS:  That's fine.
19    THE DEPONENT:  -- take 10 minutes?
20    MR. HICKS:  Let's take 15.
21    THE DEPONENT:  Okay.  Thank you.
22    MR. HICKS:  Thank you.
23    THE VIDEOGRAPHER:  Ian, can you take down
24  your exhibit so I can see the time?
25    MR. HICKS:  (Complied.)

1     THE VIDEOGRAPHER:  Thank you.  We are
2  going off the record.  The time is 2:12 p.m.
3     (Break was taken.)
4     THE VIDEOGRAPHER:  We're back on the
5  record.  The time is 2:35 p.m.
6     Q   (BY MR. HICKS)  Mr. Hinkelman, we just
7  got back from a break in your deposition, and we're
8  back on the record.
9         I wanted to go back to your time working
10  for Investability.  What was the total
11  compensation -- strike that.
12        What was the total value of any
13  compensation you received from Investability?
14    MR. WAGNER:  Object to form.
15    MS. GETCHES:  Object to the form.
16    A   Total value of any compensation was
17  500 -- approximately $500,000.
18    Q   (BY MR. HICKS)  And was part of that a
19  finder's fee?
20    A   All of that was a finder's fee.
21    Q   What about -- did you receive any money
22  into your IRA?
23    A   I received no money to my IRA from the
24  finder's fee or from compensation.
25    Q   Did your IRA receive anything of value as

1  a consequence of services performed for
2  Investability?
3     MS. GETCHES:  Object to the form.
4     A   No.
5     Q   (BY MR. HICKS)  So did you receive
6  something known as a return on investment as a
7  result of your work for Investability?
8     MS. GETCHES:  Object to the form.
9  Foundation.
10    MR. WAGNER:  Join.
11    A   Based on your question, no.
12    Q   (BY MR. HICKS)  Okay.  All right.  Did
13  you get any other money in any way as a result of
14  work you did with AltiSource -- I'm sorry -- with
15  Investability or Wally?
16    A   No.  Phrase the question properly.
17    Q   What's that?
18    A   I said -- no, that's fine.
19    Q   Just -- just -- I mean, I think that --
20  if there's something that you think I'm looking for
21  and -- by all means, please tell me.  Because my
22  understanding is you received a million dollars,
23  not $500,000.  And I don't know in what different
24  ways you received that.  But if you received more
25  than $500,000 and something more like a million

## Page 117

1 **dollars in total, please explain.**

2     A    Again, I -- I'm happy to, but if you

3 would ask the question that is relevant, I'm happy

4 to provide you with an answer.

5     **Q    I can't read your mind, Mr. Hinkelman,**

6 **with all due respect.**

7     A    No, but -- you know, I'm not trying to be

8 combative with you.  But I think you can -- you'll

9 understand from conversations with Wally and the

10 balance sheet and reading the -- the distribution

11 of capital from the sale of the company, okay, what

12 the difference is and where it came from.  And so

13 what you're doing is asking questions that are not

14 accurate.

15     **Q    Okay.  How are they not accurate?**

16     A    I'm sorry?

17     **Q    What is wrong with -- I'm just trying**

18 **to -- you know, let me phrase it like this.**

19         **Did you receive any shares or stock in**

20 **any company as a result of work for Investability?**

21     A    And -- all right.  The question is -- the

22 answer is no because of the context and how you are

23 answering -- asking the question.

24     **Q    Okay.  What does that mean?**

25     A    It means what I just said.

## Page 118

1     **Q    Do you have an IRA?**

2         **Did you hear me, Mr. Hinkelman?**

3     A    Yes, I do.  Yep, I have an IRA.

4     **Q    Okay.  Did that increase in value as a**

5 **result of Investability?**

6         MR. WAGNER:  Object to the form.

7     A    Okay.  So now -- we'll cut to the chase

8 and I'll make this easy for all of us.  I invested

9 in Investability.  I was not granted stock.  I was

10 not given stock.  I invested in Investability prior

11 to me joining the company.  I invested in

12 Investability while I was at the company.  If you

13 review the balance sheets of the company on a

14 week-by-week basis, the company was out of money.

15 I provided investments that helped the company

16 survive.

17         In exchange for those investments, I

18 received stock like every other investor that

19 invested in Investability, and there were others

20 that were part of Investability that received

21 grants and did not purchase stock.  I bought stock.

22 It was an investment.

23     **Q    (BY MR. HICKS)  So when I asked you five**

24 **minutes ago if you received a return on investment,**

25 **you didn't tell me that, okay?**

## Page 119

1     A    That's not how you asked the question.

2     **Q    Okay.  So you did -- did you receive a**

3 **return on investment from Investability?**

4     A    I received a return on investment of what

5 I invested in the company; that's correct.  But

6 that's not the question you asked.

7     **Q    Okay.  How much was that?**

8     A    I invested $300,000 over a period of

9 probably 45 days that came out of my IRA, and I

10 believe that my return on that was -- my gross

11 return on that money was approximately three times.

12 It was either two or three times.  I don't really

13 recall.  It was a good return, okay.

14         But there was a significant portion of

15 that return which still shows as an asset in my

16 IRA, which was $200,000, that was escrowed to help

17 support legal fees for Wally's case with Bob

18 Ladd.

19     **Q    Okay.  Have you received those escrow**

20 **funds back?**

21     A    No.  I never received those escrow funds

22 back.

23     **Q    What is your understanding as to whether**

24 **you will receive those escrow funds back in the**

25 **future?**

## Page 120

1     A    Well, the case was -- Wally lost in case

2 in 2017.  And sometime after that, he negotiated a

3 settlement with Bob Ladd, and that settlement did

4 not include reimbursing funds to the investors in

5 money that was escrowed.

6     **Q    Is it your understanding that there is a**

7 **judgment against Wally as a result of that lawsuit?**

8     A    Currently?

9     **Q    Yes.**

10     A    No.  I was not aware of that.

11     **Q    I ask because you mentioned that he lost**

12 **that lawsuit, and that's why I was asking you if**

13 **there was a judgment that you are aware of the**

14 **support that -- that statement that you made.**

15     A    Actually --

16         MR. WAGNER:  Object to form.  It

17 misstates prior testimony.

18     A    I'm not clear.  You made a statement, not

19 asking a question.

20     **Q    (BY MR. HICKS)  That's fine.  Did you**

21 **ever talk to Martin St. Pierre about investing in**

22 **Rent Range or Investability?**

23     A    I don't recall.

24     **Q    Was one of your functions or duties for**

25 **Investability obtaining investments?**

## Page 121

1  MS. GETCHES:  Object to the form.

2  A  No.

3  Q  (BY MR. HICKS)  Did you raise capital or

4  were you -- strike that.

5  Was one of your job duties for

6  Investability raising capital for the company?

7  A  I had arranged for the capital prior to

8  my going to work at Investability.  I actually had

9  two deals for capital.  One fell through due to an

10  event with Wally, but I had arranged for the

11  capital with AltiSource.  We started a process

12  prior to my joining the company.

13  Q  And why did you do that, as far as did

14  somebody, like, Wally requested that you raise the

15  capital, or was there some other reason?

16  A  Wally approached me after a couple of

17  meetings that we had in the fall of '14 -- in

18  either late '14 or early '15, as I stated, offered

19  me a job as president of the company.  I told him

20  that was not the right position for me.  He offered

21  me other positions.  And at that point, I said it

22  would be a lot easier if my company, Fortress,

23  invested in Investability, because I believed it

24  provided a potential solution for us and could have

25  a potential of being a good investment.

## Page 122

1  Q  Did Fortress invest in Investability?

2  A  No.

3  MR. HICKS:  I apologize.  I have to take

4  a one-minute break.  It's an emergency phone call,

5  so -- I apologize.  It's a process server on a --

6  THE VIDEOGRAPHER:  We're going off the

7  record the time is 2:46 p.m.

8  (Break taken.)

9  THE VIDEOGRAPHER:  We're back on the

10  record.  The time is 2:50 p.m.

11  Q  (BY MR. HICKS)  Mr. Hinkelman, we're back

12  on the record.  Thank you for that -- for letting

13  me take that short break for that call.

14  I wanted to ask you -- you mentioned

15  previously something about you had secured an

16  investment from George Soros, but it fell through

17  because of something Wally did.  Is that -- did

18  that happen?  Do I remember that right?

19  A  Correct.

20  Q  Just briefly -- it's not important,

21  super -- very much to this case, but what -- what

22  is it that Wally did?

23  A  Wally had a letter of intent from George

24  Soros with a private investor who happened to be --

25  I believe it was Josh Kushner, who is the brother

## Page 123

1  of President Trump's son-in-law, who owns private

2  equity fund in New York City, to invest a certain

3  amount of money -- I'm not sure what the exact was,

4  but I believe it was around $5 million -- into

5  Investability and Rent Range to complete the

6  development of the technology and bring it to

7  market.

8  Soros had gone to the point of sending a

9  banker -- one of their internal bankers out to

10  Wally's headquarters in Colorado to do what's

11  called due diligence on the company, look at the

12  company, look through the technology, financial

13  records, et cetera.  And we were proceeding towards

14  a -- a deal.

15  Wally came to New York and something

16  happened.  I don't have the full details.

17  Basically, it had to do with an action he received

18  from Bob Ladd, and he was extremely agitated by it.

19  There was an issue around -- it's a variety -- and

20  I'm sure you'll ask further questions that relate

21  to it, so we'll get to that later.  But Wally

22  became extremely agitated, anxious, stressed,

23  potentially use even the term depressed.  And I

24  left him that afternoon.

25  And the following morning, I met him

## Page 124

1  prior to the meeting with Soros, and he told me

2  that he had changed -- again, to the best of my

3  knowledge -- I don't know what the exact structure

4  was, the documents, et cetera, but that he had

5  changed the format -- something in the company that

6  he believed would protect Soros and their partners

7  in the investment.

8  I informed Wally at that point that that

9  was a bad idea, that before he did anything like

10  that, he should have consulted with his potential

11  new business partners and -- and then worked with

12  them on it.  He told me he had spent a few hours

13  either that evening or overnight working with one

14  of his attorneys.  Again, I have no idea of the

15  format, and I don't remember anything beyond that.

16  And I told him that I refused to go to the meeting,

17  that I would let him go into the meeting for the

18  first half hour alone and explain to them what --

19  what had happened, which he agreed to do.

20  I walked into the meeting a half an hour

21  after it had begun.  It was like walking into an

22  icebox.  I could tell that the investors were

23  extremely upset.  Wally and I left.  They pulled

24  the interest in the investment and informed me that

25  they thought that it was an irrational move and

1 decision and were not comfortable with the

2 investment and the management.

3    Q    Okay.  Were you consulted about the

4 settlement of the Ladd litigation at all by Wally

5 or any of his attorneys?

6    A    Could you repeat the question, please?

7    Q    Sure.  What I'm getting at is, before you

8 had mentioned in your deposition testimony about

9 how the settlement of the Ladd litigation with

10 Wally caused some of the funds that had been

11 escrowed that potentially would have gone to you --

12 that that settlement caused those funds to be lost.

13 Do you -- that's what I want to ask you about,

14 okay?

15    A    Consult -- go ahead.  I apologize.

16    Q    No worries.  So were you consulted about

17 the settlement of the Ladd litigation that affected

18 monies owed to you in the escrow fund?

19    A    I was not consulted.

20    Q    And about how much money was in the

21 escrow fund that you would have otherwise been

22 entitled to?

23    A    Two hundred thou -- approximately

24 $200,000.

25    Q    And when did you find out about the loss

1 of those funds?

2    A    Those funds were in an escrow account

3 that was shared by all of the investors, including

4 Wally.  I received an email, I don't remember when,

5 but it was probably a year after the -- the sale of

6 Investability that said, Gentlemen -- and again, I

7 don't remember the exact language of the email, but

8 it was sent to all of the investors.  Gentlemen, I

9 am informing you that the first tranche, which was

10 half of the money, has been used to pay legal

11 defenses and is gone.

12    Q    Was this 2018?  2019?  Do you recall?

13    A    Well, the decision on the case was on

14 October 20th, 2017.  So they had eaten through a

15 portion of the legal reserve, half of it, well

16 prior to that.  So I don't know the exact date.  In

17 2016.  2017.  I don't know the exact date.

18    Q    Did Nancy handle the operations of

19 ArtPort?

20    A    Yes.

21    Q    And what role did you have, if any, in

22 the operations of ArtPort?

23    A    Little to nothing.

24    Q    And I believe you mentioned earlier there

25 were some bookkeeping services.  Was it pretty much

1 limited to that?

2    A    I'm not clear what you're asking.

3    Q    What services did you provide -- I'm

4 sorry.

5        What involvement did you have with the

6 operations of ArtPort?  You said, "little to

7 nothing."  So if it's nothing, then it's zero.  But

8 if it's a little, then there's something you did,

9 and that's what I want to ask you about.  So that's

10 what I'm asking.

11    A    In the first couple of years, I took the

12 data from the bookkeeper and gave it to the tax

13 person, who then filed the taxes.

14    Q    And when did you stop having involvement

15 in that process?

16    A    I don't recall.

17    Q    I'm going to share a document with you.

18 Give me a second.

19    A    Sure.

20    Q    Do you see a document in front of you

21 that says "Exhibit B" and --

22    A    I do.

23    Q    Okay.  And it looks like at the top of

24 each page, there's a Case Number 1:19-CV-02381-MEH,

25 and it looks like Document 22-3.  Does that seem --

1 is that correct?

2    A    I do, yeah.

3    Q    All right.  So I am on the third page of

4 this PDF.  Does this appear to be a tax return

5 for -- under Form 1065 for 2016 for ArtPort, LLC?

6    A    It does.

7    Q    And do you see where it says "Sign Here"

8 at the bottom?

9    A    I do, yeah.

10    Q    Is that your signature?

11    A    It is.

12    Q    And did you prepare this tax return?

13    A    No.

14    Q    And is the preparer the guy at the

15 bottom, Eric P. Rothenberg, as far as you know?

16    A    It is.

17    Q    In what capacity did you sign this

18 document if you did not prepare it?

19    A    The capacity as a -- as a member of the

20 LLC.

21    Q    Are there any other tax returns

22 besides -- and again, I don't need to go into the

23 depth of it or anything like that, but have you

24 signed other tax returns for ArtPort?

25    A    Probably.  I'm not sure, but probably.

## Page 129

1    UNKNOWN SPEAKER: Time to take a break.
2    Q   (BY MR. HICKS)  Just going to pull up
3  another document real quick here.
4    All right.  Mr. Hinkelman, we are back,
5  and there's a document that's being shared.  The
6  title of the document itself, the file is
7  Exhibit 60, but it is the same Limited Membership
8  Investment Agreement.
9    A   Can we just take another quick 10-minute
10  break -- just a bio break for me, please?
11    MR. HICKS:  Okay.  So -- well, wait a
12  second.  Hold on.  I don't want to go off the
13  record yet.
14    MS. GETCHES:  Ian --
15    MR. HICKS:  I need to -- I need to
16  have -- okay.  I need -- this is important, and it
17  will just take a quick 20 seconds.  So just bear
18  with me.
19    Q   (BY MR. HICKS)  Mr. Hinkelman, are you in
20  communication with -- with anybody -- who is in the
21  room with you right now?
22    A   Am I what?
23    Q   Who is in the room with you right now?
24    A   No one.
25    Q   Okay.  Did somebody just say, Let's take

## Page 130

1  a bathroom break?
2    MS. GETCHES:  No.  There's -- there's a
3  woman on the phone that -- that said that, and I
4  don't know -- I was wondering if it's in the --
5  like, the videographer's room, or --
6    THE VIDEOGRAPHER:  No.
7    THE DEPONENT:  No.
8    MR. HICKS:  All right.  So that's why I
9  had to ask, David.  It would be --
10    THE DEPONENT:  Okay.  Hey, look.  If you
11  want it to be a three- or four-minute break, that's
12  fine.  It's not -- it's not anything else.
13    MR. HICKS:  That's fine.  I just wanted
14  to make sure.  The coincidence made me have to ask
15  the question.  Let's take a break.  Five minutes is
16  good.
17    THE DEPONENT:  Thanks.
18    THE VIDEOGRAPHER:  Ian, can you take the
19  exhibit down so I can see the time, please?
20    MR. HICKS:  Yes, ma'am.
21    THE VIDEOGRAPHER:  The time is 3:04.
22  We're going off the record.
23    (Break taken.)
24    THE VIDEOGRAPHER:  We're back on the
25  record.  The time is 3:11 p.m.

## Page 131

1    Q   (BY MR. HICKS)  Mr. Hinkelman, we are
2  back on the record, and I'm going to try to get
3  through some exhibits here so we can get out of
4  here sooner rather than later.  So let me go to the
5  share screen, and I'll be right back with you.
6    Okay.  This Limited Membership Investment
7  Agreement in front of you, this is Exhibit 60.  And
8  can you see this document?
9    A   I can.
10    Q   And it looks like -- what is your
11  understanding of how Art -- strike that.
12    Did this document give ISP Holdings,
13  Inc., an interest in ArtPort, or did it give it an
14  interest certain revenue from ArtPort?
15    MR. WAGNER:  Object to the form.
16  Foundation.
17    MS. GETCHES:  Join.
18    Q   (BY MR. HICKS)  Let me ask it this way.
19  We can just ask two questions instead of one.  So
20  disregard that prior question.
21    This Limited Membership Investment
22  Agreement, did that provide an interest in ArtPort
23  to ISP Holdings, Inc.?
24    MR. WAGNER:  Object to the form.
25  Foundation.

## Page 132

1    MS. GETCHES:  Same objections.
2    A   Do you have a -- kind of a line that
3  you're referring to in the document, Mr. Hicks?
4    Q   (BY MR. HICKS)  Okay.  All right.  So
5  this is page 2 of the PDF.  Do you see where it
6  says -- can you see where it says "Investment" at
7  the top?  I'll scroll down.  I'm next to Number 1.
8    A   I do.
9    Q   And under 1A, where it says, "Investor
10  hereby commits to make investments of up to," and
11  then it has some amounts.  Do you see that?
12    A   I do.
13    Q   I'm sorry.  I took this a little bit out
14  of order.  We're back on the first page of this
15  exhibit.  Do you see the second whereas clause on
16  this page, where it says, Whereas, investor wishes
17  to make an investment in ArtPort in exchange for a
18  percentage of ArtPort's --
19    A   It sounds like -- it sounds there's
20  somebody talking in the background.
21    Q   Yeah.
22    A   Okay.  Yes, there is.
23    Q   What was your understanding of how ISP
24  Holdings, Inc., was going to be receiving payment
25  under this agreement?

## Page 133

1    MR. WAGNER: Object to form.

2    MS. GETCHES: Object to foundation.

3    A   ISP Holdings was to receive a recoupment

4 of investments.

5    **Q   (BY MR. HICKS) And from -- and it was**

6 **from the percentage -- I'm sorry.**

7    **Was it to receive a recoupment of its**

8 **investment from the sale of Harold Garde's art?**

9    MR. WAGNER: Object to form. Foundation.

10    A   It was to receive a recoupment of

11 investment from activities at ArtPort, correct.

12    **Q   (BY MR. HICKS) So you did not understand**

13 **this agreement to actually provide a membership**

14 **interest in ArtPort to ISP Holdings, did you?**

15    MR. WAGNER: Object to the form.

16    MS. GETCHES: Join.

17    A   I understood that the agreement provided

18 a -- and I don't remember which was which, but one

19 was a special membership that converted into a

20 limited membership once the recoupment happened, or

21 a limited membership that turned into a special

22 membership once the recoupment happened, so -- but

23 they had no, what would be considered under an LLC

24 rules -- this was my understanding -- they had no

25 ownership of any LLC until the recoupment occurred.

## Page 134

1 And then at that point, they had the right to

2 receive -- I think it was approximately 17 percent

3 of net profit from ArtPort.

4    **Q   (BY MR. HICKS) And do you know if that**

5 **recoupment has occurred?**

6    A   I don't believe it has.

7    **Q   Mr. Hinkelman, did you happen to meet**

8 **with Wally at a storage unit in 2018 or 2019?**

9    A   Meet him where?

10    **Q   At a storage unit. At a place called**

11 **Westy's Storage.**

12    A   No, I didn't.

13    **Q   Do you know where Wally's art was stored**

14 **that he had purchased once he paid for it in 2017?**

15    MR. WAGNER: Object to the form.

16    A   I think you -- Nancy ran the operations

17 of the business. I think you would have to ask her

18 that.

19    **Q   (BY MR. HICKS) I'm going to share a**

20 **screen with you. Do you see on the screen in front**

21 **of you an email from -- it looks like from you --**

22    A   I do.

23    **Q   -- to Harold Garde? Okay.**

24    A   Yep.

25    **Q   And the date and time is August 1, 2019,**

## Page 135

1 **at 8:25 p.m.?**

2    A   I do.

3    **Q   All right. So did you write this email?**

4    A   I did.

5    **Q   Do you remember writing this email?**

6    A   I do.

7    **Q   And did you write this email in response**

8 **to Wally threatening to go to Harold Garde about**

9 **his dispute with ArtPort?**

10    A   I'm sorry. Could you repeat that,

11 please?

12    **Q   Sure. Why did you write this email?**

13 **What was the purpose of it?**

14    A   Could you repeat the question you had

15 before?

16    **Q   Sure. Did you write this email in**

17 **response to Wally threatening to go to Harold Garde**

18 **regarding his dispute with ArtPort?**

19    A   No.

20    **Q   Why did you write this email?**

21    A   I wrote this email after Wally had filed

22 a lawsuit and served the Gardes, including a

23 96-year-old man, and I wrote it to the Gardes as an

24 overview of what I believed had happened and what

25 we were dealing with.

## Page 136

1    **Q   All right. So I want you to focus on the**

2 **second sentence that ends with "tortious**

3 **interference" in the first paragraph. Do you see**

4 **that?**

5    A   Correct. Yes, I see it.

6    **Q   And what did you mean by that sentence?**

7    A   I meant exactly what it says.

8    **Q   And was it your belief that the inclusion**

9 **of Studio -- Studio 41 in this lawsuit was tortious**

10 **interference?**

11    A   Wally had threatened us with bringing

12 Harold Garde and Studio 41 into the discussion,

13 calling him, et cetera, early on in the

14 negotiations based on if we did not give him what

15 he wanted, which was outside of the scope of the

16 agreement. And my understanding of when I looked

17 up the term of that, beyond, I guess, blackmail or

18 extortion, was tortious interference. Interfering

19 in the company.

20    I'm not a lawyer, et cetera. I just

21 Googled it, and that's what came up that seemed to

22 be relevant. So, again, I'm not an attorney. I

23 wrote it with what was my kind of belief of what

24 that process would entail.

25    **Q   If you go down to the fourth paragraph --**

## Page 137

1  let's focus on that now. In that first sentence,
2  it says, "Though we do not take this lightly and
3  will defend aggressively, we are dealing with a
4  deeply troubled person." Do you see that?
5      A   I do.
6      Q   And what was the factual basis for that
7  statement that he was a deeply troubled person when
8  you wrote this email?
9      A   Wally --
10      MS. GETCHES:  Object to the form.
11      A   Wally made numerous statements to me over
12  the years that he suffered from sadness, anxiety,
13  stress, depression.
14      Q   (BY MR. HICKS)  And in the second
15  sentence, it says, Since we sold him the initial
16  collection of your work in 2016, he has been in and
17  out of treatment for mental and emotional issues,
18  lost a major lawsuit over the last company he
19  founded and sold (which we were investors in and
20  financially and personally impacted by his
21  misrepresentations that we uncovered a few weeks
22  ago), filed for bankruptcy and is suing a
23  contractor that renovated his home. Most of this
24  has developed or been made to us -- made known to
25  us this year.

## Page 138

1      So I just want to ask you about some of
2  those statements.
3      MR. WAGNER:  I don't mean to interrupt,
4  but Liza appears to have dropped off.
5      THE VIDEOGRAPHER:  Do you want to go off
6  the record?
7      MR. WAGNER:  I think we have to, yes.
8      THE VIDEOGRAPHER:  Okay. I need the
9  exhibit down, please. We're going off the record.
10  The time is 3:25 p.m.
11      (Break taken.)
12      THE VIDEOGRAPHER:  We're back on the
13  record. The time is 3:39 p.m.
14      Q   (BY MR. HICKS)  Mr. Hinkelman, I'm going
15  to share this email with you again. Do you see
16  this email we were discussing prior to going on
17  break, Exhibit 50, the August 1, 2019, email from
18  you to Harold Garde and other people in front of
19  you?
20      A   I do.
21      Q   Yes?
22      A   I do, yes.
23      Q   Okay. Sorry. I couldn't hear you. And
24  in the fourth paragraph after -- in the second
25  sentence after the dash, it says, "He has been in

## Page 139

1  and out of treatment for mental and emotional
2  issues." That statement right there, what is the
3  factual basis for that statement when you made it?
4      A   Wally had told me that due to the series
5  of maladies that we spoke about before --
6  depression, anxiety, sadness, stress -- that on two
7  separate occasions, he talked about the medications
8  he was on and that his doctor, psychiatrist,
9  whoever it was, changed the medications, which
10  means that he had to be in treatment.
11      Q   Well, was he -- do you recall what those
12  medications were?
13      A   I remember one of them. I don't recall
14  exactly what they all were. I remember one of them
15  was an antidepressant.
16      Q   Has -- strike that.
17      Was Wally in therapy or had he been in
18  therapy for psychological issues before you sent
19  this email?
20      MR. WAGNER:  Object to form. Foundation.
21      A   To the best of my knowledge, he was. If
22  you are receiving any of those medications, they
23  would come from a psychiatrist or a therapist.
24  They usually work in conjunction.
25      Q   (BY MR. HICKS)  And when you say, "those

## Page 140

1  medications," you're referring to antidepressants?
2      A   Antidepressants, anti-anxiety, sleeping
3  medications, anti-stress, any of them. I don't
4  know exactly what -- the cocktail he was on, but he
5  mentioned those different issues he had over time.
6  He also went to Canyon Ranch a couple times, he
7  said. He went down there for stress and treatment,
8  but I don't know what the exact purpose of those
9  were.
10      Q   So is there any other facts upon which
11  you base the statement that he has been in and out
12  of treatment for mental and emotional issues?
13      A   Beyond the fact that he told me that he
14  is on those medications and that those medications
15  had impacted him, no.
16      Q   Okay. And to be clear, those
17  medications to treat psychological conditions; is
18  that your testimony?
19      A   Correct, mental and emotional.
20      Q   And then it says, "lost a major lawsuit
21  over the last company he founded and sold." And
22  what was the factual basis for that statement?
23      A   I think -- again, I'm not looking to be
24  combative. I think you know the answer to that.
25  Wally had been sued by Bob Ladd. He continued to

Page 141

1 represent to myself and, I believe, other investors
2 that that suit was baseless. I am, to the best of
3 my knowledge, fairly sure he represented to
4 AltiSource that that suit was baseless.
5      And that -- on October 20th of 2017, I
6 received a text from Wally. I knew that he was
7 receiving a verdict on that case that day, and that
8 text says, Bob won. I then asked him, How bad?
9 And he replied at 8:20, He won 1.6 million, plus a
10 prejudgment, plus securities violation, plus legal
11 fees. And then he sent me another text that said,
12 It will probably equal 2.5 million.
13      **Q    That was in 2017?**
14      A    That was October 20th of 2017.
15      **Q    And this email was sent --**
16      A    You would have to pull it up. It's a
17 text. You have all of the texts. I believe we
18 sent them to you.
19      **Q    Okay. And this is dated August 1, 2019,**
20 **right, this exhibit in front of you?**
21      A    Correct.
22      **Q    After the word "sold" in this fourth**
23 **paragraph, it says, in parenthesis, "which we were**
24 **investors in and were financially and personally**
25 **impacted by his misrepresentations that we**

Page 142

1 **uncovered a few weeks ago," closed parenthesis.**
2 **What was the factual basis for that statement when**
3 **you sent this email?**
4      A    Once Wally had filed the lawsuit, I began
5 to dig into emails, texts, financial records. I
6 pulled up the closing docs from the Rent Range
7 Investability sale. And in that, Wally had
8 represented to me -- and again, we talked about
9 this case a lot. As you may recall, I was asked by
10 Wally to fly out to Denver. He told me he would
11 reimburse me for expenses, but he never did
12 personally, to do a deposition interview with his
13 two lawyers. I -- I don't recall their names.
14 And -- which I did that, and they chose not to use
15 it because they felt that it wouldn't be helpful to
16 Wally.
17      And I went through everything. And in
18 that, Wally had consistently represented to all of
19 us that the case was baseless, that Ladd did not
20 have a case, that Ladd had mislead him, et cetera.
21 That -- that night -- actually it was probably the
22 next day, Wally and I spoke on the phone, and Wally
23 told me that he thought the judge had treated him
24 unfairly and had actually done something that
25 potentially would cause -- what is it when -- a

Page 143

1 mistrial. And then he said, We plan to appeal.
2      I don't remember when is the next time I
3 talked to him, but there was a gap. And he later
4 told me that he had decided not to appeal and that
5 they had settled. He told me he had to file for
6 bankruptcy, and that he had then settled at some
7 point with Ladd. And I said to him, Does that mean
8 at this point all of the legal funds are gone,
9 and -- and there will be no recovery from what we
10 had escrowed to help you pay the expenses for this
11 case that you had guaranteed me were baseless?
12      **Q    Well, so he had guaranteed that the suit**
13 **was baseless or guaranteed a particular result of**
14 **the lawsuit?**
15      A    I'm sorry. He guaranteed what?
16      **Q    You said he guaranteed the lawsuit -- the**
17 **Ladd lawsuit was baseless?**
18      A    Yeah. I believe he -- and again, to the
19 best of my knowledge, to myself, to colleagues,
20 employees, investors, including the company that
21 bought his company, he represented to all of them
22 that the suit was baseless, that it was worth
23 fighting, and that he would win the suit, instead
24 of attempting --
25      THE REPORTER: You kind of cut out just a

Page 144

1 little bit there, Mr. Hinkelman. I'll just read
2 part of your last -- where you kind of cut out in
3 the middle.
4      (The last answer was read.)
5      ". . . he represented to all of them that
6 the suit was baseless, that it was worth fighting,
7 and that he would then sue (sic), instead of
8 attempting," and then you kind of cut out on my
9 end.
10      THE DEPONENT: I didn't "sue." I said
11 that he would continue with the suit, on defending
12 the suit versus settlement.
13      **Q    (BY MR. HICKS) Do you all know what**
14 **ultimately happened with that lawsuit? I think you**
15 **testified earlier that it had been settled, but are**
16 **you aware of what happened ultimately?**
17      A    All I know that is that he told me that
18 he settled with Bob Ladd. But he had told me he
19 lost the lawsuit.
20      **Q    I'm going to share an exhibit with you.**
21 **Give me a minute.**
22      **All right. Mr. Hinkelman, do you see a**
23 **court -- a document in front of you that has a**
24 **case number of 2015-CV-33785?**
25      A    I do.

1    **Q    Okay.  And is the title of this document**
2    **Order to Vacate the Jury Verdicts and Judgments and**
3    **to Dismiss the Action with Prejudice?**
4    A    I do.
5    **Q    And is the issue date on this order**
6    **1/30/2019?**
7    A    It is.
8    **Q    All right.  So have you seen this**
9    **document before?**
10   A    No, I have not.
11   **Q    All right.  I will represent to you this**
12   **is a signed court order in the Ladd litigation.**
13   **And it vacated the jury verdict and declared it**
14   **null and void ab initio.  Do you see the plaintiff**
15   **up here where it says, Ladd 2000 Partners, Ltd.?**
16   A    I do.
17   **Q    Do you know what ab initio means?**
18   A    Do I know what what means?
19   **Q    Void ab initio.**
20   A    No.
21   **Q    And we're back at this email, Exhibit 50,**
22   **the August 1, 2019, email from you to Harold and**
23   **others.**
24   A    Yeah.
25   **Q    Do you see in the fifth paragraph it**

1    **says -- or you say, "He is highly unpredictable,"**
2    **in reference to Wally?**
3    A    Yep.
4    **Q    And did you believe that to be true at**
5    **the time you sent this email?**
6    A    Can I ask you one question, first?  Was
7    that document part of the public record?
8    **Q    I believe so, but I -- your attorney will**
9    **have to more clearly --**
10   MS. GETCHES:  David, you don't need to --
11   you don't need to ask questions, David.  It's Ian's
12   turn to ask questions.
13   THE DEPONENT:  All right.  Thanks.
14   A    Yes, I see that paragraph.
15   **Q    (BY MR. HICKS)  Did you believe that to**
16   **be true when you sent this email?**
17   A    Yes, I did.
18   **Q    And do you still believe that Wally is**
19   **highly unpredictable?**
20   A    Absolutely.
21   **Q    And what is your factual basis for that**
22   **belief?**
23   A    We'll, I've known Wally now for six
24   years.  I've seen, and I believe his colleagues,
25   maybe even his family, his business people, his

1    friends have seen a -- a -- basically what we'll
2    consider a waffling behavior; changes his mind,
3    provides different information.  If you read
4    through the text conversations we had, some of the
5    email conversations, he would one day make one
6    statement, and come back a few days later, make
7    another statement, or a month later, et cetera.
8    I always worked with Wally, though, and
9    his colleagues, his friends, his family will tell
10   you that he always considered me like kind of like
11   an older brother.  I was one of the few people that
12   did not take his behavior and hold it against him.
13   I always worked with him, treated him like -- you
14   know, with respect.  I always made sure that he had
15   the support he needed.  I was a true friend.
16   And even when I saw this, I saw his
17   behavior, changing his mind -- so this was to the
18   best of my knowledge and my opinion, but it is --
19   it's what my experience of working with Wally
20   was.
21   **Q    When did you come to believe that he was**
22   **highly unpredictable?**
23   A    I'm sorry to laugh, Mr. Hicks.  I think
24   the first time I saw it was in the -- sometime in
25   the winter of 2015 when we were beginning to see

1    investors, including the company that I work for,
2    which I think they would be happy to corroborate.
3    **Q    What company is that?**
4    A    Fortress.
5    **Q    So after that time period in the winter**
6    **of 2015, you worked with Wally, and you received,**
7    **in total, a million dollars or more from him and**
8    **continued to talk with him in a professional**
9    **capacity; is that correct?**
10   A    All but that I received a million dollars
11   or more from him.
12   **Q    You received an approximately $500,000**
13   **finder's fee from Investability, correct?**
14   A    Correct.
15   **Q    And you received a return on an**
16   **investment you had made in Investability, which**
17   **Wally had brought to you, presented to you, that**
18   **was at least a couple hundred thousand dollars,**
19   **correct?**
20   A    Correct.  And part of that, though, was
21   Wally asking for help just to keep his company
22   alive.
23   **Q    So both you and Wally benefited from your**
24   **investment in Investability, right?**
25   A    Yes, we did.

## Page 149

1  Q   And do you recall meeting with Wally and
2  Nancy in Boulder or maybe Longmont about Wally and
3  Nancy going into business?
4     A   I met with Wally in Longmont to discuss
5  an offer he had made me to work with his company,
6  Vozillo, and then we went and met Nancy for lunch,
7  where Wally had been discussing with Nancy a
8  variety of things, and I don't recall what the
9  exact issues were or components.
10    Q   So did Nancy discuss at that lunch
11 selling art that she had already sold to Wally and
12 splitting the profit with him?
13    A   I don't recall, to the best of my
14 knowledge.
15    Q   Did Nancy get extremely upset at you and
16 raise her voice and make a scene because of
17 something Wally had done at the restaurant?
18    A   I don't recall.
19    Q   Do you recall Ms. Loving being physical
20 with you in the parking lot because she was upset
21 that the opportunity you had told her about with
22 Wally, he didn't want to follow through on it?
23    A   I -- I don't recall that at all.
24    Q   Was there ever any offers or
25 solicitations by ArtPort to Wally for Wally to do

## Page 150

1  some consulting work for ArtPort?
2        MS. GETCHES:  Objection.  Foundation.
3     A   I think you would have to ask ArtPort
4  that question.
5     Q   (BY MR. HICKS)  But you're not aware of
6  any negotiations between Wally and Ms. Loving to go
7  into business together?
8     A   Not that I recall, to the best of my
9  knowledge.  I know they had a lot of discussions.
10    Q   Okay.  If you go to the second paragraph
11 from the bottom, will you just read that paragraph
12 that begins with, This made a turn for the worse.
13 Just let me know when you're done.  You can read it
14 to yourself, please.
15    A   Okay.
16    Q   And is -- that paragraph, the second from
17 the bottom, is that based -- when it was written,
18 was that based upon your personal knowledge?
19        MS. GETCHES:  Object to the form.
20    A   It was based on personal knowledge,
21 conversations with Wally, and once the suit was
22 filed, conversations with Nancy and ArtPort.
23    Q   (BY MR. HICKS)  Were you involved in
24 communications between Ms. Loving and Wally in the
25 first half of 2019 about the delivery of his art to

## Page 151

1  Colorado?
2     A   I was involved in the communications with
3  Wally and Nancy about the delivery of the art post
4  our meeting in Longmont in April of 2019.  Wally
5  included me on texts that he was sending to Nancy.
6     Q   Did you write emails for Nancy to send to
7  Wally that would --
8     A   Did I write emails for Nancy?
9     Q   Yes, for Ms. Loving, sorry, in order to
10 give her guidance to send to Wally.
11    A   Not that I recall, to the best of my
12 knowledge.
13    Q   Just give me one second.  I've got to
14 pull this -- stop sharing, and I'll -- I'm going to
15 look at a couple of documents.  We're getting close
16 to the end here.  Bear with me.
17        Okay.  Mr. Hinkelman, I'm sharing a
18 document with you.  And this looks to be an email
19 from you to Nancy Loving on May 30th, 2019, at
20 11:24 a.m.  Do you see this document in front of
21 you?
22    A   I do.
23    Q   And the bottom -- the page number is
24 Loving 2116 in the bottom right, correct?
25    A   Yep, I see that.

## Page 152

1     Q   All right.  And the first sentence says,
2  "Please review and discuss with me before sending,"
3  correct?
4     A   Yep, I see that.
5     Q   Okay.  And what was the purpose of this
6  email from you to Ms. Loving?
7     A   Let me take a minute and read it.
8     Q   Take your time.  And let me know when you
9  need me to scroll down.
10    A   I believe this was in response to a
11 discussion we had and Nancy putting together an
12 email to basically respond -- at this point, you
13 had been brought into the process.  Wally
14 continually told us that he was going to see his
15 counsel.  And then after he would see you, he would
16 threaten.  And then after that, he would apologize.
17 And then he would go back and forth.
18        So I believe this was -- if I read
19 through all of these, these would be questions that
20 Nancy had put in and that I went through with her.
21 And then -- and then I put the last line in because
22 I knew how litigious and dangerous Wally could be
23 when he began to threaten someone and would
24 basically convert from -- in what I learned from
25 the last suit, a position of believing what

Page 153

1 was true, whether it was or not.

2 **Q So is it a fair statement that you**

3 **basically helped Ms. Loving draft a response to**

4 **Wally regarding --**

5 A I believe, to the best of my knowledge,

6 that Ms. Loving or ArtPort drafted all of the

7 responses with the exception of me helping her

8 understand a couple of components, which may have

9 been in the last paragraph.

10 **Q So at the top of the page, where it says,**

11 **Please review and then discuss with me before**

12 **sending, why would Ms. Loving need to discuss with**

13 **you before sending?**

14 A Probably because, as I said, she had sent

15 it to me and gone through it. And then I had made,

16 you know, possibly -- and again, I don't recall why

17 we did this, where we did this -- it was over a

18 year ago -- where it happened. It was a very

19 difficult time. Someone who I thought was a friend

20 and I had worked with and supported for years

21 turned on us, and as a result, trying to help

22 define it.

23 But I assume Nancy sent it to me and

24 said, What do you think? Again, I don't know. I

25 don't recall exactly what the format was and what

Page 154

1 we did.

2 **Q Did you believe that the statements in**

3 **this email were factually correct on May 30th,**

4 **2019?**

5 A Do you want to go through all the

6 statements?

7 **Q No, I don't want to -- unless you want**

8 **to, I don't think we need to do that. But you have**

9 **no -- let me ask you a different way.**

10 **Do you have any reason to believe that**

11 **there are factual inaccuracies in this email?**

12 A Factual inaccuracies?

13 **Q Correct.**

14 A No. But I don't know. Again, if you

15 want to go through it line by line and paragraph by

16 paragraph, I'm happy to do that. But from what

17 I've read quickly, I don't believe there's any

18 factual inaccuracies.

19 **Q Okay. Do you see a document in front of**

20 **you that is an email to you from Ms. Loving on**

21 **May 7th, 2019, at 10:28 p.m.?**

22 A I do. I do.

23 **Q And is the page number Loving 2110 at the**

24 **bottom right?**

25 A I'm sorry. Can you just scroll the other

Page 155

1 way a little bit?

2 **Q Sure.**

3 A Hold on. Okay. So scroll down.

4 Okay. What's your question?

5 **Q I'm just identifying it for the record at**

6 **the moment. Is the page number Loving 2110 at the**

7 **bottom right?**

8 A Yeah, it is.

9 **Q All right. At the top -- so this is an**

10 **email from you to Ms. Loving, correct?**

11 A Correct.

12 **Q All right. And it says at the top, "His**

13 **spreadsheet does not include the gifts. We will**

14 **take legal action. He has gone insane." Those are**

15 **your words?**

16 A Yeah.

17 **Q What was the significance of the**

18 **spreadsheet not including the gifts?**

19 A I can't see the spreadsheet. Do you want

20 to pull it up?

21 **Q It's a subsequent exhibit. Is there --**

22 **if you look down at his email at the bottom, it**

23 **looks like -- well, sorry. Go up just a little**

24 **bit.**

25 **Nancy -- it looks like she forwarded you**

Page 156

1 an email on May 7th, 2019, at 9:39 p.m., where he

2 mentions free gifts. There's a spreadsheet

3 attached, and you're saying it did not include the

4 gifts. Is that how you understand this email?

5 A No. The email came from Wally to Nancy,

6 and it was just Wally forwarded it. She didn't

7 forward it to me. Both of us were on the email

8 from Wally.

9 **Q Okay. When it says, We will take legal**

10 **action, what were -- what were you referring to?**

11 A Well, at that point, Wally had already

12 started to threaten Nancy. And when I looked at

13 a -- a -- a -- to the best of my recollection,

14 again, I don't see the spread --

15 (Unidentified person talking in the

16 background.)

17 THE DEPONENT: Hello. Who's talking?

18 A Okay. So to the -- to the -- I don't see

19 the spreadsheet, so I don't know what the reference

20 was there. But I would not say we will take legal

21 action unless it was based on looking at and

22 discussing with Nancy. And then on the, he has

23 gone insane, that was my opinion. That was my

24 opinion, and to the best of my belief at that time,

25 that Wally was acting irrationally.

## Page 157

1    Q    (BY MR. HICKS)  All right.  And there's a
2    document in front of you that is an email from you
3    to Ms. Loving, it looks like, dated May 28th, 2019,
4    at 7:52 p.m.  Do you see this document in front of
5    you?
6    A    Yeah.
7    Q    And is the page number at the bottom
8    right Loving 2100?
9    A    Correct.
10   Q    All right.  And the subject is Changes in
11   parentheses, correct?
12   A    Changes in parentheses, correct.
13   Q    And at the top, it looks like it says, To
14   Wally.  Please review.  And is that from you to
15   Ms. Loving?
16   A    No.  I don't know if it was to me, to
17   Ms. Loving or ArtPort, or if it was from ArtPort to
18   me, and asking me to review and -- and go over it
19   with her.  We were trying to avoid lawyers to be
20   involved as much as possible.  And so Nancy -- I
21   mean, I assume.  I really don't recall.  Nancy
22   probably asked me to just review the document.
23   Q    And did you review the document and
24   provide feedback?
25   A    Well, I said in there, Changes in

## Page 158

1    parentheses.  So I assume I reviewed the document
2    and provided the feedback.  Again, I don't recall,
3    but based on what it's showing me, that's what I
4    think would be a fair assumption.
5    Q    Mr. Hinkelman, do you see an email in
6    front of you that appears to be from you to
7    Ms. Loving, dated May 15th, 2019, at 2:50 p.m.?
8    A    I do.
9    Q    And if you -- and this page, on the
10   bottom right, it has a page number of Loving 2130,
11   correct?
12   A    Yes, I do.
13   Q    And do you see a forwarded email about
14   four inches down the page that appears to be from
15   you to Ms. Loving on May 7th, 2019, at 1:19 p.m.?
16   A    I do.
17   Q    All right.  Does it say, "Such a liar.
18   Let him hire a litigator.  I will go after him for
19   the 200K and more"?
20   A    Yes, I do.
21   Q    And what is that in reference to, that
22   statement?
23   A    Can you scroll up and let's look at the
24   bottom of the email?
25   Q    Sure.

## Page 159

1    A    You have to deal with ArtPort on most of
2    this and go through it, but since we've been
3    talking about this -- again, I had very little
4    involvement.  All I understood was that -- and from
5    the conversations I had with Nancy, was that there
6    was not factual evidence to much of what Wally was
7    saying.
8         So based on that, she probably -- again,
9    I don't know.  I don't want to make assumptions.
10   But the statement of, Let him hire a litigator, he
11   was going back and forth with threatening, and it
12   appeared that he would come out, get very
13   aggressive, change his mind, go back and see you,
14   which I assume you're the litigator, come back out,
15   get aggressive again.  And on the 200K, I had left
16   it alone.  I completely left it alone.  It was -- I
17   felt like it wasn't worth it to enter -- because of
18   how litigious Wally has been, that it wasn't worth
19   it to enter into those battles with him.  Just go
20   on with my life.  Take the hit.
21   Q    So is the 200K -- is that in reference to
22   the Ladd lawsuit, that escrow fund that we talked
23   about earlier?
24   A    It is.
25   Q    I'm asking because, to confirm, it's not

## Page 160

1    something -- 200K in this lawsuit here, that you're
2    referring to 200K from some other transaction or
3    event, like the Ladd lawsuit.
4    A    I never mentioned the lawsuit.  I said I
5    would go after him for the 200K.
6    Q    Okay.  And the 200K relates to the Ladd
7    litigation, right?
8    A    Correct.  The 200K relates to money of
9    mine that was put in escrow to help pay Wally's
10   legal bills for a case that he guaranteed was
11   baseless and frivolous, and that would be
12   dismissed, and he would win, and that there would
13   be -- and even after the first tranche of money was
14   taken and used by Wally and his lawyers to defend
15   the case -- which, again, was not just mine; it was
16   numerous other folks -- that I was still assured
17   that not only would there be -- you know, that he
18   would win the case, and we would go from there.
19   And I just always left it alone.
20        Yes, I was upset with it.  I still stayed
21   friends with him.  I shared with him that I wasn't
22   happy with the results.  He -- he went and he
23   worked with, you know -- with me in numerous
24   capacities, advisory roles.  He asked me to get
25   involved in his new company.  We still continued to

Page 161

1  be friends, colleagues, and we still continued to
2  work together.  It wasn't until I'm now dealing
3  with a situation that I consider personally
4  frivolous and baseless.
5      Q    All right.  Do you recall, Mr. Hinkelman,
6  in the spring or summer of 2019, negotiations
7  between ArtPort and Wally regarding an alleged
8  accounting error of $5,000 as being one of the
9  points of dispute?
10     A    I know that ArtPort and Wally had a lot
11 of conversations.  I do know that at one point
12 Nancy mentioned the $5,000 to me, but I don't
13 remember if it was part of negotiations or it was
14 much later when we entered into the lawsuit and the
15 counterclaims.  I don't recall when, you know, that
16 was mentioned.
17     Q    All right.  If ArtPort is -- who would
18 have -- strike that.  Let me rephrase.
19          Would you defer to ArtPort as to its
20 recollection of what happened regarding that $5,000
21 dispute?
22     A    Yeah.  I mean, I -- again, I would defer
23 to Nancy and the conversations she had directly
24 with Wally.  I mean, I -- I -- you know, I'm not
25 sure -- I don't really recall or remember her

Page 162

1  involving me in that conversation beyond at some
2  point letting me know that it was an issue.  And
3  again, as I said, I don't remember if that occurred
4  prior to the -- the filing of the suit or after the
5  filing of the suit.
6      Q    The reason I ask, Mr. Hinkelman, is we
7  went over some of these issues with -- or I went
8  over some of these issues with Ms. Loving on Monday
9  in her personal deposition, and ArtPort yesterday
10 in its deposition in its corporate capacity, and I
11 don't want to have to ask the same questions with
12 you for now a third time.  It seems like today you
13 pretty well stated that operations were pretty much
14 handled by Ms. Loving and ArtPort, so that's why
15 I'm asking those questions.  So does that make
16 sense?
17          MR. WAGNER:  Object to the form.
18          MS. GETCHES:  Join.
19     A    So you're -- again --
20     Q    (BY MR. HICKS)  Let me ask you this.  Do
21 you have any reason to believe that any testimony
22 given by Ms. Loving was inaccurate in regards to
23 her dealings with Wally Charnoff?
24     A    That the testimony provided over the last
25 couple of days?

Page 163

1      Q    Correct.
2      A    I didn't listen to either deposition.  I
3  wasn't involved, and so I really have no knowledge.
4      Q    And was it your idea to add a $5,000
5  accounting error as part of the outstanding balance
6  owed -- or allegedly owed by Wally as a condition
7  to shipping of art?
8      A    Again, I don't recall the conversations
9  that we had.  There were a lot of them with what we
10 used for local counsel in Colorado before we hired
11 Nancy, between Nancy and I, et cetera.
12          MR. HICKS:  Let's take a five-minute
13 break.  I could be done.  I just want to check a
14 couple of things.  Go off the record.
15          THE VIDEOGRAPHER:  We're going off the
16 record.  The time is 4:28 p.m.
17          (Break taken.)
18          THE VIDEOGRAPHER:  We're back on the
19 record.  The time is 4:44 p.m.
20     Q    (BY MR. HICKS)  Hello, Mr. Hinkelman.
21 We're getting close to the end here.  I've just got
22 a few more things.  Thank you for bearing with me
23 today.
24          I wanted to go back to the time period of
25 Wally's initial contact with ArtPort.  Did you talk

Page 164

1  to Wally in 2015 or 2016 about making a purchase of
2  art at ArtPort?
3      A    Again, I spoke to Wally about a lot of
4  things, especially in 2015 and 2016.  And, you
5  know, personal business.  I'm sure we discussed
6  ArtPort at some point.  I'm sure we discussed art,
7  children, cars, everything.
8      Q    Did -- you made the introduction between
9  Wally and Ms. Loving; is that correct?
10     A    I did.
11     Q    And did you tell Wally that Ms. Loving
12 needed a large purchase of art in order to maintain
13 her agreement representing Harold Garde?
14     A    I have no rellection (sic) --
15 recollection of that conversation.
16     Q    What about -- do you recall telling
17 something -- sorry -- telling Wally something like,
18 it's time to return the favor and purchase art from
19 ArtPort?
20     A    I -- I have no recollection of that, and
21 I don't think I would have ever used a statement
22 with him like it's time to return a favor.  But I
23 have no recollection.
24     Q    And you live with Ms. Loving.  You've had
25 some involvement, at least, with ArtPort.  How

1 **successful has that business been since its**
2 **creation?**
3     MR. WAGNER:  Object to form.  Foundation.
4     A    Well, could you define success?
5     **Q    (BY MR. HICKS)  Has it made a profit?**
6     A    It has not made a profit.  It's putting
7 Harold's work in major museums, shows, fairs, and
8 in the hands of some significant collectors, but it
9 has not made a profit.
10    **Q    And is it a for-profit business or a**
11 **nonprofit business?**
12    A    It's a for-profit.
13    **Q    And to what do you attribute, if**
14 **anything, ArtPort's failure to turn a profit?**
15        MR. WAGNER:  Object to the form.
16 Foundation.
17    A    I mean, I don't think that I would
18 classify it as a failure to return a profit.
19    **Q    (BY MR. HICKS)  And I -- Mr. Hinkelman, I**
20 **did not use the word failure to return a profit, at**
21 **least in that question.  So let me ask this a**
22 **slightly different way.**
23        **ArtPort has not returned a profit, and I**
24 **am asking you what do you believe the reason for**
25 **that is?**

1        MS. GETCHES:  Object to the form.
2 Foundation.
3        MR. WAGNER:  Join as to form.
4     A    Well, again, I'm not an art expert.  I
5 represent a lot of early stage fintech companies
6 that don't return profits for three, four, five
7 years and have raised millions and millions of
8 dollars.
9        ArtPort's goal was to elevate Harold
10 Garde's work to a level that it brought in new
11 museums, new collectors, basically archive the
12 work.  That was the original goal, and Nancy has
13 achieved a lot of that.
14        The ArtPort gallery that she ran in
15 Piermont, New York, was on the verge of becoming
16 profitable.  And I believe due to -- it severely
17 impacted her.
18        THE REPORTER:  I'm sorry.  You cut out
19 kind of in the middle of that.  "And I believe due
20 to" --
21        THE DEPONENT:  -- this lawsuit, it
22 severely impacted ArtPort and the gallery.
23        THE REPORTER:  Thank you.
24        THE DEPONENT:  That's my opinion, okay.
25    **Q    (BY MR. HICKS)  And how has it severely**

1 **impacted the -- the gallery and ArtPort?**
2     A    Just the -- I think we'd have to go
3 through a myriad of issues, but the lawsuit is in
4 the public record, and that Nancy had an absolutely
5 pristine and highly respected reputation in the
6 industry prior to this lawsuit.  So, you know,
7 again, I really don't know, and I would say to the
8 best of my knowledge that, you know, it is -- it
9 has been impactful in the business.
10    **Q    Has -- sorry.  I'll rephrase.**
11        **Have you had any conversations with**
12 **Martin St. Pierre about the investment of ISP**
13 **Holdings, Inc., into ArtPort and specifically the**
14 **failure to return any profit?**
15    A    I speak to Martin St. Pierre about a lot
16 of things, and there's never been a -- yes, I've
17 had conversations with Martin St. Pierre about
18 artwork.  About the failure to return profit, I
19 don't recall anything specific to that.
20    **Q    Has he expressed disappointment to you**
21 **about how his or how ISP Holdings, Inc.'s**
22 **investment has turned out?**
23    A    I think any investor, including myself in
24 numerous investments I have personally, become a
25 little disappointed when investments do not pan out

1 in the time frame that you would expect or hope.
2 On the other hand, has Martin -- has it damaged our
3 friendship or in any way Martin complained about
4 it?  Not that I recall.
5     **Q    How did Martin St. Pierre become aware of**
6 **the opportunity to invest in ArtPort, if you know?**
7        MR. WAGNER:  Object to form.  Foundation.
8     A    I believe we discussed this, but through
9 conversations, he knew what I was investing in.  He
10 knew Nancy.  And again, to the best of my
11 knowledge, we had a conversation at some point,
12 probably in late 2015 -- or, I'm sorry -- 2014 or
13 early '15 about the art business and the potential
14 of Harold and his work.
15    **Q    (BY MR. HICKS)  What was he told about**
16 **the potential of Harold and his work?**
17        MR. WAGNER:  Object to form.  Foundation.
18    A    I have no recollection of exact
19 conversations.
20    **Q    (BY MR. HICKS)  With respect to Alicia**
21 **St. Pierre, have you had any conversations with her**
22 **about the investment through ISP Holdings in**
23 **ArtPort?**
24    A    Not that I'm aware of.  Not that I can
25 recall.

1    Q    And have you had occasion to see
2  Ms. St. Pierre physically present at the gallery at
3  any time?
4    A    Yes, as a volunteer, helping out.
5    Q    And when did you see her there, roughly
6  speaking?
7    A    I don't recall exact dates.
8    Q    Spring of 2018?  Spring of 2017?  Can you
9  narrow it down, possibly?
10       MR. WAGNER:  Object to form.  Foundation.
11   A    Well, I mean, the gallery didn't open
12 until the spring of '18.  So probably at the
13 gallery at different times in 2018, 2019.  Again, I
14 don't remember.
15       I went to the gallery very rarely.  I was
16 working.  My office is 40 miles away.  I was
17 traveling all the time.  So I still had my house up
18 in -- in Massachusetts and was -- wasn't there very
19 much.
20   Q    And how did you know Ms. St. Pierre?  Was
21 it just through Martin, or did you know her because
22 you guys had worked at the same place, or -- tell
23 me about that.
24   A    I met -- I met Aly through Martin.  They
25 started -- started dating, and Martin and I are

1  very close, and he introduced me to Aly.
2    Q    Do you believe that Ms. Loving has done a
3  good job operating ArtPort gallery -- sorry --
4  ArtPort, LLC?
5        MR. WAGNER:  Object to form.
6    A    Ian -- or Mr. Hicks, can you define doing
7  a good job?
8    Q    (BY MR. HICKS)  What is your opinion as
9  to how good or bad Ms. Loving has performed in
10 operating ArtPort, LLC?
11   A    My opinion -- again, I'm, you know, not
12 speaking for Nancy.  My opinion is that she did
13 everything she could to build the business
14 initially around a single, what they call a
15 reemerging or revitalized master in the art market.
16   Q    Did you drive Wally to any storage units
17 rented by ArtPort in the summer of 2017?
18   A    Did I drive him where?
19   Q    To any storage units where ArtPort or
20 Ms. Loving rented a unit in the summer of 2017?
21   A    I -- I don't recall at all.
22   Q    Do you recall being at any storage unit
23 with Wally in 2017?
24   A    I don't recall --
25       MR. WAGNER:  Object to form.

1    A    I don't recall being in a storage unit
2  with Wally in 2017.  I saw him numerous times, but
3  I don't believe -- I don't recall being in a
4  storage unit.
5    Q    (BY MR. HICKS)  And what I mean by
6  storage unit is there's a place called Westy's
7  Storage that's -- I'll show you the document here
8  in just a minute.  So let me rephrase.
9        Do you know what I mean when I say a
10 storage unit?
11   A    I do, and I know Westy's.  A very
12 high-end storage facility.
13   Q    You don't have any recollection of being
14 at Westy's at any time with Wally in 2016, 2017, or
15 2018?
16       MR. WAGNER:  Objection.  Asked and
17 answered.  Foundation.
18       MS. GETCHES:  Join.
19   A    Sorry.
20   Q    (BY MR. HICKS)  You can answer.
21   A    I don't have any direct recollection
22 of -- of being at Westy's with Wally.  I remember
23 being -- Wally was here -- or, actually, Wally was
24 in Connecticut.  Wally was -- I'd say I saw
25 Wally -- I saw him in Denver for the MBA Mortgage

1  Conference.  I saw him numerous times.  But I don't
2  recall specifically going to Westy's with him.
3    Q    Let me just check one more thing real
4  quick here.
5        Did you ever have any discussions with
6  either Alicia or Martin St. Pierre regarding this
7  lawsuit in 2019?
8    A    I did.
9    Q    Did you have any discussions with either
10 Alicia St. Pierre or Martin St. Pierre regarding
11 conflicts with Wally before this lawsuit was filed?
12       MR. WAGNER:  Object to form.
13   A    Well, again, define before the lawsuit
14 was filed.  When Wally was threatening a lawsuit?
15 When Wally --
16   Q    (BY MR. HICKS)  Let's use July 1, 2019,
17 as the date.
18   A    When the lawsuit was filed?
19   Q    Correct.
20   A    So once the lawsuit was filed, yes, I had
21 conversations with Martin and Aly -- or Martin.  I
22 don't recall having any with Aly.
23   Q    And what did you talk about?
24   A    I don't remember.  I think I just
25 informed him -- to the best of my knowledge, I

1 informed him that the suit had been filed and that

2 we were dealing with it.

3     **Q**   **And are you aware that there's been a**

4 **lawsuit filed by Studio 41 against ArtPort in**

5 **Florida?**

6     A   There's been a -- correct, yes, I am

7 aware.

8     **Q**   **And in your mind, do you blame Wally for**

9 **the filing of that lawsuit, that he somehow caused**

10 **that?**

11     MR. WAGNER:  Object to form.

12     A   I have no idea what goes through Wally's

13 mind or what his impact is on people around him,

14 et cetera. I've experienced some things. But as

15 far as that lawsuit, it was a breach of contract

16 suit, which my understanding is there was no

17 breach.

18     **Q**   **(BY MR. HICKS)  Why do you say there was**

19 **no breach?**

20     A   My understanding from the lawyer that is

21 representing ArtPort that a breach did not occur.

22     **Q**   **And those communications, you don't need**

23 **to tell me about. I don't want to know about those**

24 **because they are privileged, but -- so I guess**

25 **we'll just leave it at that. That's a dicey area.**

1     **I'm just going to check an exhibit real**

2 **quick. Share the screen with you real quick here,**

3 **Mr. Hinkelman. Sorry. Wrong one. This is listed**

4 **as plaintiff -- I'm sorry.**

5     **In front of you is a -- should be a**

6 **document that looks like a spreadsheet. At the**

7 **bottom right, it should say Plaintiff's Number**

8 **000518. Do you see that?**

9     A   I do.

10     **Q**   **And have you seen this document before,**

11 **if you recall?**

12     A   I'm not sure. Possibly.

13     **Q**   **And do you see about halfway down where**

14 **it says, Two Vessels trade in blue between the**

15 **yellow and gray areas of this document?**

16     A   I do.

17     **Q**   **And do you recall there being a dispute**

18 **between Wally and ArtPort in -- with respect to the**

19 **value of Two Vessels as a trade-in?**

20     A   Once the suit was filed, Nancy explained

21 to me what happened.

22     **Q**   **So before the lawsuit was filed, you were**

23 **not aware of a dispute involving the Two Vessels**

24 **trade-in issue?**

25     A   No. Two Vessels trade issue around the

1 price of Two Vessels or anything else?

2     **Q**   **The price.**

3     A   Around the price issue, no.

4     **Q**   **What about anything else?**

5     A   I was aware that Wally had traded out Two

6 Vessels.

7     **Q**   **And was -- do you recall there being a**

8 **dispute over the trade-in value of that piece of**

9 **art?**

10     A   At what -- at what point?

11     **Q**   **At any point before the lawsuit was**

12 **filed.**

13     A   No. Once the lawsuit was filed, Nancy

14 and I went over a few things, and she explained to

15 me what happened and the -- and the difference in

16 pricing.

17     **Q**   **And was the difference in pricing or the**

18 **amount of the dispute that you're referencing about**

19 **$5,000?**

20     A   I believe that's what she said. Whose --

21 whose spreadsheet was this?

22     **Q**   **My understanding is this was actually**

23 **ArtPort's spreadsheet.**

24     A   So this -- this spreadsheet was not

25 created by Wally?

1     **Q**   **I mean, I don't want to -- I'm not**

2 **here -- I can't testify as to that, but that's my**

3 **understanding. Your attorney can tell you that.**

4     **Let me ask you, would that be**

5 **significant? If it was -- in your mind, if ArtPort**

6 **created this spreadsheet that said $21,000, would**

7 **that be significant, in your mind, as to that**

8 **dispute?**

9     A   I'm not sure.

10     **Q**   **Okay. Do you recognize this format of**

11 **spreadsheet? And what I mean is, do you recall**

12 **seeing spreadsheets this similar format, color,**

13 **font, things of that nature, used by ArtPort in its**

14 **business?**

15     A   I don't recall, no.

16     MR. HICKS:  All right. I don't have any

17 further questions. Thank you for your time.

18     THE DEPONENT:  We're done?

19     **Q**   **(BY MR. HICKS)  Actually, one more**

20 **question. Sorry. The -- and I have to ask this.**

21 **Don't get offended, but because of these strange**

22 **coincidence -- and I'm not saying it's not a**

23 **coincidence. Somebody -- I heard somebody earlier**

24 **saying, Let's take a break, or take a break. I**

25 **have to ask you a couple quick questions.**

1    **Has anybody been in that room with you**
2  **today during your testimony?**
3    A    Absolutely not.
4    **Q    Has anybody --**
5    A    We have people in the house.  Nancy's
6  sister is here and -- with her dog.  Her husband
7  died.  And I believe they had a friend over.  So,
8  you know, I don't know.  But I don't recall a --
9  someone -- there was no one in the room with me.
10   **Q    I'm sorry to hear about that -- that**
11 **passing.  And has anybody been in communication**
12 **with you during your testimony regarding or**
13 **relating to this case?**
14   A    Regarding what?
15   **Q    Regarding or relating to your testimony**
16 **while we were on the record today.**
17   A    I'm sorry.  I couldn't -- I couldn't
18 understand the last part of the statement.
19   **Q    No problem.  Has anybody been in**
20 **communication with you regarding your testimony**
21 **while we were on the record today?**
22   A    No.  I had gotten messages when I've
23 taken breaks from clients, et cetera.  But you
24 know, regarding my testimony, no.
25      MR. HICKS:  Thank you.  I appreciate

1  it.
2      THE DEPONENT:  Thanks.
3      THE VIDEOGRAPHER:  Liza, questions?
4      MS. GETCHES:  I have no questions.  Thank
5  you.
6      THE VIDEOGRAPHER:  Tom?
7      MR. WAGNER:  Nothing for me.  Thank you.
8      THE VIDEOGRAPHER:  Ian, if you can take
9  down your exhibit, we can end.
10     This ends the deposition of David
11 Hinkelman, August 26, 2020.  The time is 5:13 p.m.
12 We are off the record.
13     (The deposition concluded at 5:13 p.m.,
14     August 26, 2020.)
15
16
17
18
19
20
21
22
23
24
25

1    I, WILLIAM DAVID HINKELMAN, do hereby
2  certify that I have read the foregoing transcript
3  and that the same and accompanying amendment
4  sheets, if any, constitute a true and complete
5  record of my testimony.
6
7
8
9
10      _____
       Signature of Deponent
11      {    ) No amendments
       {    ) Amendments attached
12
13
14      Acknowledged before me this _____ day of
15 _____, 2020.
16
17      Notary Public: _____
18      My commission expires_____
19      Seal:
20
21 LAD
22
23
24
25

1  STATE OF COLORADO    )
2               ) ss. REPORTER'S CERTIFICATE
3  COUNTY OF DENVER     )
4
5
6    I, Lisa A. Dague, do hereby certify that
7  I am a Certified Professional Reporter and Notary
8  Public within the State of Colorado; that previous
9  to the commencement of the examination, the
10 deponent was duly sworn to testify to the truth.
11     I further certify that this deposition
12 was taken in shorthand by me at the time and place
13 herein set forth and was thereafter reduced to
14 typewritten form, and that the foregoing
15 constitutes a true and correct transcript.
16     I further certify that I am not related
17 to, employed by, nor of counsel for any of the
18 parties or attorneys herein, nor otherwise
19 interested in the result of the within action.
20     In witness whereof, I have affixed my
21 signature and seal this 4th day of August, 2020.
22     My commission expires December 23, 2020.
23
24      _____
       Lisa A. Dague
25      216 - 16th Street, Suite 600
       Denver, Colorado  80202

## Page 181

1  AB COURT REPORTING & VIDEO
   216 - 16th Street, Suite 600
2  Denver, Colorado  80202

3  September 4, 2020

4  Elizabeth H. Getches, Esq.
   1811 Pearl Street
5  Boulder, Colorado 80302

6  Re:  Deposition of WILLIAM DAVID HINKELMAN
       CHARNOFF VS. LOVING
7      Civil Action No. 19-cv-2381-LTB-MEH

8  The aforementioned deposition is ready for
   reading and signing.  Please attend to this
9  matter by following BOTH of the items indicated
   below:

10
       _____ Call 303-296-0017 and arrange with us
11     to read and sign the deposition in our
       office

12
   _XXX_ Have the deponent read your copy and sign
13     the signature page and amendment sheets, if
       applicable; the signature page is attached

14
       _____ Read the enclosed copy of the deposition
15     and sign the signature page and amendment
       sheets, if applicable; the signature page
16     is attached

17 _XXX_ WITHIN 35 DAYS OF THE DATE OF THIS LETTER

18 _____ By _____ due to a trial date of_____

19 Please be sure the original signature page and
   amendment sheets, if any, are SIGNED BEFORE A
20 NOTARY PUBLIC and returned to AB court reporting
   for filing with the original deposition.  A copy
21 of these changes should also be forwarded to
   counsel of record.  Thank you.

22
   AB COURT REPORTING & VIDEO
23
   cc:  All Counsel
24

25

---

- AMENDMENT SHEET -

Deposition of WILLIAM DAVID HINKELMAN
August 26, 2020
CHARNOFF VS. LOVING
Civil Action No. 19-cv-2381-LTB-MEH

The deponent wishes to make the following changes
in the testimony as originally given:

Page  Line        Should Read        Reason

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

Signature of Deponent: _____

Acknowledged before me this ____ day of _____,
20___.

(seal)    Notary's signature _____

          My commission expires_____

---

## Page 182

1  AB COURT REPORTING & VIDEO
   216 - 16th Street, Suite 600
2  Denver, Colorado  80202

3

4

5       WILLIAM DAVID HINKELMAN
           August 26, 2020
6         CHARNOFF VS. LOVING
      Civil Action No. 19-cv-2381-LTB-MEH

7

8

9  The original deposition was filed with

10 Ian T. Hicks, Esq. on approximately

11 the 4th day of September, 2020.

12 _____ Signature waived

13 _____ Signature not requested

14 _____ Unsigned; signed signature page and
       amendment sheets, if any, to be filed at
15     trial

16 _XXX_ Unsigned; original amendment sheets and/or
       signature pages should be forwarded to
17     AB court reporting to be filed in the
       envelope attached to the sealed original

18

19 Thank you.

20 AB COURT REPORTING & VIDEO

21 cc:  All Counsel

22

23

24

25