IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

STUDIO 41, LLC,

      Plaintiff,

vs.                                Case No. _____

ART PORT, LLC,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Studio 41, LLC ("Studio 41") sues Defendant Art Port, LLC ("Art Port") and alleges:

### Jurisdiction, Parties, and Venue

1.     This is an action for damages in excess of $30,000.00, exclusive of interest, costs, and attorney's fees.

2.     Studio 41 is a Delaware limited liability company with its principal place of business located at 41 Court Street, Belfast, ME 04915.

3.     Art Port is a New York limited liability company with its principal place of business located at 466 Piermont Avenue, Piermont, NY 10968.

4.     This Court has general jurisdiction of Art Port based on the marketing and sale of its services in the state and has specific jurisdiction, because Art Port knowingly agreed Florida law controlled the contract and disputes arising therefrom.

5.     Venue is proper in Orange County, Florida, because this action arises from a breach of contract and Section 12.8 of the contract reads: "[a]ny action related to this Agreement shall be brought exclusively in a Court of competent jurisdiction in Orange County, Florida."

## **General Allegations**

6.     On February 1, 2019, the parties entered into a Portfolio Marketing and Management Agreement (the "Agreement") whereby Art Port agreed to provide marketing and management of certain pieces of art (the "Art"). A true and correct copy of the Agreement is attached as **Exhibit "A."**

7.     Section 9.5 of the Agreement reads: "both a monthly report of any sales, and payment thereof as due [Studio] 41, shall be made by Art Port to [Studio] 41 for the preceding calendar month no later than the twenty-fifth (25th) day of the immediately following month."

8.     Furthermore, Section 9.5 provides:

Timeliness of monthly sales reports and payments shall be of the essence with regard to performance hereunder by Art Port. Any occurrence of three (3) or more failures by Art Port during any calendar year, or any continuing default beyond one (1) month from the date on which such report or payment was required, during the Term shall represent a *de facto* default by Art Port, upon which default [Studio] 41 may, at its sole option, declare a Termination.

9.     Art Port failed in multiple respects, but specifically breached the Agreement due to one continuing default beyond one month.

10.     On May 18, 2020, Studio 41 exercised its right under section 9.5 of the Agreement to immediately declare a termination and demanded the return of its Art (the "Termination Letter"). A true and correct copy of the Termination Letter is attached as **Exhibit "B."**

11.     Section 5.9 of the Agreement outlines post-termination obligations including the return of the Art and any databases, images, or intellectual property.

12.     Notwithstanding Studio 41's Termination Letter and Art Port's admission "the March and April reporting were late," Art Port refuses to acknowledge the Agreement has been terminated, refuses to return the Art, and refuses to return any databases, images, or intellectual property.

## COUNT I – Breach of Contract
### (Damages and Injunctive Relief)

13.     Studio 41 reasserts and incorporates the allegations contained in paragraphs 1 through 12.

14.     In exchange for good and valuable consideration, the parties entered into the Agreement.

15.     Section 9.5 of the Agreement reads: "both a monthly report of any sales, and payment thereof as due [Studio] 41, shall be made by Art Port to [Studio] 41 for the preceding calendar month no later than the twenty-fifth (25th) day of the immediately following month."

16.     Art Port breached the Agreement by failing to submit the required reports within one month.

17.     The breach of contract is material and detrimental to Studio 41, and the parties agreed time was of the essence.

18.     As a direct and proximate result of Art Port's breach of contract, Studio 41 has been damaged in an amount to be determined at trial, but no less than $30,000.

19.     Section 12.12 of the Agreement reads:

**Injunctive relief**. The Parties expressly agree their respective responsibilities pursuant to this Agreement are of a special, unique, and intellectual character, which gives them peculiar value, and which directly impact, and threaten to irreparably damage, or diminish the value of, the Art, or the reputation of the Artist and Art Port. In the event of a breach by any Party of any material term, condition, covenant, warranty, or representation herein, the Parties agree that the non-breaching Party shall be caused [irreparable] harm for which the remedy at law is inadequate. Accordingly, the Parties expressly agree that the non-breaching Party shall be entitled to preliminary and permanent injunctive relief, mandatory or otherwise.

20.     Art Port breached a material term of the Agreement, and Studio 41 will suffer irreparable harm unless Art Port immediately returns the Art.

WHEREFORE, Studio 41 respectfully requests this Court enter judgment in Studio 41's favor and against Art Port and order:

    a.   Art Port immediately return the Art to Studio 41;

    b.   Art Port provide Studio 41 any databases, images, or intellectual property;

    c.   Art Port pay to Studio 41 damages in an amount to be determined at trial;

    d.   Art Port pay Studio 41's reasonable attorney's fees pursuant to the Agreement; and

    e.   all other relief the Court deems just and proper.

## COUNT II – DECLARATORY AND INJUNCTIVE RELIEF

21.    Studio 41 reasserts and incorporates the allegations contained in paragraphs 1 through 12.

22.    This action is brought pursuant to Chapter 86, *Florida Statutes*, for a declaration Studio 41 has terminated the Agreement, and Art Port must immediately return the Art along with and any databases, images, or intellectual property.

23.    The plain language of Section 9.5 of the Agreement provides "both a monthly report of any sales, and payment thereof as due [Studio] 41, shall be made by Art Port to [Studio] 41 for the preceding calendar month no later than the twenty-fifth (25th) day of the immediately following month."

24.    Section 9.5 of the Agreement makes clear "[t]imeliness of monthly sales reports and payments shall be of the essence with regard to performance hereunder by Art Port. [And] any continuing default beyond one (1) month from the date on which such report or payment was required, during the Term shall represent a *de facto* default by Art Port, upon which default 41 may, at its sole option, declare a Termination.

4

25.     Art Port failed to provide timely reports, and at least one report was more than one month late.

26.     On May 18, 2020, Studio 41 exercised its right under section 9.5 of the Agreement to immediately declare a termination; however, Art Port refuses to acknowledge the Agreement has been terminated, refuses to return the Art, and refuses to comply with its post termination obligations.

27.     Section 12.12 of the Agreement reads:

> **Injunctive relief**. The Parties expressly agree their respective responsibilities pursuant to this Agreement are of a special, unique, and intellectual character, which gives them peculiar value, and which directly impact, and threaten to irreparably damage, or diminish the value of, the Art, or the reputation of the Artist and Art Port. In the event of a breach by any Party of any material term, condition, covenant, warranty, or representation herein, the Parties agree that the non-breaching Party shall be caused [irreparable] harm for which the remedy at law is inadequate. Accordingly, the Parties expressly agree that the non-breaching Party shall be entitled to preliminary and permanent injunctive relief, mandatory or otherwise.

28.

29.     There is an immediate and present controversy between Studio 41 and Art Port and there is doubt concerning the nature of their legal relations and their respective rights related to the Agreement.

30.     Under these facts and circumstances, Studio 41 is in doubt concerning its rights and obligations regarding the Agreement and the effect of its Termination Letter.

31.     There is a present need for declaratory and injunctive relief, because Studio 41 and Art Port disagree with the other's position regarding the termination, and the parties are entitled to have a resolution of these issues finally declared and established.

32.     Furthermore, there is a bona fide, actual, present practical need for a declaration, which will deal with a present, ascertained state of facts and controversy.

WHEREFORE, Studio 41 respectfully requests this Honorable Court:

a. declare Art Port breached the Agreement;

b. declare Studio 41 properly terminated the Agreement on May 18, 2020;

c. order Art Port to immediately return the Art along with and any databases, images, or intellectual property to Studio 41;

d. order Art Port pay to Studio 41 damages in an amount to be determined at trial;

e. order Art Port pay Studio 41's reasonable attorney's fees pursuant to the Agreement; and

f. all other relief the Court deems just and proper.

Respectfully submitted this 3rd day of June, 2020,

*/s/ Jason Zimmerman*
**Jason Zimmerman**
Florida Bar No. 104392
Primary Email Address:
jason.zimmerman@gray-robinson.com
Secondary E-Mail:
kathy.savage@gray-robinson.com
cindi.garner@gray-robinson.com
**Rachael M. Crews**
Florida Bar No. 0795321
Primary Email Address:
rachael.crews@gray-robinson.com
Secondary E-Mail:
marykay.hendrickson@gray-robinson.com
**Jeff Aaron**
Florida Bar No. 123473
Primary Email Address:
jeff.aaron@gray-robinson.com
Secondary E-Mail:
donna.flynn@gray-robinson.com
GrayRobinson, P.A.
P.O. Box 3068
Orlando, Florida 32802-3068
Telephone: 407-843-8880
Facsimile: 407-244-5690

*Attorneys for Plaintiff*

# AGREEMENT

**THIS AGREEMENT** *(Agreement),* is made effective February 01, 2019 *(Effective Date),* by the *Garde Children,* individually and collectively, as defined herein, for the benefit of ART PORT, LLC, a New York limited liability company, 466 Piermont Ave, Piermont, NY 10968 *(Art Port);* STUDIO 41 LLC, a Delaware limited liability company, 41 Court St, Belfast, ME 04915 *(41);* and William Hohns, an individual.

**WHEREAS,** *Art Port, 41,* Harold Garde, Keith Andrew Garde, and Elissa Garde-Joia had previously entered into an agreement effective November 22, 2013, which terminated January 01, 2017 *(Prior Agreement);* and

**WHEREAS,** *41* and Harold Garde have engaged *Art Port* to provide certain services, as defined in a PORTFOLIO MARKETING AND MANAGEMENT AGREEMENT *(Agreement)* effective February 01, 2019, a copy of which is attached hereto as *EXHIBIT A,* pursuant to which *Art Port* is to provide its services, on new terms and conditions, as set forth in the *Agreement;* and

**WHEREAS,** *Art Port* and *41* have requested acknowledgments and agreements from the *Garde Children* as a condition to their entering into the *Agreement;* and

**WHEREAS,** Amy Garde Asher, Keith Andrew Garde, Elissa Garde-Joia, and Tessa McArdelle (collectively, the *Garde Children)* are willing and able to provide such acknowledgments and agreements.

**NOW, THEREFORE,** upon the terms and conditions contained herein, the *Garde Children* acknowledge and agree as follows:

**1.1** The *Garde Children,* individually and collectively, agree they have received and reviewed a copy of the *Agreement,* and been provided the opportunity to seek the advice of their own independent counsel.

**1.2** The *Garde Children,* individually and collectively, acknowledge they are referenced in the *Agreement* as the issue of Harold Garde and agree that they are willing and able, and agree, to perform such acts as may be required of, and to do all things necessary as, the issue of Harold Garde pursuant to the *Agreement.* Further, the *Garde Children,* individually and collectively, agree that, to the extent they shall be involved directly or indirectly in the sale, gift, or loan of any *Art* (as defined in the *Agreement,* including *Franchise* and *Free Agent Works),* such sales, gifts, or loans of any *Art* shall, during the *Term* (as defined in the *Agreement)* of the *Agreement,* be solely and exclusively conducted through and by *Art Port* pursuant to the terms of the *Agreement.*

**1.3** Keith Andrew Garde and Elissa Garde-Joia agree that the provisions of **Section 2.1** in the *Agreement* shall be fully applicable to each of them, as if they were parties to the *Agreement* and that any claims they may have, or might have had, are hereby surrendered and extinguished.

**1.4** The *Garde Children,* individually and collectively, agree that the provisions of **Section 12.18** shall be fully applicable to each of them, as if they were parties to the *Agreement.*

**IN WITNESS WHEREOF,** each of the *Garde Children,* individually and collectively, have executed this *Agreement* effective as of the day and year first above written and upon the dates so indicated by each *Party.*

FOR: AMY GARDE ASHER, an individual and one (1) of four (4) *Garde Children*

By: _____  Date: _____  05/10/19
   Amy Garde Asher, ████████████████, ████████r@gmail.com

FOR: ELISSA GARDE-JOIA, an individual and one (1) of four (4) *Garde Children*

By: _____  Date: _____
   Elissa Garde-Joia, ████████████████, ████████@gmail.com

FOR: KEITH ANDREW GARDE, an individual and one (1) of four (4) *Garde Children*

By: _____  Date: _____
   Keith Andrew Garde, ████████████████, ████████@gmail.com

FOR: TESSA BONFANDIO, an individual and one (1) of four (4) *Garde Children*

By: _____  Date: _____
   Tessa McArdelle, ████████████████, ████████@aol.com

**EXHIBIT "A"**

| | |
|---|---|
| **From:** | Amy Asher █████████@gmail.com> |
| **Sent:** | Wednesday, July 24, 2019 11:56 AM |
| **To:** | keith garde |
| **Cc:** | █████@gmail.com; Harold Garde; E; ████████ Jason A. Zimmerman |
| **Subject:** | Re: Final Agreement with Art Port |

*Dear Bill,*

*I have reviewed the Portfolio Marketing and Management Agreement and my earlier dated execution of the Supplemental Agreement is affirmed and remains valid.*

Warm regards,
Amy Asher
████████

Sent from my iPhone

On Jul 24, 2019, at 11:12 AM, keith garde █████████@gmail.com> wrote:

> nderlying Agreement has changed, please acknowledge in an email back to me that you have reviewed the Portfolio Marketing and Management Agreement and your earlier dated execution of the Supplemental Agreement is affirmed and remains valid.

## AGREEMENT

THIS AGREEMENT *(Agreement)*, is made effective February 01, 2019 *(Effective Date)*, by the *Garde Children*, individually and collectively, as defined herein, for the benefit of ART PORT, LLC, a New York limited liability company, 466 Piermont Ave, Piermont, NY 10968 *(Art Port)*; STUDIO 41 LLC, a Delaware limited liability company, 41 Court St, Belfast, ME 04915 *(41)*; and William Hohns, an individual.

WHEREAS, Art Port, 41, Harold Garde, Keith Andrew Garde, and Elissa Garde-Joia had previously entered into an agreement effective November 22, 2013, which terminated January 01, 2017 *(Prior Agreement)*; and

WHEREAS, 41 and Harold Garde have engaged *Art Port* to provide certain services, as defined in a PORTFOLIO MARKETING AND MANAGEMENT AGREEMENT *(Agreement)* effective February 01, 2019, a copy of which is attached hereto as *EXHIBIT A*, pursuant to which *Art Port* is to provide its services, on new terms and conditions, as set forth in the *Agreement*; and

WHEREAS, *Art Port* and *41* have requested acknowledgments and agreements from the *Garde Children* as a condition to their entering into the *Agreement*; and

WHEREAS, Amy Garde Asher, Keith Andrew Garde, Elissa Garde-Joia, and Tessa McArdelle (collectively, the *Garde Children*) are willing and able to provide such acknowledgments and agreements.

NOW, THEREFORE, upon the terms and conditions contained herein, the *Garde Children* acknowledge and agree as follows:

**1.1** The *Garde Children*, individually and collectively, agree they have received and reviewed a copy of the *Agreement*, and been provided the opportunity to seek the advice of their own independent counsel.

**1.2** The *Garde Children*, individually and collectively, acknowledge they are referenced in the *Agreement* as the issue of Harold Garde and agree that they are willing and able, and agree, to perform such acts as may be required of, and to do all things necessary as, the issue of Harold Garde pursuant to the *Agreement*. Further, the *Garde Children*, individually and collectively, agree that, to the extent they shall be involved directly or indirectly in the sale, gift, or loan of any *Art* (as defined in the *Agreement*, including *Franchise and Free Agent Works*), such sales, gifts, or loans of any *Art* shall, during the *Term* (as defined in the *Agreement*) of the *Agreement*, be solely and exclusively conducted through and by *Art Port* pursuant to the terms of the *Agreement*.

**1.3** Keith Andrew Garde and Elissa Garde-Joia agree that the provisions of *Section 2.1* in the *Agreement* shall be fully applicable to each of them, as if they were parties to the *Agreement* and that any claims they may have, or might have had, are hereby surrendered and extinguished.

**1.4** The *Garde Children*, individually and collectively, agree that the provisions of *Section 12.18* shall be fully applicable to each of them, as if they were parties to the *Agreement*.

IN WITNESS WHEREOF, each of the *Garde Children*, individually and collectively, have executed this *Agreement* effective as of the day and year first above written and upon the dates so indicated by each *Party*.

FOR: AMY GARDE ASHER, an individual and one (1) of four (4) *Garde Children*

By: _____ Date: _____
    Amy Garde Asher, ▮▮▮▮▮▮▮▮▮▮▮▮▮ , ▮▮▮▮▮@gmail.com

FOR: ELISSA GARDE-JOIA, an individual and one (1) of four (4) *Garde Children*

By: _____ Date: 7/27/19
    Elissa Garde-Joia, ▮▮▮▮▮▮▮▮▮▮ , ▮▮▮@gmail.com

FOR: KEITH ANDREW GARDE, an individual and one (1) of four (4) *Garde Children*

By: _____ Date: _____
    Keith Andrew Garde, ▮▮▮▮▮▮▮▮▮▮▮▮ , ▮▮▮▮@gmail.com

FOR: TESSA BONFANDIO, an individual and one (1) of four (4) *Garde Children*

By: _____ Date: _____
    Tessa McArdelle ▮▮▮▮▮▮▮▮▮ , ▮▮▮@aol.com

# AGREEMENT

**THIS AGREEMENT** *(Agreement)*, is made effective February 01, 2019 *(Effective Date)*, by the *Garde Children*, individually and collectively, as defined herein, for the benefit of ART PORT, LLC, a New York limited liability company, 466 Piermont Ave, Piermont, NY 10968 *(Art Port)*; STUDIO 41 LLC, a Delaware limited liability company, 41 Court St, Belfast, ME 04915 *(41)*; and William Hohns, an individual.

**WHEREAS,** Art Port, 41, Harold Garde, Keith Andrew Garde, and Elissa Garde-Joia had previously entered into an agreement effective November 22, 2013, which terminated January 01, 2017 *(Prior Agreement)*; and

**WHEREAS,** 41 and Harold Garde have engaged *Art Port* to provide certain services, as defined in a PORTFOLIO MARKETING AND MANAGEMENT AGREEMENT *(Agreement)* effective February 01, 2019, a copy of which is attached hereto as *EXHIBIT A*, pursuant to which *Art Port* is to provide its services, on new terms and conditions, as set forth in the *Agreement*; and

**WHEREAS,** Art Port and 41 have requested acknowledgments and agreements from the *Garde Children* as a condition to their entering into the *Agreement*; and

**WHEREAS,** Amy Garde Asher, Keith Andrew Garde, Elissa Garde-Joia, and Tessa McArdelle (collectively, the *Garde Children*) are willing and able to provide such acknowledgments and agreements.

**NOW, THEREFORE,** upon the terms and conditions contained herein, the *Garde Children* acknowledge and agree as follows:

1.1   The *Garde Children*, individually and collectively, agree they have received and reviewed a copy of the *Agreement*, and been provided the opportunity to seek the advice of their own independent counsel.

1.2   The *Garde Children*, individually and collectively, acknowledge they are referenced in the *Agreement* as the issue of Harold Garde and agree that they are willing and able, and agree, to perform such acts as may be required of, and to do all things necessary as, the issue of Harold Garde pursuant to the *Agreement*. Further, the *Garde Children*, individually and collectively, agree that, to the extent they shall be involved directly or indirectly in the sale, gift, or loan of any *Art* (as defined in the *Agreement*, including *Franchise* and *Free Agent Works*), such sales, gifts, or loans of any *Art* shall, during the *Term* (as defined in the *Agreement*) of the *Agreement*, be solely and exclusively conducted through and by *Art Port* pursuant to the terms of the *Agreement*.

1.3   Keith Andrew Garde and Elissa Garde-Joia agree that the provisions of **Section 2.1** in the *Agreement* shall be fully applicable to each of them, as if they were parties to the *Agreement* and that any claims they may have, or might have had, are hereby surrendered and extinguished.

1.4   The *Garde Children*, individually and collectively, agree that the provisions of **Section 12.18** shall be fully applicable to each of them, as if they were parties to the *Agreement*.

**IN WITNESS WHEREOF,** each of the *Garde Children*, individually and collectively, have executed this *Agreement* effective as of the day and year first above written and upon the dates so indicated by each *Party*.

FOR: AMY GARDE ASHER, an individual and one (1) of four (4) *Garde Children*

By: _____    Date: _____
   Amy Garde Asher,

FOR: ELISSA GARDE-JOIA, an individual and one (1) of four (4) *Garde Children*

By: _____    Date: _____
   Elissa Garde-Joia,

FOR: KEITH ANDREW GARDE, an individual and one (1) of four (4) *Garde Children*

By: _____    Date: 7/28/19
   Keith Andrew Garde,

FOR: TESSA BONFANDIO, an individual and one (1) of four (4) *Garde Children*

By: _____    Date: _____
   Tessa McArdelle,

## AGREEMENT

**THIS AGREEMENT** *(Agreement),* is made effective February 01, 2019 *(Effective Date),* by the *Garde Children,* individually and collectively, as defined herein, for the benefit of ART PORT, LLC, a New York limited liability company, 466 Piermont Ave, Piermont, NY 10968 *(Art Port);* STUDIO 41 LLC, a Delaware limited liability company, 41 Court St, Belfast, ME 04915 *(41);* and William Hohns, an individual.

**WHEREAS,** *Art Port, 41,* Harold Garde, Keith Andrew Garde, and Elissa Garde-Joia had previously entered into an agreement effective November 22, 2013, which terminated January 01, 2017 *(Prior Agreement);* and

**WHEREAS,** *41* and Harold Garde have engaged *Art Port* to provide certain services, as defined in a PORTFOLIO MARKETING AND MANAGEMENT AGREEMENT *(Agreement)* effective February 01, 2019, a copy of which is attached hereto as *EXHIBIT A,* pursuant to which *Art Port* is to provide its services, on new terms and conditions, as set forth in the *Agreement;* and

**WHEREAS,** *Art Port* and *41* have requested acknowledgments and agreements from the *Garde Children* as a condition to their entering into the *Agreement;* and

**WHEREAS,** Amy Garde Asher, Keith Andrew Garde, Elissa Carde-Joia, and Tessa McArdelle (collectively, the *Garde Children)* are willing and able to provide such acknowledgments and agreements.

**NOW, THEREFORE,** upon the terms and conditions contained herein, the *Garde Children* acknowledge and agree as follows:

**1.1** The *Garde Children,* individually and collectively, agree they have received and reviewed a copy of the *Agreement,* and been provided the opportunity to seek the advice of their own independent counsel.

**1.2** The *Garde Children,* individually and collectively, acknowledge they are referenced in the *Agreement* as the issue of Harold Garde and agree that they are willing and able, and agree, to perform such acts as may be required of, and to do all things necessary as, the issue of Harold Garde pursuant to the *Agreement.* Further, the *Garde Children,* individually and collectively, agree that, to the extent they shall be involved directly or indirectly in the sale, gift, or loan of any *Art* (as defined in the *Agreement,* including *Franchise* and *Free Agent Works),* such sales, gifts, or loans of any *Art* shall, during the *Term* (as defined in the *Agreement)* of the *Agreement,* be solely and exclusively conducted through and by *Art Port* pursuant to the terms of the *Agreement.*

**1.3** Keith Andrew Garde and Elissa Garde-Joia agree that the provisions of **Section 2.1** in the *Agreement* shall be fully applicable to each of them, as if they were parties to the *Agreement* and that any claims they may have, or might have had, are hereby surrendered and extinguished.

**1.4** The *Garde Children,* individually and collectively, agree that the provisions of **Section 12.18** shall be fully applicable to each of them, as if they were parties to the *Agreement.*

**IN WITNESS WHEREOF,** each of the *Garde Children,* individually and collectively, have executed this *Agreement* effective as of the day and year first above written and upon the dates so indicated by each *Party.*

FOR: AMY GARDE ASHER, an individual and one (1) of four (4) *Garde Children*

By: _____    Date: _____
    *Amy Garde Asher,* ███████████         ███████ @gmail.com

FOR: ELISSA GARDE-JOIA, an individual and one (1) of four (4) *Garde Children*

By: _____    Date: _____
    *Elissa Garde-Joia, 41 Court St, Belfast, ME 04915. ElissaGardeJoia@gmail.com*

FOR: KEITH ANDREW GARDE, an individual and one (1) of four (4) *Garde Children*

By: _____    Date: _____
    *Keith Andrew Garde,* ███████████       ███████ @gmail.com

FOR: TESSA BONFANDIO, an individual and one (1) of four (4) *Garde Children*

By: *Tessa M. McArdelle*　　Date: June 28, 2019

Tessa McArdelle, ████████████ ████ █@aol.com

**From:** ███████████ @aol.com>
**Sent:** Wednesday, July 24, 2019 05:19 PM
**To:** ███████ @gmail.com
**Subject:** Artport

Dear Bill,

I have reviewed the Portfolio Marketing and Management Agreement and my earlier dated execution of the Supplemental Agreement is affirmed and remains valid.

Tessa McArdelle Bonfandio

# PORTFOLIO MARKETING AND MANAGEMENT AGREEMENT

**THIS PORTFOLIO MARKETING AND MANAGEMENT AGREEMENT** *(Agreement),* is made effective February 01, 2019 *(Effective Date),* by and between ART PORT, LLC, a New York limited liability company *(Art Port);* STUDIO 41 LLC, a Delaware limited liability company *(41);* and with, and for the services, of Harold Garde *(Artist);* any of which may hereinafter be referenced as *Party,* or, in combination or collectively, as the *Parties.*

**WHEREAS,** *Art Port, 41,* and *Artist* had previously entered into an agreement effective November 22, 2013, which terminated January 01, 2017; and

**WHEREAS,** *41* and *Artist* wish to engage *Art Port,* and *Art Port* wishes to provide its services, on new terms and conditions, as set forth in this *Agreement,* to provide marketing and management of the *Art.*

**NOW, THEREFORE,** upon the terms and conditions contained herein, the *Parties* agree as follows:

## SECTION 1. DEFINITIONS

When used in this *Agreement,* the following terms shall have the meanings set forth below. Terms **not** specifically defined herein shall be construed in accordance with the meaning and understanding given such terms in the respective trades or businesses of the *Parties.* To the extent *italicized* terms bearing *Proper Case* appear in this *Agreement* but are not defined in the *Preamble* or this **Section 1,** such terms shall have the meaning set forth elsewhere in this *Agreement.*

*Affiliates* means *(i)* any *Person* that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, or owns a greater than a fifty percent (50%) interest in another *Person; (ii)* any *Person* that has participated, or participates, with, or funded, or funds, the efforts of, *Art Port* prior to this *Agreement* or during its *Term,* during which time *Art Port* had, or has, possession of *Art;* and *(iii)* a spouse, parent, sibling, or issue of such *Person.*

*Allowable Expenses* means the proper and reasonable expenses incurred by *Art Port* for the services rendered pursuant to this *Agreement* for its representation of the *Artist* and *Art,* including *(i)* expenses directly related to the *Art* for framing, restoration and conservation, shipping, insurance, and storage; consulting costs paid to any issue of the *Artist;* or costs paid for revisions and changes to www.HaroldGarde.com, both prior to the *Effective Date* of this *Agreement;* curatorial and consulting services; creation and maintenance of the *Database* including photography of the *Art;* catalogs and similar publications (but only allocable to the *Artist* or *Art,* if such publications include multiple artists or works of art); costs associated with a public exhibition of *Art* (authorized by the *Artist* or *41)* at which the *Art* is not for sale; and similar expenses typical in the trade of representing artists and their work, offset for the tax benefits gained by *Art Port* for the deduction of such expenses; but excluding *(ii) (a)* any expenses set forth in *(i)* which have been deducted from *Purchase Prices* in determining *Profits,* and *(b)* venue, entry, or related costs for showing the *Art,* holding events, or maintaining, renting, or operating space or websites in which to exhibit the *Art* for sale or reference, including ArtSuite New York Studio & Gallery and similar venues, travel expenses (not directly related to the business of representing the *Artist* or *Art),* business insurance (but not the cost of insurance on shipment of the *Art* or *Art* in storage if paid by *Art Port),* salaries to *Art Port* staff not involved in curating, photographing, compiling, or maintaining the *Database* (and then only for such allocation of time actually spent in performing such tasks), legal costs, and operating costs of the general business of *Art Port.*

*Art* means **all** original art works, including paintings and drawings on canvas, board, and paper (including *Strappos),* created by the *Artist* during his career through the *Effective Date,* and including similar works *Artist* may create during the *Term. Art* excludes: *(i)* works by the *Artist* that are owned, whether by gift or sale, as of the *Effective Date,* by third parties **not** a named *Party* to this *Agreement,* including in third parties, any descendants of *Artist* other than his direct issue; *(ii)* works of art, created by the *Artist,* held by any issue of the *Artist,* which were acquired by them through a bona fide purchase or were received from a third party who acquired the work(s) through a bona fide purchase; *(iii)* bound journals or sketchbooks, and similar works created by *Artist* prior to or during the *Term;* and *(iv)* other works created by *Artist* prior to, or during, the *Term,* such as works of poetry, plays, writings, and videography created of, or by, the *Artist.*

*Art Description* means a description of a work of *Art,* including, at a minimum, its title, if titled, or, if not titled, an image description; size; substrate; media; condition (very fine, fine, good, or poor), and sufficient photographs to reasonably allow the *Parties* to identify the *Art* and ascertain its condition.

*Clientele* means private collectors and collections, galleries, curators, museums, public collections, art exhibits, retailers, wholesale and auction houses, Internet portals and web sites, private showings, personal introductions and referrals, and other users and consumers of *Art,* including, as applicable, their directors and staff members, whether such *Clientele* emanate from, or through, *Art Port,* the *Artist* or his issue.

*Database* means a catalog of the *Art* compiled using tools and software generally available for art cataloging within the trade, such as ArtBase, or similar software.

*Execution Date* means the date on which the last of the *Parties* shall have executed this *Agreement*.

*Franchise Work* means a work of *Art*, designated by *41* as set forth in EXHIBIT A, incorporated herein by reference, and which *Franchise Work* is **not** available for sale, except as set forth in **Section 5.4(b).**

*Free Agent Work* means any work of *Art* within the domiciles of the *Artist* or his issue as of the *Effective Date*, which *Art* is not designated as a *Franchise Work*, and which such *Free Agent Works* may not *(a)* exceed eighty (80) works in any one domicile and *(b)* all of which *Free Agent Works* must, at all times during the *Term*, be kept within the personal quarters of the *Artist* or his issue and not permitted to be displayed in areas devoted to other uses such as renting of rooms. *Free Agent Works* shall, at all times during the *Term*, be available for viewing, loan, or sale, but only pursuant to the specific terms and conditions of this *Agreement*. No more than twenty-four (24) *Free Agent Works* from the combined total of *Free Agent Works* held collectively by all of the issue of the *Artist* may be subject to any combination of *Loan Agreements* at any time during the *Term*, unless otherwise expressly agreed in advance in writing by the *Artist* or *41*.

*Gift Agreement* means a bona fide written agreement, pursuant to which agreement *Art* is gifted for a *Private* or *Public Purpose*, as set forth in **Section 7.**

*Gross proceeds* means the total consideration paid for *Art*, including *Sales Taxes*, shipping, preparation, handling, or other direct or indirect amounts, paid by a purchaser to any named *Party* to this *Agreement*.

*Initial Recovery Amount* means *Allowable Expenses* of Five Hundred Thousand Dollars ($500,000).

*Legacy Work* means a work of *Art* designated by *Art Port* as set forth in EXHIBIT A, incorporated herein by reference, that shall, during the *Term*, always be available for sale, as set forth in this *Agreement*, and which **cannot** be gifted without the advance written approval of *Art Port*.

*Loan Agreement* means a bona fide written agreement to lend *Art*, which *Loan Agreement* shall specify the terms and conditions of such loan, including, but not limited to, identification of the lender and borrower, and *(i)* agreement that *(a)* the loan of *Art* is a loan, *(b)* the *Art* is, at all times, owned by *41*, and *(c)* is returnable promptly upon the request of *Art Port* or the lender (if not *Art Port*) without dispute, offset, or question; *(ii)* arrangements for transfer to, holding during the term of the loan, and return from, the borrower, including with specificity, the date upon which the *Art* shall be returned to *Art Port* and thereafter, if applicable, to the *Artist*, his issue, or any third party (which third party owned work shall **not** be *Art*, as defined herein); and *(iii)* agreement that, while in possession of the borrower, the *Art* (or art) shall be fully insured for its *Market Price* (at its date of lending) by either insurance procured as set forth in this *Agreement* or the borrower.

*Market Price* of a work of *Art* means the amount reasonably determined by *Art Port*, and entered into the *Database*, at which *Art Port* expects a work of *Art* to sell. If the *Market Price* for a work of *Art* has not yet been determined, its *Market Price* will be determined from the *Market Price* of comparable works of *Art*.

*Net Recovery Amount* means the *Allowable Expenses*, upon a termination not caused by a default by *Art Port*, equal to the sum of the *Initial Recovery Amount* **plus** any *Recovery Amount* **plus** any *Reimbursable Costs* not yet recovered from *Profit* shares paid to *41 less* any and all *Profit* received by, or owed to, *Art Port* during the *Term*. For clarity, any Profit Split, as such term was previously used by the *Parties*, received by *Art Port* in periods prior to this *Agreement* shall **not** be included in *Profit*.

*Person* means an individual, LLC, partnership, corporation, trust, estate, or other entity.

*Private Purpose* means a use, sale, loan, or gift of *Art* for a purpose other than a *Public Purpose*.

*Profit* means the net amount remaining from the *Purchase Price* received for *Art* subject to this *Agreement*, after reduction of any proper and reasonable out of pocket expenses of the seller, documented on or before reporting of (and directly related to) such sale, including reasonable costs (which shall not, unless otherwise approved by *41*, represent more than ten percent (10.0%) of the *Purchase Price*) incurred for: *(w)* retrieving *Art*, by *Art Port*, from a remote location if not in possession of *Art Port*; *(x)* credit card processing or foreign exchange costs incurred to collect *Gross Proceeds*; *(y)* crating and shipping to purchaser, including insuring *Art* in transit, but only as incurred for that *Art* during transit; and *(z)* restoring, repairing, framing, or otherwise preparing the *Art* required to effect the purchase, which such costs shall be excluded from the *Purchase Price* in determining *Profit* hereunder, and, if such expenses are incurred by *Art Port*, shall be removed from any accounting for, or determination of, the *Net Recovery Amount*.

*Public Purpose* means a use, sale, loan, or gift of *Art*, including a donation to a recognized charitable entity; an acquisition by an accredited museum; or a sale, loan, or gift to a third party entity, which, as part of the *Sales*, *Loan*, or *Gift Agreement*, agrees to display the *Art* in a desirable, publicly accessible space; the underlying purpose of which is to strategically enhance the perceived importance, value, and/or awareness

of the *Art* or *Artist* among the general public and/or preserve works of *Art* believed by the *Parties* to be seminally important *Art,* or believed to be *Art* that should be available to the general public.

 *Purchase Offer* means a notice provided to *41* of a bona fide offer by a purchaser for a *Free Agent Work,* which offer is below the *Market Price* for that work of *Art,* which notice must include sufficient details of the proposed purchase, including *(a) Art Description; (b)* the *Art's Market Price* and the *Purchase Price* at, and, if applicable, terms upon, which the sale is proposed; *(c)* pertinent information about the purchaser; and *(iv)* the reason(s) for requesting an approval of a sales amount below the *Art's Market Price.*

 *Purchase Price* of *Art* means the *Gross Proceeds less Sales Taxes,* if applicable, received from a purchaser in an arm's length bona fide sale of the *Art.* For clarity, a commission paid to, or retained by, an art gallery not affiliated with *Art Port* or its *Affiliates,* which sells a work of *Art,* shall be excluded from *Gross Proceeds* and the determination of the *Purchase Price* of *Art.*

 *Recovery Amount* means any *Allowable Expense* expended by *Art Port* over and above the *Initial Recovery Amount,* whether such amounts were, or are, expended by *Art Port,* in periods preceding, or during, the *Term,* subject to the procedures set forth in this *Agreement* for *Art Port* to calculate the *Net Recovery Amount.*

 *Reimbursable Cost* means any amount expended by *Art Port* that, pursuant to this *Agreement,* was a cost for which *41* was responsible, but which was paid by *Art Port* in lieu of *41.*

 *Restricted Category* means any *Genre, Movement* or *Series,* or decade, of the *Art,* each of which is defined as follows: *(i) Genre* means a particular style, including a substrate or media, *e.g.,* board, canvas, paper, including *Strappos,* works in acrylic or oil, or multiple works created to be one piece, *i.e.,* diptychs, triptychs, etc.; *(ii) Movement* or *Series* means any specific movement or artistic period of the *Artist, e.g.,* abstract expressionism, pinnacles, kimonos, puppets, jazz, still-life works, sightings, chairs, etc.; and *(iii)* decades means all works dated, or, if not dated, reasonably believed to have been created, in a specific decade, delineated as follows: 1940-49, 1950-59, 1960-69, 1970-79, 1980-89, 1990-99, 2000-09, 2010-19, and 2020-29.

 *Sales Agreement* means a written agreement for the purchase of *Art* that sets forth, at a minimum, the *Art Description; Gross Proceeds,* including an itemization of *Sales Taxes* or other costs charged or included; any terms and conditions covering the sale; and which identifies the purchaser.

 *Sales Taxes* means such additional amount as was, or should have been, collected from a purchaser of *Art,* and which is required to be paid to the jurisdiction in which such sale is required to be recognized, including legislative changes, if any, arising from *Wayfair v. South Dakota.*

 *Strappo* means an acrylic work created on glass by the *Artist,* which work is, after completion, transferred by the *Artist,* generally to paper, or other substrates, including, but not limited to, canvas or board.

 *Start Date* means the date on which *41* has received notice from *Art Port* that it has inspected the storage facilities maintained by the *Artist* in Belfast, Maine and New Smyrna Beach, Florida, and reasonably determined that the contents therein have not significantly deteriorated such that the *Art* would be unusable in its present condition for the purposes of fulfilling its services pursuant to this *Agreement.* In the event *Art Port* shall not have completed its inspection within three (3) weeks from the *Execution Date, Art Port* shall automatically accept all *Art* in storage, as is, without regard to its actual condition, and this *Agreement* shall commence without opportunity for *Art Port* to terminate on the basis of condition of the *Art* in storage.

 *Term* shall have the meaning set forth in *Section 3.3.*

 *Termination* means a termination of this *Agreement* caused by a default by *Art Port.*

### SECTION 2. PRIOR AGREEMENT AND GENERAL SCOPE OF ENGAGEMENT

 **2.1** The *Parties* agree and stipulate that any and all prior agreements between *Art Port, 41,* the *Artist,* Elissa Garde Joia and Keith Garde, are null and void and shall have no effect upon, or referential basis to, the performance or interpretation, of this *Agreement.* All of the parties to the prior agreements are *Parties* to this *Agreement* and agree that any and all understandings with regard to any prior agreements have, to the maximum extent necessary, been incorporated into this *Agreement.* The *Parties* agree that no *Party* shall bring a suit or other action against any other *Party* to this *Agreement,* the basis for which such suit or action is any and all prior agreements between any *Parties* to this *Agreement.*

 **2.2** The duties, rights, and obligations set forth in this *Agreement* shall commence only upon the *Start Date.* In the event *Art Port* shall reasonably determine, on its inspection, that the *Art* in storage has deteriorated to a point it cannot reasonably be used by *Art Port* to properly perform its obligations hereunder, this *Agreement* shall, upon *immediate* notice from *Art Port,* terminate and the *Parties* shall follow the procedures set forth in *Section 3* for such termination.

 **2.3** As further set forth in this *Agreement, 41* hereby engages *Art Port* as its exclusive and worldwide marketer, manager, and promotor, of, and sales entity, for, the *Art* to *Clientele.*

**2.4**   The *Parties* agree, and stipulate, that *Art Port* has represented that the *Initial Recovery Amount* was spent, or invested, on *Allowable Expenses* by *Art Port* prior to the *Effective Date.*

### SECTION 3. TERM AND TERMINATION EVENTS

**3.1**   **Initial Term.** The *Initial Term* of this *Agreement* shall run for a period of three (3) years, beginning on February 01, 2019 *(Effective Date)* and ending at midnight on January 31, 2022 *(Initial End Date).*

**3.2**   **Extended Term.** In the event aggregate *Profit* from sales of *Art* during the *Initial Term* exceed Seven Hundred Fifty Thousand Dollars ($750,000), *Art Port,* at its sole option, may, upon advance notice to *41* of not less than one (1) month prior to its *Initial End Date,* extend this *Agreement* for an additional three (3) years. If not so extended, absent the *Parties* executing a continuing agreement on or before its *Initial End Date,* this *Agreement* shall automatically terminate on the *Initial End Date.*

**3.3**   **Term.** *Term* of this *Agreement* shall consist of its *Initial Term* and, if applicable, its extended term.

**3.4**   **Events upon termination.** The *Parties* agree to the process upon termination set forth in *EXHIBIT E,* incorporated herein by reference, and agree to the following additional matters with regard to any termination of this *Agreement:*

  *(a)*   **The Art.** Except as provided in *EXHIBIT E,* **all** *Art* shall be promptly released to *41* for retrieval, and upon release, *41* shall be solely responsible for all costs for the storage, insurance, maintenance, and, except as provided in *EXHIBIT E,* retrieval and return of the *Art.*

  *(b)*   **Loan Agreements.** *Art Port* will, within no more than one (1) week from any termination, provide *41* with a copy of the perpetual *Loan Agreement* log, maintained pursuant to **Section 5.3(g),** together with copies of any *Loan Agreements* still active, and cooperate with *41* to ensure the timely return of any *Art* not yet returned pursuant to such *Loan Agreements.*

  *(c)*   **Database.** *Art Port* will, not later than one (1) month after any termination, release the *Database* to *41,* upon which release, *41* will be solely responsible for all costs of maintenance and access.

  *(d)*   **Sunset compensation.** For a period of three (3) years from any termination not caused by a default by *Art Port, 41* will, by the twentieth (20th) day of the month following receipt of *Gross Proceeds* from any sale of *Art* to a purchaser, pay *Art Port* fifteen percent (15%) of the *Profit* from any such sale. For clarity, immediately upon any termination, *41* shall have no restrictions on gifting or lending of the *Art,* except that, for the same period of three (3) years from any termination not caused by a default of *Art Port, 41* agrees: *(i)* **not** to gift a work of *Art* in contravention of a pending sale, *(ii)* not to gift or lend in excess of ten percent (10%) of the totality, as of the date of termination, of the *Art,* and *(iii)* not to gift or lend *Art* to the issue of *Artist.*

### SECTION 4. THE ART

**4.1**   **Care of the Art.** *Art Port* agrees it will, during the *Term,* and immediately following any termination (until the *Art* has either been returned to, or made available for retrieval by, *41),* at all times the *Art,* or any portion thereof, shall be within its possession, or control, even if *Art* has been loaned by *Art Port* to other parties pursuant to this *Agreement,* take all reasonable actions to maintain, and where deemed appropriate or necessary solely by *Art Port,* improve, restore, repair, or enhance, the value of the *Art.*

**4.2**   **Storage of the Art.** The *Parties* agree to be bound by the provisions regarding storage of *Art* set forth in *EXHIBIT C,* incorporated herein by reference.

**4.3**   **Insurance of Art and insurance proceeds.** The *Parties* agree to be bound by the provisions regarding insurance of *Art* and insurance proceeds set forth in *EXHIBIT C,* incorporated herein by reference.

### SECTION 5. ART PORT, RIGHTS AND OBLIGATIONS OF, AND LIMITATIONS UPON

**5.1**   *Art Port* shall be permitted, during the *Term,* to take actions it deems appropriate to accomplish the purposes of its engagement, which the *Parties* **fundamentally agree and stipulate is to market and promote the Art to encourage sales of the** *Art* **with sufficient frequency that would allow** *Art Port* **to recover and, on success, exceed, the** *Initial Recovery Amount* **and all** *Recovery Amounts,* **so long as such actions do not cause a diminution of the value of, or endanger, the** *Art* **or reputation of the** *Artist.*

**5.2**   While the *Artist* or *41* may, on occasion, make suggestions to *Art Port,* there shall be no expectation they do so, nor any obligation upon the *Artist* or *41* to do so. The *Parties* agree that **fundamentally, it is the intention of the** *Parties* **to allow** *Art Port* **to perform on its own without direction, exercising their creativity, experience, and expertise on an unfettered basis, free of interruption or distraction, so long as such actions do not cause a diminution of the value of, or endanger, the** *Art* **or reputation of the** *Artist.*

**5.3**   **Services of Art Port.** *Art Port* agrees, at its own cost and expense, unless otherwise provided in this *Agreement,* such cost and expense to be recovered solely from its share of *Profit* from the sale of *Art,* to

provide those services and resources reasonably required, devoting as much of *Art Port's* time and efforts as reasonably necessary, to perform its services pursuant to this *Agreement,* including, but not limited to:

(a) **The Art.** Collect, retrieve, care for, store, insure, curate, catalog, and designate the *Art,* including the agreements of the *Parties* thereto, as set forth in EXHIBITS A, B and C, incorporated herein by reference.

(b) **Sales of Art.** *Art Port* shall be responsible, as the sole entity representing *41* and the *Artist,* for negotiating, purveying, and conferring, with, and for sales to, *Clientele.*

(c) **Ancillary services.** While the *Parties* recognize that certain capabilities of *Art Port* may assist in accomplishing the fundamental purposes of this *Agreement,* the *Parties* recognize that ancillary services are time-consuming and distracting, and that only *Art Port* can uniquely determine the cost benefit of such services in achieving such purpose. Accordingly, all decisions to explore, organize, perform, or provide, the ancillary or similar services enumerated below, and the amount of time devoted to each, shall be at the sole discretion of *Art Port,* so long as their actions do not cause a diminution of the value of, or endanger, the *Art* or reputation of the *Artist:*

> (i) responding to inquiries from *Clientele,*
> (ii) public showings and museum exhibitions of the *Art,*
> (iii) development, and use, of catalogs, advertising, and publicity,
> (iv) maintenance of <u>www.ArtSuiteNY.com</u> or website(s) for similar purpose(s), and
> (v) consulting and conferring with the *Artist* or other parties.

(d) **Artist attributes.** Unless its use shall cause a diminution of the value of, or endanger, the *Art* or reputation of the *Artist, Art Port* is permitted to use the *Artist's* name, likeness, signature, voice, photographs (subject to any copyright or publication right separately required by the videographer or photographer), approved biographical information, and *Art* images in promotional efforts. *Art Port* will promptly, upon publication of printed items, provide not less than ten (10) copies of each to *41,* so long as the cost of such printed items does not exceed One Hundred Dollars ($100), including the cost of shipping same to *41* (the *Cost),* in which case *Art Port* shall provide only the number of copies equal to or less than the *Cost.*

(e) **Restoration and repair of Art.** Where deemed necessary solely by *Art Port* to prepare *Art* for sale, viewing, or other permitted use, *Art Port* may, at its expense, restore or repair *Art* in its possession or control. If the *Art* is significantly damaged and its restoration or repair potentially invasive, *Art Port* shall notify *41* prior to undertaking the work. If the *Artist* can repair the work, the *Artist* will notify *Art Port,* and, in lieu of the work it planned, *Art Port* may, at its cost, return the *Art* for repair, and subsequently, at its cost, retrieve same. The *Artist* shall, if able, repair the *Art* without charge to *Art Port.* Notwithstanding the foregoing, *Art Port* shall **not** materially alter, or allow to be altered, any work of *Art* in its possession or control from the original intent of the *Artist.*

(f) **Maintenance of complete and timely records of all sales activity.** *Art Port* will, at all times, maintain complete, timely, and accurate records of all sales, including sufficient information to provide, if required, an accurate and complete *Purchase Offer;* and a documented record of any and all sales, including a sufficient *Art Description,* an accurate *Gross Proceeds, Purchase Price,* and *Market Price,* and an accurate and complete calculation of the applicable *Profit* for any sale of *Art.* Such records shall be maintained in perpetuity during the *Term* and for a period of three (3) years following any termination of this *Agreement.*

(g) **Maintenance of complete and timely records of all loan activity.** *Art Port* will, at all times, maintain a complete, timely, and accurate log of all loan activity, tracking any events, including evaluation loan receipts, and the date on which works are to be returned by the borrower and ensuring return dates are met on a timely basis, a full *Art Description* and the aggregate *Market Price* of *Art* loaned, insurance on the works to the extent not provided by the borrower, and further arranging for their return to storage, or, if ultimately borrowed from the *Artist* or his issue, ensuring the enforcement of all terms and conditions thereof, including the timely return of the works to any party other than a return to storage by *Art Port.* Such records, and the underlying *Loan Agreements,* shall be maintained in perpetuity during the *Term* and for a period of three (3) years following any termination of this *Agreement.*

(h) **Reporting.** *Art Port* agrees to provide reports on a timely basis, as set forth in **Section 9.5** and EX-HIBIT D, incorporated herein by reference.

(i) **Books of account and inspection.** While there is no obligation upon *Art Port* to provide *41* with an accounting at any time, including any periods prior to the *Effective Date,* other than a final accounting to set forth its *Net Recovery Amount* upon a termination as provided in EXHIBIT E, *Art Port* shall, at its expense, maintain banks accounts, and true, complete and correct books of account of its activities and expenditures related to its services in accordance with generally accepted accounting principles, applied on a consistent basis. Such books of accounts, together with *Purchase Offers* and executed copies of all *Sales, Gift,* and *Loan*

*Agreements,* shall be kept at all times at the principal offices of *Art Port.* Representatives of *41,* acceptable to *Art Port* (approval of which shall not be unreasonably withheld), upon prior written notice and during normal business hours, but not more than once in any calendar year (unless the immediately prior inspection resulted in a significant discrepancy), shall have access to, but not an obligation to so access, the books and records of *Art Port,* for the sole purpose of reviewing compliance with this *Agreement.*

(j)  **Taxes.** *Art Port* shall, at its own expense, be responsible for any and all tax reporting required, including *Sales Taxes* and any income, franchise, property, or other tax reports required of *Art Port,* together with the payment of, or collection and remittance of, any and all taxes arising from its business activities and any and all sales of *Art* by *Art Port,* and further including any *Gross Proceeds* received by *41* duly provided to *Art Port* as set forth in this *Agreement. Art Port* agrees to indemnify *41* for any failure on the part of *Art Port* to properly collect, allocate, remit, or pay any and all taxes.

**5.4  Rules for, and limitations upon, sales of Art.**

(a)  **Intent of the Parties.** To ensure *Art Port* can reasonably, of its own accord, manage and make sales of *Art* without an undue burden of advance notification or approval, except as set forth in this **Section 5.4,** *Art Port* may make sales, upon its reasonable sole determination without requiring pre-approval.

(b)  **Sales of Franchise Works.** While *Art Port* may provide *41* a *Purchase Offer* for a *Franchise Work, 41* shall **not** be obligated to consider or approve any offer for a *Franchise Work,* it being agreed by *Art Port* that, by their nature and designation, *Franchise Work* is specifically designated as **not** for sale. Notwithstanding the foregoing, *41* may, but may not obligated to, provide a *Purchase Price* at which it will approve the sale of a *Franchise Work.* If *41* does **not** respond to a *Purchase Offer* for a proposed sale of a *Franchise Work,* any such nonresponse shall automatically mean the *Purchase Offer* has been rejected.

(c)  **Sales of Free Agent Works.** *Art Port* may sell *Free Agent Works* for the *Market Price* for each such work of *Art.* Any proposed sale for a *Purchase Price* that fails to meet the *Market Price* of a *Free Agent Work* shall only be allowed upon advance notice to *41.* Notice is to include a *Purchase Offer* and a minimum period of two (2) weeks for consideration *(Consideration Period).* Not later than the conclusion of the *Consideration Period,* the notified *Parties* will approve or reject the *Purchase Offer,* and if rejected, advise *Art Port* of an acceptable counteroffer (except for *Franchise Works,* which can simply be rejected), which such counteroffer may not exceed the *Market Price.* In the event the notified *Parties* fail to provide their reply within the *Consideration Period, Art Port* shall be permitted to sell the work of *Art,* except a *Franchise Work*—see **Section 5.4(b)**—at the originally proposed, or if increased during the *Consideration Period,* the last such increased, *Purchase Offer* or *Price.*

(d)  **Cooperation of 41.** Acknowledging that the **fundamental purpose of this** *Agreement* **is to encourage the sales of** *Art* **by** *Art Port***, as set forth in Section 5.1,** *41* agrees to cooperate fully and promptly in transferring any work of *Art,* required by *Art Port* for viewing or sale, but only so long as *41* has been provided with a *Loan Agreement* that includes reasonably acceptable terms and conditions for such transfer to *Art Port* and its return.

(e)  **Remedy for contravention by 41.** In the event *41* shall fail to transfer a work of *Art* in contravention of this **Section 5.4,** which work of *Art* has not been destroyed or damaged by an insurable peril, whether insured or not, *41* shall promptly pay the *Profit* share as would have been earned on the sale by *Art Port.* Upon payment by *41,* the work of *Art* shall automatically be designated a *Franchise Work* and shall only be sold thereafter as set forth in **Section 5.4(b).**

(f)  **Bulk Sales.** A bulk sale of fifty (50) or fewer works of *Art* (which quantity shall not include any *Strappos* in a bulk sale) shall be within the reasonable discretion of *Art Port.* Absent the advance written consent of *41,* which will not be unreasonably withheld, no bulk sale shall be made by *Art Port (i)* to the same *Person* or their *Affiliates* more than once in the *Term, (ii)* more than once in any one calendar year during the *Term,* or *(iii)* in excess of fifty (50) works of *Art* (excluding *Strappos* in the bulk sale).

**5.5  No obligation to advance or lend to 41.** *Art Port* shall not be required to, and shall not, and *41* agrees that *Art Port* shall not, have any obligation to make any loans or advances to *41,* defer any allocation of *Profit,* as set forth in **Section 9,** or pay any expenses on behalf of *41* set forth in this *Agreement* as an obligation of *41.* Notwithstanding the foregoing, *Art Port* agrees that it is responsible for the costs incurred by *Art Port* for the services provided pursuant to this *Agreement* and *41* agrees that such costs incurred and paid, or owing, by *Art Port,* shall be included in the *Initial Recovery Amount, Recovery Amount,* and *Net Recovery Amount,* and shall be subject to recovery by *Art Port* only in the manner set forth in this *Agreement.* Amounts paid or advanced by *Art Port* on behalf of *Art Port* in furtherance of its provisions of services pursuant to this *Agreement* shall **not,** in any manner, become an obligation of *41,* but may only be recovered from allocations of *Profit* as set forth in **Section 9,** and upon a termination, then as set forth in *EXHIBIT E*

from a selection of *Art.* No provision in this *Agreement* shall be construed to create an obligation of *41* to *Art Port* except as specifically set forth in **Sections 3.4(d), 6.3, 9.4, 9.5, Section B.3** of *EXHIBIT B,* and **Items 6** and *8* of *EXHIBIT C.*

**5.6    Limitation on group shows.** *Art Port* agrees that it will not show the *Art* together with other artists (a group show), unless the venue or show organizers require group showings as a condition of participation or, otherwise, without receiving the advance written approval of the *Artist* or *41,* and agrees the *Artist* or *41* may, at its sole discretion and without explanation, withhold such approval. Any failure by the *Artist* or *41* to respond within two (2) weeks of a notice from *Art Port* shall be automatically interpreted as approval of the group showing requested by *Art Port.*

**5.7    Single point of contact.** At any time following the passage of at least six (6) weeks following the *Start Date, Art Port* shall have the right to request of *41,* a single point of contact *(SPOC). 41* shall, within two (2) weeks, designate its *SPOC,* which such *SPOC* shall be reasonably acceptable to *Art Port,* and which *SPOC* shall be the exclusive point of contact by *Art Port* for *routine* matters with regard to its responsibilities pursuant to this *Agreement.* The *SPOC* will handle any required communications within *41,* and, in turn, *Art Port. Art Port* may, without interference from the *Artist,* his issue, or their *Affiliates,* rely upon communications with the designated *SPOC* for all routine matters related to this *Agreement.*

**5.8    Non-exclusivity.** *41* agrees that *Art Port* is not required to devote its full time to the services provided in this *Agreement* and *Art Port* shall only be required to render reasonable services as and when reasonably required. *41* agrees that *Art Port* may be engaged to provide similar services to other *Persons* and/or artists and that *Art Port* may engage in other business activities, provided that *Art Port* shall be able to fully comply with its responsibilities pursuant to this *Agreement.*

**5.9    Return of the Art.** In addition to the responsibility of *Art Port* to periodically return *Art* during the *Term* pursuant to any *Loan Agreements, Art Port* will fully cooperate with *41* at any termination to facilitate the prompt retrieval of the *Art* by *41.*

**5.10    Reproduction of the Art.** *Art Port* will request, but not be held responsible for omission by a publisher, that appropriate copyrights appear with any reproduction of *Art* arranged by *Art Port.*

**5.11    Transfer of copyrights.** *Art Port* will include a "boilerplate" statement in all *Sales, Gift,* and *Loan Agreements,* as follows:

> The copyright(s) in any and all works of art, named in, or the subject of, this Agreement, are owned by Harold Garde, individually and, as applicable, Studio 41 LLC and the estate of Harold Garde (the Copyright Owners). No party shall have, or be granted or provided with, a right or claim to the copyrights legally claimed by the Copyright Owners. Any art subject to this Agreement may not be reproduced in any manner for any commercial purpose, or for distribution to the public, without the advance written permission of Studio 41 LLC.

The *Parties* recognize that copyrights for works of art sold or transferred may be difficult to enforce and agree that it will be the sole responsibility and cost of the *Artist* or *41* to enforce any claims for copyrights. The *Artist* and *41* recognize the "boilerplate" statement above may have a negative influence on a potential purchaser and *Art Port* shall be allowed, at its reasonable discretion, to modify the "boilerplate" to mitigate objections of a potential purchaser as long as the first sentence is not stricken. Further, on a loans or other transfers of *Art* for a *Public Purpose,* the "boilerplate" statement can be removed and replaced with an agreement that reproduction of the works by the transferee will include © *Harold Garde and Studio 41 LLC,* in order to facilitate including the works in catalogs and similar publications related to the *Public Purpose.*

### SECTION 6. THE ARTIST AND 41, RIGHTS AND OBLIGATIONS OF, AND LIMITATIONS UPON

**6.1    Ownership.** The *Artist,* and, as applicable, *41* (including *Franchise* and *Free Agent Works),* represent and warrant they own all right and title to, and copyright in, all of the *Art,* including but, not limited to, all images, representations, information, and attributes. *Art Port* represents and warrants that the *Artist,* and, as applicable, *41,* own all right and title to, and copyright in, all of the *Art,* including, but not limited to, all images, representations, information, and attributes; and that no term, condition, representation, or promise in this *Agreement,* nor the possession of any work of *Art* by *Art Port* or any of its *Affiliates* shall be construed under any basis, legal argument, or assertion, to be owned by, or serve as collateral, as such term is generally and specifically understood, in part or in whole, without exception, unless specifically transferred and documented as set forth in this *Agreement* pursuant to a specific provision that allows such transfer of ownership. *Art Port* agrees that *41* and the *Artist* have reserved all rights not specifically granted in this *Agreement* including, but not limited to, all publishing and other rights to its work, other than those rights specifically granted in this *Agreement.*

**6.2    Duties.** The *Artist* and *41* agree to use good faith efforts to promote and pursue the career of the *Artist;* to make the designations and meet the obligations required in *EXHIBITS A, B, C, D,* and *E,* incorporated

herein by reference; create and periodically, at *Art Port's* request and cost, but not more than twice each calendar year, transfer to *Art Port,* additional works of *Art* by the *Artist;* and encourage sales of *Art.*

**6.3**    ***Sales, or receipts, of Gross Proceeds by 41.*** *41* shall, during the *Term,* only make sales that also comply with the provisions of ***Sections 5.4,*** as if the requirements therein that apply to *Art Port* were instead applied to *41.* In the event the *Artist,* his issue, or *41,* shall receive *Gross Proceeds* from a sale of the *Art* made during the *Term,* even if such *Gross Proceeds* are received after a termination of this *Agreement* not caused by a default by *Art Port, 41* shall promptly report the sale and amount of *Gross Proceeds* received to *Art Port,* together with information or details *Art Port* would typically require to determine *Profit* from a sale. *Art Port* will promptly determine the *Profit* and provide documentation for its calculation to *41.* Upon receipt and review, *41* shall remit to *Art Port,* within no more than two (2) weeks, its allocated share of *Profit,* pursuant to ***Section 9.***

**6.4**    *41* agrees that, during the *Term,* it, the *Artist,* and his issue, shall not appoint, or negotiate or contract with any third party to provide the services, in part or in whole, set forth in this *Agreement* to be provided by *Art Port. 41* agrees that *Art Port* represents itself as experts in the services to be provided herein, and *Art Port* represents it has such expertise to perform the services. The *Parties* agree the **best results will be realized by allowing** *Art Port* **to perform the services without interference.** Accordingly, the *Artist* and *41* agree **not** to interfere, and to enforce an obligation upon the issue of the *Artist* not to interfere, with the activities of *Art Port* in contravention of this *Agreement,* except as may be required by this *Agreement* or for the purpose of securing and protecting the *Art* or reputation of the *Artist* should there be a reasonable determination by the *Artist* or *41* that there is, or may be, a diminution of the value of, or endangerment to, the *Art* or reputation of the *Artist.*

**6.5**    ***Maintaining the Artist website.*** *41* shall, at a minimum, retain the URL, www.HaroldGarde.com, and maintain the website as it exists as of the *Effective Date,* and thereafter, at the request of *Art Port,* which requests shall provide specificity with regard to the updates requested and shall not be more frequent than six (6) in any calendar year in the *Term,* update the website as reasonably requested by *Art Port* to incorporate new events, art images, and new information in the bio of the *Artist.* In the event *41* shall fail to reasonably update its URL within three (3) weeks of a request from *Art Port, 41* shall assign its URL to *Art Port,* which, on accepting such assignment, may, at its option, perform updates to the *Artist's* URL. Upon any termination of this *Agreement, Art Port* shall promptly reassign the *Artist's* URL to *41.* During the *Term, 41* may add a link from its URL to URL's as maintained by *Art Port,* and, if and as requested by *Art Port,* will allow a link from URL's as maintained by *Art Port* to its URL.

SECTION 7. GIFTS OF ART

**7.1**    ***Purpose of Gifts.*** While the *Parties* acknowledge that the *Artist* has enjoyed the privilege of gifting some of his works of art over his lifetime, the *Parties* agree that unfettered gifting of the *Art* during the *Term* may reduce the value of the *Art* and potential success of *Art Port.* Accordingly, the *Parties* agree that limitations upon gifts are an important element of this *Agreement.* Further, the *Parties* recognize that gifts should be strategic, both with regard to recipient and the *Art* to be gifted, and that the reasons for such gifts should be transparent and, wherever practical, mutually agreed upon.

**7.2**    ***Gifts by Art Port.*** Unless *Art Port* shall have received the advance written consent of *Artist* or *41, Art Port* shall, without exception, make no gifts of *Art* to any *Persons.* If *Art Port* believes a gift of *Art* would further its success, *Art Port* shall notify *41* and, concurrently, *Artist,* providing an *Art Description,* and further identifying the intended recipient, timing, and reason(s) for the gift. The *Artist* and *41* shall have one (1) month to confer with *Art Port,* discuss the reasons, and reach a decision approving, rejecting, or modifying the gift request, which modification may, but is not required to, include alternate works of *Art* the *Artist* or *41* feels may better serve the purpose. The decision of the *Artist* or *41,* including the decision to offer or not offer any alternate *Art,* shall be final and binding on all *Parties.* If a gift is so approved, it will be documented by *Art Port* in a *Gift Agreement,* the original of which will be retained by *Art Port* at all times during the *Term* and for a period of three (3) years following any termination, and a copy of which is to be promptly provided to *41* following its execution.

**7.3**    ***Gifts by Artist.*** While the *Artist* or *41* may act to approve, reject, or modify a gift request by *Art Port,* the *Parties* agree the *Artist,* and only the *Artist* (and for clarify, not *41* or the issue of the *Artist),* shall have the right, but not the obligation, to gift up to Fifty Thousand Dollars ($50,000) of *Art,* as measured by the cumulative dollar value of all *Art,* determined by their respective *Market Prices,* proposed for gifting in any calendar year during the *Term,* subject strictly to the provisions of this ***Section 7.3.***

(a) **Non-cumulative.** The limitation of Fifty Thousand Dollars ($50,000) in any calendar year is non-cumulative. Any unused amount may **not** be carried forward from one calendar year to any other.

(b) **Purpose.** The *Artist* agrees that gifting under this *Section 7.3* should be limited and have, where practical, strategic purposes that may align with *Art Port* and its success. Strategic purposes include gifts to public entities, such as museums and institutions, including those closely associated with the life of the *Artist (e.g.,* the University of Wyoming, Columbia University, and museums in Maine or Florida), or private collections the purpose of which is to build a representative body of the work of the *Artist* to be donated to a museum or institution. Gifts may also represent gratitude of the *Artist,* such as might be provided a curator, videographer, or author important to the *Artist* or his work, or as the *Artist* may have, earlier in his life, provided to a recipient to mark a seminal event in their life, and may, with reasonable discretion, be members of the *Artist's* family. While the *Artist* will disclose his reasons for making a gift, the recipient is solely his decision.

(c) **Not in contravention of Legacy Works.** The *Artist* may propose a gift of *Art* designated as a *Legacy Work,* but **only** *Art Port* may permit the gift of a *Legacy Work,* or in its published catalog of work for sale continuously maintained, as set forth in *EXHIBIT A*, incorporated herein by reference, during the *Term.*

(d) **Not in contravention of Restricted Categories.** The *Artist,* during the *Term,* may not, on a cumulative basis, gift in excess of ten percent (10%) of any *Restricted Category.* Cumulative shall include any and all gifts made by the *Artist* during the *Term.*

(e) **Not in contravention of sales by Art Port.** The *Artist* will provide an *Art Description* of his intended gift(s) to *Art Port. Art Port* will, within two (2) weeks, determine if the gift(s) are in contravention of **Sections 7.3(c)** or **7.3(d),** and if so, the *Artist* will be permitted to substitute a different work, subject to the same determinations by *Art Port. Art Port* shall provide documentation that supports its determination for each evaluated submission. Once *Art* has been determined as compliant with **Sections 7.3(c)** and **7.3(d),** *Art Port* shall advise *Artist* if it believes it can sell the *Art* or releases it without attempting to sell it. If *Art Port* believes it can sell the *Art, Art Port* shall have a period of three (3) months in which to affect a sale of the *Art.* If the *Art* has not been sold in the three (3) month period, absent a mutually agreeable extension, the *Artist* shall be free to gift the *Art* without objection by, or compensation to, *Art Port.*

(f) **Gifts in contravention of Section 7.** In the event *Art Port* shall have made a gift in contravention of this **Section 7** prior to the *Effective Date,* it shall promptly reclaim the *Art.* If it is unable to do so, or if *Art Port* shall have made, or make, a gift in contravention of this **Section 7,** prior to, or during the *Term,* it shall pay *41* an amount equal to thirty percent (30%) of the *Market Price* of the work(s) of *Art* so gifted. In the event *Artist* shall make gifts in contravention of this **Section 7** during the *Term, Art Port* shall be entitled to deduct from *Profit* allocated to and otherwise to be paid to *41* an amount equal to seventy percent (70%) of the *Market Price* of *Art* so gifted.

(g) **Taxes.** Taxes, if any, occasioned by a gift by *Artist* or *Art Port* shall be the sole responsibility of whichever *Party* made the gift.

## SECTION 8. LENDING OF ART

**8.1  Loans in general.** All loans of *Art,* regardless of the holder of the *Art,* shall be centralized through and administered, at all times, by *Art Port.* All loans of *Art* shall be notified by *Art Port* to *41,* in advance of any agreement, except for evaluation loans by *Art Port* as set forth in this **Section 8.1,** to lend the *Art.* Any notice shall include an *Art Description,* identity of the borrower, and the reasons, therefore. The *Parties* agree that a "loan" of *Art* to a prospective purchaser for purposes of evaluating the *Art,* as is common in the art world, shall be evidenced by a receipt for the *Art,* which receipt shall include an *Art Description,* and provide for a return of the *Art* within not less than two (2) weeks, and which such evaluation shall not require a formal *Loan Agreement.*

**8.2  Loan Agreements.** Any loan of *Art,* except as set forth in **Section 8.1,** shall only be made upon the terms and conditions of a *Loan Agreement* executed in advance of its lending. Lending shall include and incorporate a loan from the *Artist,* his issue, or a third party, and a loan may require more than one *Loan Agreement, e.g.,* a loan of a third party will require a *Loan Agreement* between *Art Port* and the third party, and, to further lend the work to its ultimate borrower, the loan of the work from *Art Port* to the ultimate borrower shall require a *Loan Agreement* from *Art Port* to the ultimate borrower. At a minimum, a *Loan Agreement* between a lender and borrower shall be executed by a duly authorized representative of each, and contain the information set forth in the definition of *Loan Agreement.*

**8.3  Responsibilities of Art Port.** *Art Port* shall be fully responsible for the timely administration of all aspects of any and all *Loan Agreements* hereunder (including temporary "evaluation loans," as set forth in

***Section 8.1),*** including with specificity their negotiation, return of the work to *Art Port,* and its subsequent return, if applicable, to the *Artist,* his issue, or a third party. In the event the return of the work is ***not*** effectuated by the date provided in a *Loan Agreement* (or an "evaluation loan"), *Art Port* shall immediately investigate the delay, determine the new date it will be returned, and immediately notify the lending party if not (ultimately) *Art Port* of any delay. All costs for lending of work shall be the responsibility of *Art Port,* except as it may negotiate responsibility for any, or all, costs to the borrower.

**8.4 Loans by Art Port to Persons or Affiliates of Art Port.** The *Parties* recognize that *Art Port* has made loans of *Art* prior to the *Effective Date.* Such loans to *Persons* part of, or *Affiliates* of, *Art Port* made (or can make) strategic sense, *i.e.,* a work of *Art* in the residence of a *Person* that is part of, or *Affiliates* of, *Art Port,* allows them to discuss the value and uniqueness of the *Art* and *Artist* and may result in sales among acquaintances and in their extended network. *Art Port* agrees that it has previously documented such loans with a *Loan Agreement.* If *Art Port* has not secured a *Loan Agreement* for such *Art, Art Port* agrees, within no more than one (1) month from the *Execution Date,* to identify to *41* any *Art* so lent, including an *Art Description,* and promptly document the loan with a *Loan Agreement,* and retain the original, and make a copy of the *Loan Agreement* available to *41* as required in *EXHIBIT D,* incorporated herein by reference.

**8.5 Reporting of loans.** *Art Port* shall maintain, along with original copies of all *Loan Agreements* (and receipts for "evaluation loans"), a perpetual log of all *Loan Agreements* (including "evaluation loans"), whether completed and fully returned, or still lent, showing, at all times, the date the loan was made, the date on which the *Art* was, or is, scheduled to be returned, and upon its return, the date on which the *Art* was returned, the borrower, the value of the *Art* (which shall be no less than its *Market Price),* and a designation of which party insured the *Art.* A copy of the perpetual log, together with any *Loan Agreements* and evaluation loan receipts, created in the prior calendar month will be made available by *Art Port* to *41* with the monthly reporting required as set forth in **Section 9.5** and *EXHIBIT D,* incorporated herein by reference.

### SECTION 9. ALLOCATION OF PROFITS AND PAYMENTS BY THE PARTIES

**9.1 Allocation of Profit on sale of Franchise Works.** The *Parties* agree that, with regard to a sale by *Art Port* of a *Franchise Work, Profit* shall be allocated such that forty percent (40%) shall be earned and retained by *Art Port* and sixty percent (60%) shall be earned and paid to *41.*

**9.2 Allocation of Profit, Initial Recovery Amount not yet recovered.** During the *Term,* until such time as *Art Port* shall have recovered, including any *Profit* earned pursuant to **Sections 6.3** and **9.1,** the *Initial Recovery Amount, Profit,* including a sale of a *Free Agent Work,* shall be allocated such that seventy percent (70%) shall be earned and retained by *Art Port* and thirty percent (30%) shall be earned and paid to *41,* except that, on the first $50,000 of *Profit* generated on or after the *Effective Date, Art Port* must still report as required by **Section 9.5,** but shall be entitled to retain one hundred percent (100%) of such *Profit* to a maximum of $15,000 that would have otherwise been paid to *41* pursuant to this **Section 9.2.**

**9.3 Allocation of Profit, Initial Recovery Amount recovered.** After such time as *Art Port* shall have earned the entirety of the *Initial Recovery Amount, Profit* shall, at all times thereafter, be allocated, except as otherwise provided in **Section 9.1,** such that fifty percent (50%) shall be earned and retained by *Art Port* and fifty percent (50%) shall be earned and paid to *41.*

**9.4 Offset for Reimbursable Costs.** In the event there shall be *Reimbursable Costs* owed to *Art Port, Art Port* may, at its sole discretion, recover such *Reimbursable Costs* by offsetting *Reimbursable Costs* against any payments as shall be due *41* pursuant to this *Agreement.*

**9.5 Timeliness of reports and payments.** Timeliness of monthly sales reports and payments shall be of the essence with regard to performance hereunder by *Art Port.* Any occurrence of three (3) or more failures by *Art Port* during any calendar year, or any continuing default beyond one (1) month from the date on which such report or payment was required, during the *Term* shall represent a *de facto* default by *Art Port,* upon which default *41* may, at its sole option, declare a *Termination.* To simplify reports and payments to *41* to minimize the likelihood *Art Port* shall default, the *Parties* agree that both a monthly report of any sales, and payment thereof as due *41,* shall be made by *Art Port* to 41 for the preceding calendar month no later than the twenty-fifth (25th) day of the immediately following month. For clarity, by way of example, the monthly report of all sales in May 2020 shall be due to *41* no later than June 25, 2020. If the 25th of the month in which the report and payment is due shall fall on a Saturday, Sunday, or holiday, the immediate next business day shall be the date on which the report and payment are due. Due date, for purposes of this **Section 9.5,** means the day on both the report and payment are physically received by *41. Art Pro* may use any combination of courier services, email, ACH transfers, or other means to ensure it performs on a

timely basis. A default of five (5) of fewer business days shall not be considered an event of default if *41* shall not have provided a notice of default to *Art Port* within such five (5) business days.

**9.6   Payments by the Parties.** Any payments required pursuant to this *Agreement,* owed by *41*, shall only be paid to *Art Port.* Any payments required pursuant to this *Agreement* by *Art Port,* including payment of *Profit* for the sale of any *Franchise* or *Free Agent Work,* shall only be paid to *41.*

### SECTION 10. NOTICES, DEFAULT, AND OPPORTUNITY TO CURE

**10.1   Methods of providing notice.** Any notice, demand, consent, approval, request, offer, or other communication permitted or required to be given hereunder by one *Party* to the other shall be in writing and shall be: *(i)* personally delivered, *(ii)* sent by Federal Express or other nationally recognized overnight delivery service, signature required, to the *Party* entitled or required to receive the same at the address specified on the signature page hereto, except that if the notice shall be to: *(a) 41,* a copy of any notice shall be sent concurrently to Amy Garde Asher and Keith Andrew Garde, and, if a single point of contact has been designated pursuant to *Section 5.7,* to such single point of contact; and *(b)* a copy of any notice setting forth a default by *41* shall also be sent by *Art Port* concurrently to: Jason Zimmerman, c/o Gray Robinson, P.A., 301 East Pine Street, Suite 1400, Orlando, Florida 32801 (or at such other address as may hereafter be designated by a *Party* as set forth in this *Section 10);* or *(iii)* provided by email, except that any notice to Jason Zimmerman may only be provided as set forth in *Section 10.1(ii)(b).*

Such notice shall be deemed received: *(i)* on the day personally delivered; *(ii)* on the day the overnight delivery service tracking system shows it was successfully delivered; or *(iii)* on the earlier of the day *(y)* the sender's email system shows the email has been **read** (but **not** an email system acknowledgement that it has been received), a copy of which email receipt shall be retained by sender with a copy of the email providing such notice to prove receipt, or *(z)* the recipient first acknowledges receipt of, or replies to, sender's email. Any *Party* may designate another, or change its, address for notices hereunder by delivery of a notice to all other *Parties* specified in accordance with the provisions of this *Section 10.*

**10.2   Default notice and opportunity to cure.** If *41* has reason to believe *Art Port* has, or if *Art Port* has reason to believe the *Artist* or *41* have, breached this *Agreement* and defaulted in their performance of duties set forth in this *Agreement,* the *Party* that believes the other *Party* has committed such a breach and defaulted shall provide notice of such breach or default to the other *Party,* in accordance with the notice provisions of this *Section 10,* which such notice shall include with reasonable specificity the nature of the breach or default, which such notice, shall provide for a period of one (1) month to cure such default. The *Parties* agree that, except as otherwise set forth in this *Agreement,* no breach or default, unless intentionally dishonest, shall be construed as incurable so long as cured within such one (1) month period.

### SECTION 11. INDEMNIFICATION

**11.1   Indemnification.** To the greatest extent allowed by the laws of the State of Florida, *Art Port* shall indemnify, defend, and hold harmless *41* (and, if applicable, their officers, directors, shareholders, general or limited partners, members, employees, agents, successors, and assigns) from and against any and all losses, damages, liabilities, claims, demands, obligations, fines, penalties, expenses (including reasonable fees and expenses of attorneys engaged by *41* in defense of any act or omissions), judgments, or amounts paid in settlement by *41* by reason of any act performed, or omitted to be performed, by *41* in connection with *Art Port's* business or in furtherance of *Art Port's* interests. The provisions of this *Section 11.1,* however, shall not relieve *41* of any liability it may have from its own gross negligence or willful misconduct.

**11.2   Provisions not exclusive.** The indemnification provided by this *Section 11* shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any statute, agreement, or otherwise.

### SECTION 12. GENERAL PROVISIONS

**12.1   Relationship.** Nothing contained in this *Agreement* shall be deemed or construed to constitute any *Party* as a member, manager, general partner, employee, or agent of any other *Party.* This *Agreement* shall not be construed to create a partnership or joint venture between *Art Port* and the *Artist* or *41,* individually or in any combination thereof. It is agreed that *Art Port* shall at all times during the *Term,* act hereunder as an independent contractor. *Art Port* may designate any and all other *Persons* in its reasonable discretion from time to time to assist in performing the services to be rendered by *Art Port* hereunder without, in any way, affecting the obligations of *Art Port* or the *Artist* or *41* hereunder. Any compensation payable to such other *Persons* retained by *Art Port* shall be reasonable and the sole responsibility of *Art Port.*

**12.2   Assignment.** No *Party* may delegate its duties hereunder (except as expressly provided in *Sections 5.7* or *12.1)* or assign or transfer its interest under this *Agreement* except as otherwise provided herein.

**12.3   Entire agreement; amendments.** This *Agreement* (and all agreements referred to herein, including all *EXHIBITS,* which are incorporated herein by reference) sets forth all the promises, covenants, agreements, conditions, and understandings between the *Parties,* and supersedes all prior and contemporaneous agreements, understandings, inducements, or conditions, expressed or implied, oral or written, except as herein contained. No variations from, modifications of, amendments to, or changes in this *Agreement* shall be binding upon any *Party* hereto unless set forth in a document duly executed by or on behalf of such *Party.*

**12.4   Binding effect.** Subject to the restrictions on transfers and encumbrances set forth herein, this *Agreement* shall inure to the benefit of and be binding upon the undersigned *Parties* and their respective heirs, executors, legal representatives, successors, and permitted assigns. Whenever a reference to any *Party* is made in this *Agreement,* such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors, and permitted assigns of such *Party.*

**12.5   No waiver.** No waiver of any provision of this *Agreement* shall be effective unless it is in writing and signed by the *Party* against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

**12.6   Multiple copies or counterparts of Agreement; electronic signatures.** This *Agreement* may be executed in one or more counterparts by the *Parties,* with electronic signatures presumed to be valid. All counterparts shall be construed together and shall constitute one agreement. Each counterpart shall be deemed an original hereof notwithstanding fewer than all of the *Parties* may have executed the counterpart.

**12.7   Headings.** The section headings contained in this *Agreement* are inserted for convenience only and shall not affect, in any way, the meaning or interpretation of this *Agreement.*

**12.8   Governing law and venue.** This *Agreement* is governed by and shall be construed in accordance with the laws of the State of Florida, excluding any conflict-of-laws rule or principle that might refer the governance of the construction of this *Agreement* to the law of another jurisdiction. Any action related to this *Agreement* shall be brought exclusively in a Court of competent jurisdiction in Orange County, Florida.

**12.9   Further assurances.** The *Parties* hereto agree that they will execute and deliver such further instruments and do such further acts as may reasonably be required to carry out the intent and purposes of this *Agreement.*

**12.10  Attorneys' fees.** In the event any arbitration, litigation, or controversy arises out of or in connection with this *Agreement* between the *Parties* hereto, the prevailing party in such arbitration, litigation, or controversy shall be entitled to recover from the other *Party* or *Parties* in such arbitration, litigation, or controversy, all reasonable attorneys' fees, expenses, and suit costs, including those associated with any post-judgment collection proceedings.

**12.11  Remedies.** Each *Party* hereto recognizes and agrees that the violation of any term, provision, or condition of this *Agreement,* including the *EXHIBITS* attached hereto and incorporated herein by reference, may cause irreparable damage to the other *Parties* which may be difficult to ascertain, and that the award of any sum of damages may not be adequate relief to such *Parties.* Each *Party,* therefore, agrees that, in addition to the remedies available in the event of a breach of this *Agreement,* any other *Party* shall have a right to equitable relief including, but not limited to, the remedy of specific performance.

**12.12  Injunctive relief.** The *Parties* expressly agree their respective responsibilities pursuant to this *Agreement* are of a special, unique, and intellectual character, which gives them peculiar value, and which directly impact, and threaten to irreparably damage, or diminish the value of, the *Art,* or the reputation of the *Artist* and *Art Port.* In the event of a breach by any *Party* of any material term, condition, covenant, warranty, or representation herein, the *Parties* agree that the non-breaching *Party* shall be caused irreparable harm for which the remedy at law is inadequate. Accordingly, the *Parties* expressly agree that the non-breaching *Party* shall be entitled to preliminary and permanent injunctive relief, mandatory or otherwise.

**12.13  Saving clause.** Any provisions under applicable law or regulation which supersede or invalidate any provision hereof shall not affect the validity of this *Agreement,* and the remaining provisions shall be enforced as if the invalid provision or provisions were deleted.

**12.14  Severability.** If any provision of this *Agreement,* or the application thereof to any *Person* or circumstances, shall be invalid or unenforceable to any extent, the remainder of this *Agreement,* and the application of such provisions to other *Persons* or circumstances, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**12.15  Construction rules.** All personal pronouns used in this *Agreement,* whether used in the masculine, feminine, or neuter gender, shall include all other genders, the singular shall include the plural, and vice versa, as the context may require. Titles of **Sections** are for convenience of reference only and shall neither limit nor amplify the provisions of this *Agreement* itself. References in this *Agreement* to particular **Sections** are references to **Sections** of this *Agreement* unless otherwise specifically provided. The words "hereof," "herein," "hereto," "hereunder," and similar words shall refer to this *Agreement* as a whole and not to any particular provision of this *Agreement* unless otherwise specifically provided.

**12.16  Interpretation.** The *Parties* each acknowledge to the others that it has reviewed, or had sufficient opportunity to review, this *Agreement* and its terms. The *Parties* further acknowledge to each other that each *Party* to this *Agreement* has had equal input as to the drafting and construction of this *Agreement* and that the terms of this *Agreement* are intended to express the mutual intent of the *Parties.* Accordingly, the *Parties* intend that a Court construing this *Agreement* shall not construe it more strictly against any of the *Parties* hereto. Each of the *Parties* represents and warrants to the other *Parties* hereto that it has had this *Agreement* reviewed on its behalf by independent legal counsel of its choosing or has waived its right to do so.

**12.17  No punitive or consequential damages.** In no event shall any *Party* hereto or any permitted assignee thereof, be liable or otherwise responsible hereunder for punitive damages, or for lost profits or other consequential or incidental damages of or with respect to any other *Party.*

**12.18  Hold harmless.** Each *Party* hereby acknowledges and agrees that William Hohns, an individual *(Hohns),* was requested by *Art Port, 41,* and the *Artist* (and his issue) to provide a negotiated resolution related to this *Agreement.* Both *Parties* agree that *Hohns* possessed unique knowledge of the *Parties* and structure they were seeking. Each *Party* agrees, warrants, covenants, and represents, that, at all times, and in all actions by *Hohns,* he acted as a business advisor to *Art Port* and its interests and the *Artist* and *41* and their interests, and that each *Party,* including the issue of the *Artist,* approved of such role of *Hohns.* Accordingly, the *Parties* agree that *Hohns* shall, at all times, for any and all involvement, be held harmless by all *Parties* and shall, under no circumstances, be held liable, or named as a party to any event of default, breach, or interpretation of, this *Agreement,* or any action, including any litigation or complaint that may be filed by any *Party,* related to, or arising from, this *Agreement,* regardless of the underlying cause of, or reasons for, such action, including any action as may be brought or pursued by any of the issue of the *Artist.*

*[Signature page follows]*

**IN WITNESS WHEREOF,** the *Parties* have executed this *Agreement* effective as of the day and year first above written and upon the dates so indicated by each *Party,* the last of which to execute and date shall, by their signature and date, create the *Execution Date* of this *Agreement.*

FOR: ART PORT, LLC, a New York limited liability company *(Art Port)*

By: *Nancy Loving, Director*    Date: 7/24/19

    Nancy Loving, Director, 406 Piermont Ave, Piermont, NY 10968, ArtSuiteNY@gmail.com, Aly.ArtSuiteNY@gmail.com

FOR: STUDIO 41 LLC, a Delaware limited liability company *(41)*

By: _____    Date: _____

    Harold Garde, its sole Member, notice for which is to be provided pursuant to **Section 10**

FOR: STUDIO 41 LLC

By: _____    Date: _____

    Amy Garde Asher, its co-manager, ███████████████, ███████@gmail.com

FOR: STUDIO 41 LLC

By: _____    Date: _____

    Keith Andrew Garde, its co-manager, ███████████████, ███████@gmail.com

FOR: HAROLD GARDE, an individual *(Artist)*

By: _____    Date: _____

    Harold Garde, ███████████, ███████@gmail.com

    except from May 01 to September 15, without provision of notice,

    ███████████

    at which time, notice address shall, without provision of notice, revert to Florida address first above

**IN WITNESS WHEREOF,** the *Parties* have executed this *Agreement* effective as of the day and year first above written and upon the dates so indicated by each *Party*, the last of which to execute and date shall, by their signature and date, create the *Execution Date* of this *Agreement*.

FOR: ART PORT, LLC, a New York limited liability company *(Art Port)*

By: _____     Date: _____
    Nancy Loving, Director, 466 Piermont Ave, Piermont, NY 10968, *ArtSuiteNY@gmail.com, Aly.ArtSuiteNY@gmail.com*

FOR: STUDIO 41 LLC, a Delaware limited liability company *(41)*

By: _____     Date: _____
    Harold Garde, its sole Member, notice for which is to be provided pursuant to **Section 10**

FOR: STUDIO 41 LLC

By: _____     Date: _____
    Amy Garde Asher, its co-manager, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮@gmail.com

FOR: STUDIO 41 LLC

By: _____     Date: _____
    Keith Andrew Garde, its co-manager, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮@gmail.com

FOR: HAROLD GARDE, an individual *(Artist)*

By: _____     Date: _____
    Harold Garde, ▮▮▮▮▮▮▮▮ ▮▮@gmail.com
                   except from May 01 to September 15, without provision of notice,
                   ▮▮▮▮▮▮
                   at which time, notice address shall, without provision of notice, revert to Florida address first above

IN WITNESS WHEREOF, the *Parties* have executed this *Agreement* effective as of the day and year first above written and upon the dates so indicated by each *Party*, the last of which to execute and date shall, by their signature and date, create the *Execution Date* of this *Agreement*.

FOR: ART PORT, LLC, a New York limited liability company *(Art Port)*

By: _____     Date:_____
    *Nancy Loving, Director, 466 Piermont Ave, Piermont, NY 10968, ArtSuiteNY@gmail.com, Aly.ArtSuiteNY@gmail.com*

FOR: STUDIO 41 LLC, a Delaware limited liability company *(41)*

By: _____     Date:_____
    *Harold Garde, its sole Member, notice for which is to be provided pursuant to **Section 10***

FOR: STUDIO 41 LLC

By: _____     Date: **05/10/2019**
    *Amy Garde Asher, its co-manager,* ███████████, ███████@gmail.com

FOR: STUDIO 41 LLC

By: _____     Date:_____
    *Keith Andrew Garde, its co-manager,* ███████████, ███████@gmail.com

FOR: HAROLD GARDE, an individual *(Artist)*

By: _____     Date:_____
    *Harold Garde,* ███████████ ███████@gmail.com
    *except from May 01 to September 15, without provision of notice,*
    ███████████
    *at which time, notice address shall, without provision of notice, revert to Florida address first above*

**IN WITNESS WHEREOF,** the *Parties* have executed this *Agreement* effective as of the day and year first above written and upon the dates so indicated by each *Party,* the last of which to execute and date shall, by their signature and date, create the *Execution Date* of this *Agreement.*

FOR: ART PORT, LLC, a New York limited liability company *(Art Port)*

By: _____     Date: _____
     Nancy Loving, Director, 466 Piermont Ave, Piermont, NY 10968,

FOR: STUDIO 41 LLC, a Delaware limited liability company *(41)*

By: _____     Date: _____
     Harold Garde, its sole Member, notice for which is to be provided pursuant to **Section 10**

FOR: STUDIO 41 LLC

By: _____     Date: _____
     Amy Garde Asher, its co-manager, ████████████████████

FOR: STUDIO 41 LLC

By: _____     Date: 7/28/19
     Keith Andrew Garde, its co-manager, ████████████████████

FOR: HAROLD GARDE, an individual *(Artist)*

By: _____     Date: _____
     Harold Garde, ████████████████████
     except from May 01 to September 15, without provision of notice,

     at which time, notice address shall, without provision of notice, revert to Florida address first above

**PROCESS FOR DESIGNATING ART AS, AND MATTERS RELATED TO,
FRANCHISE WORKS, FREE AGENT WORKS, AND/OR LEGACY WORKS**

In order to designate a limited number of, and certain, works of *Art* the *Artist* and his issue believe have sentimental or irreplaceable value, and to ensure *Art Port* may select a limited number of works of *Art* it considers seminal (critically important) works of *Art* to be available for sale at any time during the *Term*, the *Parties* agree to the following selection process, categories, and restrictions on designated pieces as set forth in this *EXHIBIT A* and in *Section 5.4*:

*Capitalized or Italicized Words* shall have the meaning set forth in the *Agreement*.

| Responsible Party/Parties | Timing | Item | Event and description |
|---|---|---|---|
| *41* | within two (2) weeks after *Execution Date* | **1** | *41*, only from *Art* in the respective domiciles of the *Artist* and his issue on the *Effective Date*, shall select and designate no more than six (6) works of *Art* from each such domicile as *Franchise Works*, and prepare and provide *Art Port* with an *Art Description* of their individual *Franchise Works* |
| | | | Photography of any *Franchise* or *Free Agent Works* shall be at a resolution not less than 300 dpi and include the front and rear of each work of *Art*, reasonably sufficient to determine its condition and allow its inclusion in the *Database*. |
| | | | **ALL** *Art* in any domicile of the *Artist* or his issue not properly selected and "cataloged" as *Franchise Works* pursuant to item **1**, shall be automatically designated as *Free Agent Works*, but not more than eighty (80) such *Free Agent Works* in any one domicile as set forth in the definition in *Section 1*, and the requirements at item **2** will be followed for all such *Art* |
| | | | **REMEDY for *Art Port***: If *41* fails to satisfy item **1** on a timely basis, then *41* will surrender its right to designate *Franchise* Works for any domicile the information for which has not been timely provided to *Art Port*, and all works in such domicile not notified to *Art Port* as of the timing required, shall be designated *Free Agent Works* |
| *41* | within six (6) weeks after *Execution Date* | **2** | *41* will arrange for the photography of all works of *Art* in the domicile of the *Artist* and his issue and provide an inventory of same together with the information required in an *Art Description* of all remaining *Art* in their domiciles, all of which *Art*, but not more than eighty (80) works of *Art*, shall thereafter be designated as *Free Agent Works* |
| | | | **REMEDY for *Art Port*:** If *41* fails to satisfy item **2** on a timely basis, then *41* having so failed to do so, will cooperate fully with *Art Port*, which will perform the work, on a mutually agreed upon date(s) and time duration, the agreement to which will not be unreasonably withheld, to collect the *Art Descriptions* in item **2** |
| | | | After *41* has completed the requirements of items **1** and **2**, *Art Port* shall make no further duplicative requests of *41* to again submit such an inventory. However, nothing shall preclude *Art Port* from making a reasonable supplemental request to either verify an item of information provided if it suspects it may be incorrect or missing, or, on occasion, to request further detailed photographs of a work of *Art* (or portions thereof) if it is trying to determine its condition or suitability for sale. *41* agrees to respond as promptly as reasonably practical within schedules of availability and to apprise *Art Port* promptly of the anticipated time duration they require to respond. In the event *41* fails to respond or perform within the time frame provided, *Art Port* shall have the same **REMEDY** as immediately set forth in the table line above, except the cost of performing such services shall be at the expense of *41* |
| *Art Port* | within the earlier of: *(a)* two (2) months following the receipt of substantially all the *Art* (excluding *Franchise* and *Free Agent Works)*, or *(b)* six (6) months after the *Execution Date* | **3** | *Art Port* shall select and designate, as *Legacy Works*, no more than thirty (30) works of *Art*. *Legacy Works*, as well as no more than two hundred (200) works of *Art* selected by *Art Port* within the time period for selection of *Legacy Works*, which additional works *Art Port* shall, during the *Term* hereof, maintain continuously as a published (whether digitally or in print) catalog of work that shall, during the *Term*, remain for sale at all times, shall thereafter be available for gifting by the *Artist* only upon the advance written approval of *Art Port* (and by *Art Port* only upon the advance written approval of the *Artist)*, each, when and as required in their respective approval roles, in their respective sole discretion without requirement of any explanation or reason to the requesting *Party* |
| | | | **ALL REMAINING ART NOT DESIGNATED ABOVE:** Any *Art* not designated under the procedures above shall be *Art* available for sale or gifting, but only as set forth in this *Agreement* |

The *Parties* agree and *Art Port* herein acknowledges that the *Art* has significant value. In addition to provisions in this *Agreement* regarding, among others, the care, maintenance, storage, and insurance of the *Art*, *Art Port* agrees and acknowledges that the location of each work of *Art* in its possession, including any *Art* lent pursuant to **Section 8,** must be known and tracked at all times during its possession. To that end, the *Parties* agree that an accurate, and complete, catalog or *Database* of the *Art* should be compiled and maintained by *Art Port* during the *Term*. The *Parties* agree to the following terms with regard to the *Database*.

*Capitalized or Italicized Words* shall have the meaning set forth in the *Agreement*.

**B.1**    *Art Port* shall, during the *Term,* catalog the *Art,* including the compilation, creation, continuation, and maintenance, of a *Database* of the *Art,* the purpose of which is, over time, to review, examine, photograph, assess the condition of, and, as determined by *Art Port,* categorize the *Art,* including various attributes for entry into the *Database,* among these, common attributes, such as style, year of creation or completion, substrate, media, size, elements that add to a work's provenance, such as publications and exhibitions the *Art* appeared in, and title, as well as location of the *Art* and, its owner, if not *41* and/or the *Artist,* together with a determination by *Art Port* of a reasonable *Market Price* for each work of *Art,* with particular interests in *(a)* optimizing the ease with which as many of the works of *Art* available for sale can be viewed by prospective purchasers both digitally (including remote to *Art Port)* and in person, *(b)* retrieving *Art* as promptly as possible, *(c)* assigning the *Art* by *Restricted Category,* as well as grading the *Art,* for effectively assembling viewings, showings, and other purposes set forth in this *Agreement,* and *(d)* compiling as complete a *raison d'être* of the life's work of the *Artist* as practical to promote authentication and provenance.

**B.2**    The *Parties* agree cataloging is a time-consuming task and, while agreed by the *Parties* that accomplishing as much as reasonably practical in as short a period of time as possible is additive to the ability of *Art Port* to perform its services, it is also distracting. Accordingly, the *Parties* agree that there shall be no specific parameters provided for this work other than a general expectation that *Art Port* work with reasonable diligence, as time permits, to complete as much of this task as reasonably possible during the *Term*.

**B.3**    Art *Port* agrees to provide view or read-only access to *41* to the *Database,* but only upon the payment either to *Art Port,* or its *Database* vendor(s), of any required software licenses specific only to access by a third party such as *41,* and other than those required by *Art Port* for its work. *Art Port* agrees that, if required to provide remote access, it will upgrade its system as required to enable remote access by *41.* Read-only access may be limited by *Art Port* to include only the *Art Description* and *Market Price* of each work of *Art.*

**B.4**    *Art Port* agrees that prior to, or within two (2) weeks of the *Execution Date,* it will provide a printout (or thumb drive or similar universal storage media or cloud-based access through Dropbox or a similar service) of the *Art* cataloged through the *Effective Date,* and will update the additional work, or if easier, the entire *Database,* it has cataloged, once each calendar quarter, in the same manner. *41* agrees that it shall not, during the *Term* hereof, share, directly or indirectly, its access to the *Database* with any third party that is not a named *Party* (which named *Parties* shall include the managers and members of *41)* to this *Agreement.*

**B.5**    As the *Parties* recognize that compilation of the *Database* is in the best interests of *Art Port,* any failure by *Art Port* to compile such a *Database* shall not be deemed an event of default.

**B.6.**    The ownership and maintenance of, and all costs associated with the *Database,* except as set forth in **Sections B.3** and **B.7** of this *EXHIBIT B,* shall, during the *Term* and, until such time as *Art Port* shall arrange transfer of same to *41,* including full control of, and access to, the *Database,* shall be the sole responsibility of *Art Port.*

**B.7**    Upon transfer by *Art Port,* which is required following any termination of this *Agreement*, of the full control of, and access to, the *Database,* including payment of all costs through the date of transfer, all of which *Art Port* will work to accomplish with reasonable diligence, the *Database* shall be owned by *41,* without the payment of separate cost to *Art Port,* other than its inclusion in the *Net Recovery Amount,* if any, as applicable, and *41* shall, thereafter, be responsible for all costs of maintenance and access by *41* or any other party to which *41,* at its sole discretion, shall grant access. *Art Port* may accomplish such transfer of the *Database* by providing *41* with a copy of the *Art Descriptions* of the *Art* as then exist in the *Database. Art Port* shall not have any obligation to *(a)* transfer the underlying technology in which the *Database* is compiled or maintained or *(b)* add items or information not then in, or otherwise verify the accuracy of, or improve, the *Database.*

EXHIBIT C

**CARE OF, AND STORAGE AND INSURANCE PROTOCOLS FOR, THE ART**

*Capitalized or Italicized Words* shall have the meaning set forth in the *Agreement.*

| Responsible Party/Parties | Timing | Item | Event and description |
|---|---|---|---|
| *41* | within one (1) month after *Start Date* | **1** | All *Art,* excluding *Franchise* or *Free Agent Works,* in possession of the *Artist* or *41,* will be prepared for retrieval by *Art Port;* preparation to include, at the cost of *41,* a review, and photographic inventory, of all such *Art* |
| *Art Port* | during, and promptly on completion of, item **1** | **2** | As necessary, add (or replace) storage beyond that in place for *Art* in its possession on the *Effective Date,* and, based upon resources available to *Art Port* to receive inbound shipments, promptly make all arrangements to retrieve, at its sole expense, all *Art* in item **1** |
| | | | *Art Port* shall not be required to retrieve all *Art,* excluding *Franchise* or *Free Agent Works,* in possession of the *Artist* or *41,* but instead may make a selection of such *Art* at its sole discretion; further, *Art Port* may elect to return *Art* in its possession to *41* or the *Artist* at the time it retrieves *Art* from *41* or the *Artist* |
| | | | Any *Art* so returned or not retrieved by *Art Port* shall be thereafter retained by *41* and the *Artist* and (except for *Franchise and Free Agent Works* and *Art* newly created by the *Artist* after the day such *Art* has been retrieved or returned by *Art Port)* may not be included in the *Database* of *Art,* or otherwise, offered for sale by *Art Port* |
| | | | All such *Art* as shall be returned or not retrieved by *Art Port* (except for *Franchise* or *Free Agent Works* or *Art* newly created by the *Artist* after the date such *Art* has been retrieved or returned by *Art Port,* all of which shall continue to be governed by the terms of the *Agreement)* shall be retained by *41* or the *Artist* and shall no longer be included in the *Database* of *Art,* or otherwise, offered for sale by *Art Port,* except that *(a)* *41* and the *Artist* may lend or gift such returned or non-retrieved *Art* at their discretion and *(b)* any sales of such returned or non-retrieved *Art* by *41* or the *Artist* may only be thereafter made in accordance with the terms of this *Agreement,* including the provisions of ***Sections 6.3*** and ***9.1, 9.2,*** and ***9.3*** |

**Storage of *Art*:**

| Responsible Party/Parties | Timing | Item | Event and description |
|---|---|---|---|
| *Art Port* | At all times in their possession | **3** | **Requirements.** Storage shall, at a minimum, provide for security of, controlled access to, and climate control of, the *Art,* together with other attributes typical of the long-term storage of art, including preferably humidity control, that would reasonably be expected to prevent further deterioration or diminution of its value |
| | | | **Agreement embargo.** *Art Port* shall not execute any third-party agreement for *Art* storage without first submitting it to *41* for review and approval |
| | | | **Agreement requirements.** Any third-party agreement for storage may ***not*** include provisions that would allow the lessor to take possession of the *Art* without providing notice of not less than one (1) month to both *Art Port* and *41* |

*Art Port* agrees to include revisions reasonably requested by *41* in any third-party storage agreement; in the event *41* does not return its review within two (2) weeks of its receipt from *Art Port, Art Port* may complete the agreement as if *41* had no comments in its review

| Responsible Party/Parties | Timing | Item | Event and description |
|---|---|---|---|
| *Art Port* | at all times during the *Term* | **4** | **Keys, access codes.** Within one (1) week after *(a)* the *Execution Date* and *(b)* any change in storage facilities, *Art Port* will deliver a set of keys and access codes to *41* |
| *Art Port & 41* | at all times during the *Term* | **5** | **Access to storage.** Both *Art Port* and *41* shall have equal access to enter and assess *Art* in storage; each must, and agrees to, follow all Protocols governing access |
| *Art Port & 41* | at all times during the *Term* | **6** | **Storage costs shared.** The *Parties* shall share the cost of storage, based on the percentage allocation, at the time the cost is incurred, of *Profit* set forth in ***Section 9;*** the share owed by *41* shall be a *Reimbursable Cost,* not to exceed $300/month, and shall be recovered as set forth in ***Section 9.4*** |
| *Art Port & 41* | within one (1) month after *Execution Date* | **7** | **Access Protocol.** Within two (2) weeks, *Art Port* shall draft and *Art Port* and *41* shall, within one(1) month, both time durations after the *Execution Date,* agree on a one-page access protocol to be used by all *Parties* to include a perpetual log, maintained by *Art Port,* setting forth, at a minimum (other than routine access by *Art Port* for the purposes set forth in this *Agreement),* the *(a)* date and time of each access entry and departure, *(b)* facility accessed, *(c) Persons* that accessed the facility, *(d)* intended purpose, and *(e)* any actions, *e.g.,* additions, viewing, or removal, of *Art,* a copy of which perpetual log shall be included in each monthly report to *41* |

EXHIBIT C *(continued)*

**CARE OF, AND STORAGE AND INSURANCE PROTOCOLS FOR, THE ART**

| Responsible Party/Parties | Timing | Item | Event and description |
|---|---|---|---|
| **Insurance of *Art:*** | | | |
| *Art Port* | at all times during the *Term* | **8** | **Insurance coverage.** During the *Term*, *Art Port* will insure the *Art* for reasonable amounts and pay the premiums for such coverage. *41* will pay for the cost of up to $1.0 million of coverage as a simple proportionate ratio to the total coverage in force, which will be included in *Reimbursable Cost* and recovered as set forth in ***Section 9.4;*** if coverage in excess of $1.0 million is desired, *Art Port* shall pay for the premiums required to provide up to $1.5 million of additional *Art* value covered and, thereafter, the *Parties* may participate in payment for any premiums for *Art* value covered beyond $2.5 million at their own discretion |
| *Art Port* | at all times during the *Term* | **9** | **Copies of offers, policies, and renewals.** *Art Port* agrees to provide *41* with copies of offers, policies in force, and renewals; policies shall name *41* as an additional insured and require advance notice of thirty (30) days on cancellation to both *Art Port* and *41* |
| *Art Port & 41* | at all times during the *Term* and thereafter, should a claim occur during the *Term* | **10** | **Insurance proceeds.** If there is an insured event ***during*** the *Term,* proceeds (up to a cumulative $2.5 million) shall be earned and paid to *Art Port* and *41* as if it were a sale of *Art* to the extent of their respective interests in *Profit* as set forth in ***Section 9*** at the time proceeds are received; cumulative proceeds in excess of $2.5 million shall be earned by the *Parties* to the extent of their participation in premiums for value in excess of $2.5 million shall have been paid by each respective *Party* |

*41,* the *Artist,* and his issue shall, during the *Term,* have the right, but not the obligation, to insure *Art* in their residences, including *Franchise* and *Free Agent Works;* insurance proceeds on *Art* in the residences of the *Artist* or his issue shall solely benefit the insured party, or *41*, as applicable, and *Art Port* shall not share in such insurance proceeds

The *Parties* agree, and *Art Port* herein acknowledges that the provision of timely reports as set forth in **Section 9.5,** is an absolute obligation pursuant to this *Agreement*. To assist the *Parties* in tracking reports due the other, the following supplemental table of reporting requirements has been provided and agreed to by the *Parties*. The *Parties* agree to rely upon the provisions set forth in the *Agreement* regarding all reporting requirements and acknowledge that the table below is purely for convenience.

*Capitalized or Italicized Words* shall have the meaning set forth in the *Agreement*.

| Responsible Party/Parties | Timing | Reports, or payment, required—**Section** reference |
|---|---|---|
| *Art Port* | on the twenty-fifth (25th) day of each calendar month during the *Term* and continuing thereafter until all reports reflecting activity through and including the date of any termination have been provided | **1.** Report, to *41*, all sales in preceding calendar month—***Sections 5.3(f)*** and ***9.5***<br>**2.** Payment to *41* of the *Profit* due *41* on any sales of *Art* in the preceding calendar month—***Section 9.5***<br>**3.** Copy of perpetual log, through and including the last day of the preceding calendar month, of all *Loan Agreement* activity, including an explanation of any loans for *Art* the return of which is past due its agreed upon return date—***Sections 5.3(g)*** and ***8.6***<br>**4.** Copies of any and all *Loan Agreements* entered into in the preceding calendar month—***Sections 5.3(g)*** and ***8.6***<br>**5.** Copy of perpetual log, through and including the last day of the preceding calendar month, showing all access to, and actions taken, with regard to storage of the *Art*—***Item 6*** in ***EXHIBIT C***<br>**6.** Report to *41*, any activity in, and a running balance (including the deduction of any recovery from *Profit* that otherwise would have been paid to *41*) of, *Reimbursable Costs* as set forth in **Section 9.4** and ***Items 6*** and ***8*** in ***EXHIBIT C*** |
| | In order to ensure there is a monthly report even if there was no activity in the preceding calendar month, *Art Port* will, for sales, provide a report stating there were no sales in the preceding calendar month, and/or, if there was no activity in the perpetual logs for either *Loan Agreements* or storage access, or in *Reimbursable Costs*, *Art Port* will provide a copy of the respective previous monthly report(s), as applicable, marked "no changes" | |
| *Art Port* | on the twenty-fifth (25th) day of each Jan, Apr, Jul, and Oct during the *Term* | Provide *41*, if *41* shall not have remote access to the *Database*, with a printout of any and all additions or revisions to the *Database* during the preceding calendar quarter—***Section B.4*** in ***EXHIBIT B*** |
| *Art Port* | Within one (1) week of any termination of this *Agreement* | Provide *41* with a copy of the perpetual log, through and including the date of termination, of all *Loan Agreement* activity, including copies of any and all *Loan Agreements* pursuant to which *Art* has not yet been returned to *Art Port*—***Section 3.4(b)*** |
| *41* | within two (2) weeks of receipt of *Gross Proceeds* received from any sale of *Art* during the *Term* | Report, to *Art Port*, the *Gross Proceeds* received, but only in such months as sales may occur, together with all details of the purchase and any further information requested by *Art Port* to reasonably determine the *Profit* attributable to that sale **(Section 6.3)** |
| *41* | on the twentieth (20th) day of each calendar month for three (3) years following a termination (other than a *Termination* caused by a default by *Art Port*) | Provide *Art Port* with a report of any sales of *Art* in the preceding calendar month, but only in such months as such sales may occur, including a calculation of *Profit* together with payment to *Art Port* equal to fifteen percent (15%) of the amount so determined as *Profit*—**Section 3.4(d)** |

This *EXHIBIT E,* and any rights or obligations herein, applies **only** to a termination of the *Agreement* that is the result of: (a) the end of a *Term,* unless evidenced by a new agreement that supersedes this *Agreement;* or *(b)* a termination resulting from an uncured default caused by actions of the *Artist* or *41.* The process set forth in this *EXHIBIT E* shall **not** apply to any *Termination.*

*Capitalized or Italicized Words* shall have the meaning set forth in the *Agreement.*

| Responsible Party/Parties | Timing | Item | Event and description |
|---|---|---|---|
| *Art Port* | within two (2) months of date of termination | **1** | Provide *41* with *Net Recovery Amount. Accounting* to include for each expense, at a minimum: *(a)* its date; *(b)* party paid or owed; *(c)* description of and, if description is not self-explanatory, reason; *(d)* amount; and *(e)* underlying receipt/record |
| If there shall be no *Net Recovery Amount* due on termination, skip to item **3** | | | |
| *Art Port* | within two (2) months of date of termination | **2** | Provide *41* with a selection of *Art,* the aggregate value of which is equal to the *Net Recovery Amount,* including, for each work selected: *(a)* its *Art Description* and (b) *Market Price** |
| * *Market Price(s),* for purposes of Item **2** above, shall not be less than $8/sq inch for works in excess of 999 sq inches and $16/sq inch for works less than 1,000 sq inches, determined by the product of the image's height and width for each work of *Art* selected by *Art Port. Art Port* agrees that no one work, or multiple number of works, of *Art* in its selection in item **2** shall represent, individually or collectively, more than ten percent (10%) of any *Restricted Category* | | | |
| *Art Port* | within two (2) months of date of termination | **3** | Release, for collection by *41,* all *Art* in its possession not included in item **2,** upon which release, *41,* will assume all costs of care, storage, insurance, etc., and may collect, move, transfer, and relocate, the *Art,* at its cost and convenience |
| **REMEDY for *41*:** If *Art Port* fails to provide items **1** and **2** on a timely basis, *Art Port* agrees to surrender its right to do so and all *Art,* not sold or gifted as set forth in the *Agreement* during its *Term,* shall be returned to *41* promptly at the sole expense of *Art Port. 41* agrees to provide to *Art Port* within one (1) week of *Art Port's* failure to provide items **1** and **2,** a single destination for the return of all *Art* | | | |
| *41* | within two (2) weeks of **both** items **1** and **2** | **4** | Review the information provided in items **1** and **2,** and provide *Art Port* with either its approval or a list of any questions or disagreements it has, with sufficient specificity to allow *Art Port* to respond to each |
| If *41* agrees with *Art Port,* skip to item **9** | | | |
| **CAVEAT 1:** The *Parties* agree that, unless the questions raised by *41 (a)* exceed ten percent (10%) of either the *Net Recovery Amount* or the total *Market Price* of the *Art* selected, or *(b)* question the authenticity of selections by *Art Port* with regard to *Restricted Categories,* the information provided by *Art Port* shall be automatically approved and the *Parties* shall skip to item **9** | | | |
| While *41* is permitted to question the accuracy of *Market Price* and categorization of works selected, *41* agrees that it may **not** question or object to the merits of any *Art* selected by *Art Port* on any basis, including historical value, rarity, or other such factors | | | |
| **REMEDY for *Art Port*:** If *41* fails to provide item **4** on a timely basis, then items **1** and **2** shall be automatically approved, and the *Parties* shall skip to item **9** | | | |
| *Art Port* | within two (2) weeks of item **4** | **5** | Review the information provided in item **4** and provide its response, and any other further clarifying information, to *41* |
| *Art Port* and *41* | during the two (2) weeks following item **5** | **6** | The *Parties* shall confer diligently, applying reasonable and timely efforts, to resolve any differences that remain following item **5,** using the same standard set forth in subpart *(a)* of caveat 1 above |
| *Art Port* and *41* | during the two (2) weeks following item **5** | **7** | During item **5,** the *Parties* shall agree on a public accounting firm *(PAF)* with not less than ten (10) partners, to which the *Parties, if* unable to conclude item **6** successfully, will assign the final resolution of all matters remaining following item **6** |
| If the *Parties* reach agreement in item **6,** skip to item **9** | | | |
| *PAF* | Immediately following items **5 & 6** for as long as *PAF* shall require | **8** | The public accounting firm *(PAF)* shall resolve all remaining differences between the *Parties* and issue a report of their findings, which such report shall be binding upon both *Parties* |
| If the *PAF* shall resolve sixty percent (60%) or more of the aggregate dollar value of all differences submitted in item **7** in favor of either *Art Port* or *41,* the *Party* with the lesser dollar value of differences resolved in its favor, shall pay one hundred percent (100%) of the costs of the *PAF.* In all other cases, the *Parties* shall equally split the costs of the *PAF.* | | | |
| *41* | within two (2) weeks of items **3, 5,** or **7** | **9** | Transfer ownership of, and title in, the selection of *Art* in item **2** (as modified in subsequent items above) to *Art Port* |
| *Art Port* | within two (2) weeks of items **3, 5,** or **7** | **10** | Release, and ship to *41,* at *Art Port's* sole expense, all remaining *Art* in its possession, not sold or gifted as set forth in the *Agreement* during its *Term* or transferred as set forth in item **9** |



GRAY ROBINSON
ATTORNEYS AT LAW

301 EAST PINE STREET
SUITE 1400
ORLANDO, FLORIDA 32801
TEL 407-843-8880
FAX 407-244-5690
gray-robinson.com

BOCA RATON
FORT LAUDERDALE
FORT MYERS
GAINESVILLE
JACKSONVILLE
KEY WEST
LAKELAND
MELBOURNE
MIAMI
NAPLES
ORLANDO
TALLAHASSEE
TAMPA
WASHINGTON, DC
WEST PALM BEACH

407-843-8880
JASON.ZIMMERMAN@GRAY-ROBINSON.COM

May 18, 2020

**VIA EMAIL AND FEDERAL EXPRESS (SIGNATURE REQUIRED)**
Ms. Nancy Loving, Director and Registered Agent
Art Port, LLC
75 West Street, #17C
New York, NY 10006
ArtSuiteNY@gmail.com
Aly.ArtSuiteNY@gmail.com

Re:     Termination of Portfolio Marketing and Management Agreement ("Agreement") and
        Demand for Immediate Return of Art

Dear Ms. Loving:

We represent Studio 41, LLC ("41") regarding Art Port, LLC's default on the Agreement.  Section 9.5 states, "both a monthly report of any sales, and payment thereof as due 41, shall be made by Art Port to 41 for the preceding calendar month no later than the twenty-fifth (25th) day of the immediately following month."  Furthermore, Section 9.5 provides:

Timeliness of monthly sales reports and payments shall be of the essence with regard to performance hereunder by Art Port. Any occurrence of three (3) or more failures by Art Port during any calendar year, or any continuing default beyond one (1) month from the date on which such report or payment was required, during the Term shall represent a *de facto* default by Art Port, upon which default 41 may, at its sole option, declare a Termination.

Art Port failed in multiple respects, but specifically due to one continuing default beyond one month.  Therefore, **41 is hereby exercising its right, pursuant to section 9.5 of the Agreement, to immediately declare a Termination[1].**

We expect Art Port will comply with its post termination obligations under the Agreement, including specifically Section 5.9 (Return of the Art) and any databases, images or intellectual property, and immediately provide dates and times on which you will deliver the Art to 41's soon to be leased storage unit located at Sunshine Self Storage, 20555 Boca Rio Road, Boca Raton, FL 33434.

---

[1] Capitalized terms not defined in this letter are used as they are defined in the Agreement.

**EXHIBIT "B"**

**GRAYROBINSON**
PROFESSIONAL ASSOCIATION

Nothing herein releases Art Port from any outstanding obligations, including but not limited to, its obligation to provide within one week a copy of the perpetual Loan Agreement Log, copies of any Loan Agreements still active. Art Port must also provide any Database to 41 within one month.

Thank you for your cooperation.

Sincerely,

Jason Zimmerman