## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.   19-cv-2381-LTB-MEH

WALTER CHARNOFF

                Plaintiff,

      v.

NANCY LOVING, d/b/a ARTSUITE NY,
ARTPORT LLC,
STUDIO 41, LLC,
ALICIA ST. PIERRE,
MARTIN ST. PIERRE,
ISP HOLDINGS, INC., and
DAVID HINKELMAN

                Defendants.

---

## DEFENDANTS NANCY LOVING, d/b/a ARTSUITE NY, ARTPORT LLC, STUDIO 41, LLC AND DAVID HINKELMAN'S MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

Plaintiff Charnoff's ever shifting and inconsistent theory of his case reveals the frivolous nature of his claims.  First, he claimed Defendants failed to deliver the art he purchased — despite requesting that Defendants not ship the art.  After Defendants were sued and the art was shipped, he refused to accept the art and then claimed it was damaged while Defendants stored it at his request — despite that he has not seen the art and he does not have an expert to opine it is damaged.  Finally, he claims the art he purchased at $186,000, has zero value yet, at the same time, claims he is owed $446,000 for the value of the art —despite that he testified that an entity, not he, individually owns

the art. Fatal to his claims, Charnoff identifies no evidence that the art he purchased has declined in value, other than his own *feeling* the art is valueless to him. As set forth below, Charnoff cannot state a claim as a matter of law and his complaint must be dismissed as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     This lawsuit arises out of $186,000 Walter Charnoff alleges he paid defendant ArtPort LLC for art created by artist Harold Garde. Second Amended Complaint ("SAC") [DOC 64] ¶¶ 1, 66.

2.     ArtPort LLC is an entity through which defendant Ms. Loving sells Harold Garde art and which she is a member. Ex. 1 (Loving Decl.) ¶ 2. Ms. Loving sold art at her gallery titled ArtSuite NY.

3.     Walter Charnoff saw and selected art he wished to purchase while he was in New York or Connecticut, in Ms. Loving's presence, in her gallery, home and storage facility. *Id.* ¶ 3.

4.     Mr. Charnoff alleges he made two purchases, the First Purchase, totaling $45,120 and the Second Purchase, totaling $141,000. SAC ¶¶ 35, 66.

5.     On August 3, 2016, payment for the First Purchase was made by wire by from an entity known as Wolliz Investment Properties ("Wolliz"). Ex.2 (LOVING 697).

6.     Walter Charnoff and his wife Brande Charnoff are each 50% owners of Wolliz. *See In re: Walter Charnoff*, Case No. 17-21-594, Disclosure Statement Plan for Reorganization, attached hereto as Ex. 3, p. 10.

7.     The First Purchase included four artworks. *See* SAC ¶ 43.

2

8.      On August 5, 2017, Ms. Loving emailed Mr. Charnoff to "make sure I am clear on the terms of our agreement" and "create an agreement that we are both comfortable with." Ex. 4 (PLAINTIFFS 389-91) at 390.

9.      Mr. Charnoff responded to the terms proposed by Ms. Loving and stated he would "deal with framing and conservation once [the art] arrives in Colorado" that he would select and pay the "direct cost for the storage unit" and that he would "insure the work while it's being stored." *Id.* at 389-90.

10.      Ms. Loving agreed and added that Mr. Charnoff would "be responsible for the packaging" or crating. *Id.* at 389.

11.      On August 11, 2017 Ms. Loving provided her "written agreement that I believe covers all of our considerations" wherein she listed when the deposit and three invoices would be due and agreed that ArtPort would ship the art to Colorado upon completion of the sale as determined by the final payment on invoice 3, due December 15. Ex. 5 (LOVING 68).

12.      Five days later, Mr. Charnoff cut several pieces of art from the Second Purchase, reducing the sale price from $214,000 to $141,000, because he did not get a mortgage on his $3.1mm property and needed to close cash. Ex. 6 (LOVING 28-29) at 28.

13.      The fourth and final payment for the art was made on November 16, 2017. Ex. 7 (Charnoff Dep.) 170:16-25.

14.      The next month, Walter Charnoff filed Chapter 11 bankruptcy. *In re: Walter Charnoff*, Case No. 17-21-594.

15.      On January 10, 2018, Mr. Charnoff disclosed, under penalty of perjury, his assets and liabilities, including that he individually owned assets in art totaling $250. *In re: Walter Charnoff*, Case No. 17-21-594, Schedule A/B: Property, attached hereto as Ex. 8, at pg. 4; *Id.*, Declaration About an Individual Debtor's Schedules, attached hereto as Exhibit 9.

16.      On July 18, 2016, July 24, 2016, July 29, 2016, August 30, 2017, February 12, 2018, Ms. Loving contacted Mr. Charnoff in writing regarding the shipment of the art whereas the first time Mr. Charnoff asked for his art to be shipped was April 5, 2018.   Ex. 10 (PLAINTIFFS 170), Ex. 11 (PLAINTIFFS 407), Ex. 12 (PLAINTIFFS 167), Ex. 13 (PLAINTIFFS 131), Ex. 14 (LOVING 36), Ex. 15 (PLAINTIFF 266), Ex. 16 (LOVING 40), Ex. 17 (PLAINTIFFS 267).

17.      On June 26, 2018, with respect to shipment of the art, Ms. Loving suggested that they "come up with a more complete plan" stating that it "would be best for all of us to get on the same page and for you to be really comfortable with our course of action." Ex. 18 (PLAINTIFFS 268).

18.      Mr. Charnoff responded: "Let's just leave [the art] in storage until we figure it out when I return." *Id.*

19.      Mr. Charnoff's next written communication regarding the art was nine months later, on April 16, 2019.  Ex. 19 (PLAINTIFFS 269).

20.      On May 2, 2019, Ms. Loving asked Mr. Charnoff for a list of the artwork that he wanted shipped and stated that she could not get an estimate or confirm any dates for shipping until she had the exact list with sizes and weight.  Ex. 20 (PLAINTIFFS 270).

21.     Mr. Charnoff responded that he "would not have waited to have the art shipped" if he were informed that he was expected to pay for storage and insurance as he had more economical options in Colorado.  Ex. 21 (LOVING 44).

22.     Until May 6, 2019, all written communications reflected Mr. Charnoff's agreement to pay for storage, insurance and crating. *See e.g.*, Undisputed Facts 8-11.

23.     On May 7, 2019 he stated that the "reason I had you hold the art was you telling me I needed to pay crating while I was in Chapter 11." Ex. 22 (LOVING 59).

24.     On June 20, 2019, Mr. Charnoff initiated this lawsuit, bringing claims of breach of contract, SAC ¶¶ 87-91, unjust enrichment, *id.* ¶¶ 76-82, fraudulent misrepresentation, *id.* ¶¶ 83-87; civil theft, *id.* ¶¶ 86-90, conversion, *id.* ¶¶ 91-95; vicarious liability under respondeat superior, *id.* ¶¶ 91-94, joint venture liability, *id.* ¶¶ 95-99, vicarious liability under actual and implied authority, *id.* ¶¶ 100-105; vicarious liability under apparent authority, *id.* ¶¶ 106-109, civil conspiracy, *id.* ¶¶ 110-113, intentional interference with contractual relations, *id.* ¶¶ 114-119.  The essence of Mr. Charnoff's claims were that the Defendants refused to ship the art he purchased. *See* SAC, generally.

25.     In his bankruptcy, however, Mr. Charnoff represented on May 7, 2018 that Wolliz Investment Group, Inc. owned $446,000 in art and he individually owned only $250 in art. Ex. 3 at 10 (Wollz owning $446,000 in art) vs. p. 8-9 (debtors assets in "art objects & collectibles" totaling $250.).

26.     Mr. Charnoff testified that Nancy Loving helped him value the "after-purchase value" of the art he individually purchased from ArtPort LLC at $446,000 and

that the valuation was for specific use in his bankruptcy case. Ex. 7 (Charnoff Dep.) 223:10-225:8; *see* Ex. 28 (LOVING 724-25).

27.     Mr. Charnoff testified that it was important to be truthful and have an accurate value for the art and that what he included on his Schedule A/B for property was done under penalty of perjury.  Ex. 7 (Charnoff Dep.) 225:6- 227:8 (testifying the value of "my art" was $446,000, that the value was arrived at after he purchased the art).

28.     In this litigation, however, Mr. Charnoff individually claims ownership of art he purchased from ArtPort LLC and individually seeks damages totaling "at least $440,000." SAC at p.23.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*, 27 F.3d 1499, 1503 (10th Cir. 1994) (citing Fed. R. Civ. P. 56(c)). To satisfy its burden, the moving party "may demonstrate that there is no evidence in the record to support the nonmoving party's case." *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.*, 892 P.2d 230, 235 (Colo. 1995), *as modified on clarification* (Feb. 21, 1995) (citation omitted). In seeking to establish a genuine issue of material fact and avoid summary judgment, the non-moving party "may not rest upon the mere allegations … of the pleadings" and must present "more than a mere scintilla of evidence." *Hom v. Squire*, 81 F.3d 969, 973-74 (10th Cir. 1996).

## ARGUMENT

## I. Charnoff's Claims Must Be Dismissed Because He Is Judicially Estopped From Bringing This Lawsuit.

Plaintiff should be judicially estopped from asserting claims related to the art he purchased from Defendants because he previously disclaimed ownership of the art to the bankruptcy court. The equitable doctrine of judicial estoppel prevents a party from taking a position in a legal proceeding that is contradictory to a position he successfully relied upon in a previous proceeding. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The doctrine is aimed at protecting the integrity of the judicial process by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 750 (internal quotation marks omitted). A party should not be allowed to "gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981)) (internal quotations omitted).

Judicial estoppel is "a discretionary remedy courts may invoke to prevent improper use of judicial machinery." *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005) (internal quotation marks omitted) (quoting *New Hampshire*, 532 U.S. at 750). Three factors inform the application of the doctrine of judicial estoppel in a particular case. *Eastman v. Union Pacific R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007). First, the position taken by a party in the present case must be clearly inconsistent with the position of that party in a former case. *Id.* Second, the court should determine whether the party succeeded in persuading a court to accept the former and inconsistent position taken by the party so that judicial acceptance of an inconsistent position in a later proceeding would

create the perception that either the first or the second court was misled. *Id.* (internal quotation and citation omitted). Third, the court should inquire whether the party asserting an inconsistent position would gain an unfair advantage in the litigation if not estopped. *Id.*

Here, all three factors are met. The position taken by Mr. Charnoff on Schedule A/B of his bankruptcy petition was that he owned only $250 in art/collectibles. Statement of Undisputed Material Facts ("Facts") ¶ 15.[1] Mr. Charnoff affirmed, under penalty of perjury, that the assets and liabilities stated on his Schedules were true and correct. *Id.* In Mr. Charnoff's Disclosure Statement to Accompany his Plan of Reorganization Dated May 7, 2018, Mr. Charnoff, again, disclosed only $250 in "Art Objects & Collectibles". Facts ¶ 25. He further disclosed that Wolliz Investment Properties, LLC owned art and collectibles in the amount of $446,000. *Id.*; Ex. 3 at p. 10. Here, Mr. Charnoff seeks that same amount in damages related to art he (now) claims he individually purchased from Defendants. Facts ¶ 27-28. The two positions are clearly inconsistent. This Court has stated that "judicial estoppel is particularly appropriate where, as here, a party fails to disclose an asset to a bankruptcy court, but then pursues a claim in a separate tribunal based on that undisclosed asset." *Eastman*, 493 F.3d at 1158 (internal quotation and citation omitted).

As to the second factor, Mr. Charnoff without question succeeded in persuading the bankruptcy court to accept his former and inconsistent position. The bankruptcy court

---

[1] Defendants request that the Court take judicial notice of Charnoff's bankruptcy filings. *In re Winslow*, 186 B.R. 716, 721 (D.Colo.1995) (citing *St. Louis Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir.1979)) (court properly may take judicial notice of its own records and those of other courts).

approved a settlement and ultimate dismissal of Mr. Charnoff's bankruptcy based on his disclosure of assets that did not include $446,000 in art. Instead, he testified that he owned only $250 in art, thereby depreciating his assets in comparison to his debts, to the detriment of his creditors.[2]

Finally, Mr. Charnoff will gain an unfair advantage if not estopped. Unlike equitable estoppel, judicial estoppel does not require detrimental reliance by the party asserting estoppel. *See Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005) (judicial estoppel typically requires a showing "that a previous court has accepted the prior inconsistent factual position"). The doctrine protects the integrity of the judicial system, not the litigants. *Hermann v. Hartford Casualty Insurance Company*, No. 11-CV-03188-REB-MEH, 2016 WL 1170102, at *5 (D. Colo. Mar. 25, 2016*), judgment entered*, No. 11-CV-03188-REB-MEH, 2016 WL 1178592 (D. Colo. Mar. 25, 2016), *and aff'd*, 675 F. App'x 856 (10th Cir. 2017). Here, Mr. Charnoff presented his Plan of Reorganization to the bankruptcy court and later requested that it approve a settlement and dismissal of his case based on a bankruptcy schedules and other filings that failed to disclose the existence of a valuable asset known to Mr. Charnoff, to the detriment of his creditors' interests. Indeed, Mr. Charnoff testified he knew it was important to be truthful, that the

---

[2] To be sure, Mr. Charnoff cannot return to the bankruptcy court and disclose his claim in an attempt to save him from judicial estoppel, here. In *Eastman*, the debtor returned to bankruptcy court to make a belated disclosure of an asset but it did not preclude the application of judicial estoppel because, to allow a debtor/plaintiff to "back up" and benefit from the reopening of his bankruptcy only after his omission had been exposed would suggest that a debtor should consider disclosing potential assets only if he is caught concealing them. The Eastman court found that "this so-called remedy would only diminish the necessary incentive to provide the bankruptcy court with a truthful disclosure of the debtor's assets." *Id.* at 1160 (internal quotation and citation omitted).

$446,000 valuation was created for the use in his bankruptcy case, but he disclosed that he owned only $250 in art. Ex. 7, 223:10-227:4. Where, as here, the debtor has both knowledge of and motive to conceal the asset courts will infer deliberate manipulation. *Eastman*, 493 F.3d at 1157 (internal citations and further internal quotation marks omitted). Finally, Mr. Charnoff is further gaining an unfair advantage by claiming in the current lawsuit that he *individually* owns the art so that he can prevent his wife from testifying as a fact witness under the shield of the marital privilege, a shield that he admits would not allow him to prevent Mrs. Charnoff from testifying were the actual owner of the art, Wolliz Investment Group (of which Mrs. Charnoff is part-owner), the plaintiff in this lawsuit. See Motion for Protective Order (Doc. 147).

Therefore, Mr. Charnoff must be estopped from suing Defendants with respect to art over which he disclaimed ownership under oath in bankruptcy.

## II. Plaintiff Has Not Established Any Fraudulent Misrepresentations and Defendants Are Entitled To Judgment As a Matter of Law on His Third Claim.

To establish his Third Claim for Relief for Fraudulent Misrepresentation, Mr. Charnoff must prove the following: 1) a representation; 2) of material fact; 3) that is false; 4) Defendants made the representation with knowledge of the falsity or with indifference to its truth or falsity; 5) he relied on the representation; 6) had a right to rely on it; and 7) he acted in accordance with the reliance; and 8) in doing so, he suffered damage. *Inst. for Prof'l Dev. v. Regis Coll.*, 536 F. Supp. 632, 633 (D. Colo. 1982) (citing *Zimmerman v. Loose*, 425 P.2d 803, 807 (Colo. 1967)). "'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *See AT & T Corp. v. Gen. Steel Domestic Sales, LLC*, No. Civ 04-CV-01334

EWN MEH, 2006 WL 894903, at *5 (D. Colo. Mar. 30, 2006) (citation omitted). As described below, Mr. Charnoff has not alleged any misrepresentations that sink to the level of actionable fraud. Instead, each representation is simply an (allegedly) unmet contractual promise or a future promise without a present intent not to perform. Mr. Charnoff's claim independently fails because there was no justifiable reliance on the alleged misrepresentations or any damages.

> a. **The Purported Misrepresentations Are Trumped Up Contractual Promises and Do Not Rise to the Level of Fraud.**

"An alleged misrepresentation must be of a material fact that either exists in the present or has existed in the past." *Myers v. All. for Affordable Servs.*, 371 F. App'x 950, 957 (10th Cir. 2010) (citing *Bell Press, Inc. v. Phillips*, 364 P.2d 398, 400 (Colo. 1961)). "'[A] mere expression of an opinion in the nature of a prophecy as to the happening or non-happening of a future event is not actionable." *Id.* (citing and quoting *Bell Press*, 364 P.2d at 400) (statements by insurance agent that "everything was in order" and that the insurance policy "would be issued" were statements "mere expressions" of opinion and "could not support a claim of fraudulent misrepresentation"); *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.*, 892 P.2d 230, 237 (Colo. 1995), *as modified on clarification* (Feb. 21, 1995) ("Expressions of opinion cannot support a misrepresentation claim."). A promise as to "future events without a present intent not to fulfill the promise is not actionable." *Van Leeuwan v. Nuzzi*, 810 F. Supp. 1120, 1124 (D. Colo. 1993) (statements that by a doctor that he could help a patient with her illness were simply statements of professional opinion and not actionable as a misrepresentation).

Here, at most, Mr. Charnoff alleges Defendants misrepresented they would perform their contractual promises, but that is not actionable fraud. *Hart v. Zaitz*, 211 P. 391, 395 (Colo. 1922); *see Friedman v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-cv-02432, 2013 WL 5448078, at * (D. Colo. Sept. 27, 2013) ("A misrepresentation is not a breach of contract.") (internal quotations and citation omitted); *see also Myklatun v. Flotek Indus., Inc.*, 734 F.3d 1230, (10th Cir. 2013) ("[T]he proper remedy for breach of contract will be found in a breach of contract claim, not in a claim of fraud based on the breaching party's failure to disclose its potential future breach."); *H & H Distributors, Inc. v. BBC Int'l, Inc.*, 812 P.2d 659, 662 (Colo. App. 1990) ("A claim for the tort of fraud cannot be predicated upon the mere nonperformance of a promise or contractual obligation or upon the failure to fulfill an agreement to do something at a future time.") (citation omitted).

### i. Opinion or Statements Regarding Future Events Are Not Actionable As A Matter of Law

Mr. Charnoff's alleges Nancy Loving and David Hinkelman made "material misrepresentations of past or present fact" that Ms. Loving "would perform coupled with a present intent not to perform."  SAC ¶¶ 83-87. In discovery, Mr. Charnoff was asked to identify each misrepresentation he claims were fraudulent and to identify the evidence supporting his assertion Defendants knew they were "false when made."  Plaintiff's Amended Responses to Defendants First Written Discovery at Interrogatory Nos. 1, 2 and 10 ("Discovery Responses"), attached hereto as Exhibit 23. The alleged representations advanced by Mr. Charnoff mirror the alleged contractual promises and evidence no present intent not to perform.  *Id.*  Mr. Charnoff claims Defendants made 18 misrepresentations, that: (1) the art would be insured, (2) the art would be shipped

promptly by a date certain and professionally, (3) the art would be crated, (4) the art would be shipped and insured at Artport's expense, (5) Ms. Loving would work with Edward Robinson and others to create a market for the art and increase the value as an investment for the second purchase, (6) Ms. Loving would ship the journal, (7) the journal would be bound, (8) she improperly imposed new conditions and payments that were not part of the original contract, (9) that she would store the art and care for the art yet it was damaged in her home or during shipment, (10) that the art was rapidly increasing in value due to recent collector, museum and other acquisitions, (11) that Mr. Charnoff was not the largest collector of Garde art, (12) that the art would be shipped professionally and properly crated and insured until delivery into Colorado, (13) that she improperly stated she could hold the art until Plaintiff paid shipping fees, (14) that the art would be "white glove" delivery, (15) that the art was museum quality, undamaged, and would be on loan to museums, (16) that Edward the curator was going to put it into gallery shows to double the price, (17) that there would be custom crates, (18) and the free gifts signed. *Id.*

The vast majority of the alleged misrepresentations are promises that make up, and are duplicative of, the parties' contract with no demonstrable evidence of a present intent not to perform. *See* SAC ¶ 25 (art delivery protocol), ¶ 48 (agreement to properly store art, promptly ship, museum placement), ¶ 51-56 (deliver journal), ¶ 65 (insurance, storage cost, museum placement by Defendants), ¶ 73 (shipping, storage, insurance). When asked for evidence that Defendants knew the contractual promises were false when made, Mr. Charnoff heavily relies on a single email from Ms. Loving regarding only one of the alleged misrepresentations (#15 above), where he claims that she told him the

art is "*rapidly* increasing in value and that it should be purchased *immediately* while it is

still available," Ex. 23 at Interrogatory 1, but the email actually states:

> "*As a result of recent museums and private collector acquisitions Harold's work has increased in value and many of the historical pieces and the master works now reflect a substantial increase in retail prices in the last year. We firmly believe that Garde's work will continue to appreciate as he will be given further recognition for his historical relevance and contributions to the art world. With that said, I have the ability for a limited time, due to your earlier interest in the work to create a pricing structure that you will find attractive.*"

7/11/2016 email, attached as Exhibit 24.

Mr. Charnoff asserts that ArtPort's invoices and tax returns show this email was a

fraudulent misrepresentation because there were no recent museum and private collector

acquisitions that could have increased the retail prices , no rush of sales on Garde artwork

to impact the value of the art and there could be no true ability to market the art given her

misrepresented sales. Ex. 23 at Interrogatory No. 1. Even if the loans to museums, or

museum acquisitions, were reflected on invoices or a tax return (and they would not have

been)[3], Ms. Loving's statement that the *retail prices* have increased is not a statement

regarding the *value* of the art. Tellingly, she couches her opinion as follows: "we firmly

*believe* the art will continue to appreciate", but that is simply an expression of her opinion

and belief as to future events and not actionable fraud.

Moreover, alleged misstatements about the value of individual art pieces are

"'nonactionable opinion that provide[s] no basis for a fraud claim." *MAFG Art Fund, LLC

v. Gagosian*, 998 N.Y.S.2d 342, 343 (App. Div. 1st Dep't 2014); *Mandarin Trading Ltd. v.

---

[3] *See* Ex. 1 ¶ 9.

*Wildenstein*, 944 N.E.2d at1108  (letter representing a certain painting's value was $15-17 million merely a disclosure of a belief and provided no basis for a fraud claim); *Rubin v. Sabharwal*, 171 A.D.3d 580, 581, 99 N.Y.S.3d 17, 19 (2019) (alleged misrepresentations that pieces were "museum quality," "highest quality" and "generational" were nonactionable opinion speaking to value).

In other words, the alleged misrepresentation reflect Ms. Loving's opinion and aspirational belief as to the value, continued appreciation, and recognition surrounding Mr. Garde's artwork, as reflected in her chosen retail prices. *See* Ex. 24. Like any salesperson, she offered a limited-time pricing structure to Mr. Charnoff but her email does not state that he must "purchase immediately," while "still available" and he did not, his First Purchase was 22 days after the email. *See id.*; Facts 5. Thus, Plaintiff's claim must fail.

### ii. The Alleged Misrepresentations Are Not Material Nor Relied Upon By Charnoff And Are Therefore Not Actionable As A Matter of Law

"A fact is material if a reasonable person under the circumstances would attach importance to it in determining his course of action." *Denberg v. Loretto Heights Coll.*, 694 P.2d 375, 377 (Colo. App. 1984); *United States v. Ostrom*, 80 F. App'x 67, 70 (10th Cir. 2003) ("A material fact is a fact that would be of importance to a reasonable person in making a decision about a particular matter or a particular transaction.") (citing proffered jury instruction with approval).  "A party's reliance on a purported misrepresentation is not justified when the party is aware of or on inquiry notice of the falsity of the representation." *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54, ¶ 53, 420 P.3d

223, 234; *see MAFG Art Fund, LLC v. Gagosian*, 123 A.D.3d 458, 459, 998 N.Y.S.2d 342, 343 (2014) (no reasonable reliance on a statement about the value of art being supported by market data because the plaintiffs conducted no due diligence and did not ask for the data demonstrating the value of the art). Here, Mr. Charnoff alleges Ms. Loving misrepresented the recent sales or acquisitions of the art and her ability to market the art in the future to induce him to purchase the art, but he repeatedly testified that he made the First Purchase of the art for an entirely different reason. He also testified that he knew the true facts surrounding the state of Ms. Loving's gallery business.

The First Purchase was comprised of 4 paintings totaling $45,120 and was completed on August 2, 2016. SAC ¶ 35. Instead of purchasing the art based on the cited email representations, Mr. Charnoff testified that he made the purchase "more out of - - any sense of wanting to help [David Hinkelman's] life partner with her business, was more out of a sense of friendship and loyalty than it was out of some obligation." Ex. 7, 56:15 - 57:3; 193:7-12 ("Since I spent that money -- which I thought I was doing something good for a friend of mine. I thought I was buying something that I could enjoy for the rest of my life and think happy thoughts when I looked at it and feel a connection to the artist and enjoy."). The testimony confirms Mr. Charnoff's motivation in purchasing the art was to help his friend and, by extension, his friend's girlfriend's struggling art business, not any representation as to the increase in sales or value of the art.

With respect to the Second Purchase of Art, comprising three quarters of Mr. Charnoff's art purchase, Mr. Charnoff again, admits he knew the reality surrounding Ms. Loving's gallery business and the state of the market with respect to Mr. Garde's art, and

therefore could have not have relied upon any statements regarding the success, sales or increase in value of the art in making the second purchase. Ex. 7, 253:18- 254:1 ("Q. Mr. Charnoff you knew at the time you were purchasing art from Ms. Loving and ArtPort that you were helping a struggling business correct.? A. Correct. Q. And at one point in time, Ms. Loving referred to your art purchase as throwing her a lifeline, correct? A. Correct.") Indeed, Mr. Charnoff testified that he knew that Ms. Loving was going to use his purchase monies "specifically to make a market for the Garde art to get these gallery shows off the ground, to pay Edward to do a bunch of things in the promoter's name and do other things." *Id.* 254:9-15.

In addition, Mr. Charnoff, who has started and invested in many companies, *see id.* 25:14-28:23, also admitted that it is a good idea to review capitalization of a company, review the company's revenue, profit trends and margins, and competitors, but did not do so with respect to his purchase of art from Defendants, *id.* 35:17-36:11. He testified that "the basis that I have for any value assumptions I made on Garde's art at the time of the purchase is what Nancy stated to me about the value to induce me to purchase the art." *Id.* 130:20-23. Mr. Charnoff did no due diligence whatsoever and, instead, relied on his desire to help his friend and an art business he knew was struggling, making his reliance on any alleged misrepresentations unjustifiable as a matter of law. To date, Charnoff advances no evidence her statements as to value are incorrect.

Because there is no genuine issue of material fact on which a reasonable jury could find that the alleged representations were material to Mr. Charnoff or that he

justifiably relied on the alleged misrepresentations because he had actual knowledge of the gallery's business state, his claim fails as a matter of law.

### b. There Are No Damages Associated With Any Alleged Misrepresentations

To establish a claim for fraudulent misrepresentation, Plaintiff must prove the existence of damages. *See Inst. for Prof'l Dev. v. Regis Coll.*, 536 F. Supp. 632, 633 (D. Colo. 1982); *Clark v. Morgan Cty. Nat. Bank of Fort Morgan*, 196 F. 709, 712 (D. Colo. 1912) ("[F]raud without damage or damage without fraud will not sustain the action for deceit.") (citations omitted). The defrauded party "is entitled to recover as damages in an action of deceit against the maker the pecuniary loss of him of which the misrepresentation is a legal cause, including … the difference between the value of what he has received in the transaction and its purchase price or other value given for it." Restatement (Second) of Torts § 549 (1977). "The value of the article is normally determined by the price at which it could be resold in an open market or by private sale if its quality or other characteristics that affect its value were known." *Id.* cmt on § (1)(a). "[D]amages based on mere speculation and conjecture are not allowed." *Roberts v. Adams*, 47 P.3d 690, 696-97 (Colo. App. 2001) (citing *Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287 (Colo. App. 2001)); *see Sedoy v. Provine*, No. 15-CV-02168-RBJ, 2017 WL 744024, at *6, n. 1 (D. Colo. Feb. 27, 2017) (in a negligent misrepresentation case, noting that the "value of what the plaintiff received" necessarily required evidence of what someone in the relevant market would attach to the property in question). A party must submit "substantial evidence, which together with reasonable inferences to be drawn therefrom, provides a basis for computation of the damage." *Graphic Directs, Inc. v. Bush*,

862 P.2d 1020, 1024 (Colo. App. 1993) (citation omitted). "Substantial evidence [of damages] is that which is probative, credible, and competent." *Roberts*, 47 P.3d at 696-67.; *see Bennet v. Price*, 692 P.2d 1138, 1140 (Colo. App. 2001).

Here, Mr. Charnoff's original three complaints seek economic damages of "no less than $440,000" based on Defendants failure to deliver the art he purchased and contain no allegations of damage to the art. SAC at "Prayer for Relief" p. 23; *see* generally Complaint (DOC 5), Amended Complaint (DOC 9), and SAC (DOC. 64).[4] After litigation commenced, Defendants shipped the art but Mr. Charnoff refused to accept it. Ex. 7, 235:10-15. Now, although he has never seen the art since he purchased it, *id.* at 276:5-9, he claims for the first time that the art has been damaged and has zero value to him because of the "drama" involved in getting the art, *id.* at 193:6-23 (testifying he paid $186,000 because he thought he was "doing something good for a friend" and was "buying something that [he] could enjoy for the rest of [his] life and think happy thoughts when I looked at it and feel a connection to the artist and enjoy" but now "the emotional connection I had to it, the feeling that I got thinking about the art is all being destroyed by Ms. Loving because of all the drama, hardship and even money I had to spend to even get her to perform her side of the deal.").

Mr. Charnoff testified that he "solicited the advice of an expert as to whether the paintings are "less – worth less" but —tellingly— he has not endorsed any expert who will so opine at trial. *Id.* 82: 11-12. And the expert he *did* endorse will render no such opinion.

---

[4] Charnoff oddly details damage to Two Vessels but that painting is not the subject of this lawsuit nor was it part of his ultimate purchase from Defendants. Ex. 7, 173: 8-12 ("I do not own Two Vessels.")

*See* Ex. 25 (Bradley Dep.) 36:12-14 (Q: "And you have no opinion regarding the value of any of the art you viewed, right?" A: "Correct."). Thus, Mr. Charnoff chose not to have an expert or anyone else who will corroborate his personal feeling that the art, which he has not seen since it arrived in Colorado, has decreased in value. In essence, Mr. Charnoff's statement that the art has no value is purely emotional and subjective. Ex. 7, 218:25-219:1-5 (the art was "…something that was supposed to bring me long-term joy, draw me close to the artist, and be a sense of happiness and enjoyment, and hopefully increase value over time and it's turned into aggravation, heartache, and additional expense."); 83: 1-7 ("it used to be pleasing to me to look at that journal and I planned on keeping that journal as something of esthetics, sentimental, and art value where I would get enjoyment looking at the piece, and now every time I see the journal all I'm going to think about is how Nancy destroyed it"); 193:18-23 ("So already the enjoyment of the art, the emotional connection I had to it, the feeling that I got thinking about the artist who painted it, it's all been destroyed by Ms. Loving because of all the drama, hardship, and money I had to spend to even get her to perform her side of the deal.").

Stated differently, Charnoff admits that the art has value, but the purchase experience left a bad taste in his mouth and, as a result, the art's value – *to him alone* – is zero. When asked what the value of the art he purchased is worth today he stated: "***To me***, nothing. To the rest of the world, I don't know." *Id.* at 218:1-7 (emphasis added); *id.* at 220:25 – 221:2 (testifying that the art is worth zero dollars today, "***To me***.") (emphasis added). *Id.* at 82: 5-6 ("**to me**, the value is zero [of the journal] unbound versus what I paid for it bound."). But a plaintiff's own personal feeling for the purposes of a

reasonable basis for a damages calculation is not the basis for establishing the existence of non-speculative, actual damages. Personal opinion of value does not constitute a reasonable basis for measuring value of goods and personal property. *See, e.g., Champion Home Builders v. Shumate*, 388 F.2d 806, 810 (10th Cir. 1967) (damages to be considered when property cannot be restored to original condition is "the difference in the fair and reasonable market value of [the property] immediately prior to the time of said injury and its fair market value immediately after such injury") (internal quotations and citation omitted); *Mackey v. Monahan*, 56 P. 680, 680 (Colo. App. 1899) (finding the damages evidence insufficient to establish the damages verdict where the only evidence of damages introduced was one witness who testified as to the value of the property, and noting that "the fact to be ascertained was what the [property] was worth on the market … or … what the value was; and not what it might be worth to some particular individual"). A jilted purchaser's personal theory as to the value is insufficient as a determination of actual loss. *See Olsen v. Ry. Exp. Agency, Inc.*, 295 F.2d 358, 359-60 (10th Cir. 1961) (noting that although the purchaser "simply [did] not want the object in the condition after transit" the "rule is not absolute that where no market value exists at point of destination the intrinsic value to the owner is the limit of inquiry into actual loss. Reference can and should be made to the nearest advantageous market.") (citing V Williston on Contracts, § 1378, p. 3850);*See Frontrage Sols. USA, Inc. v. Newroad Software, Inc.*, 505 F. Supp. 2d 821, 835 (D. Colo. 2007) (dismissing trademark claim because damages were "speculative and unfounded" because damages were based on "a number he felt was appropriate for these damages claims"); *see Pomeranz v. McDonald*, 843 P.2d 1378

(Colo. 1993) (on reviewing whether sufficient evidence was presented to provide a "reasonable basis" for a future damages calculation, the damages evidence was insufficient where there "no evidence was before the court on what the actual [future damages] costs were").

Conversely, when asked if he could tell the jury whether the art had in fact *increased* in value since the time he purchased it, he only provided that it "decreased in value **to me**…What else matters?" Ex. 7, 216: 5-14. He testified that the difference in value between what he purchased and what he received – the usual measure of damages – is "irrelevant". *Id.* at 187:14-17. Although he has no evidence regarding the difference in value between receiving signed and unsigned art, it is "completely less valuable to me and I am the one who is paying … It does not matter whether that art is worth more or less money to somebody else." *Id.* at 189: 8-15; 190:5-6. He testified that he does not "need an expert to tell me that those paintings are valueless to me unbound." *Id.* at 82: 17-20. In other words, the art could have tripled in value but Charnoff is asking the jury to disregard its actual value, in favor of his buyer's remorse.

In the end, Mr. Charnoff has not advanced a scintilla of evidence as to what the value of the paintings would be worth but-for Defendants' alleged misrepresentations or, stated differently, the value of the art as represented versus the actual present value a buyer would pay or an appraiser appraise.[5] He has further failed to present any evidence regarding the damages from Defendants (alleged) failure to market, promote or increase

---

[5] Plaintiff admits in his Complaint that art has some sort of ascertainable value, "like real estate" based on extrinsic factors. *See* SAC ¶ 61.

the value of the art. Because he consulted an expert regarding value and he does not dispute that there could be an increase in value, any damages are imaginary. As a result, Mr. Charnoff's claim fails as a matter of law.

## III.   Defendants Are Entitled To Judgment As a Matter of Law on Plaintiff's Breach of Contract Claim

"To establish a breach of contract, a plaintiff must prove: "(i) the existence of a binding agreement; (ii) the plaintiff's performance of its obligations; (iii) the defendant's failure to perform its obligations; and (iv) resulting damages." *Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1243 (D. Colo. 2013) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).

### a.   Defendants Shipped the Art Plaintiff Purchased

To establish an actionable breach, Plaintiff must prove that Defendants failed to perform their obligations under their contract. *Id.*  The gravamen of Mr. Charnoff's breach of contract claim is that Defendants allegedly refused to ship the art he purchased, whereas Defendants claim Mr. Charnoff refused to accept shipment of the art. *See generally* SAC. The art Mr. Charnoff purchased was the art itemized in the First Purchase , Ex. 27 (PLAINTIFFS 129-30) at 130, and his email to Ms. Loving regarding his Second Purchase, Ex. 29 (LOVING 28-43) at 28. The titles of free gifts, "help" with obtaining Garde's signatures and certificates of authenticity were not specifically itemized on either purchase contract. *See id.* Years later, Mr. Charnoff insisted these terms were contractual but —closely viewed— each email and text from Mr. Charnoff regarding these art terms is well after the agreement was reached and he paid for the art.   After litigation

commenced, Defendants shipped Mr. Charnoff the art he selected but he refused to accept it. *See* SAC ¶ 50 (art was recently "shipped to Plaintiff without his consent and in an effort to force a "settlement" on him…")  After that point in time, Mr. Charnoff began to claim that his breach of contract claim is based on alleged damage to the art (that he has not seen) and missing art pieces.  Specifically, he claims: (1) a different painting was sent in place of the "Red Chair" painting he purchased, (2) journal paintings were removed from his purchase and placed online for sale; (3) the art he purchased is damaged, and (4) a few pieces of art unsigned. SAC ¶¶ 43-47, 54-57, 60, 64-65, 79-80.  Mr. Charnoff has no evidence to support his allegations and, therefore, his breach of contract claim must be dismissed.

**Red Chair.** Mr. Charnoff claims that the painting titled "Red Chair" was switched yet he has produced no evidence to support his allegation.  While he claimed he has a "photo of [the true] red chair" painting that he purchased "on [his] old phone" and that he would send it to Ms. Loving he has produced no such evidence in this litigation. *See* text exchange from Mr. Charnoff to Ms. Loving, attached hereto as Exhibit 26 (PLAINTIFFS 274-275). Mr. Charnoff admits he cannot identify anyone with more knowledge about Harold Garde art than Ms. Loving, Ex. 7, 45:17-46:18,  and she testified that there was only one Red Chair 1979 painting that Harold Garde painted and that she had ever seen or shown to Mr. Charnoff, and that is the Red Chair painting sold to and shipped to Mr. Charnoff.  Ex. 1, ¶ 4.

**Missing Art.** Mr. Charnoff was asked to identify the paintings he believes were removed from the journal he purchased and allegedly sold online. *See* Ex. 23 (Discovery

Responses) at Interrogatory 7. Mr. Charnoff affirmed in discovery that he had and would produce screenshots of his journal paintings that were allegedly for sale online but he has produced no such evidence. *Id.* Mr. Charnoff was asked to identify the art that he purchased but did not receive and, instead, he cited to certificates of authenticity, a bill of sale, and missing *free* gifts. *Id.* at Interrogatory 8. To begin, these certificates, bill of sale, and missing "gifts" were not specifically identified on the purchase contract. However, certificates of authenticity cannot be provided to a buyer until the art is in possession of the buyer. Ex. 1, ¶ 5. Mr. Charnoff refused to accept shipment of the art, but Ms. Loving will provide a Bill of Sale when Mr. Charnoff accepts delivery of the art. *Id.* ¶ 6. Each of the journal paintings have all been delivered as well as the gifts she provided free of charge. *Id.* ¶ 7. Finally, Loving will "help" obtain the signatures requested. *Id.* ¶ 8. Mr. Charnoff has no evidence to prove he did not receive each item in the parties' contract and instead Defendants predict he will rely solely on post-contractual emails, well after payment had been made and the agreement reached, wherein he dictates new terms that contradict the parties' pre-contractual and contractual promises.

**Damage to Art.** Finally, the art is not damaged and Mr. Charnoff cannot show any imperfections noted by his expert occurred *after* he saw and selected the art. First, Mr. Charnoff's expert will testify that each of the 84 pieces of art he purchased is in "stable condition" which means that the art is "the best that can be said" regarding the condition of an artwork. Ex. 25 (Bradley Dep.) 37:13-16 (Q: "And it's your opinion that every single piece of artwork that you reviewed for Mr. Charnoff is in stable condition, correct? A: "Yes."); Ex. 30 (Museum Level Condition Reporting) at Rule 1. While the art has

accretions, abrasions, chips, cracks and other imperfections, Mr. Charnoff's expert will not opine that any of the art was damaged while under Ms. Loving's care, custody or control. Ex. 25, 36:7-11 (Q: "And you can't tell the jury that any abrasion, loss, rub, accretion was done to the art by Nancy Loving while in her care, custody, or control, correct?" A: "Yes."). Mr. Charnoff claims that he can show the art was damaged under her control because Ms. Loving sent him a portfolio of the (four pieces of) art in the First Purchase, and stated it was in "pristine" "perfect" and "damageless" condition, and that he has "several emails from Nancy" using those words. Ex. 7, 207:8-22. Watch closely, Mr. Charnoff has produced zero such emails or texts from her using those exact terms. Moreover, Mr. Charnoff saw each piece of art in person that he purchased and it is in the same condition as when he saw it and selected it. Ex. 1 ¶ 3, 10.

Because the Defendants performed the essential terms of the contract, there is no issue of triable fact concerning whether the Defendants were in breach, and Plaintiff's breach claim must fail.

### b. Plaintiff Has No Damages

To establish a breach of contract claim, Plaintiff must prove damages. *See Xtreme Coil Drilling Corp.*, 958 F. Supp. 2d at 1243; *Williams v. Am. Family Mut. Ins. Co., S.I.*, No. 18-CV-00621-CMA-NRN, 2019 WL 2502207, at *3 (D. Colo. June 17, 2019) (plaintiff must prove the damages he is legally entitled to recover from defendant); *see Joplin v. Sw. Bell Tel. Co.*, 753 F2d 808, 809 (10th Cir. 1983) ("Since plaintiff would have no damages for breach of contract, defendant was entitled to summary judgment."); *See,*

*supra*, Sec. II.b at pp. 17-22 and cases cited re: "substantial evidence" and "reasonable basis" standard for damages calculations.

Here, Plaintiff has pled economic damages exceeding $440,000, SAC p. 23, ¶ 2 , while oddly and simultaneously claiming the art has "no value." *supra* at pp. 19. Thus, Charnoff at times is *de facto* seeking a rescission (*i.e.*, a full refund irrespective of the actual value of property conferred pursuant to the contract) but he advances no evidence of a "substantial breach," as is required to assert a rescissionary remedy,[6] and therefore Mr. Charnoff's claim must be for damages. And, his testimony that the art now has "no value to him" is not evidence sufficient to create a triable issue of genuine material fact that the art is in fact worth nothing entitling Mr. Charnoff to rescission.

---

[6] "[R]escission may [only] be granted if the facts show that there is a substantial breach, that the injury caused is irreparable, or that damages would be inadequate, difficult, or impossible to assess." *Wall v. Foster Petroleum Corp.*, 791 P.2d 1148, 1150 (Colo. App. 1986) (citation and internal quotations omitted). "[Rescission] is not a proper remedy for a mere variance from the terms of the contract." *Kole v. Parker Yale Dev. Co.*, 536 P.2d 848, 850 (Colo. App. 1975).

Here, Mr. Charnoff has alleged that despite being shipped the art he contracted to purchase, he has decided the art no longer as any "value" to him (and him alone), *supra* pp 19-20, and that somehow constitutes a justification for unwinding the entire contract. Ex. 7, 191:20-192:1 (Q: "Well, how does the jury award you damages for your unsigned artwork, Mr. Charnoff"" A: "If you buy something and you can't get it in the form you purchased it in, a refund should be given."). This is not the type of evidence that could support a finding of substantial breach. *Cf. Tromp v. Martinez*, 719 P.2d 380, 381 (Colo. App. 1986) (substantial breach found where the facts established one party's total failure to perform for five years); *Cooper v. Peoples Bank & Tr. Co.*, 725 P.2d 78, 80 (Colo. App. 1986) (total breach found where full purchase price paid and nothing received); *Rudd Paint & Varnish Co. v. White*, 403 F.2d 289, 291 (10th Cir. 1968) (finding evidence of substantial breach where the products shipped were clearly not marketable and would be discontinued). Rescission fails because the art is marketable and has value.

Mr. Charnoff's damages claim is deficient for the reasons stated in Sec. II.b, *supra*. "The party seeking to recover damages has the burden of presenting competent evidence which furnishes a reasonable basis for assessing them." *Bennett v. Price*, 692 P.2d 1138, 1140 (Colo. App. 1984) (citing *Colo. Nat'l Bank v. Ashcraft*, 263 P. 23 (Colo. 1927)); *Realty Loans, Inc. v. McCoy*, 523 P.2d 476, 478 (Colo. App. 1974) (noting that it "was necessary to determine the market value of the property" in order to "calculate properly the amount of damages suffered by plaintiff" and that if plaintiff failed to sustain its burden of proof with respect to damages, "it is not entitled to recovery"). Here, as set forth above, has no damages because the *only* evidence put forth by Mr. Charnoff as to his damages is his own feeling that the art has no value despite consulting with an expert on the subject. Thus, his damages claim is barred because the jury has no tools with which to award damages.

## IV. Plaintiff's Related Claims Fail as a Matter of Law.

Finally, because Plaintiff's breach of contract claim fails, each of his claims flowing from the alleged breaches also fail. *See supra*, II.a.i. Thus, his Second Claim (Unjust Enrichment) SAC ¶¶ 76-82, Fifth Claim (Conversion) SAC ¶¶ 91-95, Sixth Claim (Vicarious Liability under Respondeat Superior) ¶¶ 91-94, Seventh Claim (Joint Venture liability) SAC ¶¶ 95-99, Eighth Claim (Vicarious Liability under Actual and Implied Authority) SAC ¶¶ 100-105; Ninth Claim (Vicarious Liability under Apparent Authority) SAC ¶¶ 106-109; and Eleventh Claim (Intentional Interference with Contractual Relations) SAC ¶¶ 114-119. These claims, premised on the same underlying breaches, must similarly fail.

## CONCLUSION

For the reasons set forth herein, Defendants motion for summary judgment should be granted.

Dated: October 19, 2020.

Shoemaker Ghiselli + Schwartz LLC

*/s/ Liza Getches*
Elizabeth H. Getches
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO  80302
Telephone:  (303) 530-3452
FAX:  (303) 530-4071
Email:  lgetches@sgslitigation.com
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19 of October, 2020 a true and accurate copy of the foregoing **DEFENDANTS NANCY LOVING, d/b/a ARTSUITE NY, ARTPORT LLC, STUDIO 41, LLC AND DAVID HINKELMAN'S ANSWER MOTION FOR SUMMARY JUDGMENT** was filed and served via ECF on the following:

Ian T. Hicks, Reg. No. 39332
The Law Office of Ian T. Hicks LLC
6000 East Evans Avenue, Building 1, Suite 360
Denver, Colorado, 80222
Telephone: (720) 216-1511
Facsimile: (303) 648-4169
E-mail: ian@ithlaw.com


*s/ Vanya P. Akraboff*