# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                             )
                                   )        Case No. 17-21594-JGR
WALTER CHARNOFF                    )
SSN: XXX-XX-3670                   )        Chapter 11
                                   )
      Debtor.                      )

**DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION DATED APRIL 20, 2018**

Walter Charnoff ("Charnoff" or "Debtor") prepared this Disclosure Statement to accompany his Chapter 11 Plan of Reorganization dated April 20, 2018 ("Plan"), which was filed in the above-captioned Chapter 11 case.  This Disclosure Statement is being provided to all creditors and Interest holders of the Debtor.   This Disclosure Statement is subject to final approval pursuant to 11 U.S.C. § 1125 by the United States Bankruptcy Court for the District of Colorado as containing adequate information to enable creditors and Interest holders to determine whether to accept the Debtor's Plan. The Court's approval of this Disclosure Statement does not constitute a decision on the merits of the Plan.  Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing which is scheduled for **_____, 2018 at ___:00 _.m. at the United States Bankruptcy Court for the District of Colorado, Courtroom B, 721 19th Street, Denver, Colorado 80202.**

**THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION.   THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.**

The Plan is the governing document or contract with creditors once it is confirmed by the Court.  In the event of any inconsistencies between the Plan and this Disclosure Statement, the Plan supersedes the Disclosure Statement and will be the sole Court-approved document that governs the post-confirmation relationship and agreements between the parties.

This Disclosure Statement is provided to you along with a copy of the Debtor's Plan and a Ballot to be used for voting on the Plan.  Please complete the Ballot according to the instructions contained on the Ballot if you intend to vote for or against the Debtor's Plan.  Each

creditor or Interest holder may vote on the Plan by completing the enclosed Ballot and returning it to counsel for the Debtor at the address below:

> Lee M. Kutner
> Kutner Brinen, P.C.
> 1660 Lincoln Street
> Suite 1850
> Denver, CO 80264

This Ballot must be received by Kutner Brinen, P.C. no later than **5:00 p.m. on _____, 2018**, which is the date set by the Court as the last day to vote on the Plan. Capitalized terms contained in this Disclosure Statement that are defined in the Plan have the same meaning as set forth in the definitional section of the Plan, Article II.

**Recommendation.** As discussed more fully below, the Debtor firmly believes that the Plan represents the best alternative for providing the maximum value for creditors. The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtor. **Again, the Debtor strongly believes that confirmation of the Plan is in the best interest of creditors and recommends that all creditors entitled to vote on the Plan vote to accept the Plan.**

**Voting Requirements.** Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting.

**Voting Classes.** Each holder of an Allowed Claim in Classes 2, 3, 4 and 5 shall be entitled to vote to accept or reject the Plan.

**Deemed Acceptance of Plan.** Unimpaired classes are conclusively presumed to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Class 1 is unimpaired under the Plan.

**Deemed Rejection of Plan.** Classes that receive and retain nothing under the Plan are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code. There are no Classes that receive or retain nothing under the Plan.

2

**One Vote Per Holder.**  If a holder of a Claim holds more than one Claim in any one Class, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

## I.      CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the United States Bankruptcy Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals.  Chapter 11 allows the Debtor to retain his assets during the administration of the Chapter 11 case as debtor-in-possession.  Following confirmation of the Plan, Chapter 11 allows the Debtor to retain his assets as a reorganized debtor or as otherwise provided in the Plan.  If the Plan is approved by the Court, the Plan is the permanent restructuring of the Debtor's financial obligations.  The Plan also provides a means through which the Debtor will restructure or repay his obligations.  The Plan will provide the Debtor with an opportunity to pay all creditors through the sale of assets and the generation of income on an ongoing basis from Charnoff's business interests.

The Plan divides creditors into Classes of similarly situated creditors.  All creditors of the same Class are treated in a similar fashion.  All Interests are also classified and treated alike.  Each Class of creditors or interest holders is either impaired or unimpaired under the Plan.  A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled or if the Plan provides for the cure of a default and reinstatement of the maturity date of the claim as it existed prior to default.

On March 13, 2018, the Debtor filed an Application requesting that the Court set a deadline for filing Proofs of Claim and certain administrative expense claims.  On March 14, 2018, the Court entered an Order establishing April 30, 2018, as the last day: (a) for filing of any Proof of Claim for a pre-petition claim or interest; and (b) by which motions or requests for allowance of administrative expense claims pursuant to 11 U.S.C. § 503(b)(9) must be filed with the Court ("Bar Date").  The Plan provides that Claims and Interests of all Classes shall be allowed only if such Claims are either: (a) evidenced by a timely filed Proof of Claim or Interest; or b) appear in the Schedules filed by the Debtor and are not scheduled as disputed, contingent or unliquidated, unless subsequently allowed by the Court.  Creditors may check as to whether or not their Claims are scheduled as disputed, contingent or unliquidated by reviewing the Schedules and the amendments thereto filed by the Debtor in the Bankruptcy Court for the

District of Colorado.  Alternatively, creditors may contact counsel for the Debtor or the Debtor directly in order to determine how their claim was scheduled.

Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Court to confirm the Plan.  The Plan, however, must be accepted by at least one impaired Class of Claims by a majority in number and two thirds in amount, without including insider acceptance, of those Claims of such Class actually voting on the Plan. Assuming one impaired Class votes to accept the Plan, it may be confirmed over its rejection by other Classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims that is impaired under and has not accepted the Plan.  Since the Debtor believes that the Plan provides the best alternative for creditors, all creditors are urged to vote to accept the Plan.

If all Classes of Claims and Interests vote to accept the Plan, the Court may confirm the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, Section 1129 requires that the Plan be in the best interest of the holders of Claims and Interests and be feasible through a showing that confirmation will not be followed by the need for further financial reorganization of the Debtor.

## II.   OVERVIEW OF THE PLAN AND MEANS OF EXECUTION

The Plan divides creditors and Interest holders into the following five (5) Classes. Treatment of each of the Classes is discussed in greater detail below and in the Plan.  The following table summarizes the five (5) Classes, whether or not each such Class is impaired, and, to the extent determinable, the treatment of each Class.

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|
| 1: Boulder County Treasurer | Unimpaired | Paid in full or as otherwise agreed to by the parties. |
| 2: Arvest Central Mortgage | Impaired | Allowed in an amount agreed upon by the parties or determined by the Court pursuant to 11 U.S.C. § 506. The Class 2 Claim shall bear interest at a rate of 4% per annum, and amortized and paid in equal monthly installments over twenty-five (25) years following the Effective Date of the Plan.  The Debtor may prepay the Class 2 Claim at any time |

4

| | | without penalty. |
|---|---|---|
| 3: Louis Herrera | Impaired | Allowed in the amount due on the Confirmation Date or an amount agreed to by parties or pursuant to 11 U.S.C. § 506. The Class 3 claim shall bear interest at a rate of 6% per annum. The Debtor shall make interest-only payments for 120 months following the Effective Date of the Plan, and on the ten-year anniversary of the Plan, shall pay the full balance due on account of the Class 3 Claim in a single balloon payment. |
| 4: Unsecured Creditors | Impaired | Class 4 Claims shall be paid in full plus interest at a rate of the 3% per annum. Funds shall be held in the segregated Creditor Escrow Account, which account shall initially be funded with $650,000. To the extent allowed, the Ladd Claims will be paid first from the Indemnity Accounts. Class 4 Claims shall be paid on a pro rata basis once all claims are known and Allowed. |
| 5: Interests in Charnoff | Impaired | Retained subject to Plan provisions. |

The Plan provides for the reorganization of the Debtor under Chapter 11 of the Bankruptcy Code. The Debtor believes that the Plan represents the best and most efficient way for creditors to recover on their claims.

## III.     BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

Charnoff is an individual who currently resides in Longmont, Colorado. Charnoff provides technology and business development consulting services through one of his companies, and through another company owned with his wife, invests in precious metals, collectible art, automobiles, and watches. Charnoff also invests in real estate.

Pre-petition, in 2011, Charnoff formed Rent-Range, LLC ("RentRange") as a Colorado limited liability company. RentRange was engaged in the business of collecting and selling information regarding rental rates for commercial properties. RentRange had a number of other investors who provided capital and held member interests. Charnoff successfully grew the

business and proved out the underlying concept of the company business plan.  In 2012, Bob Ladd ("Ladd"), initially through his company Consumer Financial Asset Management ("CFAM") and later through his company Ladd 2000 Partners, LTD ("Ladd Partners"), invested up to $575,000 in RentRange in exchange for what at its peak was an 8.9%ownership interest in the company.  CFAM required at the onset that RentRange hire their associates, Mike Morgan for advice and Edward Pierce to act as President.  During the time that Messrs. Morgan and Pierce were managing RentRange, based on their information and offering documents, Ladd invested most of his contribution in the company which brought his total investment up to $575,000.  Ladd also required that Messrs. Morgan and Pierce continue to be retained as an advisor and as president.  While RentRange had a continuing need for additional funding, Ladd would not agree to new funding proposals unless Charnoff and RentRange agreed to certain requirements he was imposing.  Ladd wanted Charnoff to stop working on non-profit charitable or any other matters without Ladd's prior consent.  Ladd also wanted a percentage of any other existing companies owned by Charnoff, as well as any new company developed by Charnoff in the future.  Ladd also demanded changes in the company operating agreement, and other monetary benefits.  In 2014, the situation between Ladd, the Debtor, and the other members of RentRange became untenable.  RentRange was struggling financially and was unable to attract further investors or complete a sale of the business due to the demands made by Ladd.  Charnoff offered to buy out the member interests of Ladd and CFAM.  Both investors were offered all of their investment back to buy out their interests.  Some of the members of CFAM agreed and was paid $200,000 for its interest.  Ladd refused the offer.

In order to minimize the losses of various companies that had contracted with RentRange for services and meet creditor obligations, the company was sold in 2015, to another business in which Charnoff had an interest, GoldenGator, LLC ("GoldenGator") in exchange for payment of RentRange's outstanding short term debt obligations, assumption of RentRange's long term debt obligations, and cash.  The sale of the assets was ratified at a special meeting of the company by all members except Ladd and followed all proper procedures related to the sale.  Ladd was provided with appropriate notice of the special meeting.  The company that bought the RentRange assets invested substantial additional money in the company, in excess of $2,500,000 to make it successful.  RentRange never had that much money to further invest in the products and could not raise the money due to the Ladd demands.  The RentRange trade name of

"Investibility" was sold in a separate transaction in July 2014.  The name was not being used by RentRange at the time it was sold.  The Debtor had another company named Onit Solutions, LLC which never did business with Ladd Partners and never acquired assets from RentRange.

In October 2015, the Debtor sold GoldenGator, together with two of his other companies, Onit Solutions, LLC and REIsmart, LLC, to Altisource Portfolio Solutions S.A. ("Altisource") for substantial consideration in excess of approximately $12 million.  Following the sale of the companies, Ladd filed a Complaint in the District Court for the City and County of Denver, Case No. 2015CV33785 ("Ladd Litigation").  The forty-five page single spaced Complaint named the Debtor, GoldenGator, ONIT Solutions, LLC, REIsmart, LLC, RentRange, Phillip E. Comeau, the Phillip E. Comeau Trust, Frederick Heigold III, Louis Herrera, the CSB Asset Trust U/A 01/17/2002, Carl Bell and Brande Charnoff (collectively the "Ladd Litigation Defendants") as defendants, and alleged twenty-eight causes of action, both directly and derivatively on behalf of RentRange.  In response, the Ladd Litigation Defendants asserted counterclaims against Ladd, Ladd Partners, and another of Ladd's companies, Ladd Financial Services, LLC ("Ladd Financial") for: (1) tortious interference with economic advantage; (2) tortious interference with contract; (3) anticipatory breach of contract by repudiation with respect to certain Unit Acquisition Agreements; (4) anticipatory breach of contract by repudiation with respect to certain LLC Operating Agreements; (5) breach of the implied covenant of good faith and fair dealing; and (6) attorney fees.

A jury trial was held in the Ladd Litigation from October 10, 2017 through October 20, 2017.  Leading up to and during the course of the trial, it because evident to the Debtor that there were substantial issues with respect to the handling of the Debtor's case and that of the twelve defendants by his then attorneys, Jones & Keller, P.C. ("J&K").  Following the trial, the jury rendered a verdict in favor of Ladd and against Charnoff and several of the Ladd Litigation Defendants on eight of Ladd Partners Claims.  Despite the fact that Ladd Partners has claimed its attorney fees exceed the amount of $2.1 million, the verdicts and judgments entered total only $575,000 on the fraudulent inducement claim, $45,000 on the negligent misrepresentation claim, and $29,017 on the breach of fiduciary duty claim. The jury also rendered verdicts in favor of Ladd Partners with respect to the counterclaims, dismissing them all.  Charnoff and the Ladd Litigation Defendants assert, among other bases, that the jury verdicts were inconsistent with the jury instructions and applicable law, resulted in an improper double recovery to Ladd Partners

with respect to several of the claims, and improperly included a determination of joint and several liability since there was no apportionment of liability among the Defendants as required under Colorado law.  Ladd Partners obtained no judgment against either Onit Solutions or Brande Charnoff, the Debtor's wife.  Onit received a substantial amount of the consideration paid by Altisource for the three companies.  The judgment entered in the case further allowed Ladd Partners to later pursue their unjust enrichment claim, and seek an award of attorney fees and costs on the single Colorado securities act claim which resulted in a jury verdict in the amount of zero dollars.

Due to the pressing ongoing need for defense of the Ladd Litigation, including seeking reconsideration of the trial court's order for judgment and Charnoff's need to retain new counsel to represent him with respect to both the ongoing Ladd Litigation and subsequent appeals, Charnoff filed his Chapter 11 case on December 22, 2017.  The Chapter 11 case has given Charnoff the opportunity to retain new counsel, contest and request reconsideration of the judgment, file an appeal of the order for judgment dated December 8, 2017, and sell assets in order to fund his Plan of Reorganization and reorganize his financial affairs.

## IV.     DESCRIPTION OF ASSETS

The values of the Debtor's assets, owned on the petition date, are set forth in the following chart:

| Asset | Estimated Value |
|---|---|
| 50% interest in Real Property – 6950 Rabbit Mountain Rd. | $1,550,000[1] |
| 50% interest in Real Property – 11241 Lookout Rd. (Gross Value of Sale Price) | $657,500[2] |
| Bank Accounts (as of April 18, 2018) | |
| Cars and Other Motor Vehicles | $15,250 |
| Recreational Vehicles, Trailers, Etc. | $2,000 |
| Household Goods and Electronics | $21,250[3] |

1 This property is owned by the Debtor jointly with his wife, who is not in bankruptcy.  The Debtor's one half value in the property is listed as opposed to the full value of the property.
2 This property is owned by the Debtor jointly with his wife, who is not in bankruptcy.  The Debtor's one half value in the property is listed as opposed to the full value of the property.
3 This property is owned by the Debtor jointly with his wife, who is not in bankruptcy.  The Debtor's one half value in the property is listed as opposed to the full value of the property.

| | |
|---|---|
| Books, Pictures, Art Objects & Collectibles | $250 |
| Wearing Apparel | $2,000 |
| Health aids | $2,000 |
| Jewelry | $300 |
| Firearms and Hobby Equipment | $1,600 |
| Indemnity Account- GoldenGator (value as of Petition Date) | $317,664.81 |
| Indemnity Account- REISmart (value as of Petition Date) | $797,390 |
| Indemnity Account- ONIT Solutions (value as of Petition Date) | $1,236,252 |
| Lulu Acres LLC (50%) | $0 |
| Lulu Feed LLC (50%) | $28,030.12 |
| Wolliz Investment Properties, LLC (50%) | $0 |
| CEFR, LLC d/b/a Tech Stem (50%) | $53,023.45 |
| IRA and 401K Plans | $167,000 |
| Loan due from Wolliz Investment Properties | $1,200,000 |
| Reimbursement due from Altisource | $12,000 |
| Health Savings Account (value as of Petition Date) | $2,000 |
| Claim against Jones & Keller | unknown |
| Claim against Kirkland and Ellis | unknown |
| Counterclaims against Ladd, Ladd Partners, Ladd Financial | unknown |
| **Total** | $6,065,510 |

**The asset values set forth above represent a gross value for each asset, not a value net of liens.** The values for all assets represent the values as listed in the Debtor's Schedules or generally as determined by the Debtor based on his knowledge of the assets and the market. The Debtor has used what he believes to be fair market value for his assets.

The value of the real property located at 6950 Rabbit Mountain Road ("Residence") is based on the purchase price. The Residence was purchased in August 2017 by Charnoff and his wife for a total purchase price of $3,100,000. The Residence is comprised of a single family detached house, a seven-stall barn with a loft, and 65-acres located in the Flatirons, Inc. Improvement District and all water rights associated with the property. The Debtor owns a 50% interest in the Residence, resulting in a total value of the Debtor's interest in the amount of $1,550,000.

The value of the real property located at 11241 Lookout Road ("Lookout Road Property")

set forth above is based on the anticipated sale price of the Lookout Road Property. The Debtor listed his 50% interest in the Lookout Road Property on his Schedule A/B with a value of $674,500. On April 6, 2018, Charnoff and his wife entered into a Contract to Buy and Sell Real Estate (Residential) for the sale of the Lookout Road Property for a total gross sale price of $1,315,000, resulting in the total gross value of the Debtor's 50% interest of $657,500. The Lookout Road Property is subject to a lien in the amount of $398,100.

The Debtor also owns a 50% interest in a number of limited liability companies. A description of the principle entities owned by Charnoff are as follows:

**Wolliz Investment Properties, LLC ("Wolliz").** Wolliz is an investment company that invests in art, collectibles, collectible vehicles, real estate, technology, and early stage concepts and companies. Charnoff currently owns a 50% interest in this company and the other 50% is owned by his wife. On March 21, 2018, the Debtor filed his Periodic Report Regarding Value, Operations, and Profitability of Entities in Which The Debtor's Estate Holds a Substantial or Controlling Interest (Docket No. 115) ("426 Report") in which Wolliz was described and assets valued as of February 28, 2018. Wolliz has total assets valued at approximately $1,339,297.94, including inventory comprised of collectible cars in the amount of $446,200, precious metals in the amount of $320,056, art and collectibles in the amount of $446,200, and other assets. Wolliz's only outstanding liabilities are due to affiliates including Charnoff and his wife in the amount of $1,676,715.05.

**Lulu Acres, LLC ("Lulu Acres").** Lulu Acres is a working farm that raises and breeds goats, chickens, ducks, geese, and other poultry. Lulu Acres also maintains other farm animals, including horses, llamas, and donkeys. Charnoff owns a 50% interest in Lulu Aces, and the other 50% is owned by his wife. The Debtor's 426 Report lists the net value of Lulu Acres as ($85,500.37) as of February 28, 2018. Lulu Acres has total assets valued at approximately $111,718.62, and total liabilities of $197,218.99, of which approximately $195,000 is a loan from Charnoff and his wife.

**Lulu Feed, LLC ("Lulu Feed").** Lulu Feed is a working farm that grows and harvests brome and field grasses for hay, primarily to supply to Lulu Acres. Charnoff owns a 50% interest in Lulu Feed, and the other 50% is owned by his wife. The Debtor's 426 Report lists the net value of Lulu Feed as $56,060.23 as of February 28, 2018. Lulu Feed has total assets valued at approximately $109,807.08, and total liabilities of $53,746.85 comprised of a loan from

Charnoff and his wife.

**CEFR, LLC d/b/a TechStem ("TechStem").** TechStem is a consulting and software development company through which Charnoff provides software, marketing, business planning, and management consulting services. Charnoff owns a 50% interest in TechStem, and the other 50% is owned by his wife. The Debtor's 426 Report lists the net value of TechStem as $106,046.89 as of February 28, 2018. TechStem has total assets valued at approximately $193,596.30, and total liabilities of $87,549.41, of which approximately $45,000 is a loan from Wolliz, and the remainder is a loan from Charnoff and his wife. TechStem's primary asset is a contract with Lyft for services provided by Charnoff. In the event of a liquidation, it is unlikely that the contract would be capable of being sold, substantially reducing the value of TechStem.

**Claims and Counterclaims**

The Debtor has scheduled a number of claims against third parties on his Schedule A/B. The Debtor listed claims against Jones & Keller, P.C. ("J&K") for malpractice and breach of fiduciary duty with an unknown value. These claims arise out of J&K's representation of the Debtor during the Ladd Litigation and certain improper and unauthorized charges on the Debtor's billing statements. The Debtor has determined that these claims likely have substantial value, and intends to pursue these claims.

The Debtor has also scheduled claims that may exist against Kirkland and Ellis ("K&E") with an unknown value. Charnoff employed K&E as his primary counsel with respect to the Ladd Litigation shortly after the case was filed with J&K acting as local counsel. The Debtor believes that certain issues and claims may have arisen with respect to K&E's handling of the Ladd Litigation. The Debtor is still investigating these claims, and has not determined if he intends to pursue the claims or if the claims have any value.

The Debtor has also scheduled his counterclaims against Ladd, Ladd Partners, and Ladd Financial. As set forth above, the jury previously found in favor of Ladd, Ladd Partners, and Ladd Financial with respect to the counterclaims. The Debtor has filed a Motion to Reconsider and will likely pursue an appeal of the verdicts and judgment entered in the Ladd Litigation. Unless the judgment on the counterclaims is vacated by the trial court or reversed on appeal, the counterclaims do not have any value.

**Avoidance Actions**

The Debtor is reserving the right to bring avoidance actions pursuant to 11 U.S.C. §§ 545

through 550 and state and bankruptcy law fraudulent conveyance actions.  While the Debtor listed a number of payments to creditors in the ninety (90) days before filing, all of the payments the Debtor has determined that there are likely valid defenses to any preference actions that could be brought by the Debtor, and therefore will likely not pursue any preference claims.

Nor does the Debtor believe any fraudulent transfer claims exist.  Even to the extent that Charnoff may have transferred any assets, none of the transfers were done with the intent to hinder, defraud, or delay any creditors.  Furthermore, the Debtor is and was solvent at the time any transfer occurred. As a result, the Debtor believes that valid defenses exist to any potential fraudulent transfer claims.


## V.   DESCRIPTION OF LIABILITIES

### A.   Priority Claims

#### 1.   Priority Claims

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claim.


#### 2.   Administrative Claims

Administrative Claims are those Claims for payment of an administrative expense of a kind specified in § 503(b) or § 1114(e)(2) of the Code and entitled to priority pursuant to § 507(a)(2) of the Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estate and operating the business of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fee Claims; (c) all bankruptcy fees and charges assessed against the Estates under 28 U.S.C. § 1930; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims.   The Administrative Claims include the Professional Fees incurred during the case which remain unpaid, including fees and cost for all professionals retained during the case.

On December 26, 2017, the Debtor filed an Application to Employ Kutner Brinen, P.C. ("KB") as bankruptcy counsel.  The Court entered an Order authorizing Charnoff's employment of KB on December 27, 2017 *nunc pro tunc* to December 22, 2017.  Charnoff provided KB with

a pre-petition retainer in the amount of $29,368, which was approved by the Court on January 12, 2018.  On April 20, 2018, KB filed an Application for Interim Allowance and Payment of Attorney Fees and Reimbursement of Costs seeking interim approval of attorney fees in the amount of $39,443.50 and costs in the amount of $1,036.87 for the time period of December 22, 2017 through March 31, 2018.  KB's fees are anticipated to increase by up to an additional $80,000 through confirmation of the Plan, although this amount is subject to the level of litigation in the case.

On January 4, 2018 the Debtor filed an Application to Employ the Hamil Law Group, LLC ("HLG") as Special Counsel to provide litigation consulting services and assist in coordinating with the various attorneys employed by the Debtor.  The Court entered an Order authorizing the Debtor's employment of HLG on January 23, 2018.  Charnoff provided HLG with a pre-petition retainer in the amount of $15,000, which was approved by the Court on February 5, 2018.  As of March 31, 2018, HLG has incurred attorney fees in the amount of approximately $[needed] and costs in the amount of $[needed].  HLG will have ongoing fees through confirmation of the Plan.

On January 17, 2018, the Debtor filed an Application to Employ Sherman & Howard, LLC ("Sherman & Howard") as Special Counsel to provide litigation services with respect to the Ladd Litigation and any appellate work.  The Court entered an Order authorizing Charnoff's employment of Sherman & Howard on February 28, 2018.  Charnoff provided Sherman & Howard with a post-petition retainer in the amount of $75,000 which was approved by the Court on February 29, 2018.  Through March 31, 2018, Sherman & Howard has incurred attorney fees and costs in the amount of approximately $209,027.36.   Sherman & Howard's fees are anticipated to increase through confirmation of the Plan.

On May 4, 2018 the Court entered an order authorizing the Debtor's retention of Jeffrey S. Pagliuca as an expert witness attorney to act as an expert on legal fees in the Ladd Litigation. Ladd Partners is seeking allowance of attorneys fees against the Debtor in an amount in excess of $2.1 million.  The Debtor required the services of an attorney expert witness to defend against the attorney fee claim.  Mr. Pagliuca will be charging for his time on an hourly basis and at this time it is not possible to accurately predict the amount that will be billed to the Debtor.

In addition to attorneys, the Debtor also filed an Application to Employ Kimberly Thompson with Colorado Landmark-Boulder as a real estate broker to market and sell the

Lookout Road Property.  The Court entered an Order authorizing the Debtor's employment of Ms. Thompson on February 20, 2018. Pursuant to the Exclusive Right to Sell Listing Agreement, Ms. Thompson shall receive a commission in the amount of 5% of the gross sale price, less $20,000.

The Debtor also intends to retain Mr. John Purvis an attorney with the law firm of Purvis Gray Thomson, LLP.  Mr. Purvis has agreed to represent the Debtor on a contingency fee basis to pursue claims held by the Debtor against his prior counsel J&K.  While the representation is on a contingency basis, the Debtor is required to pay out of pocket costs and expenses that are currently capped at $25,000.  An application to retain Mr. Purvis is expected to be filed in May 2018.

Other than the administrative expenses for certain professionals, the Debtor has paid his administrative expenses in the ordinary course of business during the course of the bankruptcy case and therefore does not believe there will be any other material administrative claims asserted against the estate.

**3.      Tax Claims**

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8).  The Internal Revenue Service ("IRS") filed Proof of Claim No. 2-1 asserting a Claim in the total amount of $100,000 based on the Debtor's estimated amounts owed for tax year 2017.  The Debtor has since filed his 2017 tax returns and anticipates that amount owed to the IRS will be reduced to $0.

**B.      Secured Claims**

1.      **Class 1, Boulder County Treasurer ("Boulder County").**  Boulder County may hold a statutory lien encumbering the Lookout Road Property.  The Boulder County Assessor's Office reflects that no balance is owed at this time.

2.      **Class 2, Arvest Central Mortgage ("Arvest").**  Arvest holds a secured Claim encumbering the Lookout Road Property.  On April 24, 2015, the Debtor and his wife entered into a Note and Deed of Trust in the original principal amount of $417,000 with Great Western Bank.  The Deed of Trust was filed with the Boulder County Clerk and Recorder on April 29, 2015 at Reception No. 03442509.  The Note and Deed of Trust were subsequently transferred to Arvest on or about January 5, 2018.  On March 30, 2018, Arvest filed Proof of Claim No. 5-3 asserting a secured claim in the amount of $393,860.22.

2.     **Class 3, Louis Herrera ("Herrera").**   Louis Herrera holds a secured Claim encumbering the Residence.  The Debtor and his wife entered into a Note and Deed of Trust in the original principal balance of $350,000 with Herrera.  The Deed of Trust was recorded with the Boulder County Clerk and Recorder on November 9, 2017 at Reception No. 03625042.  On April 30, 2018, Herrera filed Proof of Claim No. 9-1 asserting a secured claim in the amount of $350,000.

### C.     Class 4, Non-Priority Unsecured Creditors

The Debtor has several unsecured pre-petition creditors which comprise Class 4, a list of which is attached hereto as Exhibit A.  This list includes the amount of the Claim as listed on the Debtor's Schedules and the amount asserted by the creditor in its Proof of Claim, if filed.  To the extent the amount filed by the creditor is different than the amount listed on the Debtor's Schedules, the amount of the Claim as filed by the creditor is considered in the analysis.  As set forth on Exhibit A, the total amount of the Class 8 unsecured Claims currently asserted against the Debtor's estate is approximately $1,595,964.67.

The amount of unsecured claims set forth above includes the full amount sought by Ladd Partners in its Proof of Claim.  If Ladd Partners is awarded the full amount of its anticipated attorney fees and costs, Ladd Partners' Claim could increase by over $2,100,000.  Ladd Partners has also elected to pursue its unjust enrichment claims which, if it prevails, may also increase Ladd Partners' Claim substantially.  If Charnoff prevails in his Motion to Reconsider, or if the Judgment is reversed on appeal, the claim may be eliminated or reduced.

The Debtor also listed three indemnity accounts (the "Indemnity Accounts") on his Schedule A/B that may be used to satisfy all or part of Ladd Partners' Claim.  The Purchase Agreement by and between Altisource and Charnoff, among others, included indemnification provisions pursuant to which Charnoff is required to indemnify Altisource, GoldenGator, ONIT Solutions, and REIsmart against claims that occurred prior to the sale of the businesses. In accordance with the indemnification provisions, the Indemnity Accounts were established as security for Altisource in the event of litigation. The Ladd Litigation triggered the indemnification provisions.  In the event that a final, nonappealable judgment is entered in favor of Ladd Partners, the funds may be disbursed either to Charnoff or to Altisource based on the directions in the Order to pay such judgment.  If Ladd Partners judgment is vacated or reversed,

the Indemnity Accounts may be disbursed to the Debtor in accordance with the applicable contracts.

**D.      Leases and Unexpired Executory Contracts**

The Debtor is a party to an Exclusive Right to Sell Listing Contract with respect to the marketing and sale of the Lookout Road Property ("Listing Contract").  The Court entered an Order authorizing the Debtor to assume the Listing Contract on February 20, 2018.  The Debtor is not a party to any other executory contracts or leases.

## VI.      DESCRIPTION OF THE PLAN

**A.      General Description**

The Debtor filed his Plan of Reorganization with the United States Bankruptcy Court for the District of Colorado on April 20, 2018.  The Plan may be amended prior to confirmation. The Plan provides for the reorganization of the Debtor under Chapter 11 of the Bankruptcy Code.  Pursuant to the Plan, the Debtor shall restructure his debts and obligations, sell certain properties and business interests, and otherwise continue to operate in the ordinary course of business.  Funding of the Plan will be derived from the sale of assets and ongoing income generated by the Debtor.

The Plan provides for the specification and treatment of all creditors and interest holders of the Debtor.  The Plan identifies whether each Class is impaired or unimpaired.  A Class is unimpaired only if the Plan leaves unaltered the legal, equitable or contractual obligations between the Debtor and the unimpaired claimants or interest holders.  The following is a brief summary of the Plan.  The actual text of the Plan should be reviewed for more specific detail.  In the event of any conflict between the Plan and this Disclosure Statement, the terms of the Plan govern.

As provided in § 1123(a)(1) of the Code, the Administrative and Tax Claims against the Debtor are not designated as classes. The holders of such Allowed Claims are not entitled to vote on the Plan and such claims will be paid in full.

**B.      Claims**

**1.      Unclassified Priority Claims**

**a.      Administrative Claims**

The holders of Allowed Claims of the type specified in Section 507(a)(2) of the Code,

Administrative Claims, shall receive cash equal to the Allowed amount of such Claim or a lesser amount or different treatment as may be acceptable and agreed to by particular holders of such Claims.  Such Claims shall be paid in full on the Effective Date of the Plan, or as otherwise agreed to by the particular holders of such Claims.  Section 507(a)(2) Administrative Claims that are Allowed by the Court after the Effective Date of the Plan shall be paid upon Allowance.

The Debtor has paid his administrative expenses in the ordinary course during the bankruptcy case and therefore does not believe that any material administrative claim exists against the bankruptcy estate, except for the administrative claims of the Debtor's professionals as set forth below.

As of the Petition Date, Kutner Brinen, P.C. ("KB"), bankruptcy counsel, held a pre-petition retainer for payment of post-petition fees and costs in the amount of $29,368.  The retainer was paid by the Debtor and KB has been authorized to be paid 80% of monthly fees and 100% of costs on an ongoing basis subject to filing interim fee applications.   On April 20, 2018, KB filed an Application for Interim Allowance and Payment of Attorney Fees and Reimbursement of Costs seeking interim approval of attorney fees in the amount of $39,443.50 and costs in the amount of $1,036.87 for the time period of December 22, 2017 through March 31, 2018.  KB has incurred additional attorney fees in the amount of $13,948.50 and costs in the amount of $224.90 through April 30, 2018.  To date, KB has received payments in the amount of $29,368 from its pre-petition retainer.

As of the Petition Date, the Hamil Law Group, LLC ("HLG") held a pre-petition retainer in the amount of $15,000.  As of March 31, 2018, HLG has incurred attorney fees in the amount of approximately $54,197.50.  The Debtor has paid HLG approximately $26,974.50 from the pre-petition retainer and interim payment of fees.

The Debtor has also employed Sherman & Howard, LLC ("Sherman & Howard") as special counsel to provide litigation services with respect to the Ladd Litigation. Through March 31, 2018, Sherman & Howard has incurred attorney fees and costs in the amount of $209,027.36.  The Debtor has been paying Sherman & Howard 80% of its fees as they are billed on a monthly basis.  The Debtor also paid Sherman & Howard a post-petition retainer in the amount of $75,000, which will be held until Sherman & Howard's representation of Charnoff is concluded.

All Administrative Claims of professionals are subject to Court approval on notice to creditors with an opportunity for a hearing.  Certain professional fees may be paid pursuant to

interim fee applications and upon Court allowance.  The Debtor may also pay up to 80% of fees and 100% of costs on a monthly basis subject to the professional's compliance with L.B.R. 2016-2.

### b.      Tax Claims

The Allowed Claims of a type specified in Section 507(a)(8) of the Code, unsecured Tax Claims of governmental taxing authorities, shall be paid in full on the Effective Date of the Plan.

### c.      United States Trustee Fees

All payments due from the Debtor to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid on the Effective Date, and the U.S. Trustee shall thereafter be paid fees due on a quarterly basis until the case is closed, converted, or dismissed.  The Debtor shall request entry of a final decree closing the case on or before the later of the date all Claim objections and any pending litigation is concluded or after the Debtor receives a discharge.

### 2.      Class 1, Boulder County Treasurer.

The Class 1 Secured Claim is unimpaired by the Plan.  The Class 1 Secured Claim will be Allowed in its full amount and paid in full with interest at the statutory rate on the Effective Date of the Plan.  The Boulder County Assessor's Office reflects that no Class 1 Claim exists.

### 3.      Class 2, Arvest Central Mortgage.

The Class 2 Secured Claim is impaired by this Plan.  The Class 2 Secured Claim will retain its lien and will be allowed in an amount agreed to by the Debtor and Arvest or set by the Court.  The Class 2 Claim shall bear interest at a rate of 4% per annum, or, if the Class 2 claimant objects, and amount agreed to by the parties or set by the Court.  The Class 2 Claim will be amortized and paid in monthly installments over twenty-five (25) years.  The Debtor shall also sell the Lookout Road Property within one (1) year of confirmation of the Plan, at which point the Class 2 Claim and any accrued interest shall be paid in full.

Arvest filed Proof of Claim No. 5-3 asserting a secured claim in the amount of $393,860.22.  On April 9, 2018, the Debtor filed a Motion to Sell Property Free and Clear of Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. § 363, seeking authorization to sell the Lookout Road Property free and clear of liens, claims, and encumbrances.  The Court entered an Order granting the Motion on April 25, 2018.  Closing is currently scheduled to occur on May 11, 2018.  If the closing occurs on May 11, the Class 2 Claim will be paid in full from the proceeds of the sale.  If the sale does not close, the monthly payment on account of the Class 2

Claim will be approximately $2,078.94.

    **4.**    **Class 3, Louis Herrera.**

The Class 3 Secured Claim is impaired by the Plan. The Class 3 Claim is secured by a first position Deed of Trust encumbering the Residence. The Class 3 Claim will retain its lien and will be allowed in the amount due on the Confirmation Date of the Plan or as otherwise agreed to by the Debtor and the Class 3 claimant. The Class 3 Claim will bear interest at 6% per annum, or, if the Class 3 claimant objects, and amount set by the Court or agreed to by the Debtor and Class 3 claimant. The Class 3 Claim shall be paid interest only on a monthly basis for 120 months, and the full principal balance will be paid in full with a single balloon payment on the ten (10) year anniversary of the Effective Date Plan.

Herrera filed Proof of Claim No. 9-1 asserting a secured claim in the amount of $350,000. Assuming that the interest rate is 6% per annum, the monthly interest only payment on account of the Class 3 Claim will be $1,750, with a balloon payment in the amount of $350,000 to be paid on the ten (10) year anniversary of the Effective Date of the Plan.

    **4.**    **Class 4, Unsecured Claims**

Class 4 is impaired by the Plan. All Allowed Class 4 claim shall be paid in full with interest at a rate of 3% per annum. Payments to the Allowed Class 4 claims will funded through the Debtor's ongoing income, proceeds from the sale of the Lookout Road Property, and the collection of distributions from entities in which the Debtor holds an interest following the liquidation of assets and investments. To effectuate the Plan, the Debtor will establish a segregated interest bearing account (the "Creditor Escrow Account") for the purpose of collecting funds and making distributions to unsecured creditors pursuant to the Plan. The Creditor Escrow Account will initially be funded with $650,000 from the proceeds of the Lookout Road Property and the collection of money due from Wolliz investments, which it will fund through its sale of assets. If the total amount Class 4 Allowed Claims is over $3,000,000, the amount of the Creditor Escrow Account may be increased. Once all of the of the Class 4 Claims are known and are Allowed Claims, the Debtor shall distribute the funds held in the Creditor Escrow Account and any amounts he receives from the Indemnity Accounts through a pro rata distribution. Interim distributions may be made on a pro-rata basis provided funds are set aside for payments that would be made on account of disputed claims.

Distributions to all Class 4 creditors shall begin after all claims are determined by a court

of competent jurisdiction through final, non-appealable orders. To the extent distributions are made before the claims are finally determined, distributions shall be made to all creditors on a pro rata basis.  To the extent the Debtor has objected to the allowance of a Class 4 claim, the distribution to the disputed claim will be held in a segregated account by the Debtor until the disputed claim is allowed or disallowed.  If the disputed claim is allowed, the funds will be released to the Class 4 claimant holding the previously disputed claim.  If the disputed claim is disallowed, the funds will be distributed pro rata to the remaining Allowed claims.

If the Creditor Escrow Account and Indemnity Accounts are insufficient to pay all Allowed Class 4 claims in full, Class 4 claimants shall receive a pro-rata distribution of all the net proceeds due to the Debtor from the liquidation of assets on account of his affiliated companies, liquidation of the Debtor's non-exempt assets, and liquidation of any and all assets acquired by the Debtor post-petition (the "Assets").  Payments will be made to Class 4 after payment of Unclassified Priority Claims and payments due senior classes.  Additional distributions shall be made quarterly beginning after the Indemnity Accounts and the Creditor Escrow Account have been distributed. The liquidation of assets will be directed by the Debtor, and will be conducted through public or private sales by qualified third party brokers or the Debtor, on notice to creditors.  The Debtor will liquidate sufficient assets to pay all Allowed Class 4 claims in full within one (1) year after the all claims are determined by a court of competent jurisdiction through final orders and become Allowed Claims.

In addition to the distributions set forth above, the Indemnity Accounts may be used to satisfy all or part of the Ladd Partners' Claim. Any distributions from the Indemnity Accounts to Ladd Partners shall only occur after Ladd Partners' Claim is deemed allowed by virtue of a final non-appealable order.  Distributions from the Indemnity Account shall be made in accordance with the terms and conditions of the Escrow Agreement dated October 9, 2015 which governs the Indemnity Account.  In the event that Ladd Partners does not have an allowed claim, or the amount held in the Indemnity Accounts is greater than the amount of Ladd Partners' allowed claim, the remaining funds will be disbursed in accordance with the Escrow Agreement and related contracts.

Unsecured creditors shall also receive pro rata distributions of any funds collected from Avoidance Actions, including any claims against J&K.  The Debtor shall be authorized to pursue such litigation and make decisions concerning such litigation, including settlement.  As set forth

in Section IV above, the Debtor does not believe any Avoidance Actions exist at this time. However, the Debtor does intend to pursue his claims against J&K, and believes that his claims against J&K have significant value.

###### 5. Class 5, Interests

Class 5 consists of the interests held by Charnoff in the estate.  While this Class is impaired, Charnoff will be retaining his interests pursuant to the terms of the Plan.  Charnoff believes that this can be accomplished under this Plan because: a) Class 4 will be paid in full with interest; b) Class 4 may vote to accept the Plan; and c) exempt assets and abandoned assets will not be distributed to Charnoff on account of the Plan but by virtue of their status as exempt or abandoned.

## VII.   PLAN FEASIBILITY

The Debtor believes that the Plan, as proposed, is feasible.  The feasibility of the Plan is tested at two levels.  First, at the time of Plan confirmation the Debtor should have sufficient assets and funds to make all payments that are required under the terms of the Plan.  These payments will consist primarily of administrative expense claims and ongoing payments that have been made on a monthly basis during the course of the chapter 11 case.  Second, during the course of the Plan the payments to creditors will be derived from two primary sources, distributions from the Debtor's entities and the ongoing earnings of the Debtor.  The Debtor has and continues to successfully run several businesses, and anticipates that the continued operation of his businesses will continue to generate significant income for the Debtor.  Additionally, the Debtor has been able to continue to earn substantial funds during the course of the case despite the Chapter 11 filing.  The Debtor has a history of substantial earnings and should be capable of continuing his earnings at a high level during the course of the Plan.

Most importantly, based upon the known claims in this case and the assets already owned by the Debtor, the Debtor is currently solvent.  The Debtor's assets are sufficient to pay all known claims that have a reasonable likelihood of becoming Allowed Claims or are currently allowed.  While the Ladd Partners Claim is argued by that creditor to be a significant claim in a much larger amount, the fact is that following a trial to a jury the verdict and resulting judgment was for a much smaller amount of $575,000 plus added judgments for $45,000 and $29,017. While Ladd Partners also claims attorney fees, those fees are only allowable based on the state law securities claim which was entered in the amount of zero.  The Ladd Partners request for an

unjust enrichment claim appears to be very inconsistent with the relief already granted in the case.  Assuming the claims stand at no greater amount than already determined, the Debtor can readily pay the claim.

Attached to this Disclosure Statement as Exhibit B is a projection of the Debtor's expected earnings, revenue generation and Plan payments over the first year of the Plan.  The extent of the funds needed to be raised to fund the Plan is subject to uncertainty due to the nature of the Ladd Litigation.   Nonetheless, based upon the Debtor's knowledge of the case, it is expected that both claims will be resolved through the appropriate court at a level that will allow the Debtor to pay all Class 4 claims in full.    The litigation over Ladd Partners' Claim, to the extent of the pending litigation and any subsequent appeal, will take time to resolve.    Given the timing on this claim, the Debtor expects that an estimation of the claim may have to take place in the Bankruptcy Court for voting purposes pursuant to 11 U.S.C. §502(c)(1).  This provision of the Bankruptcy Code permits the court to estimate a claim when the claim is unliquidated, if the liquidation or fixing of the claim would unduly delay the administration of the case.

## VIII.    TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or interest holders.  **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.**  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation.  Generally, unsecured creditors should have no tax impact as a result of Plan confirmation.  The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized.  Interest holders may have very complicated tax effects as a result of Plan confirmation.

## IX.    EVENTS DURING THE CHAPTER 11 CASE

The Debtor has complied with all requirements of the Bankruptcy Code and of the Office of the U.S. Trustee, including attending an initial debtor interview and his meeting of creditors, establishing a debtor-in-possession bank account, and the filing of monthly operating reports.

**Ladd Litigation**

In connection with the Ladd Litigation, the Debtor filed Applications to Employ the Hamil Law Group and Sherman & Howard as special counsel.  The Court entered an Order authorizing the Debtor to employ the Hamil Law Group ("HLG") on January 23, 2018. Following an evidentiary hearing, the Court entered an Order authorizing the Debtor to employ Sherman & Howard on February 28, 2018.

On January 31, 2018, Ladd Partners filed a Motion for Relief from Stay on January 31, 2018.  The Debtor filed his Response on February 20, 2018.  The Debtor and Ladd Partners were able to reach an agreement, and on February 23, 2018, the Court entered a Stipulated Order Regarding Ladd 2000 Partners, Ltd.'s Motion Seeking Relief from the Automatic Stay and the Debtor's Response ("Stay Order"), granting relief from stay for the purposes of allowing the Ladd Litigation to proceed in the Denver District Court.

Following the entry of the Stay Order, the Debtor actively pursued his post-trial remedies.  The Debtor filed a Motion for Judgment Notwithstanding the Verdict on April 23, 2018.  Ladd Partners has not yet filed a Response to the Motion.  On April 30, 2018, the Debtor filed a Notice of Appeal, initiating Case No. 2018CA820 with the Colorado Court of Appeals (the "Appeal").

While the Appeal is pending, certain aspects of the Ladd Litigation will proceed in the Denver District Court.  The Debtor anticipates that Ladd Partners will file a renewed Motion for Attorney Fees and Costs.  The Debtor also anticipates that Ladd Partners will attempt to proceed with their claim for unjust enrichment.

**Lookout Road Sale**

Pre-petition, the Debtor and his wife had listed the Lookout Road Property and were actively marketing the property when the bankruptcy case was filed.  After filing his bankruptcy case, the Debtor filed a Motion to Approve and Assume Exclusive Right-to-Sell Listing Contract and Application to Employ Broker, seeking to employ Kimberly Thompson, a realtor with Colorado Landmark-Boulder, and continue to market the property.  The Court entered an Order Authorizing Assumption of Exclusive Right-to-Sell Listing Contract and Employment of Broker

on February 20, 2018.

On April 9, 2018, the Debtor filed an Amended Motion to Sell Property Free and Clear of Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. § 363 ("Sale Motion"), seeking authorization to sell the Lookout Road Property free and clear for a gross sale price of $1,315,000. The Sale Motion further sought authorization to pay the mortgage in favor of Arvest Central Mortgage encumbering the property, the costs of sale, and the commissions owed pursuant to the contract, and then split the net proceeds between Charnoff and his wife, the co-owner of the Lookout Road Property. The Ladd Partners filed a Limited Objection to the Motion on April 23, 2018, objecting to the distribution of proceeds to Charnoff and his wife.

On April 25, 2018, the Debtor and Ladd Partners filed a Stipulation Resolving Limited Objection to Amended Motion to Sell Property Free and Clear of Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. § 363, pursuant to which the Debtor and Ladd Partners agreed that 50% of the net proceeds would be disbursed to Charnoff for deposit into his Debtor-in-Possession account. The remaining 50% of the net proceeds would be held in a segregated account pending further Order from the Court. The Court subsequently entered a Stipulated Order Granting Motion to Sell Property Free and Clear of Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. § 363 on April 25, 2018. The sale of the Lookout Road Property is expected to close on May 11, 2018.

## X.   LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to the Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. Chapter 7 requires the liquidation of the Debtor's assets by a Trustee who is appointed by the United States Trustee's office. In a Chapter 7 case, the Chapter 7 Trustee would take over control of the assets and be able to review claims. However, in this case since the Debtor is solvent the Debtor would retain standing to contest claims as he is currently doing. Any remaining non-exempt assets would be liquidated and the proceeds distributed to creditors in the order of their priorities. Funds would first be used to pay priority claims of the Chapter 11 case and the Chapter 7 case. Section 326 of the Bankruptcy Code defines the limitations of compensation of the Chapter 7 Trustee. Following the payment of the Chapter 7 costs and expenses of administration, the Chapter 7 Trustee would pay the Chapter 11 costs and expenses of administration, and then other priority claims existing

in the Chapter 11 bankruptcy case.   A Chapter 7 trustee may also elect to retain their own attorneys and accountants for the Chapter 7 estate.   It is doubtful that a Chapter 7 trustee could realize as much from the Debtor's assets as the Debtor.  The Debtor's assets and in particular the business assets are fairly complicated and the Debtor has a tremendous amount of knowledge with respect to the assets and the markets for sale of the assets.   Some of the value of the Debtor's businesses is also reliant on the Debtor continuing to provide services to the company. Without Charnoff's continued involvement, several of the entities would likely have significantly less value.   The Debtor also has the most knowledge regarding the claims particularly with respect to Ladd Partners' Claim.  It is also the case that in a conversion to Chapter 7, creditors and the estate would lose any income that the Debtor has earned or generated post-petition since the estate would be limited to the assets that existed on the petition date for the Chapter 11 case and would not include post-petition earnings from personal services and earnings.

It is also the case that the Ladd Partners Claim would continue to be the subject of the same litigation since no distributions could take place in the Chapter 7 case until the claims are all allowed.  This means that a Chapter 7 case would be subject to the same delay and cost to determine the claim as the Chapter 11 case.  In addition, one of the assets that may turn out to be significant is the claim held by the Debtor against J&K.   The Debtor is the one most knowledgeable about this claim and is the best party to assert it on behalf of the estate.

Given the uncertainty that a Chapter 7 conversion would bring and the extended amount of time it would take a trustee to learn and understand the case, the Debtor's Plan presents a better alternative for creditors.  It is urged that all creditors vote to accept the Debtor's Plan.


DATED: May 7, 2018

_____ */s/ Walter Charnoff*_____
Walter Charnoff

Kutner Brinen, P.C. ("KB") has acted as legal counsel to the Debtor on bankruptcy matters during the Chapter 11 case.  KB has prepared this Disclosure Statement with information provided primarily by the Debtor.  The information contained herein has been approved by the Debtor.  KB has not made any separate independent investigation as to the veracity or accuracy of the statements contained herein.

Counsel to the Debtor and Debtor- In-Possession:

KUTNER BRINEN, P.C.

By: ____/s/ Lee M. Kutner_____
         Lee M. Kutner
         Keri L. Riley
         1660 Lincoln St., Suite 1850
         Denver, CO 80264
         Telephone: (303) 832-2400
         Telecopier: (303) 832-1510
         Email:  lmk@kutnerlaw.com

### EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A:    List of Unsecured Creditors

Exhibit B:    Projections

Exhibit A - Class 4 Claims

| Creditor | Amount of Claim on Schedule F | Amount in Proof of Claim | Amount of Claim for Class 4 Analysis | Notes |
|---|---|---|---|---|
| Visual Advantage | $53,929.28 | | $53,929.28 | |
| Rubin Brown | $81,085.00 | $49,250.00 (POC 6-1) | $49,250.00 | Disputed |
| Portia Group, LTD | Unknown | | $0.00 | |
| Ladd 2000 Partners Ltd | $2,900,000.00 | $651,008.50 (POC 8-1) | $651,008.50 | Disputed |
| Jones and Keller | $788,603.77 | $796,048.00 (POC 7-1) | $796,048.00 | Disputed |
| Hunter & Geist, Inc. | $23,746.88 | | $0.00 | Disputed |
| Holland & Hart | $35,750.00 | $35,750 (POC 4-1) | $35,750.00 | Disputed |
| Haynie & Company | $1,500.00 | | $1,500.00 | |
| Chase Bank | Unknown | | $0.00 | |
| Centurion | Unknown | | $0.00 | |
| Onit Solutions LLC | | indemnification POC 10 | $0.00 | |
| REIsmart LLC | | indemnification POC 11 | $0.00 | |
| GoldenGator LLC | | indemnification POC 12-1 | $0.00 | |
| Altisource S.a.r.l. | | indemnification POC 13-1 | $0.00 | |
| American Express | $7,472.27 | $8,478.89 (POC 3-1) | $8,478.89 | |
| **Total** | | | **$1,595,964.67** | |