# EXHIBIT 7

Page 3

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
 2
   Case No. 19-cv-2381-MEH
 3   _____
 4   VIDEOCONFERENCE DEPOSITION OF:  WALTER CHARNOFF
 5          September 29, 2020
          (Confidential Designations Pending)
 6   _____
 7   WALTER CHARNOFF,
 8   Plaintiff,
 9   v.
10   NANCY LOVING, d/b/a ARTSUITE NY,
     ARTPORT LLC,
11   STUDIO 41, LLC,
     ALICIA ST. PIERRE,
12   MARTIN ST. PIERRE,
     ISP HOLDINGS, INC., and
13   DAVID HINKELMAN,
14   Defendants.
     _____
15
          PURSUANT TO NOTICE, the deposition of WALTER
16   CHARNOFF was taken on behalf of the Defendants Loving,
     ArtSuite, Studio 41, and Hinkelman, remotely, on
17   September 29, 2020, at 9:12 a.m., before Kirsten M.
     Thorngate, Registered Professional Reporter and Notary
18   Public within Colorado.
19
20
21
22
23
24
25
```

Page 2

```
 1              A P P E A R A N C E S
 2   Present Via RemoteDepo:
 3   For the Plaintiff:
 4        IAN T. HICKS, ESQ.
          The Law Office of Ian T. Hicks LLC
 5        6000 East Evans Avenue
          Building 1, Suite 360
 6        Denver, Colorado, 80222
          ian@ithlaw.com
 7
 8   For the Defendants Loving, ArtSuite, Studio 41, and
     Hinkelman:
 9
          LIZA GETCHES, ESQ.
10        Shoemaker Ghiselli + Schwartz LLC
          1811 Pearl Street
11        Boulder, Colorado 80302
          lgetches@sgslitigation.com
12
13   For the Defendants Martin and Alicia St. Pierre and ISP
     Holdings, Inc.:
14
          THOMAS H. WAGNER, ESQ.
15        Anderson Law Group
          7385 West Highway 50
16        Salida, Colorado 81201
          tom@anderson-lg.com
17
18   Also Present:
19        Nancy Loving
          David Hinkelman
20
21
22
23
24
25
```

```
 1              I N D E X
 2   EXAMINATION OF WALTER CHARNOFF:              PAGE
     September 29, 2020
 3
   By Ms. Getches                                   7
 4
   By Mr. Hicks                                   277
 5
 6                                            INITIAL
     DEPOSITION EXHIBITS:                     REFERENCE
 7
   Exhibit 1  Plaintiff's Amended Responses to     66
 8            Defendant Nancy Loving d/b/a
              ArtSuite NY, ArtPort LLC,
 9            Studio 41, LLC, and David
              Hinkelman's First Set of Written
10            Discovery
11   Exhibit 2  List of emails                      84
12   Exhibit 3  Email to Loving from Charnoff,       87
              6/14/19, Subject:  Re:  Insurance
13
   Exhibit 4  Photograph                           90
14
   Exhibit 5  Affidavit of Walter Charnoff          99
15
   Exhibit 6  Plaintiff's Second Amended           103
16            Complaint
17   Exhibit 7  Email to Hicks from Charnoff,       119
              4/29/20, Subject:  Fwd:  Harold
18            Garde Pricing
19   Exhibit 8  Email to Charnoff from ArtPort,     132
              10/21/15, Subject:  Harold Garde
20            Selections
21   Exhibit 9  List of text messages              138
22   Exhibit 10 Email to Charnoff from Loving,      140
              5/17/16, Subject:  a few more phot...
23
24   Exhibit 11 Email to Hicks from Charnoff,       147
              4/29/20, Subject:  Fwd:  Garde invoice
25
```

Page 4
```
 1   Exhibit 12 Email to Hinkelman and Loving from  150
              Charnoff, 5/6/19, Subject:  Art
 2            purchase and delivery
 3   Exhibit 13 Email to Hicks from Charnoff, 4/29/20, 154
              Subject:  Fwd:  layby on art
 4
   Exhibit 14 Email to Loving from Charnoff,       161
 5            8/16/17, Subject:  amended art
              purchase
 6
   Exhibit 15 Email to Hicks from Charnoff, 4/29/20, 169
 7            Subject:  Fwd:  Garde invoice
 8   Exhibit 16 Email to Hicks from Charnoff, 4/29/20, 170
              Subject:  Fwd:  Charnoff Pricing -
 9            Garde Art
10   Exhibit 17 List of text messages; email to     184
              Loving from Charnoff, 6/15/19,
11            Subject:  Re:  Final Checklist for
              Art Shipment; photographs
12
   Exhibit 18 Walter Charnoff Art Collection       186
13            Condition Reports
14   Exhibit 19 Email to Loving from Charnoff,      197
              5/8/19, Subject:  Re:  amended art
15            purchase
16   Exhibit 20 Email to Hicks from Charnoff,       199
              4/29/20, Subject:  Fwd:  Final
17            Checklist for Art Shipment
18   Exhibit 21 Plaintiff's Federal Rule of Civil   202
              Procedure 26(a)(2)(c) Disclosure
19
20   Exhibit 22 Deposition of Bradley, pages 23-28  203
21   Exhibit 23 Museum Level Condition Reporting    205
22   Exhibit 24 Condition Report                    211
23   Exhibit 25 Bankruptcy Schedule A/B             226
24   Exhibit 26 Screenshot, various text messages   227
25
```

Page 25

1  for this deposition is not our problem.  I think we
2  should call the judge right now.
3           MR. HICKS:  Well, I'm sorry, I didn't
4  predict that you would ask completely irrelevant
5  questions about something --
6           MS. GETCHES:  We're going to go off the
7  record and call the judge.
8           MR. HICKS:  Okay.
9           MS. GETCHES:  And I'm going to seek fees
10 as well.
11          MR. WAGNER:  I'm going to join in that.
12          MR. HICKS:  Go ahead.
13          (Recess taken, 9:34 a.m .to 9:38 a.m.)
14      Q.  (BY MS. GETCHES)  Mr. Charnoff, where are
15 you currently employed?
16      A.  I have a consulting company called Tec
17 Stem.
18      Q.  Tec Stand?
19      A.  Tec Stem, T-e-c, S-t-e-m.
20      Q.  What does that company do?
21      A.  It consults different starter companies
22 and works on various entrepreneurial endeavors.
23 Currently I'm focused on a project that is trying to
24 make diagnostic heart health tests that are not
25 covered by insurance and currently are only available

Page 26

1  to the wealthy available to mainstream America.
2       Q.  Did you start this company, or did you
3  invest in this company?
4       A.  Both.
5       Q.  I guess my question is was the company
6  formed before you invested in it or did you create the
7  company?
8       A.  I created the company.
9       Q.  Are there any other investors in the
10 company?
11      A.  No.
12      Q.  Any other owners?
13      A.  No.
14      Q.  Are you involved in any other employment
15 at this time?
16      A.  No.
17      Q.  Where were you employed prior to Tec
18 Stem?
19      A.  Altisource Portfolio Solutions.
20      Q.  What is Altisource Portfolio Solutions?
21      A.  They're a publicly traded company that
22 provides various services to the mortgage space.
23          (At this time Mr. Hinkelman entered the
24 videoconference.)
25      Q.  Now, did you start Altisource, or did you

Page 27

1  join it as an investor?
2       A.  They acquired my companies; and as a
3  result, I got stock in their business.
4       Q.  Which companies did Altisource acquire?
5       A.  REIsmart LLC, Onit Solutions LLC, and
6  GoldenGator LLC.
7       Q.  Altisource acquired all three companies
8  at one time?
9       A.  Correct.
10      Q.  What is REIsmart?
11      A.  I don't know what it is currently.  At
12 the time that they acquired it, it was a --
13 Ms. Getches, please don't roll your eyes at me.
14      Q.  Mr. Charnoff, I was looking up at the
15 ceiling.
16      A.  Okay.  As I started to say, it is not --
17 I don't know what it is currently.  But at the time
18 they acquired it, it was a Zillow-type website where
19 investors can search for those same investments; but
20 instead of searching by regular house characteristics,
21 they could also search by what type of yield those
22 investments would give them.
23      Q.  And what was Onit?
24      A.  Onit Solutions, which is O-n-i-t, one
25 word, space, Solutions, was a software development

Page 28

1  company that developed software for companies that had
2  complex needs they needed to solve with software or
3  regulatory compliance concerns specializing in
4  financial services, real estate mortgage space.
5       Q.  And GoldenGator?
6       A.  Did rental data analytics for the
7  institutional real estate investor space.
8       Q.  Were you involved at Altisource after it
9  acquired these three companies you just mentioned?
10      A.  I was.
11      Q.  In what capacity?
12      A.  I was -- my official title was executive
13 vice president.
14      Q.  For how long were you executive vice
15 president?
16      A.  Until approximately July of 2017.
17      Q.  And from what point in time until July
18 2017 were you executive vice president?
19      A.  It might have been senior vice president.
20 I forget if they use the term "senior" or "executive."
21 And I was the vice president of Altisource from
22 October 10, I believe.  October 10 or October 11 of
23 2015 until, I believe, mid-July of 2017.
24      Q.  And you were asked to leave Altisource?
25      A.  I wasn't asked to leave Altisource.  I

Walter Charnoff  09/29/2020                                      ConfidentialPages 29..32
WALTER CHARNOFF vs NANCY LOVING

Page 29

1  left Altisource because of suffering from heart
2  disease at the time.
3      Q.  Were you accused of misrepresentation by
4  employees at Altisource?
5      A.  I was not.
6      Q.  Where were you employed prior to -- first
7  of all, were you employed at REIsmart?
8      A.  I was the founder of REIsmart.
9      Q.  Did you have a job title there or just
10  the founder?
11      A.  I was the manager.
12      Q.  And at Onit Solutions, were you employed
13  there or were you also the founder?
14      A.  I was the founder of Onit Solutions also.
15      Q.  Same question with respect to
16  GoldenGator?
17      A.  Also the founder.
18      Q.  Prior to those three companies, how were
19  you employed?
20      A.  Onit Solutions was since 2004.
21      Q.  2004 until 2015?
22      A.  Yep.
23      Q.  And then how long -- when did you found
24  REIsmart?
25      A.  2014, I believe.

Page 30

1      Q.  And GoldenGator?
2      A.  2005.
3      Q.  Okay.  Prior to Onit Solutions, were you
4  employed?
5      A.  I mean, my work history from 1993 forward
6  was five years in United States Air Force, got out of
7  the United States Air Force when my daughter was born
8  with an honorable discharge in 1998.  Became a
9  financial planner.  Was a financial planner for three
10  years.  And in 2001 started doing technology
11  consulting and working in the tech space.
12      Q.  Have you ever invested in any company
13  before?
14      A.  Yes.
15      MR. HICKS:  Object to form.
16      Q.  (BY MS. GETCHES)  Tell me about a company
17  that you invested in that you did not also find --
18  found.
19      MR. HICKS:  Same objection.
20      A.  Can we take a break for a moment?
21      Q.  (BY MS. GETCHES)  Yeah.  If you could
22  answer the question first.
23      A.  Can you please -- that's a pretty broad
24  question.  Can you please . . .
25      Q.  Sure.  Can you name one company that you

Page 31

1  invested in that you did not also found?
2      A.  Coca-Cola.
3      Q.  And I'm not talking about investing in
4  publicly traded companies.  I'm talking about -- for
5  example, have you ever invested in a start-up before?
6      MR. HICKS:  Object to the form.
7      A.  Yes.  I have invested in start-ups
8  before.
9      MR. HICKS:  So we've answered that
10  question.  So can we take a break?
11      MS. GETCHES:  Sure.
12      (Recess taken, 9:48 a.m. to 9:55 a.m.)
13      Q.  (BY MS. GETCHES)  I was asking you before
14  the break about whether you invested in any start-up
15  before.  Can you name the name of a company that you
16  have invested in that was a start-up?
17      A.  CJ Porter Solutions is a start-up that I
18  have invested in.
19      Q.  What kind of business was that?
20      A.  It was a processing technology for 1031
21  exchange investors.
22      Q.  And to be clear, you invested money in
23  that company but did not found that company, correct?
24      A.  Correct.
25      Q.  What kind of due diligence do you

Page 32

1  typically do before investing in a company or a
2  product?
3      A.  It depends on the company or the product.
4      Q.  Why is it important to do due diligence?
5      A.  As a philosophy why is it important to do
6  due diligence?
7      Q.  Why is it important to you, Mr. Charnoff?
8      A.  Why is due diligence important to me?
9      Q.  Why is it important to you to do due
10  diligence prior to investing in a company or a
11  product?
12      A.  Depending on the company or product I am
13  investing in, it is important to do enough -- I don't
14  know if you want to say evaluation, research,
15  investigation, to where I feel comfortable putting my
16  money in.  Now, how much due diligence I do depends on
17  how I feel about the people involved, how much I trust
18  the people involved, how many prior business deals
19  I've done with those people, and then other factors
20  about the company and the products.
21      Q.  Do you review capitalization of the
22  company before you invest in it?
23      A.  It depends.
24      Q.  Do you think it's a good idea to do that?
25      A.  It depends.

Walter Charnoff  09/29/2020                    ConfidentialPages 33..36
WALTER CHARNOFF vs NANCY LOVING

Page 33

1    Q.  Is it ever a good idea not to review
2  capitalization of a company?
3    A.  It depends on why you're investing and
4  what the use of your proceeds would be.
5    Q.  Okay.  When would be an instance where it
6  wouldn't be helpful to review the capitalization of a
7  company prior to investing in the company?
8    A.  That's a really broad question.  I would
9  prefer not to theorize on that just openly.
10    Q.  Can you think of any instance where it
11  would not be a good idea?
12    A.  Sure.
13    Q.  Okay.  What's one?
14    A.  Where it would not be a good idea, or
15  where it would not be necessary?
16    Q.  Where it would not be a good idea.
17    A.  Again, I can't speculate on every
18  situation that could exist when you're looking at
19  putting money into a company.
20    Q.  I'm asking for one instance.  I'm not
21  asking every situation.
22    A.  Can you please clarify the question that
23  you're asking and tell me exactly what you would like
24  me to respond to?
25    Q.  Sure.  When would be, in your opinion, a

Page 34

1  good idea not to review the capitalization of a
2  company prior to investing in that company?
3    MR. HICKS:  Object to the form.
4    A.  Way too broad a question.  I can't
5  hypothesize about every situation that could exist
6  that would make it necessary and/or to what level to
7  invest to review the capitalization of the company.  I
8  can give you an example for my own investing.
9    I just built a house for River's Promise
10  for Rwandans who don't have shelter.  It cost $2,500
11  to build the house.  I made that investment without
12  reviewing the capitalization of the rest of the
13  company, because I felt strongly that for $2,500 they
14  could build that one house and that that Rwandan
15  family would have shelter in the very near future.
16    So to me, the rest of the capitalization
17  was irrelevant to that specific investment.  And I'm
18  sure there's many other situations where you're
19  investing in a company and they're going to use your
20  money for a specific marketing campaign, a specific
21  endeavor or specific art gallery show, where the
22  overall capitalization of the company is relevant as
23  to do they have the money for the specific activities
24  they're promising they're going to do and where are
25  they going today.  As far as --

Page 35

1    Q.  (BY MS. GETCHES)  Mr. Charnoff, with your
2  Rwandan house example, did you consider that an
3  investment, or was it a donation to a charitable
4  cause?
5    A.  It was a donation to a charitable cause.
6  But I'm as discerning about my charitable
7  contributions as I am investments, because there's a
8  lot of companies out there that don't really use the
9  money for what you believe you're giving the money
10  for; and, also, when I donate to charity, I care about
11  the actual result, not just the feel-good feeling from
12  donating the money.  So if I was going to give them
13  money to build a house and they didn't actually have
14  the ability to use that money to build a house, then I
15  really wasn't helping the family that I was trying to;
16  so . . .
17    Q.  When you're investing in a company and
18  you're expecting to receive a profit from that
19  investment, is it a good idea to review the
20  capitalization of the company?
21    A.  Is it a good idea?
22    Q.  Yeah.
23    A.  Most likely.
24    Q.  Okay.  Is it a good idea to review the
25  revenue, the profit, the margin trends of that company

Page 36

1  prior to investing into a company that you expect to
2  get money from?
3    A.  Can you repeat that question, please?
4    Q.  Sure.  If you're investing into a company
5  that you expect to receive a return on your
6  investment, is it a good idea to review that company's
7  revenue, profit trends, or margins?
8    A.  In most cases, I would say so.
9    Q.  Would you look at a company's competitors
10  prior to investing into it?
11    A.  In most cases.
12    MR. HICKS:  Object to form.
13    Q.  (BY MS. GETCHES)  Would you look at
14  valuation multiples, for example, to see if similar
15  assets of that company sold at similar prices in the
16  past?
17    A.  Again, every scenario is different.  It
18  depends on what the purpose of my investment is and
19  how I'm looking at getting a return.
20    Q.  Would you look at balance sheets of the
21  company that you're investing in prior to investing in
22  it?
23    A.  Again, it depends on the investment and
24  the situation.
25    Q.  Would it be a good idea to do that if

Page 37

1 you're expecting to get a return on your investment?
2    A.  I'm not going to speculate about an
3 unknown investment and an unknown situation.
4    Q.  What experience do you have with
5 purchasing art prior to the Harold Garde artwork you
6 purchased from ArtPort?
7    A.  None.
8    Q.  Did you own any art other than the Harold
9 Garde art that you purchased from Nancy Loving and
10 ArtPort?
11    A.  Prior to my first purchase?
12    Q.  Correct.
13    A.  It depends on what you consider art.  Do
14 you consider the music CDs that I own art?  Do you
15 consider the prints that I bought in American
16 Furniture Warehouse when I bought my furniture art?
17 Do you consider all of the souvenirs and knickknacks
18 that I bought in my various trips to different places
19 art?  Like, the definition of art is so broad that is
20 a really difficult question to answer.
21    Q.  Please tell the jury all the pieces of
22 art that you consider art that you purchased prior to
23 the Harold Garde art that you purchased from ArtPort.
24       MR. HICKS:  Object to form.
25    A.  That's a really tough question to answer.

Page 38

1 Because if you can please define what type of art and
2 what you mean by "art," then I can answer that
3 question.
4    Q.  (BY MS. GETCHES)  I'm asking you what you
5 consider art, and I'm asking you to tell the jury what
6 you purchased prior to the Harold Garde artwork.
7       MR. HICKS:  Object to form.
8    A.  So fine art paintings like Harold
9 Garde's, I had not purchased any prior to the Harold
10 Garde purchase.
11    Q.  (BY MS. GETCHES)  Do you consider
12 yourself an art collector now?
13    A.  I do not.
14    Q.  Do you have any experience in the
15 valuation of art?
16    A.  I do not.
17    Q.  Do you have any understanding what makes
18 art appreciate in value?
19    A.  Oh, I was going by, until recently, all
20 of the information given to me by Nancy.
21    Q.  And what did Ms. Loving tell you made art
22 appreciate in value?
23    A.  Specifically as it relates to Harold
24 Garde's art?  Because she told me specific things
25 about Harold Garde's art and things about art in

Page 39

1 general.  Which one are you asking me about?
2    Q.  My question to you was do you have any
3 understanding about what makes art appreciate in
4 value, and you said all of your understanding came
5 from Ms. Loving.  And I'm asking you to explain your
6 answer.
7       MR. HICKS:  Object to form.
8    A.  Ms. Loving told me that once I purchased
9 the art she was going to use those resources to get
10 the art into different museums and different art
11 galleries.  And she said that showing that art in
12 those museums and galleries would make the awareness
13 go up and would increase the value of the art.
14       Ms. Loving also gifted around the value
15 of what I purchased and basically had me overpaying
16 for some paintings, and in her words -- it's in her
17 words and underpaying for others, because she said the
18 comparables of me purchasing that art itself would
19 raise the value of Harold Garde's art.
20       Quite morbidly, Nancy would say all of
21 the time -- which really upset me because I really
22 like Harold, and it shocked me to hear Dave speak that
23 way -- I didn't know Nancy well enough to know if that
24 would be part of her character or not -- but
25 shockingly Nancy and Dave would say over and over

Page 40

1 again that Harold had one foot in the grave and then
2 when he got his other foot into the grave his art
3 would skyrocket in value.  Because once an artist
4 passes away, according to Nancy and Dave both, their
5 art could double, triple, quadruple, and even go up
6 100 times in value.
7       Nancy hired this guy Edward, allegedly
8 using my money to hire him, and she told me that
9 Edward's efforts would bring up the value of Harold
10 Garde's art also, because he would be getting it
11 written up in several different art publications and
12 out there into the art community and shown at various
13 places where it would create -- I believe she used the
14 word "provenance" for the art.
15    Q.  (BY MS. GETCHES)  Now, your statement
16 that Nancy Loving said that Harold Garde had one foot
17 in the grave was that a direct quote, or are you just
18 saying that?
19    A.  I can name several direct quotes.  "One
20 foot in the grave" was a direct quote.  I also believe
21 she said several times, "He's over 90 years old; I
22 mean, how long can he really live?"
23    Q.  And, I mean, that's an accurate statement
24 as far as you can tell, right?
25    A.  What's an accurate statement, "How long

Walter Charnoff  09/29/2020                    ConfidentialPages 45..48
WALTER CHARNOFF vs NANCY LOVING

Page 45

1  viewed the deposition at all.  What my testimony is
2  based on is what they told me, and what they told me
3  is that not only is that not how they would have
4  shipped it, but that is not typically how they receive
5  art packaged and shipped of that expense or age.
6      Q.  And you're aware that Terry Dowd is not
7  going to testify that the artwork was improperly
8  packaged or shipped; they're just going to testify
9  that it wouldn't be the way they would do it?  Did you
10  know that?
11      MR. HICKS:  Form and foundation.
12      A.  No.  I didn't.
13      Q.  (BY MS. GETCHES)  Okay.  Well, if you
14  review the transcript, I think you'll be apprised of
15  that information.
16      MR. HICKS:  Object to form.
17      Q.  (BY MS. GETCHES)  Would you agree that
18  Nancy Loving is an expert in Harold Garde's art?
19      A.  I would agree that she represented
20  herself to me as an expert in Harold Garde's art.
21      Q.  Would you agree that she knows more about
22  his art than anyone else --
23      MR. HICKS:  Object to form.
24      Q.  (BY MS. GETCHES)  -- other than Harold
25  Garde?

Page 46

1      MR. HICKS:  Object to foundation.
2      A.  Nancy represented to me that she knows
3  more about Harold Garde's art than anyone else.
4      Q.  (BY MS. GETCHES)  Name one person who
5  knows more about Harold Garde's artwork than Nancy
6  Loving.
7      MR. HICKS:  Object to form and
8  foundation.
9      A.  I haven't tried to find anyone who knows
10  more about Harold Garde's artwork than Nancy.
11      Q.  (BY MS. GETCHES)  And you can't tell the
12  jury a single name, can you?
13      MR. HICKS:  Object to form.
14      A.  Only because I haven't tried to find a
15  single person.
16      Q.  (BY MS. GETCHES)  And so you can't give
17  the jury a name, correct?
18      A.  Correct.
19      MR. HICKS:  Same objection.
20      Q.  (BY MS. GETCHES)  You would agree that
21  Nancy Loving knows more about Harold Garde's art than
22  you do?
23      A.  I would agree that Nancy represented to
24  me that she knows more about Harold Garde's art than I
25  do.

Page 47

1      Q.  Do you think you know more about Harold
2  Garde's art than Nancy Loving, Mr. Charnoff?
3      A.  I did not say that.
4      Q.  Do you?
5      A.  Know more about Harold Garde's art than
6  Nancy Loving?
7      Q.  Yes.
8      (At this time Mr. Hinkelman entered the
9  videoconference.)
10      A.  So at this point, Nancy has lied to me so
11  much it would be speculative of me to say what Nancy
12  knows or doesn't know about Harold Garde's art.
13      Q.  My question to you, Mr. Charnoff, was do
14  you know more about Harold Garde's art than Nancy
15  Loving does?
16      MR. HICKS:  Object to foundation and
17  form.
18      A.  And my answer is Nancy has represented to
19  me that she knows significantly more about Harold
20  Garde's art than I do.  I would hope that Nancy knows
21  significantly more about Harold Garde's art than I do,
22  but Nancy has lied to me so much during the course of
23  our relationship what she does or doesn't know is in
24  question to me.
25      MS. GETCHES:  We're going to go off the

Page 48

1  record because I think the judge is calling me again.
2  I missed one of the calls, and I will try to -- so
3  please go off the record.
4      (Discussion off the record.)
5      MS. GETCHES:  Are we back on the record?
6  Okay.  Great.
7      Q.  (BY MS. GETCHES)  Mr. Charnoff, you have
8  no idea how art ages on different mediums, correct?
9      (Phone ringing.)
10      MS. GETCHES:  Hold on.
11      (At this time an off-the-record
12  discussion occurred with the Court.)
13      (Recess taken, 10:15 a.m. to 10:38 a.m.)
14      (At this time Ms. Loving and
15  Mr. Hinkelman were not present.)
16      Q.  (BY MS. GETCHES)  Mr. Charnoff, why did
17  Mr. Ladd sue you?
18      A.  What his motivations were, you would have
19  to ask Mr. Ladd.
20      Q.  He claimed that you fraudulently induced,
21  negligently misrepresented, breached fiduciary duty,
22  and that your company committed a breach of contract;
23  is that correct?
24      A.  Correct.
25      MR. HICKS:  Object to form.

Walter Charnoff 09/29/2020      ConfidentialPages 53..56
WALTER CHARNOFF vs NANCY LOVING

Page 53

1      MR. HICKS: Object to form.
2     A. What was found against me at trial was
3 under a million dollars. I believe that you were
4 saying that they found the value of an asset in 985,
5 but the jury failed to value the claim on that. So I
6 do not know what would have been found or not as to
7 what the damages were.
8      MS. GETCHES: I just told the defendants
9 they can get back on.
10     **Q. (BY MS. GETCHES) Mr. Charnoff, you had**
11 **made your final payment and were the owner of the**
12 **Harold Garde art that you purchased from ArtPort as of**
13 **November 2017, right?**
14      MR. HICKS: Object to form.
15     A. There's an email record of the exact day
16 I made the final payment. I don't recall the exact
17 day. But as of the final payment that I made to
18 Nancy, which was verified in writing, I was the owner
19 of the Harold Garde art.
20     **Q. (BY MS. GETCHES) Okay. Does it ring a**
21 **bell that that was November 2017?**
22     A. It does not. I would have to check my
23 email to see the exact date.
24     **Q. Okay. And you were the sole owner of the**
25 **Harold Garde artwork that you purchased from Nancy**

Page 54

1 **Loving, correct?**
2      MR. HICKS: Object to form.
3     A. What do you mean, the sole owner of the
4 artwork?
5     **Q. (BY MS. GETCHES) Did you own it along**
6 **with your wife?**
7     A. We never really discussed whether her and
8 I owned it together, but . . .
9     **Q. Do you consider her to be an owner of the**
10 **art as well?**
11      MR. HICKS: Object to form.
12     A. Sure.
13     **Q. (BY MS. GETCHES) Sure?**
14      MR. HICKS: Object to form and
15 foundation.
16      (At this time Ms. Loving entered the
17 videoconference.)
18     **Q. (BY MS. GETCHES) Okay. Now, in one of**
19 **your court filings, you indicated that the reason you**
20 **purchased the art was to return a favor to**
21 **Mr. Hinkelman; is that correct?**
22     A. That is not what I -- that is not what I
23 wrote in the court filing. What I wrote is that Nancy
24 and Dave were pushing me over and over again, saying
25 that Dave helped me sell a company and now it was time

Page 55

1 to return the favor. They were very aggressive about
2 pushing that issue.
3     **Q. What was the favor you were being asked**
4 **to return?**
5     A. Well, I didn't consider it a favor,
6 because Dave was compensated for it. But what they
7 considered the favor, apparently, was Dave getting a
8 million dollars richer by helping me sell a company.
9     **Q. So Dave got a million dollars richer, and**
10 **he's asking you to do a favor on top of that to --**
11 **that doesn't make any sense.**
12     A. I believe I even said that in my court
13 filings also that -- I mean, there's no --
14     **Q. I mean, why did you consider it to be a**
15 **favor?**
16      MR. HICKS: Object to form.
17     A. There's no -- for greed and pushiness.
18 Again, even in the court filing, if you read it, it
19 didn't say I considered it to be a favor. I said Dave
20 and Nancy started hounding me and soliciting me and
21 saying that Dave helped me sell my company, I made a
22 bunch of money, and it's time to return the favor. I
23 didn't say that I considered it a favor.
24     **Q. (BY MS. GETCHES) Well, explain to the**
25 **jury --**

Page 56

1     A. I even said in the court document that
2 Dave pushed me to do that favor, even though Dave made
3 over a million dollars on the sale of my company.
4     **Q. So explain to me -- well, explain to the**
5 **jury why you believed you should return the favor in**
6 **response to that request from Mr. Hinkelman if you had**
7 **already allegedly made him a million dollars. Explain**
8 **why that makes sense?**
9      MR. HICKS: Object to form and
10 foundation.
11     A. I've already answered that question.
12 I've never said anywhere that I needed to return the
13 favor. I said that Dave and Nancy started soliciting
14 me and saying it was time for me to return the favor.
15     **Q. (BY MS. GETCHES) Okay. You must not**
16 **have felt much obligation if you had already made him**
17 **a million dollars, right?**
18     A. So at the time I considered Dave a close
19 friend, and Dave had shared with me that the business
20 was suffering and that it would very much help him out
21 if I made the purchase. So part of it, yes, was
22 motivated by a desire to help Dave, but not out of
23 obligation; whereas, I felt like I needed to return a
24 favor, because, again, Dave got paid over a million
25 dollars. So it was more out of -- any sense of

Page 57

1  wanting to help Dave's life partner with her business,
2  was more out of a sense of friendship and loyalty to
3  Dave than it was out of some obligation.
4      Q.  Okay.  And you and Mr. Hinkelman were
5  good friends, right?
6      A.  I thought we were.
7      Q.  And you worked closely with him for many
8  months, right?
9      A.  Yes.
10     Q.  And you trusted him, right?
11     A.  Correct.
12     Q.  Did you think he knew you well?
13     A.  Sure.
14     Q.  And you were business colleagues with
15  Mr. Hinkelman in what businesses?
16     A.  REIsmart and GoldenGator and Lift
17  Strategic Partners and during his tenure at Fortress
18  and at Nation Star/Solution Star.
19     Q.  Did Mr. Hinkelman provide an investment
20  prior to the acquisition of your three companies into
21  Altisource that allowed the actual acquisition to go
22  forward?
23     MR. HICKS:  Object to form.
24     A.  That's a two-part question.  Would you
25  like me to answer each part of that question

Page 58

1  separately?
2      Q.  (BY MS. GETCHES)  Sure.
3      A.  Dave invested in one of the businesses
4  that was acquired by Altisource, REIsmart LLC.  No,
5  that is not what allowed the acquisition of Altisource
6  to move forward.
7      Q.  What did allow it to go forward if it
8  wasn't his investment or his loan?
9      A.  That is a really --
10     MR. HICKS:  Object to form.
11     A.  -- where the parts of the question are
12  not related to each other.
13     Q.  (BY MS. GETCHES)  Do you think there
14  would have been a bankruptcy if you hadn't provided
15  that investment?
16     A.  No way.
17     Q.  Do you remember the date you were
18  diagnosed with COVID?
19     MR. HICKS:  Object to the form.  Why is
20  this relevant?
21     A.  I believe July -- I believe the official
22  diagnosis came in either on Monday, July 13, or
23  Tuesday, July 14.  My COVID symptoms started on
24  July 12.
25     Q.  (BY MS. GETCHES)  Were you hospitalized?

Page 59

1      A.  Twice.
2      Q.  Do you recall the dates you were
3  hospitalized from COVID?
4      A.  Both hospitalizations were between, I
5  believe -- I can look up the exact dates, but I
6  believe they were between the 14th and the 20th.
7      Q.  Meaning you went back to the hospital
8  twice, but both stays occurred between the 14th and
9  the 20th?
10     A.  Correct.
11     Q.  Do you recall the date that your wife
12  contracted COVID?
13     A.  Well, she started showing symptoms the
14  day after I did.  So she started showing symptoms
15  on -- and, again, this is to the best of my
16  recollection.  I believe she started showing symptoms
17  on the 13th.
18     Q.  After you returned home from the hospital
19  on the 20th, how long until you recovered?
20     A.  So I was still having issues with
21  COVID-related problems as late as a week ago.  And I'm
22  waiting to find out if all of my COVID-related issues
23  are still there or not.  I have other doctors'
24  appointments next Wednesday and Thursday.
25     And just to be clear, I don't know that

Page 60

1  it was exactly on the 20th.  I believe that it was
2  that day, but I can look at -- there's a hospital bill
3  from the day I was in the hospital.  Both days.
4      Q.  Did a doctor ever instruct you that you
5  could not be deposed by video until August 6, 2020?
6      MR. HICKS:  Objection.
7      A.  So our doctor said for both Brande and I
8  it was a better idea not to be deposed, because we
9  were both still having pulmonary symptoms and I was
10  having cardiac symptoms.  And he said that --
11  actually, he said the additional stress you put on my
12  wife might have actually already impeded her recovery.
13     Q.  (BY MS. GETCHES)  Did a doctor instruct
14  you that you could not be deposed by video on
15  August 6?
16     MR. HICKS:  Object to form.
17     A.  Doctors can't tell you what to do or not.
18  My doctor instructed me that it would be a bad idea,
19  and he didn't recommend it.
20     Q.  (BY MS. GETCHES)  You're aware that
21  doctors do give instructions that prohibit employees,
22  for example, from lifting over a certain weight,
23  correct?
24     MR. HICKS:  Object to form and
25  foundation.  Liza, what does this have to do with the

Walter Charnoff  09/29/2020                    ConfidentialPages 81..84
WALTER CHARNOFF vs NANCY LOVING

Page 81

1  buying a bound historic piece of Harold Garde's
2  history and art during that time frame and all of the
3  relevant artworks that were in it, which she tried to
4  remove and still I haven't gotten -- I don't know if
5  those pictures she sent me was a good faith laurel
6  wreath saying that she's going to send the paintings
7  that are missing that are currently -- some of them
8  are still for sale on Artsy, but after she said that
9  those paintings were getting 100 percent online, which
10 is very troubling to me -- but all I had to go by is
11 that Nancy said much of the value -- and I'm talking
12 about she placed a significant amount of her what I
13 now know to be a sales pitch on the fact that it was a
14 bound together journal.
15        So my feeling is unless she was boldface
16 lying to me that journal is significantly less value
17 now that it's unbound.  But at any rate, it is not
18 what I purchased.  What I purchased was a bound
19 together with 11 paintings.  And this --
20     Q.  (BY MS. GETCHES)  Mr. Charnoff, my
21 question to you is what is the difference in value?
22 What is your understanding of the difference in value?
23        MR. HICKS:  Object to form.
24     A.  Well, how Nancy pitched it, she pitched,
25 like, at least half of the value of the journal was

Page 82

1  tied to the fact that it was bound together.  But for
2  me, the value was completely diminished.  Because what
3  I bought was a bound together journal; Nancy took it
4  upon herself to unbind it, so it is no longer what I
5  purchased.  So to me, the value is zero unbound versus
6  what I paid for it bound.
7     Q.  (BY MS. GETCHES)  Has any expert agreed
8  with your opinion that the journal paintings are worth
9  less unbound versus bound?
10        MR. HICKS:  Object to the form.
11     A.  I solicited the advice of an expert as to
12 whether the paintings are less -- worth less.  But
13 Nancy is setting herself out as an expert, and, again,
14 she's the expert witness on her side of this case.
15 And Nancy clearly told me prior to purchase and at the
16 time of purchase that much of the value is tied to the
17 fact that it's binding.  And I don't need an expert to
18 tell me that those paintings are valueless to me
19 unbound.
20        Valueless to me for several reasons.
21 One, it's not what I paid for.  I bought something,
22 Nancy altered it, and now it is irreparable and it's
23 no longer what I purchased.  So an expert doesn't need
24 to tell me that I bought something that now I can
25 never get again.  That's number one.

Page 83

1        And, two, I used to get -- it used to be
2  pleasing to me to look at that journal and I planned
3  on keeping that journal as something of esthetics,
4  sentimental, and art value where I would get enjoyment
5  looking at the piece, and now every time I see the
6  journal all I'm going to think about is how Nancy
7  destroyed it, how she tried -- by unbounding it; how
8  she tried to sell the pieces that she sold me on were
9  the most historically relevant, she tried to take away
10 from me and sell it to somebody else without my
11 permission.
12     Q.  (BY MS. GETCHES)  Has anyone corroborated
13 your opinion that the journal has less value unbound
14 versus bound?
15        MR. HICKS:  Object to form.
16     A.  Just Ms. Loving.
17     Q.  (BY MS. GETCHES)  Has anyone corroborated
18 your opinion?
19     A.  Just Ms. Loving.
20     Q.  Okay.  And if she doesn't agree with
21 that, then you have no one corroborating your opinion,
22 correct?
23     A.  Ms. Loving is the one who told me the
24 journal would be worth less money unbound than bound.
25     Q.  Okay.  Did Ms. Loving tell you that this

Page 84

1  is akin to buying the original manuscript of a famous
2  book such as Moby Dick or A Tale of Two Cities?
3        MR. HICKS:  Can you read the rest of the
4  sentence, please?
5     Q.  (BY MS. GETCHES)  Did she, Mr. Charnoff?
6     A.  I think you're miscategorizing what he
7  wrote there.  I think --
8     Q.  Did she use any of those words in
9  describing the value of the journal, that it was akin
10 to an original manuscript of a famous book such as
11 Moby Dick or A Tale of Two Cities?
12     A.  I do not remember Nancy using that
13 reference with me, and I don't think we said in our
14 response that she specifically made that reference.
15        (Deposition Exhibit 2, remotely
16 introduced and provided electronically to the court
17 reporter.)
18     Q.  All right.  Mr. Charnoff, are these
19 the -- this is an email from May 20, 2019, of 11
20 journal paintings that Ms. Loving is saying were sold
21 to you.  Is it your testimony that these 11 journal
22 paintings are not the journal paintings you had
23 purchased or just that they are short of the journal
24 paintings that you purchased?
25     A.  It is my testimony that they are no

Page 129

1  that Nancy was not lying to fraudulently induce me to
2  buy the art.  And that assumption appears to be
3  incorrect.
4       Q.  (BY MS. GETCHES)  I guess we'll find out.
5       When she says she firmly believes that
6  Garde's art will continue to appreciate, she's
7  expressing a belief, not a guarantee.  Correct?
8       A.  She said "We firmly" --
9       MR. HICKS:  Object to foundation.
10      A.  She says it's already appreciated.  Let's
11  not lose site of that.
12      Q.  (BY MS. GETCHES)  I'm asking about the
13  next sentence.
14      A.  Well, the second part doesn't seem like a
15  belief.  It seems like a statement of fact.
16      Q.  Okay.  If that's your testimony, that's
17  fine.
18      A.  "As he will be given further recognition
19  for his historical relevance and contributions to the
20  art world."  And then --
21      Q.  Did you look in to see how much Patrick
22  Downs spent on artwork with Ms. Loving?
23      A.  Well, I went by what Dave told me,
24  that --
25      Q.  Yes or no?  Patrick Downs?

Page 130

1       A.  Only what Dave told me, because I took
2  him at his word.
3       Q.  Did you look in to see the value of the
4  art on collection at the University of Wyoming?
5       A.  I did not, but if the art is on
6  collection on loan, it's not the same as the art being
7  purchased.  So if Nancy used the same inflated numbers
8  she used to value my art when I asked her for the
9  value for a court issue, who would have placed the
10  value on that art?  Nancy.
11      Q.  And you have no basis for saying the
12  value was incorrect?
13      A.  Which value?  The value that Nancy sold
14  me the art for?
15      Q.  Whatever value she put on the art that
16  she sold.  You have no basis for saying that it was
17  inflated or that an arm's length transaction would not
18  result in a sale?
19      MR. HICKS:  Object to form.
20      A.  The basis that I have for any value
21  assumptions I made on Garde's art at the time of the
22  purchase is what Nancy stated to me about the value to
23  induce me to purchase the art.
24      Q.  (BY MS. GETCHES)  Perfect.
25      You understand that Ms. Loving was

Page 131

1  operating a small business at the time you purchased
2  the art from ArtPort, correct?
3       MR. HICKS:  Object to form, foundation.
4       A.  It depends on your definition of "small
5  business."  What Ms. Loving told me at the time was
6  that Harold Garde had been painting much longer than I
7  had been alive and continues to paint and she valued
8  that collection at over $5 million and that she had
9  $5 million worth of art she could sell in the next few
10  years and that she had the exclusive right for the
11  foreseeable future to do that.
12      She also told me that the St. Pierres
13  were coming in with half a million dollars and that
14  Dave would support her in her business endeavors as
15  deep as he needed to go and that my purchase would
16  also be used to do things to directly build and grow
17  the business.
18      Q.  (BY MS. GETCHES)  So you did not think
19  Ms. Loving was operating a small business at the time
20  you purchased art from her?
21      Is that your testimony?
22      MR. HICKS:  Object to form.
23      A.  My testimony is I don't understand what
24  your definition of "small business" is.
25      Q.  (BY MS. GETCHES)  Okay.  If that's what

Page 132

1  you want to tell the jury, that's fine.
2       MR. HICKS:  Same objection.
3       Q.  (BY MS. GETCHES)  Mr. Charnoff, tell me
4  the second time you visited an art gallery or a
5  location where Ms. Loving was displaying art.
6       A.  Her display in Connecticut or her display
7  in New York?
8       Q.  You told me you visited in March of 2015,
9  and I want to know the second time you saw Harold
10  Garde art with Ms. Loving.
11      A.  I would have to go back and look through
12  the emails again to answer that question.
13      (Deposition Exhibit 8, remotely
14  introduced and provided electronically to the court
15  reporter.)
16      Q.  Okay.  Exhibit 8 is an email that
17  Ms. Loving sent to you on October 21, 2015, to
18  wally@rentrange and wally@investability, correct?
19      A.  Correct.
20      Q.  Those are your email addresses, correct,
21  Mr. Charnoff?
22      A.  Correct.
23      Q.  And she states that she created a
24  PowerPoint presentation of selected works by Harold
25  Garde that we -- you might dispute the definition of

Page 169

1 refresh your recollection that the total amount was
2 $25,900 on August 24?
3      A.  Of what year?
4      Q.  2017.
5      A.  Okay.
6      Q.  And that wire came from you individually?
7      A.  That's what it looks like.
8          (Deposition Exhibit 15, remotely
9  introduced and provided electronically to the court
10  reporter.)
11      Q.  And the third payment, do you recall what
12  the amount of the third payment was?
13      A.  Not the exact dollar amount, no.
14      Q.  Do you recall that it was $72,350?  Does
15  that ring a bell?
16      A.  What date was that?
17      Q.  September 25, 2017.
18      A.  Okay.
19      Q.  So does this refresh your recollection
20  that Ms. Charnoff wrote a check for $72,350 on
21  September 27, 2017, for art?
22      A.  Yes.  Dave came to my house and picked
23  that up.
24      Q.  And when David Mr. Hinkelman came to your
25  house to pick up the art check, why was your wife

Page 170

1  individually paying for that?
2      A.  Because I asked her to because Dave said
3  Nancy needed the money that day, because she had made
4  some marketing commitments and some gallery
5  commitments and some other things for the gallery, and
6  that it would be extremely helpful to him if I could
7  give him a check that day.
8          And I asked Brande to write the check and
9  said we would work it out later so that Dave could --
10  he hit me with it when he flew to Colorado and said,
11  "Hey, man, I need to get a check today.  Can you
12  please do this for me?"  So I accommodated.
13      Q.  And you're not listed on this bank
14  account, correct?
15      A.  Correct.
16      Q.  And the fourth payment was $42,750 on
17  November 16, 2017?
18      A.  What was the date?
19      Q.  November 16, 2017.
20      A.  Okay.
21      Q.  Do you see this record stating that
22  there's a wire transfer from Walter Charnoff on
23  November 16 in the amount of $42,750?
24      A.  Yep.
25          (Deposition Exhibit 16, remotely

Page 171

1  introduced and provided electronically to the court
2  reporter.)
3      Q.  And there's an email where you're
4  directing Heather Johnson, now at Wally's Investments,
5  to send a wire from your personal checking account?
6      A.  Not now.  Heather always had a Wally's
7  email.  And, again, I told you I hired Heather to also
8  do my business and personal accounting.
9      Q.  And so did you direct Heather to set up a
10  wire from your personal checking account in the amount
11  of $42,750?
12      A.  That's what it looks like.
13      Q.  And this is the fourth and final payment
14  of art that you made, correct?
15      A.  I would have to go back and look and see
16  what those dollar amounts total and if there's any
17  other wires or not.
18      Q.  You think what?
19      A.  I would have to go double-check if those
20  dates match my records, and if you -- you gave me four
21  different totals at four different times.  We didn't
22  total them to see if they totaled the approximately
23  $186,000.
24      Q.  Okay.
25      A.  Again, I'm leary to go off of what you've

Page 172

1  shown me because I've already seen at least one
2  doctored document today, and there's been several in
3  this case.
4      Q.  Okay.  Well, we'll let you prove that at
5  trial, Mr. Charnoff.
6      A.  Okay.
7      Q.  So let's talk about Two Vessels.  You
8  mentioned that Two Vessels you traded in?
9      A.  Correct.
10      Q.  And so it is ultimately not a part of
11  either of your purchases, correct?
12      A.  It was part of the first purchase.  It
13  was damaged while it was in Nancy's care.  To deal
14  with the damage, we traded it in during the second
15  purchase.
16      Q.  Okay.  So Two Vessels is neither a part
17  of the first or the second purchase, correct?
18      A.  Two Vessels was part of the first
19  purchase.  I purchased it.  Nancy hung it in her home
20  for over a year, damaged it while it was hanging in
21  her home.
22          According to Nancy, it depreciated in
23  value to $25,000 while it was hanging in her home for
24  a year.  So she damaged my then $25,000 painting.  And
25  then since I did not have confidence she was going to

Walter Charnoff  09/29/2020                    Confidential Pages 173..176
WALTER CHARNOFF vs NANCY LOVING

Page 173

1  be able to repair it, as she did not express very
2  confidently that she could repair it, I traded it
3  during the second purchase.
4         So it was apparently part of both
5  purchases.  I purchased it during the first purchase.
6  I traded it in for a credit during the second
7  purchase.
8     Q.  Okay.  So as we sit here today, is it
9  your position that you own Two Vessels?
10    A.  No.
11    Q.  That's not your position?
12    A.  I do not own Two Vessels.
13    Q.  Okay.  August 10, 2016, Ms. Loving writes
14  you and your wife, Ms. Charnoff, and attaches a
15  portfolio of newly acquired paintings, correct?
16    A.  Correct.
17    Q.  And in that portfolio -- well, first of
18  all, do you recall receiving this portfolio titled
19  "The Charnoff Collection"?  I'll kind of scroll down
20  so you can look.
21        That's Two Vessels, right, on
22  page PLAINTIFFS 121?
23    A.  Correct.
24    Q.  And this is Round Head, I believe?
25    A.  Yep.

Page 174

1     Q.  And this is Sculptures on Table, correct?
2     A.  Correct.
3     Q.  And you currently own all of the art we
4  just looked at in that email except for Two Vessels,
5  right.
6     MR. HICKS:  Object to form.
7     A.  I currently have paid in full for all the
8  art in that except for Two Vessels.
9     Q.  (BY MS. GETCHES)  Okay.
10    A.  Whether I own it or not will be
11  determined on whether -- on the outcome of litigation.
12    Q.  Okay.
13    A.  As far as I understand it.  And, again,
14  I'm not an attorney.
15    Q.  And on this email, Ms. Loving states that
16  she's listed the full retail price on the portfolio
17  for insurance purposes, correct?
18    A.  That's what it says.
19    Q.  Okay.  And so the prices we were looking
20  at were actually higher than what you paid; isn't that
21  right?
22    A.  According to Ms. Loving, that is the
23  prices that they were worth.  And according to
24  Ms. Loving -- well, that one is what I paid.  I
25  believe I paid $5,200 for that one.

Page 175

1         The rest of them, she said she gave me a
2  discount for buying the painting -- for buying four
3  paintings instead of one and for buying the paintings
4  when I did and that she couldn't hold that discount
5  for much longer because --
6     THE REPORTER:  I can't hear you.
7     A.  This is what the paintings were actually
8  worth and what I paid was a discounted price,
9  according to Ms. Loving, which is part of how she
10  induced me to purchase the paintings, by stating that
11  I was paying substantially less than retail.
12    Q.  (BY MS. GETCHES)  And do you have
13  anything to show that she was inflating the value of
14  the paintings?
15    A.  What do you mean "inflating the value of
16  the paintings"?
17    Q.  Do you have anything to show that the
18  value she put here is not what she could sell the
19  paintings for to some other art purchaser?
20    A.  No.
21    Q.  Now, tell me -- you brought up Tan
22  Vessels for the first time kind of years -- at least
23  in writing, years after you made your fourth art
24  purchase.
25        Why did you believe Tan Vessels was

Page 176

1  something you were entitled to receive?
2     A.  Nancy had included Tan Vessels in my
3  purchase.  She took it off of that purchase
4  spreadsheet because she added the value of Tan Vessels
5  to present among other paintings because she said she
6  needed higher --
7     THE REPORTER:  You're too far from your
8  mic.
9     A.  I was under the impression from the time
10  I made the purchase that Tan Vessels was one of the
11  paintings that she called free gifts.
12        And she called it free gifts, but in
13  reality some of them were paintings that she said
14  rather than deeply discount the art for me buying in
15  bulk, she would be better off applying the extra value
16  to some of the paintings and then giving some of the
17  other paintings as free gifts because the free gifts
18  would not impact the comparable pricing for Harold
19  Garde art, but the paintings that she would inflate
20  the price of would make the comps higher, which would
21  make the art higher -- make the art value higher in
22  the future.
23    Q.  (BY MS. GETCHES)  Okay.  So this is,
24  again, a picture of Two Vessels on PLAINTIFFS 121?
25    A.  Correct.

Walter Charnoff  09/29/2020                    ConfidentialPages 185..188
WALTER CHARNOFF vs NANCY LOVING

Page 185

1    A.  Correct.
2    Q.  (BY MS. GETCHES)  Great.  And Nancy
3 Loving would know more about whether there was simply
4 one Red Chair painting versus multiple, as you're
5 alleging?
6    A.  Well, it's funny you say that because
7 there were several other paintings that Nancy sent me
8 that were incorrect that she tried to switch on me
9 just like she tried to switch Red Chair.  Fortunately,
10 those paintings, I did have photos of.
11         It seems funny to me that all the
12 paintings I had photos of, she said was an honest
13 mistake; there were two paintings with the same name
14 in her inventory.  But the only one painting that I
15 neglected to take a phot of is the only one she made a
16 mistake on that she claims was not a mistake and
17 there's no other painting named that.
18         So it seems like your client operates
19 under the premises where if you have proof, she'll fix
20 your mistakes.  If you don't have proof, it didn't
21 happen.
22         Ms. Loving also told me at a meeting in
23 April that --
24    Q.  There's no question pending,
25 Mr. Hinkelman -- thank you -- or Mr. Charnoff.

Page 186

1         MR. HICKS:  Objection.
2         (Deposition Exhibit 18, remotely
3 introduced and provided electronically to the court
4 reporter.)
5    Q.  (BY MS. GETCHES)  With respect to the
6 signatures, you've claimed in this lawsuit that you
7 were entitled to receive help from Ms. Loving in
8 obtaining Harold Garde's signatures on a few pieces of
9 art, correct?
10         MR. HICKS:  Object to form.
11    A.  Part of what Ms. Loving put in writing
12 and was contingent on the second purchase was that she
13 would get me signatures on any and all unsigned art.
14         When I purchased it, there were some
15 pieces that were unsigned; and I said I want them
16 signed.  And she said I will get them signed for you
17 as part of the purchase.  And she put that in writing
18 several times.  Even right up to the filing of
19 litigation, she still said before she'd shipped the
20 art that she would get it all signed by Mr. Garde.
21    Q.  (BY MS. GETCHES)  Well, she said she
22 would help you get the signatures, right?
23         MR. HICKS:  Object to form.
24    A.  No.  Signatures were part of the bargain.
25 I would not have purchased any of the art -- any of

Page 187

1 the second purchase.  I probably would have still made
2 the first purchase, but the signatures were definitely
3 part of the bargain for the second purchase.
4         The second purchase was a bulk deal made
5 all at once, and part of that bargain was Nancy would
6 get me signatures on the unsigned art.  And she still
7 has not done that to this day, and now that art is in
8 Colorado.
9         And Nancy was supposed to get those
10 signatures at her expense, not mine.  So I would like
11 to know how, if I end up with that art at the end of
12 this litigation, those signatures are going to get on
13 that art.
14    Q.  (BY MS. GETCHES)  What's the difference
15 in value between the art signed and unsigned?
16    A.  That's irrelevant.  The deal was I
17 wouldn't have --
18    Q.  It's irrelevant?
19    A.  Your question is relevant as to whether
20 or not she performed on the contractor or not.  The
21 contract called for specific performance for her to
22 get signatures on the art.
23         I am telling you, and I will testify
24 under oath because it is a fact, I would not have made
25 any of that second purchase for the price I paid if

Page 188

1 Nancy did not agree that that second purchase would be
2 complete with signatures on all the art.  I also
3 wouldn't have made it if the certificates of
4 authenticity weren't included.
5    Q.  What specific performance, Mr. Charnoff?
6    A.  Nancy was supposed to get all the
7 unsigned art signed before it got shipped to me.
8         Sorry.  I live out in the country.  I
9 have issues sometimes.
10         Nancy was supposed to get all of the
11 unsigned art signed before it was shipped to me.
12    Q.  And you don't know one way or the other
13 whether Mr. Garde would be willing to sign the art
14 today, do you?
15         MR. HICKS:  Object to form.
16    A.  He already shipped the art without
17 signatures.
18    Q.  (BY MS. GETCHES)  My question to you is
19 do you know one way or the other --
20    A.  I do not.
21    Q.  -- whether Mr. Garde would be willing to
22 sign the art today?
23    A.  I do not, but that bargain was not struck
24 today.  Part of the requirement of the purchase, part
25 of her contractual obligation to me, part of her

Walter Charnoff  09/29/2020                                   ConfidentialPages 189..192
WALTER CHARNOFF vs NANCY LOVING

Page 189

1 specific performance was she was supposed to have all
2 of the unsigned art signed before the art was shipped.
3 That did not occur.
4         She was also supposed to give me
5 certificates of authenticity for each and every piece.
6 For some reason, she shipped the art, but I still have
7 not received my certificates of authenticity yet.
8     **Q.  And what's the difference in value**
9 **between the art signed and unsigned?  Please tell the**
10 **jury so they can understand.**
11         MR. HICKS:  Object to form.
12     **Q.  (BY MS. GETCHES)  What was your answer?**
13     A.  I do not know, but I can tell you that
14 the art unsigned is completely less valuable to me,
15 and I am the one who is paying for the art.
16         That would be like selling somebody a car
17 that has the Camaro SS emblem on it -- RS SS emblem on
18 it, not delivering the car with the RS SS emblem on
19 it, and saying what's the difference in value of your
20 classic 1969 Camaro RS SS with the RS SS emblem on it
21 or not?  To the person who bought that car, they
22 bought that car with that on there.
23         I bought original art, allegedly original
24 fine art, by an artist who painted some of those
25 paintings more than 50 years ago.  Part of the bargain

Page 190

1 was she guarantee me signatures on all of the art.
2 That is important to me.  I would not have made that
3 purchase.  I am the one writing the check.  I am the
4 one who is paying the money.
5         It does not matter whether that art is
6 worth more or less money to somebody else.  I'm the
7 one paying for it.  I paid for it with a promise of
8 signatures.  I paid for it with a promise of
9 certificates of authenticity.  I expected to get what
10 I was paying for.
11     **Q.  Do you agree with your expert that**
12 **sometimes artists intentionally choose not to sign**
13 **artwork and that it does not decrease the value of the**
14 **art?**
15         MR. HICKS:  Objection form, foundation.
16     A.  Again, I made a specific deal.  That is
17 like telling somebody you paid to have a house painted
18 a certain color, but the person painting your house
19 decided that blue would be better in your bedroom than
20 pastel yellow.  So you still have to pay the full
21 price for the paint job because that expert decided
22 your room would look better pastel yellow.
23         All that matters in this instance is I
24 struck a deal.  That deal included all of the art
25 being signed.  I paid in good faith the money

Page 191

1 expecting Nancy to hold up her end of the bargain.
2 She didn't get that art signed.
3         So you can't tell me that now I should
4 accept something that's different from what I paid for
5 because a third party gets to decide whether it's more
6 or less valuable or whether that signature was left
7 off intentionally or not.
8         The fact of the matter is Nancy didn't
9 say in writing "all unsigned artwork except that which
10 Harold thinks is better unsigned will be signed."  She
11 said, "If you buy this artwork, I will get each and
12 every piece signed."  I paid my money.  I expect each
13 and every piece signed.
14         Nobody else has the right -- once the
15 bargain is struck, nobody else has the right to tell
16 me that it's okay to change what I bought or the
17 agreement that we made because somebody else will say
18 it won't impact the value or because the artist
19 intended it that way.
20     **Q.  (BY MS. GETCHES)  Okay.  Well, how does**
21 **the jury award you damages for your unsigned artwork,**
22 **Mr. Charnoff?**
23         MR. HICKS:  Object to form.
24     A.  If you buy something and you can't get it
25 in the form that you purchased it in, a refund should

Page 192

1 be given.
2     **Q.  (BY MS. GETCHES)  And if some of this was**
3 **a gift, what does the jury do to put you back in the**
4 **position you thought you were going to be in?**
5         MR. HICKS:  Object to form, foundation.
6     A.  Keep in mind, it was a gift.  A lot of it
7 was, because I've already explained to you, Nancy
8 wanted to change the value of the art so that the
9 comps would be higher.
10         She said:  "I am going to give you a
11 discount for buying in bulk.  It is better for me to
12 give some for free and the other one at full price or
13 even above full price so that I can use those comps to
14 show Harold Garde's art is increasing in value."
15         I looked at the whole purchase, including
16 what was marked "free gifts," as one bulk purchase
17 made under specific terms and conditions.  So if part
18 of that deal cannot be delivered on, then the deal
19 should be rescinded.
20     **Q.  (BY MS. GETCHES)  Is that what you want**
21 **in this lawsuit, Mr. Charnoff, to rescind the deal?**
22     A.  What I want is to be made whole by
23 whatever a jury of my peers or the judge thinks --
24 whatever restitution the jury and the judge thinks
25 should be granted.

U.S. LEGAL SUPPORT, INC
303-832-5966

Page 193

1      Q.  Restitution is probably a word the jury
2   is not going to understand.  So explain to them what
3   you're seeking in this lawsuit.
4           MR. HICKS:  Object to form and
5   foundation.
6      A.  I paid $186,000 a long time ago.  That
7   was a massive amount of money to me.  Since I spent
8   that money -- which I thought I was doing something
9   good for a friend of mine.  I thought I was buying
10  something that I could enjoy for the rest of my life
11  and think happy thoughts when I looked at it and feel
12  a connection to the artist and enjoy.
13         I thought I was buying something that had
14  at least a monetary value or more than I was paying
15  for it and that it would continue to go up in value.
16  I didn't think I was getting treated like a sucker and
17  getting duped and being ripped off.
18         So already the enjoyment of the art, the
19  emotional connection I had to it, the feeling that I
20  got thinking about the artist who painted it, it's all
21  been destroyed by Ms. Loving because of all the drama,
22  hardship, and money I had to spend to even get her to
23  perform her side of the deal.
24      Q.  (BY MS. GETCHES)  When Ms. Loving told
25  you she would help you get the signatures --

Page 194

1      A.  That's not what she said in her
2   agreement --
3      Q.  Can you let me finish my question?
4      A.  Okay.
5      Q.  When she said that she would help you get
6   the signatures, did you see that as a guarantee?
7      A.  Ms. Getches, I'm telling you, on more
8   than one occasion, more than one occasion, you can
9   look through the texts and the emails that I provided
10  because I've seen this on more than one occasion.  I
11  made a mental note of it every time I saw it.
12         Ms. Loving did not say, "I would attempt
13  to get the signatures."  She did not say, "I would try
14  to help you every time."  She said, on several
15  occasions, "I will ensure that the unsigned art is
16  signed before it is delivered."
17      Q.  You're going to put those in front of the
18  jury so they can rely on that testimony at trial,
19  correct, Mr. Charnoff?
20         MR. HICKS:  Object to form and
21  foundation.  His testimony, whatever you do in front
22  of --
23         MS. GETCHES:  No speaking objections.  No
24  speaking objections.
25         MR. HICKS:  I don't care.  I'm going to

Page 195

1   speak.  I'm going to speak.
2           MS. GETCHES:  No speaking objections.
3           MR. HICKS:  You don't like it, you can
4   take it up with the judge.
5           MS. GETCHES:  I will take it up with the
6   judge.
7           MR. HICKS:  Take it up with the judge if
8   you don't like it.  We can sit here and keep talking
9   for 10 minutes.  I don't care.  All right?
10          What we're going to do at trial, all
11  these legal questions you're asking him, is based upon
12  work product --
13      Q.  (BY MS. GETCHES)  Mr. Charnoff, I'm going
14  to put another exhibit in front of you.
15          MR. HICKS:  He's going to testify to
16  whatever I tell him to or whatever we decide.  So we
17  can keep talking over each other.  I don't care.  We
18  can stay here all day doing it.
19          MS. GETCHES:  That's the kind of lawyer
20  you are.
21          MR. HICKS:  Stop asking him legal
22  questions like that.  You're harassing him.
23      Q.  (BY MS. GETCHES)  Mr. Charnoff on May 8,
24  2019, Ms. Loving wrote to you that -- she said "I will
25  help you on the signatures of the unsigned work by

Page 196

1   Harold as well."
2          Did you see that statement as a guarantee
3   she would get you signatures?
4      A.  That was not the statement that was
5   made --
6      Q.  Yes or no?
7      A.  -- at the time I purchased the art.
8          I saw that as a -- if you look at her
9   original statement where she guaranteed the
10  signatures, I saw that as a reaffirmation that she
11  would still honor that part of the agreement, which
12  she did not.
13      Q.  Okay.  Well, I would like you to direct
14  me to the date, text, email, where you had a guarantee
15  from Ms. Loving that she would get the signatures for
16  the unsigned art.  So the jury can understand how that was part of
17  the contract.
18      A.  Would you like to stay on the record
19  while I look through all of my original emails on the
20  second purchase?
21      Q.  No.  As long as you put it in front of
22  the jury, they will be able to make their decision.
23          How many pieces total --
24          MR. HICKS:  Liza --
25      Q.  (BY MS. GETCHES)  -- of art did you

Page 205

1 that I just made?
2       A.  I don't know.
3       Q.  Really?
4       A.  Really.
5       Q.  Okay.  Well, I will represent to you that
6 each and every 82 pieces -- actually, 84 pieces of art
7 that you purchased from Ms. Loving, Terry Dowd has
8 represented to be in stable condition.  Okay?
9             MR. HICKS:  Object to form.
10            (Deposition Exhibit 23, remotely
11 introduced and provided electronically to the court
12 reporter.)
13      Q.  (BY MS. GETCHES)  And Terry Dowd's
14 definition -- this is an exhibit, Exhibit 4 from Terry
15 Dowd's deposition.  It has definitions they assign to
16 their condition reports.  And Terry Dowd's definition
17 for "stable" is the best that can be said.
18            Did you know that, Mr. Charnoff?
19            MR. HICKS:  What are we looking at?
20 Sorry, Liza.  What is this?
21            MS. GETCHES:  We're looking at Exhibit 4
22 from Ms. Bradley's deposition.  You were at the
23 deposition.
24            MR. HICKS:  You wouldn't give me
25 exhibits, like a child.  So I remember that.

Page 206

1       A.  So I think you're taking this out of
2 context, like you do everything else.  What this says
3 to me is that they don't opine that it's good or
4 excellent, that they say it appears stable.  And they
5 keep looking until they find an exception, and then it
6 says possible apparent damage.
7             And one thing I can tell you I know from
8 looking at most of the damage reports, there was notes
9 of damage on almost every condition report.  Almost
10 every condition report have notes of damage.
11            So if you want, we can go look through
12 their definitions of blanching, because I saw a bunch
13 of that, abrasions, because I saw a bunch of that -- I
14 notice you just took that away from me.
15            So to me, that document simply states
16 that they're not going to use the term "good" or
17 "excellent."  They're going to say that it's "stable"
18 and note what damage is worth noting.  And I think you
19 just actually helped our case because they had noted a
20 lot of damage on a lot of artwork.
21      Q.  (BY MS. GETCHES)  And you're aware that
22 no one at Terry Dowd is going to opine that any of the
23 damage -- what you're characterizing as damage, at
24 least -- occurred during Ms. Loving's care, custody,
25 or control of the art?

Page 207

1       A.  I am not aware of that, but I don't
2 believe that's what we hired them to opine on.  Like,
3 how are they supposed to -- all they can tell you is
4 whether the art is damaged or not.
5             If Nancy kicked it down the stairs or
6 jammed it into a box or hung it next to a pool table,
7 I wasn't present for those actions.
8       Q.  Okay.  So who is going to tell the jury,
9 other than you, that any of what you're characterizing
10 as "damage" occurred during Ms. Loving's custody or
11 control of the art?
12      A.  Nancy is, because I've already submitted
13 emails to you where Nancy said -- I bought the first
14 artwork off of that portfolio Nancy put together,
15 sight unseen.  Nancy sent an email saying this
16 reflects the art, and then sent me those pictures
17 which I've blown up super big on a giant screen.  And
18 those pictures do not include the damage that is
19 currently on those first four pieces.
20            And also I have several emails from Nancy
21 where she uses the word "pristine," "perfect,"
22 "damageless," describing the art that I'm purchasing.
23 So since Nancy was my art counselor and my art expert,
24 I bought the art off of Nancy's photos and description
25 of what the art looked like.  And it currently does

Page 208

1 not look like that.
2       Q.  Okay.  And you're going to show the jury
3 emails or texts where she uses the word "pristine,"
4 right?
5       A.  I'm not going to answer legal questions
6 as to what my attorney is going to direct to the jury
7 or not.  I'm simply saying those emails exist.
8       Q.  Okay.  And is it your testimony that if a
9 piece of art has an accretion or an abrasion that it
10 is worth less than if it doesn't have those
11 conditions?
12            MR. HICKS:  Object to form.
13      A.  It is my testimony that the art should
14 have been delivered to me in the condition it was in
15 when I purchased it, and it was not.  How much it
16 decreased the value is a factor, but it's not as big a
17 factor as the fact that I bought the art, the art was
18 left in Nancy's care, the art was not delivered in the
19 condition it was sold to me in.
20            So whether she misrepresented the
21 condition it was sold to me in and doctored those
22 photos and lied in her email, or she damaged it after
23 I purchased it or while it was in her care, or it got
24 damaged during shipping, either of those --
25      Q.  (BY MS. GETCHES)  What art did you not

Walter Charnoff  09/29/2020                    ConfidentialPages 213..216
WALTER CHARNOFF vs NANCY LOVING

Page 213

1  look at the photos of this art, for instance,
2  Sculptures on Table, in the portfolio that she used to
3  sell it to me -- you blow up and you look at these
4  photos from Terry Dowd, there is damage visible even
5  on the front of the painting in this that is not
6  visible in the catalog that Nancy used to sell me the
7  art.
8        That's a fraudulent misrepresentation.
9  She sent me a picture, said this is what it looks
10  like, including the damage that's on it, and then she
11  sends me a painting that is substantially more damaged
12  once I got it.
13        Now, was this damaged when she took those
14  photos and she photoshopped the damage?  Or was this
15  damaged because I witness with my own two eyes this
16  hanging in a rec room above an air hockey table where
17  her kids were playing air hockey all the time.
18        So did this get damaged by people
19  slamming up against it when they were playing air
20  hockey?  Did it get damaged from the air hockey air
21  blowing across the top of the painting?  Because it
22  was literally not even 2 feet away from the side of
23  the air hockey table.
24        Did it get damaged because people were
25  smoking in that room?  Did it get damaged because

Page 214

1  people were roughhousing?  Did it get damaged during
2  shipment?  Or were the photos that she sent me
3  originally doctored and a fraudulent
4  misrepresentation?
5        Well, whichever one of those -- whichever
6  way the damage occurred, the fact is I got the
7  painting in a different condition than it was
8  represented to me when I bought it.
9     Q.  (BY MS. GETCHES)  Okay.  And what is the
10  difference in value between the value of the painting
11  that you believed you were receiving at the time you
12  were sent the portfolio and today?
13     A.  Ms. Getches, the difference in value
14  of -- the questions that you're asking me now, the
15  difference in value without signatures -- the
16  difference in value --
17     Q.  No, no, no.  I'm asking about Sculptures
18  on Table.
19     A.  The difference in value of Sculptures on
20  Table is 100 percent because I purchased the painting
21  in a certain condition.  I gave my money to buy a
22  painting in the condition Nancy represented it was to
23  me.
24        Whether she misrepresented the condition
25  of the painting in the catalog that you yourself said

Page 215

1  she used to sell it to me, or if she damaged it by
2  hanging it next to her air hockey table and letting
3  her kids roughhouse around it, whether she damaged it
4  by shoving it in a box when specifically in writing my
5  first purchase came with custom crates.
6        My first purchase, I was not responsible
7  to pay for crating.  She put it in writing on the
8  first purchase, this painting was supposed to be
9  custom crated in its own individual create, paid for
10  completely by her.
11        So whether she damaged it by shipping,
12  whether she damaged it by hanging it next to the pool
13  table, whether she just lied in the first place and
14  photoshopped the photo she sent to me, what matters to
15  me is I paid, I think, for this painting close to
16  $15,000 for something I was promised in a certain
17  condition, and then got it in a completely different
18  condition.
19        And the answer to your question is the
20  value difference to me is 100 percent.  Just like the
21  value difference to me is 100 percent of the art
22  having those signatures on it, and just like the
23  difference to me is 100 percent of not having COAs.
24     Q.  Mr. Charnoff, can you tell the jury
25  whether or not Sculptures on Table, for example, has

Page 216

1  increased in value since the time you purchased it?
2     A.  What I can tell you is --
3     Q.  Yes or no?
4        MR. HICKS:  Object to form, foundation.
5     Q.  (BY MS. GETCHES)  I don't need a speech.
6  I just need to know can you tell the jury -- yes or
7  no -- whether Sculptures on Table has increased in
8  value since the time you purchased it?
9     A.  It has decreased in value to me.
10     Q.  And what's the basis for that statement
11  other than your own feeling that you didn't get what
12  you thought you purchased?
13     A.  What else matters?  I paid -- not my own
14  feeling.  I didn't get what I purchased.  When you buy
15  something -- that's like you going and buying a car
16  that has no scratches on it and has never been driven,
17  and the dealer takes it through the mud, beats the
18  crap out of it, delivers it with scratches.
19        You bought it with 1,000 miles on it, he
20  delivers it to you with 2,000 miles on it, ruined; and
21  says the value isn't less because it still drives the
22  same, even though it looks different than what you
23  purchased.
24     Q.  Okay.  So, Mr. Charnoff, based on your
25  hypothetical, if you're buying a car based on a

Page 217

1  picture in a catalog, you're taking the risk that that
2  picture might not show all of the little scratches and
3  dents that might be visible on that car in person,
4  aren't you?
5          MR. HICKS:  Object to form.
6      A.  When you buy a car online, they have to
7  identify all the scratches and dents.  And you do have
8  recourse in most states if they sell you a car that
9  has unidentified scratches and dents on it online.
10      Q.  (BY MS. GETCHES)  Is that the way it
11  works in the art world, Mr. Charnoff?
12          MR. HICKS:  Object to form, foundation.
13      A.  Nancy was my art adviser, and I'm a
14  novice.  Here is what I know:  Nancy showed me a
15  picture and said this is what it looks like.  When I
16  asked her if there was any damage on it, she said the
17  art was in pristine condition.
18          All I knew about the art world at the
19  time I made the first purchase is trust Nancy.  She's
20  Dave's life partner.  She's an art expert.  She has my
21  best interest at heart.  She tells me the painting is
22  undamaged, it's museum quality, it's pristine; and I'm
23  looking at the picture in a catalog that doesn't show
24  me damage.  At that point in time I had no reason not
25  to believe her.

Page 218

1      Q.  (BY MS. GETCHES)  What's the value of
2  your art worth today, Mr. Charnoff?
3          MR. HICKS:  Object to form.
4      A.  To me, nothing.  To the rest of the
5  world, I don't know.
6      Q.  (BY MS. GETCHES)  To you it's worth what?
7      A.  Nothing.
8      Q.  So you're asking for your art purchase to
9  be rescinded, aren't you?
10      A.  You didn't ask me that.  You asked me
11  what the value of my art is to me.  And to me, right
12  now, it is worth nothing.
13          It is worth less than nothing, because
14  every time I look at it I think about having to sue;
15  all the parties involved; having to go through this
16  litigation; having Nancy use my $186,000 for a long
17  time for free with no interest and failing to deliver
18  the art; having to pay to store the art; having to pay
19  to fight; dealing with the fact that the art is
20  damaged and not in the condition she promised that she
21  would sell it in; having to deal with the fact that I
22  still haven't received my COAs; having to deal with
23  the fact that the art still isn't signed.
24          This ordeal went from me spending more
25  money than my first house on something that was

Page 219

1  supposed to bring me long-term joy, draw me close to
2  the artist, and be a source of happiness and
3  enjoyment, and hopefully increase value over time.
4  And it's turned into aggravation, heartache, and
5  additional expense.
6      Q.  How long were you waiting for the art to
7  increase in value?  What was your timeline for that?
8      A.  I didn't have a timeline, but according
9  to Nancy, in writing in an email you pulled up, the
10  art had already increased in value even over the
11  course of that year and continued to increase in
12  value -- I forget the words she used, but that it was
13  rapidly increasing in value.
14      Q.  What she actually said is she believed it
15  would increase in value.  And I'm asking you, after
16  you purchased it, what was the trajectory of the
17  increase in value in your mind?
18      A.  Well, Nancy told me, when she decided to
19  keep the art to -- they had talked me into having her
20  sell the art and split the profit with me.  She felt
21  like the majority of my pieces could be sold at a
22  profit in the very near term.  As far as the
23  trajectory of value on the rest of the art, I didn't
24  know.
25      Q.  Mr. Charnoff, if you believe the art is

Page 220

1  worth zero dollars today --
2      A.  To me.
3          MR. HICKS:  Objection, form.
4      Q.  (BY MS. GETCHES)  -- why did you insure
5  it for $200,000 at Terry Dowd?
6          MR. HICKS:  Same objection.
7      A.  This art is the subject of litigation.
8  She already lied to me about the insurance and failed
9  to insure it.  If Nancy had the proper insurance and
10  then shipped it or damaged it, she could have done an
11  insurance claim to cover the difference.  I felt it
12  was responsible to insure the art while it was in
13  storage and still the subject of litigation.
14      Q.  (BY MS. GETCHES)  Where did you get the
15  $200,000 number, Mr. Charnoff?
16      A.  What do you mean where did I get the
17  $200,000 number?
18      Q.  Say it again?
19      A.  What do you mean where did I get the
20  $200,000 number?
21      Q.  Why did you insure it for $200,000?
22      A.  Because I paid $186,000 for it.  Nancy
23  has spent that money already.  It's obvious from the
24  bank statements.  Nancy took my money and spent it,
25  and didn't even reserve the money to ship the art to

Walter Charnoff  09/29/2020                                    Confidential Pages 221..224
WALTER CHARNOFF vs NANCY LOVING

Page 221

1 me.  The $186,000 at this point is going to be hard to
2 collect, I believe, even if I win.
3        If the art got stolen or damaged, and I
4 paid $186,000 for it, I wanted to insure it for at
5 least what I paid for it.  And I believe it was in
6 $20,000 increments at Terry Dowd for the stated value
7 for the art.  So I was trying to insure the art to
8 insure the amount of money that I had purchased the
9 art for.
10    Q.  So you believe the art has increased in
11 value $14,000?
12    A.  What part of my answer did you hear me
13 say I believe the art has increased $14,000?
14    Q.  You said you paid $186,000, yet you
15 insured it for 200,000, correct?
16    A.  Because I believe it was $20,000
17 increments.  So I would have been stuck insuring it
18 for $180- or $200-.  I was trying to insure the art
19 for the money that I had paid for it so that if
20 anything happened to the art, I could at least be made
21 whole on my purchase.
22    Q.  Okay.  Well, if the actual increment was
23 $1.25 for $1,000 of declared value --
24    A.  You keep trying to change my answers, and
25 sometimes I fall for it.  I didn't say the art was

Page 222

1 worthless.  I said it was worthless to me, and I'm the
2 one who paid for it.  It was worth at least $186,000
3 to me at the time I purchased it.  And through Nancy's
4 actions, breach of contract, it has become worthless
5 to me.
6        So what it's worth to the rest of the
7 world, what an art appraiser would say it's worth, I
8 do not know.  What Nancy says it's worth is $440,000.
9    Q.  Well, let's talk about that.  Earlier in
10 this exhibit that I just shared with you, it showed
11 your actual increments for the art is $1.25 for every
12 $1,000 of declared value and that you insured it for
13 $200,000.
14    A.  Okay.
15    Q.  Earlier in the exhibit, there's --
16    A.  Whoa.  Meaning if I insured it for
17 $200,000 and it's $1.25 for declared value, that means
18 that I declared the value at --
19    Q.  I couldn't hear you.
20    A.  It means I declared the value at about
21 $180-; is that what you're saying?
22    Q.  You could have declared it for zero.  I'm
23 asking you why you chose 200-.  But you've answered,
24 so I'm going to move on.
25        You had a discussion with Ms. Loving, and

Page 223

1 I'll represent to you that this is a text exchange
2 between you and Ms. Loving.  And she texts you and
3 says "Hey, I'm headed" -- I think she meant to say
4 "back to the office.  "Are you ready to do the
5 valuations?" on March 16, 2018, correct?
6    A.  That's what it looks like on this text
7 stream.  Can you make it a little bit bigger?  It's
8 really hard for me to see.
9        Okay.  Thank you.
10    Q.  All right.  So it looks like on March 17,
11 2018, there's a valuation sent.  And I'll blow that up
12 for you here.
13        It may be hard to read, but does this
14 look like what the valuation was that you and
15 Ms. Loving discussed?
16    A.  Not what me and Ms. Loving discussed.  I
17 asked Ms. Loving for a valuation for a court
18 proceeding.  I told her it was important that the
19 valuation be accurate because it was for a legal
20 venue, and she said she would get the valuation to me.
21 This is what she sent.
22    Q.  So why would she call you and say "Are
23 you ready to do the valuations?" if she was just
24 dictating what the number was?
25        It sounds like you guys were working

Page 224

1 together.
2    A.  I don't know why she wrote it that way,
3 but we were not working together on it.  I needed her
4 to give me an accurate value of the art.  And I told
5 her she had to include my first and second purchase.
6 So maybe she needed to make sure that she had all the
7 paintings correct.
8    Q.  Maybe?
9    A.  Well, it looks like she separated out and
10 has the -- a total value for the first purchase and
11 then separately added the three of the four paintings
12 I still owned from the first purchase.
13    Q.  And if you add that up, that equals
14 $446,200, correct?
15    A.  No.  It equals more than that.  It equals
16 at least -- it equals -- I can't add in my head.  I
17 thought it was around $440-.
18    Q.  You thought it was around what?
19    A.  $440-.  If you can open it up -- if you
20 can make it bigger, I can add it up, but I can't
21 really see the numbers.
22    Q.  Well, $376- . . .
23    A.  Okay.
24    Q.  I mean, this is the number you used in
25 what court proceeding, Mr. Charnoff?

Walter Charnoff  09/29/2020                              Confidential Pages 225..228
WALTER CHARNOFF vs NANCY LOVING

Page 225

1        A.  It was for the bankruptcy court.
2        Q.  Okay.  If you add this up, I think it's
3  what I just said it was.
4        A.  No.  You said $404,000.  It looks like
5  it's $440,000 to me.
6        Q.  It's $446,200, correct?
7        A.  That is correct.  That's not what you
  said earlier.
9        Q.  And that's the number you gave your
10  bankruptcy court, Mr. Charnoff?
11       A.  I believe I gave them what Nancy said.
12       Q.  You believe you gave them what?
13       A.  I'd have to go back and look.  I mean,
14  you can look too.  It's public record.  But I believe
15  I would have given them the number that Nancy gave me,
16  because after I received this from her, I called her
17  and said, "Nancy, it is really important this is
18  accurate.  Are you sure that my art is worth this
19  much?"  And she said, "Yes."
20          And once she had that, I had no choice
21  but to give them what she gave me, because otherwise
22  it would look like I was deflating the value.
23       Q.  Why was it important to be truthful with
24  the bankruptcy court, Mr. Charnoff?
25       A.  You've got to be truthful in every legal

Page 226

1  proceeding, Ms. Getches.
2          Do you not think it's important as an
3  attorney to be truthful?
4        Q.  All right.  Here is Schedule A and B from
5  your bankruptcy proceeding, which is Exhibit 25.
6          (Deposition Exhibit 25, remotely
7  introduced and provided electronically to the court
8  reporter.)
9        A.  Okay.
10       Q.  And that's your name as the debtor,
11  correct?
12       A.  Correct.
13       Q.  And the case number is 17-21-594-JGR,
14  correct?
15       A.  Correct.
16       Q.  This was in the District of Colorado,
17  correct?
18       A.  Correct.
19       Q.  You understood that what you included in
20  your Schedule A/B for property, you were doing under
21  penalty of perjury, right?
22          MR. HICKS:  Object to form, foundation.
23       A.  Correct.
24       Q.  (BY MS. GETCHES)  And if we scroll down,
25  it says under Part 3, "Describe your personal and

Page 227

1  household items."  And you've listed under 8,
2  "Collectibles of value," "Decorative paintings
3  totaling $250."  Correct?
4        A.  Correct.
5        Q.  And you had already purchased and paid
6  for the Harold Garde art as of January 10, 2018,
7  correct?
8        A.  Correct.
9        Q.  All right.  Let's look back at --
10       A.  Are those all the questions on that?
11       Q.  Yep.
12          Let's look back at the second amended
13  complaint --
14       A.  The date of the valuation was 3/17.
15       Q.  -- which is Exhibit 6.
16       A.  Ms. Getches, you realize I didn't get the
17  valuation until after this, and then this was amended,
18  correct?
19       Q.  I sure do.
20       A.  So then --
21       Q.  Yet it wasn't amended to say it was part
22  of your assets.
23       A.  Is that a question?
24          (Deposition Exhibit 26, remotely
25  introduced and provided electronically to the court

Page 228

1  reporter.)
2        Q.  Yeah, I do have a question.
3          So your disclosure statement to accompany
4  your plan of reorganization dated April 20, 2018, that
5  occurred after this valuation discussion, correct?
6        A.  Correct.
7        Q.  Okay.  Because the valuation discussion
8  we just saw occurred on March 16 and 17 of 2018,
9  correct?
10       A.  Correct.
11       Q.  All right.  And so -- at this point in
12  time you didn't list your claim against Ms. Loving as
13  an asset, did you?
14       A.  I didn't know I had a claim against
15  Ms. Loving at this point in time.
16       Q.  Okay.  And you list "wearing apparel,
17  health aids, firearms."  And here's your arts objects
18  and collectibles, and it's still $250, right?
19       A.  Correct.
20       Q.  Okay.  Not $446,200, right?
21       A.  I believe that it's on the schedule
22  somewhere.
23       Q.  Okay.  Well, if it's not, then I guess
24  we'll see how that plays out.
25       A.  Okay.

Page 229

1    Q.  All right.  In your second amended
2  complaint, Mr. Charnoff, you had no allegations of
3  damage to the artwork, correct?
4       MR. HICKS:  Object to form, foundation.
5    A.  I do not know.
6    Q.  (BY MS. GETCHES)  Okay.  If you don't
7  know, we can scroll through the whole thing.
8       Would you like to do that?
9       MR. HICKS:  Liza, why were you asking
10  about a nonoperative pleading?  I'm really confused by
11  that.
12       MS. GETCHES:  Mr. Hicks, no speaking
13  objection.  You haven't filed any additional pleading,
14  although you were granted leave to file a different
15  pleading.
16       MR. HICKS:  The third amended complaint
17  is the operative pleading.  It was filed in the motion
18  to amend.
19       MS. GETCHES:  No, it isn't because you
20  have a claim in there that you lost and you can't
21  file.
22       MR. HICKS:  That's not what the court --
23    Q.  (BY MS. GETCHES)  Okay.  Mr. Charnoff --
24       MR. HICKS:  I object that you're asking
25  about --

Page 230

1    Q.  (BY MS. GETCHES)  Mr. Charnoff, when you
2  filed your complaint in this action, did you have any
3  allegation that Ms. Loving damaged the artwork that
4  you actually purchased from her?
5    A.  We didn't know that the artwork was
6  damaged until Ms. Loving shipped the artwork and the
7  damage reports were done from Terry Dowd.  So I don't
8  know which version of the complaint has the damage
9  allegations, and we didn't know until the artwork was
10  shipped.
11       Other than the damage that I witnessed to
12  Two Vessels, which got traded out, until the artwork
13  was shipped to Terry Dowd and the condition reports
14  were done, I did not have any way to know that the
15  artwork was damaged or the extent of the damage.
16    Q.  Okay.  So when you filed the complaint
17  and up until the time you hired Terry Dowd to do
18  condition reports, what was the difference in value
19  between the art that you purchased from Ms. Loving and
20  ArtPort to the time it was shipped to Terry Dowd and
21  prior to the condition reports being completed?
22    A.  To me, 100 percent.
23    Q.  So the value of the art, to you, has zero
24  value, regardless of whether there's damage, correct?
25    A.  Not regardless of whether it's been

Page 231

1  damaged.  It's because I begged Nancy to honor her
2  side of the agreement and send me art, and then
3  conceded to pay her money that I didn't owe her as
4  part of trying to get her to ship me the art.
5       Once Nancy created a situation where I
6  had to sue all the parties involved to try to get my
7  art shipped.  She didn't get the art signed, that I
8  purchased.  She didn't send me the actual art that I
9  purchased.  She unbound my journal.
10       All the other issues that happened with
11  the art, all the drama associated with it, all the
12  pain associated with it, all the expense associated
13  with it significantly diminished the value of the art.
14  Dwindled it down to nothing to me.
15    Q.  Okay.  But my question is the art had
16  zero value at the time you filed the complaint where
17  there were no allegations of damage, and it also has
18  zero value now that you've seen the Terry Dowd reports
19  and you believe there is damage to the artwork,
20  correct?
21    A.  Are you asking value to me or value to a
22  third party?  There's two different values, Liza.
23  There's the value to me, like I paid her -- keep in
24  mind, $186,000 is so much money.  It is a massive
25  amount of money.  And I paid her $186,000 for a

Page 232

1  specific bargain that she did not deliver her end of.
2       I gave her my money right away.  She even
3  showed -- and I should have not been so dumb because
4  she showed how desperate she was by pushing so hard
5  for the money to come in quicker, and then not
6  delivering on anything as soon as she got it.
7       So she took my money, $186,000 that I
8  paid her in good faith, thinking that she was going to
9  fulfill her end of the bargain.  She did not fulfill
10  her end of the bargain.  There's no way for her to
11  restore the value of what -- to me of what I paid
12  $186,000 for.
13       Now, what's the value to a third party?
14  If in the unfortunate scenario that I lost this case
15  and was stuck with the damaged art that Nancy didn't
16  care for properly, misrepresented the condition of, or
17  shipped improperly, or all of the above -- if I'm
18  stuck with art that is now more damaged than when I
19  received it, the value to a third party might be
20  50 percent.  It might be 20 percent.  It might be
21  80 percent.  I really don't know.  I don't know what
22  the value to a third party in a liquidation sale would
23  be of the art if I tried to sell it.
24       I believe that the damage on the art
25  would make it less valuable than if the art was

Page 233

1 undamaged. I think that's just common sense. But the
2 value to me, as the person who paid for the bargain,
3 was zero once Nancy unlawfully detained my art, tried
4 to extort me for more money, refused to ship it, and
5 caused all the other issues related to the art. And
6 ruined my relationship with the artist.
7     Q.   Ruined your relationship with the artist?
8     A.   Ruined my -- how I feel about the artist
9 and his artwork, and how he probably feels about me.
10 She made it so that instead of feeling -- at least
11 having an amicable, colleague relationship with the
12 artist, we're now in litigation.
13     Q.   And you don't really know what he thought
14 about you before everything went south, do you?
15     MR. HICKS:  Object to form, foundation.
16     A.   He didn't tell me.
17     Q.   (BY MS. GETCHES)  And the value of art to
18 a third party could actually have increased quite a
19 bit in value, couldn't it have?
20     MR. HICKS:  Object to form.
21     A.   I don't know.
22     Q.   (BY MS. GETCHES)  What?
23     A.   I don't know what the value to a third
24 party is, whether it increased or decreased.  I just
25 know to me, and I'm the one who paid for it.

Page 234

1     Q.   List out all the pieces of art that
2 Ms. Loving promised to deliver but failed to deliver.
3     A.   Well, she failed to deliver all of it.
4 100 percent of it.  When I tried to get the art
5 delivered, she said, no, I won't deliver it until you
6 pay me varying amounts of money.  First, it was
7 $15,000, then it was $1,500, then it was $500, then it
8 was $6,500.
9     Q.   So the art purchase all went south based
10 on a couple thousand dollars?
11     A.   That's not what I just said.
12     MR. HICKS:  Object to form.
13     A.   She initially refused to ship any of the
14 art. Any of the art.  Because --
15     Q.   (BY MS. GETCHES)  And then she shipped
16 the art to you, and you refused to accept it, right?
17     A.   No, she didn't ship the art to me until
18 after she diminished the value.  She didn't ship the
19 art to me until after I was forced to file litigation.
20     First, it was the money, and it was a
21 moving target, and it was variable amounts of money.
22 Then it was a new contract that took away my copyright
23 to the art, added sales tax, added an as-is clause,
24 and a whole bunch of other things I didn't agree to.
25     The target kept moving, and she still

Page 235

1 hasn't fulfilled her obligation.  She still today
2 hasn't sent the certificates of authenticity.  Still
3 today --
4     Q.   True or false:  Ms. Loving shipped the
5 art to you after the litigation commenced, and you
6 refused to accept delivery of the art?
7     MR. HICKS:  Object to form, foundation.
8     A.   Ms. Loving shipped the art to me in
9 attempt to force a remedy that I did not agree to on
10 the art.  I refused shipment of the art because I
11 wanted it to be stored in a safe facility, pending the
12 outcome of litigation, and unpacked by professionals
13 so Ms. Loving couldn't try to shift any blame for any
14 damage that occurred during shipping or her care onto
15 me.
16     And also because I had a suspicion, which
17 ended up being correct, that Ms. Loving shipped the
18 art absent fulfilling all of her obligations:  i.e.,
19 the certificates of authenticity; replacing that Red
20 Chair painting that I didn't buy with the Red Chair
21 painting I did buy; having the journal in the same
22 bound condition that it was in when I purchased it;
23 having the missing journal paintings back.
24     Yeah, Ms. Loving did not still -- even by
25 shipping the art, she did not fulfill on her

Page 236

1 agreement.
2     Q.   (BY MS. GETCHES)  How did you know, if
3 you didn't even bother to open up the package, when it
4 was sent to you?
5     A.   Because Terry Dowd unpacked the package.
6     Q.   No, that's not what I asked.
7     You refused shipment of the art --
8     MR. HICKS:  Object to form.
9     Q.   (BY MS. GETCHES)  -- before it went to
10 Terry Dowd without knowing the contents.  So how did
11 you know you weren't getting what you purchased?
12     A.   It was a much better idea to have a third
13 party who was in the business of receiving and
14 unpacking and storing art, unpack, document the
15 condition, and record the packing method/condition the
16 art was delivered in because -- and video record all
17 the contents as they came out of the box.  Because if
18 I was incorrect -- after Nancy behaved the way she
19 behaved, any reasonable person would assume she was
20 going to continue to behave that way.
21     But if I was wrong and all of a sudden
22 Nancy woke up and did everything she said she was
23 going to do, then it was safer to hear that from the
24 third-party shipper than it would have been for me to
25 open the art, unpack it myself.  And then we would be

Walter Charnoff  09/29/2020                    ConfidentialPages 253..256
WALTER CHARNOFF vs NANCY LOVING

Page 253

1  I'm in the right, I concede all these issues.  Just
2  ship me my art.
3         And the 1,500 bucks wasn't good enough.
4  Then it became 65-.  But worse than the 65-, it became
5  sales tax, it became give up a copyright, it became
6  sign an as-is clause.
7         There was no ending it with her.  I did
8  not file this litigation over $1,500.  I filed the
9  litigation because the civil theft and the extortion
10 wouldn't end.  Every time I conceded one thing, she
11 added two more.
12    Q.  Are you done?
13    A.  Yep.
14       THE REPORTER:  At some convenient point,
15 I could use five minutes.
16       MS. GETCHES:  We can do it now.
17       (Recess taken, 4:31 p.m. to 4:39 p.m.)
18    Q.  (BY MS. GETCHES)  Mr. Charnoff, you knew
19 at the time you were purchasing art from Ms. Loving
20 and ArtPort that you were helping a struggling
21 business, correct?
22    A.  Correct.
23    Q.  And at one point in time, Ms. Loving
24 referred to your art purchase as throwing her a
25 lifeline, correct?

Page 254

1    A.  Correct.
2    Q.  And you understood that she saw your
3  purchases as an investment not just for you but
4  something that would hopefully return value to
5  ArtPort, right?
6       MR. HICKS:  Object to foundation.
7    A.  Ms. Loving wrote me an email where she
8  described what she was going to do with my money,
9  which I anticipated her actually doing.  And in the
10 email she described my $186,000 as an investment for
11 all involved because she said she was going to use the
12 money specifically to make a market for the Garde art
13 to get these gallery shows off the ground, to pay
14 Edward to do a bunch of things in the promoter's name,
15 and do other things.
16       So, yes, as I understood it, she was
17 looking at my money as a lifeline and something that
18 would reap benefit to the business, but that was also
19 because of what she conveyed to me -- and I genuinely
20 believed -- that she was going to do with the money.
21       And by the way, this is -- sometimes this
22 can get confusing, but this is the second purchase
23 only.  The first purchase, she led me to believe that
24 things were going excellent.  They were doing
25 gangbusters.  The first purchase was much more

Page 255

1  salesman, saleswoman style.
2       The first purchase was like, hey, we have
3  so much business, we can't handle it.  It's a feeding
4  frenzy.  Ignorance is not bliss.  All these museums
5  are buying the art.  All these collectors are buying
6  the art.  You know, the art is selling like hotcakes.
7  Everything is awesome.  It was like a used car
8  salesman.  These things are flying off the shelf.
9       It was more like, you're lucky we're
10 giving you the art at this price.  Things are going so
11 good.  We can't even guarantee you that Garde will let
12 us sell this art to you at this price for much longer.
13 And, you know, it's going to be his decision, not
14 ours, that we have to raise the price because the
15 retail value is going so great so fast.  So that was
16 the first $45,120.
17       The setup -- and I do think it was a
18 setup -- was things are awesome.  You're not throwing
19 us a lifeline.  Even though we said it's time to
20 return the favor and buy some art, we're also giving
21 you the friend discount, and the Gardes might not let
22 us do that that longer [sic].
23       And then it completely changed for the
24 second purchase.  And the biggest thing about the
25 second purchase was she said she needed my purchase --

Page 256

1  she needed a big purchase, a sizable purchase, or the
2  Gardes were going to pull her contract.
3       So she still lead me to believe that the
4  doctor was the biggest collector and that there was
5  still value to the art and that I was paying a deep
6  discount on the art.  But she said she needed more
7  volume.  And the way she presented it to me was that
8  the Gardes were being unreasonable and greedy and all
9  these other things that we'll probably not get into
10 here.
11       But she gave me the impression that the
12 art sales themselves were good but that her business
13 was struggling, and that I was throwing her a lifeline
14 by helping her sell enough art to appease the Gardes
15 in one purchase and get her -- get the resources she
16 needed to do these galleries and do these other
17 marketing materials.
18    Q.  (BY MS. GETCHES)  Okay.  So you knew as
19 of the second purchase that ArtPort wasn't this
20 gallery selling art like hotcakes, as you said it?
21    A.  No, that's not what I said.  She still
22 said she had sold a substantial amount of art and
23 there was value in the art.
24       The gallery itself -- I mean, I think she
25 had made some bad spending decisions, like, on her

Page 273

1     A.  I think I sold it in -- I think it might
2  have been June of 2019.
3       Q.  And what about a Range Rover?  Do you own
4  a Range Rover that costs over $100,000?
5          MR. HICKS:  Same objection.
6     A.  Yes.
7       Q.  (BY MS. GETCHES)  Do you still own that?
8     A.  Yes.
9       Q.  And how much is that worth?  Do you know?
10         MR. HICKS:  Object to foundation.
11    A.  What's it worth today?
12      Q.  (BY MS. GETCHES)  What did you buy it
13  for?
14    A.  I don't remember the exact price.  I
15  think I paid somewhere around $108-.
16      Q.  And the Maserati, do you remember what
17  you paid for that?
18    A.  I think I paid like $118-.
19      Q.  And you have watches that cost tens of
20  thousands of dollars, don't you?
21    A.  Yes.
22      Q.  Could you list those for me?
23         MR. HICKS:  Object to form, foundation.
24    A.  I mean, you --
25      Q.  (BY MS. GETCHES)  How about your Rolex?

Page 274

1  How much -- the rose gold one, how much is that?
2     A.  You learned when you represented me that
3  I'm an extremely private person.
4       Q.  You can't tell me what I know about you.
5  That's not what this deposition is, because I don't
6  know any of this.
7          So you just need to answer my question,
8  and it is how much did the rose gold Rolex cost?  I
9  don't mean to offend you, but I don't remember any of
10  that.
11         MR. HICKS:  It's okay.  It's the
12  brilliant defense of, "You're rich; it's okay to rip
13  you off."  So just wait, Wally.
14    A.  $40,000-ish.
15      Q.  (BY MS. GETCHES)  That's the rose gold
16  Rolex?
17    A.  Correct.
18      Q.  I don't know how to pronounce this:
19  H-u-b-l-o-t.  That watch?  Hublot?
20    A.  Okay.
21      Q.  How much is that one?
22    A.  $8,500.
23      Q.  Any other watches?
24    A.  Do I have other watches?
25      Q.  Yeah.

Page 275

1     A.  I have a silver Rolex that's worth about
2  $7,500.
3       Q.  And that's it?
4     A.  That's it.
5       Q.  Any other kind of sports cars or fancy
6  cars that you have?
7     A.  Nope.
8       Q.  Okay.  Anything else you collect?
9     A.  What do you mean?
10      Q.  Well, it sounds like you collect watches
11  and cars and art.  Anything else?
12         MR. HICKS:  Object to the form.
13    A.  Nothing that comes to mind.
14      Q.  (BY MS. GETCHES)  Gold?
15    A.  Nope.
16         MS. GETCHES:  I'm going to take a
17  two-minute break.  I don't know if Tom's going to ask
18  questions because I think the judge dismissed his
19  clients from the case, but I only need like
20  two minutes.
21         MR. HICKS:  Okay.
22         (Recess taken, 5:14 p.m. to 5:23 p.m.)
23      Q.  (BY MS. GETCHES)  Mr. Charnoff, have you
24  ever seen the art in person that is in the possession
25  of Terry Dowd?

Page 276

1     A.  Some of the art I saw in person while it
2  was in -- hanging in Nancy's home, and some of it I've
3  seen in person while it was in the storage unit in
4  Connecticut -- Nancy's storage unit in Connecticut.
5       Q.  I didn't ask the question very well, I
6  guess.  I'm asking whether since the time the art has
7  been in the possession of Terry Dowd, have you seen
8  the art that you purchased from ArtPort?
9     A.  No.
10      Q.  Okay.  And I just want to be able to tell
11  the jury what you're seeking in this lawsuit.
12         Is it rescission of the art purchase that
13  you made from ArtPort, meaning return of $186,000, or
14  is it damages to the tune of $446,200?
15         MR. HICKS:  Object to the form,
16  foundation.
17    A.  What I'm asking the jury for is a return
18  of my $186,000, my legal fees, and whatever else the
19  jury thinks is fair.
20         MS. GETCHES:  Okay.  That's all I have.
21  I don't know if Tom has any questions.
22         MR. WAGNER:  No, no questions from me.
23         MR. HICKS:  I have some questions.
24
25

Walter Charnoff  09/29/2020                    ConfidentialPages 277..280
WALTER CHARNOFF vs NANCY LOVING

Page 277

EXAMINATION

BY MR. HICKS:

Q.  Mr. Charnoff, you know me.  I'm your attorney, correct?

A.  Correct.

Q.  Okay.  Do you know where in the law it says that in America, if you're successful and you make money, you have less rights?

A.  No.

Q.  Okay.  Is it okay to commit wrongful acts and steal from people just because they're wealthy?

A.  No.

Q.  Okay.  And in your businesses, you employee people, correct?

A.  Correct.

Q.  So you just didn't make yourself money, but you provided jobs and livelihoods for lots of other people, right?

A.  Correct.  I also started from zero.  I grew up lunch-for-dinner poor, which means I could only afford -- my family could only afford to feed me two meals a day when I was a kid instead of three.  I went in the United States Air Force, did five years, and worked my way up from literally zero.

Q.  Ms. Getches asked you during the

Page 278

deposition about appraisals and whether you looked at any appraisals that were produced in this case.

Do you generally recall that?

A.  Yes.

Q.  Okay.  And, obviously, you did not disclose any appraisals, but did you see an appraisal disclosed by one or more of the defendants in this case?

(At this time Ms. Loving left the videoconference.)

A.  Yes.

Q.  All right.  And did you have any discussions with David Mr. Hinkelman or Ms. Loving about how they would get appraisals done for tax purposes or something of that nature?

A.  Yes.  Mr. Hinkelman was also -- was a very wealthy people [sic].  By the way, I owned a Maserati, but Mr. Hinkelman owned a Ferrari that was almost $300,000.  And he has some watches that are much nicer than mine.

Mr. Hinkelman would explain -- and he tried to get me to do this, but I did not think it was on the right side of the law enough for me.  But he said basically a way to make money on the arts is to buy the art and then donate it at a much higher

Page 279

appraised value and take the tax write-off on the donated art to subsidize the money that you spend on the art that you actually keep.

So he basically told me he he had appraisers who would -- especially for the Waksman Institute and for one other one where Dave would get various art pieces donated on an almost annual basis, I think, appraised at a much higher value than what the customer paid.

And then that customer would get a nice tax write-off when they donated the art to the charitable auction.

Q.  Okay.  And then also Ms. Getches asked you about disclosing the value of the art in a bankruptcy case.  Do you recall that line of questions?

A.  Yes.

Q.  Okay.  And that bankruptcy was ultimately voluntarily dismissed by you, correct?

A.  Correct.  And all creditors were paid in full.

Q.  Okay.  So -- and there was, in fact, a disclosure of the art in the bankruptcy -- Ms. Getches didn't ask you about that, but it's your understanding it was actually disclosed through your bankruptcy

Page 280

attorneys, right?

A.  Correct.

Q.  Okay.

A.  And I believe the 440- value that Nancy provided me.

Q.  Okay.  Now, in your discovery responses that were an exhibit, there was a reference to a question about pictures that weren't disclosed -- sorry -- pictures that were identified as possibly being things that you looked at that helped to induce you to purchase the art.

Do you recall that testimony generally?

A.  Say that again, Ian.  I'm sorry.

Q.  Were there pictures that you looked at to induce your purchase of the art, in part?

A.  Yes.

Q.  And when I say "in part," were there a variety of misrepresentations that were all material and formed a basis for your inducement to purchase the art?

A.  Yes.

Q.  As to both the first and second purchase, right?

A.  Correct.

Q.  Are you aware that written discovery was