*CHARNOFF*

*VS.*

*LOVING*

**Deposition**

*NANCY LOVING*

*08/25/2020*

---

*AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-2381-LTB-MEH

WALTER CHARNOFF,

Plaintiff,

v.

NANCY LOVING d/b/a ARTSUITE NY, SUITE 41, LLC, DAVID HINKELMAN, ISP HOLDINGS, INC., ALICIA ST. PIERRE, MARTIN ST. PIERRE,

Defendants.

---

30(b)(6)VIDEO AND VIDEOCONFERENCE DEPOSITION OF ART PORT LLC AS GIVEN BY NANCY LOVING
August 25, 2020

---

Pursuant to Notice and the Federal Rules of Civil Procedure, the video 30(b)(6) deposition of NANCY LOVING, taken by Plaintiff, was held by remote Zoom videoconference, on Tuesday, August 25, 2020, at 9:48 a.m., before Jason T. Meadors, RPR, CRR, CRC, and Notary Public for the State of Colorado.

APPEARANCES

IAN T. HICKS, ESQ.
The Law Office of Ian T. Hicks, LLC
6000 East Evans Avenue, Building 1, Suite 360
Denver, Colorado 80222
(720)216-1511
ian@ithlawcom
For the Plaintiff

ELIZABETH H. GETCHES, ESQ.
Shoemaker Ghiselli + Schwartz
1811 Pearl Street
Boulder, Colorado 80302
(303)530-3452
lgetches@sgslitigation.com
For the Defendants Nancy Loving, d/b/a ArtSuite NY, Studio 41, LLC and David Hinkelman

THOMAS H. WAGNER, ESQ.
Anderson Law Group
7385 West Highway 50
Salida, Colorado 81201
(719)539-7003
tom@anderson-lg-com
For the Defendants Martin St. Pierre, Alicia St. Pierre, ISP Holdings, Inc.

Also Present:
Paula Wolff, videographer and remote technician

TABLE OF CONTENTS

30(b)(6)VIDEO AND VIDEOCONFERENCE DEPOSITION OF ART PORT LLC AS GIVEN BY NANCY LOVING

| EXAMINATION | Page |
|---|---|
| BY MR. HICKS | 5 |

| EXHIBITS | | Page |
|---|---|---|
| Loving Exhibit 3 | Forwarded email of 6/21/19, Loving to Charnoff | 169 |
| Loving Exhibit 5 | 6/21/19 ArtSuite Invoice - Second Request | 114 |
| Loving Exhibit 39 | *Tenant History Westy Self-Storage | 71 |
| Loving Exhibit 40 | *Email chains between Charnoff and Loving | 102 |
| Loving Exhibit 41 | *6/14/19 Charnoff email to Loving | 174 |
| Loving Exhibit 43 | Loving response to Charnoff | 131 |

*To be provided

| EXHIBITS (Previously Marked) | | Page |
|---|---|---|
| Loving Exhibit 4 | Sales Agreement SA-0127 | 170 |
| Loving Exhibit 25 | 8/9/16 Loving email to Garde | 67 |
| Loving Exhibit 35 | Answer/Counterclaims/ Jury Demand | 107 |

THE VIDEOGRAPHER: We are on the record at 9:48 a.m. Today is August 25th, 2020.

This begins the 30(b)(6) deposition of ArtPort, LLC, given by Nancy Loving, in the matter of Charnoff versus Loving. This video deposition is being recorded via videoconference.

The court reporter is Jason Meadors. I am the videographer and technician, Paula Wolff.

Will counsel please state their appearances.

MR. HICKS: Ian Hicks, Registration Number 39332 for plaintiff.

MS. GETCHES: This is Liza Getches. I represent the defendants, ArtPort, LLC, Nancy Loving, David Hinkelman, and Studio 41.

MR. WAGNER: This is Tom Wagner. I represent defendants Martian and Alicia St. Pierre of ISP Holdings, Inc.

And I need to state for the record that my attendance at the deposition today is not intended to waive any objection my clients have to personal jurisdiction in this matter.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

NANCY LOVING,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HICKS:

**Q Good morning, Ms. Loving.**

A Good morning.

**Q Can you hear me? Can you hear me okay?**

A Now, that's better. Thank you, Ian.

**Q No worries. Okay. So today -- yesterday there was a deposition taken of you in this case in your personal capacity. Today, you're appearing as what's known as a Rule 30(b)(6) witness, meaning you are appearing on behalf of ArtPort, LLC, to provide answers to questions regarding information that is known or reasonably available to that limited liability company.**

**Is that consistent with your understanding of your role today?**

A It is.

MS. GETCHES: Object to the --

**Q (By Mr. Hicks) Okay. And obviously, there were topics provided in the deposition notice. We don't need to go over them, because a lot of what we're going to talk about today is somewhat what we talked about yesterday. But did you recall seeing a deposition notice that had a list of topics at some point in this case?**

A I did.

MS. GETCHES: Object to the form.

**Q (By Mr. Hicks) Okay. And did you recall seeing a 30(b)(6) notice for your deposition today -- in fact, it was an amended deposition notice for your 30(b)(6) deposition today on behalf of ArtPort, LLC.**

A I'm not sure that I saw an amended. I may have. I wouldn't know the difference if it was just -- if one was provided for me. So I -- I saw one. I think it's called a 30(b)(6). Was it --

**Q And the only -- and just to clarify. The only thing, Ms. Loving, that the court amended or changed between the original and the second one, was --the topics all stay the same so --**

A Okay.

**Q -- if you saw the first one -- okay.**

A Okay.

**Q And obviously, as you understand from yesterday, the rules and how we proceed and so forth. If you have any questions or need any breaks, just let me know, and we will just go ahead and proceed as we did yesterday in your corporate capacity on behalf of ArtPort, LLC, okay?**

A Okay.

**Q And where was ArtPort, LLC, incorporated?**

A In New York, New York.

**Q And where is its principal place of business?**

MR. WAGNER: Object to the form. Talking about now or when it was incorporated?

**Q (By Mr. Hicks) Well, let's go through all of it.**

**Where did ArtPort, LLC, have its principal place of business when it was first incorporated?**

A When it was first incorporated, it was 75 West Street, New York, New York.

**Q And the locations after that where it -- ArtPort, LLC, had its principal place of business.**

A I had an office in Westport, Connecticut. And following that was 466 Piermont Avenue, Piermont, New York.

**Q At which of those locations, if any, did ArtPort, LLC, have a physical art gallery where it sold art that was hanging on walls or displayed?**

A At 466 Piermont, I would consider as a retail business. And -- and at 75 West, it was an office, although we were in a residential building on the 17th Floor. So it would be a By Appointment Only, is how we conducted business.

**Q Understood. Okay. And for what purpose was ArtPort, LLC, created?**

A We formed the organization for the marketing, the management, and the promotion of Harold Garde, and to sell his artwork.

**Q And did ArtPort, LLC, act in that capacity for any other artists during its existence?**

A Not completely. We showed other artists at the Piermont 466 space. But we were really pretty much focused, like we were with Harold, on the management and the sole marketing. They worked -- the artists that we had there were independent. They worked at a lot of different galleries. We just basically showed their work and sold their work through the gallery and on the website.

**Q Okay. So if I'm understanding correctly, you had the sole representation arrangement with Harold Garde, but the other artists, ArtPort did not. Is that correct?**

A Yeah, let me -- to explain, I guess, more completely, no. We -- not always. The rule didn't always apply. For example, if we had a show of an artist, a local artist, here during the duration of that show, while the show is up, they wouldn't be -- they could only sell through us. It was just a way to make sure that they weren't selling out of their gallery at a time when we had their -- their art up.

But I would say that each artist, we had, you know, kind of a different set of circumstances, so we would work accordingly.

**Q So as I'm understanding -- strike that.**

**Just to be clear today, Ms. Loving, when I say "you," I'm meaning you as a representative of ArtPort, LLC, in this deposition as if ArtPort were a person, just so it's not confusing. Does that make sense?**

A Uh-huh.

**Q You have to give a verbal response.**

A Well, if you can please ask a complete question, then I can answer it for you. I'm sorry. I -- if you could either restate or rephrase your question completely.

**Q When I say the word "you" when I'm phrasing questions today, I'm referring to ArtPort, LLC. Does that make sense?**

A Yes.

**Q Thank you.**

A Did you have a question? Thank you.

**Q Not -- I'm getting there.**

**So as I understand your testimony, Harold Garde only sold art through ArtPort, LLC, during the time that he had such an agreement with ArtPort, LLC.**

**But the other artists would only be exclusively tied to ArtPort, LLC, for set periods of time?**

**For example, if they were selling in ArtPort, LLC, they couldn't sell somewhere else. Is that what you're saying here?**

A Yeah, I'll try my best to answer that --

**Q Excuse me. Let me ask a little more simple question.**

A Yeah.

**Q Did you have the same type of written contract with the other artists that you had with Harold Garde, as far as --**

A No.

**Q -- representation?**

A No.

**Q And is ArtPort, LLC, still in business as a going concern?**

A Yes.

**Q And what is it presently doing for its business?**

A Right now, because of the shutdowns with the coronavirus, we are working on -- online through different sales, online sales, and making -- you know, working with private dealers and collectors like most of the art world is doing right now.

**Q Are there any art exhibitions that ArtPort, LLC, facilitated in any way for Harold Garde at any time?**

A Yes. We had many art exhibitions of Harold Garde's work.

**Q And explain what that means, exactly. When you go to a museum, for example, and say, Hey, we'd like, you know, to have a Harold Garde exhibition in the museum. Is that in the gallery only or a combination or something different?**

A It could be a variety of exhibitions that could be public or private. We had -- or institutional. We worked on exhibitions with museums. We worked in conjunction with them. It's a long and complicated process. It usually takes about a year. Or longer. We do private exhibition where we might, for example, host an event in, let's say, a show house or -- you know, a space, for instance.

We would -- it's kind of -- a long process, I won't go into in all, but we hang the work, we invite potential collectors and patrons. We will socialize, kind of, the event. We invite Harold. I can give you examples of some, if you'd like, but that would be an example of something private.

Then we would have exhibitions in the gallery

where we would hang work. Generally, there would be a theme. We would hang work that fit into that theme. And create catalogs. And invite -- have an opening night, invite collectors, and, again, socialize the art and the artists.

**Q Did ArtPort, LLC, ever have a written marketing plan that was presented to Harold Garde or Studio 41?**

A On many occasions. We have marketing plans. We would update it. We would get input. We worked together, all of us, meaning, all the members of Studio 41. And talk about opportunities for engagement, with movies, exhibitions, play readings with Harold, shows on television. We were always working on marketing.

**Q I want to shift gears and talk about sales to out-of-state-purchasers of Harold Garde artwork --**

A All right.

**Q -- by ArtPort, LLC. If you can answer this, go ahead. If you can't, that's fine.**

A Okay.

**Q But were most of the purchasers of Harold Garde's art located within the same state as ArtPort's principal place of business or outside of the state?**

A Most? Could you use a word that would define

that? I don't know what you mean by "most." Are you talking three-quarters, a half? What would you mean by most? Because I have a lot of collectors. I've never done any kind of accounting of where they live, but what -- what are we trying to get at here?

I'm sorry. I'm missing what you mean to answer you factually. I could do a count, if you'd like, and get back to you.

**Q 51 percent.**

A Excuse me?

**Q 51 percent equals most.**

A I -- I really have no idea. We have a -- I have out of state sales. If I'm just kind of talking off the top of my head without actually doing accounting. We sold a lot out of state, and we sold a lot in state. You know, it's just -- that's -- I really can't answer that. I'm sorry. Not factually, but we've sold to both, out of state and in state.

**Q That's a sufficient answer. That helps me.**

A Yes. I'm sorry.

**Q No, you don't have to apologize.**

A Thank you.

**Q Were the Harold Garde artwork sold to an out-of-state purchaser, would they typically come and see their selections in person or not?**

A Well, they wouldn't come to see their selections in person. They would actually, generally, make their selections while they're viewing the work or after they had viewed the work.

Let's see. Here is an example, if you'd like. We have a collector in Florida. And we knew what he was looking for. He was looking for a genre of historical works that were painted in the '50s. I created a presentation, a physical presentation, of an exhibition that was held privately for him on a day when we had the doors closed in the gallery, and he came in and made his selections. I'll take that one, that one, and that one.

That's, I would say, more customary, although with online sales in the art world shifting, especially now more than ever, people are making selections online without any physicality or -- you know, tangible, you know, touching or looking at the art, which is just a lot more prevalent.

**Q How common was it before COVID for a purchaser of Harold Garde art to purchase art not having had seen it in person?**

A I would say that we would have -- I can't really do percentage, but we would sell smaller works, meaning less expensive works, without someone seeing

the work, physically. But most of the time, the work is seen -- you know, seen in person. Which is a preferred way, I believe, to actually, you know, connect with the work.

**Q Is there any other reason why seeing the artwork in person before making the purchase is considered preferable?**

MS. GETCHES: Object to the form.

A Yeah, I can't talk on behalf of a collector. I'm really on the other end of this. But you know, I really -- I think it's all up to the consumer what his preferences are or his needs are.

**Q (By Mr. Hicks) The reason I ask, is because you said seeing in person is the preferable way so you connect with it. So you provided a reason why seeing it in person is preferable to connect with it. And so I'm asking, is there any other reason why seeing it in person is also preferable other than just connecting with it?**

MS. GETCHES: Object to form. Object to foundation.

A So, Ian, just -- you're breaking up just a little. I don't know if anyone else is hearing Ian. But I believe that what you're asking me, if there's any other reason. And to see it in person, the most

important thing, is, of course, to respond to it. Second of all would be to look at the condition, to look at your, perhaps, you know, size and scope.

I always, personally, would like to see something in person. Because I have -- it's a different -- different response altogether. But those would be the reasons I would.

**Q (By Mr. Hicks) With respect to condition, does ArtPort have any policies or procedures for disclosing the condition of artwork before selling it to a purchaser?**

A So --

MS. GETCHES: Object to the form. Object to form. Object to foundation.

A Our policy, if you will, would be to have, you know, conversation and to discuss why certain works of art would have different appearances. So if the work is historical, which oftentimes an historical work has value just because of the nature of what was going on in the world when that painting was painted and what significance it has, and you know, age with art comes natural, just like humans. We age, we might wrinkle. It's just a natural process.

And art is no different. It ages. So when collectors buy older work, generally, informed -- not

informed collectors will see that a brand-new work of art might look slightly different.

So what -- what we would do is discuss -- and pretty much, anybody buying Harold's work, look, he's 97 years old, they know that when the work that when the work says 1950 or 1948 that they're not getting a brand-new piece of work. They're getting a work that is older, and again, probably, has more value because it is older and it's more significant, but then again, you have to look at condition.

One of the policies that we have is to always ask our client to let -- allow us to send the work for conservation or do some type of preservation. And the reason that we do that is because older works may need to be looked at to see if anything needs to be resolved before it goes to the collector.

Normally, that is, pointed out to a particular collector. We might point out any reason that things like pin holes -- pin holes actually show the hand of the artist, that it was not rendered by a machine, that it was manmade, which actually makes it more valuable. Certain nuances from processes and procedures that the artists has to make the work are -- are literally just nuances of the art, but they may appear to look different because a line is not straight

or a print is not perfect.

And so generally, we do that as we go through the work. You know, sometimes we call it romancing the work. We look at each piece. We look at the front. We look at the back. We talk about the meaning of the work, the age it was made, where Harold may have been in his life, the meaning to the artist.

There's a lot that goes into the sales process, especially, we were building what we would call collectorship with Harold Garde, and there's a certain level, kind of like a connoisseurship, and that is my role, and that is always what I've tried to do.

**Q (By Mr. Hicks) The policies you mentioned in your answer; are those in writing?**

A Probably not in under any of my policies and procedures or -- no, because that's just what you do. It's not something that you need to write down. It's just what you do.

Now, if I have -- and I haven't had anyone -- if I had employees, I would certainly create a handbook, but I'm single-handedly responsible and the authority on Harold Garde. I don't have anyone else conducting these transactions.

**Q When Alicia St. Pierre worked at ArtPort -- and when I say "worked," I understand your position**

**that she was a volunteer, so I'm not disputing that. But when Alicia St. Pierre was at the gallery by herself, interacting with customers, was she informed of this policy regarding condition?**

MR. WAGNER: Object to the form, foundation.

A So -- Ian, could you rephrase your question?

**Q (By Mr. Hicks) Yes. We've been discussing in the last few questions and answers ArtPort's policy for disclosing the condition of art works being sold.**

**And my question is: Was Alicia St. Pierre made aware of that when she was at the gallery on behalf of ArtPort?**

MR. WAGNER: Object to the form. Foundation.

A So Aly St. Pierre was not conducting sales of Harold Garde's work at any time on her own or without authority, of my authority. So she was present during sales, and she would witness and oftentimes help me handle the work. It's rather large. So she was present and knew very well that we handled things delicately. And she was very aware of policies, just by the nature of being in the gallery and -- and hearing, you know, transactions and conversations and discussions.

**Q (By Mr. Hicks) And what was Ms. St. Pierre told when she was working at the gallery, the ArtPort**

**gallery, when she had been volunteering?**

MR. WAGNER: Object to the form.

MS. GETCHES: Join.

A And I'm sorry. Again, on my end, Ian, I. . . you are breaking up, and I don't know if anyone else hears that. I am on mine. So could you just repeat the question?

**Q (By Mr. Hicks) Sure. What was Alicia St. Pierre's role when she volunteered at the gallery?**

MS. GETCHES: Object to the form.

MR. WAGNER: Join.

**Q (By Mr. Hicks) Let me rephrase.**

**Ms. Loving, what did Alicia -- I'm sorry. Did Alicia St. Pierre ever volunteer at ArtPort gallery?**

A Yes.

MR. WAGNER: Object to form.

A Yes. Aly volunteered and helped out at the gallery.

**Q (By Mr. Hicks) And when she volunteered and helped out at the gallery, what was her role?**

MR. WAGNER: Object to the form.

A You know, I would use the word "float," because she did anything we needed, from planting a tree in the front yard to helping me with an Excel

sheet. The limited amount of time that she was there, when she was there, she did whatever was needed. A lot of the work she did was on Excel and helping with the archiving of the works on paper that was an ongoing project during the months that she was in the gallery in 2018.

**Q (By Mr. Hicks) Did she receive training?**

A She was --

MR. WAGNER: I'm sorry, Ian. Could you repeat that? I didn't hear it.

**Q (By Mr. Hicks) Did she receive any training?**

MR. WAGNER: You're referring to Ms. St. Pierre.

MR. HICKS: Yes.

MR. WAGNER: Object to the form.

A So because she wasn't handling any work without me, she followed whatever I told her to do. The training was like a hands-on training. Same with our interns. They followed my direction, and they learned through the process.

So any level of training would be the same training that I would have with anyone to familiarize themselves with the work, the environment, the artist, the way you turn on your computer, the way you unlock the front door, the way you turn the music on in the

gallery.

Sure. She was trained to do those things, because sometimes she had to be in the gallery by herself. Not often, every now and then when Nancy got a day off, she would fill in.

**Q (By Mr. Hicks) All right. Did Ms. St. Pierre have authority to make decisions on what art would be displayed in the ArtPort gallery?**

MR. WAGNER: Object to the form.

A We in the art world are very open and collectively, especially with Donna Cristy, who still continues to work with me, about -- okay. Stand back. Is it level. Is it not. Oh, I think that one looks better.

We oftentimes, on hundreds of pieces of art, in the time that Aly was volunteering at the gallery, and I would respect her personal opinion if she said, I think that one's too close. And we might move it over.

But Aly did not assert herself in any way in an authoritative position to demand, you know, where something should be or the way something should look. But we did consult each other on the aesthetics of a show or a painting.

**Q (By Mr. Hicks) So my question is slightly different.**

A Okay.

**Q What I am focusing on is, and let me ask -- reask this question in a slightly different way.**

**Did Ms. St. Pierre have authority to decide which artists would appear at the ArtPort gallery for sale?**

MR. WAGNER: Object to the form.

A I've been really clear about this. I'm the final authority. I made all the decisions.

**Q (By Mr. Hicks) Is your answer, then, no?**

MR. WAGNER: Object to the form.

MS. GETCHES: Join.

A Aly St. Pierre did not have the final authority to make decisions about what was hanging or what was shown. I was the final authority.

**Q (By Mr. Hicks) Was it ever a practice of ArtPort gallery to confer with Ms. St. Pierre regarding whether a particular artist could be shown in the ArtPort gallery?**

MR. WAGNER: Object to the form. And Ian, just to clarify, you keep saying ArtPort gallery, which is one of the reasons why I'm objecting to form. So if you use the correct name, which I believe is the ArtSuite gallery, you might reduce the number of objections that you draw.

MR. HICKS: Thank you. It's kind of -- there's really not good way to say it, because ArtSuite is a fictitious entity in the legal existence, but I can -- for the purposes of this deposition, I can agree to use that, and I'll do that. Thank you. How about I just call it the gallery?

A Yes. Let's just call it the gallery. That's a good idea. Fine.

So on that note, do you mind repeating the question. And I apologize. Oftentimes when there's an objection or an interruption, I need to hear the question again.

**Q (By Mr. Hicks) No problem. I'll ask a slightly different one.**

**Was it ever your practice to confer with Ms. St. Pierre regarding which artists could appear at the gallery for sale?**

MS. GETCHES: Object to the form.

A ArtPort's policy was me, Nancy Loving in authority, and I always had the final authority, not Aly St. Pierre.

**Q (By Mr. Hicks) Would there be any reason for you, Ms. Loving, to check with Ms. St. Pierre before agreeing to display a particular artist's work at the gallery?**

MR. WAGNER: Object to form. Foundation.

A I was under no obligation to ever check with Aly St. Pierre on any artist or artwork that was shown or exhibited or proposed to be exhibited in the gallery.

MR. HICKS: I'm going to share a screen with you real quick.

**Q (By Mr. Hicks) Do you see a text message?**

A I do. Can you tell me the date, please?

**Q Looks like Wednesday, April 17th. I presume the --**

A What --

**Q -- year is 2019.**

A 2019?

**Q Yes.**

A Okay.

**Q I don't know what year this is, honestly.**

A Well, the year's really important.

**Q Okay. Well, I don't know that right now. But this is a communication with you. So Art -- ArtPort, you in your capacity on behalf of ArtPort, do you recall -- can you just read this, and I'll scroll down to the next page when you're done with this page.**

A I certainly will. I'm done. You can scroll down.

That text was written on Wednesday, April 17th, 2019. Aly had not been in the gallery for over a year. The partner is, and we've talked about this yesterday in my deposition. I'll say it again for today's deposition. In ArtPort, I used the term "partner" with people that I work with as a -- something that I just personally do. It's kind of a courtesy. My partner was Donna Cristy at the time. She still is. I call her my partner. Partner in all of the selections. And she calls me a lot with curating. So I would check with my partner and get back to you.

Because she -- so I used her as a consultant. I pay her as a consultant, because she is my expert in curatorial -- like my curatorial eyes. She's a fine artist herself. So oftentimes, I would say and consult with Donna Cristy, who is an expert, to see if I think a piece of art is -- can stand up and be sold or shown in the gallery. So that's who I'm speaking about.

**Q Is this -- Donna Cristy's a female? I think you said she was.**

A Yes.

**Q What periods of time did she act in this consulting capacity that you described?**

A She -- Donna Cristy has been working with me,

again, as a consultant on and off for many, many years.

**Q So would you say that arrangement happened on and off throughout ArtPort, LLC's existence?**

A Most importantly, as Aly St. Pierre became ill in March of 2019, and that is when she could not help out anymore at the gallery, and Donna Cristy was working with -- working with the gallery, working with ArtPort.

Prior to that, oh, I don't know exactly how many months, but she -- actually, please, you know what? I'm just going to remember something. Donna Cristy was actually working with me in 2017. I had her work with me to help archive a body of work for the University of Maine and a curator that was coming. You kind of need two hands to hold the artwork.

And she worked with me for months to prepare for several different curatorial exhibitions. And I had her working as a consultant almost completely through -- at the end of 2018 and 2019. And up till today.

**Q Approximately when did ArtPort, LLC, switch to conducting the majority of its sales online?**

MR. WAGNER: Object to form.

A I -- let me answer the question to switching by state mandate that our governor -- we were no longer

allowed to keep our doors open and only essential businesses in March and I believe it was maybe around, you know, early March or whenever the laws were enacted.

So I shut down the business and began working from home and worked on relationships with other galleries, the private collectors, and took online art sales -- focused a little bit more on the online art sales and connecting with private dealers.

**Q (By Mr. Hicks) And for online sales, what websites has ArtPort, LLC, used?**

A Almost primarily Art-- Artsy.

**Q And when a piece of art is represented for sale by ArtPort on artsy.com, are there any policies or procedures that ArtPort has for conducting that sales for advertising?**

A So the process generally for a sale through Artsy would be that a collector or a designer or interested customer would send an email and ask for -- through the Artsy site, it doesn't come directly, and make an inquiry to the art, ask about the artist, obtain more information, and then generally, there's discussions and communications back and forth where they learn more.

I might send catalogs. I might send magazine

articles. I'll send, you know, trailers from the movies that we've made. And anything that would let them understand a little bit more about the artist and the particular piece they were interested in.

And then if they decided to purchase the work, they were sent a sales agreement, like the one that we looked at yesterday, and it's usually sent back electronically. And it may -- check, wire, Square, Edge, and then we would ship the work. And there may be more, but I was trying to sum that up in the -- most efficiently for you to get what you're trying to get here.

**Q I understand. Has Harold Garde's art ever been advertised online by the gallery for sale?**

A Harold Garde's art is on Artsy. On -- it's also on my website. And it is shown and exhibited on Harold's website, but that is not a selling site. And our ArtSuite, okay, I've used the word "our" because that's me, ArtPort, ArtSuite, on the website, we show the work as well.

But Artsy is generally where more of the defined, definitive, selling site. And you'd show exhibitions. So oftentimes, we would show buyers work or work what we'll call in situ where it might be shown as a collection.

**Q Has ArtPort ever advertised for sale a copy or reproduction of Harold Garde's artwork online?**

MR. WAGNER: Object to the form.

A There are no copies or reproductions. I'm afraid I'm misunderstanding. Do you mean a print or a -- something -- I'm sorry, Ian. Do you mean a copy? Like, if I had a print made?

**Q (By Mr. Hicks) What is a print?**

A Well, I'm not sure how you're referring to it. If you mean make a copy of something, in a print, or a -- a print could be a process in which an artist makes -- because there's dozens of processes, makes what we call a unique work.

Harold had a process where he had wood cuts where he would cut into the wood. It would be put on a printer. And they're one of a kind. Each one is unique because of the way he would lay the ink.

So if you're asking me -- if you could just rephrase the question so I understand exactly what you're asking, I think I can be -- have a little more clarity.

**Q So what I'm focusing on is, when I say "copy or reproduction," I mean that there's at least two versions of the same thing. Meaning, it's not solely unique to itself. There's another one that looks just like it.**

**And my question is: Would that definition of copy or reproduction, has ArtPort ever sold a copy or reproduction of Harold Garde online?**

A Okay. First of all, ArtPort has never sold a copy or reproduction of Harold Garde's work that I'm aware of. And we would have work on -- we would leave work on Artsy. For instance, we might load up a whole show and we would not take down, because it's kind of a great way to, like, free advertising. So to say for a certain body of work or type of work, and that -- that painting or that work would stay on Artsy, and -- but it would not be published for sale. So we wouldn't put a price, or we would put "not for sale," or when they inquired, it would be, Sorry, that piece is no longer available.

But that's a common practice. Because you kind of want to use Artsy. Even though it's a selling site, people use it mostly for marketing. People can research and pull up the entire body of work. Some of the work is already privately in the hands of private collectors or institutions but we leave it up there, because. . .

THE REPORTER: I'm sorry. You cut out. "We leave it up there because"?

THE WITNESS: It's a good way to market and to show a body of work. Because if you're asking me if I take down -- we don't necessarily take off work that has previously sold or it's at a museum. That's the part that I told you earlier. If somebody were to inquire, it comes up in kind of inside the internal part of Artsy, a lot of information, and it would be not for sale, or on exhibit, or on hold for a client, or not available or available, and here's the price.

So you're asking me if you see something twice on there, it's not because there's two. It might have shown up in several exhibitions. So, for instance, we have a kimono exhibition. And one of the kimonos in that exhibition might show up in an exhibition for all works pink for Harold Garde. It happens to be pink. So oftentimes, you might see several different or one piece of art shown in several different categories.

**Q (By Mr. Hicks) So if there is a piece of Harold Garde art that has been sold and paid for --**

A Uh-huh.

**Q -- would it still show up on artsy.com?**

MS. GETCHES: Object to the foundation.

A So are you familiar with --

**Q (By Mr. Hicks) Let me just rephrase. I'm**

**sorry.**

**So if ArtPort sold a piece of Harold Garde art and it was paid for, would it still show up in ArtPort's section on artsy.com?**

A Harold Garde has the rights to reproduction to each and every single piece of work in his body of work. That piece could show up anywhere. It could show up on a greeting card. He owns the rights.

The owner of the art who has bought and purchased an artwork only owns that artwork. So, yes, we might use that image on anything. We would keep it up, because it shows the breadth of his work. It might show the entirety of a collection. It doesn't mean that it's not owned by someone else.

**Q So if a piece of Harold Garde art was sold by ArtPort on artsy.com, would it still show up with a price next to it as if it were available for sale?**

A The only way --

MS. GETCHES: Objection.

A Sorry. The only way it would still show up with a price is if somehow it wasn't taken down, the price. We wouldn't take the image down, but we would take the price off. But it couldn't be sold twice, for obvious reasons, since there's only one. So the only way that would happen is if by default from, you know,

the organization.

And that -- but if -- are you referring to anything in particular that you would want to show me? Because then I could answer the question and we could probably make this a little more efficient.

**Q (By Mr. Hicks) We will get there. You have some certain things in mind. I just want to understand ArtPort's --**

A Okay.

**Q -- business practices --**

A Yeah.

**Q -- with the respect to the sale of online art.**

A Right.

**Q As I understand your testimony, if a piece of Harold Garde art was sold and paid for, it would not appear as if it were for sale with a price on artsy.com; is that correct?**

MS. GETCHES: Object to the form. Misstates the testimony.

A So, if, hypothetically, a piece still showed up with the price, it has -- it would be -- doesn't mean that it's going to be sold again. It would probably just mean that in the thousands of images that it just wasn't -- the price was not removed or not for

sale was not applied to it, but it would be more an oversight that would be. . . that was intentional. And only because we waste our time if someone is, you know, thinking that something's for sale.

But again, I -- I really don't know where you're -- you're going with this. I guess it's okay, but, so I'm just trying to answer it. Again, if a piece -- we almost always leave the work up so that it makes a very full body of work. Again, for us, we paid for that site, it's free advertising. It's free marketing. It shows Harold Garde.

When pieces are sold, which they are on Artsy, we do our best to update information within the internal, you know, settings that allow it to reset. But if something was missed, then it was missed. I did have an intern that was working with me and from Sotheby's and she did almost all of our work on Artsy.

MR. HICKS: I understand. Hey, I actually need to use the restroom, though. Can we take a ten-minute break?

THE WITNESS: Okay.

MR. HICKS: Thank you. I'll be back.

THE VIDEOGRAPHER: We're going off the record. The time is 10:43 a.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:00 a.m.

**Q (By Mr. Hicks) Ms. Loving, when -- strike that.**

**Ms. Loving, did ArtPort ever send portfolios to potential customers that reflected art they might buy?**

MR. WAGNER: Object to the form. Foundation.

A Yes.

**Q (By Mr. Hicks) Who put those together? Those portfolios? I mean, you had a potential customer, and ArtPort wanted to send pictures of what might be available that might interest that customer?**

A Who put those together?

**Q Yes.**

A A variety -- could be a variety of people. Whoever was helping me or myself.

**Q Did ArtPort have any policies or procedures to ensure that the portfolios accurately depicted the condition of that art?**

MS. GETCHES: Object to the form.

MR. WAGNER: Join.

A A photograph is a photograph. I mean, it -- it was not -- I believe what we're talking about is a portfolio for selection purposes only. It was actually

only used as a guide or a gauge to show them selections. It wasn't used in some official way as a condition you know, report that would have been acceptable.

**Q (By Mr. Hicks) And I'm speaking generally, to be clear --**

A Correct.

**Q -- about ArtPort's business. Not with respect to any particular transaction.**

A Okay.

**Q Do you understand?**

A I do.

**Q Thank you. Does ArtPort believe that it is important to accurately depict artwork that it sells when it provides a picture of that artwork to a potential customer?**

MS. GETCHES: Object to the form.

MR. WAGNER: Join.

A It depends on the purpose of that photo. If a client asks for a high-res photo, especially, for instance, if you're buying it online, we send it to them. But there are problems with sending high-res photos with regard to copyright, so we're very cautious. But generally, when we're creating, let's say a catalog or for a potential collection or purchase

of work, it's just for purposes of selection.

**Q (By Mr. Hicks) Tell me about the problems with copyright that are associated with sending high-res photos, as you just mentioned, in your answer.**

A Well, potential problems. Probably more so in photography. But you just have to be careful with high-res photographs that can be duplicated or replicated and used without consent.

**Q Has ArtPort had authority to send high-resolution photographs of Harold Garde's artwork to potential customers?**

A Yes.

**Q And what would be the purpose of sending a high-resolution photo of such artwork versus a low-resolution photo?**

A If a purchaser, someone who's, let's say, purchased the work, wanted high-res photos, I would have no problem sending them to them, because they would know that they were bound by law that they did not have the rights to the image.

But they could have those for, you know, especially high-network collectors who keep extensive data, collection data. Those would be entered into their archives, their own personal archives.

**Q Was there a particular or specified process**

**for taking pictures of art that was going to be presented to a potential customer, meaning, did you have, like, a particular camera? Did you use the same process every time? Or was it more ad hoc?**

A Each client is unique and every situation is unique. If you're -- you know, maybe you could be more specific about what -- what you're asking me with the photography.

**Q Okay. So has ArtPort sent at least -- strike that. I'll rephrase.**

**Has ArtPort sent photographs of art to at least two potential customers during its existence?**

A Yes.

**Q Was the same process used for both of those customers with respect to taking those photographs?**

MS. GETCHES: Object to the form.

A The -- you're asking about two hypothetical clients that I sent art to. So for example, there was a database that existed before I began managing Harold, and there were what were considered high-res images back in 2004. And because there's thousands of work in the collection, I didn't have a photograph, because the art was located in Florida, so I used an image that was from an older database to send to a client as a way for them to view several pieces of art for selection.

**Q (By Mr. Hicks) And I was not speaking of hypothetical.**

A Oh.

**Q I didn't mean to intend that. I'm talking about -- I assume there's at least two actual, potential customers, whether they ended up purchasing the art or not, to whom ArtPort sent pictures of Harold Garde art, and my question was -- was the same process used? I mean, did you take it with a particular lighting, a particular camera? Or was it just sort of on-the-fly, you go and take a picture? That's basically what my inquiry is.**

A Okay. There's no on-the-fly when you're dealing with artwork. It's precious. And so there's no, you know, cavalier quickly throwing things around. There's always a process. And each time, because each work of art is unique, the process is unique.

**Q Does ArtPort have a system or process for keeping track of the Harold Garde art that it sells?**

A We have several databases. Yes, we have a system.

**Q And what is that system?**

A Called ArtBase.

**Q Please spell that?**

A A-r-t-b-a-s-e.

**Q I'm sorry, A-r-t-b-a-s-e? ArtBase?**
A ArtBase.
**Q Oh, I thought you said bathe, like -- sounds like something marijuana-related. Must be getting old, use the word "marijuana."**
**And how long has that system been used by ArtPort?**
A Since 2014.
**Q So would that include the entire time that ArtPort has represented Harold Garde?**
A We didn't begin using ArtBase for maybe months afterwards. The exact date, I do not know.
**Q For the art -- strike that. I'll rephrase.**
**For the Harold Garde art that ArtPort is authorized to sell, does it have possession of that artwork before it sells it, or does it have to order it from Mr. Garde? How does it keep the physical inventory of Harold Garde's art that is available for sale through ArtPort?**
MS. GETCHES: Object to the form.
A So the physical location of artwork has changed several times throughout the years. But to date, the art is in storage units. It's in Florida and in Maine and in New York. And in Harold's studios. And in my office. And in my -- the gallery.

**Q (By Mr. Hicks) Is it also in your place of residence?**
A My office is in my home, yes.
**Q And can you give me the street address of your home, as you refer to it, so I make sure that I'm thinking of the same thing that you're talking about, please?**
A Okay. My home address is 27 Hester Street, Piermont, New York.
**Q How long have you used that location as a residence?**
A I'm just trying to think here. When did we move? Oh, gosh.
MS. GETCHES: Are we using -- are we using "you" now as Ms. Loving instead of ArtPort?
MR. HICKS: Yes. I'll specify that next time. Thank you.
A Okay. Sorry. I moved here less than a year ago.
**Q (By Mr. Hicks) And where did you, Ms. Loving, reside prior to that in the five years leading up to that?**
A Also in Piermont, 674 Piermont. 674 Piermont Avenue, Piermont, New York. 26 Covlee Drive or Street in Westport -- I'm sorry, Norwalk, Connecticut.

**Q Was the 674 Piermont Avenue or 26 Covlee addresses, was any Harold Garde art ever located there?**
A Yes.
MR. WAGNER: Object to the form.
**Q (By Mr. Hicks) And approximately how many pieces?**
A It would depend. It fluctuates, depending on what -- you know. What we might be working on or what -- where we lived or, you know. We have loan agreements in place for that.
**Q And loan agreements with whom?**
A So I could loan art out to basically anyone I want for opportunities for placement, for selling, to show the work in a residential setting. Put it on display. But we call that a loan, because it's not necessarily for sale. It might be, but it's more for, I would say, display. But that's, you know.
**Q Was any Harold Garde art sold by ArtPort and then, after that sale, stored at 674 Piermont Avenue or 26 Covlee?**
A Yes. I think -- I'm sorry. I'm misunderstanding. I -- my office was 26 Covlee. So if you could rephrase the question. I'm just misunderstanding what -- the answer that you're looking for.

**Q So that's an important specification. So let me just ask basically about how the addresses were used where Ms. Loving has resided, you, Ms. Loving, has resided.**
A Okay.
**Q The three addresses we've been discussing today, 27 Hester, 674 Piermont, 26 Covlee.**
**So that being the preface, of those three addresses, have -- has -- I'm sorry, have you, Ms. Loving, used each of those addresses for an office, for ArtPort?**
A I've had an office in all three locations.
**Q For each of those three locations, I want to get a feel for how big they are and what part or what percentage of that space the office would then take up. Because it's important as to whether it's, like, just a room off in the corner or if it's -- the office is kind of the whole place, or you know, if you could kind of give me a feel for that.**
A In the Norwalk, 26 Covlee, two upper floors of the house.
At 674 Piermont, you know, it was floor -- at my office. But -- and here, at 27 Hester, I am, right now, making a temporary office. But, you know, basically, in all of these addresses, Dave and I have

Page 45

lived alone, and so I would -- I would use the whole house if I had to. Oftentimes, I did.

**Q When you say you'd "use the whole house if you had to," are you referring to the whole house to store already sold Harold Garde art or are you referring to something else?**

A Oh, well, for example, I entertain collectors and -- in all of my homes as a way to show the work residentially, to show the people what it looked like in a home environment, and I would also entertain directors or curators from different institutions. And we might sit at a very large farm table that I have that seats 14, and we might take work and lay it all out on the table and look at pieces and discuss them. That happened often while we were in Norwalk.

**Q So were -- let me rephrase. Strike that.**

**Has ArtPort, LLC, used a storage facility to store any Harold Garde art?**

A Yes.

**Q And what storage facilities has ArtPort used? In that capacity.**

A Are you asking me location?

**Q Yes.**

A And are you asking me if I'm paying for storage or I have --

Page 46

**Q So if --**

A Yes, so I'm just confused, because there's a quite a different scenarios here we could discuss. Could you be more specific, Ian?

**Q Yes. So when I say "storage facility," I mean somewhere other than 27 Hester Street, 674 Piermont, 26 Covlee Drive, Street, and other than any space that's used as a gallery.**

**So with that specification, regardless --**

A I have --

**Q -- regardless of who is paying for it, has any Harold Garde art been stored in places other than those four we just mentioned?**

A Yes.

**Q And were these storage facilities like U-Haul or Westy Storage, or did it include other things as well?**

MS. GETCHES: Object to the form.

A It included others.

**Q (By Mr. Hicks) Okay. Can you explain, again, other than those first four places, that is, places where you, Ms. Loving, have resided, and other than any place ArtPort has used as a gallery, can you give me a general description of the places where Harold Garde art is stored?**

Page 47

A Starting in Maine, we store art all throughout Harold's home. In his barn. In his studio. In storage units located in Belfast, Maine.

In New York, storage units that you've already listed, including a CubeSmart Storage in North Dale.

A storage -- storage unit in New Symrna Beach, Florida. Harold's studio in Florida. Harold's home in Florida.

And to the best of my knowledge, that's all that I can recall at this time.

**Q Where was Mr. Charnoff -- I guess we'll refer to him as Wally -- where was the art that Wally, once he paid for it, where was that stored?**

A Could you be more specific? There were 83 pieces of art.

**Q Yes. Once Wally had wired money -- let's start with the first purchase. Once he had wired money for the first purchase, please identify where that art was stored prior to its shipment to Colorado.**

A The art was stored at several different places, because it wasn't always stored. Wally had wanted the pieces to be presented to museums, so they were hung for presentation. So on and off through that time, they were stored, you know, each piece, again, is

Page 48

unique. There were different mediums and different formats. But if they were not at Westy's in Norwalk, they would have been hanging for presentation.

**Q So with respect to the first purchase of Wally's art, you mentioned it was either in Westy's, in storage in Norwalk, or hanging for presentation. And within that second category of hanging for presentation, tell me the general description of those locations, please.**

A Where they were hung?

MS. GETCHES: Hold on, Nancy.

THE WITNESS: I'm sorry, Liza.

MS. GETCHES: Ian, are you -- can you give a time period, meaning before the art that was -- that became a part of the first purchase or after it was the completed first purchase, where was art stored? It's very confusing --

**Q (By Mr. Hicks) All right. So --**

MS. GETCHES: -- what you're referring to.

**Q (By Mr. Hicks) The question is: When I've asked her before, I guess I need to do it again, I'm talking about the time period, Ms. Loving, once Wally had wired you the money for the first purchase, where was his art ever placed or stored or physically located in any way other than Westy's in Norwalk?**

A August -- let's see. The purchase was in August of 2016.

To the best of my knowledge right now, I believe that, out of the four pieces, two -- sorry. I'm just trying to think. One was -- Sculpture on Table was shown in -- and a piece called Two Vessels was shown in Westport. They were hanging for presentation for a curator.

And -- I think -- just let me think. Sorry. There's just been so many hundreds of pieces. And -- and perhaps Round Heads, too, but to the best of my knowledge right now, I believe it was just those two pieces.

**Q Where was that? You said it was hanging for a curator, those two pieces? Where at? At someone's house or somewhere else?**

A In west -- in Norwalk. I'm sorry. I keep saying Westport. We were right on the line. So half of the house was in Westport and half was in Norwalk. So let's just say Norwalk. It was at the Covlee house in Norwalk.

**Q All right. So there were four items that comprised the first purchase by Wally, correct?**

A Correct.

**Q And at least two of those, for some period of**

**time after they were paid for, were displayed in the 26 Covlee home, correct?**

A That was at Wally's request. Yes.

**Q Did those two pieces ever suffer any physical damage while they were either in the possession of you, Ms. Loving, or ArtPort?**

A No.

**Q Describe the area where those two pieces were located at the 26 Covlee address, meaning, was it in a family room? A game room? A bathroom? Or something else?**

A Can you repeat what time period that you are referencing? Because there are quite a different circumstances and set of circumstances, because they were moved around as they were selected for a -- for the, you know, museum.

So are you talking about a particular time? Or are you talking about anytime?

**Q Anytime. So if, for example, they were six months in a family room, then went out for a show for two months and came back for another six months and went to a dining room, then I would want to know about both those rooms. So --**

A Okay. To the best of my knowledge, the Sculpture on Table, it was hanging -- it was a large

piece. It was hanging on a wall that could accommodate that, for presentation. And it was moved, I believe, one time into a second -- well -- a second floor of the house for -- to be photographed for the museum.

The piece Two Vessels was hanging on, we'll call it the second floor of the house, which is where my office was. My office, again, was on the second and third floor. And it was hanging on a wall, when you walked up the steps to the right, I had kind of reinvented that space. We had a large pool table that I had covered, and with board, so that I could go through literally hundreds of works on -- on paper while Edward Robinson was with us.

**Q Was there an air hockey table also near that space you had reinvented with the pool table?**

A The -- the lower floor of the house was a large finished basement. And it had an air hockey table. At one point, I guess there was Ping Pong and television, and that was the largest wall in the house where we hung a Sculpture on Table to show to Edward Robinson.

**Q Okay. So I may be a little bit confused.**

A Yes.

**Q So earlier, you talked about that there was a pool table with a board on it so that you could look at**

**art. Was that in this basement that you described or was that up --**

A No, no. That was on the second floor. It's on the second -- the second floor of the house.

**Q And was there any of the four pieces of art that comprised Wally's first purchase by that pool table on the second floor of the house at any time?**

A Two Vessels was in that room.

**Q During the time that Two Vessels was near the pool table, was that pool table ever used to play pool?**

A Yes.

**Q All right. And who played pool on that table?**

A Who played pool? Our family when they were there. Myself, not often. David.

**Q Approximately how frequently in terms of how many times per week do you think someone might play pool on that table when Ten Vessels was or -- I'm sorry, Two Vessels on the wall in the same room?**

A Dave and I lived in the house alone. Our kids were not with us. They lived in New York. So when they came for holidays or on occasion.

**Q And was Mr. -- I'm sorry, was Wally aware that his paintings were being displayed in a location that had, at least in part, you, Ms. Loving's**

Page 53

**residence?**

A Wally bought the work off of the walls. That's where he saw them the second time. He was very aware that -- the way that I'm showing the work in that office, slash -- you know, we can't really call it a gallery, but we used the house as a gallery.

**Q Was any of Wally's art that comprised the first purchase that was located at 26 Covlee ever damaged while in that location?**

A No.

**Q Do you have any knowledge, Ms. Loving, of a pool cue making physical contact with any of the art that comprised Wally's first purchase?**

A No.

**Q Did Wally ever complain that there was damage to some of his art while it was located at 26 Covlee?**

A Some of his art? Or a particular piece? Are you talking -- I'm sorry. So can you be more specific, Ian?

**Q Yes. Did Wally ever complain that there had been art in a place where you had a residence, Ms. Loving, that had been damaged while located in that same building?**

A So on an evening when Wally was at the house and up in my office, Wally -- I heard Wally say, Oh, he

Page 54

made a comment about, One of your kids must have hit my piece. And I never heard anything about it again, for years, and until he maybe brought it up in the spring of 2019, after he was not willing to compromise on payment. And we laughed it off. That was -- it was a comment that was just said, and we just laughed it off.

**Q Approximately when did that occur?**

A I don't remember.

**Q Do you remember the year, 2016 or 2017?**

A I don't remember. I really don't. Sorry. I don't. He visited the house several times.

**Q Going back to where -- well, let me ask you this a different way.**

**Was Wally's art ever stored in a storage unit such as Westy's storage or CubeSmart, something like that?**

A Yes.

**Q And generally describe where that storage occurred.**

A Wally's art was stored in Westy's in Norwalk. Norwalk, Connecticut.

**Q How many units did ArtPort have at Westy's at any time?**

MS. GETCHES: Object to the form. At any time. How is that helpful?

Page 55

MR. HICKS: I want the range of the minimum and maximum if it's different.

**Q (By Mr. Hicks) So if there's a time period you had three, please tell me that. If there's a time period you had two, tell me that. If there's a time period you only had one, please tell me that. Does that make sense?**

A Yes, it does. I have had several units. I oftentimes would rent a unit, a large unit, when I was showing volumes of work to a curator. And we would set up tables and look at art, you know, in space.

So I had a one large unit, and I rented a very. . . at one point.

**Q I'm sorry. It cut out right before you said -- can you repeat your answer, please? The last four or five seconds cut out, so. . .**

A Yeah. I -- we had, to the best of my memory right now, I had a large unit a -- and also rented a smaller unit.

**Q So --**

A But not limited to that. It wasn't limited to that. There were times when I had other units.

**Q What's the -- the most amount of units that ArtPort had at Westy's at any one time?**

A Maybe, at any one time, which could have been

Page 56

one 24-hour period, three. But generally, two. I had one large one. And then we took a -- a small unit that was used for storage.

**Q Was any unit that housed Wally's art used to store any other art at Westy's?**

A What time period are you thinking about, Ian? Prior to Wally's art being put in storage or after or. . .

**Q So -- well, before, during, and after, if that's how it happened. So you knew where Wally's art was, once he paid for it. Did it also -- he at any time have other art? I guess concurrently is the main -- is the main focus.**

A The -- we had -- let's see. We had boxes, empty boxes, in there for some really large work that I saved to try to, you know, cut costs for shipping. And when -- and even prior to Wally paying for a complete payment for the work, the art was stored there.

So from the time that we looked at it, and he asked for it -- you know, if he was going to store it, and he paid for it himself, I told him that I thought he should get a small unit and -- and then he would have his work stored separately. But he failed to ever follow through with his promise of that.

So it stayed in a small unit, which we talked

about on many occasions, the fact that it was there. All the other art was removed. It was Wally's work and empty boxes.

**Q So once Wally paid the money for his art, there was no other art stored in that unit. Correct?**

A To the best of my knowledge.

**Q And there was, as I'm understanding your testimony, a large and small unit at Westy's. Wally's was in the small unit once he paid for his art and the larger unit was used to store other art. Is that a correct understanding of your testimony?**

A So actually, before Wally even made the first payment for the art, I had already separated the art, because we discussed this at -- when he stood in the storage unit and selected the work that he wanted. And shortly thereafter, I transitioned the work into a small unit, moved out everything else that would have been in there to the large unit, to make room, and he -- his work was stored in that small unit.

**Q And had Wally agreed to have that art stored in the small unit?**

A Wally requested that he purchase the small unit and that he insisted on paying for it, but he never did, even though he promised on, you know, when we'd spoken. And he got, I guess, you know, distracted

by things in life. And he never called the storage facility, and he never, you know, did what he promised he was going to do, which was get his own unit.

So as a courtesy, I kept it there, and I continued to pay for it. He knew I was doing that, and at the time, that was fine.

**Q Was Wally's art moved from that large unit to the smaller unit before he had paid for it? You may have already answered that, but just clarify, please.**

A You know, I -- to the best of my recollection, as it was several years ago, the art was moved. And when I say "the art," that is, may or might not be all of the pieces, because other works, okay, were being, you know, looked at by museum directors and curators. And so a piece might have been taken out to be shown.

So to the best of my knowledge, all of the work was moved into this small unit and that's where it resided until -- until we left.

**Q And was -- for the Wally's art that was stored in that small storage unit, does that include both the first and second purchase, or is it something else? Because I do understand that it was -- the first purchase, or at least part of it, was at 26 Covlee for some period of time.**

A Correct. Everything that comprised of the first sale, second sale, aside from what may or may not have been out for selection, was stored in that small unit.

**Q Did Wally request that his art that was located at 26 Covlee be moved from that location to a storage unit?**

A No.

**Q So why was the art moved to the storage unit?**

A I didn't say that it was. Would you like to -- to -- if I did, let's read what Jason has to say, but I never said that we moved his work to storage.

**Q Okay. So Wally's first purchase. Tell me every place that it was located or stored after he paid for it.**

A Okay. It was stored at -- either in my home office or in Westy's.

**Q So the only two places that the artwork comprising Wally's first purchase was located, once he paid for it, was either 26 Covlee or at the storage unit at Westy's we've been discussing, correct?**

A To the best of my knowledge.

**Q And the purpose of having some of Wally's art at 26 Covlee is, I believe, you testified earlier, but if I'm wrong in my understanding, please clarify, was**

**to show it for curators or collectors or other interested persons. Is that accurate or not?**

A Not accurate.

**Q Okay. Please tell me why the art was at 26 Covlee?**

A I wouldn't have shown all of Wally's work to other collectors. There was really only -- the purpose was that Wally had requested that we try to promote his work through museums.

We spoke about the -- this yesterday, about collectors wanting their work to be loaned to museums. It raises the prestige of the art, and it's a status symbol for big art collectors to loan their work to museums.

And so Wally was very interested in having his work loaned to a museum. And asked me to work on that. And I -- I did.

**Q What does having Wally's art at a place that you reside in, Ms. Loving, what does that have to do with promoting the art as you've described? I don't understand. I'm sorry.**

A It's okay. Let's be clear. This was my office which happened to be a home office, and this is where curators and directors of institutions might come and visit to discuss an exhibition for Harold Garde,

and you would always bring whatever you wanted them to be interested in to them.

So I would have it there. It would be hanging so that they could see it. And it wouldn't be appropriate, necessarily, especially if I'm really looking to place a particular piece, would be to offer them 400 pieces in storage. I would select the genre of what they might be looking for and show that. So that's. . . that's why.

**Q Of those people you described, such as curators, how many of those people saw any of Wally's art at that 26 Covlee location?**

A Oh, probably about a half a dozen.

**Q And as a result of the art being hung at 26 Covlee and those approximately half a dozen people seeing it, was the art ever displayed in a museum or anything of that nature?**

A We've had a lot of exhibitions since then. Are you asking me about Wally's art or all of the art that I had on display?

**Q So my understanding is the reason why at least some of Wally's art was at your -- or at 26 Covlee --**

A Uh-huh.

**Q -- was so that, you know, people such as**

**curators or others in that category would want to see it.**

**And my question now is: Was any action taken as a result of showing the art at 26 Covlee to those people. Meaning, did it result in being placed in a museum or anything like that?**

A It did. It did. Sculpture on Table was selected for a show at the University of Maine Museum of Art.

**Q And did someone affiliated with the University of Maine physically view Sculpture on Table at 26 Covlee?**

A To the best of my knowledge.

**Q To the best of your knowledge, yes, they did? I'm just clarifying your answer, yes or no. I'm sorry.**

A I said, to the best of my knowledge. Yes.

**Q Okay. And who was that person that came and saw Sculpture on Table --**

A George -- that's fine. George Kinghorn.

**Q Any other -- any other piece owned by Wally that was used by anyone like that at 26 Covlee that ultimately resulted in some action being taken on it to put it in a museum or something like that?**

A No.

**Q When Wally visited and saw one of his**

**paintings near the pool table at 26 Covlee, how long did those -- any of his art remain at 26 Covlee? Was it immediately put into storage or did it just stay at 26 Covlee?**

A I don't -- I can't recall exactly, because are you talking about the first purchase or the first and second or the second?

**Q Let's start with the first purchase. So as I understand -- so it's in reference to when he came and there was the pool cue joke situation. Once he came and saw -- came to 26 Covlee and saw one of his paintings hanging near a pool table, and there was this communication about maybe it got poked with a pool cue, whether it's in jest or otherwise, who knows.**

**From that point forward, what happened to the, the first purchase paintings?**

MS. GETCHES: Object to the form.

A To the best of my knowledge, I believe that at some point, Two Vessels is what you're talking about, was taken to storage. And Sculpture on Table at one point, I believe, was also taken to storage, to the best of my knowledge.

**Q (By Mr. Hicks) How soon after that, that visit I described, did that occur?**

A I don't recall.

**Q Do you recall if it was more than six months or less than six months?**

A I don't recall.

**Q Same question with respect to a year? Do you know if it was more than a year or less than a year?**

A I don't recall.

**Q Was Harold Garde charged any money for the shipment of any of Wally's art to Colorado?**

A Not -- not at this point.

**Q Is shipping something that is included as a cost that Harold Garde or Studio 41 is required to cover for any -- for Harold's art that is sold by ArtPort?**

A It is part of our agreement. Expenses are taken off the top.

**Q Was shipping for any of Wally's art taken off the top, as you've described, of anything -- any moneys going to Harold Garde or Studio 41?**

A Did you say the first sale, second sale, or both? I'm sorry.

**Q Either. Any of Wally's art. Was Harold ever charged any -- when I say "charged," was he ever sent a check, or some amount was deducted for shipping with respect to Wally's art?**

**Did Harold ever -- did Harold Garde or**

**Studio 41 ever receive a lesser amount than they otherwise would have to cover shipping for any of Wally's art? Or --**

A He was --

**Q Or --**

A He was -- yeah. He was charged an estimate on -- based on an estimate that I received in -- on the first sale.

**Q Was that estimate ever updated?**

A Not at this point. Because the -- it has not been resolved at this point. So. . .

**Q At this point, the -- Wally's art was shipped to Colorado, correct?**

A It has been shipped, correct.

**Q So ArtPort has knowledge of a final cost for that shipment, correct?**

A No. I -- unfortunately, Wally Charnoff still owes us money for an accounting mistake that he made. He owes us for crating that I paid for. He owes us for -- for storage.

**Q How do those costs relate to the authorized shipping expenses that ArtPort is allowed to charge Studio 41 or Harold Garde? Are they included within that or not?**

A I -- we don't have an exact number other than

the authority for the shipping. Then I wouldn't be able to do the accounting to take the 30 percent off, is what my agreement with the Studio 41 is at this time.

**Q So under that agreement with Studio 41 at this time, is ArtPort allowed to charge for crating, storage -- well, just those two items?**

A So storage --

MS. GETCHES: Object to form.

A Studio 41 does pay a percentage of our storage costs. At this -- at this point, if we pay for it, it's a little convoluted, but it gets deducted and thrown it into a bucket of recoupable expenses.

Crating is unique to each and every sale, and in the Charnoff sale, and the crate was going to be used as per their request, that would be Brande and Wally, had wanted to have a custom crate built that they could possibly store in a basement or a barn.

And so in that situation, the crate would be purely the cost to the buyer. Because they would be using it, and it would be generally, you know, more substantial.

**Q (By Mr. Hicks) How many crates were used to ship Wally's art to Colorado?**

A To the best of my knowledge, I believe it was

two -- two crates.

**Q Where was it shipped from? Like, was there, like, an art shipper anywhere when this was all put together, or what happened?**

A There were two shipments. One came later, which was Sculpture on Table, that was shipped independently through Terry Dowd. I believe shipped directly to Terry Dowd in Colorado.

And the other -- the larger crate, let's say, that contained the other 82 pieces was shipped from Grosso Art Shippers in New Jersey.

**Q I'm going to share a screen with you, Ms. Loving. And this is -- oh, wait here -- Exhibit 25. We looked at that yesterday.**

A Right.

**Q So you see where it says, Charnoff sale, accounting for ArtPort and Garde?**

A Right.

**Q And you recognize this from yesterday?**

A I certainly do.

**Q And so for shipping art from New York to Colorado, $2,000. Do you see that?**

A I do.

**Q Okay. What does that intended to cover?**

A The first purchase.

**Q Is it the shipping from New York to Colorado?**

A It is.

**Q Does that include all costs for shipping? I just want to clarify what's authorized --**

A No, I want to make it very clear. This is an estimate. So it's not conclusive.

**Q That amount was deducted from the check sent to Harold Garde, correct?**

A It was.

**Q So it's an estimate for which you charged, correct?**

A I'm sorry. It was an estimate for which I charged him?

**Q Correct. Is that right?**

A Deducted, yes. Uh-huh.

**Q Has that amount -- how much did it cost to ship the art? Not -- I understand there's two shipments. One is just one piece from -- I understand that later on, but the main shipment of, you know, 60-plus pieces of art from New York to Colorado after this lawsuit was filed, approximately how much did that cost?**

A Several thousand. I would have to look to be exact.

**Q And is it ArtPort's contention that gets to**

**charge both -- or bill that amount to both Wally and Harold Garde?**

A Sorry. To bill Wally for -- please be more clear.

**Q Okay. So as we -- with that -- well, strike that. I'll ask it differently.**

**So ArtPort has a counterclaim in this lawsuit, correct?**

A Correct.

**Q Okay. Is shipping costs included as part of the damages for that counterclaim?**

A You know, I would have to look at the counterclaim, since, you know -- I would have to look at the counterclaim.

**Q All right. Does ArtPort contend that Wally had a contract to pay for shipping to Colorado for his art?**

A Wally was not asked to pay for shipping.

**Q What is ArtPort's contention as to what Wally is supposed to pay for? Is it shipping and storage or something else? Just generally speaking. I'm trying to clarify that.**

A Wally asked to pay for storage for the two years that I guarded the art while they were renovating their house.

The -- I've invoiced him for the accounting mistake made on a trade-in.

And the crating.

**Q So is ArtPort seeking shipping costs for shipping Wally's art from New York to Colorado in this lawsuit?**

A I would have to look at -- at our counterclaims. I'm just not clear right now on that.

**Q Is it a fair statement that if ArtPort is seeking shipping costs as part of its -- or in this lawsuit from Wally, that it would be in its counterclaim?**

MS. GETCHES: Object to the form. And foundation.

A Ian, could you just repeat the question so I understand exactly what you're asking here?

**Q (By Mr. Hicks) Sure. So you're saying -- I was asking you if ArtPort is seeking shipping costs from -- from Wally in this lawsuit, and you said, I'd have to see the counterclaim. Which would lead me to indicate that it's -- that's not in the counterclaim, ArtPort is not seeking it. Do you understand why I think that?**

A I do. At this time, and to the best of my knowledge, I -- I -- I'm not -- I don't believe that

we're seeking shipping costs.

MR. HICKS: Okay. Let's take a lunch break. Let's take an hour if that's okay with everyone. We can go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 12:05 p.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:15 p.m.

**Q (By Mr. Hicks) I'm going to share an exhibit with you, Ms. Loving.**

A Okay.

**Q Actually, let me get it just pulled up here.**

**Do you see the document in front of you with the name of the file is Exhibit 39, and there is -- it says Tenant History at the top, Westy Self Storage?**

A I do.

**Q Now, this -- what is this document? Do you recognize it?**

A It's a Westy's storage in Norwalk. It's the years of storage unit charges.

**Q Okay. And for how many units does this cover?**

A I believe it's just one. It's Unit 1-A of 06. I'd have to scroll through the whole thing though,

to be certain, but I believe it is.

**Q And what was that unit used for?**

A That was the smaller of two units that was used for storage of the Charnoff art.

**Q And was only Charnoff's art stored in there? When I say "Charnoff," I mean Wally.**

A Yes. It -- at the point where Wally made his selections in storage, and prior to even the first payment, the artworks were moved after he and I had that discussion.

**Q When you say "that discussion," can you just refresh what you're talking about, please?**

A Oh, I'm sorry. I just -- a discussion in the -- while we were in the storage units, we discussed where things could be kept. He knew that there was no way, because I guess the house that was being renovated that we could have the art shipped, but we began discussions early on about that.

**Q Okay. So did Wally agree at some point in time to pay for a storage unit to store art that you had purchased?**

A He did.

**Q And when did that happen?**

A Formally in an email which, I'm sorry, that I don't have up, but at some point when we began

negotiating the terms of the agreement, in the summer of 2017.

**Q Do you recall approximately when each of the payments were made for the two purchases?**

A The -- I believe August, September -- August -- late August, maybe the 24th, September probably the 25th, and at some point in November, mid-November, was a third payment.

**Q Is that for the -- so does this sound correct: That there was a -- the first purchase, that payment, was made in 2016 at some point?**

A Are you talking about the first sale now or the second sale?

**Q First sale.**

A First sale was made in August of 2016.

**Q And the second purchase was completed -- you said the last payment was approximately late 2017, maybe November?**

A Mid-November of '17.

**Q The first payment for the second purchase was -- sorry, did you say August or September of 2017?**

A August -- August 24th. I believe.

**Q And were you present when Ms. Loving, on behalf of ArtPort, when Wally's two purchases, that is -- strike that. I'll rephrase it.**

**Ms. Loving, on behalf of ArtPort, LLC, were you physically present when the artwork comprising Wally's two purchases was put in a box for shipment to Colorado?**

A I was physically present at Grosso Art when a majority of the work or almost all of the art, and remember, one piece was shipped separately was packed and -- for first -- for shipping.

**Q Do you recall the approximate cost for that shipping?**

A I -- sorry. Exactly, I do not. It's several thousand.

**Q So it's somewhere between 2- and 5,000?**

A Yeah, exactly, because the second piece, Sculpture on Table was several thousand.

**Q Was that the one that was sent later in time, after -- I mean, there was two shipments, right? So the majority, all of them, except for one, was sent from Grosso Art Packers, and then there was a later shipment from a museum. Which one was -- I think the Sculpture on Table you just mentioned. Where was that, in that process?**

A That was shipped later on. It was returned from the museum and shipped by Terry Dowd at my expense.

**Q The Grosso Art Packers though, for all the other art that was shipped. Do you remember approximately how much that was?**

A Several thousand. I will have to -- to look for an exact number.

**Q So we looked earlier at the estimate that was provided by ArtPort to Harold Garde for -- and included a transportation cost, included a shipping cost of $2,000. Do you recall that? It has a blue ink --**

A I do.

**Q Okay. So that was for four pieces of art, correct?**

A It was, yes.

**Q So if you look at the exhibit I'm sharing with you, Exhibit 39.**

A Right.

**Q The pages are -- page 1 is actually listed as -- it's page 3 in this document. It's a little bit out of order.**

A Okay.

**Q That's how it was received. But, no big deal.**

A Right.

**Q So would you agree with me that the earliest date of a transaction or rental deposit was June 21st,**

**2017?**

A Is that where the document -- I asked Westy's, who sent me the major receipt. But I'm fairly sure, and I may be wrong, but I didn't calculate in the first two months for storage. You might want to do the math and check me, but I'm fairly sure I didn't.

**Q Right. And my question is this -- I appreciate that. But the first date on here is 6/21/17, correct?**

A Right.

**Q Where would this -- so this was obviously -- that's was after the first purchase of four paintings. Where was the four paintings held from the time that they were paid for until the time they were stored in the storage unit reflected by this exhibit in front of you, Exhibit 39?**

A In a variety of places as we've already discussed, in my office and also in storage.

**Q When you say "your office," you mean 26 --**

A Yes, 26 Covlee.

**Q Anywhere else?**

A Not to the best of my knowledge.

**Q And when you look at this, the cost for these monthly payments, it looks like about $245.67. Would you generally agree with that?**

Page 77

A I -- yes, uh-huh.

**Q And do they have different sized unit at this Westy storage location -- I'm sorry, Westy Self Storage location in Norwalk?**

A All different sizes, correct.

**Q Is -- about how big is this -- the one that's reflected in this receipt, this Exhibit 39?**

A It was long and narrow. I'd say maybe -- maybe 8 feet wide. I could go back and look or call the -- call the Westy's. It's maybe 8 feet wide by maybe 15 feet long, if that.

**Q All right. Why was a unit that size necessary to store art -- to store Wally's art? Did he have that much art or some other reason?**

A Well, I did the best I could under the circumstances. He was obligated to get his own unit and he failed to do that, and every month we spoke, I asked him when he was going to get his own unit, as he told me, but he never followed through. He was always too busy. So I as a courtesy, a professional courtesy, kept the work stored here. It was the smallest unit that they have at Westy's. I do know that.

**Q It's a smallest unit they have there?**

A The smallest unit in -- in the area where I had my larger unit and where I often did work, because

Page 78

like I said, I'd work in other units, but it was the smallest unit that I could get. This is prior to Wally, and as you can see, storage is rather expensive.

**Q Other than the one piece of art that is the one painting, Sculpture on Table, that was shipped from a museum in the past couple months, the main shipment of Wally's art from New York to Colorado was shipped in one box, correct?**

A It was not a box. It is a crate. And it was a custom-built crate. Large. You may have seen it. But it's a large crate. Kind of packed like a jigsaw puzzle. They do that to keep it really compact.

**Q And who was responsible for placing the art into that crate?**

A The professionals at Grosso Shippers.

**Q And did you place anything in that crate yourself, personally?**

A I physically didn't place anything inside the crate.

**Q Did you physically put any art together that was then put into that crate by Grosso Art Packers?**

A Works on paper were protected by archival vellum, which is the way they were stored prior to the shipping at Grosso. And so the works were delivered in the way -- the format that they were -- you know, our

Page 79

kind of procedure with works on paper.

**Q And --**

A To best of my knowledge, they were shipped. They added material around those and shipped the way they normally do, according to their procedures, inside the crate.

**Q Did anybody -- did you see any bubble wrap on any of the art?**

A There was bubble wrap that was used -- I definitely did see bubble wrap. It's often used, especially for cushioning in between works or between the crates -- or between the box.

**Q Were you provided different options for the costs of shipping from Grosso Art Packers for Wally's art?**

A Provided -- no, I -- to the best of my knowledge, I wasn't provided any -- we discussed the shipping. They actually came to the gallery, and in May, when Wally and I first had discussion about him, you know, and Brande being ready for the shipping, and they went through everything.

They're -- they just ship it the way that they shipped it, which they're, you know, a very well-known, long-established family business of shippers. They ship blue chip art and -- and any art.

Page 80

I trusted their professional judgment.

**Q So there wasn't any conversations about doing it as cheaply as possible. . .**

THE REPORTER: Ian, I'm sorry. Can you repeat that? You got a little garbled.

**Q (By Mr. Hicks) I said, so there wasn't any discussions between you and Grosso Art Packers about doing it as cheaply as possible or anything of that nature?**

A It's only -- the conversation we had is that I would have for any client, it would be the most efficient and effective way to ship the art.

**Q So is it your understanding that the cheapest way is also the safest way to protect the art?**

A The cheapest way? I'm sorry. I'm just confused. Could you explain? Or clarify, what do you mean by that?

**Q Is the lowest expense way, the cheapest, lowest-cost way to ship it, is that, in your experience as an expert, the safest way to protect the art?**

MS. GETCHES: Ian, object to the form. Are you -- is this an art court deposition? Are you asking -- you just referred to her as an expert? What's going on?

MR. HICKS: I'll ask the question.

**Q (By Mr. Hicks) Ms. Loving, would you agree that the cheaper you try to ship something, the less safe it's going to be?**

MR. WAGNER: Same objection. Form. Foundation.

MS. GETCHES: Join.

A I really can't answer that. I'm not a shipper, and I'm sorry, but I don't really have an answer.

**Q (By Mr. Hicks) So --**

A Sorry, but. . .

**Q So you believe there's zero relationship between cost and safety for protecting art when it's shipped. Is that your testimony?**

MR. WAGNER: Objection. Form. Foundation.

MS. GETCHES: Join.

A My answer to that would be, I always find -- and Grosso is someone that I trust. They have an unprecedented reputation in the serious art world. They ship blue chip art and I always go to the professionals.

**Q (By Mr. Hicks) Did you request that they ship the art in a cheap fashion?**

A Absolutely not.

**Q And so whatever they would have said to you**

**about how much it's going to cost, you would have been okay with that?**

MR. WAGNER: Objection. Form. Foundation.

MS. GETCHES: Join.

A So I'll have to take a moment to clarify, if I may.

**Q (By Mr. Hicks) Sure.**

A If you have a Baustoff that's worth $23 million, you're going to have to buy your insurance, provide, let's say, a -- probably a single, let's say, I don't know because I'm not a shipper, but there is -- I would imagine that if I had a museum or a gallery that was selling a $23 million painting, I would probably hand-deliver it to my client, because it's $23 million.

So I'm -- that's the only reference that I can tell you that I know where you're going with this. I'm sorry. I'm just -- I'm not a shipping expert. I only go to the professionals. I've considered Terry Dowd one of the top professionals in the country, and their prices are very much aligned with Grosso. And they work together and have for years. They know each other well.

**Q Wait. You said Terry Dowd is one of the best -- I thought you were talking about Grosso Art**

**Packers? Did I hear you correctly?**

A I said to you that Terry Dowd shipped the second piece. The price for shipping was in line with the price of shipping with Grosso.

**Q So --**

A So I'm making a comparison to say that they're in alignment. One might have a different, you know -- okay. Here's an example.

If I'm shipping a glass sculpture, there is no comparison. We're not comparing apples to apples, of how you would pack and ship. But because I'm not an expert shipper, I think you're asking the wrong person.

**Q So for the Grosso shipment, there was no discussions about how to do it more cheaply.**

MS. GETCHES: Object to the form. Asked and answered.

A The most important thing that was discussed with Grosso is the safe and efficient delivery of the work. Because that is my job, to make sure the work is shipped safely and arrives safely, and that's why I always trust professionals like Grosso.

**Q (By Mr. Hicks) Have you used that company before?**

A I have. And I've used -- I'd have to look up to see what they shipped for me, but I believe they

shipped either a piece up to Maine or to. . . I was referred to them for -- from different art dealers. I can look up and see. I just don't know at this time.

**Q Okay. So your understanding at the time of making the Grosso shipment from Grosso Art Packers of Wally's art that they were a safe and competent art shipper, correct?**

A They are a safe and competent art shipper, and again, they have an incredible reputation for shipping.

**Q And your knowledge of their capabilities came from your one shipment with them and what you heard about them? Is that right?**

MR. WAGNER: Object to the form.

MS. GETCHES: Join.

A I rely on art dealers, curators, directors. We all rely on each other for references and referrals like any other professional business, and they were referred to me at some point, and I began using them.

**Q (By Mr. Hicks) And all I'm trying to clarify here is, when you're testifying about how good they are at shipping, what that is based upon. Do you understand what I'm getting at?**

A Absolutely.

**Q Okay. And you had your experience, ArtPort,**

**LLC, using that company is restricted to one prior shipment. Correct?**

A No. References -- references in the art world.

**Q Okay. How many times has ArtPort used Grosso Art Packers?**

A I'll have to check. I'm not sure at this time.

**Q Okay. How many do you believe it to be, approximately?**

A Excuse me?

**Q Do you have any idea whether it's more than five or less than five?**

A Well, I've had many conversations with them. But they were referred to me by people that I respect that work at museums and institutions and galleries. Those are the people I trust, because they only use the best, because, again, it's really important that the work is packed safely and arrives safely.

Do you know anything about Grosso? I can read to you. They've been around for, I think, three generations. That says a lot in this business.

**Q Ms. Loving, I appreciate -- I know it's a strange way to have a discussion with someone, but I have to ask the questions. Otherwise, we're going to**

**be here all day.**

A Right, right.

**Q So who did you talk to, when you received a recommendation from, regarding Grosso Art Packers?**

A At this time, I don't recall exactly.

**Q Do you know approximately how many people you talked to?**

A I don't.

**Q Did you call around and get price quotes from other shippers as part of this process of deciding who's going to ship the art to Wally?**

A No. I didn't. I -- I trust them and I wanted to use them.

**Q And do you recall how much the shipment -- I think I already asked you this -- it's a couple thousand dollars for the shipment from Grosso to Wally?**

A And I should have looked. I apologize, but I don't know exactly what the total cost was. Several thousand dollars.

**Q All right. I want -- I'm guess I'm done with this exhibit here.**

A Yes.

**Q Just double checking the dates.**

**Okay. We're back at Exhibit 25. Do you see where it says, Shipping art New York, Colorado, $2,000?**

A Correct.

**Q Okay. So that was for four pieces of art? That was your estimate?**

A It was.

**Q Okay. Do you have any explanation for why shipping four pieces of art would be more than or close to the cost of shipping, I don't know, 60-plus pieces of art that were sent to Wally?**

A I do.

**Q Okay. What is there -- the explanation for that?**

A The largest piece in the collection, because shipping costs go by length and width and weight. But, again, I'm not a shipper. But the length of the piece, I believe, was over 96 inches or somewhere around 90 inches for Sculpture on Table. That was included in this estimate, which no matter what, the cost automatically is much higher, because of just the sheer size. The length. And the length it would take up in the truck, no matter what. Even if you compress it, you can't shrink this thing down.

So let's just be clear about the works that were shipped from the second sale as far as size. We have 82 paintings that were shipped and 12 were works on border canvas, and the balance were works on paper,

like thin -- like, paper.

And so there was packing material, but I -- I think what you're not looking at and why this might look like one is more than the other, even though we're only really talking about maybe a couple hundred dollars, was the size of the piece of art.

And if you may notice, I'm not sure -- I don't think you've see any invoice from Terry Dowd, but to ship that one piece from New York was almost the same estimate right here.

**Q I want to go back to talking about how inventory is tracked at ArtPort. There should be a record, correct, of any Garde art that was sold by ArtPort somewhere, right?**

MR. WAGNER: Object to the form.

A Okay. Could you repeat the question? There should be an inventory of Garde art?

**Q (By Mr. Hicks) Yeah, I'll rephrase it.**

**ArtPort has records showing all of the Harold Garde art that it sold, correct?**

A ArtPort has an inventory of all the work sold, correct.

**Q And do you recall discussions with Wally regarding the journal paintings?**

A Yes.

**Q I don't know if they're paintings, but the items in the journal?**

A Yes. We can call them paintings. They were -- they were individual paintings.

**Q And as I understand it, he viewed that in a journal and in person and it was bound together, and he believed there was 16 paintings in there, but when it was listed on an inventory to be sent to him by ArtPort, there was less than 16. Does that sound generally accurate?**

MS. GETCHES: Object to the form and foundation. Are you asking her what he believed?

MR. HICKS: No, what he contended as far as ArtPort intended.

MS. GETCHES: Again, if you're asking her what he's contending, then I object to the foundation and form.

MR. WAGNER: Join.

**Q (By Mr. Hicks) Did he communicate something like that to you, Ms. Loving, on behalf of ArtPort?**

A In May of 2019, after I asked him to please pay for the crating and the storage, he complained about a lot of. . . there was a list of a lot of, you know -- like, I don't know, I would call them -- he was claiming a lot of different things.

But that was one of the, you know, things that he claimed. He claimed I stole this, I did this. That was definitely one of them, yes.

**Q How many paintings were in that journal?**

A I think there was only about four. There was -- it was not a -- they're paintings from a journal from 1970 and almost 50 years old, that were removed from a spiral notebook. There was no spiral. There was no metal. I believe that's usually what they put or, you know, in a spiral notebook. So they had been removed at some point during Harold's life by Harold. And masking tape that had -- was -- looked ancient was applied for the spiral edges.

So if that's what you're referring to, that -- those paintings were from a journal or from journals, because Harold has dozens of journals and paintings from journals. But if that's what you're referring to, I can't tell you. Because that paint -- that journal is long gone.

**Q Where did it go?**

A I'm not Harold Garde. He's the artist. He has the right to take out anything he wants. And often, he did. There were -- I have evidence of many paintings that Harold, way before I even knew him, took out and exhibited, and there was one that I exhibited

in 2014 in the Hamptons for an exhibition.

**Q When Wally was shown what we're calling the journal paintings, how many was he shown?**

A How many?

**Q Yes.**

A Dozens and dozens.

**Q Was he shown the journal paintings when they still had that masking tape on it?**

A Some did and some didn't, as evidenced in the photographs that you have.

**Q Did you have discussions with him where he complained that the bound journal had been unbound and some of the paintings had been removed?**

A We actually didn't have discussions. I'm sorry, but there was -- a lot of Wally's nature, is highly suspicious, a paranoia, that people are trying to do things to him. And quite honestly, I really didn't take it seriously, because it didn't happen, and I, you know, did my best to explain to him that what he thinks he may have seen or what he was, you know, he was saying just was not correct.

And that all he had to do was look at the pictures and see the masking tape, and some of the masking tape was gone and there was just a residue of the adhesive from years of that masking tape. I mean,

almost 50 years of masking tape being on these, you know, journal pages. And some were actually a little stuck together.

And it may seem odd to you, but I will only say that we were in the process of -- of archiving and going through the work with a curator prior to Wally coming into the studio that long weekend that he went through every -- all the art and made his selections. That was -- the paintings that were there were taken out by the curator, and we -- Wally was going through them. I can, you know -- I can only say that I don't know. I can't speak for him, why he, for some reason, thought that this was a complete journal.

I actually don't know of any spiral notebooks that only have 11 or 12 or 20 pages. I just don't know about that. And I don't know if they did that in the '70s or not. 10-page journal? Spiral notebook? But maybe. But there was no spiral.

**Q And setting apart whether it was bound together as he -- as is being alleged, because it was bound together with tape or bound together with a spiral, I'm just focusing on what he saw that was bound together. Do you understand what I'm getting at?**

A There's a very big difference.

**Q Okay. So you said a curator --**

Page 93

A One spiral. . . and again, if you look at each and every individual photograph that was taken on the night that Wally looked through the work, those time-stamped photographs that show the work that evening in July, you will see masking tape and some without masking tape.

And you will see that each one, although they may have been on a stack on top of each other, because they were in a pile, they were not bound by any leather binding or any spiral or anything else.

**Q Well, what --**

A Wally referred to these paintings as loose in several emails because he saw them loose.

**Q Why is it referred to as a journal if it's just a stack of paintings?**

A So when an artist, many artists, travel or they're sitting at a desk, instead of standing at a wall, or their easel, they sketch and they paint. They formulate ideas. And Harold's journals, some are poetry. Some are his life story. Some are thoughts. Some are sketches. Some are paintings. I can't answer for Harold.

But that's why an artist might have journals, because he's made smaller renderings or just paintings as he's sitting or traveling. I -- you know, that's

Page 94

why they're journals. Was that the question?

**Q Yeah, so it's called a journal, or it can referred to as a journal, because it came out in the journal --**

A Exactly. And it's often -- often -- or almost always referred to, It came from a journal. It would be called a journal painting.

**Q So as I understand your testimony, Mr. Charnoff is not -- I'm sorry, Wally was not sold -- strike that. I'll rephrase.**

**ArtPort never showed Wally a collection of journal paintings that were held together by tape as a single journal. Is that what you're saying?**

A Ian, forgive me, but that was a really long question. I'm not exactly sure you're -- what you're asking me. Could you rephrase?

**Q Was -- did ArtPort ever show Wally a unitary collection of paintings that it represented were a journal, meaning, they were together, bound together?**

A Again, Wally was shown journal paintings that were individual paintings from a historical journal at some point in Harold's career that happened to be on -- in a -- and I was just going to say, in a stack where we had been dividing works, okay, by genre. Those were -- and there were more than the 11 that he

Page 95

purchased. Like I said, there were dozens and dozens and dozens in that stack.

**Q So what we've been referring to as the paintings, the journal paintings, which were -- I'll rephrase that.**

**So that stack of paintings, none of them were bound together by spiral notebook, coil, by tape, or by staple, or by any other means? Is that your testimony?**

A I'm saying to you that each individual painting, to the best of my knowledge -- we can go back and look at the photographs, which pretty much, you know, describe or to demonstrate what was on there -- there were some with tape and some without tape. Some with the tape with the spiral. For whatever reason, I don't know why Harold would do that, okay. But he taped down the spiral edge of -- randomly, as far as I'm concerned, because I don't know his methodology, but some paintings have them and some paintings didn't.

I would guess that as they were sitting together in a flat file that the adhesion may have stuck some of them together, but I don't -- yeah.

MS. GETCHES: Nancy. Nancy. He's not asking you to guess. He's just asking you whether --

THE WITNESS: Okay. I'm not to guess.

**Q (By Mr. Hicks) Yes, don't guess. Thank you.**

Page 96

**All I'm trying to get at, quite simply, if there's a pile of journal paintings, are they all separated loosely? Like if you take printer -- sorry, paper out of your printer it's not stapled together, otherwise, it wouldn't print, right? I mean, was he shown them like that, or were there some stuck together, like, three, you know, different -- you know, stacks of paper that were bound together in some way and some were loose-leaf. I mean, they're either loose-leaf or stuck together or a combination. Those are the only three options, I think. So what did you see, I guess, is what I'm trying to figure out.**

A There was a combination. There was some loose, some stuff -- there was a combination. Some larger, some smaller.

**Q Okay. So were any of those paintings later for sale online? After he saw them and selected --**

A They may have been. They may have been. Out of any of the journal paintings? You're talking about all the journal paintings that I have in the collection of Harold Garde?

**Q Well, let's start with any.**

A I'm sorry?

**Q Yes, were any of those paintings, that he was shown that day, any journal paintings he was shown that**

Page 97

**day, after he made his selections and paid for them, were they later -- any of those paintings later sold online?**

A I'm not sure about dates, whether it was before or after or during. We were actively working with Artsy at the time. So I would imagine that we had a variety of work online. There might be some online. There might not. I -- I -- I don't know. Like I said, we had an intern working on that project. But I -- there might be.

**Q What's that intern's name?**

A I've had many. Akila Johnson.

**Q Well, anybody who worked with stuff that -- that my client bought or saw is probably -- needs to be disclosed, so I'll just make a note of that.**

A No, again -- we're not physically working with art. We were talking about photographs. And this could have been uploaded years before. Again, the database was in place when I started working with Harold, the beginning of it.

So there's a difference between using a photograph and working with the art. So just -- just to be clear. But like I said, a lot of those things were most likely, you know, added, as far as shows or collections or exhibitions.

Page 98

If you could show me what you're referring to, I could probably answer the question more specifically, because I'm afraid the vagueness of your question is misleading to me.

**Q Did ArtPort advertise any of the journal paintings that were shown to Wally on Artsy at any time?**

A I don't know. Again, we're talking dozens and dozens and dozens of painting. I really don't know. It would be hard for me to give you a factual answer unless you're very specific.

**Q Well, I wasn't there, and you were, so I don't know what you showed him. So that's why --**

A Well, you're referring to something. So maybe you should show me.

**Q Ms. Loving, do you know what journal -- is there -- let me ask it like this.**

**Is there a record somewhere that ArtPort has as to what journals paintings were shown to Mr. Charnoff so that he could make his selections?**

A I have a database of all the work and the journal paintings. Indeed.

**Q So there would be a way in looking at ArtPort's records for you to determine what was shown to Mr. Charnoff on that day so he could make his selections, correct?**

Page 99

A That was a long time ago, and over the course of a very, you know, a lot of art we went through, literally, thousands of paintings. I could make guesses, but I don't think I'm here to do that.

**Q So is your answer no, that there's not a way to determine from ArtPort's business records what journal paintings were shown to Mr. Charnoff so he could make his selections?**

A No. No. There would be no way to definitively answer that question because, let's remember, there are journal paintings that reside in Maine in Harold's studio. His journal paintings that are in Florida, in his studio. So I couldn't definitively tell you exactly what he saw. But I -- again, I don't think you're wanting me to guess.

**Q My understanding is that Mr. Charnoff made his selections as to what journal paintings he was going to buy by looking at them in person at the storage unit, correct?**

A No, he -- actually, he did look at them in person. He looked at them in a large office that -- where the stacks were on the table. We looked at them in my home office. Those. Those were.

**Q Okay. So he looked at the journal paintings to buy at your home office. Then it wouldn't matter what's in Maine or what's in Florida, right? That's not the --**

Page 100

A No, actually it would matter. Sorry, didn't mean to interrupt. We move art around for shows and for -- and presentation. So art gets moved all the time. Shipping is a very large expense in this business. I -- I've shipped literally hundreds of paintings. The museum's chose dozens of paintings to work on paper. They get shipped back. They don't always come back here. They might come back to Maine.

I just had an online sale and works on paper, and I shipped everything to Florida, probably 75 works. And sorry, but I -- I can't definitively answer that, but if you could show me something, that would be very helpful and I might be able to answer that for you.

**Q Well, I'm just trying to confirm whether or not ArtPort knows what Mr. Charnoff looked at that day in your home office.**

A Well, I'm -- I don't understand what -- he looked at over a thousand paintings. Do you -- I'm sorry. Do you want to know what he bought or what he looked at? What's the relevance? I don't understand. Sorry. He looked at thousands of paintings.

**Q And so ArtPort is unable to determine what**

Page 101

**was in that home office that day for Walter to look at.**

A I could, again, I think you're not asking me to guess. I could guess, because I have thousands of paintings that were out, not because of Wally coming to the studio and falling in love with this work. It was out for an exhibition that I had a curator from LACMA in California visiting for months and months to -- who was going through the work. So that's why the work was out. And for me to definitively tell you every thousands of pieces of work on paper, I wouldn't even try to do that.

**Q Well, it --**

A I can't. . .

**Q Okay. So I'm not asking to you guess, and --**

A Right.

**Q -- these are why I'm trying to make it a yes-or-no question.**

A Okay.

**Q Yes or no, ArtPort can determine from its business records what art Wally looked at in your home office that day to make his selections. Yes or no?**

A I'm sorry. I need you to ask me that question again, please. I really want to listen to what you're asking me.

**Q Yes or no. ArtPort can determine from its**

Page 102

**business records what art was shown to Wally that day in your home office.**

A Because Wally looked at thousands of paintings over the course of three days in my home office, it would be a guess for me to tell you what he looked at and what he didn't, since I'm not him.

**Q So the answer is no. Correct?**

A The answer is no.

**Q Was there a tape that was removed from a set of the journal paintings that he looked at?**

A Ian, you could be more specific? What are you talking about? What time frame? Maybe Harold removed tape in 1980 or 1975. I think you need to be specific. If you're asking me if I removed tape?

**Q Yes.**

A When?

**Q Well, hold on one second here. I'll show you.**

A Sure.

**Q I'm going to share a screen with you.**

A Okay.

**Q Do you see this document in front of you? It's Exhibit 40.**

A I do.

**Q Okay. So it looks like a it's chain of**

Page 103

**emails?**

(Off the record.)

MR. HICKS: I don't know what it is. Some kind of technical thing. Because nothing's changed here. Can you hear me now?

THE REPORTER: Yes, thank you.

**Q (By Mr. Hicks) So Loving 149 through Loving 152. It looks like it's a chain of emails between you and Wally, right?**

A Looks like, right.

**Q Okay. So you can see on Loving 151 and Loving 150, do you see the hand right here?**

A I do. Yes.

**Q What where it says, Hello Wally, about halfway down the page. Above that, it says, on June 14th, 2019, at 10:03 a.m., NancyLovingArtSuiteNewYork@gmail.com wrote -- so it looks like from that line below -- that's an email, right, from you to him?**

A Looks like, right.

**Q Okay. And then below that, he wrote you an email on June 14th, 2019, at 10:10 a.m.**

A Right.

**Q Do you see that?**

A I do, yeah.

Page 104

**Q Okay. Then it looks like -- all right. I actually think this is an email from you but for some reason, it's not coming from you exactly the same. Do you recall -- see paragraph 3, where it says, There were -- this is by the hand on page 21151.**

**There were more journal paintings, and many of them were bound. The journal entries had crude 40-year-old tape binding, only some of them. That was removed when we went through them.**

**Do you know what that's about?**

A Can you scroll back up?

**Q Yeah.**

A Okay. Now scroll down, please.

I need to see the top, please. I'm sorry. Could you go back up -- okay. Country. . . start where it says, I've been out of the country.

So this is Wally's email to me, right? I'm sorry. I need to ask you because this is -- I don't see any email signature. I don't see a date. So you'll have to tell me what this is. I -- I don't know who wrote this.

**Q I've actually got a better copy of this about, because at the bottom it says -- it looks like it's from the top, but at the bottom it says, Nancy, so -- I'll find at the next break, I'll find a better**

Page 105

**copy that we've got.**

**All right. Do you recall any arguments or discussions about the missing journal paintings? Allegedly missing journal paintings?**

A Once I asked Wally for money to -- that he had -- was obligated to pay, that he had agreed to pay, there was a lot of delusional, vicious remarks by Wally, and it was actually really hard to keep track of it. He actually believed that he didn't buy certain paintings and that other paintings were wrong or -- it wasn't enough, and I made every attempt to help him out, to -- I'd be happy to look for that. Show me what you're thinking. I did the best that I could to try to figure out what was causing this delusional response with this, and he could never provide me an explanation, a photograph, or anything.

And you can see, witness through the emails and the documentation and the texts, that I acted in such good faith to try to amend any issue or problem he was having, but it was -- he was in a paranoid, you know, state of mind, I believe. That's all I can describe it.

I'm sorry. I do recall that, but there was a lot of accusations, all of them unfounded and baseless.

**Q Share a screen again?**

Page 106

A Sure.

**Q This is the Answer and Counterclaim filed on behalf of ArtPort, LLC. Do you agree with that?**

A Yes.

**Q So we'll go down the Counterclaim.**

MR. WAGNER: Ian, this is Tom. I'm not seeing what you're sharing. Could you. . . on the share?

MS. GETCHES: I'm not seeing it.

MR. HICKS: Give me a second.

MR. WAGNER: There we go.

MR. HICKS: All right. Here we go. Sorry.

**Q (By Mr. Hicks) Okay. So the -- this is the -- let me scroll up. Do you see where it says Counterclaims? Ms. Loving?**

A I only see Exhibit 35 in a list of all the exhibits, 9 through 40.

**Q Okay. Hold on. Let me just double-check.**

A Okay.

**Q All right. We're seeing different things on the same -- on the screen. Hold on.**

A Okay.

**Q Okay, now do you see where it says, Counterclaims in the middle of the page?**

A I do.

Page 107

**Q Okay. All right. So this is a Counterclaim filed on behalf of ArtPort, LLC, by your attorney. Okay. So it looks like in paragraph 15, it says that, Mr. Charnoff agreed to pay for storage, insurance, and crating of the art he purchased. Right?**

A Correct.

**Q And then in paragraph 17, it says, Upon information and belief, Mr. Charnoff no longer desires to purchase the art. Right? Is that what it says?**

A That's what it says.

**Q Okay. And it says, To date, Mr. Charnoff has not paid for defendants' storage, insurance, or crating of the art. Correct?**

A I'm sorry. Okay. Correct.

**Q And then in the actual First claim for relief breach of contract, under paragraph 3, it says, Mr. Charnoff agreed to pay for storage, insurance, and crating.**

A Correct.

**Q Okay. So would you agree that the counterclaim is based upon the costs for storage, insurance, and crating?**

A No.

**Q Okay. What is it -- what is it based upon?**

A A breach of contract and the damages.

Page 108

Storage, insurance, and crating. And although I'm not an attorney, based on what we're looking at here, probably more specific was the damages from --

**Q So --**

A -- from a frivolous and baseless lawsuit.

**Q You think the lawsuit is frivolous and baseless?**

A I do.

**Q Is that -- it's a breach of contract claim, Ms. Loving. If maybe there was something else that you wanted to add. I'm just talking about --**

A Okay. So I'm sorry. What was your question?

**Q What is -- what contractual obligations that are identified in this document in front of you, the counterclaim filed on behalf of ArtPort, LLC, did Wally breach?**

A Failed to pay for storage. Failed to pay for insurance as he agreed. I did cover the insurance. And he failed to pay for the crating. He failed to accept delivery and possession of the artwork. So any -- are you -- we're just talking about my counterclaims here. So that's all -- that's all that -- like I said, I'm not an attorney, and it's to the best of my knowledge.

**Q Okay. And I'm just trying to confirm.**

**My plain language reading of that is --**

A Right.

**Q -- it's based upon accepting -- refusing to accept delivery or possession of the artwork as alleged on paragraph 4, and under paragraph 5, he has not paid for storage, insurance, or crating from -- of the art from the time period he purchased art and during his remodel. Is that your understanding of the counterclaim?**

A Part of the counterclaim. The contractual part, what he had obliged and agreed to -- to do.

**Q Okay. Is there anything that's not listed in this document in front of you, this counterclaim, that ArtPort believes is part of its counterclaim?**

A I had mentioned before, and the accounting for the -- the misaccounting, but it's, you know, not a counterclaim. And so that would be the only thing that I've discussed previously, was the -- the accounting on the trade-in of that artwork.

**Q Okay. And do you see in this counterclaim where that misaccounting, as you've alleged, is included or listed?**

A I do not see that.

**Q And was that misaccounting offered by you as a reason why the art could not be shipped to him until he paid for it?**

A No, I shipped the art. The art was not withheld. So I did ship the art. So -- no. But I -- as we spoke earlier, I did need him to purchase the crating, as he agreed, so we could put the art in a crate to ship it safely.

**Q So the art was not withheld to obtain payment from the misaccounting in the approximate amount of $5,000?**

A Not on its own merit.

**Q Can you clarify what you mean by that, please?**

A The art -- okay. Rephrase your question for me, please, Ian.

**Q Was the art withheld for any reason? Meaning, and I say "withheld." Was the art -- I'll rephrase. Let me strike that. This is the question.**

**Did ArtPort communicate to Wally reasons why it would not ship the art to him?**

MS. GETCHES: Object to the form.

A So the art was not withheld from shipping. We were negotiating, definitely, different -- different -- we had different opinions to what was owed. And it seemed to me that on April 17th, we'd never had any conversation other than friendly and

fine. On May 2nd was our first discussion, and by, I think, May 8th, he was threatening lawsuit and to tell Harold that I was a crook.

And so within about a week, which it takes weeks to set up shipping, as you know now from what you've seen at Terry Dowd. I called Grosso shippers as soon as Wally and I began negotiating, to set up a time for them to come and begin the process.

So the art was never withheld. It wasn't going to be withheld for shipping, in hopes that Wally and I could come to some form of agreement.

**Q (By Mr. Hicks) So ArtPort never said, Wally, we could ship your art, but we're not going to do it unless you pay this money. Nothing like that ever happened?**

A You know, I need to take a break right now. I'm sorry. It's 4:30 here, and I just need a little fresh water. Can I try to answer your question before we break, and then just take 10 minutes? So what was your question again?

**Q Did ArtPort ever refuse to ship the art unless Wally paid a certain amounts?**

MS. GETCHES: Object to the form.

**Q (By Mr. Hicks) Let me -- let me ask it a different way.**

**Did ArtPort ever tell Wally it would not ship the art unless he paid for the approximately $5,000 of the misaccounting?**

A I don't know. And I don't recall.

MR. HICKS: Okay. Let's take a break. How much -- do you want five, ten minutes?

THE WITNESS: If we could take ten, that would be great. I need to get some eyedrops. Staring at the screen. Thank you.

MR. HICKS: Thanks.

THE VIDEOGRAPHER: We're going off the record. The time is 2:24 p.m.

(Recess.)

(Off the video record.)

THE REPORTER: Ian, did you want this transcribed, and if so, is electronic okay?

MR. HICKS: Yes. Electronic and condensed.

THE REPORTER: And Liza and or Tom, did you want a copy of the transcript?

MS. GETCHES: Yes, please.

MR. WAGNER: Not at the moment, thanks.

THE REPORTER: Understood. And Liza, electronic okay?

MS. GETCHES: Yes, that's fine, thank you.

THE REPORTER: Thank you.

(On the video record.)

THE VIDEOGRAPHER: We're back on the record. The time is 2:36 p.m.

**Q (By Mr. Hicks) Ms. Loving, are you ready to proceed?**

A Oh, yes. I'm sorry. I'm here.

MR. HICKS: Okay. Actually, let's go off the record. I have a technical issue. It's cutting in and out. I need to reset my Internet. So if we can just take five minutes off the record, please.

THE VIDEOGRAPHER: We're going off the record. The time is 2:37 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 2:46 p.m.

**Q (By Mr. Hicks) Okay. Actually, wrong one. Hold on.**

**Okay. This is Exhibit 5. The title, at least the file name, it says, ArtSuite New York, and it's an invoice, second request. Do you see the date, June -- sorry, 21 June, 2019. Do you see that, Ms. Loving, in front of you?**

A I do.

**Q And who is this to?**

A Walter Charnoff.

**Q Okay. And this has an invoice number of 19-46606. Is that right?**

A That's what it says, yes.

**Q Okay. What system generates this invoice?**

A It's on -- it's a program that I have on Adobe.

**Q Okay. Well, tell me how that works. Does it pull information from other sources, or is it like an accounting system like QuickBooks, or something totally different than that?**

A Yes, something totally different. It's. . .

**Q What systems does ArtPort have to keep track of its records? So financial and business records and inventory and communications.**

A We use a program called ArtBase for all of the archiving. I use logs, monthly recording, and -- every month, and we use logs which are on Adobe. And on that format. And we use Excel for -- and I have an accountant who used to use QuickBooks. I have an accountant now that does all of our monthly accounting.

We're still a small business, but -- I do as much as I can.

**Q Does ArtPort keep track of the art that is in its inventory?**

A I think we're hearing someone else, right?

Are we, Ian -- did you hear that?

**Q Yeah, I do. It looks like Tom is muted, so. . .**

A Okay. So I'm sorry. I couldn't hear you a bit. What was that?

**Q What system does ArtPort use to keep track of its inventory? Like, paintings that it received, sold, things of that nature?**

A Oh. Again, we have monthly reporting that -- all of that is tracked. We have different agreements -- not agreements, I'm sorry. Reports. So, for instance, we have a gift report, and that's where they're logged in, and they're logged out by, you know, loans, sales, moneys, and -- I think there's probably maybe five or six that pretty much account for everything. It's done through -- again, through Acrobat and Adobe. And Excel.

**Q Has that -- or have those systems been the same systems used for those same purposes throughout ArtPort's existence?**

A No.

**Q All right. So has it -- it sounds like it's changed over time, correct?**

A It's evolved as the business has changed.

**Q Is ArtPort required to provide reports to**

**Studio 41 regarding the sales of any Harold Garde art?**

A Yes.

**Q And how frequently is -- is ArtPort required to do that?**

A Monthly.

**Q Okay. And has ArtPort performed that function in compliance with its obligations to Studio 41?**

A To the best of my abilities. Except for the month of March, April, during COVID-19, when we were directly affected and the business was shuttered by law.

**Q Did Harold Garde -- strike that.**

**Were -- was any money provided to either Studio 41 or Harold Garde from either of Wally's two purchases?**

A On the first purchase, which we've seen several times during this deposition yesterday and today, the invoice, and Harold was paid on the first sale. And not on the second sale.

**Q And how -- why is it that Harold -- or sorry.**

**Why was it that no money was received by Studio 41 for Harold Garde on the second sale?**

A So as we discussed previously, we have had two agreements, portfolio management agreements. The

first one, which was effective January 1st, 2014, was a much more liberal policy and it didn't have a lot of focus on sales. It had more focus on probably the promotion of Garde.

The second agreement, which was effective -- effectuated on February of 2019, has much more defined policies or procedures around recoupable and reversible expenses. And so our policy became that all expenses, once the art was completely shipped and had been received and we could tabulate, again, shipping, marketing, any of those fees that we would attribute to a sale, that would be deducted from the top. And then Harold would receive his portion.

**Q Okay. So how does that explain why --**

A Well -- sorry.

**Q -- why neither Harold -- why neither Harold nor Studio 41 received any money from Wally's second purchase?**

A Because we hadn't shipped the work yet, and we didn't have any shipping costs or transportation.

**Q Okay. So to date, to clarify, neither Harold Garde nor Studio 41 have received any money from plaintiffs -- I'm sorry, from Wally's second purchase; is that correct?**

A To date.

**Q And the only hang-up or hold-up with that is the art hasn't -- well, strike that.**

**The art has been shipped for the second purchase, correct?**

A Correct.

**Q So why hasn't the art -- I'm sorry. Why hasn't any of the money from the second purchase been provided to Studio 41 or Harold Garde?**

A Well, we entered litigation before the shipping, and so once we define how this is going to play out, then we will rectify anything that's owed to Mr. Garde.

**Q So is that money being held somewhere? Is it -- what I mean, has it been spent yet or is being held pending the outcome of this litigation?**

A It's being held.

**Q All of it?**

A I really -- I can't answer that right now. It would be available when we're prepared to pay Harold his commission.

**Q And what is his commission percentage?**

A 30 percent.

**Q 30 percent after costs?**

A So it's the structure, actually. It's 30 percent after normally attributable expenses, framing,

shipping, transportation, marketing, until I -- recoupment event. Or a -- recoupment of expenses that we've already spent.

So to date, Harold owes me some $358,000.

**Q What is that $358,000 for? Is it for other sales of art that you have recoupable expenses or otherwise? Just explain --**

A Yeah, I won't get too detailed. Over the course of seven years that I've been working with Studio 41 and Harold Garde, we have covered expenses that due to the lack of funds by the artist that would be normally attributed to him.

**Q What are --**

A And be covered as costs.

**Q What are the primary --**

A Yeah, I'm in --

MS. GETCHES: Hold on. Nancy?

THE WITNESS: Yes.

MS. GETCHES: Nancy, hold on.

This is beyond the scope of the 30(b)(6) notice. If you can point to me to a number on your 30(b)(6) notice that you think that it fits into, I will let her answer the question.

**Q (By Mr. Hicks) So paragraph 15 says, AP, agency agreement, or any other written agreement with**

**Studio 41, LLC or Harold Garde including the content, negotiation, performance, or breach under this agreement.**

MS. GETCHES: Okay.

THE WITNESS: So, Ian, can you rephrase the question, please?

**Q (By Mr. Hicks) Yeah, just -- and again, I don't want to get too far into the weeds. I'm just trying to figure out what are the largest categories of recoupable expenses that constitute that $358,000 that has been incurred by ArtPort.**

A Okay. Real quick. Things like, but not limited to, thousands of dollars spent in professional photography, thousands of dollars spent in building websites and, you know, thousands of dollars spent in framing, which as we all know is very expensive. Museum shows which, by my contract, we're not obligated to really have a direct expenses.

And we, you know, paid for things just as small as having his home cleaned in Belfast, Maine -- he's 90 years old -- before we had an artist's lunch, a brunch, an open house, where we exhibited art to large things like what I've already mentioned.

**Q How much of Wally's purchase of $186,000 or thereabouts, made its way to ISP Holdings, Inc.?**

Page 121

A None.

MR. WAGNER: I'm going to object to the form.

A Directly attributed to that sale? None.

**Q (By Mr. Hicks) Well, how can you -- let me ask you this.**

A Okay.

**Q Was ISP Holdings, Inc., paid some money by ArtPort under their investment agreement between those two entities?**

A A check for $10,000 was kind of a good faith -- to show a good faith that we had made some progress and we wrote them, I say, again, ArtPort as "we" wrote a check for $10,000 to Martin and Aly St. Pierre. Or ISP Holdings.

**Q And do you know approximately when that was paid?**

A I'm trying to think. Fall of 2016, I believe.

**Q And Wally's first purchase was in July of 2016, correct?**

A July.

**Q Okay. And did he wire money to the same account that was used to make that $10,000 payment to ISP Holdings, Inc.?**

A I believe that is an entity that Wally is a member of. Wired the funds to ArtPort. And yes, naturally, if I'm writing ISP via check, it would come from the same account. Everything came from one account, and it has for seven years.

Page 122

**Q Okay. All right. So looking at this Exhibit 5 in front of you, I'll just scroll through it.**

**What does this reflect? Is this -- there's a bunch of pictures. It looks like -- I'll just go down to the bottom, but. . .**

**So looks like there's two invoices and then some pictures; is that correct?**

A Those invoices to -- I see that, right. You'll have to slow down because I can't see -- oh, uh-huh. Yes. Yes. Uh-huh.

**Q What is this $1500 seeking payment of?**

A Ian, to the best of my knowledge, these were kind of for settlement purposes only, and I don't think that Wally ever compromised and would agree to anything. So they're kind of meaningless.

**Q Okay. So -- well, the storage settlement is $1500, right?**

A Which he refused to pay.

**Q Okay. And is that about how much in storage expenses ArtPort incurred in storing Wally's art? Approximately? It doesn't have to be exact.**

Page 123

A No, I believe it was around 5,000.

**Q Okay. And it looks like the next page, final invoice, 19-46607, it says, Past due balance, $5,000, correct?**

A Again, this is for settlement purposes. I thought that Wally would acquiesce and at least do what he had promised to do, and it was for settlement purposes and he never agreed and never paid us a dime. I don't see how this has any bearing.

**Q So -- okay. So do you know why it says, the word "settlement" on storage settlement on the first page?**

A Again, we were -- we were desperately trying to get Wally to compromise, and which he refused to do. He had taken a hostile position, a threatening and bullying position. And I tried my best as identified in almost every email or text that I wrote him, up until the point where he filed a lawsuit. And I tried to offer him, you know, opportunity to settle.

He did the same. This went back and forth. You know, he obviously didn't honor the promise, but let's just remember, that we were both trying to put some conditions to get us to agree and come to a compromise, and it never happened.

So I don't -- you know, think that this has any real, you know, merit.

Page 124

**Q Are you -- okay. So you say this doesn't have real merit. Are you meaning --**

A Well, it had merit when we were doing it because we thought that he might agree, knowing that he owed us a lot more than that. That this was just a settlement. It was just an offer. It was for settlement purposes only. So I -- that's all I can say. I don't --

**Q The reason I'm asking you about the difference between these two invoices, the one -- I can see how the first one might reflect that type of negotiation, because it says "settlement" on it, and it deals with costs that were incurred after the art was original, paid for as storage.**

A Right.

**Q The second one says "final invoice," and it doesn't use the word "settlement" and it talks about Charnoff art purchase, which is money that he would have owed regardless, you know, or allegedly would have owed regardless --**

A Right.

**Q -- of anything. So are they both for settlement purposes or only the first one?**

A So to the best of my knowledge, this was

written, this invoice, to collect on an accounting mistake that Wally made himself, and even acknowledged in an email that he may have made a mistake. And I verbally told him that when we settle out, when you -- when we ship the art, because he never took the storage, he never did what he promised, and I was paying for it.

He acknowledged it many times over the course of two years, that we would settle everything before the art was shipped. And when I did the accounting, I saw the mistake. I alerted him to it, and he refused to pay. This is a invoice that I presented to him that represented that difference for the trade of a -- of a work of art.

**Q Is that for the trade of, is it, Two Vessels?**

A It was.

**Q Okay. And at the time that that was traded or agreed to be traded, were you aware of what he -- the value he had assigned to that trade?**

A No, he didn't assign a value. It was -- it was, if I believe, it was an accounting area, because the piece was -- 20,000 -- it's 25,000 when we began, when he first looked. We gave him a discount of 20,000.

He had asked me for a bigger discount, of 20

percent. So the piece went down to, I think, 16,000. But he didn't account for that percentage that I took off to bring the sale to whatever it was, 45-some thousand. And then he accidentally added another thousand and made it 21,000, okay. So he traded it in for $5,000 more than what he paid for it.

Does that make sense?

**Q Yes, what -- I think it does. Thank you. So what you're -- how I understand your testimony is that he -- when he traded it in, there were some kind of written exchanges, communications, where he assigned a value of 21,000, and in fact, it was -- should have been, had a value of 16,000, and that differential accounts for the 5,000. Is that accurate, generally?**

A Yes. I believe.

**Q Okay. Did ArtPort agree to that assignment of value, meaning, he wrote out that he thought it was worth 21,000, sent that off, and it was accepted, correct, which was a mistake between the parties?**

A Yeah, actually, it wasn't accepted, because he wrote that he may have made a mistake. And when -- in conversations that we had, many over weeks, anything that was left, we would take care of at the very end. So that's how that came to be.

**Q When you referenced in a couple of your**

**answers the --**

A Correct.

**Q -- conversations that Wally had with you on behalf of ArtPort about, quote, you know, settling up at the end, did those occur verbally or in writing at some time?**

A Wally's not much for putting anything in an email or text. So verbally, we talked about it. At different times over the course of, you know, several years.

**Q So this -- this $5,000 is based upon the accounting error for a trade-in of art, essentially.**

A Right.

**Q Okay. If you look at the counterclaim, the counterclaim we looked at earlier filed on behalf of ArtPort does not specifically identify that.**

A It does not.

**Q Okay. All right. Let me go to some text messages here.**

A Okay.

**Q So do you see the phone number -- these were produced by Wally. There's a couple of different sets of text messages from different phones, I will represent to you.**

A Right.

**Q The From, if you look at the top line. First of all, do you see the exhibit in front of you?**

A I do. Thank you.

**Q Okay. And is the first ID number is 19295 and the From is plus 1(303)507-9950? Do you see that?**

A Correct.

**Q Okay. All right. And is your phone number** (917)703-7172, or at least was it at this time?

A Yes.

**Q Okay. And was that a phone that you used in your business activities on behalf of ArtPort?**

A Yes.

**Q All right. If you look at the first one, a text, it looks like Wally texted you, and is that David Hinkelman, the phone number? Do you recognize that name, David Hinkelman, with his phone number --**

A I do. I do.

**Q And is that the David Hinkelman who has been on some of the emails and exhibits we've looked at and who is -- at one point, had some involvement with ArtPort?**

A Yes.

**Q Okay. All right. And what is Wally saying in that first text?**

A Guys, I would really. . .

**Q Go ahead.**
A . . . art shipped.
**Q Please tell me how to make that happen?**
A I see that part.
**Q And do you recall what the resolution of that request to have the art shipped was?**
A Absolutely, I do. His -- the first time we talked about having the art shipped, I immediately went to the shipper and then Wally kind of disappeared, which he did often. Sometimes for months. And sometimes for weeks. And Wally never answered me when I asked him on several texts and emails to even give me an address to where to ship the art.
It kind of came up again in this email, which we had these episodes with him where he'd dip in and dip out. He'd dip out for long periods, and then dip back in, and say, Hey, but this is -- with all due respect, there's nothing going on here. We're, you know, obviously, we're out of communication. You can see that it's also friendly. Hey, guys, like to have my art shipped.
I immediately, on the day or the day after, called a shipper at that time that I had shipped work for a museum. And asked them to give me a date, because for shipping, you've got to have sometimes

weeks in advance. It's not done immediately, Yes, we're going to come ship it in two weeks or three weeks. I needed to call the shipper. I set it up and Wally kind of disappeared again and didn't ask us.
And I asked him, which you can see evidenced in email, Hey, Wally, what do you want me to do? I've got the shippers lined up. I didn't hear from you. You didn't call me. And then I believe at some point, we'll have to look at the texts, in maybe June, I asked him if we could get this firmed up.
Here, I believe it's right here, Wally wanted update of the shipping companies confirmed.
**Q Okay. And what --**
A I don't know where you went. But this went on -- yes, this -- in 2019, on and off. This is much later.
**Q Okay. So which -- so in this text that's on the page now, it's number 20554 from you to dated -- Wally, on May 16, 2019, at 13:56 and 46 seconds, starts with, Hi, Wally just wanted to update you that the shipping company has confirmed the date of May 28th for the art to be shipped. Do you see that?**
A Uh-huh.
**Q Did you write that?**
A I did.

**Q Okay. And what shipping company was that?**
A Grosso.
**Q Okay. And did you get an answer to that, your inquiry, in this text message?**
A From Wally?
**Q Yes. You asked -- go ahead. Sorry.**
A No, I'm sorry, Ian. Could you be more specific? I don't understand your question.
**Q What was the resolution of this initial attempt to ship the art?**
A Well, this was not an initial attempt. This is after dozens of attempts of me asking both Brande and Wally to get the art shipped. What was the outcome?
**Q Yes.**
A Not really sure what you -- that's a very broad question. What -- where -- what -- I'm sorry. Could you be more specific or refine your question so I understand what -- what you mean?
**Q Did the art get shipped on the 28th of May as was confirmed in this text message we're looking at, number 20554?**
A No. Grosso picked up the art in June. Grosso came, I think, at the beginning of June or confirmed shipping company. They came early. It was

at some point shortly thereafter. It left the gallery. But Wally and was, you know, uncompromising and it created a lot of confusion and, you know, so we know what -- we can go through the rest of the texts and see what the outcome is. The outcome is where we are now.
**Q Is the reason -- the only reason why this art didn't get shipped as referenced in this text as confirmed on May 28th because of things Wally did?**
A Okay. So because of things Wally did? I would have to have something way more specific to answer that factually, and to you, Ian. Could you be specific and what Wally did?
**Q Why was it -- okay. I'll ask you like this.**
A Yeah. Sorry.
**Q What prevented the art from being shipped as referenced in this text?**
A Oh, as referenced in this text. Well, then, I need to read the text. Are you talking about this exact text, 20554?
**Q Yes.**
A Okay. If you could -- let's see.
**Q I mean, I'm asking you, like, do you remember today, as a prepared representative for the company? And if you don't, that's fine. That's what I was asking about. Because it will take forever --**

A No, you're asking me if I can answer you, an honest answer about a text that I wrote over a year ago? Not without reading it. I wouldn't be able to do that, factually. But I can certainly look at it and tell you what I think.

**Q All right. Did you have these communications over the phone or were they in text or emails or was it a combination?**

A To the best of my knowledge, at the time where, you know, kind of Wally went off the rails on this, there were incessant, you know, emails and texts coming from Wally. It's the first time in two years that he communicated with me as much as he did.

I -- let's see. I -- sorry. Okay. What's the question?

**Q Do you recall if there's anything that prevented the art from being shipped as referenced in this text?**

A Well, the art was picked up, again, day -- within days of me telling Wally that we had confirmed the date, and Wally had a lot of parameters that, you know, he was traveling again, or he was -- I'm not sure where he was going, and. . . I think, you know, we just couldn't agree on the terms.

You know, I trusted he'd honor his

commitment, and he didn't. And you know, there was a lot of conditions we were both putting on this shipment of art, and mostly, about his lack of honoring his promises. And you know, at some point, I gave up, you know, trying to deal with this kind of -- you know, this behavior. It turned very -- he turned very hostile.

**Q All right. And so --**

A And. . .

**Q When you say he didn't honor commitments, were those commitments by him made in writing or over the phone or a combination of both?**

A Well, the agreement that we had was an email that you didn't pull up or choose to pull up, where Wally agreed to insurance. He agreed to getting a storage unit on his own. He agreed to paying for the storage unit. He did not want me to conserve the work, which he acknowledged that he knew they were historical works and that they needed, perhaps, to be looked at and conserved if -- if they, you know, that was necessary. He refused that. He refused photographs.

These are things that I always offered clients, he refused it all. That email that you didn't pull up where he made those agreements to pay for crating. I agreed to the shipping. That's where we

fell.

**Q Are you familiar with the Red Chair painting that was sold to Wally?**

A I'm familiar with Red Chair painting 1979, I believe.

**Q Okay. And is the Red Chair painting that was represented to Wally for the -- paid for the second purchase the same Red Chair that was identified in the inventory that was maybe sent to him during the year 2019?**

A Yes.

**Q So Red Chair 1979. Is that how the -- how was that painting identified in ArtPort's business records?**

A Comma, base, 1979.

**Q In what database or system?**

A In our ArtBase program.

**Q Okay. So that -- where is -- where is that Red Chair 1979 now?**

A To the best of my knowledge, Red Chair 1979 is in Colorado.

**Q At Terry Dowd?**

A Wherever Wally is storing it.

**Q Okay. So if you look at 20834, is the left column in the text from Wally at (303)517-9550 to you**

**and David Hinkelman on May 24, 2019? Do you see that?**

A Correct. 20834?

**Q Yes.**

A Uh-huh.

**Q All right. And do you see where Wally says, I don't know how I can make this any easier. If confirmed the art is insured and that you will ship it or give me the info I need to insure and ship it myself. Do you see that?**

A I do.

**Q Okay. Then below that, in text number 20835 from Nancy Loving ArtPort to Wally and David Hinkelman on the same day, it looks like that's from you to him, correct, in response?**

A Yes.

**Q It says, As I previously informed you, your work is scheduled to arrive after July 3rd.**

A Correct.

**Q Okay. Was that -- was the art shipped pursuant to the description in your text?**

A Was the art shipped. Was the art shipped already? I'm sorry. The art wasn't shipped before May 24th.

**Q Where it says, so in your text, you say back to him, As I previously informed you, your work is**

**scheduled to arrive after July 3rd.**

A Correct. I had scheduled with Grosso for the art to be, I believe, it left the gallery sometime maybe June 20th or maybe before. But it was scheduled to be on a truck, and Wally -- I believe I, I'd have to look at the rest of texts. There was a lot of, you know, kind of banter from him. He was traveling and I'm not sure if this upset him. I don't know. But we had a delay.

**Q And do you recall why you had the delay?**

A I don't. There was -- there was just a lot of volatile emails and texts from him and it -- I don't.

**Q All right. Is Wally the sole reason for the delay in shipping his art as reflected in this text message number 20835?**

A Okay. So the delay in Wally actually receiving his work is because he refused the shipment. And when -- to the best of my knowledge, he refused the shipment when it did arrive. And there was -- I was always prepared -- the art had already left. The art was sitting, ready to go, at Grosso, and they were just waiting to -- confirmation. I mean, maybe if we go down further in the text, we could see, you know, more of what Wally wrote.

**Q And we'll get there. I just wanted to ask you, do you recall, as a representative of ArtPort, LLC, whether this shipment reflected in text 20835 actually happened?**

A I believe that Wally was traveling and asked -- and was concerned about it coming when he wasn't there, to the best of my knowledge.

**Q Okay. Okay. And do you see where it says in 20894, you, Nancy Loving, at ArtPort to David and Wally now on May 24th, 2019, that text message?**

A I do.

**Q Okay. And it looks like you say, My only obligation to you at this point is to ship the work. I will release the work for shipment once you have finalized the outstanding balance that you have with us.**

A Correct. I did write that.

**Q And what was the balance at that time, approximately?**

A Ian, I think we would need to look at where we were in some of these, you know, settlement, you know, negotiations we were having, and to answer that factually. Because this is going back and forth for both of us, there were conditions being made on both sides. And Wally was not you know, willing to

compromise. So I'd have to see where we were when we were having these -- these, you know, conversations at this point.

**Q Okay.**

A Yes.

**Q Earlier, we looked at the two invoices, one for 1500 and one for 5 K?**

A Right.

**Q Okay. So do you believe that it's possible that it would be this 6,500 or thereabouts as the outstanding balance?**

A I believe it was probably the crating. Because he understood that we couldn't ship the work without a crate. The crate's essential and it was essential on his end for the storage if he was going to store it in his barn or his basement as he proposed.

And without the crate, there -- and he was obliged to pay for the crate. I wasn't going to put any more moneys out for Mr. Charnoff, since I realized that he was going to go back on his promises and had a some sense of entitlement that I was going to owe him all of this stuff, this free stuff, just because, you know, he thought he was entitled.

So, you know, my belief is that I was asking for him to pay for the crate so I didn't have to have

more moneys out of pocket that he would never reimburse me for or think he was entitled to, regardless of his obligation or responsibility.

**Q Did you send him an invoice for the cost of that crate?**

A I'm not sure. I'd have to look.

**Q Okay. Do you recall how much the crate was?**

A Well, wait a minute. I think we did. We already looked at it, didn't we? I -- I think we did. I think around $1500, was the -- 1500 or 1100, Ian. I'd have to look to be sure.

**Q Okay. So storage settlement, 1500 --**

A Right.

**Q -- is Exhibit 5. It doesn't say "crate." Do you think that's what that -- maybe that means?**

A Yeah, I think if you dig a little deeper, you might find one that says, and it was, again, for settlement purposes only, a storage and crating, you know, fee, and I think it was $1500.

Look, I was desperately trying to get Wally to calm down and not be hostile and to threaten and bully, and at this point, you know, I was worried, because he threatened to ruin my business. He threatened to ruin my name with Harold. And I -- I thought it best that I do anything that I could just

to, you know, calm the beast.

**Q Okay. So if you look -- actually, now we're back on Exhibit 5. That reminds me of something. You see where it says, Total due upon receipt, $5,000?**

A Correct.

**Q Do you see below that where it says, Buyer agrees that the copyright, to paraphrase, are owned by Harold Garde. Do you see that?**

A Yes.

**Q Okay. And is that a provision that Wally had agreed to in writing before he paid the money for the second purchase?**

A Wally doesn't need to agree with this. This is the law.

**Q So why is it this? Why is it in here, then?**

A To remind Wally, because Wally told me in one of our conversations that he could do whatever he wanted with the images. With the -- the rights to the image. And he was actually quite upset when I tried to explain to him that it's no different than using music that the Beatles wrote. It's a copyright law.

He didn't understand it. He disagreed. And I thought it might be a good idea to remind him that this was a law and that when the buyer agrees, that they're subject to understanding that law.

**Q Okay. And with respect to the first purchase, did you have a disclaimer of this type in any written communications to him prior to him paying for the first purchase?**

A I, again, the first purchase, we were operating under a different portfolio management agreement, and that wasn't part of our policy or procedures. That changed, and that's why it looks different in this. We were using policies and procedures from the second agreement.

**Q Well, I thought the reason you did it is something specific to Wally, because he had raised some kind of kerfuffle about, you know, his rights to the copyright.**

A Exactly. But you're asking -- you didn't ask me that question. You asked me why it was here and not on the first one. So on the first one, this is part -- actually, you can see that this is taken from the sales agreement that was presented to Wally. And I --

**Q So this really -- so what you're saying, this disclaimer has really nothing to do with Wally because it's. . . is that correct?**

A I couldn't hear that. You broke up a little bit, Ian. I'm sorry. Could you repeat the question?

**Q This disclaimer is here because of your**

**agreement with Studio 41, not because of something Wally did --**

A It's two-fold.

**Q -- right?**

A Exactly what I told you. It's two-fold. There's two reasons why.

**Q Okay. Was this disclaimer on other invoices for purchasers of Harold Garde art, or where those purchases happened after your second agreement was in place with Studio 41?**

A Yes.

**Q Okay. So going back to this Exhibit 43, 20894, you said, I will release the work for shipment once you have finalized the outstanding that you have with us, correct?**

A Correct.

**Q Okay. And we believe, or I think it was established that it was probably the 6500. Correct?**

A No. I said it's probably, due to the fact that the crate needed to be paid for before the work could be released.

**Q Okay. So was another component of this outstanding balance that he -- you're saying he owed the $5,000 accounting mistake?**

A I had faith in Wally that he would honor a

mistake that he made. But obviously, he can't be held accountable. And so -- you know. . . that's probably -- go ahead. I'm sorry. What was the question?

**Q Just trying to figure out if when you say "the outstanding balance that you have with us," yes or no, that includes the $5,000 accounting mistake.**

A I believe it was about the crate, in order to release the work.

**Q And in the next text, 20895, Wally texted you and David and says, Nancy, that is contrary to, and there's the word out, or that's because he's sending to you. Sorry.**

**Nancy, that is contrary to what we agreed to in writing. You do not have the legal right to hold my $186,000 of my art hostage. Please tell me where and when I can have it picked up. I will have a shipper come and get it. Then we can both seek legal remedies for the rest of the issues. I think you should check with your attorney before you hold my art hostage. Refusing to release my art to me is theft of at least 186 K. Did I read that accurately?**

A You did.

**Q Okay. So did you ship the art or provide him the opportunity to have the art picked up once he sent**

**this message?**

A As I previously told you, the art was picked up several days after this communication on May 24th. And was taken to Grosso shippers. I made every possible provision to get the work, and again, in good faith that he would honor his commitment, honor his obligation, and his contractual responsibility. But -- which he never did.

**Q Okay. So 20896, 20897, and 20898. Do you see those text messages?**

A Right.

**Q Okay. And I'll just read them in order. And these are from Wally to you and David Hinkelman, correct?**

A Correct.

**Q All right. So it goes, here's the three, It would be easier -- it would probably be easier for my attorney to talk to your attorney before this gets out of control. Please send your attorney's contact info. There's no balance due and the art is paid for in full.**

**And then you respond in text 20899 to Wally and Hinkelman, you say, Correct, there's no balance due on the art. There is a balance due for the storage, for insurance, and for the crating -- crate that you agreed to provide. Please check your email as a**

**reference. Unfortunately, you've been misinformed. I have every right to hold your art until the balance is paid. Please check with your attorney. I'm sure he will agree. You are more than welcome to spend your money on litigation and attorneys. Did you write that?**

A I did.

**Q Okay. And do you still believe that for an outstanding balance of less than $10,000 that you are entitled to withhold $186,000 of paid-for art?**

A That's not what I'm writing here. I wasn't contractually obligated to buy his crate. He was. The art could not be shipped without the crate.

**Q Okay. Had the art -- had the crate been paid for at that time?**

A No, the crate had not been paid for.

**Q And how much did the crate cost to -- I mean, it was ultimately shipped by --**

A It was -- I -- I'd have to look. I don't know. I think, like I said, it was somewhere around 1100 or 1500. I'm not sure.

**Q And you say in this text, I have every right to hold your art until the balance is paid.**

A Correct. Yeah. That's right.

**Q That doesn't really have anything to do with the crate because you're saying in that sentence you're**

**going to hold it whether there's a crate or not. You want the full balance paid, correct?**

A I never said that.

**Q Balance due for the storage and insurance. Okay? That's how you described it.**

A And for the crate. And for the crate. So, again, without the crate, the work could not be shipped. And I wasn't going to put out any more moneys for Wally Charnoff when I knew he would not respect my position. He would not compromise. And I would never get reimbursed without a legal battle, even if it was something as small as $1500.

**Q So based on this text message, is your testimony that had there been a crate paid for by Wally, you would have shipped it?**

MR. WAGNER: Object to the form.

A I can't answer to what I would have or wouldn't have done a year ago.

**Q (By Mr. Hicks) And it says, There's a balance due for the storage for the insurance and for the crate. Does that mean the balance -- it had already been paid for, the crate, the insurance and storage?**

MS. GETCHES: Object to the form.

A The insurance and storage?

**Q (By Mr. Hicks) If the crate had not been purchased yet -- strike that. I'll rephrase.**

**At the time that that second sentence was written, had a crate been paid for?**

A A crate had not --

MR. WAGNER: Objection to form.

MS. GETCHES: Go ahead.

A A crate had not been paid for. We had an estimate on the crate which I had given to Wally on many occasions, we talked about it.

**Q (By Mr. Hicks) Okay. So what was that estimate, approximately?**

A 1100 or $1500, somewhere in that range. I'm sorry, I don't know the exact amount.

**Q Okay. So again, it was, as I'm understanding your testimony, the reasons why his $186,000 of art that had already been paid for in 2017, was not shipped, based upon these text messages, a balance already incurred by ArtPort for storage and for insurance, and an estimate on a crate to ship the art; is that correct?**

MR. WAGNER: Object to the form.

MS. GETCHES: Object to the form. Misstates hours of testimony.

MR. HICKS: That's why I said, as I

Page 149

understand it.

**Q (By Mr. Hicks) Tell me if I'm wrong. So is that a correct understanding or not?**

MR. WAGNER: Object to the form, foundation. How can she testify as to what your understanding is?

MR. HICKS: I told her my understanding and asked her to either agree or disagree with it.

MR. WAGNER: I'm going to object to the form and foundation. That question is ridiculously improper.

MR. HICKS: Your presence is kind of improper. I don't even know why you're here, but that's fine.

MR. WAGNER: I'm here because your client baselessly and fraudulently and frivolously sued my clients, and I have to defense their position here. Any other editorial you want to add?

MS. GETCHES: I'll join in Tom's comments.

**Q (By Mr. Hicks) Ms. Loving, what are the reasons why the art was not shipped? Is it the balance for the insurance and storage and crate. Is there anything else?**

MS. GETCHES: Objection. Form. If you want her to restate the hours of testimony --

MR. HICKS: Stop making speaking objections,

Page 150

please.

MS. GETCHES: -- that's improper.

MR. WAGNER: I join the objection.

MR. HICKS: Every single time you make a speaking objection, she's coached, changes her answer, says she doesn't understand, really obvious, and we're just going to be here a lot longer if you keep doing speaking objections.

MR. WAGNER: I object to the form of the question.

MS. GETCHES: Join.

A Wally agreed to provide the crate.

**Q (By Mr. Hicks) What's that?**

A Wally agreed to provide a crate.

**Q Okay. And when was the art ultimately shipped?**

A On -- I'm sorry. I have to look at -- I don't have an exact date. I need to look at a calendar. It's almost 6:00 o'clock here and I'm just -- either -- if we're going to continue on like this, I'm going to need a five-minute bathroom break.

MR. HICKS: Okay. Let's go ahead and take a five-minute break.

THE WITNESS: Okay.

MS. GETCHES: Before we -- go ahead, Nancy.

Page 151

I just want to ask the court reporter a question.

THE VIDEOGRAPHER: Hang on one second. Ian, if you could take your exhibit down, and then we can go off the record.

MR. HICKS: Okay.

THE VIDEOGRAPHER: We're going off the record. The time is 3:46 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:00 p.m.

**Q (By Mr. Hicks) Are you ready, Ms. Loving? You ready?**

A I apologize. I was muted.

**Q No worries.**

**Going back to the portion of Harold's funds or Studio 41's funds from the second purchase, as I understood it, you were holding that money pending the outcome of this litigation?**

A No.

**Q Are you -- what is it -- what was the reason why that money hasn't been paid to him? I know. . . to be clear.**

A As I stated earlier, we began a new contract portfolio management agreement with the Gardes that became, you know, much more focused on the policies and

Page 152

procedures around how we handle expenses, because ArtPort was owed and is owed at this point around 350-some thousand dollars for reimbursable costs.

And so we got really detailed about how we handle things, and the policy is that once the art is shipped or delivered or transported, mailed, whatever it might be, and all costs can be attributed to a sale, then that's deducted from the sale. And Harold, depending on what our artist's, you know, gallery split is at the time, at the time now, it has been for many years, it's been 30/70, 30 for Garde and 70 for ArtPort. Harold would get his 30 percent.

And so the procedure is that once we can have all of the costs, not partial, not some, not estimates, but actual costs, then we proceed with a payment to the artist.

**Q Okay. So even though that money -- Wally paid his money, you know, two years ago, and you've already deducted a definitive amount from Harold's cut, you're still holding the money, pending -- and also noting the shipping costs. So I'm a little confused, because you actually do know the shipping costs now, right, because it was shipped to Wally.**

MR. WAGNER: Object to form.

MS. GETCHES: Join. What question do you

want her to answer?

**Q (By Mr. Hicks) Ms. Loving -- Ms. Loving, do you know what the shipping cost was to ship the art to Wally? Ship it from ArtPort?**

A Okay. The shipping cost from -- the shipping cost from Grosso shippers was somewhere around 2750, 2700, and Terry Dowd, the second shipment was somewhere around 2,000 or 1800.

**Q Okay. So the cost to ship the art is known and definite at this time, correct?**

A It is.

**Q Okay. And you're still holding Harold's cut of the second purchase, correct?**

A We're in litigation and we've been advised to wait until this litigation is -- the outcome of the litigation is complete.

**Q And I don't want to know why, if that's what your attorney told you, but if it's something that Harold or Studio 41 told you, I would like to know that. So it's something -- is that a request from Harold or Studio 41, or is that some other source?**

A I've had no requests from Harold or Studio 41.

**Q Okay. So --**

A Either way.

**Q So figuring out what the actual shipping costs were is not really the reason you withheld that money from Harold, is it?**

MR. WAGNER: Object to the form.

MS. GETCHES: Join.

A Again, our policies and procedures as set forth in an agreement that Studio 41 and ArtPort, that's not our procedure. I mean, our procedure is exactly as it is. And I follow the procedures.

**Q (By Mr. Hicks) So the first agency agreement that you had with Studio 41 says you can withhold the artist's cut until the art is shipped and delivered?**

A Are you asking --

MR. WAGNER: Object to form.

A That's -- are you asking me if that's -- you'll have to rephrase this and use -- let me know specifically what agreements. Let's call 1 being the first one and 2 the second, okay, so that I understand where you're going.

**Q (By Mr. Hicks) Okay. So agreement 1 was the one that is operative during the -- for Wally's first and second purchase, correct?**

A First purchase. Agreement number 1.

**Q Okay. And payment was made to the artist, Harold Garde, under the first purchase, so I'm not worried about that. It's the --**

A Okay.

**Q -- second purchase.**

A Right.

**Q Was that under the second agreement?**

A It would -- it would fall in the time period where we were negotiating -- which the negotiations took awhile. A lot of it was due to things like this. Just, you know, details.

Was the negotiation and the second agreement, it was effective on February of 2019.

**Q Okay. But Wally paid his money in 2017.**

A Correct.

**Q So that was when he paid all of his money, correct?**

A I'm sorry?

**Q At some point in 2017, he paid the full price, $186,000, right?**

A He did.

**Q Okay. So is it your testimony that a 2019 agreement applies to a 2017 transaction?**

A We had been working in good faith within the parameters of this agreement. A second agreement.

**Q Okay. And does that second agreement say that you don't have to give Harold's cut to -- to him until the total art in question is shipped and delivered?**

MR. WAGNER: Object to the form.

A So it says nothing about Wally in the second agreement. So it says that our procedure is, because there was a lot of confusion, and it was a -- it's just a procedure what we both -- we all agreed to in this agreement, that the procedure would be exactly what I've already told you before.

We would collect all expenses. And especially in a situation like this, okay, where, you know, people don't pay when they're obligated to. We know exactly what our expenses are going to be. We know exactly what we've had to spend and what portion is Harold's, it's deducted from the sale, and Harold received his portion.

**Q (By Mr. Hicks) Then why hold back anything, an estimate or otherwise, until you actually know what those final costs are going to be? Because you still held back an estimate before you knew that, right?**

A I'm sorry --

MR. WAGNER: Object to form.

MS. GETCHES: Join.

A Ian, I'm sorry. I don't understand your question. Please rephrase your question.

Page 157

**Q (By Mr. Hicks) Okay. And we can move on.**
A Okay.
**Q Did Wally promise somewhere to pay for the crate? To ship for the second -- actually, I'm sorry. Did Wally promise somewhere to pay for the crating of the art?**
A In emails and texts. And verbally. But the written agreement, which we've never looked at here, he agreed to pay for crating.
**Q Okay. Did -- who agreed to pay for shipping?**
A We agreed to pay for shipping.
**Q Okay. And how do you ship art? In a crate?**
A Are you --
MS. GETCHES: Object to the form.
A Are you talking -- what type of art are you talking about? There's all kinds of art. There's video. There's glass. There's sculpture. Please define exactly what you're talking about.
**Q (By Mr. Hicks) Art of the type that Wally purchased.**
A The work on paper? The work on canvas? The work on board? Please be specific if you're asking me to give you an informed decision, even though I'm not a shipper.
**Q Are any of those items shipped in a crate,**

Page 158

**typically?**
MR. WAGNER: Object to form.
**Q (By Mr. Hicks) Let me ask you -- let me ask you a better question.**
**Wally's art was shipped in a crate, correct?**
A Yes.
**Q Okay. And in fact, it was just one crate, right?**
A It was one -- to the best of my knowledge, it was one crate. Or, well, two, because the second one, the second piece, the second shipment, was shipped by Terry Dowd.
**Q Okay.**
A And. . .
**Q That second one is just one painting. So the other --**
A But that second one cost almost $2,000 to ship. So let's just remember that.
**Q But the bulk of his art, like 95 percent of it, had already been shipped long before that, correct?**
A Correct.
**Q Okay. So you never said, I'm not going to ship the art until you pay for this crate, you know, for that -- for that one painting that comprised the second shipment. That's not really what the dispute**

Page 159

**has been about for the vast bulk of the art.**
A I'm sorry.
MR. WAGNER: Object to form.
A What is your question, Ian?
**Q (By Mr. Hicks) We can move on. The record's clear enough on that issue.**
**Was it Grosso Art Packers who created that crate that was the first shipment was shipped in? There wasn't like a separate crating company that you had to go to or anything like that?**
MR. WAGNER: Object to the form.
A To the best of my knowledge, Grosso, that's what they do. They make custom crates and do shipping. So I would imagine, although I didn't see them build it, that they were the ones that built it.
**Q (By Mr. Hicks) And did they separately itemize the cost of the crate?**
A They did.
**Q All right. I want to -- let's go back very generally to this timeline, okay? Wally agrees to -- there's two purchases of art, okay. He pays for the first one at some point in 2017. Approximately $45,000, right?**
A Right.
**Q There's a second purchase of art which he**

Page 160

**pays for at some point in 2017. That's about $141,000.**
A Correct.
**Q Okay. And so as of some point in 2017, he had paid for both purchases and had paid in full, correct?**
A He had paid for everything that the invoice that we had at that time. He was lacking paying or what he didn't pay was -- but, yes. Yes. I'm sorry. I'm really tired. Go ahead, Ian. So I'm sorry. Could you ask the question again? I'm just a little -- a little exhausted. So please repeat.
**Q I think your answer's fine. Don't worry about it.**
**The -- strike that.**
**And it is ArtPort's position that the reason the art was not shipped in 2016 or 2017 or 2018, is because Wally asked ArtPort to hold on to it, to store it? Is that right?**
MR. WAGNER: Object to the form.
A Wally and Brande both were involved in the process of determining that the -- there was no room for them to store the art or hang the art since they in the matter of time, two years, or since 2016, longer than that, they were, you know, renovating homes and building a big ranch and -- and other things that were

more of a priority. So I understand. That's why they didn't.

**Q (By Mr. Hicks) Oh. And so where did Wally or Brande tell ArtPort not to ship the art and to hold on to it?**

A On many texts. Emails. Once on -- they invited us to come see their ranch, and we went -- and we walked through the barn, and Brande showed me where she thought she might be able to store the art, and -- but they had a lot of exotic animals and a lot of horses, and it didn't seem like a suitable place to store art.

And we all agreed that it was not a good idea to ship the art. I had been asking because it was a big responsibility for me and to keep the art and to continue to pay for the storage.

And -- but, on many occasions. But that, most notably, was one of the occasions that Brande and Wally asked us or asked me to continue to hold their art.

**Q Okay. When else -- or were there other -- strike that. I'll rephrase.**

**Was there another time that either Wally or Brande instructed you not to ship the art?**

A Yes.

**Q Okay. And tell me about that.**

A The -- first, in the agreement, Wally asked us to hold the art. He asked me to hold the art in 2017 when he was in Norwalk. And told me that he'd have no way to take this. That's why we were talking about a storage unit, because he couldn't accept the work. That's why we spent hours of discussions over the storage unit because he couldn't accept the work, unless -- you know, there's some other reason, but I'm pretty sure that's what it was, because that's what he told me.

And there were many times where Wally would -- I don't know, these episodes were all of a sudden, you know, he decides he wants the work and immediately starts the transaction and then he pulls -- he says, No, don't ship it. But there are texts and emails.

**Q Okay. So I want to -- I'm trying to talk about each time that you can remember testifying today in the 30(b)(6) as a representative of ArtPort where either Wally or Brande told you, Don't ship the art. Okay?**

**And in fact, so that's what we're going through, and so as I understand it now, so far, we have two occasions that we talked about? Is that correct?**

**Do you remember anything else?**

A There were more occasions. I would have to look. My memory's not serving me well right now. I am a little tired, but I don't recall exact dates.

But there were many times that Wally would say, How's my art? Okay, you guys. As soon as the house can be finished or as soon as I get through this bankruptcy, or as soon as I get through other lawsuits. And those were a lot of verbal conversations.

But I can't do it right now, and I don't have it in the -- to give you a factual response to tell you exactly on this date. But I'm sure if you go through the texts and emails yourself, you'll see where Wally tells me not to ship the art.

**Q Okay, Ms. Loving. So under Rule 30(b)(6), you know, if -- if ArtPort is going to take a position that it was prevented from performing, prevented from shipping the art, I'm entitled to know when that happened, how it happened. And it sounds like you're not able to tell me that except to point to texts and emails; is that correct?**

MR. WAGNER: Object to the form.

A Let's go back to. . . okay. Let's go back to --

**Q (By Mr. Hicks) Are you -- Ms. Loving, if**

**there's an exhibit you're looking at, is there something you're looking at? Because you're supposed to testify --**

A No, I'm not -- I'm just --

**Q I just --**

A No, I'm not -- I -- no. I'm sorry. Really, my eyes are extremely dry from looking at this screen.

Okay. So let's go back to the two -- let's go back to the first sale. We know that Wally asked us not to ship it because he asked us to hold it and because the house was being renovated. Exact date, I can give you time frames that he asked us not to ship it when -- that was in 2016, the summer.

And then in 2017, in August, he asked us, when we finalized the selections and we wrote the terms of agreement, which was in an email, I don't remember the exact date, but let's say it was August, he asked us to keep the art in Norwalk. He told me he would provide a storage unit. He told me he would insure it. And he told me when he was ready to have it shipped, that he would ship it -- I mean, I would ship it, I agreed, but he would conserve the work when it arrived at the future date in Colorado.

And I -- I asked him a lot, when he would be able to accept shipment of the work, and when we could

confirm it, and again, all I heard from Wally was delays. He was out of town. He was going out of the country. He was -- it -- had some health issues.

And on February -- maybe -- I'm sorry. Maybe March -- I'd have to look in 2018, he told me not to ship the work, and then again in June via a text, he was jumping on his plane. I had already two times had a call to shipper. I called the shipper once in February. He denied that. And then again in April, he was jumping on a plane. I had already set up the shipper, which documented in an emails, and he said, Don't ship the art.

Conversations that we had with Brande. We had a lunch one day with Wally and Brande. That date would have been prior to -- prior to the first purchase at a lunch, Wally and Brande were agreeing to, you know, how we would, you know, ship the art and make some selections prior to that. We had lunch. They asked us on that date when David and I and Wally and Brande were having lunch that they were renovating their house, but could we hold the art and wait until the house was finished.

Of course, we agreed. There was no problem.

So on many occasions through that, exact dates, I'm giving you time periods right now, as I

can't give you a factual date, but on many occasions, we were told not to ship the art. But more importantly is when we started in August of the sale of the 141,000, Wally told me at that point, Do not ship the art. I will get a storage unit and I will pay for the insurance of the art while it resides here in Norwalk.

**Q Okay. Thank you for your answer. And in August 2017, as you just stated --**

A Right.

**Q -- you received instructions from Wally in writing.**

A I'm sorry. Can you repeat that? You broke up.

**Q Was that instruction from Wally in August of 2017 that you just mentioned at the end of your answer in writing?**

A Did you say in July -- I'm sorry. You are breaking -- in July?

**Q In August of 2017, that instruction from Wally that you used at the end of your answer, not to ship the art, was that in writing?**

A We had an email exchange that went back and forth that were the terms of the agreement. And Wally wrote in the terms of agreement to please put -- hold the art in storage. He would provide a unit. And he

would provide insurance. I don't. . . I don't have that. If you'd like to -- if you go through that, I'm sure you have it. We could look at it.

**Q Ms. Loving, I'm not here to make you have a -- you know, remember what the weather was and, you know, what you had on that date a couple of years ago, but I do need to know generally, you know, how communications, you know, happened, whether it was writing or oral, general time period, and the general content, I think you've provided that --**

A Okay.

**Q -- in the last answer or so.**

**You did instruct Wally in 2019 that, as we saw from the text messages, that you wouldn't ship the art until he paid his outstanding balance for insurance, crating, and storage, correct?**

MR. WAGNER: Object to the form.

A No. That's not correct.

**Q (By Mr. Hicks) Okay. Was there -- well, whatever his outstanding balance was, you wanted him to pay that before you shipped the art in 2019.**

A I was hoping he would honor his word.

**Q Okay. So if you look at -- I'm going to share the screen right now. This -- okay.**

**So in text 20899, on the exhibit that's in**

**front of you, you say there's a balance due for the storage, for the insurance and for the crate that you agreed to provide. Correct?**

A That's what it says, yes. Correct.

**Q Okay. And but was there also another thing that you wanted him to do before you would ship the art, and that is sign that sales agreement?**

A I was hoping that he would.

**Q Even though that sales agreement was the result of a contract that you had with Studio 41 that wasn't even effective until 2019, two years after Wally fully paid for his art.**

MR. WAGNER: Object to the form.

A Is there a question, Ian?

**Q (By Mr. Hicks) Yes.**

A Could you repeat --

**Q Yeah, I'll restate the question.**

**Why did you withhold shipment of art because -- to get Wally to sign an agreement that didn't even apply to his 2017 transaction?**

MR. WAGNER: Object to the form.

MS. GETCHES: Join.

A I did not.

**Q (By Mr. Hicks) So there's -- there's not a written communication from you to Wally in 2019 saying,**

**ArtPort's not going to ship the art until you sign this sales agreement?**
MR. WAGNER: Object to the form.
MS. GETCHES: Object to the form. Join.
A Wait, could you show me that agreement that you're talking about, please?
**Q (By Mr. Hicks) Yeah, we looked at it yesterday. Here we go. Hold on. I will stop sharing. I've got to get through, somehow, the -- give me a minute.**
**Okay. All right. Do you see this exhibit in front of you, which is Exhibit 3, Ms. Loving, which has an email from Nancy Loving to W. Charnoff, June 21st, 2019, at 3:49 p.m.?**
A I see that.
**Q Can you please read the last three sentences of your email to Wally.**
A (Examines exhibit.) Correct.
**Q Could you please read that out loud.**
A The whole thing? The last three sentences? The sales agreement must -- the sales agreement must be signed by the buyer before the art can be delivered. This is mandatory. I reserve all rights.
**Q All right. And then I'm going to show you another exhibit here. And do you see the sales**

**agreement, number SA-0127?**
A Yes.
**Q Okay. And is this the sales agreement that is referred to in the exhibit we just looked at?**
A It is.
**Q And --**
A That --
**Q -- the sales agreement -- is that -- okay.**
**This sales agreement was required by the agreement ArtPort had with Studio 41 as a result of a 2019 contract between those two parties, right?**
A Correct. Just. . .
**Q Okay. And so what you're saying in these two exhibits that we just looked at is, ArtPort's not going to ship your art unless you sign a contract that was created in 2019 for a sale that was fully paid for in 2017. That's the result, right?**
MR. WAGNER: Object to the form.
MS. GETCHES: Form.
A Look --
**Q (By Mr. Hicks) You don't have to answer that. Let me ask you this question.**
**Even if Wally had paid the outstanding amounts, you told him on this date that he also had to sign this contract before you would ship the art,**

**right?**
MR. WAGNER: Object to the form.
MS. GETCHES: Join.
A Could you repeat the question, please, Ian? I'm sorry.
**Q (By Mr. Hicks) You told Wally he -- you couldn't ship his art to him until he signed this sales agreement, right?**
MR. WAGNER: Objection to form.
A No, I think -- okay. Look, things had gotten cross-ways with both Wally and I. There were many conditions being made by this point in June.
**Q (By Mr. Hicks) With all -- with all due respect, that's fine, I don't mean to cut you off, but, listen, I'm asking a yes-or-no question.**
**You told Wally, yes or no, ArtPort's not going to ship the art unless you sign this exhibit, and this exhibit in front of you, SA-0127. Yes or no?**
A No --
MR. WAGNER: Object to the form.
MS. GETCHES: Join.
A It's per my agreement, although the art was paid for, as you said in 2017, as per my agreement with Studio 41, that this is a condition of a sale. And most importantly is the copyright clause that is very

important to Harold Garde and the Estate of Harold Garde.
And in my effort to be consistent with policies and procedures set forth in the management agreement, I tried my best to uphold those procedures. But he refused.
**Q (By Mr. Hicks) Okay. So as of the date of this agreement in 6/21/2019, ArtPort had had possession, either directly or through a storage unit of some kind, of Wally's art for several years, correct?**
A I -- I'm sorry. Please repeat the question.
**Q I said, as of the date of this agreement, 6/21/2019, ArtPort had had possession of Wally's art for at least two years, correct?**
A Wally's art was in possession of a storage unit.
**Q For how long before this agreement on 6/21/2019?**
A Wally -- Wally Charnoff left their art with me for several years.
**Q Okay. So when you see where it says, Terms and conditions, and there's a buyer and seller agreed that the works of art, subject to the sales agreement are sold as-is. Do you see that?**

A I do.

**Q Okay. So what was the last time Wally saw his art, physically? Before this agreement.**

MR. WAGNER: Object to the form, foundation.

MS. GETCHES: Join.

**Q (By Mr. Hicks) Let me ask you a different way.**

**When was the last time that you know Wally saw his art in person before 6/21/2019?**

A The fact that Wally didn't come and see his work, but the last time that I can remember that he saw it, which I can't speak for Wally. I don't know if he visited David or at any time, but the last time I know Wally, was in January of 2018.

**Q Okay. In any of your prior communications with Wally in writing, had he agreed to an "as is" clause for the purchase of his art?**

MR. WAGNER: Object to the form, foundation.

**Q (By Mr. Hicks) That you know of.**

A Wally actually, in an email which I believe you have, that we both agreed to the terms of the agreement. Wally rejected conservation. So he understood that the works were older. He understood, and he saw all the works, and he understood the nature of -- especially some of the historical, more valuable

pieces. And rejected any conservation at that time and told me he would care for that when the work arrived in Colorado.

**Q Okay. Listen to my narrow question, it's narrower than that.**

**When in writing that you're aware of before 6/21/2019, had Wally agreed that he would receive the art as is?**

MR. WAGNER: Object to the form.

A The only time that Wally, in writing, acknowledged that he was purchasing historical works that might need conservation or might not was in our agreement. When he said, he would work to conserve the work once it arrived in Colorado.

**Q (By Mr. Hicks) And Ms. Loving, I am -- the reason I am asking this question about as is that is a significant term of importance. And so the word sold as is, where else --**

A I did not use the word sold as is, and neither did he.

**Q Okay. All right. Another exhibit to look at.**

**Can you see this? The exhibit in front of you is identified as -- by title as Exhibit 41? And it starts with an email that's from you to W. Charnoff on**

**June 14th, 2019, at 1:37 p.m.?**

A You know what, Ian. I can't see it. Would you mind double-clicking and maybe it will come up.

**Q Yeah, I'll do it again.**

A Thank you.

**Q Okay. Do you see that?**

A I do.

**Q Okay. All right. I'm going to scroll down -- okay.**

**So -- all right. Do you see at the bottom the page here where it says, on June 14th, 2019, at 10:03, Nancy Loving at artsuite@gmail.com wrote, Hello, Wally, and it's got an email from you to him. Do you see that?**

A Yes, I see that.

**Q Okay. And it says, at the bottom of that, Please see my notes in red below?**

A I see that.

**Q Okay. And do you see the numbered paragraphs in both black and red writing?**

A I do.

**Q Okay. And it looks -- and numbered paragraph 3 says, There were more journal paintings and many of them were bound. That's in black, correct?**

A Correct.

**Q And then there's a response that begins with, The journal entries had crude 40-year-old tape binding, only some of them in red. Do you see that?**

A I do.

**Q Okay. And do you understand this to be the stuff in black is from Wally to you and the stuff that's in red is from you back to Wally?**

A I do.

**Q Okay. So and we looked at the email like this, but it was produced by your attorney, it was all in black. This appears to be that same email. You don't have to answer that, but I'm just representing to you that's what this is.**

**So can you explain, now, that what you meant by, The journal entries had crude 40-year-old tape binding, only some of them?**

A There was tape, which is identified in the photographs, on some of them. Not all of them. Not binding them together. So when they're pulled out of the spiral notebook, Harold bound the loose parts of the spiral. So it's very easy to see if you pull up the pictures that some have tape and some don't.

And binding, by a 40-year-old masking tape, you were asking me, and to be clear, you were talking about a journal, a formal journal. I'm talking about

tape on each piece that may have stuck together. And there's -- there's -- it's very clear from the photographs what I'm talking about.

**Q Okay. So having seen your writing in red in this exhibit in this form that it's in, red and black so it's easier to understand, in fact, who is saying what, would you agree that you showed Wally a collection of journal paintings that were held together with tape?**

MR. WAGNER: Object to form.

MS. GETCHES: Object to form.

A No, I do not agree.

**Q (By Mr. Hicks) So let me ask this question clearer for the record: You did not show Wally a collection of journal paintings held together with tape. Is that correct?**

MR. WAGNER: Object to the form.

MS. GETCHES: Join.

A I showed Wally journal pages that had been. . . in a journal at some point in Harold's lifetime. They were out of a spiral notebook, and the tape was on some and not on others. And what it looked to me, but I'm not Harold, that tape was used to hold down the kind of frazzled part of the spiral.

And if, in fact, that tape, the adhesive it

had lost over the year, some of the tape was off on some of them and some of it wasn't. And some of them were stuck together by the adhesive, probably over the course of 40 years.

**Q (By Mr. Hicks) In 2019, you and Wally were having discussions about shipping the art, did he offer to escrow the $1500 in shipping so that you could ship the art and that cost might be covered?**

A Did he offer to pay the -- I'm sorry. Ian, I can't quite hear you, and I'm not quite clear what you're asking. So if you could rephrase the question.

**Q Let me -- I'll ask you a different question.**

A Okay.

**Q Who is obligated to -- strike that. I'll ask it differently.**

**Did you tell Wally that he did not have to pay the sales tax on his first purchase?**

A I told Wally that -- so let's go back.

I told Wally that he did not have to pay New York sales tax because it was being shipped out of state. Wally told me he understood that he would have to pay his taxes or, if he had a contractor or designer, he was asking somebody, he said, if they could purchase the work and he could not pay taxes. A builder or designer for his house. I don't know, a

contractor or a woman that he was going to ask.

And -- but it didn't matter, because if I shipped the art out of state, you don't pay New York taxes. His responsibility as the buyer is to pay the taxes that he would need to pay in his state.

**Q So the communication that you just attributed to him in your answer --**

A Uh-huh.

**Q -- is that in writing?**

A I don't know. I would have to look -- right now, I would have to look through my emails, you know. There are hundreds of them, as you know.

**Q But ArtPort did tell him he didn't have to pay sales tax. Maybe you're referring just to New York sales tax, but you did make that statement in writing to him, correct?**

MR. WAGNER: Object to the form.

A Wally's pretty astute business person. I think he understands taxes. He did not have to pay New York taxes. It is not my responsibility to tell people who I ship art to that they're going to have to figure out their taxes. My only responsibility is to tell him because I'm shipping out of state, New York taxes would not be applied.

**Q (By Mr. Hicks) My question was: Did ArtPort**

**tell Wally he did not have to pay sales tax in writing?**

MR. WAGNER: Object to the form.

A Again, I told Wally, in writing, at some point, the date that I don't have off the top of my head, or I put it in the invoice, that taxes, New York taxes, were not applicable to his sale.

**Q (By Mr. Hicks) It says, New York tax or No sales tax? Do you recall?**

A I don't recall, but again, Wally's a savvy business. . . he knows when he has to pay taxes and when he doesn't. I don't think it's my job to tell him what he needs to do. He's bought a lot of expensive things. I'm sure that he's dealt with tax before. And we talked about -- we had talked about it many times. So. . .

**Q You talked about what?**

A He told me that he was going to see if -- I believe he had a female contractor working on his house at the time. And he was looking to ask her if she could buy the art and use her, you know, VIN number or tax, you know, number to purchase the work. I informed him and I do believe I said in writing to let him know that there would be no tax, and he really didn't have to ask this woman to avoid tax payments.

**Q The certificates of authenticity, was that**

**something that were promised to Wally?**

A If -- they were promised to Wally.

**Q Were those delivered?**

A They're never delivered until after the art is shipped. They can't be shipped with the art because if you lose both the art and the certificate, then it's really hard to prove ownership.

**Q Where are those certificates of authenticity right now?**

A They're with me. And I do believe Wally -- I mean, Wally may have -- I shipped to Brande and Wally catalogs that they asked for that were signed by the artist.

I would have to look and see if any are missing. They may have -- no, no, they don't. I have them all. I'm sorry. I have them all. That's right.

**Q You would agree that was part of your contract with Wally, to provide those certificates of authenticity when you shipped the art, right?**

A Right. Does Wally have the art?

**Q Have you shipped the art?**

A I have. But Wally is saying that it's in limbo. He said, It's sitting at Terry Dowd. He said he didn't accept it.

So I can't ship him certificates of

authenticity when he's telling me that he doesn't have the art. Because that would be really irresponsible of me. How would I know if he would burn them? I don't know what he's going to do with them.

**Q You shipped him his $186,000 of art --**

A Right.

**Q -- okay. So -- but you held back the certificates of authenticity, correct?**

A I did not hold them back.

**Q But they're not with the art. They're with you.**

A They're not supposed to be with the art. They're supposed to be with the owner.

**Q Why did you ship the art to Colorado if you believe Wally didn't own it?**

A Wally owns the art. I never believed he didn't own the art. He doesn't possess the art right now. It's sitting in a storage unit somewhere and he's denying ownership or denying possession. I'm not sure what his thinking is today.

But why did I ship it? Because I gave up on him ever agreeing to fulfill any of his contractual obligations.

**Q Was he told, as far as you know, that the shipment was on its way when you shipped the art to**

**Colorado during this lawsuit in 2019?**

MS. GETCHES: Object to the form.

A I'm sorry. Can you please repeat?

**Q (By Mr. Hicks) Do you know if Wally was informed that the art was on its way when it was shipped in 2019?**

A I think we saw in several emails that I told him that the art was being shipped.

**Q Talking about emails from today?**

A No. Well, I thought we saw in several emails today that the art was being shipped.

**Q Okay. Is there any other basis for your belief, if you have one, that Wally was informed that the art was on its way when it was shipped in 2019?**

A You'll have to be more specific. Are you asking when the art was actually shipped or one of the many, you know, times that when we were in the -- kind of, you know --

**Q Well, how many --**

A I'm sorry. What -- I don't understand what you're asking.

**Q What I'm asking is when the art was actually shipped. Because what actually happened is --**

A Oh.

**Q -- neither I nor Wally knew and he randomly**

**got a call from some moving company that had nothing to do with art, saying that they had a 300-pound box, they didn't know what was in it and it said Art on its side. Okay. So, again, was he told within a week of that shipping commencing that the art was on its way, as far as you know?**

A Well, there must be --

MR. WAGNER: Object to form.

A There must be a mistake. What moving company? So maybe we're not talking about the same thing. A moving company? If you could tell me the name of that moving company, maybe I could understand what you're talking about. It must have been a different shipment.

**Q (By Mr. Hicks) As far as you know, here today, as a 30(b)(6) representative of ArtPort --**

A Uh-huh.

**Q -- was Wally informed that his art was being shipped?**

MS. GETCHES: Object to the form.

A Exactly on that date, I don't think that Wally was informed. We had already gone into litigation. And -- and I was not in communication with Wally.

**Q (By Mr. Hicks) Okay. As far as you know,**

**was Wally informed within a week prior to the shipment being sent out that the art was on its way?**

MR. WAGNER: Object to the form.

A ArtPort did not inform Wally because I was not in communication with him.

**Q (By Mr. Hicks) Okay. And without revealing any privileged communications --**

A Uh-huh.

**Q -- are you aware if your attorney informed me that the art was on its way within a week of it being shipped?**

A I'm not aware.

**Q What is white glove delivery?**

A It can mean a variety of things.

**Q And did you promise white glove delivery for Wally's art?**

A It was a white glove delivery as per the shippers. And generally, white glove means they open the crate, they take out each set of works or each individual work, and then they remove the packaging and the crate, if they desire the crate to be removed.

**Q I'm going to pull up an exhibit. We're getting close to being done here.**

MR. WAGNER: Is it me, or is Nancy frozen?

MR. HICKS: I -- I can't see right now.

MR. WAGNER: Now we just lost -- there we go.

THE WITNESS: May I ask a question? I'm sorry, but are we completing this in four minutes?

MR. HICKS: No, let's take a break. Let's take a break, and I don't think -- I have a couple more questions and we should be done soon. So let's take ten minutes.

THE WITNESS: Well, I can't make my obligation tonight for a meeting I have with the board of the Chamber of Commerce. Okay.

THE VIDEOGRAPHER: We're going off the record. The time is 4:56 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 5:11 p.m.

**Q (By Mr. Hicks) Ms. Loving, I don't have any more questions. I didn't mean to keep you over 5:00 o'clock on purpose. But I just wanted to make sure. So I don't have any more questions. Thank you for your time today.**

THE WITNESS: Oh, okay. Thank you.

THE VIDEOGRAPHER: Liza or Tom?

MS. GETCHES: No, thank you.

MR. WAGNER: Nothing for me, thank you.

THE VIDEOGRAPHER: This ends the deposition

of Nancy Loving, August 25th, 2020. The time is 5:11 p.m.

(Deposition adjourned at 5:11 p.m.)

* * *

REPORTER CERTIFICATE

I, JASON T. MEADORS, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner and Notary Public, appointed to take the video deposition of

NANCY LOVING,

certify that prior to the video deposition the witness was sworn by me to tell the truth; that the deposition was taken by me via remote Zoom videoconference on August 25, 2020.

I certify that the proceedings were reduced to typewritten form by computer-aided transcription consisting of 188 pages herein; that the foregoing is an accurate transcript of the proceedings.

I certify that I am not related to, employed by, of counsel to any party or attorney herein, nor interested in the outcome of this litigation.

I further certify review of the transcript was not requested.

Attested to by me this September 16, 2020.

____________________________
Jason T. Meadors, RPR, CRR, CRC

My commission expires
January 26, 2021

Re: Charnoff v. Loving, et al.
Reporter: JM
Proofer: SLM

I, NANCY LOVING, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

________________________

Signature of Deponent

( ) No amendments

( ) Amendments attached

Acknowledged before me this _______ day of _____________, 20___.

Notary Public: _________________________

My Commission expires: ________________

Seal:

AB COURT REPORTING & VIDEO
216 - 16th Street, Suite 600
Denver, Colorado 80202

September 16, 2020

ELIZABETH H. GETCHES, ESQ.
Shoemaker Ghiselli + Schwartz LLC
1811 Pearl Street
Boulder, Colorado 80302

Re: 30(b)(6) DEPOSITION OF ART PORT LLC
AS GIVEN BY NANCY LOVING
Charnoff v. Loving, et al.
Civil Action No. 19-cv-2381-LTB-MEH

The aforementioned deposition is ready for reading and signing. Please attend to this matter by following BOTH of the items indicated below:

_____ Call 303-296-0017 and arrange with us to read and sign the deposition in our office

_XXX_ Have the deponent read your copy and sign the signature page and amendment sheets, if applicable; the signature page is attached

_____ Read the enclosed copy of the deposition and sign the signature page and amendment sheets, if applicable; the signature page is attached

_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

_____ By _______ due to a trial date of________

Please be sure the original signature page and amendment sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and returned to AB Court Reporting for filing with the original deposition. A copy of these changes should also be forwarded to counsel of record. Thank you.

AB REPORTING & VIDEO

cc: All Counsel

AB COURT REPORTING & VIDEO
216 - 16th Street, Suite 600
Denver, Colorado 80202

30(b)(6) DEPOSITION OF ART PORT LLC
AS GIVEN BY NANCY LOVING
August 25, 2020
Charnoff v. Loving, et al.
Civil Action No. 19-cv-2381-LTB-MEH

The original deposition was filed with Ian T. Hicks, Esq. on approximately the 16th day of September, 2020.

_____ Signature waived

_____ Siganture not requested

_____ Unsigned; signed signature page and amendment sheets, if any, to be filed at trial

_XXX_ Unsigned; original amendment sheets and/or signature pages should be forwarded to AB Reporting & Video, Inc., to be filed in the envelope attached to the sealed original

Thank you.

AB COURT REPORTING & VIDEO

cc: All Counsel

- AMENDMENT SHEET -
30(b)(6) DEPOSITION OF ART PORT LLC
AS GIVEN BY NANCY LOVING
August 25, 2020
Charnoff v. Loving, et al.
Civil Action No. 19-cv-2381-LTB-MEH

The deponent wishes to make the following changes in the testimony as originally given:

| Page | Line | Should Read | Reason |
|---|---|---|---|
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |
| ____ | ____ | ____________________________ | ____________ |

Signature of Deponent: ___________________________

Acknowledged before me this ____ day of _________, 20___.

(seal) Notary's signature __________________

My commission expires_______________

